**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Kevin S. Asfour (SBN 228993)
kevin.asfour@klgates.com
Lauren E. Elvick (SBN 348619)
lauren.elvick@klgates.com

Attorneys for Respondent
CHINA BRANDS GROUP

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PAUL FRANK LIMITED

Petitioner,

vs.

CHINA BRANDS GROUP,

Respondent.

Case No.: 2:24-cv-2759

**RESPONDENT CHINA BRANDS GROUP'S NOTICE OF REMOVAL PURSUANT TO 9 U.S.C. §§ 202, 203, 205 AND 28 U.S.C. §§ 1331, 1401, 1406**

**[FEDERAL QUESTION JURISDICTION]**

(Los Angeles County Superior Court, Case No. 23STCP03323)

**TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Respondent China Brands Group ("CBG" or "Respondent") hereby removes the above-entitled action from the Superior Court of the State of California in and for the County of Los Angeles, Case No. 23STCP03323 to the United States District Court for the Central District of California. This Court has federal jurisdiction over this lawsuit pursuant to 9 U.S.C. §§ 202, 203 and 205 and 28 U.S.C. §§ 1331, 1441 and 1446.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Removal constitutes a special appearance by CBG. CBG does not waive service of process or consent to personal jurisdiction and reserves all rights regarding personal jurisdiction, Petitioner's failure to effectuate valid service upon CBG (as detailed herein), and otherwise, including, without limitation, the right to raise such defenses by way of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) following removal. *See, e.g., Buckelew v. Gore*, No. 20-0158, 2020 WL 4188166, at *3 (S.D. Cal. Jul. 21, 2020).

## I. BACKGROUND AND PLEADINGS

1. Upon information and belief, CBG alleges as follows. On January 1, 2015, Paul Frank Industries, LLC ("PFI"), a predecessor-in-interest to Petitioner Paul Frank Limited ("Paul Frank" or "Petitioner"), on the one hand, and non-party Grand Union Trading Limited ("Grand Union"), on the other hand, entered into a Master Licensing Agreement ("MLA") for Grand Union to exclusively license PFI/Paul Frank's brand trademark in mainland China, Hong Kong, and Macao from January 1, 2015 through February 28, 2030. At the time of the MLA's execution, PFI was a Delaware limited liability company with its principal place of business in California. In or about 2020, PFI assigned to Paul Frank, and Paul Frank assumed, PFI's rights and obligations under the MLA. Paul Frank and Grand Union have their principal places of businesses in and are incorporated under the laws of Hong Kong, China.

2. CBG is not a party to the MLA.

3. The MLA provided that any disputes arising under the agreement would be subject to JAMS Arbitration in Los Angeles, CA. Thereafter, Paul Frank purported to terminate the MLA, and Paul Frank and Grand Union commenced a JAMS arbitration in Los Angeles County on or about November 22, 2022, JAMS Reference No. 5220002118 (the "Arbitration").

4. CBG is a limited liability company organized under the laws of the Republic of China, with its registered address in Tsingdao and principal place of business in Shanghai. CBG specializes in commercializing the intellectual property for various western brands in China, including managing and sublicensing the brands' products to various sublicensees in China.

5. CBG entered into an agreement with Grand Union to sublicense and manage the Paul Frank brand under the MLA. Beginning in July 2022, Paul Frank began infringing upon CBG's exclusive sub-license right to manage the Paul Frank brand. Paul Frank sent notices and letters to CBG's sublicensees threatening and inducing them to stop all business activities concerning the Paul Frank brand, as well as falsely alleging that CBG was engaged in illegal business conduct. On or about October 14, 2022, CBG filed a lawsuit in China against Paul Frank for the heavy financial losses it suffered as a result of Paul Frank's infringement of its sublicense.

6. On September 11, 2023, Paul Frank filed the underlying Petition to Compel Arbitration ("Petition") against CBG in the Superior Court of the State of California, County of Los Angeles, which was assigned Case No. 23STCP03323 (the "State Court Action"). The Petition sought to compel CBG to join the Arbitration between Paul Frank and Grand Union on the basis of Paul Frank's allegation that CBG is the agent and alter ego of Grand Union. Paul Frank also sought to stay CBG's civil lawsuit filed in China against both Paul Frank and Grand Union.

7. On November 15, 2023, Paul Frank filed a purported Proof of Substituted Service on CBG in the State Court Action, purporting to have served CBG

via e-mail and Fedex and registered mail to Bo Zheng, Chairman and CEO of CBG. On November 20, 2023, Paul Frank also filed a purported Proof of Personal Service, purporting to have personally served Mr. Zheng on October 17 at the Shanghai New International Exhibition Center.  Neither proof of service purported to comply with, and in fact both failed to comply with, the Hague Service Convention, which is the controlling authority for service, and exclusive means of service, on CBG as a Chinese corporation.  As CBG was not properly served or brought into the State Court Action, it did not respond to Paul Frank's Petition.

8.     On November 21, 2023, the state court entered a minute order granting Paul Frank's Petition in part, finding that CBG was an agent, but not the alter ego, of Grand Union, and that it could be compelled to join the Arbitration, despite the fact CBG is not a signatory to the MLA and agreement to arbitrate.  The state court declined to stay CBG's pending civil suit against Paul Frank in China.  The order did not make any findings as to whether Paul Frank's attempted service of process of the Petition was proper and valid on CBG.  Moreover, the order was and is void as to CBG, given that CBG was never properly served with process and thus the state court did not acquire jurisdiction over CBG.

9.     On March 6, 2024, Paul Frank filed a renewed petition to compel arbitration against CBG (the "Renewed Petition") in the State Court Action, requesting that the state court find that CBG is the alter ego of Grand Union and compelling CBG to appear as such at the Arbitration.  The state court has not yet acted on the Renewed Petition, nor has CBG been properly served with this Renewed Petition under the requirements of the Hague Service Convention.

10.    Under 28 U.S.C. § 1446(a), a defendant filing a notice of removal shall include "a copy of all process, pleadings, and orders served upon such defendant or defendants in such action."  Here, as detailed above, CBG has not been validly served with process or any papers in the State Court Action.  Nonetheless, for the convenience of the Court and the parties, CBG has gathered all documents on file in

the State Court Action and has attached them hereto, as follows. A true and correct copy of the Petition filed in the State Court Action is attached hereto as **Exhibit A**. A true and correct copy of the Declaration of Jessica R. Corpuz filed in support of the Petition filed in the State Court Action is attached hereto as **Exhibit B**. A true and correct copy of the Declaration of Stanley Yookloong Wan filed in support of the Petition filed in the State Court Action is attached hereto as **Exhibit C**. A true and correct copy of the Notice of Case Assignment filed in the State Court Action is attached hereto as **Exhibit D**. A true and correct copy of the Civil Case Cover Sheet filed in the State Court Action is attached hereto as **Exhibit E**. A true and correct copy of the First Amended General Order filed in the State Court Action is attached hereto as **Exhibit F**. A true and correct copy of the Voluntary Efficient Litigation Stipulation Packet filed in the State Court Action is attached hereto as **Exhibit G**. A true and correct copy of the Alternative Dispute Resolution Packet filed in the State Court Action is attached hereto as **Exhibit H**. A true and correct copy of the Notice of Petition filed in the State Court Action is attached hereto as **Exhibit I**. A true and correct copy of the Proof of Substituted Service filed in the State Court Action is attached hereto as **Exhibit J**. A true and correct copy of the Proof of Personal Service filed in the State Court Action is attached hereto as **Exhibit K**. A true and correct copy of the Minute Order Granting Petitioner's Petition to Compel Arbitration in Part filed in the State Court Action is attached hereto as **Exhibit L**. A true and correct copy of the Renewed Petition filed in the State Court Action is attached hereto as **Exhibit M**. A true and correct copy of the Declaration of Kavan J. Jeppson filed in support of the Renewed Petition filed in the State Court Action is attached hereto as **Exhibit N**. A true and correct copy of Petitioner's Request for Judicial Notice filed in support of the Renewed Petition filed in the State Court Action is attached hereto as **Exhibit O**. A true and correct copy of Petitioner's Notice of Renewed Petition filed in the State Court Action is attached hereto as **Exhibit P**.

/ / /

## II.    THIS COURT HAS ORIGINAL JURISDICTION UNDER THE NEW YORK CONVENTION

11.    The State Court Action is a civil action of which this Court has original federal jurisdiction under 9 U.S.C. § 203 and is one that may be removed to this Court by CBG pursuant to the provisions of 9 U.S.C. § 205 (and, by extension, 28 U.S.C. § 1446), in that the Petition relates to the international arbitration agreement between Paul Frank and Grand Union, which is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and which Paul Frank improperly seeks to enforce against CBG and compel CBG to submit to the pending international Arbitration.

12.    The United States District Court for the Central District of California has jurisdiction over this case pursuant to Sections 203 and 205 of the New York Convention.  *See* 9 U.S.C. §§ 203, 205.  Adopted by the United States and nearly 200 other signatory nations, the New York Convention provides for "the recognition and enforcement of commercial arbitration agreements in international contracts."  *Day v. Orrick, Herrington & Sutcliffe, LLP*, 42 F.4th 1131, 1138 (9th Cir. 2022) (internal citations omitted).  "An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  9 U.S.C. § 203.  "Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States."  9 U.S.C. § 205.

13.    Under the New York Convention, "a federal court has original jurisdiction over an action or proceeding if two requirements are met: (1) there is an underlying arbitration agreement or award that falls under the Convention, and (2) the action or proceeding relates to that arbitration agreement or award."  *Day*, 42 F.4th at

1138. Here, the parties are both Chinese corporations, Petitioner alleges that Respondent is subject to the arbitration agreement in the commercial MLA, and Petitioner seeks to compel CBG to international arbitration pursuant to that agreement. Jurisdiction under the New York Convention is plainly present.

**A. Paul Frank's Petition Arises From an Underlying Agreement to Arbitrate Under the Convention**

14. "An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the Convention." 9 U.S.C. § 205. Courts find an agreement to arbitrate falls under the Convention where: "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F.Supp.3d 728, 734 (N.D. Cal., 2023) (citing *Balen v. Holland Am. Line Inc.*, 583 F.3d 647 (9th Cir. 2009)).

15. Here, all four conditions are met: (1) Paul Frank, a Hong Kong corporation, alleges the MLA's arbitration agreement is valid and enforceable against CBG, a company incorporated under the laws of the People's Republic of China, and China is a contracting state to the Convention[1]; (2) the arbitration agreement provides that the parties will submit to JAMS arbitration in Los Angeles, CA, and the United States is a signatory to the Convention[2]; (3) the relationship between the parties is commercial because it allegedly arises out of the Master Licensing Agreement to

[1] *See* https://www.newyorkconvention.org/countries.

[2] *See id.*; *see also Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1153 (9th Cir. 2008) (the New York Convention "entered into force for the United States on December 29, 1970").

license Paul Frank's trademark; and (4) neither party is a citizen of the United States,[3] and the commercial relationship is reasonably related to China.

16. Thus, there is an arbitration agreement falling under the Convention.

**B. Paul Frank's Petition Seeks to Enforce The Arbitration Agreement Against CBG.**

17. "[N]ecessary ancillary proceedings that ensure the proper functioning of the underlying arbitration," are "'related to' an arbitration agreement falling under the Convention." *Day*, 42 F.4th at 1138. Frank Limited contends that CBG is a party to the MLA's arbitration agreement as an alter ego of Grand Union and seeks to compel CBG to participate in the international Arbitration.[4] Thus, the Petition relates to the underlying arbitration agreement under the Convention. *See id*; *see also Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133 (9th Cir. 2011); *Sunvalley Solar, Inc. v. CEEG (Shanghai) Solar*, 2015 WL 5471434, *3 (C.D. Cal. Sept. 18, 2015) ("Because a court could find that the Agreement governs this dispute, the suit 'relates to' the Agreement and is governed by Section 205.").

**III. THIS NOTICE OF REMOVAL IS PROCEDURALLY PROPER**

18. **The Removal Venue Is Proper.** Removal is properly made to the United States District Court for the Central District of California under 9 U.S.C. § 204. Venue is proper under the Convention in "the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States." *Id.* Here, the underlying arbitration agreement

---

[3] CBG is an entity organized under the laws of China, and Paul Frank Limited is an entity organized under the laws of Hong Kong.

[4] CBG is not an agent or alter ego of Grand Union, is not a party to the arbitration agreement between Grand Union and Paul Frank, and cannot be compelled to join the Arbitration. Nonetheless, there is no requirement for a binding arbitration agreement to exist between CBG and Petitioner for this Court's jurisdiction to vest under the Convention. *See Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1024 (9th Cir. 2021) ("[T]he existence of a written agreement to arbitrate is a merits question that does not affect subject-matter jurisdiction.").

designates Los Angeles, CA as the location of the arbitration, which is where the pending Arbitration is presently venued. Thus, venue in the Central District is proper.

19. **The Removal Is Timely.** Where subject matter jurisdiction falls under the Convention, a defendant may remove, "at any time before the trial thereof." 9 U.S.C. § 205. Section 205's time of removal provisions control, and the time limitations of 28 U.S.C. § 1446(b) are inapplicable where removal is sought under the Convention. *See Infuturia Glob. Ltd.*, 631 F.3d at 1138; *Sunvalley Solar, Inc.*, 2015 WL 5471434, at *3. Moreover, even if *arguendo* the time limitations of 28 U.S.C. § 1446(b) did apply here, removal would nonetheless be timely, given that CBG has not yet been properly served with process in the State Court Action, and thus the 30-day timeframe for removal under Section 1446(b) has not yet begun to run. *See, e.g., Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) ("the defendant's period for removal will be no less than 30 days from service").

20. **Consent.** Under 28 U.S.C. § 1146(b)(2)(A), "all defendants who have been properly joined and served must join in or consent to the removal of the action." The only defendant/respondent named in the Petition is CBG (which has not yet been served with process, as detailed above). Accordingly, no consent to this Notice of Removal is needed from any other party.

21. **Service of Notice of Removal.** CBG will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court of the County of Los Angeles, and serve a copy on Plaintiff, as required by 28 U.S.C. § 1446(d).

**WHEREFORE**, CBG hereby removes the State Court Action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California.

K&L GATES LLP

Dated: April 4, 2024

By: /s/ Lauren Elvick
Christina N. Goodrich
Kevin S. Asfour
Lauren E. Elvick

Attorneys for Respondent CHINA BRANDS GROUP

10

**RESPONDENT CHINA BRANDS GROUP'S NOTICE OF REMOVAL**

**EXHIBIT LIST**

| Exhibit | Description | Removal Page Number |
|---|---|---|
| A | Petition | 12 – 33 |
| B | Declaration of Jessica R. Corpuz | 34 – 106 |
| C | Declaration of Stanley Yookloong Wan | 107 – 1143 |
| D | Notice of Case Assignment | 1144 - 1147 |
| E | Civil Case Cover Sheet | 1148 - 1155 |
| F | First Amended General Order | 1156 - 1163 |
| G | Voluntary Efficient Litigation Stipulation | 1164 - 1176 |
| H | Alternative Dispute Resolution Packet | 1177 – 1179 |
| I | Notice of Petition | 1180 – 1183 |
| J | Proof of Substituted Service | 1184 – 1196 |
| K | Proof of Personal Service | 1197 – 1200 |
| L | Minute Order | 1201 – 1209 |
| M | Renewed Petition | 1210 – 1230 |
| N | Declaration of Kavan J. Jeppson | 1231 – 1243 |
| O | Petitioner's Request for Judicial Notice | 1244 – 1256 |
| P | Notice of Renewed Petition | 1257 – 1261 |

# EXHIBIT A

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....3

I. INTRODUCTION .... 6

II. FACTUAL AND PROCEDURAL HISTORY .... 6

A. The Parties and the MLA .... 6

B. Grand Union Acts Only Through CBG .... 7

C. Paul Frank Terminates the MLA and Files the Arbitration .... 10

D. CBG Filed the China Lawsuit in an Attempt to Avoid the Jurisdiction of the Arbitration and Obtain a More Favorable Ruling .... 10

E. Paul Frank Promptly Sought Relief in the Arbitration .... 12

F. CBG has Refused and/or Failed to Respond to Paul Frank's Demand to Arbitrate. .... 13

III. CBG IS REQUIRED TO ARBITRATE ALL CLAIMS RELATED TO THE MLA.... 13

A. California Law Governing Arbitrations.... 13

B. The Court Should Compel CBG to Arbitrate All Claims Related to the MLA .... 15

1. CBG is Grand Union's Agent and Alter Ego.... 15

2. CBG is Bound by the Arbitration Agreement as Grand Union's Agent and Alter Ego .... 17

3. CBG's (Baseless) Claims Against Paul Frank are Intimately Intertwined with the MLA and Must be Arbitrated.... 19

IV. CONCLUSION.... 20

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) .......... 18

*AT&T Techs. v. Communs. Workers of Am.*,
475 U.S. 643 (1986) .......... 15

*Berman v. Dean Witter & Co., Inc.*,
44 Cal. App. 3d 999 (1975) .......... 18

*Boucher v. All. Title Co., Inc.*,
127 Cal. App. 4th 262 (2005) .......... 20

*Cohen v. TNP 2008 Participating Notes Program, LLC*,
31 Cal. App. 5th 840 (2019) .......... 15, 19

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) .......... 18

*E.I. DuPont de Nemours v. Rhone Poulenc Fiber.*,
269 F. 3d 187 (3d Cir. 2001) .......... 19

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) .......... 14

*Goldman v. KPMG, LLP*,
173 Cal. App. 4th 209 (2009) .......... 19

*Gueyffier v. Ann Summers, Ltd.*,
144 Cal. App. 4th 166 (2006) .......... 14

*Harris v. Superior Court*,
188 Cal. App. 3d 475 (1986) .......... 18

*Hernandez v. Meridian Management Services, LLC*,
87 Cal. App. 5th 1214 (2023) .......... 15

*Jensen v. U-Haul Co. of Cal.*,
18 Cal. App. 5th 295 (2017) .......... 19

*Klajic v. Castaic Lake Water Agency*,
90 Cal. App. 4th 987 (2001) .......... 16

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
235 Cal. App. 3d 1220 (1991) .......... 16

weintraub tobin chediak coleman grodin
LAW CORPORATION

*Lebastchi v. Superior Court*,
33 Cal. App. 4th 1465 (1995) .......... 16

*NORCAL Mut. Ins. Co. v. Newton*,
84 Cal. App. 4th 64 (2000) .......... 19, 20

*Pacific Invest. Co. v. Townsend*,
58 Cal. App. 3d 1 (1976) .......... 15

*RN Sol., Inc. v. Catholic Healthcare W.*,
165 Cal. App. 4th 1511 (2008) .......... 19

*Rowe v. Exline*,
153 Cal. App. 4th 1276 (2007) .......... 18, 19

*Salgado v. Carrows Restaurants, Inc.*
33 Cal. App. 5th 356 (2019) .......... 15

*Suh v. Superior Court*,
181 Cal. App. 4th 1504 (2010) .......... 17, 18

*United Transp. Union v. Southern Cal. Rapid Transit Dist.*,
7 Cal. App. 4th 804 (1992) .......... 14

*Zoran Corp. v. Chen*,
185 Cal. App. 4th 799 (2010) .......... 16, 17

**Statutes**

California Code of Civil Procedure § 1280, *et seq*. .......... 13, 14

California Code of Civil Procedure § 1285, *et seq*. .......... 14, 18

California Code of Civil Procedure § 1290, *et seq*. .......... 14

California Code of Civil Procedure § 1290.2 .......... 14

California Code of Civil Procedure § 1297.11, *et seq*. .......... 13, 14

California Code of Civil Procedure § 1297.12 .......... 13

California Code of Civil Procedure § 1297.13 .......... 13

California Code of Civil Procedure § 1297.17 .......... 14

California Code of Civil Procedure § 1297.81 .......... 6, 14

California Code of Civil Procedure § 1297.82 .......... 6, 14

California Code of Civil Procedure § 1589 .......... 18

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**Other Authorities**

2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416 .......... 16

9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, pp. 524-525 .......... 16

Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416 .......... 16

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4002656.DOCX:2}

5

PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

## I. INTRODUCTION

Pursuant to California Code of Civil Procedure §§ 1297.81 and 1297.82, Petitioner Paul Frank Limited ("Paul Frank") hereby petitions the Court for an order (1) compelling Respondent China Brands Group ("CBG") to arbitrate Paul Frank's claims against CBG in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Paul Frank and CBG's alter ego Grand Union Trading Limited ("Grand Union"); and (2) staying the improper lawsuit filed by CBG against Paul Frank and Grand Union in the Intermediate People's Court of Court of Tsingdao City of Shandong Province., Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit"). As Grand Union's agent and alter ego, CBG is bound by the arbitration agreement it signed on behalf of Grand Union. Further, because its claims in the China lawsuit are inextricably linked with the claims between the parties in the Arbitration, CBG should be compelled to stay the China Litigation during the pendency of the Arbitration to avoid the risk of competing rulings on the same facts.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. The Parties and the MLA

Paul Frank owns the intellectual property associated with the world-famous Paul Frank® brand. On January 1, 2015, Paul Frank and Grand Union entered into the Master License Agreement ("MLA"), pursuant to which Grand Union was granted the right to certain elements of the Paul Frank brand within the territory of mainland China, Hong Kong, and Macau. *See* MLA, Exhibit 1 to the Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration, filed concurrently herewith ("Wan Decl."). The MLA was negotiated on behalf of Paul Frank by Saban Brands Entertainment Group ("Saban"), which held the rights to the Property prior to Paul Frank's acquisition of the brand in 2020. *See* Wan Decl. at ¶¶ 4-5.

Grand Union admitted in the underlying Arbitration that it was CBG that actually negotiated the MLA. According to Grand Union, it was CBG's "plan" to help Saban "achieve [the] goal" of repositioning the Property to be more "high-end in mainland China." Grand Union's Application for Interim Relief ("Application"), Ex. 16 to Wan Decl. Therefore, "[i]n around 2014, Saban began negotiating with CBG on what would become the MLA." *Id.*; *see also* First Witness Statement of Tao

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Zheng ("Tao Zheng Statement"), Ex. 17 to Wan Decl. at p. 2, ¶ 8.

The MLA originally provided that any disputes between the parties would be submitted to arbitration in Hong Kong. *See* MLA, Ex. 1 to Wan Decl., at Section 28. However, in 2018, the parties agreed that any disputes "shall be determined by arbitration in Los Angeles, California before a single arbitrator… [and] administered by JAMS." See First Amendment to MLA, Ex. 3 to Wan Decl., at Section 28. The First Amendment was negotiated and signed by Bo Zheng, in his capacity as the Director of Grand Union. *See id*. at p. 2; see also Wan Decl. at ¶ 9; *see also* First Witness Statement of Zheng Bo, Ex. 25 to Wan Decl. ("Bo Zheng Statement")[1] at ¶ 2. Bo Zheng also negotiated and signed the Second Amendment in 2021 and the Third Amendment in 2022. See Wan Decl. at ¶¶ 10-11.

**B. Grand Union Acts Only Through CBG**

There is no dispute that Grand Union exclusively acts through CBG. In fact, Grand Union admitted as much in the Arbitration. *See* Grand Union Response and Counterclaims, Ex. 15 to Wan Decl., at ¶ 160, ("Grand Union operates under the MLA by entering into business relationships (through CBG) with Sublicensees."). Grand Union does not conduct any business itself – CBG is the only operating entity. Grand Union does not have any employees. Paul Frank has dealt exclusively with CBG since the signing of the MLA. *See* Wan Decl. at ¶ 44. Bo Zheng testified in the Arbitration that he is the "sole director of Grand Union" and "the chairman and chief executive officer of China Brands Group." Bo Zheng Statement, Exhibit 25 to Wan Decl. His brother, Tao Zheng, also testified in the Arbitration on behalf of Grand Union, but solely in his capacity as the Vice Chairman of CBG and the "person-in-charge of the intellectual property affairs department." Tao Zheng Statement, Exhibit 17 to Wan Decl. at ¶ 2. Both are shareholders and officers of CBG. *See* Exs. 37-38 to Wan Decl. Bo Zheng is the Chairman of CBG and Tao Zheng is the Vice Chairman. *Id.*; *see also* Exs. 39-40 to Wan Decl.

CBG is the contact party for all legal actions relating to Paul Frank. Any formal notice to be given to Grand Union under the MLA must be sent to Bo Zheng at his CBG email address, with a copy to a David Zhou, also at a CBG email address. *See* Second Amendment, Ex. 4 to Wan Decl., at Section 29. In the Arbitration, Grand Union identified its own contact persons as Bo Zheng, via his CBG email

[1] Chinese naming conventions put the surname before the given name. Thus, his surname is Zheng and his given name is Bo.

weintraub tobin chediak coleman grodin LAW CORPORATION

address, and CBG employee Jennifer Huang, also via her CBG email address. Counterclaim, Ex. 15 to Wan Decl. at ¶ 10. Grand Union also filed an Application for Interim Relief in the Arbitration. The only parties to provide witness statements in support of Grand Union's Application for Interim Relief were Tao Zheng, Bo Zheng, and Jennifer Huang – all of CBG. Ms. Huang testified that she is an employee of CBG, yet manages the Paul Frank brand for Grand Union. She is the "General Manager of the Licensing Management Department within CBG. As part of my role, I am responsible for Grand Union's management of the Paul Frank brand and the main liaison with PF Hong Kong relating to the activities under the Master Licensing Agreement." *See* First Witness Statement of Jennifer Huang ("Huang Statement") Ex. 18 to Wan Decl. at p. 1, ¶ 4. All three individuals use the terms Grand Union and CBG interchangeably in their witness statements. *Id.*, *see also* Tao Zheng Statement, Ex. 17 to Wan Decl., *see also* Bo Zheng Statement, Ex. 25 to Wan Decl.

All of the email communications between Paul Frank and Grand Union / CBG were with CBG employees. *See*, *e.g.*, Exs. 6-13 to Wan Decl. Grand Union does not maintain an email server. As Bo Zheng testified in the China Lawsuit, "[t]here is no website" for Grand Union. *See* Investigation Transcript, Exs. 47-48 to Wan Decl. All communications are through CBG's domain name and email server. *See* Wan Decl. at ¶ 45. Paul Frank has never communicated with any person with a Grand Union email address. *Id.* Grand Union also does not maintain any physical offices. The physical address specified in Section 29 of the Second Amendment as No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by CBG. *See* Wan Decl. at ¶ 46.

There is no distinction between the funds, assets, and debts of Grand Union and CBG. Grand Union admits that CBG paid royalties to Saban under the license agreement that predated the MLA. *See* Counterclaim, Ex 15 to Wan Decl. at p. 7, ¶ 23 ("CBG paid royalties to Paul Frank Industries under such licensing arrangement."). Grand Union also admits that CBG funded the development of the brand. *See* Application, Ex. 16 to Wan Decl. at ¶ 19 ("CBG was required to inject long-term, sustained investment to develop the Paul Frank Brand in the Territory and achieve the objectives of the licensing program."). Ms. Huang, an employee of CBG, uses the term "we" when discussing the payment of the license fee to Paul Frank. *See* Huang Witness Statement, Ex. 18 to Wan Decl. at p. 6, ¶ 29. She also states that the Second Amendment was negotiated in part to "justify the payment with the CBG

weintraub tobin chediak coleman grodin LAW CORPORATION

organization," despite the fact that Grand Union was supposed to be paying the license fee under the Second Amendment. *Id.* at p. 7-8, ¶ 38.

In fact, CBG has directly held itself out as liable for the responsibilities of Grand Union. Pursuant to the Second Amendment, Grand Union was required to pay a minimum guarantee to Paul Frank on September 18, 2021. On August 23, 2021, a CBG employee wrote to Paul Frank stating, "Pls. do me a favor, CBG is preparing the first payment of Royalty in the amendment, that is USD 1 million, could you send me the invoice…." *See* Email dated August 21, 2021 in Email Chain at Ex. 35 to Wan Decl., p. 3. On August 24, 2021, that same employee said, "CBG has paid it this morning." *Id.* at p. 2.

Bo Zheng later emailed Mr. Wan regarding the payment:

> According to the amendment 2 to the Master License Agreement, CBG needs to pay the second installment by September 18, 2021. But now due to CBG don't have enough US dollar in GU's bank account, we can pay USD 200,000 in advance today…. Based on the above reasons, CBG hereby applies for postponing the payment of the second installment to October 25, 2021.

Email dated September 17, 2021, Ex. 36 to Wan Decl.

CBG has also held out to the public that CBG holds the rights to the Paul Frank property in China, not Grand Union. In a press interview in 2021, Bo Zheng is identified only as the Chairman of Hongfang Culture (another name for CBG) and bragged that "we started to transform into a brand operation and management company, and made Paul Frank Big Mouth Monkey brand a hit in China, and then started a multi-brand operation model." News Article at Ex. 39 to Wan Decl., p. 1. A 2016 article featured Bo Zheng and Tao Zheng together, stating "Hongfang Culture, led by these two [former] students [of the business school sponsoring the article], has signed a 15-year exclusive image and brand licensing agreement with Paul Frank USA in June last year by spending a huge amount of money…. Hongfang Culture, which is the Chinese brand operator of Paul Frank, owns all rights of its merchandise, cross-border and content development as well as the rights to fight against counterfeit goods…." News Article at Ex. 40 to Wan Decl., p. 2, 3. Grand Union is never mentioned in either article.

With no employees, no offices, no business, and no control over its operations, Grand Union is merely a shell set up by CBG to hold the intellectual property rights under the MLA. CBG is the only operating entity.

/ / /

weintraub tobin chediak coleman grodin LAW CORPORATION

### C. Paul Frank Terminates the MLA and Files the Arbitration

In 2021 and 2022, the relationship between Paul Frank and Grand Union / CBG deteriorated. Paul Frank discovered that CBG's affiliate Hong Tong Fang (Shanghai) Cultural Development Co., Ltd. ("Hong Tong Fang") had forged an official Paul Frank letter of authorization and submitted it to the online platform TikTok. *See* Paul Frank Preliminary Injunction Brief at 15-20. Paul Frank also discovered licensed products sold outside the authorized territory and channels of distribution (*id*. at 22-29), and that Grand Union had refused to comply with the additional obligations set forth in the Second Amendment (*id*. at 29-38). Paul Frank has since discovered additional breaches of the MLA, including the sale of unapproved products, the filing of fraudulent "anti-counterfeiting" lawsuits, and subjecting the Paul Frank brand to public disrepute. *Id.* at 39-48. Each of these actions were in fact committed by CBG – Grand Union does nothing except through its agent and alter ego CBG.

Therefore, in September 2022, Paul Frank terminated the MLA. *See* Exs. 10-11 to Wan Decl. Shortly thereafter, pursuant to the arbitration provision in the First Amendment, Paul Frank filed a Demand for Arbitration against Grand Union on November 22, 2022. *See* Ex. 14 to Wan Decl. Grand Union filed a Response and Counterclaims on December 16, 2022. *See* Ex. 15 to Wan Decl. The Arbitration is presently set for hearing on January 29, 2024. *See* Wan Decl. at ¶ 40.

### D. CBG Filed the China Lawsuit in an Attempt to Avoid the Jurisdiction of the Arbitration and Obtain a More Favorable Ruling

Months after Paul Frank filed the Arbitration against Grand Union, Paul Frank discovered that CBG had secretly filed the China Lawsuit against *Grand Union itself* and against Paul Frank. *See* Civil Statement of Claim, Exs. 41-42 to Wan Decl.

In its Statement of Claim, CBG (and a related entity also controlled by CBG, Shanghai Hong Fang Culture Co. Ltd.) asks the Chinese court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…." *Id.* at 1. In other words, CBG is asking the Chinese Court to protect its rights to the Paul Frank intellectual property, obtained only through the MLA. CBG's main complaint is that in July and September 2022 (i.e., when Paul Frank terminated the MLA), "Paul Frank sent Letters to the sub-licensees… stating that all sub-licenses

weintraub tobin chediak coleman grodin LAW CORPORATION

and related certificates that CBG had granted and issued pursuant to its exclusive sub-license had become invalid and requiring them to immediately stop all business activities concerning the band 'Paul Frank.'" *Id.* at 2. CBG claims that such actions infringed its "legal and valid exclusive sub-license." *Id.* at 3. In short, CBG is claiming that it was the party harmed by Paul Frank's termination of the MLA, as the exclusive sub-licensee of Grand Union's intellectual property rights.

Using some questionable legal sleight of hand, CBG also named Grand Union – its own alter ego – as a party to the China Lawsuit, claiming that it "once contacted Grand Union, requesting it to address the dispute between the parties." *Id.* at 3. The allegations are laughable, as Grand Union has no employees, no offices, and serves as a mere holding company for CBG intellectual property. CBG cannot "contact" Grand Union – it would be contacting itself.

CBG's nefarious plan in naming Grand Union soon became clear. Despite the fact that Paul Frank was still entirely unaware of the China Lawsuit, CBG and Grand Union together submitted an "Agreement on Jurisdiction" to the Chinese court in an attempt to remove jurisdiction from California. *See* Exs. 43-44 to Wan Decl. The Agreement on Jurisdiction states that "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either [Grand Union] or [CBG] can file lawsuits to the court with jurisdiction at [CBG's] domiciliate. *Id.* In short, CBG sued its own alter ego, then acting as if they were parties on the opposite ends of the lawsuit, "agreed" that any dispute with Paul Frank could be brought in CBG's local Chinese courthouse in order to deceive the Chinese court into retaining jurisdiction over the case.

Soon after the China Lawsuit was filed (but still without notice to Paul Frank), CBG also asked the Court to block Paul Frank's trademarks and copyrights within China. The Chinese court granted CBG's request without any notice to Paul Frank or opportunity to be heard. *See* Civil Ruling, Ex. 45-46 to Wan Decl. This has caused enormous harm to Paul Frank; whose trademarks and copyrights are now frozen. *See* Wan Decl. at ¶ 54.

Paul Frank was unaware of the China Lawsuit until, in January 2023, Paul Frank attempted to update license information for one of its trademarks. *See* Wan Decl. at ¶ 51. It was informed by the trademark office that it could not do so because the trademark was blocked. Paul Frank investigated to determine why the trademarked was blocked, and discovered the China Lawsuit. *Id.*

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4002656.DOCX:2}
11
PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

Paul Frank has of course contested the jurisdiction of the Chinese court in the China Lawsuit. Yet Grand Union / CBG persists in seeking to retain jurisdiction in China. On March 15, 2023, Bo Zheng testified before the Chinese court in order to support CBG's claims of jurisdiction. *See* Investigation Transcript, Exs. 47-48 to Wan Decl. He testified that he is the "sole Director" in Grand Union" and the "legal representative" of CBG. He describes himself as the "main decision-making person." *Id.* at 1. He claims that it has three other employees (whom he does not actually identify and which likely do not exist, as no Grand Union employee ever interacted with Paul Frank during the entire history of the parties' relationship), but that their work is entirely "assisting China Brands Group in approval and stamping." *Id.* "The main business partner is China Brands Group, to help submitting relevant stamped materials." *Id.* In other words, Grand Union only exists as a fiction to issue formal approvals and rubber stamp the actions of CBG – both literally and metaphorically, as Grand Union is often required to use its official company stamp to approve the actions of CBG. Bo Zheng essentially admits that there is no separation between Grand Union and CBG.

The China Lawsuit is a sham. The entire purpose of the lawsuit is to bring this dispute into a favorable court and avoid the jurisdiction of an American arbitrator who is sure to rule in Paul Frank's favor. This Court should not permit CBG to continue to perpetrate this fraud.

**E. <u>Paul Frank Promptly Sought Relief in the Arbitration</u>**

CBG's actions in filing the China Lawsuit left Paul Frank with no choice. On April 27, 2023, Paul Frank filed a Motion for Leave to Amend Demand for Arbitration ("Motion for Leave to Amend"), seeking to add CBG as a party to the Arbitration. *See* Ex. 19 to Wan Decl. Paul Frank argued that CBG was clearly the alter ego of Grand Union and should therefore be compelled to resolve its disputes with Paul Frank under the terms of the MLA (which it negotiated and signed). *Id.* Paul Frank prepared and submitted a proposed Amended Demand for Arbitration, setting forth its claims against CBG ("Proposed Demand for Arbitration"). *See* Ex. 20 to Wan Decl. Also, on April 27, 2023, Paul Frank asked the Arbitrator for a preliminary injunction ordering Grand Union and CBG to dismiss the Chinese Lawsuit. *See* Paul Frank Preliminary Injunction Brief, Ex. 21 to Wan Decl. at 54-57.

CBG unquestionably received notice of both motions – Bo Zheng, Tao Zheng, and Jennifer Huang all submitted Witness Statements related to these motions. CBG is the only party actually

participating in the Arbitration, since Grand Union has no employees of its own.

After both motions were fully briefed, the Arbitrator denied Paul Frank leave to amend its Demand for Arbitration on the grounds that the question of whether CBG should be compelled to participate in the Arbitration should be up to a Court to decide, not to the Arbitrator. *See* Ruling on Motion for Leave to Amend, Ex. 30 to Wan Decl. Then, on July 18, 2023, the Arbitrator denied the preliminary injunctions requested by all parties (including in particular Grand Union's request that the MLA be reinstated). *See* Ruling on Claimant's and Respondent's Applications for Interim Preliminary Injunctive Relief, Ex. 33 to Wan Decl. Thus, Paul Frank has been forced to seek an Order from this Court compelling CBG to participate in the Arbitration.

**F. <u>CBG has Refused and/or Failed to Respond to Paul Frank's Demand to Arbitrate.</u>**

On August 30, 2023, Paul Frank sent CBG a Demand for Arbitration, demanding that CBG appear and defend its breaches of the MLA in the Arbitration and stay the China Lawsuit during the pendency of the Arbitration. *See* Ex. 34 to Wan Decl.; *see also* Ex. 1 to Declaration of Jessica R. Corpuz in Support of Paul Frank Limited's Petition to Compel Arbitration, filed concurrently herewith ("Corpuz Decl."). The letter attached the Proposed Amended Demand for Arbitration, which sets forth Paul Frank's claims against CBG. *Id.* CBG failed to respond Paul Frank's Demand for Arbitration and has refused to arbitrate as required under the MLA. *See* Wan Decl. at ¶ 41; *see also* Corpuz Decl. at ¶¶ 3-7. Thus, Paul Frank brings the instant Petition to Compel Arbitration.

## III. <u>CBG IS REQUIRED TO ARBITRATE ALL CLAIMS RELATED TO THE MLA</u>

**A. <u>California Law Governing Arbitrations</u>**

Two different titles of the Cal. Civ. Proc. Code govern arbitrations within California. The California Arbitration Act, Section 1280, *et seq*., and its cousin, Section 1297.11, *et seq*., work together to set forth the rules for arbitrations within California. The California Arbitration Act applies to most arbitrations within the state of California. However, Section 1297.11, *et seq*. governs the manner and conduct of so-called "international commercial arbitrations." It applies where the parties have "their places of business in different states" (i.e. in different countries) but the place of arbitration is within the State of California. Cal. Civ. Proc. Code §§ 1297.12, 1297.13. Here, Paul Frank's principal place

weintraub tobin chediak coleman grodin LAW CORPORATION

of business is in Hong Kong (*see* Wan Decl. at ¶ 3) while CBG's principal place of business is in Shandong Province, China (*see* Statement of Claim, Exs. 19-20 to Wan Decl.) and Grand Union's principal place of business is in Shanghai, China (*see* Second Amendment, Ex. 4 to Wan Decl.). The First Amendment specifies that the place of arbitration is Los Angeles, California. *See* Ex. 3 to Wan Decl. Thus, the provisions of Section 1297.11, *et seq*. govern the Arbitration. These provisions preempt the overlapping provisions of California Arbitration Act. *See* Cal. Civ. Proc. Code § 1297.17 ("this title supersedes Sections 1280 to 1284.2, inclusive"). However, Sections 1285, *et seq*. of the California Arbitration Act are not preempted by Section 1297.11, *et seq*., including in particular Chapter 5, "General Provisions Relating to Judicial Arbitration," Section 1290, *et seq*. *See Gueyffier v. Ann Summers, Ltd.*, 144 Cal. App. 4th 166, 190 (2006), reversed on other grounds, 43 Cal. 4th 1179 (2008). Therefore, this Petition is governed by the provisions of both Section 1297.11, *et seq*. and Section 1290, *et seq*. of the California Arbitration Act.

Per Section 1297.81, if any party to an agreement governed by Section 1297.11, *et seq*. "commences judicial proceedings seeking relief with respect to a matter covered by the agreement to arbitrate, any other party to the agreement may apply to the superior court for an order to stay the proceedings and to compel arbitration." Section 1297.81. Section 1297.82 further states that, "[a] timely request for a stay of judicial proceedings under Section 1297.81 *shall* be granted."

Section 1290.2 of the California Arbitration Act creates a "summary proceeding" for ordering parties to arbitrate disputes. The petitioner must "prov[e] the existence of a valid arbitration agreement by the preponderance of the evidence," and the opposing party "bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997). "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." *Id.*

"Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration." *United Transp. Union v. Southern Cal. Rapid Transit Dist.*, 7 Cal. App. 4th 804, 808 (1992). The general rule is that arbitration will be ordered "unless it can be said with assurance that the arbitration clause is not susceptible of an interpretation that covers the

**weintraub tobin** chediak coleman grodin LAW CORPORATION

asserted dispute." *Pacific Invest. Co. v. Townsend*, 58 Cal. App. 3d 1, 9–10 (1976). The presumption favoring arbitration is particularly applicable where the arbitration clause is broad, as it is here. *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986). The relevant provision here states that any dispute which "arises out of or relates to this Agreement, or the breach hereof" is subject to arbitration. This exceedingly broad provision applies to CBG, in addition to Paul Frank and Grand Union. In fact, the Court must compel arbitration unless it can be said with assurance that the arbitration clause is not susceptible to an interpretation covering the asserted dispute. *Salgado v. Carrows Restaurants, Inc.* 33 Cal. App. 5th 356, 360 (2019).

Because CBG is bound by this valid and far-reaching arbitration provision, it must be compelled to arbitrate Paul Frank's claims, as well as its own purported claims against Paul Frank.

**B. The Court Should Compel CBG to Arbitrate All Claims Related to the MLA**

There can be no dispute that there is a valid arbitration clause in the First Amendment which requires arbitration of all disputes related to the MLA, as both Paul Frank and Grand Union have asserted claims in the Arbitration pursuant to this clause. *See* Demand for Arbitration, Ex. 14 to Wan Decl., *see also* Grand Union Response and Counterclaims, Ex. 15 to Wan Decl. CBG is bound by the arbitration agreement because it is Grand Union's agent and alter ego, and because the claims CBG has asserted in the China Lawsuit are intimately founded in and intertwined with the MLA.

**1. CBG is Grand Union's Agent and Alter Ego**

There is no question that CBG is Grand Union's agent. Agency is the fiduciary relationship that arises when a person or Company consents to an agent acting on the principal's behalf and subject to the principal's control, and the agent agrees as such. *See Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214, 1214 (2023). "In a parent-subsidiary relationship, the agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises sufficient control over the subsidiary's activities such that the subsidiary becomes a mere agent or instrumentality of the parent." *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal. App. 5th 840, 840 (2019). As Grand Union admits, it acts only through CBG, and CBG is the only party that ever did business with Paul Frank. *See* Grand Union Response and Counterclaims, Ex. 15 to Wan Decl., at ¶ 160; *see also* Wan Decl. at ¶ 44.

weintraub tobin chediak coleman grodin LAW CORPORATION

Here, Grand Union is shell corporation with no real employees or involvement in the agreements in which it entered into. Grand Union relied upon CBG, as its agent, to conduct its business under the licensing agreements it entered into, as demonstrated by the fact that it was CBG's director that signed the key agreements, which are directly at issue in this case. Agency is also shown by the fact that CBG demonstrated sufficient control over the business dealings stemming from the MLA, as CBG employees were the ones carrying out all communications related to the Paul Frank brand and controlled all actions and decisions related to the brand. CBG controlled the flow of money from sublicensees, and the flow of funds to Paul Frank. CBG was the only operating business – Grand Union exists as a mere shell for CBG's convenience.

There is also no question that CBG is the alter ego of Grand Union. When assessing alter ego, "[t]he issue is not whether the corporate entity should be disregarded for all purposes, nor whether its very purpose was to defraud the plaintiff. Rather, the issue is whether in the particular case presented and for the purpose of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Lebastchi v. Superior Court*, 33 Cal. App. 4th 1465, 1470 (1995), citing 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, pp. 524-525. It can be applied so as to impose liability on corporation for the acts of its parent or affiliated companies:

> In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both.

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249-50 (1991) (citing 2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416. Whether the alter-ego doctrine applies is a question of fact. *See Klajic v. Castaic Lake Water Agency*, 90 Cal. App. 4th 987, 1000 (2001). Two conditions must exist: "(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010).

In determining whether the alter ego doctrine, a Court or arbitrator looks to a range of factors including "the commingling of funds and other assets," "the failure to segregate funds of the separate entities," "the representation by an [alter ego] that he/she is personally liable for the debts of the corporation," "the identical equitable ownership in the two entities," "the identification of the equitable owners thereof with the domination and control of the two entities," "the identification of the directors and officers of the two entities in the responsible supervision and management," "the failure to adequately capitalize the corporation," "the absence of corporate assets, and undercapitalization," "the use of a corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation," "the use of the corporate entity to procure labor, services, or merchandise for another person or entity," and "the formation and use of a corporation to transfer to it the existing liability of another person or entity," among others. *Zoran*, 185 Cal. App. 4th at 81-812. "This long list of factors is not exhaustive. The enumerated factors may be considered among others under the particular circumstances of each case. No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Id.* at 812 (2010) (internal citations and quotations omitted).

Here, CBG is plainly the alter ego of Grand Union. Grand Union has no employees, no offices, and no business. It is merely a holding company for the rights that are entirely exercised by CBG. CBG controls the business of Grand Union entirely. It negotiates the agreements, pays the royalties, and holds itself out to the public as the holder of the Paul Frank intellectual property in China. These facts demonstrate a clear unity of interest and ownership between CBG and Grand Union. CBG was the only operating business – Grand Union exists as nothing more than a piece of paper.

**2. <u>CBG is Bound by the Arbitration Agreement as Grand Union's Agent and Alter Ego</u>**

As Grand Union's agent and alter ego, CBG is bound by the MLA to arbitrate its disputes with Paul Frank. "There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement.... [T]here are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." *Suh v. Superior Court*, 181 Cal.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

App. 4th 1504, 1513 (2010).

An alter ego of a signatory to an arbitration agreement may be compelled to arbitrate claims related to that agreement. "Indeed, while an agent is one who acts on behalf of a corporation, an alter ego is one who, effectively, *is* the corporation." *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1285 (2007) (compelling arbitration of claims between a signatory and an alter ego of other signatory); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (nonsignatory may enforce arbitration agreement through assumption, alter ego, third-party beneficiary theories, etc.); *see also Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (nonsignatory may be bound under ordinary contract principles such as agency, alter ego and estoppel).

Further, a nonsignatory who is the agent of a signatory can be compelled to arbitrate claims against its will. In *Harris v. Superior Court*, 188 Cal. App. 3d 475, 477–478 (1986), the plaintiffs were patients in a health services program that required arbitration of disputes. After the patients sued the hospital, a physician, and others for malpractice, the hospital's motion to compel arbitration was granted. The plaintiffs then sought to compel the physician to arbitrate as well. The trial court denied the motion because the physician had not signed the enrollment form containing the arbitration provision. The Court of Appeal reversed, holding that the physician's relationship as an employee of the corporation was "sufficient to bind [him] to the arbitration agreement which named [the corporation]." *Harris*, 188 Cal. App. 3d at 478. "Acting as [Hospital's] employee and on its behalf, [Physician] rendered medical care to plaintiffs. In so doing he was subject to [Hospital's] obligations under the arbitration agreement. *Id.* at 479. "Further, the voluntary acceptance of the benefit of a transaction constitutes consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." *Id.*, citing Cal. Civ. Code, § 1589. "Here, [Physician] obtained patients through enrollments in the [Hospital] health plan. His acceptance of this benefit necessarily entailed acceptance of the agreement that members' claims would be subject to binding arbitration." *Id.* Similarly, in *Berman v. Dean Witter & Co., Inc.*, 44 Cal. App. 3d 999, 1004 (1975), a husband was compelled to arbitrate his dispute with a securities broker despite his objection that he was not a party to the arbitration agreement signed by his wife when she opened her account with the broker. The husband's claim against the broker arose from a purchase he made for the wife's account; the court

held that in making the purchase he was acting as the wife's agent, a status which bound him to the arbitration agreement. In *RN Sol., Inc. v. Catholic Healthcare W.*, 165 Cal. App. 4th 1511, 1520 (2008), the nonsignatory was the employee who signed the arbitration agreement against her employer. She "benefited financially and professionally from the recruitment agreement between RNS and CHW, as alleged in her complaint." *RN*, Cal. App. 4th at 1520. Thus, she was bound by the arbitration agreement contained therein. *See also Cohen*, 31 Cal. App. 5th at 836-65, citing *E.I. DuPont de Nemours v. Rhone Poulenc Fiber,* 269 F. 3d 187 (3d Cir. 2001) (nonsignatory parent can be bound by arbitration agreement signed by subsidiary where the parent had control over the subsidiary's activities and the cause of action arose out of the parent-subsidiary relationship).

There can be no question that CBG is an alter ego and agent of Grand Union, and is therefore bound by the arbitration agreement CBG itself signed.

**3. <u>CBG's (Baseless) Claims Against Paul Frank are Intimately Intertwined with the MLA and Must be Arbitrated</u>**

The principal of equitable estoppel holds that, where the nonsignatory relies on the contract in order to pursue its own claims, a signatory can compel the nonsignatory to arbitration. "A nonsignatory plaintiff may be estopped from refusing to arbitrate when he or she asserts claims that are dependent upon, or inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." *Jensen v. U-Haul Co. of Cal.*, 18 Cal. App. 5th 295, 306 (2017) (internal citations omitted). "The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory… [is] always the sine qua non of an appropriate situation for applying equitable estoppel." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 229 (2009). "[E]ven if a plaintiff's claims 'touch matters' relating to the arbitration agreement, 'the claims are not arbitrable unless the plaintiff relies on the agreement to establish its cause of action.'" *Id.* at 230. "The fundamental point" is that a party is "not entitled to make use of [a contract containing an arbitration clause] as long as it worked to [his or] her advantage, then attempt to avoid its application in defining the forum in which [his or] her dispute … should be resolved." *NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 84 (2000). "Claims that rely upon, make reference to, or are intertwined with claims under the subject contract are arbitrable." *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1287 (2007), citing

weintraub tobin chediak coleman grodin LAW CORPORATION

*Boucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262, 269-270 (2005).

Here, CBG's claims in the China Lawsuit are entirely based on the MLA. CBG claims that Paul Frank violated CBG's own "exclusive sub-license" under the MLA – by terminating the MLA. Not only does this mimic the claims of Grand Union in its own Counterclaims in the Arbitration, it also makes the MLA an inextricable part of CBG's claims. CBG argues that Paul Frank's termination of the MLA was improper, thus implicating all of Paul Frank's allegations of wrongdoing by CBG and Grand Union in the Arbitration. CBG did exactly what the court in *NORCAL* predicted – used the MLA to its advantage while it sold Paul Frank goods yet now attempting to avoid its application by complying with the arbitration agreement it signed.

Should the China Lawsuit be allowed to proceed, in a jurisdiction hand-picked by CBG as friendly to local companies, there is a significant risk of multiple, conflicting rulings. The Chinese court will be unable to apply California law (as required by the First Amendment) and may issue a ruling that conflicts with the Arbitrator already appointed by Paul Frank and Grand Union to resolve this dispute. The Court should compel CBG to bring its own claims in the Arbitration, as well as respond to the allegations by Paul Frank in the Proposed Demand for Arbitration.

## IV. CONCLUSION

For the foregoing reasons, Paul Frank respectfully requests that the Court grant this Petition and enter an Order (1) compelling CBG to appear in the pending Arbitration and (2) staying the China Lawsuit pending the completion of the Arbitration.

DATED: September 11, 2023

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

# EXHIBIT B

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**DECLARATION OF JESSICA R. CORPUZ IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4030024.DOCX:}
1
DECLARATION OF JESSICA R. CORPUZ SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

I, Jessica R. Corpuz, declare and state as follows:

1. I am an attorney licensed to practice before all courts in the State of California and am a shareholder with Weintraub Tobin Chediak Coleman Grodin Law Corporation, attorneys of record for Claimant and Counter-Respondent Paul Frank Limited ("Paul Frank"). I am familiar with the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts under oath.

2. This Declaration is made in support of Paul Frank's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration ("Petition").

3. Attached hereto as Exhibit 1 is a true and correct copy of the Demand for Arbitration that Paul Frank served on CBG on August 30, 2023.

4. Attached hereto as Exhibit 2 is a true and correct copy of an email dated August 30, 2023 sent by my office to Matthew Weldon, Esq., counsel of record in the arbitration pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Paul Frank and Respondent China Brands Group's ("CBG") alter ego Grand Union Trading Limited ("Grand Union"). The email attaches a copy of the Demand for Arbitration asks Mr. Weldon to confirm that he is authorized to accept the Demand for Arbitration on behalf of Bo Zheng, Chairman and CEO of CBG. Mr. Weldon did not respond to this email.

5. Attached hereto as Exhibit 3 is a true and correct copy of an email dated September 1, 2023 sent by my office to Mr. Zheng, attaching a copy of the Demand for Arbitration. Mr. Zheng did not respond to this email.

6. Paul Frank also sent a copy of the Demand for Arbitration to Mr. Zheng at each of the two addresses listed in the Demand for Arbitration, via FedEx and Registered Mail. According to FedEx, Mr. Zheng signed for one of the packages on September 7, 2023 and a Q. Lantai signed for one of the packages, also on September 7, 2023.

7. Paul Frank has not received any response to the Demand for Arbitration.

/ / /

/ / /

/ / /

weintraub tobin chediak coleman grodin
LAW CORPORATION

{4030024.DOCX:}

2

DECLARATION OF JESSICA R. CORPUZ SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 11, 2023, at Los Angeles, California

Jessica R. Corpuz

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4030024.DOCX:} 3
DECLARATION OF JESSICA R. CORPUZ SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

# EXHIBIT 1

weintraub | tobin

**Jessica Rankin Corpuz**
**310.860.3327** DIRECT
jcorpuz@weintraub.com

August 30, 2023

**Via Email**

Mr. Bo Zheng
China Brands Group
No. 196, 1st Branch of Tianjingshan Road,
Jimo District
Tsingdao City
Shandong Province
China

Mr. Bo Zheng
China Brands Group
No. 9, 2899 Guangfu West Road
Shanghai 200062
P.R. China

c/o Matthew Weldon, Esq.
K&L Gates LLP
599 Lexington Avenue
New York, New York 10022
matthew.weldon@klgates.com

**Re: Demand for Arbitration to China Brands Group**
**JAMS Ref. No. 5220002118**

Mr. Zheng:

As you know, this firm is litigation counsel to Paul Frank Limited ("Paul Frank"), which is presently engaged in the above-referenced Arbitration with Grand Union International Trading Limited ("Grand Union") relating to Grand Union's multiple material breaches of the Master License Agreement Dated January 1, 2015 (the "MLA").

There is a dispute between Paul Frank and China Brands Group ("CBG") relating to the MLA, as set forth in the attached Proposed Amended Demand for Arbitration, which was filed by Paul Frank in the Arbitration on April 27, 2023 in connection with its Motion for Leave to Amend. Exhibit 1 hereto contains a "clean" version of the Proposed Amended Demand for Arbitration while Exhibit 2 contains tracked changes showing the changes from the original Demand for Arbitration.

We are further informed that China Brands Group ("CBG") has filed a lawsuit against Paul Frank and Grand Union in the Intermediate People's Court of Court of Tsingdao City of Shandong Province., Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit"), alleging claims related to the MLA.

{4006042.DOCX:}

Pursuant to the First Amendment to the Master License Agreement dated April 27, 2018 ("First Amendment"), any dispute which "arises out of or relates to" the MLA are to be settled by arbitration before JAMS in Los Angeles, California. A copy of the First Amendment is attached hereto as Exhibit 3.

Therefore, Paul Frank hereby demands that (1) the dispute set forth in the attached Proposed Amended Demand for Arbitration be determined by the Arbitrator in the pending Arbitration; and (2) CBG dismiss and/or stay the China Lawsuit during the pendency of the Arbitration.

Please confirm by September 8, 2023 that CBG agrees to Paul Frank's demands. If we do not hear from you by that date, or if you expressly refuse, Paul Frank will take further steps to proceed with arbitration according to the law.

All legal and equitable rights reserved.

Sincerely,

**weintraub|tobin**

Jessica Rankin Corpuz

JRC/det

{4006042.DOCX:}

**EXHIBIT 1**

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

| | |
|---|---|
| PAUL FRANK LIMITED,<br><br>Claimant,<br><br>v.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED and CHINA BRANDS GROUP,<br><br>Respondents. | JAMS Ref. No. 5220002118<br><br>**PAUL FRANK LIMITED'S AMENDED DEMAND FOR ARBITRATION – STATEMENT OF CLAIMS** |
| GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Counter-Claimant,<br><br>v.<br><br>PAUL FRANK LIMITED,<br><br>Counter-Respondent. | |

weintraub tobin chediak coleman grodin
LAW CORPORATION

Claimant Paul Frank Limited ("Paul Frank"), by and through its counsel of record, brings this Demand for Arbitration against Respondents Grand Union International Trading Limited ("Grand Union") and China Brands Group ("CBG") alleging as follows:

**PRELIMINARY STATEMENT**

1. Paul Frank, the owner of the world-famous Paul Frank brand, seeks money damages against its former licensee, Grand Union, and CBG, Grand Union's alter ego, as a result of Grand Union's and CBG's repeated material breaches of the license agreement. Despite Paul Frank's exceptional efforts to resolve the dispute, Grand Union and CBG's egregious and deliberate conduct forced Paul Frank to terminate the agreement and seek damages for Grand Union and CBG's violations of the license agreement.

**THE PARTIES**

2. Paul Frank is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

3. Grand Union is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

4. CBG is a corporation organized under the laws of China with its principal place of business in Shanghai, China. Upon information and belief, CBG is an agent of Grand Union and Grand Union is liable for the acts of CBG, all of which occurred under Grand Union's direction and control and Grand Union directed or otherwise participated in CBG's wrongful actions.

5. Upon information and belief, at all times relevant hereto, there existed a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union. Upon information and belief, CBG created and continue to use Grand Union to shield CBG from liability for the actions alleged in this Demand for Arbitration. Upon information and belief, CBG shares a unity of ownership, control, and management with Grand Union such that any activities attributed to Grand Union are in fact activities of CBG and the activities attributed to CBG are in fact activities of Grand Union. Adherence to the fiction of existence of each as an entity separate and distinct from the other would permit an abuse of the corporate privilege and would

promote injustice and fraud in that it would enable Grand Union CBG to continue to commit the actions complained of herein while being shielded from liability.

6. Paul Frank is informed and believes that there is a unity of interest and control between Grand Union and CBG, including but not limited to the following actions:

a. CBG has and continues to commingle and fail to segregate Grand Union's funds and other assets from those of CBG, and diverts corporate funds of Grand Union to other than corporate uses.

b. CBG has held out that it is liable for the debts of Grand Union.

c. CBG and Grand Union use the same office and employ the same employees.

d. Grand Union has inadequate capitalization and functions as a mere shell, instrumentality, and/or conduit for the business ventures of CBG.

e. CBG has concealed and misrepresented the identity of its responsible ownership, management, and financial interest and the responsible ownership, management, and financial interest of Grand Union.

f. CBG and Grand Union have disregarded legal formalities and failed to maintain arm's length relationships between them.

g. CBG has diverted the assets of Grand Union to the detriment of creditors, and/or has manipulated assets and liabilities so as to concentrate the assets in one and the liabilities in the other.

h. CBG and Grand Union have acted with an intent to avoid performance of contract by use of one corporation as a shield against personal liability, and as a subterfuge of illegal transactions.

i. CBG treat assets nominally belonging to Grand Union as belonging to CBG.

j. Grand Union exclusively acts through CBG.

7. Grand Union and CBG are collectively referred to herein as "Respondents." Paul Frank and Respondents are collectively referred to herein as the "Parties."

**JURISDICTION AND VENUE**

8. The First Amendment to the Master License Agreement, dated April 27, 2018 (the

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

"First Amendment"), attached hereto as Exhibit 2, provides at Section 28 that any dispute between the Parties will be administered by JAMS:

> If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

9. Pursuant to Section 28, Paul Frank and Grand Union conducted a mediation on November 7, 2022 at JAMS before Hon. James L. Smith (Ret.). Despite Paul Frank's best efforts, the Parties were unable to resolve their dispute. Therefore, Paul Frank filed this Demand for Arbitration.

10. The First Amendment further provides at Section 30 that the agreement "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law."

## FACTUAL ALLEGATIONS

11. Paul Frank owns the intellectual property associated with, *inter alia*, the Paul Frank® brand.

12. The Paul Frank brand began in 1995 with 28-year-old Paul Frank sewing gifts for

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

friends in his parent's home in Hunting Beach, California. That business eventually became Paul Frank Industries, Inc. ("Paul Frank Industries") and the brand grew to a global pop-culture sensation – in particular its most famous character, Julius the Monkey. In 2010, Saban Brands Entertainment Group ("Saban") purchased Paul Frank Industries from its founders. In 2020, Futurity Brands Switzerland AG purchased the brand from Saban through its subsidiary Paul Frank Limited (the Claimant herein).

**The Master License Agreement**

13. Effective as of January 1, 2015, Paul Frank Industries (still under the ownership of Saban) granted Grand Union an exclusive license to certain elements of the Paul Frank brand (the "Property"). The Master License Agreement dated January 1, 2015 ("MLA") is attached hereto as Exhibit 1. Paul Frank assumed the rights and obligations of the MLA when it acquired the brand in 2020. The Parties later entered into the First Amendment, attached hereto as Exhibit 2, on April 27, 2018. The First Amendment was negotiated and signed on behalf of Grand Union by Bo Zheng, Director of Grand Union and shareholder and Chairman of CBG.

14. Upon information and belief, Grand Union granted a sublicense to CBG whereby Grand Union gave CBG authority to act on its behalf in all matters related to the MLA and the Property. At all times relevant herein, Grand Union was a shell corporation set up to hold the intellectual property rights under the MLA. Grand Union acts exclusively through its agent and alter ego CBG. Grand Union does not conduct any business other than entering into the MLA. Rather, Grand Union is a mere conduit for CBG's operations. All actions nominally by Grand Union were actually conducted by CBG and there was no distinction between CBG and Grand Union.

15. The Parties entered into the Second Amendment to Master License Agreement dated August 19, 2021, attached hereto as Exhibit 3, and the Third Amendment to Master License Agreement dated February 10, 2022, attached hereto as Exhibit 4. The Second and Third Amendments were also signed by Bo Zheng. The various amendments are collectively referred to herein as the "Amendments."

16. Before its termination, the MLA provided that Respondents had the exclusive right to manufacture, sell, and distribute certain Paul Frank branded products (the "Licensed Products") and

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

services (the "Licensed Services") within the territory of China, Hong Kong, and Macau (the "Territory"), from January 1, 2015 to February 28, 2030 (the "License Period"). *See* MLA, Schedules A-C. The MLA limited the sale of Licensed Products to certain "Channels of Distribution," including for example department stores and e-commerce retailers. *Id*. at Schedule G. In return, Respondents paid a license fee of sixty-five million dollars ($65 million). *Id.* at Schedule D.

17. The MLA at Section 1(b) also states that Respondents had the right to grant sublicenses subject to certain conditions:

> (i) every sublicensee ("Sublicensee") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services; (ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;
>
> (iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;
>
> (iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;
>
> (v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

18. Further, Section 2(a) of the MLA states that "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." Sales outside the Territory require prior written approval of Paul Frank and are subject to payment "of a market-rate royalty, to be agreed upon by Licensor and Licensee." Section 2(b).

19. Respondents must sell Licensed Products "outright at a competitive price" and may not engage in "Dumping," which is defined in the MLA as "the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products." Section 10(b) and (i). Respondents must also provide annual sales reports

weintraub tobin chediak coleman grodin LAW CORPORATION

identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products. *See* Section 10(i).

20. The MLA at Section 6(a) also states that Respondents shall submit quarterly statements "specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products" and "report[ing] the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof," as well as "any additional non-financial information reasonably requested by Licensor from time to time."

21. Further, the MLA at Section 6(b) states that Paul Frank may conduct periodic audits of Respondents: "Licensee shall maintain and make available to Licensor, no more than once during any two-year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

22. The MLA at Section 7 also states that Respondents must obtain approval for "all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("SKU") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)."

23. The MLA at Section 9(c) further states that Respondents were responsible for identifying "misuses of the Property." Respondents were required to provide Paul Frank "a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter." In the event that Respondents identified any significant infringement, they were required to "promptly notify" Paul Frank in writing. Paul Frank had the option, "in its sole discretion" to commence an infringement action, or request that Respondents do so. In such an event, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements."

24. Lastly, the MLA specifies the result of a breach of the MLA by Respondents. A "Material Breach" is defined in Section 13(b) as (i) the failure to pay the License Fee (which is not asserted here); (ii) "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by

weintraub tobin chediak coleman grodin
LAW CORPORATION

Licensee;" (iii) "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days;" or (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission" that similarly materially affects the goodwill and market value of the Property for more than 120 days.

25.     Should Respondents commit a Material Breach, "Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." *See* Section 13(a).

26.     In the event that Respondents breach the agreement but such breach does not rise to the level of a Material Breach, Section 13(d) of the MLA states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach.  If a breach is not cured within thirty (30) days after notice of breach, then such breach shall be an Uncured Breach."

**The 2021 Notice of Termination and the Second Amendment**

27.     On June 21, 2021, Paul Frank issued a Notice of Termination to Respondents (the "2021 Notice of Termination"), a copy of which is attached hereto as Exhibit 5.  The 2021 Notice of Termination states that Respondents, through an entity controlled by Respondents, had registered the Property as trademarks in China in violation of Section 9(e) of the MLA.  It further states that an affiliate of Respondents had incorporated the Property into its company name.  On the basis of such breaches and pursuant to Section 13(a)(iii) and 13(b)(iii)-(iv), Paul Frank notified Respondents that the agreement would be terminated unless the breaches were completely cured.

28.     On July 29, 2021, Paul Frank sent a Notice of Material Breaching to Respondents ("2021 Notice of Material Breaching"), a copy of which is attached as Exhibit 6.  The 2021 Notice of Material Breaching states that Respondents had authorized an affiliated entity to launch "Paul Frank Beauty" on an e-commerce platform and social media.  It further states that Respondents registered a new trademark derived from the Property.

weintraub tobin chediak coleman grodin
LAW CORPORATION

29. After significant negotiations between the Parties, the Parties agreed to and executed the Second Amendment. Bo Zheng negotiated and signed the Second Amendment on behalf of Respondents.

30. The Second Amendment, Schedule K, Section 7(i) states that Respondents would, by February 19, 2022 (the "Cure Date"), enter into an "Extraordinary Cure Period" during which it would "cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor." Section 7(ii) states that, "in consideration of Licensee's obligations under this Second Amendment," Paul Frank "agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known [sic] to Licensor as of the Second Amendment Date." Paul Frank further represented and warranted that it had disclosed all known potential breaches to Respondents – i.e. that all breaches were set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching.

31. Section 7(iii) states that Paul Frank has the "right to perform a due diligence in order to ascertain whether there are any uncured breaches." Respondents were obligated to "collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence."

32. Section 6(ii) similarly states:

> Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

33. The Second Amendment also stated at Schedule K, Sections 1-5 that Respondents had the right to an exclusive license for a limited series of Paul Frank-related intellectual property, the A.NI.MA Series. In return, Respondents were obligated to pay a royalty of eight million, five hundred thousand dollars ($8,500,000) in addition to twenty percent (20%) of Grand Union's "net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calendar year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year" for the exclusive categories, and thirty percent (30%) of the

weintraub tobin chediak coleman grodin
LAW CORPORATION

"net invoiced billings" originating from sublicensees for the non-exclusive categories. Respondents were also obligated to pay a "participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties." The Participation Fee was to be paid on a quarterly basis, and Respondents were obligated to provide "complete and accurate statements in Chinese ("Royalty Statements"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time." Respondents were also obligated to inform Paul Frank of any brand collaborations, and pay Paul Frank a royalty of "30% of the net invoiced billing of Licensor's royalty income from such brand collaborations." Schedule K also states that Respondents would pay a Brand Management Fee of two hundred thousand dollars ($200,000) per calendar quarter, which amount was amended in the Third Amendment to one million three hundred thousand RMB Plus VAT (which is approximately $181,630 USD at the present exchange rate). Schedule K further states that Respondents were required to expend "(i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (¥ 10,000,000), whichever of (i) or (ii) is greater" as a Marketing Commitment.

34. Lastly, the Second Amendment provides updated notice provisions for both Grand Union and Paul Frank. For Grand Union, all notices were to be provided to "Bo Zheng (bo.zheng@chinabrandsgroup.com.cn) With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)."

**Paul Frank Discovers Further Breaches and Terminates the MLA**

35. After the execution of the Second Amendment, the Parties continued to operate under the MLA, as amended. However, Paul Frank discovered – and continues to discover – multiple egregious breaches of the MLA by Respondents.

36. On July 21, 2022, Paul Frank sent a Notice of Material Breaching and Further Steps to Respondents ("Notice of Material Breaching"), a copy of which is attached hereto as Exhibit 7. The Notice of Material Breaching states:

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

> Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

37. The Notice of Material Breaching also states that a "third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period."

38. Respondents did not take any steps to cure the breaches identified by Paul Frank in the Notice of Material Breaching. In fact, Respondents denied the existence of the breaches in an email dated September 16, 2022, attached hereto as Exhibit 8. Respondents also stated, "[w]e have no obligation to get audited by the Licensor," which is a clear misrepresentation of the terms of the MLA and the Second Amendment.

39. On August 24, 2022, Paul Frank sent a Notice of Termination to Respondents ("Notice of Termination"), a copy of which is attached hereto as Exhibit 9. The Notice of Termination identified four major categories of breaches by Respondents:

> a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.
>
> b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.

weintraub tobin chediak coleman grodin LAW CORPORATION

c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.

d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

40. Pursuant to Section 13 of the MLA, the Notice of Termination stated that the "Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor."

41. Respondents did not completely cure the Material Breaches identified in the Notice of Termination – they did not even attempt to cure any of the Material Breaches.

42. Therefore, on September 23, 2022, Paul Frank sent a Termination of Master License Agreement, which is attached hereto as Exhibit 10. The Termination of Master License Agreement confirmed that the MLA terminated effective as of September 23, 2022 (the "Termination Effective Date") and instructed Respondents to cease and desist from all activities related to the Paul Frank brand, except for a ninety-day (90-day) Sell-Off period. Paul Frank was not obligated to grant Respondents a Sell Off Period pursuant to Section 20(b) of the MLA, as Respondents were in Material Breach of the MLA. However, Paul Frank agreed to a Sell-Off period in good faith to permit Respondents to sell off remaining inventory and to minimize the impact of the termination on the brand.

43. The Termination of Master License Agreement also requested, pursuant to Section 17 of the MLA, a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of

the date of such statement ('Statement of Inventory')."

44. On September 29, 2022, Respondents sent an email responding to the Notice of Termination, again stating that they would not cure the breaches identified in the Notice of Termination. A copy of this email is attached hereto as Exhibit 11.

45. Upon the Termination Effective Date, the following provisions of the MLA immediately went into effect:

a. Pursuant to Section 8(f), "all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement."

b. Pursuant to Section 14, "[n]either the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination."

**Additional Breaches Discovered by Paul Frank**

46. In addition to the Material Breaches identified in the Notice of Termination, Paul Frank is informed and believes that Respondents have committed the following Material Breaches, Uncured Breaches, and/or other breaches of the MLA:

a. Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

b. Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

c. Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

d. Respondents have executed sublicenses that contain territory terms that are

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

e. Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

f. Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

g. Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

h. Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

i. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

j. Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

k. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

l. Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

m. Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

n. Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

o. Respondents have failed to or refused to maintain and make available to Paul

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

p. Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

q. In particular, Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

r. Further, Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

s. Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

t. Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

u. Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

v. Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

w. Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

x. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

y. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

z. Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

aa. Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

bb. Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

cc. Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

dd. Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ee. Respondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

ff. Respondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

gg. Respondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

hh. Respondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

ii. Respondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

47. Respondents have also filed wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

48. Upon information and belief, Respondents acting on behalf of Grand Union have committed additional Material Breaches, Uncured Breaches, and/or other breaches of the MLA which are presently unknown to Paul Frank.

**Respondents' Attempt to Circumvent the Jurisdiction of this Arbitration**

49. CBG has filed a lawsuit in lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China against Paul Frank and Grand Union. CBG asks the Chinese Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products.

50. Respondents then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from California, stating (in English translation): "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A [Grand Union] or Party B [CBG] can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate." Upon information and belief, Respondents filed this Agreement on Jurisdiction

weintraub tobin chediak coleman grodin LAW CORPORATION

in order to deceive the Chinese court into retaining jurisdiction over the case.

51. CBG also filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard. The Court's ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. While the trademarks and copyrights are blocked, Paul Frank is prohibited from the use of its own trademarks and copyrights in China.

52. Respondents' actions in filing this lawsuit are in violation of the First Amendment, which states, "If a dispute arises out of or relates to this Agreement, or the breach hereof… such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator… in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/)." First Amendment at Section 28.

53. Upon information and belief, Respondents filed this lawsuit in order to interfere with the jurisdiction of this Arbitration and prevent the potential effect of this Arbitrator's rulings in the future.

**Paul Frank is Entitled to Audit Respondents' Performance Under the MLA and the Amendments**

54. Paul Frank has an unquestionable right to audit Respondents' compliance with the MLA and the Amendments pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment.

55. Because Respondents have refused to permit Paul Frank to conduct an audit pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment, Paul Frank is unable to determine whether there are any additional violations of the MLA and the Amendments.

56. Paul Frank will ask that the Arbitrator compel an immediate audit of Respondents once this Arbitration is initiated, by Paul Frank's appointed third-party auditor.

weintraub tobin chediak coleman grodin
LAW CORPORATION

57. Paul Frank reserves the right to amend this Demand for Arbitration and seek damages for any breaches of the MLA and the Amendments, or any other wrongful conduct of any kind, discovered during the audit.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Grand Union and CBG)**

58. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

59. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

60. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

61. Paul Frank has fully performed its obligations under the MLA and the Amendments.

62. Respondents have committed numerous material breaches of their contractual obligations under the MLA and the Amendments including without limitation that:

a. Respondents have forged Licensor's official stamps and used Licensor's forged signatures, as set forth in the Notice of Termination;

b. Respondents have sold and/or distributed Licensed Products outside the Territory and Channels of Distribution, as set forth in the Notice of Termination;

c. Respondents have failed to or refused to cure the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as set forth in the Notice of Termination;

d. Respondents have failed to or refused to comply with Paul Frank's request for an audit and have prevented and obstructed Paul Frank's efforts to conduct the due diligence, as set forth in the Notice of Termination;

e. Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

f. Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

g. Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

h. Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

i. Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

j. Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

k. Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

l. Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

m. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

n. Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

o. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

p. Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

q. Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

r. Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

s. Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

t. Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

u. In particular, Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

v. Further, Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

w. Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

x. Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

y. Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

z. Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c)

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

of the MLA;

aa.    Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

bb.    Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

cc.    Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

dd.    Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

ee.    Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

ff.    Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

gg.    Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

hh.    Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ii.    Respondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

jj.    Respondents have failed to or refused to cure the breaches of the MLA set forth

weintraub tobin chediak coleman grodin
LAW CORPORATION

in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

kk. Respondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

ll. Respondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date, in violation of Section 14 of the MLA;

mm. Respondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA; and

nn. Respondents engaged in conduct intended to interfere with this Arbitration, including but not limited to the filing of a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China.

63. As a result of Respondents' material breaches of the MLA and the Amendments, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Grand Union and CBG)**

64. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

65. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

66. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

67. Paul Frank has fully performed its obligations under the MLA and the Amendments.

68. Respondents engaged in conduct intended to prevent Paul Frank from receiving the benefits under the MLA and the Amendments, including without limitation by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank

and its Counsel and prevent Paul Frank from exercising its legal rights.

69. By doing so, Respondents did not act fairly and in good faith.

70. As a result of Respondents' conduct, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**THIRD CAUSE OF ACTION**

**(Violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125) Against Grand Union and China Brands Group)**

71. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

72. Paul Frank owns the intellectual property, including without limitation all trademarks, trade dress, and copyrights in the U.S. and China associated with the Paul Frank® brand.

73. As set forth in Sections 1 and 8 of the MLA, Paul Frank gave Respondents a limited right during the Licensed Period to utilize the Property to design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer the Licensed Products in the specified Territory and Channels of Distribution and provide Licensed Services in the Territory.

74. Paul Frank owns all trademarks, trade dress, and copyrights in the U.S. and China associated with all Licensed Products and Licensed Services. Paul Frank holds multiple registrations over trademarks and/or trade dress in the U.S. and China, some of which have been used by Grand Union. The trademarks and/or trade dress covered by those registrations and others incorporating and/or relating to the Name are actionable under 15 U.S.C. § 1114.

75. Paul Frank also owns the rights in the U.S. and China to valid and protectable trade dress incorporating and/or relating to the Property, at least some of which have been used by Respondents and not registered. Such trade dress is actionable under 15 U.S.C. § 1125.

76. The Property has great value and consumer recognition associated with Paul Frank.

77. Respondents has never been authorized to use the Property outside the scope of the MLA or its Amendments.

78. The MLA terminated on September 23, 2022.

79. Upon information and belief, after the termination of the MLA, Respondents

weintraub tobin chediak coleman grodin LAW CORPORATION

continued without authority to utilize the Property – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

80. Upon information and belief, Respondents has also utilized the Property prior to the termination of the MLA without obtaining the approval of Paul Frank – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

81. Upon information and belief, Respondents have also utilized the Property prior to the termination of the MLA outside the Territory – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

82. Upon information and belief, Respondents have also utilized the Property prior to the termination of the MLA outside the Channels of Distribution – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

83. In all of these ways, Respondents have, without authority, used the Property in commerce in a manner that misrepresents and is likely to cause mistake or confusion on the part of consumers as to the existence or nature of Paul Frank's sponsorship of, endorsement of, approval of, affiliation with, or association with such use.

84. Paul Frank has made repeated efforts, over the course of several years, to engage Respondents in good faith discussions concerning the violations of the MLA and the Amendments.

Paul Frank also gave Respondents ample opportunity to avoid termination of the MLA and the Amendments. Respondents nonetheless refused to engage in good faith discussions, and continued to act as described above, during the period of the MLA and after its termination. Moreover, Respondents are sophisticated entities that should, at all relevant times, have been well aware of its rights and obligations under the MLA and the Amendments. Respondents' violation of the MLA and the Amendments have, therefore, been willful.

85. As a result of the foregoing violations of its rights in registered and unregistered trademarks and trade dress – i.e. Respondents' unauthorized use of the valuable Property outside the scope and beyond the life of the MLA and the Amendments, which is likely to cause consumer confusion – Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

86. Pursuant to 15 U.S.C. § 1117, Paul Frank is entitled to recover, without limitation, its damages; Respondents' profits in connection with Respondents' use of the Property and, in particular, its violations of Paul Frank's trademark and trade dress rights; and the costs associated with filing this Demand for Arbitration.

**FOURTH CAUSE OF ACTION**

**(Quantum Meruit and/or Unjust Enrichment Against Grand Union and CBG)**

87. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

88. Paul Frank pleads that, in the alternative, no agreement ever existed between it and Grand Union as to one or more material terms of the MLA and the Amendments. In that event, Paul Frank nevertheless conferred substantial benefits on Respondents in connection with Paul Frank's support, goodwill, and intellectual property, including without limitation Respondents' use of the iconic Paul Frank brand.

89. Paul Frank has not been fully compensated for the full and fair value of the benefits conferred upon Respondents.

90. In the absence of an enforceable contract as to material terms, Paul Frank has no adequate remedy at law.

weintraub tobin chediak coleman grodin LAW CORPORATION

91. Respondents accepted and enjoyed the benefits that Paul Frank conferred upon it, deriving significant profit therefrom.

92. Respondents accepted those benefits knowing that Paul Frank expected to be paid the fair value of those benefits.

93. Under the circumstances, it would be inequitable for Respondents to retain the benefits Paul Frank conferred without paying Paul Frank the full value for those benefits.

94. As such, Paul Frank is entitled to recover the balance of the value that Respondents has accepted from Paul Frank under a theory of *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing.

## PRAYER FOR RELIEF

WHEREFORE, Paul Frank requests relief as follows:

1. For an award of damages, including amounts to be determined at the Arbitration Hearing for the various breached described herein;

2. For an award of damages, in amounts to be determined at the Arbitration Hearing, as a result of Respondents' violation of Paul Frank's trademark and trade dress rights;

3. For an award of Respondents' profits associated with the violations of Paul Frank's trademark and trade dress rights;

4. In the alternative, an award of recovery in *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing;

5. For an award of reasonable attorney's fees and costs of suit; and

6. For such other and further relief as the Court deems just and proper.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

DATED: April 27, 2023

**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

____________________________________________

Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Claimant and Counter-Respondent Paul Frank Limited

# EXHIBIT 2

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for ~~Petitioner~~ Claimant and Counter-Respondent~~Paul Frank Limited~~
Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

~~Petitioner~~Claimant,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED and CHINA BRANDS GROUP,

Respondents.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Counter-Claimant,

v.

PAUL FRANK LIMITED,

Counter-Respondent.

JAMS Ref. No. ~~1220073501~~ 5220002118

**PAUL FRANK ~~LIMITED~~LIMITED'S AMENDED DEMAND FOR ARBITRATION – STATEMENT OF CLAIMS**

weintraub tobin chediak coleman grodin LAW CORPORATION

Claimant Paul Frank Limited ("Paul Frank"), by and through its counsel of record, brings this Demand for Arbitration against Respondents Grand Union International Trading Limited ("Grand Union") and ~~alleges~~China Brands Group ("CBG") alleging as follows:

**PRELIMINARY STATEMENT**

1. Paul Frank, the owner of the world-famous Paul Frank brand, seeks money damages against its former licensee, Grand Union, and CBG, Grand Union's alter ego, as a result of Grand Union's and CBG's repeated material breaches of the license agreement. Despite Paul Frank's exceptional efforts to resolve the dispute, Grand ~~Union's~~Union and CBG's egregious and deliberate conduct forced Paul Frank to terminate the agreement and seek damages for Grand ~~Union's~~Union and CBG's violations of the license agreement.

**THE PARTIES**

2. Paul Frank is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

3. Grand Union is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China. ~~Paul Frank and Grand Union are collectively referred to herein as the "Parties."~~

4. ~~Grand Union acts through its subsidiary ("CBG"), which~~CBG is a corporation organized under the laws of China with its principal place of business in Shanghai, China. Upon information and belief, CBG is an agent of Grand Union and Grand Union is liable for the acts of CBG, all of which occurred under Grand Union's direction and control and Grand Union directed or otherwise participated in ~~G~~CBG's wrongful actions.

5. Upon information and belief, at all times relevant hereto, there existed a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union. Upon information and belief, CBG created and continue to use Grand Union to shield CBG from liability for the actions alleged in this Demand for Arbitration. Upon information and belief, CBG shares a unity of ownership, control, and management with Grand Union such that any activities attributed to Grand Union are in fact activities of CBG and the activities attributed to CBG

weintraub tobin chediak coleman grodin LAW CORPORATION

are in fact activities of Grand Union. Adherence to the fiction of existence of each as an entity separate and distinct from the other would permit an abuse of the corporate privilege and would promote injustice and fraud in that it would enable Grand Union CBG to continue to commit the actions complained of herein while being shielded from liability.

6. Paul Frank is informed and believes that there is a unity of interest and control between Grand Union and CBG, including but not limited to the following actions:

a. CBG has and continues to commingle and fail to segregate Grand Union's funds and other assets from those of CBG, and diverts corporate funds of Grand Union to other than corporate uses.

b. CBG has held out that it is liable for the debts of Grand Union.

c. CBG and Grand Union use the same office and employ the same employees.

d. Grand Union has inadequate capitalization and functions as a mere shell, instrumentality, and/or conduit for the business ventures of CBG.

e. CBG has concealed and misrepresented the identity of its responsible ownership, management, and financial interest and the responsible ownership, management, and financial interest of Grand Union.

f. CBG and Grand Union have disregarded legal formalities and failed to maintain arm's length relationships between them.

g. CBG has diverted the assets of Grand Union to the detriment of creditors, and/or has manipulated assets and liabilities so as to concentrate the assets in one and the liabilities in the other.

h. CBG and Grand Union have acted with an intent to avoid performance of contract by use of one corporation as a shield against personal liability, and as a subterfuge of illegal transactions.

i. CBG treat assets nominally belonging to Grand Union as belonging to CBG.

j. Grand Union exclusively acts through CBG.

7. Grand Union and CBG are collectively referred to herein as "Respondents." Paul Frank and Respondents are collectively referred to herein as the "Parties."

weintraub tobin chediak coleman grodin LAW CORPORATION

## JURISDICTION AND VENUE

~~5.~~8. The First Amendment to the Master License Agreement, dated April 27, 2018 (the "First Amendment"), attached hereto as Exhibit 2, provides at Section 28 that any dispute between the Parties will be administered by JAMS:

> If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

~~6.~~9. Pursuant to Section 28, ~~the Parties~~Paul Frank and Grand Union conducted a mediation on November 7, 2022 at JAMS before Hon. James L. Smith (Ret.). Despite Paul Frank's best efforts, the Parties were unable to resolve their dispute. Therefore, Paul Frank filed this Demand for Arbitration.

~~7.~~10. The First Amendment further provides at Section 30 that the agreement "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law."

## FACTUAL ALLEGATIONS

~~8.~~11. Paul Frank owns the intellectual property associated with, *inter alia*, the Paul Frank®

weintraub tobin chediak coleman grodin LAW CORPORATION

brand.

9.12. The Paul Frank brand began in 1995 with 28-year-old Paul Frank sewing gifts for friends in his parent's home in Hunting Beach, California. That business eventually became Paul Frank Industries, Inc. ("Paul Frank Industries") and the brand grew to a global pop-culture sensation – in particular its most famous character, Julius the Monkey. In 2010, Saban Brands Entertainment Group ("Saban") purchased Paul Frank Industries from its founders. In 2020, Futurity Brands Switzerland AG purchased the brand from Saban through its subsidiary Paul Frank Limited (the Claimant herein).

///

**The Master License Agreement**

10.13. Effective as of January 1, 2015, Paul Frank Industries (still under the ownership of Saban) granted Grand Union an exclusive license to certain elements of the Paul Frank brand (the "Property"). The Master License Agreement dated January 1, 2015 ("MLA") is attached hereto as Exhibit 1. Paul Frank assumed the rights and obligations of the MLA when it acquired the brand in 2020. Paul Frank Industries and Grand Union The Parties later entered into the First Amendment, attached hereto as Exhibit 2, on April 27, 2018. The First Amendment was negotiated and signed on behalf of Grand Union by Bo Zheng, Director of Grand Union and shareholder and Chairman of CBG.

14. Upon information and belief, Grand Union granted a sublicense to CBG whereby Grand Union gave CBG authority to act on its behalf in all matters related to the MLA and the Property. At all times relevant herein, Grand Union was a shell corporation set up to hold the intellectual property rights under the MLA. Grand Union acts exclusively through its agent and alter ego CBG. Grand Union does not conduct any business other than entering into the MLA. Rather, Grand Union is a mere conduit for CBG's operations. All actions nominally by Grand Union were actually conducted by CBG and there was no distinction between CBG and Grand Union.

11.15. The Parties entered into the Second Amendment to Master License Agreement dated August 19, 2021, attached hereto as Exhibit 3, and the Third Amendment to Master License Agreement dated February 10, 2022, attached hereto as Exhibit 4. The Second and Third

weintraub tobin chediak coleman grodin LAW CORPORATION

Amendments were also signed by Bo Zheng. The various amendments are collectively referred to herein as the "Amendments."

~~12.~~16. Before its termination, the MLA provided that ~~Grand Union~~Respondents had the exclusive right to manufacture, sell, and distribute certain Paul Frank branded products (the "Licensed Products") and services (the "Licensed Services") within the territory of China, Hong Kong, and Macau (the "Territory"), from January 1, 2015 to February 28, 2030 (the "License Period"). *See* MLA, Schedules A-C. The MLA limited the sale of Licensed Products to certain "Channels of Distribution," including for example department stores and e-commerce retailers. *Id*. at Schedule G. In return, ~~Grand Union~~Respondents paid a license fee of sixty-five million dollars ($65 million). *Id.* at Schedule D.

~~13.~~17. The MLA at Section 1(b) also states that ~~Grand Union~~Respondents had the right to grant sublicenses subject to certain conditions:

> (i) every sublicensee ("Sublicensee") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services; (ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;
>
> (iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;
>
> (iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;
>
> (v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

~~14.~~18. Further, Section 2(a) of the MLA states that "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." Sales outside the Territory require prior written approval of Paul Frank and are subject to payment "of a market-rate royalty, to be agreed upon by Licensor and Licensee." Section 2(b).

weintraub tobin chediak coleman grodin LAW CORPORATION

~~15.~~19. ~~Grand Union~~Respondents must sell Licensed Products "outright at a competitive price" and may not engage in "Dumping," which is defined in the MLA as "the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products." Section 10(b) and (i). ~~Grand Union~~Respondents must also provide annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products. *See* Section 10(i).

~~16.~~20. The MLA at Section 6(a) also states that ~~Grand Union~~Respondents shall submit quarterly statements "specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products" and "report[ing] the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof," as well as "any additional non-financial information reasonably requested by Licensor from time to time."

~~17.~~21. Further, the MLA at Section 6(b) states that Paul Frank may conduct periodic audits of ~~Grand Union~~Respondents: "Licensee shall maintain and make available to Licensor, no more than once during any two~~-~~-year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

~~18.~~22. The MLA at Section 7 also states that ~~Grand Union~~Respondents must obtain approval for "all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("SKU") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)."

~~19.~~23. The MLA at Section 9(c) further states that ~~Grand Union was~~Respondents were responsible for identifying "misuses of the Property." ~~Grand Union was~~Respondents were required to provide Paul Frank "a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter." In the event that ~~Grand Union~~Respondents identified any significant infringement, ~~it was~~they were required to "promptly notify" Paul Frank in writing. Paul Frank had the option, "in its sole discretion" to

weintraub tobin chediak coleman grodin
LAW CORPORATION

commence an infringement action, or request that ~~Grand Union~~Respondents do so. In such an event, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements."

~~20.~~24. Lastly, the MLA specifies the result of a breach of the MLA by ~~Grand Union~~Respondents. A "Material Breach" is defined in Section 13(b) as (i) the failure to pay the License Fee (which is not asserted here); (ii) "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee;" (iii) "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days;" or (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission" that similarly materially affects the goodwill and market value of the Property for more than 120 days.

~~21.~~25. Should ~~Grand Union~~Respondents commit a Material Breach, "Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." *See* Section 13(a).

~~22.~~26. In the event that ~~Grand Union breaches~~Respondents breach the agreement but such breach does not rise to the level of a Material Breach, Section 13(d) of the MLA states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of breach, then such breach shall be an Uncured Breach."

**The 2021 Notice of Termination and the Second Amendment**

~~23.~~27. On June 21, 2021, Paul Frank issued a Notice of Termination to ~~Grand Union~~Respondents (the "2021 Notice of Termination"), a copy of which is attached hereto as Exhibit 5. The 2021 Notice of Termination states that ~~Grand Union~~Respondents, through an entity controlled by ~~Grand Union~~Respondents, had registered the Property as trademarks in China in violation of Section 9(e) of the MLA. It further states that an affiliate of ~~Grand Union~~Respondents had

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

incorporated the Property into its company name. On the basis of such breaches and pursuant to Section 13(a)(iii) and 13(b)(iii)-(iv), Paul Frank notified ~~Grand Union~~Respondents that the agreement would be terminated unless the breaches were completely cured.

~~24.~~28. On July 29, 2021, Paul Frank sent a Notice of Material Breaching to ~~Grand Union~~Respondents ("2021 Notice of Material Breaching"), a copy of which is attached as Exhibit 6. The 2021 Notice of Material Breaching states that ~~Grand Union~~Respondents had authorized an affiliated entity to launch "Paul Frank Beauty" on an e-commerce platform and social media. It further states that ~~Grand Union~~Respondents registered a new trademark derived from the Property.

~~25.~~29. After significant negotiations between the Parties, the Parties agreed to and executed the Second Amendment. Bo Zheng negotiated and signed the Second Amendment on behalf of Respondents.

~~26.~~30. The Second Amendment, Schedule K, Section 7(i) states that ~~Grand Union~~Respondents would, by February 19, 2022 (the "Cure Date"), enter into an "Extraordinary Cure Period" during which it would "cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor." Section 7(ii) states that, "in consideration of Licensee's obligations under this Second Amendment," Paul Frank "agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known [sic] to Licensor as of the Second Amendment Date." Paul Frank further represented and warranted that it had disclosed all known potential breaches to ~~Grand Union~~Respondents – i.e. that all breaches were set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching.

~~27.~~31. Section 7(iii) states that Paul Frank has the "right to perform a due diligence in order to ascertain whether there are any uncured breaches." ~~Grand Union was~~Respondents were obligated to "collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence."

~~28.~~32. Section 6(ii) similarly states:

> Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such

weintraub tobin chediak coleman grodin
LAW CORPORATION

> books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

29.33. The Second Amendment also stated at Schedule K, Sections 1-5 that Grand UnionRespondents had the right to an exclusive license for a limited series of Paul Frank-related intellectual property, the A.NI.MA Series. In return, Grand Union wasRespondents were obligated to pay a royalty of eight million, five hundred thousand dollars ($8,500,000) in addition to twenty percent (20%) of Grand Union's "net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calendar year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year" for the exclusive categories, and thirty percent (30%) of the "net invoiced billings" originating from sublicensees for the non-exclusive categories. Grand Union wasRespondents were also obligated to pay a "participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties." The Participation Fee was to be paid on a quarterly basis, and Grand Union wasRespondents were obligated to provide "complete and accurate statements in Chinese ("Royalty Statements"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time." Grand Union wasRespondents were also obligated to inform Paul Frank of any brand collaborations, and pay Paul Frank a royalty of "30% of the net invoiced billing of Licensor's royalty income from such brand collaborations." Schedule K also states that Grand UnionRespondents would pay a Brand Management Fee of two hundred thousand dollars ($200,000) per calendar quarter, which amount was amended in the Third Amendment to one million three hundred thousand RMB Plus VAT (which is approximately $181,630 USD at the present exchange rate). Schedule K further states that Grand Union wasRespondents were required to expend "(i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (¥ 10,000,000), whichever of (i) or (ii) is greater" as a Marketing Commitment.

weintraub tobin chediak coleman grodin LAW CORPORATION

34. Lastly, the Second Amendment provides updated notice provisions for both Grand Union and Paul Frank. For Grand Union, all notices were to be provided to "Bo Zheng (bo.zheng@chinabrandsgroup.com.cn) With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)."

**Paul Frank Discovers Further Breaches and Terminates the MLA**

30.35. After the execution of the Second Amendment, the Parties continued to operate under the MLA, as amended. However, Paul Frank discovered – and continues to discover – multiple egregious breaches of the MLA by Grand UnionRespondents.

36. On July 21, 2022, Paul Frank sent a Notice of Material Breaching and Further Steps to Grand UnionRespondents ("Notice of Material Breaching"), a copy of which is attached hereto as Exhibit 7. The Notice of Material Breaching states:

> Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

31.37. The Notice of Material Breaching also states that a "third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period."

32.38. Grand UnionRespondents did not take any steps to cure the breaches identified by Paul Frank in the Notice of Material Breaching. In fact, Grand UnionRespondents denied the existence of the breaches in an email dated September 16, 2022, attached hereto as Exhibit 8. Grand UnionRespondents also stated, "[w]e have no obligation to get audited by the Licensor," which is a clear misrepresentation of the terms of the MLA and the Second Amendment.

weintraub tobin chediak coleman grodin LAW CORPORATION

~~33.~~39. On August 24, 2022, Paul Frank sent a Notice of Termination to ~~Grand Union~~Respondents ("Notice of Termination"), a copy of which is attached hereto as Exhibit 9. The Notice of Termination identified four major categories of breaches by ~~Grand Union~~Respondents:

> a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.
>
> b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.
>
> c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.
>
> d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

~~34.~~40. Pursuant to Section 13 of the MLA, the Notice of Termination stated that the "Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor."

~~35.~~41. ~~Grand Union~~Respondents did not completely cure the Material Breaches identified in

weintraub tobin chediak coleman grodin LAW CORPORATION

the Notice of Termination – ~~it~~they did not even attempt to cure any of the Material Breaches.

~~36.~~42. Therefore, on September 23, 2022, Paul Frank sent a Termination of Master License Agreement, which is attached hereto as Exhibit 10. The Termination of Master License Agreement confirmed that the MLA terminated effective as of September 23, 2022 (the "Termination Effective Date") and instructed ~~Grand Union~~Respondents to cease and desist from all activities related to the Paul Frank brand, except for a ninety-day (90-day) Sell-Off period. Paul Frank was not obligated to grant ~~Grand Union~~Respondents a Sell Off Period pursuant to Section 20(b) of the MLA, as ~~Grand Union was~~Respondents were in Material Breach of the MLA. However, Paul Frank agreed to a Sell-Off period in good faith to permit ~~Grand Union~~Respondents to sell off remaining inventory and to minimize the impact of the termination on the brand.

~~37.~~43. The Termination of Master License Agreement also requested, pursuant to Section 17 of the MLA, a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of the date of such statement ('Statement of Inventory')."

~~38.~~44. On September 29, 2022, ~~Grand Union~~Respondents sent an email responding to the Notice of Termination, again stating that ~~it~~they would not cure the breaches identified in the Notice of Termination. A copy of this email is attached hereto as Exhibit 11.

~~39.~~45. Upon the Termination Effective Date, the following provisions of the MLA immediately went into effect:

a. Pursuant to Section 8(f), "all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement."

b. Pursuant to Section 14, "[n]either the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination."

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**Additional Breaches Discovered by Paul Frank**

~~40.~~46. In addition to the Material Breaches identified in the Notice of Termination, Paul Frank is informed and believes that ~~Grand Union and/or CBG acting on behalf of Grand Union~~Respondents have committed the following Material Breaches, Uncured Breaches, and/or other breaches of the MLA:

a. ~~Grand Union and/or CBG~~Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

b. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

c. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

d. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

e. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

f. ~~Grand Union and/or CBG~~Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

g. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

h. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

i. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and

weintraub tobin chediak coleman grodin LAW CORPORATION

encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

j. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

k. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

l. ~~Grand Union and/or CBG~~Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

m. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

n. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

o. ~~Grand Union and/or CBG~~Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

p. ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

q. In particular, ~~Grand Union and/or CBG~~Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

weintraub tobin chediak coleman grodin
LAW CORPORATION

r. Further, ~~Grand Union and/or CBG~~Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

s. ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

t. ~~Grand Union and/or CBG~~Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

u. ~~Grand Union and/or CBG~~Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

v. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

w. ~~Grand Union and/or CBG~~Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

x. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

y. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

z. ~~Grand Union and/or CBG~~Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

aa. ~~Grand Union and/or CBG~~Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

bb. Grand Union and/or CBGRespondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

cc. Grand Union and/or CBGRespondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

dd. Grand Union and/or CBGRespondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ee. Grand Union and/or CBGRespondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

ff. Grand Union and/or CBGRespondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination -and the 2021 Notice of Material Breaching;

gg. Grand Union and/or CBGRespondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

hh. Grand Union and/or CBGRespondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

ii. Grand Union and/or CBGRespondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

41.47. Grand Union and/or CBGRespondents have also filed wrongful and false complaints

weintraub tobin chediak coleman grodin
LAW CORPORATION

against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

~~42.~~48. Upon information and belief, ~~Grand Union and/or CBG~~Respondents acting on behalf of Grand Union have committed additional Material Breaches, Uncured Breaches, and/or other breaches of the MLA which are presently unknown to Paul Frank.

**Respondents' Attempt to Circumvent the Jurisdiction of this Arbitration**

49. CBG has filed a lawsuit in lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China against Paul Frank and Grand Union. CBG asks the Chinese Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products.

50. Respondents then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from California, stating (in English translation): "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A [Grand Union] or Party B [CBG] can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate." Upon information and belief, Respondents filed this Agreement on Jurisdiction in order to deceive the Chinese court into retaining jurisdiction over the case.

51. CBG also filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard.

weintraub tobin chediak coleman grodin LAW CORPORATION

The Court's ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. While the trademarks and copyrights are blocked, Paul Frank is prohibited from the use of its own trademarks and copyrights in China.

52. Respondents' actions in filing this lawsuit are in violation of the First Amendment, which states, "If a dispute arises out of or relates to this Agreement, or the breach hereof… such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator… in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/)." First Amendment at Section 28.

53. Upon information and belief, Respondents filed this lawsuit in order to interfere with the jurisdiction of this Arbitration and prevent the potential effect of this Arbitrator's rulings in the future.

**Paul Frank is Entitled to Audit ~~Grand Union's~~Respondents' Performance Under the MLA and the Amendments**

~~43.~~54. Paul Frank has an unquestionable right to audit ~~Grand Union's~~Respondents' compliance with the MLA and the Amendments pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment.

~~44.~~55. Because ~~Grand Union has~~Respondents have refused to permit Paul Frank to conduct an audit pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment, Paul Frank is unable to determine whether there are any additional violations of the MLA and the Amendments.

~~45.~~56. Paul Frank will ask that the Arbitrator compel an immediate audit of ~~Grand Union~~Respondents once this Arbitration is initiated, by Paul Frank's appointed third-party auditor.

~~46.~~57. Paul Frank reserves the right to amend this Demand for Arbitration and seek damages for any breaches of the MLA and the Amendments, or any other wrongful conduct of any kind, discovered during the audit.

weintraub tobin chediak coleman grodin LAW CORPORATION

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Grand Union and CBG)**

~~47.~~58. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

~~48.~~59. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

60. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

~~49.~~61. Paul Frank has fully performed its obligations under the MLA and the Amendments.

~~50.~~62. ~~Grand Union and/or CBG acting on behalf of Grand Union~~ Respondents have committed numerous material breaches of ~~Grand Union's~~their contractual obligations under the MLA and the Amendments including without limitation that:

a. ~~Grand Union and/or CBG~~Respondents have forged Licensor's official stamps and used Licensor's forged signatures, as set forth in the Notice of Termination;

b. ~~Grand Union and/or CBG~~Respondents have sold and/or distributed Licensed Products outside the Territory and Channels of Distribution, as set forth in the Notice of Termination;

c. ~~Grand Union and/or CBG~~Respondents have failed to or refused to cure the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as set forth in the Notice of Termination;

d. ~~Grand Union and/or CBG~~Respondents have failed to or refused to comply with Paul Frank's request for an audit and have prevented and obstructed Paul Frank's efforts to conduct the due diligence, as set forth in the Notice of Termination;

e. ~~Grand Union and/or CBG~~Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

f. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain

terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

g. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

h. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

i. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

j. ~~Grand Union and/or CBG~~Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

k. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

l. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

m. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

n. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

o. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

p. ~~Grand Union and/or CBG~~Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

q. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

r. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

s. ~~Grand Union and/or CBG~~Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

t. ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

u. In particular, ~~Grand Union and/or CBG~~Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

v. Further, ~~Grand Union and/or CBG~~Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

w. ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

x. ~~Grand Union and/or CBG~~Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

y. ~~Grand Union and/or CBG~~Respondents have registered one or more domain

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

z. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

aa. ~~Grand Union and/or CBG~~Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

bb. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

cc. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

dd. ~~Grand Union and/or CBG~~Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

ee. ~~Grand Union and/or CBG~~Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

ff. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

gg. ~~Grand Union and/or CBG~~Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

hh. ~~Grand Union and/or CBG~~Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from

weintraub tobin chediak coleman grodin
LAW CORPORATION

Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ii. Grand Union and/or CBGRespondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

jj. Grand Union and/or CBGRespondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination -and the 2021 Notice of Material Breaching;

kk. Grand Union and/or CBGRespondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

ll. Grand Union and/or CBGRespondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date-, in violation of Section 14 of the MLA; and

mm. Grand Union and/or CBGRespondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.; and

nn. Respondents engaged in conduct intended to interfere with this Arbitration, including but not limited to the filing of a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China.

51.63. As a result of Grand Union'sRespondents' material breaches of the MLA and the Amendments, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Grand Union and CBG)**

52.64. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 4757 as fully set forth herein.

weintraub tobin chediak coleman grodin LAW CORPORATION

~~53.~~65. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

~~///~~

66. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

~~54.~~67. Paul Frank has fully performed its obligations under the MLA and the Amendments.

~~55.~~68. ~~Grand Union~~Respondents engaged in conduct intended to prevent Paul Frank from receiving the benefits under the MLA and the Amendments, including without limitation by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

~~56.~~69. By doing so, ~~Grand Union~~Respondents did not act fairly and in good faith.

~~57.~~70. As a result of ~~Grand Union's~~Respondents' conduct, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**THIRD CAUSE OF ACTION**

**(Violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125) Against Grand Union and China Brands Group)**

~~58.~~71. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

~~59.~~72. Paul Frank owns the intellectual property, including without limitation all trademarks, trade dress, and copyrights in the U.S. and China associated with the Paul Frank® brand.

~~60.~~73. As set forth in Sections 1 and 8 of the MLA, Paul Frank gave ~~Grand Union~~Respondents a limited right during the Licensed Period to utilize the Property to design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer the Licensed Products in the specified Territory and Channels of Distribution and provide Licensed Services in the Territory.

~~61.~~74. Paul Frank owns all trademarks, trade dress, and copyrights in the U.S. and China associated with all Licensed Products and Licensed Services. Paul Frank holds multiple registrations

weintraub tobin chediak coleman grodin LAW CORPORATION

over trademarks and/or trade dress in the U.S. and China, some of which have been used by Grand Union. The trademarks and/or trade dress covered by those registrations and others incorporating and/or relating to the Name are actionable under 15 U.S.C. § 1114.

62.75. Paul Frank also owns the rights in the U.S. and China to valid and protectable trade dress incorporating and/or relating to the Property, at least some of which have been used by Grand UnionRespondents and not registered. Such trade dress is actionable under 15 U.S.C. § 1125.

63.76. The Property has great value and consumer recognition associated with Paul Frank.

64.77. Grand UnionRespondents has never been authorized to use the Property outside the scope of the MLA or its Amendments.

65.78. The MLA terminated on September 23, 2022.

66.79. Upon information and belief, after the termination of the MLA, Grand UnionRespondents continued without authority to utilize the Property – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

67.80. Upon information and belief, Grand UnionRespondents has also utilized the Property prior to the termination of the MLA without obtaining the approval of Paul Frank – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

68.81. Upon information and belief, Grand Union hasRespondents have also utilized the Property prior to the termination of the MLA outside the Territory – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

weintraub tobin chediak coleman grodin LAW CORPORATION

~~69.~~82. Upon information and belief, ~~Grand Union has~~Respondents have also utilized the Property prior to the termination of the MLA outside the Channels of Distribution – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

~~70.~~83. In all of these ways, ~~Grand Union has~~Respondents have, without authority, used the Property in commerce in a manner that misrepresents and is likely to cause mistake or confusion on the part of consumers as to the existence or nature of Paul Frank's sponsorship of, endorsement of, approval of, affiliation with, or association with such use.

~~71.~~84. Paul Frank has made repeated efforts, over the course of several years, to engage ~~Grand Union~~Respondents in good faith discussions concerning the violations of the MLA and the Amendments. Paul Frank also gave ~~Grand Union~~Respondents ample opportunity to avoid termination of the MLA and the Amendments. ~~Grand Union~~Respondents nonetheless refused to engage in good faith discussions, and continued to act as described above, during the period of the MLA and after its termination. Moreover, ~~Grand Union is a~~Respondents are sophisticated entit~~y~~ies that should, at all relevant times, have been well aware of its rights and obligations under the MLA and the Amendments. ~~Grand Union's~~Respondents' violation of the MLA and the Amendments have, therefore, been willful.

~~72.~~85. As a result of the foregoing violations of its rights in registered and unregistered trademarks and trade dress – i.e. ~~Grand Union's~~Respondents' unauthorized use of the valuable Property outside the scope and beyond the life of the MLA and the Amendments, which is likely to cause consumer confusion – Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

~~73.~~86. Pursuant to 15 U.S.C. § 1117, Paul Frank is entitled to recover, without limitation, its damages; ~~Grand Union's~~Respondents' profits in connection with ~~Grand Union's~~Respondents' use of the Property and, in particular, its violations of Paul Frank's trademark and trade dress rights; and the costs associated with filing this Demand for Arbitration.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**FOURTH CAUSE OF ACTION**

**(Quantum Meruit and/or Unjust Enrichment Against Grand Union and CBG)**

~~74.~~87. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

~~75.~~88. Paul Frank pleads that, in the alternative, no agreement ever existed between it and Grand Union as to one or more material terms of the MLA and the Amendments. In that event, Paul Frank nevertheless conferred substantial benefits on ~~Grand Union~~Respondents in connection with Paul Frank's support, goodwill, and intellectual property, including without limitation ~~Grand Union's~~Respondents' use of the iconic Paul Frank brand.

~~///~~

~~76.~~89. Paul Frank has not been fully compensated for the full and fair value of the benefits conferred upon ~~Grand Union~~Respondents.

~~77.~~90. In the absence of an enforceable contract as to material terms, Paul Frank has no adequate remedy at law.

~~78.~~91. ~~Grand Union~~Respondents accepted and enjoyed the benefits that Paul Frank conferred upon it, deriving significant profit therefrom.

~~79.~~92. ~~Grand Union~~Respondents accepted those benefits knowing that Paul Frank expected to be paid the fair value of those benefits.

~~80.~~93. Under the circumstances, it would be inequitable for ~~Grand Union~~Respondents to retain the benefits Paul Frank conferred without paying Paul Frank the full value for those benefits.

~~81.~~94. As such, Paul Frank is entitled to recover the balance of the value that ~~Grand Union~~Respondents has accepted from Paul Frank under a theory of *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing.

**PRAYER FOR RELIEF**

WHEREFORE, Paul Frank requests relief as follows:

1. For an award of damages, including amounts to be determined at the Arbitration Hearing for the various breached described herein;

2. For an award of damages, in amounts to be determined at the Arbitration Hearing, as

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

a result of Grand Union'sRespondents' violation of Paul Frank's trademark and trade dress rights;

3. For an award of Grand Union'sRespondents' profits associated with the violations of Paul Frank's trademark and trade dress rights;

4. In the alternative, an award of recovery in *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing;

5. For an award of reasonable attorney's fees and costs of suit; and

6. For such other and further relief as the Court deems just and proper.

///

///

///

DATED: April 27, 2023

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

______________________________
Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Petitioner Claimant and Counter-Respondent
Paul Frank Limited

**EXHIBIT 3**

# FIRST AMENDMENT TO MASTER LICENSE AGREEMENT

This First Amendment ("Amendment") to the Master License Agreement dated January 1, 2015 (the "Agreement") is entered into by and between Paul Frank Industries LLC ("Licensor") and Grand Union International Trading Limited ("Licensee"), as of April 27, 2018 (the "Amendment Date"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS, Licensor and Licensee duly executed the Agreement pursuant to which, inter alia, Licensor granted to Licensee the License as set forth therein; and

WHEREAS, Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

1. Section 9(h) - Right of First Negotiation. Section 9(h) of the Agreement is deleted in its entirety.

2. Section 28 - Dispute Resolution. Section 28 of the Agreement is deleted in its entirety and replaced with the following:

   If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having

jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

3. Section 30 - Governing Law. Section 30 of the Agreement is deleted in its entirety and replaced with the following:

This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law.

4. Waiver of Jury Trial. EACH PARTY TO THE AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THE AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AMENDMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 4.

5. General. The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Amendment Date set forth above.

PAUL FRANK INDUSTRIES LLC

By: [signature]
Name: Janet HSU
Title: CEO

GRAND UNION INTERNATIONAL TRADING LIMITED

By: [signature]
Name:
Title:

# EXHIBIT 2

**Denise Thurman**

| | |
|---|---|
| **From:** | Denise Thurman |
| **Sent:** | Wednesday, August 30, 2023 1:31 PM |
| **To:** | Matthew.Weldon@klgates.com |
| **Cc:** | Jessica R. Corpuz; Kavan J. Jeppson |
| **Subject:** | Demand for Arbitration to China Brands Group |
| **Attachments:** | 2023-08-30 Letter from Jessica Corpuz to Bo Zheng - Demand for Arbitration.pdf |

Counsel,

Please see the attached correspondence from Jessica Corpuz.

We are sending this letter to you as counsel of record for Grand Union out of an abundance of caution. Please confirm by no later than 5:00pm PDT on Thursday, August 31, 2023 that you are authorized to accept this letter on behalf of Mr. Zheng. If we do not hear from you by then, we will send this letter to Mr. Zheng directly.

Thank you.

**Denise Thurman**
Assistant to Jessica R. Corpuz, Gary A. Waldron
and Jacqueline M. Simonovich

**weintraub | tobin**
Direct (310) 860-3353 | Email: dthurman@weintraub.com

# EXHIBIT 3

## Denise Thurman

| | |
|---|---|
| **From:** | Denise Thurman |
| **Sent:** | Friday, September 1, 2023 9:03 AM |
| **To:** | 'bo.zheng@chinabrandsgroup.com.cn' |
| **Cc:** | Jessica R. Corpuz; Kavan J. Jeppson |
| **Subject:** | Demand for Arbitration to China Brands Group |
| **Attachments:** | 2023-08-30 Letter from Jessica Corpuz to Bo Zheng - Demand for Arbitration.pdf |

Mr. Zheng,

Please see the attached correspondence from Jessica Corpuz. A hard copy of this letter will follow.

Thank you,

**Denise Thurman**
Assistant to Jessica R. Corpuz, Gary A. Waldron
and Jacqueline M. Simonovich

**weintraub | tobin**
Direct (310) 860-3353 | Email: dthurman@weintraub.com

# EXHIBIT C

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4002658.DOCX:}
1
DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

weintraub tobin chediak coleman grodin
LAW CORPORATION

I, Stanley Yook-Loong Wan, declare and state as follows:

1.    I am the Director of Paul Frank Limited, Petitioner in the above-captioned case ("Paul Frank") and the Chief Executive Officer of Futurity Brands Switzerland AG ("Futurity"), the parent company of Paul Frank.  This declaration is based upon facts within my knowledge, and I could competently testify to such facts if called upon to do so as a witness.

2.    This Declaration is made in support of Paul Frank's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration ("Petition").

3.    Paul Frank is a corporation organized under the laws of Hong Kong, China, with its principal place of business in Hong Kong, China.

4.    Paul Frank acquired the rights to the Paul Frank® brand from Saban Brands Entertainment Group ("Saban") in 2020.

5.    Attached hereto as Exhibit 1 is a true and correct copy of the Master License Agreement dated January 1, 2015 (the "MLA").  The MLA was negotiated on behalf of Paul Frank by Saban, which held the rights to the Property at the time of the MLA.

6.    The other signatory to the MLA is Grand Union Trading Limited ("Grand Union").

7.    Grand Union's parent company, agent, and alter ego is Respondent China Brands Group ("CBG").

8.    Attached hereto as Exhibit 2 is a true and correct copy of the Schedules and Exhibits to the Master License Agreement dated January 1, 2015.

9.    Attached hereto as Exhibit 3 is a true and correct copy of the First Amendment to Master License Agreement dated April 27, 2018.  The First Amendment was negotiated by Bo Zheng.

10.    Attached hereto as Exhibit 4 is a true and correct copy of the Second Amendment to Master License Agreement dated August 19, 2021.  The Second Amendment was negotiated by Bo Zheng.

11.    Attached hereto as Exhibit 5 is a true and correct copy of the Third Amendment to Master License Agreement dated February 10, 2022.  The Third Amendment was negotiated by Bo Zheng.

12.    Attached hereto as Exhibit 6 is a true and correct copy of an email I received on July 21, 2022 with the subject line "Notice of Material Breaching and Fruther [sic] Steps."

13.     Attached hereto as Exhibit 7 is a true and correct copy of an attachment to Exhibit 6, a Letter dated July 21, 2022 with the subject "Notice of Material Breaching and Further Steps."

14.     Attached hereto as Exhibit 8 is a true and correct copy of an email I received on August 24, 2022 with the subject line "Notice of Termination."

15.     Attached hereto as Exhibit 9 is a true and correct copy of an attachment to Exhibit 8, Letter dated August 24, 2022 with the subject "Notice of Termination."

16.     Attached hereto as Exhibit 10 is a true and correct copy of an email I received on September 23, 2022 with the subject line "Re: Notice of Termination."

17.     Attached hereto as Exhibit 11 is a true and correct copy of an attachment to Exhibit 10, a Letter dated September 23, 2022 with the subject "Termination of Master License Agreement."

18.     Attached hereto as Exhibit 12 is a true and correct copy of an email I received on June 20, 2021 with the subject line "Notice of Termination."

19.     Attached hereto as Exhibit 13 is a true and correct copy of an attachment to Exhibit 12, a Letter dated June 21, 2021 with the subject "Notice of Termination."

20.     Attached hereto as Exhibit 14 is a true and correct copy of Paul Frank's Demand for Arbitration, filed in the underlying arbitration with Grand Union, JAMS Reference No. 5220002118 (the "Arbitration") on November 22, 2022.

21.     Attached hereto as Exhibit 15 is a true and correct copy of Grand Union' Response to Paul Frank's Demand for Arbitration and Counterclaims, filed in the Arbitration on December 16, 2022.

22.     Attached hereto as Exhibit 16 is a true and correct copy of Grand Union's Application for Interim Relief, filed in the Arbitration on March 24, 2023.  Grand Union also filed exhibits in support of its Application for Interim Relief.  They are not included herein due to size, but are available on request.

23.     Attached hereto as Exhibit 17 is a true and correct copy of the First Witness Statement of Zheng Tao (the "Tao Zheng Statement"), filed in the Arbitration on March 24, 2023.

24.     Attached hereto as Exhibit 18 is a true and correct copy of the First Witness Statement of Jennifer Huang ("Huang Witness Statement"), filed in the Arbitration on March 24, 2023.

25.     Attached hereto as Exhibit 19 is a true and correct copy of Paul Frank's Motion for Leave

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

to Amend Demand for Arbitration ("Motion for Leave to Amend"), filed in the Arbitration on April 27, 2023.

26. Attached hereto as Exhibit 20 is a true and correct copy of the Declaration of Jessica R. Corpuz, filed in the Arbitration on April 27, 2023. Exhibit 1 to the Declaration contains a copy of Paul Frank's proposed Amended Demand for Arbitration, excluding the Exhibits thereto. Exhibit 2 to the Declaration contains a redline comparison of Paul Frank's original Demand for Arbitration to Paul Frank's proposed Amended Demand for Arbitration.

27. Attached hereto as Exhibit 21 is a true and correct copy of Paul Frank's Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction ("Paul Frank Preliminary Injunction Brief"), filed in the Arbitration on April 27, 2023. Paul Frank also filed exhibits in support of its brief. They are not included herein due to size, but are available on request.

28. Attached hereto as Exhibit 22 is a true and correct copy of the Declaration of Stanley Yook-Loong Wan, filed in the Arbitration on April 27, 2023.

29. Attached hereto as Exhibit 23 is a true and correct copy of the Declaration of Hana Mu, filed in the Arbitration on April 27, 2023.

30. Attached hereto as Exhibit 24 is a true and correct copy of Grand Union's Opposition to Paul Frank's Motion for Leave to Amend, filed in the Arbitration on May 23, 2023.

31. Attached hereto as Exhibit 25 is a true and correct copy of the First Witness Statement of Zheng Bo (the "Bo Zheng Statement"), filed in the Arbitration on May 23, 2023.

32. Attached hereto as Exhibit 26 is a true and correct copy of Paul Frank's Reply in Support of Motion for Leave to Amend, filed in the Arbitration on May 30, 2023.

33. Attached hereto as Exhibit 27 is a true and correct copy of the Declaration of Hana Mu, filed in the Arbitration on May 30, 2023.

34. Attached hereto as Exhibit 28 is a true and correct copy of Grand Union's Reply Brief in Support of Application for Interim Relief and Opposition to Claimant's Motion for Preliminary Injunction. Grand Union also filed exhibits in support of its brief. They are not included herein due to size, but are available on request.

35. Attached hereto as Exhibit 29 is a true and correct copy of the Second Witness Statement of Zheng Bo ("Second Bo Zheng Statement"), filed in the Arbitration on June 5, 2023.

36. Attached hereto as Exhibit 30 is a true and correct copy of the Arbitrator's Ruling on Paul Frank Limited's Motion for Leave to Amend, filed in the Arbitration on June 6, 2023.

37. Attached hereto as Exhibit 31 is a true and correct copy of Paul Frank's Reply in Support of Motion for Preliminary Injunction, filed in the Arbitration on June 27, 2023. Paul Frank also filed exhibits in support of its brief. They are not included herein due to size, but are available on request.

38. Attached hereto as Exhibit 32 is a true and correct copy of the Supplemental Declaration of Stanley Yook-Loong Wan, filed in the Arbitration on June 27, 2023.

39. Attached hereto as Exhibit 33 is a true and correct copy of the Ruling on Claimant's and Respondent's Applications for Interim Preliminary Injunctive Relief, filed in the Arbitration on July 18, 2023.

40. The Arbitration is presently set for hearing on January 29, 2024.

41. Attached hereto as Exhibit 34 is a true and correct copy of the Demand for Arbitration that Paul Frank served on CBG on August 30, 2023. CBG has not responded to the Demand for Arbitration.

42. Attached hereto as Exhibit 35 is a true and correct copy of an email I received on September 1, 2021 with the subject line "Notice of Termination – Indemnification Claim."

43. Attached hereto as Exhibit 36 is a true and correct copy of an email I received on September 17, 2021 with the subject line "Re: Notice of Termination – Indemnification Claim."

44. Grand Union itself does not have any employees. Paul Frank has dealt exclusively with employees of CBC, since the signing of the MLA.

45. All email communications relating to the Paul Frank property are with individuals with email addresses containing the domain name @chinabrandsgroup.com.cn. Paul Frank has never communicated with any person with an email address containing the domain "@grandunion" or any similar name.

46. Grand Union does not maintain any physical offices. The physical address specified in Section 29 of the Second Amendment, No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China,

is an office maintained by CBG.

47. CBG also uses the name Hongfang Culture Co., Ltd. or "Hongfang."

48. Attached hereto as Exhibits 37 and 38 are true and correct copies printouts of the National Enterprise Credit Information Publicity System ("NECIPS"), dated April 7, 2023, for China Brands Group, in English and Chinese. NECIPS is a publicly-accessible national database for all legal entities registered in China. NECIPS is accessible in both English and Chinese.

49. Attached hereto as Exhibits 39 and 40 are true and correct copies of translations of news articles about CBG, accessed on April 3, 2023. Exhibits 39 and 40 were previously attached as Exhibits 79 and 81 to Paul Frank's Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction, filed in the Arbitration on April 27, 2023

50. Attached hereto as Exhibits 41 and 42 are true and correct copies of the Civil Statement of Claim filed by CBG in Intermediate People's Court of Court of Tsingdao City of Shandong Province, Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") on October 14, 2022, in both English and Chinese.

51. CBG did not give Paul Frank notice of the China Lawsuit. Paul Frank was unaware of the China Lawsuit until, in January 2023, Paul Frank attempted to update license information for one of its trademarks. It was informed by the trademark office that it could not do so because the trademark was blocked. Paul Frank investigated to determine why the trademarked was blocked, and discovered that CBG had filed the China Lawsuit.

52. Attached hereto as Exhibits 43 and 44 are true and correct copies of the Agreement on Jurisdiction filed by CBG in the China Lawsuit on October 9, 2022, in both English and Chinese.

53. Attached hereto as Exhibits 45 and 46 are true and correct copies of the Civil Ruling issued by the Intermediate People's Court of Court of Tsingdao City of Shandong Province on November 21, 2022, in both English and Chinese.

54. Shortly after the lawsuit was filed, CBG filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard.

weintraub tobin chediak coleman grodin
LAW CORPORATION

{4002658.DOCX:}

6

DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

DocuSign Envelope ID: 85514876-BCC3-4932-A2F7-E9361FE40124

55. Attached hereto as Exhibits 47 and 48 are true and correct copies of the Investigation Transcript for the Confirmation of Domicile of Grand Union International Trading Limited given by Bo Zheng on March 15, 2023, in both English and Chinese.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on Sep 10, 2023 | 5:09 PM PDT, at Singapore.

Stanley Yook-Loong Wan

Stanley Yook-Loong Wan

weintraub tobin chediak coleman grodin
LAW CORPORATION

{4002658.DOCX:}

7

DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

**[EXHIBITS 1 – 16]**

weintraub tobin chediak coleman grodin
LAW CORPORATION

# EXHIBIT 1

# MASTER LICENSE AGREEMENT

This Master License Agreement ("**Agreement**") is made as of the Effective Date between Paul Frank Industries LLC ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Any reference herein to a Schedule or Exhibit shall refer to the applicable Schedules or Exhibits attached to this Agreement, which are incorporated herein and made a part of this Agreement; and any capitalized terms used in this Agreement shall have the meaning ascribed to them in the Schedules or Exhibits or the body of the Agreement, as applicable.

WHEREAS, Licensor owns all right, title and interest in and to the Paul Frank Intellectual Property listed in Exhibit 1 to this Agreement (as amended from time to time to update the status of Intellectual Property applications and registrations) and the Core IP, including all related trademarks, designs, copyrights and other intellectual property as may be designated in writing by Licensor from time to time for use by Licensee under this Agreement (collectively, the "**Property**"); and

WHEREAS, Licensee desires to obtain the right to utilize the Property and modifications to the Core IP in connection with Licensed Products and Licensed Services pursuant to the terms and conditions as specifically set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, Licensor and Licensee hereby agree as follows:

1. <u>License</u>.

(a) Licensor hereby grants to Licensee an exclusive, sublicenseable, and non-transferable license under the Property and modifications to the Core IP to (i) design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer Licensed Products in the Territory and the Channels of Distribution and (ii) provide Licensed Services in the Territory and during the License Period (all together, the "**License**").

(i) The License granted in this Section 1 does not cover any Derivative Property (e.g., Julius Jr.); provided, however, that during the License Period and provided that Licensee is not then in Material Breach of this Agreement, Licensee shall have a forty-five (45)-day right of first negotiation to license the Julius Jr. property, subject to: (A) Licensor making Julius Jr. available in the Territory, which Licensor may do in its sole discretion; and (B) the parties reaching agreement on the license terms within forty-five (45) days of the date that Licensor notifies Licensee of its decision to make Julius Jr. available in the Territory.

(ii) By way of example, and without limitation, modifications to the Core IP include a modification of the Julius design having a frown instead of a smile.

(b) During the License Period, Licensee shall have the right to grant sublicenses to third parties, solely and only in connection with the design, development,

manufacture, marketing, promotion, distribution, advertising, offer for sale of, sale of, providing, and otherwise offering one or more Licensed Products or the provision of Licensed Services in the Territory, subject to the following conditions:

(i) every sublicensee ("**Sublicensee**") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services;

(ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;

(iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;

(iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;

(v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

(c) Every Assigned License Agreement shall be deemed to be a Licensor-approved sublicense agreement and each licensee thereto shall be deemed to be a Sublicensee as of June 1, 2015. Any payments paid by the licensees under those Assigned License Agreements and that arise from actions or sales that occurred prior to June 1, 2015 shall be governed by Schedule J, Paragraph 4.

2. <u>Territory and Channels of Distribution</u>.

(a) The License granted herein is limited to the Territory. Except as otherwise provided in this Agreement, no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory. This Agreement shall not be interpreted and the rights granted herein shall not be exercised in a manner as would contravene any provision of any national anti-trust or restrictive practice legislation in the Territory.

(b) Licensee may sell or distribute Licensed Products to authorized Paul Frank retail stores located outside the Territory with the prior written approval of Licensor and subject to payment to Licensor of a market-rate royalty, to be agreed upon by Licensor and Licensee.

(c) The License granted herein for Licensed Products is limited to the Channels of Distribution.

3. License Period. License Period shall have the meaning set forth in Schedule C.

4. Payment Terms.

(a) Licensee shall pay to Licensor such sums as set forth, with payment dates, in Schedule D. Except as otherwise provided herein, no portion of the license fees shall be refundable or returnable to Licensee, regardless of the circumstances.

(b) To the extent that any Withholding Taxes are imposed in the Territory and if Licensee timely provides Licensor with a Withholding Tax receipt referred to below, then Licensee shall be entitled to deduct Withholding Taxes from the license fees, provided that the total Withholding Tax, if any, applicable to any fees paid under this Agreement shall be capped at 4.5% of the total fees paid. Licensee shall, within a reasonable time after the receipt thereof by Licensee, furnish to Licensor the original or a certified copy of a tax certificate from the governmental authority to which the Withholding Taxes were paid evidencing payment of the Withholding Taxes, sufficient for Licensor to claim a foreign tax credit on its respective U.S. income tax return, if applicable. If the actual Withholding Tax is greater than 4.5%, Licensee shall gross up any payment due hereunder such that Licensor shall have netted and actually received 95.5% of any payment earned or owed hereunder. Licensee will be responsible for any penalties, interest, charges and damages resulting from Licensee's failure to properly withhold and pay such Withholding Taxes to the applicable taxing authority. "**Withholding Tax**" means a tax imposed by the taxing authority in the Territory that is levied on Licensee as withholding agent of Licensor for the purpose of paying income taxes due to such taxing authority by Licensor as a result of the license fees payable by Licensee to Licensor pursuant to this Agreement.

(c) Licensee shall bear all costs and expenses of any currency conversion to U.S. Dollars and the risk of any currency fluctuation. No cost, expense or risk related to a currency conversion shall reduce any amount payable to Licensor pursuant to this Agreement.

5. Licensor Agent. Licensor may, after prior written notification to Licensee, delegate its rights and obligations hereunder to any third party designated by Licensor ("**Licensor's Agent**"), provided that Licensor's Agent shall not be a direct competitor of Licensee.

6. Statements.

(a) Licensee shall, on or before the thirtieth (30th) day after the end of each calendar quarter, commencing with the first calendar quarter (or partial calendar quarter) ending after the Effective Date, furnish Licensor complete and accurate statements in English ("**Quarterly Statements**"), specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, during such quarter, and any additional non-financial information reasonably requested by Licensor from time to time. The Quarterly Statement will also report the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof.

(b) Licensee shall maintain and make available to Licensor, no more than once during any two year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

7. Licensed Products, Packaging, Promotional Material and Advertising Approvals.

(a) Pre-production Concepts, Designs, etc. As early as possible, but in no event later than the date requested by Licensor, Licensee shall submit to Licensor for Licensor's review and written approval all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("**SKU**") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee). Such approval cannot be unreasonably withheld by Licensor, provided that if Licensor does not provide its approval or disapproval of any such concepts, artwork, or SKU within ten (10) Business Days after it is submitted for approval, such concepts, artwork, or SKU shall be deemed disapproved. Thereafter, Licensee may notify Licensor of Licensor's deemed disapproval and Licensor shall then have five (5) Business Days to approve or disapprove such concepts, artwork, or SKU, provided that if Licensor does not provide its approval or disapproval of such concepts, artwork, or SKU within five (5) Business Days thereafter, such concepts, artwork, or SKU shall be deemed approved. Notwithstanding the foregoing, Licensor shall not disapprove of more than twenty percent (20%) of all concepts, artwork, or SKUs submitted for approval in any semi-annual period during the License Period.. Any pre-production approval Licensor may grant will not constitute or imply a representation or belief by Licensor that such materials comply with any applicable laws.

(b) Approvals. Licensee shall ensure that all Licensed Products, as well as packaging, promotional, marketing and advertising material therefor, whether produced by or for Licensor or by or for any Sublicensee maintain the same level of quality and style heretofore associated with Licensed Products and that serve to maintain and uphold the goodwill associated with the Property. In this connection, from time to time, at the reasonable request of Licensor, Licensee shall provide Licensor, at no cost to Licensor, samples of designs, concepts, prototypes, finished Licensed Products as well as packaging, promotional, marketing and advertising material therefor, so that Licensor can confirm that such standards are being upheld by Licensee and all Sublicensees. If Licensor finds any such materials to be deficient in such manner that in Licensor's reasonable discretion the quality or style standards for Licensed Products are not being upheld, or the goodwill associated with the Property is likely to suffer, Licensor shall so inform Licensee and Licensee shall promptly correct, or cause its manufacturers or Sublicensees (as the case may be) to correct, such deficiencies. All Licensed Products, advertising and marketing materials, and packaging shall contain the legends set forth in Exhibit 2 hereto or such other legends approved in writing by Licensor.

(c) Labels, Tags, etc. Licensor has designed character artwork or a brand name logo(s), or both, to be used by all licensees in connection with the packaging of all merchandise using the Property and, if applicable, on hang tags and labels for such merchandise. Licensor will supply Licensee with reproduction artwork thereof, and Licensee agrees to use and to cause Sublicensees to use, such artwork or logo(s) on the packaging of Licensed Products, and, if applicable, on hang tags and garment labels, which Licensee and Sublicensees will have printed and attached to each Licensed Product at Licensee's or Sublicensee's cost. Licensor shall

supply Licensee with new artwork or new brand name logo(s) for the Property, or both, as appropriate; provided, however, that Licensee shall have reasonable time upon receiving Licensor's notice to complete the transition to the use of new packaging, hang tags and garment labels, and shall be entitled to continue to sell all remaining inventory through all Channels of Distribution within such reasonable time.

(d) Certain Licensor Remedies. The rights granted hereunder do not permit Licensee or any of its manufacturers or Sublicensees to sell or otherwise distribute any "seconds" or "irregulars" or any damaged, imperfect/irregular, defective or substandard inventory of Licensed Products.

(e) Deviation or Variation by Licensee. Licensee shall not, after having received Licensor's written approval of any Licensed Products, advertising, promotional and/or packaging materials, cause or permit any deviation or variation in the artwork, design, quality or style of Licensed Products, advertising, promotional and/or packaging materials without Licensor's approval in writing prior to any such deviation or variation. Licensee acknowledges that Licensor may disapprove any SKU of Licensed Products or a production run of any SKU of Licensed Products because the quality, the standard of which shall be established reasonably based on the applicable local laws and regulations, is unacceptable to Licensor. Licensor will not unreasonably object to any change in the design of Licensed Products or in the materials used in the manufacture of Licensed Products or in the process of manufacturing Licensed Products that Licensee advises Licensor in writing is necessary to make Licensed Products safer or more durable.

(f) Certain Representations and Warranties Relating to Quality. Licensee represents and warrants that:

(i) each of the Licensed Products and components thereof shown, marketed, manufactured, distributed or sold shall be of good quality and free of defects in design, materials and workmanship, and shall comply with all applicable laws, and such specifications, if any, as may have been reasonably specified by Licensor, and shall conform to the samples thereof approved by Licensor;

(ii) both before and after Licensee puts Licensed Products on the market, Licensee shall follow reasonable and proper testing procedures for safety testing so that Licensed Products comply with all applicable product safety laws, and shall permit Licensor's designees to inspect testing and quality control records and procedures, including requesting copies of general conformity certificates of Licensee, no more than two (2) times per year. Licensor shall use reasonable efforts in scheduling and conducting any such inspection to minimize disruption of Licensee's ordinary business. Licensee agrees to promptly reimburse Licensor for the actual costs of such testing as to any of the Licensed Products not tested by Licensee. Licensee shall also give due consideration to any recommendations by Licensor that Licensed Products exceed the requirements of applicable laws. Licensed Products not manufactured, packaged or distributed in

accordance with applicable laws shall be deemed deficient and shall not be shipped unless and until they have been brought into full compliance therewith;

(iii) Licensee shall comply with all applicable laws in performing this Agreement, including but not limited to, those pertaining to the manufacture, pricing, sale and distribution of Licensed Products (including, without limitation, such associated with environmental protection, minimum wages, child labor, health and the safety in the work place, and advertising and labeling, and product safety), and upon Licensor's reasonable request, which is no more than two (2) times per year, Licensee shall provide Licensor with all the appropriate documentation related thereto at Licensor's cost. In addition, Licensee shall manufacture, market, distribute and sell Licensed Products in an ethical manner and in accordance with the provisions and the intent of this Agreement, and shall not engage in unfair or anti-competitive business practices.

(g) Code of Conduct for Manufacturers. Licensee shall require all manufacturers to sign and date and covenant to comply with **Exhibit 4**, the Code of Conduct for Manufacturers, and Exhibit 5, the Approval of Manufacturer, in the manufacturing, packaging and distribution of Licensed Products. The Code of Conduct for Manufacturers as well as the Approval of Manufacturer shall not be interpreted to require Licensee or its manufacturers to violate any applicable law. As provided in the Code of Conduct for Manufacturers and the Approval of Manufacturer, Licensee, for itself and on behalf of its manufacturers, agrees that Licensor and Licensor's designated agents that are not direct competitors of Licensee may engage in monitoring activities to confirm compliance with this Section 7.

(h) Code of Conduct for Licensees. Licensee shall comply with the Code of Conduct for Licensees, attached hereto as **Exhibit 6** and incorporated herein by this reference. This includes, but is not limited to, taking appropriate steps, in consultation with Licensor, and as required by Licensor's compliance program for licensees, to develop, implement and maintain procedures to evaluate and monitor the manufacturers it uses to manufacture Licensed Products or components thereof, and to use best efforts to ensure compliance with this sub-clause (h), including but not limited to, unannounced on-site inspections of manufacturing, packaging and distribution facilities and employer-provided housing, reviews of books and records relating to employment matters and private interviews with employees.

(i) Collateral Materials and Works Made for Hire.

(i) To the extent materials, artwork, cover design, photographs, packaging, literary text, advertising and promotional materials, works of authorship, and the goodwill pertaining thereto ("**Collateral Materials**") concern or incorporate the Property or Derivative Property, as defined in Section 9 below, and are created pursuant to this Agreement, all elements thereof shall be "works made for hire" (as the term is defined in the U.S. Copyright Act of 1976, as amended), or its equivalent under other applicable laws in the Territory, and Licensor shall be the sole owner thereof from creation.

(ii) If Licensee engages one or more parties to create all or any part of any Collateral Materials concerning or incorporating the Property or Derivative

Property, Licensee shall use an appropriate written agreement under which Licensor and/or its designee shall be deemed the sole author of all such Collateral Materials, including the registration of copyrights in such Collateral Materials in the name of Licensor, and all ownership rights therein will be made to vest in Licensor and/or its designee upon creation. Licensee hereby acknowledges that all works made for hire are the sole property of Licensor and/or its designee, and at all times remain in the name and control of Licensor.

(iii) Any Collateral Materials that concern or incorporate the Property or Derivative Property created by an employee-for-hire shall be under Licensee's sole supervision, responsibility, direction, control and monetary obligation. If any part or element of any such Collateral Materials, or any right, title or interest therein, is acquired by or licensed to Licensee from any other person, or if any non-employee of Licensee contributes to the creation of any such work, or if, for any reason, any such work does not qualify as a "work made for hire," Licensee shall obtain and shall deliver to Licensor, a written assignment, in form and substance satisfactory to Licensor, by which all right, title and interest in and to the applicable Collateral Materials that concern or incorporate the Property or Derivative Property throughout the universe, in perpetuity, in all media now known or hereafter devised, vest in Licensor exclusively, irrevocably, and unconditionally, free and clear of any and all claims, encumbrances, rights, titles or interests of any kind or nature whatsoever. Upon the request of Licensor, at any time and from time-to-time, Licensee shall submit to Licensor, for Licensor's approval, copies of all such agreements prior to use thereof. Licensee shall not permit any such person to obtain or reserve, by any means or method whatsoever, any rights as an "author" or "inventor" of any such work (as such terms are defined in any applicable law).

(j) Third Party Rights. If and as applicable, the likenesses and product application of the characters used on or in connection with the Licensed Products are subject to any third party approvals Licensor deems necessary to obtain, Licensor will act as the liaison with such third parties during the approval process.

8. Use of Property. Use by Licensee of the Property shall be governed by the following additional conditions:

(a) Licensee shall limit its use of the Property to the Territory, in the Channels of Distribution and to Licensed Products and the Licensed Services, all in accordance with this Agreement and according to processes, specifications and other quality standards established or approved by Licensor for the Licensed Products in connection with which the Property is used.

(b) In order that Licensor may be assured that the provisions of this Agreement are being observed, Licensee shall allow Licensor or its designee to enter upon Licensee's premises (as well as the premises of all contract manufacturers and all facilities where Licensed Products and/or packaging are produced or located) during regular business hours, upon not less than five (5) days' notice, for the purpose of inspecting Licensed Products and the facilities in which the Licensed Products are manufactured and packaged. In the event that the quality standards as may be reasonably established by Licensor based on the applicable local

laws and regulations from time-to-time, are not maintained throughout the period of manufacture of any Licensed Products hereunder, then, upon written notice from Licensor, Licensee shall immediately discontinue the manufacture and distribution of those specific Licensed Products that do not meet such quality standards and shall not resume the manufacture and distribution of such Licensed Products until the quality standards are again met and approved by Licensor.

(c) Licensee shall display any trademarks in the Property only in such forms set forth in Exhibit 1, unless otherwise approved by Licensor in writing. Licensee also agrees that it shall cause to appear on all material on or in connection with which the Property is used, such legends, markings and notices as Licensor may reasonably request in order to give appropriate notice of any Property, trademarks, trade name or other rights therein or pertaining thereto.

(d) Licensee shall use no markings other than the legends set forth in Exhibit 2, as appropriate, on and in connection with Licensed Products, advertising and marketing materials, and packaging without first obtaining Licensor's written approval.

(e) All rights in the Property other than those specifically granted herein are reserved to Licensor for its own use and benefit. Licensee acknowledges that it shall not acquire any rights of whatsoever nature in the Property as a result of Licensee's use thereof, and that all use of the Property by Licensee shall inure to the benefit of Licensor. In addition, Licensor shall solely and exclusively own all other rights in, derived from, under or related to the Property.

(f) Upon the termination of the License Period of this Agreement, all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement.

9. Ownership and Protection of Property.

(a) Licensee recognizes the great value of the publicity and goodwill associated with the Property and acknowledges that such goodwill associated with the Property belongs exclusively to Licensor and that the trademarks included within the Property that may at one time have had a non-trademark primary meaning have acquired a secondary meaning in the mind of the purchasing public. Licensee further acknowledges that all rights in any new versions, translations, rearrangements, or derivations, or other changes in any Property that may be created by, for or on behalf of Licensee in connection with the License and/or this Agreement shall be and shall remain the exclusive property of Licensor and such new versions, translations, rearrangements or derivations, if licensed by Licensor to Licensee hereunder, shall be subject to the provisions and conditions of this Agreement.

(b) Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property or attack the validity of this Agreement or breach the confidentiality of the terms of this Agreement.

(c) Licensee, at its cost and in accordance with applicable laws, will be responsible for actively monitoring the Territory to identify misuses of the Property, and shall undertake all actions reasonably necessary or advisable to protect the Property, including

conducting investigations, raids, administrative actions, enforcement actions, anti-counterfeiting actions, litigation, and any other suit, action or proceeding with respect to claims for infringement or imitation of the Property. To this end, Licensee will provide to Licensor a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter. Independently of issuing the quarterly reports, Licensee shall promptly notify Licensor in writing of any significant manufacture, distribution, sale or advertisement for sale of any product of the same general type or class as the Licensed Products that Licensee believes may constitute an infringement upon Licensor's rights or an unauthorized use of the Property. Licensor may, in its sole discretion, and at its cost, commence, prosecute or institute any suit, action or proceeding with respect to claims for infringement or imitation of the Property or instead Licensor may request that Licensee take such action at Licensee's cost, using legal counsel reasonably acceptable to Licensor. The damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements. Licensee shall assist Licensor to such extent as Licensor reasonably requests in protecting the Property. Specifically, Licensee agrees to give testimony, provide exhibits, provide facts and otherwise cooperate with Licensor. Licensee shall not have any rights against Licensor for damages or otherwise by reason of any determination by Licensor not to act or any settlement to which Licensor may agree with respect to any alleged infringements or imitations by others of the Property and/or Licensed Products, nor shall any such determination of Licensor or such settlement by Licensor affect the validity or enforceability of this Agreement. Notwithstanding the foregoing, to the extent necessary to maintain any suit, action or proceeding to enforce the Property, Licensor shall, at Licensee's request join the suit action or proceeding as a party.

(d)     Licensor shall use best efforts to: (i) register and maintain the registration for all Core IP in the Territory; (ii) take legal or administrative action to oppose or cancel the application for or registration of trademarks that are confusingly similar to "Paul Frank" or the Julius design; (iii) permit Licensee to take such actions, at Licensee's expense, if Licensor chooses not do so; (iv) provide Licensee with a report each calendar quarter identifying all trademarks in the Territory known to Licensor and that are confusingly similar to the Core IP, describing the actions, if any, taken by Licensor against such trademarks in the Territory.

(e)     Without Licensor's express prior written consent, Licensee shall not use the Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property as a corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee or as a URL or social media name or identifier, whether in Western or Chinese characters, except that Licensee is licensed and entitled to use the Property in signage in relation to providing Licensed Services.

(f)     Except as expressly authorized by Licensor in writing (and then only to the extent of, and subject to the terms of, such written authorization), Licensee shall not (i) join any names, words, symbols, designs, trademarks, service marks, characters, likenesses, or any other literary or artistic elements, with the Property or Derivative Property so as to form a new or derived trademark, (ii) make, or authorize to be made, any use, directly or indirectly, of any variation of the Property or Derivative Property, or (iii) use the Property or Derivative Property in connection with any cross collaboration or cross licensing programs with third party designs, brands, trademarks, copyrights, properties and/or otherwise.

(g) If Licensee obtains any rights in the Property or Derivative Property for whatever reason, then Licensee shall, at Licensor's expense, execute any instrument and assist Licensor in every proper way in order to fully assign or transfer such rights to Licensor. Licensee hereby irrevocably appoints Licensor as Licensee's attorney-in-fact, with full authority in the place and stead of Licensee and in the name of Licensee, to take any action and/or to execute, acknowledge and/or deliver any instrument that may be necessary to evidence, establish, protect, perfect, record, register, enforce, defend or secure any or all of Licensor's right, title, property and interest with the same legal force and effect as if originally executed by Licensee. Licensee hereby waives and irrevocably quitclaims to Licensor any and all claims for infringement of any and all rights assigned to Licensor.

(h) **Right of First Negotiation.** Prior to selling, assigning, transferring, or otherwise divesting all or substantially all of Licensor's ownership interest in the Property in the Territory apart from the rights in the Property in other jurisdictions, Licensee shall have a thirty (30)-day right of first negotiation to acquire from Licensor such ownership interest on terms and conditions to be negotiated by the parties. For avoidance of doubt, either the direct or indirect sale of the Licensor or a sale of rights in the Property in the Territory together with rights in the Property in other jurisdictions shall not trigger this right of first negotiation. The parties shall begin their negotiations no later than five (5) days following Licensee's receipt of written notice from Licensor that Licensor intends to sell, assign or transfer its ownership interest in the Property in the Territory. If Licensor and Licensee fail to reach agreement on the terms and conditions of Licensee's acquisition of all or substantially all of Licensor's ownership interest in the Property in the Territory within thirty (30) days from the commencement of the negotiations, this right of first negotiation shall terminate and Licensor shall be free to sell, assign, transfer or otherwise divest its ownership interest in the Property to one or more third parties other than Licensee.

10. Distribution and Marketing of Licensed Products.

(a) Licensee shall exercise commercially reasonable best efforts to manufacture sufficient quantities of Licensed Products to meet the market demand for Licensed Products and shall diligently and continuously manufacture, distribute and offer for sale Licensed Products (including all lines or categories thereof) to fulfill orders for Licensed Products. From and after the Marketing Date, Licensee shall diligently market and promote the sale of all Licensed Products (including all lines or categories thereof) continuously during the License Period; provided that Licensee shall not advertise in any publication or communications medium that could damage the goodwill or reputation of the Property in any way or manner.

(b) Except otherwise provided in this Agreement, Licensee shall distribute and sell Licensed Products outright at a competitive price and not on approval, consignment, sale or return basis, and only via authorized Channels of Distribution, and only to retail stores (within the authorized Channels of Distribution) for sale to the public. Unless otherwise provided in this Agreement, Licensee shall not knowingly without the express prior written consent of Licensor distribute or sell Licensed Products to distributors, wholesalers, jobbers, sponsors of a radio or television program or retail stores or merchants whose sales or distribution are or will be made for publicity or promotional tie-in purposes, combination sales, premiums, giveaways or similar methods of merchandising or whose business methods and practices are questionable, or who are not included within the authorized Channels of Distribution.

(c)    Licensee shall use its commercially reasonable best efforts to market and promote Licensed Products during the License Period throughout the Territory and, in doing so, shall ensure that its marketing and advertising efforts are in good taste and will be no less extensive in scope, depth, and quality than any of Licensee's other "top-tier" licensed titles or brands.

(d)    Upon Licensor's request from time-to-time during the License Period, Licensee shall sell to Licensor reasonable quantities, as determined jointly by Licensee and Licensor, at a price equal to Licensee's actual costs; provided, however, that Licensed Products purchased by Licensor pursuant to this subsection (d) shall be used for promotional purposes only and not resold in any way.

(e)    Notwithstanding any other term or provision of this Agreement, Licensor shall be permitted to enter into collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property, whether or not such are in product categories included in Licensed Products hereunder, in the Territory and/or during the License Period, provided that such collaboration does not materially adversely affect Licensee's exclusive rights under Section 5 of Schedule J of this Agreement, or otherwise materially adversely affect Licensee's rights under this Agreement.

(f)    Notwithstanding any other term or provision of this Agreement, Licensee shall be permitted to enter into collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property, in the Territory and/or during the License Period, provided that Licensee obtains Licensor's prior written consent that shall not be unreasonably withheld.

(h)    Other than in Paul Frank-branded stand-alone Premium Retail Stores controlled by Licensee or Sublicensees, Licensee shall not (i) sell or otherwise provide Licensed Products for use as premiums, promotions, giveaways, fund-raisers, or prizes in sweepstakes, (ii) except as otherwise agreed in Schedule G, sell Licensed Products by or use direct mail and marketing methods to sell Licensed Products or sell Licensed Products to third parties that sell by or use direct marketing methods or door-to-door solicitation or unapproved marketing methods or home shopping television programs without the prior written consent of Licensor.

(i)    "Dumping" means the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products; provided however, that nothing contained herein shall be deemed to restrict Licensee's ability to set product prices at Licensee's discretion. In consideration of the rights granted to Licensee herein and in recognition of Licensor's interest in maintaining a stable and viable market for Licensed Products, Licensee shall use best efforts to avoid Dumping any Licensed Products during the Licensed Period and the Sell-Off Period, and shall provide Licensor with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products; provided, however, that such annual sales reports shall not include information on returns, rebates, or incentives.

11. <u>Marketing Date.</u> Licensee shall commence in good faith the manufacture, shipping, marketing and sale in substantial quantities of Licensed Products (including all lines or categories thereof) in the Territory no later than the date set forth in <u>Schedule F</u>..

12. <u>Music and Other Rights</u>. Except as specifically designated in writing by Licensor, neither musical compositions, nor musical recordings, nor any video clips, nor any name, voice, or likeness of any actor or musical performer associated with the Property are licensed under this Agreement. In the event that Licensee wishes to use such materials in connection with Licensed Products and/or the advertising or packaging therefor and Licensor approves such use, Licensee will be solely responsible for securing any and all permissions (e.g., from the appropriate music publisher or collection society, or from the applicable performer for use of name, voice or likeness) required in connection with Licensee's use thereof before manufacturing any of Licensed Products or engaging in any activities hereunder utilizing same, even in cases where Licensor has provided such materials to Licensee. Licensor may act as the liaison between Licensee and any applicable rights holders in connection with Licensee's license of any such rights, or in some cases may direct Licensee to contact a rights holder directly. Any charges, fees or royalties payable for music rights or any other rights not covered by this Agreement shall be Licensee's responsibility and shall be additional to the license fee and covered by separate agreement.

13. <u>Termination, Breaches, and Bankruptcy</u>.

(a) Termination by Licensor. If (i) any bankruptcy, insolvency, liquidation, or dissolution, domestic or foreign, is instituted by or against Licensee and is not dismissed within sixty (60) days after the filing date thereof, or (ii) Licensee becomes insolvent or suspends the transaction of all or a substantial portion of its usual business (except in the case that the suspension of business results from a Force Majeure, which shall be governed by Section 23 of this Agreement); or (iii) Licensee commits a Material Breach (as defined below) of this Agreement, Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee (except Licensor shall have the right to immediately terminate this Agreement for breach of Section 13(b)(i) below), and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period.

(b) The following are deemed to be a Material Breach under this Agreement: (i) the Non-Refundable Extension Fee was not paid by March 20, 2015, or the remainder of the License Fee was not paid by May 31, 2015; or (ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or (iii) Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days; or (iv) Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of

Section 34 = FCPA

Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv)).

(c)    Breach by Licensor. In the event that (i) Licensor breaches the obligation under Section 3 of Schedule J, or any licensee under an Assigned License Agreement refuses to recognize the assignment of its license agreement to Licensee, Licensor shall (A) use commercially reasonable efforts to terminate such Assigned License Agreement and (B) forward to Licensee any amounts received under such license agreement that arise from actions or sales that occurred on or after June 1, 2015, after deduction of all reasonable costs, including conversion and remittance costs, if any, applicable to such amounts; (ii) Licensor breaches the obligation under Section 5 of Schedule J by granting a (1) multi-territorial license that includes the Territory and covers Core IP in any Core Category or (2) license for the Property that covers only the Territory, it shall be deemed a material breach by Licensor and Licensee shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensor, and such notice of termination shall become effective unless Licensor completely cures such breach within such thirty (30) day period;, or (iii) Licensor loses rights in the Core IP in the Core Categories as specified in Schedule D, Licensee shall be entitled to a partial refund of the license fees as specified in Exhibit 7 to this Agreement.

(d)    Breach by Licensee. In the event that Licensee commits any breach of this Agreement this is not a Material Breach, Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of the breach, then such breach shall be an **Uncured Breach**. Licensee shall pay a fine of $20,000 for each Uncured Breach.

(e)    Bankruptcy of Licensor. The parties agree that (i) the material obligations of the parties under this Agreement have been performed as of May 31, 2015, (ii) after May 31, 2015 the terms and conditions of this Agreement are non-executory in nature, and (iii) this Agreement shall in no event be deemed an executory contract. If, notwithstanding the foregoing, a judicial authority (including a U.S. Bankruptcy Court) holds that this Agreement is an executory contract, Licensee shall retain all rights to continued use of the Property in accordance with the terms and conditions of this Agreement pursuant to Section 356(g) of the United States Bankruptcy Code upon any rejection of this Agreement under Section 365(a) of the Bankruptcy Code.

14.    Result of Termination. Neither the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination.

15.    **Additional Representations and Warranties.**

(a)    Licensor represents and warrants and further agrees that: (i) this Agreement is the valid and binding obligation of Licensor, enforceable in accordance with its terms; (ii) Licensor has the right to license the Property in accordance with the terms of this Agreement; (iii) to Licensor's knowledge, the Property does not infringe upon any Intellectual Property right of any third party; provided, however, that Licensor makes no representation or

warranty concerning any part of the Property at any time acquired by or from, or created by or on behalf of, Licensee (including any Derivative Property); (iv) Licensor has the right to assign to Licensee all of Licensor's current merchandise license agreements under the Property for the Territory; and (v) the execution, delivery and performance of this Agreement will not conflict with or result in any violation of or constitute a default under the organizing or governing documents of Licensor, any stipulation, judgment, writ, injunction, license, permit, decree or order of any governmental authority, any agreement or other instrument by which Licensor may be bound, or any laws. Except for the warranties in this sub-section (a), Licensor grants no warranties, express or implied regarding the Property, including, without limitation, any representation by Licensor or by anyone acting on its behalf concerning the prospects for sales of Licensed Products.

(b) Licensee represents and warrants and further agrees that: (i) this Agreement is the valid and binding obligation of Licensee, enforceable in accordance with its terms; (ii) Licensee has, and at all times will continue to have, the financial and other resources necessary to timely and properly pay, perform and discharge all of its obligations under this Agreement, and has the requisite ability, experience, expertise, to design, manufacture, market and sell Licensed Products in a manner that will enhance the prestige of the Property and to otherwise perform all of its obligations under this Agreement; (iii) Licensee owns and controls all right, title and interest in and to, or has all necessary licenses to use, any and all intellectual and other properties, rights, software, middleware, hardware and other technology that is or may be used in the manufacture, production and distribution of Licensed Products and packaging; (iv) Licensee has the right to grant to Licensor the right in and to the rights and materials contributed by or on behalf of Licensee to Licensed Products, packaging or Property (including Derivative Property) hereunder, with regard to the rights Licensee grants to Licensor under this Agreement; and (v) the execution, delivery and performance of this Agreement will not conflict with or result in any violation of or constitute a default under the organizing or governing documents of Licensee, any stipulation, judgment, writ, injunction, license, permit, decree or order of any governmental authority, any agreement or other instrument by which Licensee may be bound, or any laws.

16. Indemnification.

(a) Licensee hereby indemnifies and agrees to defend and hold harmless Licensor and its parents, direct and indirect equity holders and investors, directors, officers, employees, Affiliates, agents, representatives, and contractors of and from any loss, damage, liability, expenses, claims or suits (including reasonable attorneys' fees and costs) ("**Claims**") arising out of or in connection with: (i) any breach of Licensee's representations, covenants or obligations under this Agreement; (ii) any alleged defects or violation of law in or related to the Licensed Products, other than any infringement claim for which Licensor is obligated to indemnify Licensee pursuant to Section 16(b); (iii) any infringement or violation of any right of person or entity (including without limitation patent, copyright, trade name, patent or libel, or invasion of the right of privacy or publicity, breach of warranty or contract, or other property rights) resulting from or arising out of any process, method or device utilized by or on behalf of Licensee, or otherwise in connection with the preparation, manufacture, distribution, advertising, promotion and/or sale of Licensed Products, packaging and/or any materials relating thereto, except claims arising only in connection with Licensee's use of the Property or Derivative Property in accordance with this Agreement. With respect to the foregoing indemnification,

Licensee shall defend and hold harmless such Licensor at no cost and expense whatsoever to Licensor, including but not limited to reasonable attorney's fees and court costs. Notwithstanding the foregoing, Licensor shall have the right to defend any such action or proceed with attorneys of its own selection at its own cost.

(b) Licensor hereby indemnifies and agrees to defend and hold harmless Licensee and its parents, direct and indirect equity holders, investors, directors, officers, employees, Affiliates, agents, representatives, and contractors of and from any Claims, arising out of or in connection with (i) any third party claim alleging copyright or trademark infringement out of Licensee's use pursuant to the License of the Property (excluding the Derivative Property, which has not been licensed under this Agreement), or (ii) any breach of Licensor's representations, covenants or obligations under this Agreement, provided that in each case, Licensee shall notify Licensor in writing promptly upon Licensee's acquiring knowledge of any such claim or suit. With respect to the foregoing indemnification, Licensor shall defend and hold harmless such Licensee at no cost and expense whatsoever, including but not limited to reasonable attorney's fees and court costs. Licensor shall have the option to undertake and conduct the defense of, at any time prior to judgment, any claim or suit that may be subject to the indemnification provisions of this sub-section, without Licensee's express consent in writing. Licensor acknowledges that Licensee will conduct a private placement of equity securities and an initial public offering, and Licensee's rights granted by Licensor under this Agreement are significant in the private placement and initial public offering.

17. Remaining Inventory. Licensee shall, sixty (60) days or more prior to the Expiration Date or, if the License is terminated prior to the Expiration Date, ten (10) days after the effective date of any such termination, account to Licensor in a statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of the date of such statement. Licensor shall have the option to conduct a physical inventory of Licensee in order to verify such statement of remaining inventory. If Licensee refuses to permit Licensor to conduct such physical inventory, Licensee shall forfeit its rights to dispose of any of Licensed Products subsequent to the Expiration Date or the effective date of any termination pursuant to the provisions of this Agreement. Nothing contained in this section shall be construed to limit Licensor's rights or remedies.

18. Confidentiality. The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, Intellectual Property and other proprietary information that is confidential and considered to be of substantial value to the other party, which value might be impaired if such information were disclosed to third parties (including the terms of this Agreement, "**Confidential Information**"). Confidential Information does not include information that: (a) is or becomes generally known to the public through no fault or breach of this Agreement by the receiving party; (b) is known to the receiving party at the time of disclosure without an obligation of confidentiality; (c) is independently developed by the receiving party without use of the disclosing party's Confidential Information; or (d) the receiving party rightfully obtains from a third party without restriction on use or disclosure. Each party shall use at least the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance, but in no case use less than a reasonable degree of care; and in any event, during the License Period of this Agreement (as may be

extended or renewed), and after any termination or expiration of this Agreement, each party will not disclose or use the other party's Confidential Information except as permitted herein, and will not disclose such Confidential Information to any third party (other than disclosure to such party's employees, accountants, attorneys, bankers and financial advisers who must have such information in order to advise and perform professional services and who are bound by confidentiality obligations with respect thereto) as is reasonably required in connection with the exercise of its rights and obligations under this Agreement (and only subject to restrictions on use and disclosure at least as protective as those set forth herein and executed in writing by such employees and consultants). Each party may disclose Confidential Information of the other party: (i) with the prior written consent of the party that owns the Confidential Information; and (ii) pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided that the disclosing party gives prompt and reasonable notice to the other party to contest such order or requirement, and such disclosing party agrees to cooperate with the other party in any attempt to obtain a protective order. Each party will comply with any law applicable to the privacy of personal identifying information and data.

19. **Publicity**. Except to the extent necessary under applicable laws, Licensee shall not make any public announcement or issue any press release relating to the existence or terms of this Agreement or the business relationship contemplated herein without Licensor's prior written consent, in Licensor's reasonable discretion.

20. Sell-Off Period.

(a) Except as provided in subsection (b) below, Licensee shall have the right to dispose of, on a non-exclusive basis such items of Licensed Products as Licensee has remaining in inventory as of the Expiration Date (or the date of termination of the License, if earlier) for the period of time subsequent to the Expiration Date (or the date of termination of the License, if earlier) set forth in **Schedule H**, provided that Licensee shall have complied, and shall continue to comply, in all material respects with all of the provisions of this Agreement ("**Sell-Off Period**"), including the reporting of sales. Any Licensed Products not disposed of at the expiration of the Sell-Off Period shall, at Licensor's option, be delivered to Licensor or destroyed, in which case Licensee shall deliver to Licensor a certificate of destruction signed by an officer or director of Licensee.

(b) If the License is terminated pursuant to a Material Breach by Licensee of this Agreement, Licensee's disposal of any items of Licensed Products which Licensee has remaining in inventory shall be in strict accordance with such instructions as Licensor shall give to Licensee.

(c) Upon the expiration of the Sell-Off Period, Licensee shall provide to Licensor a final statement of the total number of items of Licensed Products distributed and sold by Licensee during the License Period and the Sell-Off Period.

21. **Remedies for Failure to Cease Manufacture, Distribution, etc**. Licensee's failure to cease the manufacture, distribution, sale or advertisement for sale of Licensed Products upon the expiration or termination of the License or relevant Sell-Off Period will result in immediate and irreparable damage to Licensor. Licensee acknowledges that no adequate remedy at law exists for such failure to cease the manufacture, distribution, sale or advertisement for sale of

Licensed Products and Licensee agrees that Licensor shall be entitled to the remedies of injunction, specific performance or other equitable relief to prevent a breach of this Agreement by Licensee. However, Licensee shall be entitled to sell Licensed Products as Licensee has remaining in inventory as of the Expiration Date to Licensor, or any third party as instructed by Licensor or to any other third party in case Licensor or any third party as instructed by Licensor refuses to purchase such Licensed Products or in case Licensee is unable to sell such Licensed Products to Licensor or any third party as instructed by Licensor. None of the provisions of this section shall constitute or be construed to limit or waive any rights and remedies which Licensor may have.

22. Liquidated Damages. If Licensee invoices, ships or sells Licensed Products in violation of Section 2 ("**Territory and Channel of Distribution**"), then, in addition to Licensor's other remedies, Licensor may require Licensee by written notice to pay, as liquidated damages and not as a penalty, an amount equal to ten percent (10%) of the total gross sales for all Licensed Products invoiced, shipped, or sold in violation of this Section. Such liquidated damages shall be due fifteen (15) days after notice by Licensor. The parties agree that the foregoing liquidated damages are reasonable in light of the anticipated or actual harm caused by a breach of this Section, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. Nothing herein shall preclude Licensor from enforcing the provisions of this Section by pursuing any action or other remedy, all of which shall be cumulative. However, in no case, shall the liquidated damages exceed US$5,000,000.

23. Force Majeure.

(a) Licensee shall be released from its obligations under this Agreement (other than payment obligations) in the event that governmental regulations, or other causes arising out of a state of national emergency, or war, or natural disaster render performance by Licensee impossible, and in such event no portion of the License Fee shall be repayable or returnable to Licensee.

(b) Licensor shall be released from its obligations under this Agreement in the event that governmental regulations, or other causes arising out of a state of national emergency or war, or natural disaster render performance by Licensor impossible, and in such event no portion of the License Fee shall be repayable or returnable to Licensee.

24. Assignment. Licensor may assign its rights and obligations under this Agreement to any person or entity, provided that Licensor gives Licensee prior written notice.

(a) In the event that Licensor assigns its rights in the Property, Licensor shall (i) cause any agreement assigning such rights to require the assignee to assume all of Licensor's obligations and responsibilities under this Agreement, (ii) remain fully responsible for any act of Licensor prior to the assignment of any Licensor's ownership interest in the Property, and (iii) cause any agreement assigning such rights to require that the assignee shall not adversely affect any and all rights of Licensee under this Agreement as a result of anysuch assignment.

(b) In the event of any equity interest transfer or any change of corporate structure of Licensor which may lead to an assignment of any or all of its rights and obligations stipulated in this Agreement, Licensor shall (i) cause any agreement with the assignee to require

assignee to assume any or all obligations and responsibilities of Licensor in this Agreement, and (ii) remain fully responsible for any performance by Licensor prior to the assignment under this Agreement; and (iii) cause any agreement assigning such rights to require that the assignee shall not adversely affect any and all rights of Licensee under this Agreement .

(c) Upon prior written notice to Licensor, Licensee may assign its rights and obligations under this Agreement to any of its Affiliates, or (i) in connection with an initial public offering ("IPO") or a private investment during the first five (5) years of the License Period, or (ii) in connection with a private sale, investment, merger, consolidation, reorganization, IPO or as the result of the sale of all or substantially all of Licensee's assets or equity after the first five (5) years of the License Period, provided that:

A. such assignee shall maintain this Agreement in effect for a term at least equal to the remainder of the term (including the Extension Term, if applicable);

B. Licensee shall remain fully responsible for the performance by such assignee of all of Licensee's duties and obligations under this Agreement;

C. Licensee shall ensure that any and all rights of the Licensorr under this Agreement are not adversely affected in any respect as a result of such assignment by Licensee;

D. such assignee is financially and operationally capable of fulfilling all of Licensee's obligations under this Agreement;

E. such assignee has not been "adverse" to Licensor or any of its Affiliates in the five (5) years prior to such assignment ("adverse" means Licensor or any Affiliate asserted a claim against such assignee or such licensee asserted a claim against Licensor or any Affiliate, in either case in an amount exceeding US$5,000,000);

F. Licensee shall remain liable for any claims, liabilities or damages arising from any acts or omissions that occurred prior to Licensee's assignment of this Agreement; and

G. During the License Period, Chunlei (Dave) Qian shall sit on the Board of Directors of any assignee

25. <u>Certain Definitions.</u>

"**Affiliate**" means, with regard to either party, any corporation or other entity that directly or indirectly Controls or is Controlled by or is under common Control with the party.

"**Business Day**" means a day in which the commercial banks are open for business in Los Angeles, California, USA and The People's Republic of China.

"**Control**" means the power of a person to secure that the affairs of another are conducted directly or indirectly in accordance with the wishes of that person whether by means of:

(a)    in the case of a company, being the beneficial owner of more than 50 per cent. of the issued share capital of or of the voting rights in that company, or having the right to appoint or remove a majority of the directors or otherwise control the votes at board meetings of that company or having the right to control the management of that company by virtue of any powers conferred by the articles of association, shareholders' agreement or any other document regulating the affairs of that company; or

(b)    in the case of a partnership, being the beneficial owner of more than 50 per cent. of the capital of that partnership, or having the right to control the composition of or the votes of the management of that partnership by virtue of any powers conferred by the partnership agreement or any other document regulating the affairs of that partnership; and

"**Controlled**" shall be construed accordingly.

"**Derivative Property**" means any Intellectual Property based on or derived from the Property with the exception of modification to Core IP.

"**Intellectual Property**" means trademarks, service marks, trade names, copyrights and copyrightable works, and design rights.

26.    Additional Provisions.  Schedule J contains additional provisions that are deemed included herein.

27.    **Relationship of Parties**.  This Agreement does not constitute and shall not be construed to constitute an agency, a partnership, or a joint venture between Licensor and Licensee.  Licensee shall have no right to obligate or to bind Licensor in any manner whatsoever, and nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.  In providing any information, approval or materials hereunder, Licensor is acting in an advisory capacity only and shall have no responsibility, obligation or liability to Licensee or any other person for or in connection with the development, manufacture, distribution, advertising, marketing or sales facilities owned or used by Licensee or for any decisions that may be made in connection therewith, whether upon the recommendation of Licensor or otherwise.

28.    **Dispute Resolution**.

Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration, conducted in English, administered by the Hong Kong International Arbitration Centre ("**HKIAC**") in Hong Kong, under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted ("**HKIAC Rules**"). The arbitration shall be conducted by three (3) arbitrators appointed by the Parties or the Chairman of the HKIAC in accordance with the HKIAC Rules. The arbitration award shall be final and binding upon all parties. Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction in any country, or application may be made to such court for a judicial acceptance of the award or an order of enforcement, as the law of such jurisdiction may require or allow. All expenses of the arbitration, including reasonable attorneys'

fees, shall be borne by the losing party in the arbitration or, as the case may be, shall be pro-rated to properly reflect any partial prevailing or losing of the parties to the arbitration, as determined by the arbitrators under the HKIAC Rules. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of this Agreement.

29.    Notice.  Notices by either party to the other shall be in writing and shall be given by addressing them as indicated above and sending them by overnight carrier such as FedEx or UPS, or by email with confirmation copy to follow, and shall be effective upon receipt.  Unless prior written notice of a change of address is given,

all statements and notices to Licensor must be sent to:

Paul Frank Industries LLC
10100 Santa Monica Blvd.
Los Angeles, CA 90067
Attn: Elie Dekel  (edekel@sabanbrands.com)

With copy to: Rami S. Yanni (ryanni@sabanbrands.com)

all statements and notices to Licensee must be sent to

Grand Union International Trading Limited
Flat/rm 1303, 13/F New East Ocean Centre
9 Science Museum Road
Tsim Sha Tsui, Kowloon, Hong Kong
Attention: Dave Qian (dave@roommar.com)

With a copy to:  Lillian He (lillian.he@affluential.com.cn)

30.    Governing Law.  This Agreement, including the Dispute Resolution provisions in Section 28, shall be governed by and construed in accordance with the laws of Hong Kong without reference to its conflict of law rules.

31.    Translations.  In the event that this Agreement is translated into any language other than English, the English language version of the Agreement will control.

32.    Cumulative Remedies.  No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity or by statute or otherwise.  The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

33.    No Third Party Beneficiary or Broker.  This Agreement is made and entered into solely for the benefit of Licensor and Licensee, their successors and permitted assigns, and no other entity shall have any rights hereunder.  Licensee hereby represents and warrants to Licensor that it has not engaged a broker or other intermediary in connection with this License.

34. Foreign Corrupt Practices Act. Licensee represents and warrants that it has reviewed and understands the provisions of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), and its purposes, and that it has taken no action with respect to this Agreement and the transactions contemplated hereby which, would constitute a violation of the applicable laws or which would or might cause Licensor or the parent or any subsidiary or affiliate of the parent of Licensor to violate the FCPA. Licensee further represents and warrants that Licensee will not take any action in connection with this Agreement that would constitute a violation of any PRC or Hong Kong anti-corruption laws, as applicable. Licensee undertakes promptly to notify Licensor in writing upon knowing of any fact or circumstance that would render Licensee's representations herein to no longer be true. The parties agree that full disclosure of the existence and terms of this Agreement may be made at any time and for any reason to such persons, departments, branches or agencies of the Government of the United States of America and/or the government of the Territory, as Licensor's legal counsel shall determine has a legitimate need to know such terms.

35. Entire Agreement. This Agreement, constitutes the complete, final and exclusive statement of the terms of the agreement between Licensee and Licensor pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, communications, promises and discussions of the parties, whether oral or written, with respect to such subject matter. No party has relied on any statement, representation, warranty or promise not expressly contained in this Agreement. The provisions of this Agreement may not be explained, supplemented or qualified through evidence of trade usage or a prior course of dealings. This Agreement may not be modified or amended unless in writing signed by both Licensor and Licensee. The failure of either Licensor or Licensee to enforce, or the delay by Licensor or Licensee in enforcing any of such party's rights under this Agreement shall not be deemed a continuing waiver, and such party may, within such time as is provided by applicable law, commence appropriate suits, actions or proceedings to enforce any or all such rights.

36. Headings. The headings of the provisions of this Agreement are inserted for convenience of the parties hereto only and shall not affect the construction or interpretation of any provision hereof.

37. Counterparts. This Agreement may be executed in counterparts, each of which when executed shall be deemed an original and all of which together shall constitute one and the same instrument. This Agreement shall be legally binding upon the electronic transmission, including by facsimile or email, by each party of a signed signature page to this Agreement to the other party.

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement as of the Effective Date.

LICENSOR:
Paul Frank Industries LLC

By: [signature]

Name: ELIE DEKEL

Title: PRESIDENT

LICENSEE:
Grand Union International Trading Limited

By: ____________________

Name: ____________________

Title: ____________________

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement as of the Effective Date.

LICENSOR:
Paul Frank Industries LLC

By: ____________________

Name: ____________________

Title: ____________________

LICENSEE:
For and on behalf of
Grand Union International Trading Limited
宏聯國際貿易有限公司

By: ____________________
Authorized Signature(s)

Name: Bian Chunle

Title: Director

# EXHIBIT 2

## SCHEDULES

The following are the schedules ("**Schedules**") referred to in the attached Master License Agreement ("**Agreement**") dated as of January 1, 2015 ("**Effective Date**") between Paul Frank Industries LLC, a Delaware, U.S.A., limited liability company, located at 10100 Santa Monica Blvd., Suite 600, Los Angeles, CA 90067 ("**Licensor**") and Grand Union International Trading Limited, a Hong Kong limited company, with a registered address at Flat/rm 1303, 13/F New East Ocean Centre, 9 Science Museum Road, Tsim Sha Tsui, Kowloon, Hong Kong ("**Licensee**"). Capitalized terms used in these Schedules shall have the same meaning as defined within these Schedules or the body of the Agreement, as applicable. In the event of a conflict between the Schedules and the body of the Agreement, the Schedules shall govern.

## SCHEDULE A

### Licensed Products and Licensed Services

"**Licensed Products**" means all product categories including apparel, fashion accessories, footwear, cosmetics, fragrances, health & beauty aids, food and non-alcoholic beverages, pet products, leather goods, baby gear, eyewear (prescription and otherwise), jewelry, watches, stationery, paper products, school supplies, home goods, tableware, electronics, phone accessories, computer accessories, plush, bags, luggage, automotive accessories, sporting goods, emoticons/emojis offered only in packs and only for purchase via mobile messaging apps (but excluding use of pictographs or picture characters for any type of content creation, production or distribution), and additional categories as approved by Licensor from time to time that bear any of the Property, provided that such approval may not be unreasonably withheld.

Licensed Products shall not include tobacco products, weapons, firearms, ammunition, fireworks, sexual or adult content, products or services, gambling services or related goods, sweepstakes, virtual currency, alcohol, drugs (illicit or otherwise), drug paraphernalia, medical or therapeutic devices, the exploitation or distribution of entertainment content based on the Property, third party promotional rights related to the Property or goods or services prohibited or regulated within the Territory.

"**Licensed Services**" means the operation of retail stores dedicated to Licensed Products, and the operation of cafes and restaurants.

## SCHEDULE B

### Territory

"**Territory**" means mainland China, Hong Kong and Macau. For the avoidance of doubt and regardless of any geopolitical change that occurs during the License Period, the Territory does not include Taiwan.

Exhibit 3, Part II, identifies all of Licensor's multi-territory license agreements that include the Territory within the territory of such agreements. For the avoidance of doubt, the existence of

such agreements, as they are, does not violate the exclusive license rights granted under this Agreement.

## SCHEDULE C

### License Period

The "**License Period**" shall commence on January 1, 2015 and continue until February 28, 2030 ("**Expiration Date**"), unless terminated earlier pursuant to the terms and conditions of this Agreement.

For the avoidance of doubt, all License and other rights granted under this Agreement revert to Licensor upon expiration of the License Period or earlier termination of this Agreement as provided herein.

## SCHEDULE D

### License Fees

Licensee shall pay to Licensor a license fee of Sixty-Five Million U.S. Dollars (US$65,000,000) ("**License Fee**") as follows: (a) a **Non-Refundable Extension Fee** of Ten Million U.S. Dollars (US$10,000,000) on March 20, 2015 and (b) the remaining Fifty Five Million U.S. Dollars (US$55,000,000) on or before May 31, 2015 as non-recoupable, non-reimbursable, and fully paid-up license fee as consideration for the License and all other rights granted under this Agreement. The Non-Refundable Extension Fee shall be applied towards the License Fee if Licensee pays the remainder of the License Fee on or before May 31, 2015. If Licensee fails to pay the full amount of the License Fee on or before May 31, 2015, then Licensor shall be entitled to retain the Non-Refundable Extension Fee in whole with no obligation to Licensee and Licensee shall have no rights whatsoever under this Agreement.

For the avoidance of doubt, all dates referenced with respect to payments due to Licensor are based on Los Angeles, California time.

**Withholding Tax**

The total Withholding Tax, as such term is defined in Section 4(b) below, applicable to any license fees paid under this Agreement, if any, shall be capped at 4.5% of the total license fees paid. If the actual Withholding Tax is greater than 4.5%, Licensee shall gross up any payment due hereunder such that Licensor shall have netted and actually received 95.5% of any payment earned or owed hereunder.

**Partial Refund of License Fees**

If Licensor loses any meaningful rights in any Core IP (as defined in Exhibit 7 to this Agreement) in any of the "**Core Categories**" (defined as apparel, footwear and accessories), Licensor will grant Licensee a partial refund of the license fees as set forth in Exhibit 7 attached hereto.

## SCHEDULE E

**Intentionally Omitted**

## SCHEDULE F

**Marketing Date**

The "Marketing Date" means the date that Licensee commences manufacture, distribution and sale of Licensed Products in accordance with the terms and conditions of the Agreement, and shall be concurrent with the commencement of the License Period, unless a later date is approved by Licensor.

## SCHEDULE G

**Channels of Distribution**

The sole "**Channels of Distribution**" for Licensed Products are as follows:

1. **Department Stores** (for example, Wanda Plaza, Metro City, Raffles)

2. **eCommerce** - provided that shipment of Licensed Products is limited to consumers residing within the Territory. (for example, www.tmall.com, www.jd.com, www.chjchina.com)

3. **Specialty Retailers** (for example, CHJ Jewelry, Luolai Home Textile, Mujiushi by Shenzhen Heze)

4. **Paul Frank-branded Premium Retail Stores controlled by Licensee or Sublicensees**; Licensee or its Sublicensees shall open a minimum of five hundred (500) Paul Frank-branded stand-alone premium retail stores in the Territory by the fifth (5th) anniversary of the Effective Date; provided, however, that if Licensee and its Sublicensees have opened at least four hundred (400) Paul Frank-branded stand-alone premium retail stores in the Territory by the fifth (5th) anniversary of the Effective Date, Licensee shall use best efforts to open the additional one hundred (100) Paul Frank-branded stand-alone premium retail stores in the Territory by the sixth (6th) anniversary of the Effective Date. At least eighty percent (80%) of the first five hundred (500) Paul Frank-branded premium retail stores shall be at least fifty (50) square meters in size, provided that no Paul Frank-branded retail stores in the first five hundred (500) Paul Frank-branded premium retail stores shall ever be less than thirty (30) square meters in size.

5. TV Shopping Channels

6. Tele-Shopping

Licensee shall position the Property as a premium fashion-lifestyle brand and may not sell or distribute Licensed Products in any Core Categories via mass market channels, or the following list of specified discount retailers and off-price retailers: Walmart, Carrefour, Tesco, Hua Lian Supermarkets, 7-Eleven, Circle K, Family Mart, Lawson, wholesale markets, TV Shopping Channel and Tele-Shopping; provided, however, that Licensee may distribute Licensed Products that are not in Core Categories through mass market channels, discount retailers, off-price

retailers, wholesale markets, TV Shopping Channel and Tele-Shopping, unless otherwise provided in this Agreements.

## SCHEDULE H

**Sell-Off Period**

Ninety (90) days

## SCHEDULE I

**Licensee Contact**

## SCHEDULE J

**Additional Provisions**

1. Licensee shall commit to reasonable marketing of Licensed Products. Any Licensee marketing of Licensed Products must be consistent with Licensor's guidelines and brand-appropriate.

2. Licensor and Licensee acknowledge and shall ensure that all agreements between Licensor, on one hand, and Licensee's Affiliates, on the other hand, existing as of the Effective Date ("**Existing Agreements**") have, to the best knowledge of the Parties, been properly performed and terminated as of the Effective Date. Licensee shall not be liable for obligations of the parties to the Existing Agreements. All royalties, fees or other amounts payable to Licensor or Licensor's Affiliates under the Existing Agreements have been paid on time, the receipts of which are hereby acknowledged by Licensor. Licensee and Licensee's Affiliates shall not be responsible for any claim against third party Licensees (those authorized by Licensor based on the existing license agreements prior to the Effective Date of this Agreement) that Licensor may now or afterwards have arising under the Existing Agreements prior to the Effective Date of this Agreement.

3. Licensor shall assign or cause to be assigned to Licensee all license agreements between Licensor and other licensees of Licensor granting rights in the Property in the Territory and as existing as of the commencement of the License Period, as set forth in Exhibit 3, Part I ("Assigned License Agreements") so that Licensee becomes the sub-licensor to the third party sublicensees under such Assigned License Agreements.

4. Any royalties, fees or other amounts payable to Licensor under the Assigned License Agreements (whether or not assigned to Licensee at that time) and that arise from actions or sales that occurred prior to June 1, 2015 will belong to Licensor and will be paid to Licensor regardless of when received and Licensee shall promptly notify Licensor of any such payments received by Licensee and shall forward to Licensor any such amounts received after deduction of all reasonable costs, including conversion and remittance costs, if any, applicable to such amounts within five (5) Business Days of receipt.

5.    After commencement of the License Period, Licensor shall exclude the Territory from future license agreements under the Property for Licensed Products or Licensed Services. Upon the Effective Date and during the License Period, Licensor shall not grant third party licenses under the Property in the Territory for Licensed Products or Licensed Services or use the Property in violation of Licensee's exclusive rights in the Territory.

6.    Upon Licensee's request, Licensor shall, at Licensee's cost, cooperate with Licensee in obtaining any and all governmental approvals, consents, licenses, permits, certificates, registrations and the like as may be required in respect of the performance of and effecting the purpose of this Agreement, including but not limited to recording this Agreement or the licenses herein granted with applicable governmental authorities.

**EXHIBIT 1**
**TRADEMARKS and COPYRIGHTS**

Paul Frank Industries LLC Characters Julius

**Devil Julius**

**Skurvy**

**Clancy**

**Chachi**





**Worry Bear**

**Bunny Girl**

**Sheree**

**Pufak**

**Steve the Krab**

**Shaka Bra Yeti**

**Bob**

**Bride**

**Vic**



**Spicoli**




**Francie**



**Randolph**



**Leser**



**Sir Randolph**



**Tyrone Bat**



**William**



**Sam the Grub**



**Dic**



**Ellie**



**Longshot**



**Aku(& Tooth Brush)**



**Cornelius**



**Mika Cat**



**Elaine**



Cozy molar

Hot cocoa river rapids rider

Isaac

Tyrone

Tooth Brush





大嘴猴

paul frank

保罗 弗兰克

# Trademark Records By Trademark

| Owner / Client | Trademark / File Reference | Country / Next Renewal Due | Appl. Date / Reg. Date | , No. / , No. | Status / Sub Status | Agent / Supervisor | |
|---|---|---|---|---|---|---|---|
| **BAOLUO FULANKE in Chinese Characters** | | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN151* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170501<br>*10170501* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 41 | Goods: Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN149* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170503<br>*10170503* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 28 | Goods: Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks (toys); building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dollsâ€™ beds; dollsâ€™ houses; dolls; toy masks; scale model vehicles; dollsâ€™ clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens [sports articles] in Class 28 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN148* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170504<br>*10170504* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 25 | Goods: Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; childrens' helmets; socks; gloves (clothing); mittens; scarves; neckties; belts [clothing]; leather belts for wear; bathing caps in Class 25 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN147* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170505<br>*10170505* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 16 | Goods: Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter, postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN146* | China<br>*6 Jan 2023* | 10 Nov 2011<br>*7 Jan 2013* | 10170506<br>*10170506* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 9 | Goods: Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [integrated circuit cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; diversâ€™ apparatus; diversâ€™ masks; diversâ€™ suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film [exposed] in Class 09 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN145* | China | 10 Nov 2011 | 10170507 | Pending | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 3 | Goods: Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants [toiletries]; sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes ; incense; cosmetics for animals in Class 03. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN057* | China<br>*20 Nov 2022* | 30 Dec 2008<br>*21 Nov 2012* | 7141291<br>*7141291* | Registered | Boss & Young<br>*Tim Quinlan* | 保罗 弗兰克 |
| Class: 25 | Goods: Shoes, hats, gloves [clothing] scarves, hosiery, straps, caps (shower-), clothing, child cloth, bathing suits, waterproof clothing, costumes [masquerade-] in Class 25 | | | | | | |
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN056* | China<br>*6 Oct 2020* | 30 Dec 2008<br>*7 Oct 2010* | 7141292<br>*7141292* | Registered | Boss & Young<br>*Tim Quinlan* | 保罗 弗兰克 |

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins, imitation leather, cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; check holders made of leather, imitation of leather; umbrellas; credit card cases (made of leather of imitation leather); credit card holders (made of leather of imitation leather) in Class 18. |

## Clancy Giraffe Design

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860419 | Registered | Boss & Young
044225-3-CN002 | 27 Dec 2020 | 28 Dec 2010 | 4860419 | Tim Quinlan

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860420 | Registered | Boss & Young
044225-3-CN003 | 27 Apr 2019 | 28 Apr 2009 | 4860420 | Tim Quinlan

| | |
|---|---|
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons and webisodes, distributed over television and the internet, featuring animated characters in Class 41. |

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860476 | Registered | Boss & Young
044225-3-CN001 | 6 May 2019 | 7 May 2009 | 4860476 | Tim Quinlan

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins, imitation leather, leather, unworked or semi-worked, suitcases, bags, beach bags, handbags, multipurpose holdalls, waist bags, pouches, suitcase, traveling bags and cases, valises, vanity cases (not fitted), attachÃ© cases, briefcases, portfolios, pocket wallets, billfolds, key holders, luggage, purses; walking sticks; credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, book bags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; umbrellas; cosmetics cases (empty); credit card holders (made of leather or imitation leather); check book covers (made of leather or imitation leather) in Class 18. |

## DA ZUI HOU in Chinese Characters

PAUL FRANK INDUSTRIES LLC | Characters | China | 14 Oct 2011 | | Registered | IP Services
044225-3-CN129 | 13 Dec 2022 | 14 Dec 2012 | 10065921 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | Services
044225-3-CN127 | 13 Jan 2023 | 14 Jan 2013 | 10065923 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | Services
044225-3-CN126 | 6 Dec 2022 | 7 Dec 2012 | 10065924 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065925 | Pending | SIPS - Simone IP Services
044225-3-CN125 | | | | Published | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs (downloadable software); computer software (recorded); computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse (data processing equipment); pocket calculators; smart cards (integrated circuit cards); compact discs (read-only memory); clocks (time-) (time recording devices); reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks, divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles (optics); sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | Services
044225-3-CN124 | 6 Dec 2022 | 7 Dec 2012 | 10065926 | Tim Quinlan

大嘴猴

Class 8

Goods Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065927 | Registered | SIPS - Simone IP Services
044225-3-CN123 | 6 Jan 2023 | 7 Jan 2013 | 10065927 | Tim Quinlan

大嘴猴

Class 5

Goods Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters; plasters for medicinal purposes; Preparations to facilitate teething in Class 05.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065929 | Pending | SIPS - Simone IP Services
044225-3-CN141 | Tim Quinlan

大嘴猴

Class 35

Goods Business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines in Class 35

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065930 | Pending | SIPS - Simone IP Services
044225-3-CN140 | Tim Quinlan

大嘴猴

Class 32

Goods Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065932 | Registered | IP Services
044225-3-CN138 | 13 Apr 2023 | 14 Apr 2013 | 10065932 | Tim Quinlan

大嘴猴

Class 28

Goods Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks (toys); building games; novelties for parties, dances (party favors); dominoes; toy pistols; parlor games; dollsâ€™ beds; dollsâ€™ houses; dolls; toy masks; scale model vehicles; dollsâ€™ clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings (parts of sports suits); roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery); fishing tackle; camouflage screens (sports articles) in Class 28.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065935 | Pending | SIPS - Simone IP Services
044225-3-CN135 | opposed | Tim Quinlan

大嘴猴

Class 25

Goods Clothing; layettes (clothing); babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes (masquerade-); soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065938 | Registered | IP Services
044225-3-CN132 | 13 Dec 2022 | 14 Dec 2012 | 10065938 | Tim Quinlan

大嘴猴

Class 20

Goods Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses);picture frames; fans for personal use (non-electric); figurines (statuettes) of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065947 | Registered | IP Services
044225-3-CN143 | 6 Jan 2023 | 7 Jan 2013 | 10065947 | Tim Quinlan

大嘴猴

Class 41

Goods Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services (entertainment or education); entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065948 | Registered | SIPS - Simone IP Services
044225-3-CN142 | 13 Dec 2022 | 14 Dec 2012 | 10065948 | Tim Quinlan

大嘴猴

Class 38

Goods Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 28 Feb 2012 | 10541841 | Registered | IP Services
044225-3-CN155 | 6 May 2023 | 7 May 2013 | 10541841 | Tim Quinlan

大嘴猴

Class 7

Goods Food preparation machines, electromechanical; sewing machines; mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers; washing machines; vacuum cleaners; shoe polishers, electric in Class 7.

JULIUS

| PAUL FRANK INDUSTRIES LLC | JULIUS | China | 31 Dec 2006 | 5822886 | Registered | Boss & Young | JULIUS |
|---|---|---|---|---|---|---|---|
| | *044225-3-CN009* | ***6 Jan 2020*** | ***7 Jan 2010*** | ***5822886*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 18 |
| Goods | Cases; attache cases; credit card cases; key holders; traveling cases; briefcases; handbags; vanity cases (not fitted); bags; multi-purpose carrying bags; beach bags; handbags; hold-alls; waist bags; pouches; book bags; rucksacks; knapsacks; school bags; satchels; tote bags; sport bags; athletic bags; shoulder bags; traveling bags; suitcase; valises; document files (made of leather); purses; billfolds; luggage; pocket wallets; walking sticks; backpacks; umbrellas in Class 18. |

| PAUL FRANK INDUSTRIES LLC | JULIUS | China | 31 Dec 2006 | 5822887 | Registered | Boss & Young | JULIUS |
|---|---|---|---|---|---|---|---|
| | *044225-3-CN008* | ***27 Oct 2019*** | ***28 Oct 2009*** | ***5822887*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 16 |
| Goods | Paper, paperboard products, printed matter; children's books; series of fiction books featuring animated characters; series of non-fiction books featuring animated characters; cartoon prints; cartoon strips; address books; notepads; day planners; stationeries; picture books; periodicals; photographs; card boards; flash cards; gums (adhesives) for stationery or household purpose; books (biography); wrapping gift paper; wrapping gift boxes of cardboard; diaries; wrapping gift bags of paper and plastic; bubble packs for wrapping or packaging in Class 16. |

## JULIUS Design

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 28 Feb 2012 | 10541642 | Registered | SIPS - Simone IP Services |  |
|---|---|---|---|---|---|---|---|
| | *044225-3-CN154* | ***12 Oct 2023*** | ***13 Oct 2013*** | ***10541642*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 7 |
| Goods | Food preparation machines, electromechanical; sewing machines, mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers; washing machines; vacuum cleaners; shoe polishers, electric in Class 7. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 30 Jul 1999 | 1469453 | Registered | Boss & Young |  |
|---|---|---|---|---|---|---|---|
| | *044225-3-CN017* | ***6 Nov 2020*** | ***7 Nov 2000*** | ***1469453*** | *renewed* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear, headgear and hosiery in Class 25. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867857 | Pending | SIPS - Simone IP Services |  |
|---|---|---|---|---|---|---|---|
| | *829* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 3 |
| Goods | Soap; windscreen cleaning liquids; wax polish for automobiles & bikes; sandcloth; aromatics (essential oils); scented water; mouth cologne/aromatic mouth wash; potpourris (fragrances); deodorants for pets; air fresheners |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867859 | Pending | SIPS - Simone IP Services |  |
|---|---|---|---|---|---|---|---|
| | *831* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 9 |
| Goods | Electronic data media; parking meters; reflecting discs for wear (for the prevention of traffic accidents); cellphone bands/cords; digital photo frames; photography bags; eyeglass cords; clothing for protection against accidents, irradiation and fire; magnets (decorative); battery-heated gloves. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867860 | Pending | SIPS - Simone IP Services |  |
|---|---|---|---|---|---|---|---|
| | *832* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 11 |
| Goods | Air purifying apparatus and machines; anti-dazzle devices for automobiles (lamp fittings); ice boxes; ventilation (air-conditioning) installations for vehicles; hair driers (dryers); heating apparatus; toilets (portable); water filtering apparatus; disposable sterilization pouches; footmuffs (electrically heated). |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867861 | Pending | SIPS - Simone IP Services |  |
|---|---|---|---|---|---|---|---|
| | *833* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 12 |

| Goods | Upholstery for vehicles; vehicle covers [shaped]; covers for vehicle steering wheels; anti-dazzle devices for vehicles; gear shift covers; brake linings for vehicles; safety belts for vehicle seats; seat covers for vehicles; head-rests for vehicle seats; trunk organizers for vehicles |
|---|---|

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867862 | Pending | SIPS - Simone IP Services |
|---|---|---|---|---|---|---|
| | *816* | | | | | *Tim Quinlan* |

| Class | 22 |
|---|---|
| Goods | Ropes; bags for washing hosiery; vehicle covers (not fitted); sails; awnings of textile; tarpaulins; sacks [bags] of textile(for packaging); straw wrappers for bottles; packing [cushioning, stuffing] materials(not of rubber or plastics); plastic fibers [fibres] for textile use. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867864 | Pending | SIPS - Simone IP Services |
|---|---|---|---|---|---|---|
| | *830* | | | | | *Tim Quinlan* |

| Class | 6 |
|---|---|
| Goods | Clothes hooks of metal; keys (rings of common metal for --); locks of metal for vehicles; safes; hooks (metal hardware); containers of metal; metal number-plates for automobiles (license plate frames); cattle chains; identification bracelets of metal; works of art of common metal. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 6 Jul 2002 | 3235587 | Registered | Boss & Young |
|---|---|---|---|---|---|---|
| | *044225-3-CN016* | ***6 Feb 2024*** | ***7 Feb 2004*** | ***3235587*** | *renewed* | *Tim Quinlan* |

| Class | 18 |
|---|---|
| Goods | Animal skins; imitation leather; suitcases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, cheque book cases; umbrellas in Class 18. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 26 Dec 2002 | 3417966 | Registered | Boss & Young |
|---|---|---|---|---|---|---|
| | *044225-3-CN018* | ***6 Sep 2014*** | ***7 Sep 2004*** | ***3417966*** | *Renewal due* | *Tim Quinlan* |

| Class | 28 |
|---|---|
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals and games, namely card games, board games and amusement machines, automatic and coin-operated in Class 28. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 21 Jul 2003 | 3640318 | Registered | Boss & Young |
|---|---|---|---|---|---|---|
| | *044225-3-CN014* | ***6 Feb 2015*** | ***7 Feb 2005*** | ***3640318*** | *renewed* | *Tim Quinlan* |

| Class | 9 |
|---|---|
| Goods | Electronic data media; optical data media; magnetic data media; eyeglasses; sunglasses; protective goggles; protective cases for glasses; frames for glasses; eyeglass chains; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks; floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes cassettes, magnetic tapes; data processing apparatus; and equipment; cameras; mouse pad in Class 09. |

| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 21 Jul 2003 | 3640319 | Registered | Boss & Young |
|---|---|---|---|---|---|---|
| | *044225-3-CN015* | ***20 Aug 2015*** | ***21 Aug 2005*** | ***3640319*** | | *Tim Quinlan* |

| Class | 14 |
|---|---|
| Goods | Jewelry, Imitation jewelry, clocks, watches, ornamental pins; precious metals; Alloys of precious metals; Imitation gold; household utensils of precious metal; Containers of precious metal; Works of art of precious metal; Boxes of precious metal; bands for watches, chains of watches, buckles; key rings (trinkets or fobs) in Class 14. |

044225-3-CN020 | 27 Mar 2020 | 28 Mar 2010 | 5822888 | Tim Quinlan

| Class | 41 |
| --- | --- |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the Internet, television and satellite with animated characters; video media featuring animated characters; motion picture film production and distribution in Class 41. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 31 Dec 2006 | 5822889 | Registered | Boss & Young |  |
| | *044225-3-CN019* | *27 Oct 2019* | *28 Oct 2009* | *5822889* | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 16 |
| Goods | Paper, paperboard products, printed matter; children's books; series of fiction books featuring animated characters; series of non-fiction books featuring animated characters; cartoon prints and strips; address books; notepads; day planners; stationeries; picture books; periodicals; photographs; cardboards; flash cards; gums (adhesives) for stationery or household purposes; books (biography); personal diary journals; wrapping gift paper; wrapping gift bags of paper and plastic; wrapping gift boxes of cardboard; wrapping gift boxes of plastic in Class 16 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 13 May 2011 | 9460744 | Registered | Boss & Young |  |
| | *044225-3-CN076* | *13 Apr 2023* | *14 Apr 2013* | *9460744* | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 9 |
| Goods | Calculating machines; Laptop computers; Computer programs [downloadable software]; Computer peripheral devices; Publications (Electronic ) [downloadable]; Electronic pens [visual display units]; Electronic pocket translators; Data processing apparatus; Time recording apparatus; Punched card machines for offices; Measures, Mechanical signs; Portable telephones; Network Communication Equipment, Personal stereos; Microphones; Video game cartridges; Earplug ware; Sound transmitting apparatus; Acoustic player (digital-), MP3/MP4/MP5 players; Cell-phone cover; Monitoring apparatus, electric; Video recorders; Camcorders; Projection apparatus; Measuring instruments; Acoustic [sound] alarms; Chargers for electric batteries; Flat irons, electric; covers for MP3 players; covers for iPads; covers for laptop computers in Class 9. |

**JULIUS Design & Chinese Characters**

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design & Chinese Characters | China | 12 Feb 2009 | 7196334 | Pending | SIPS - Simone IP Services |
| | *044225-3-CN060* | | | | *opposed* | *Tim Quinlan* |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, children's garments, swimsuits, waterproof clothing, masquerade costumes, footwear, headgear, gloves, scarfs, hosiery, hoods, shower caps, neckties, football boots, layettes in Class 25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design & Chinese Characters | China | 12 Feb 2009 | 7196335 | Registered | Boss & Young |
| | *044225-3-CN059* | *20 Nov 2020* | *21 Nov 2010* | *7196335* | | *Tim Quinlan* |

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins; imitation leather; suit; cases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; cheque book cases (made of leather or imitation leather), umbrellas in Class 18 |

**JULIUS Design (Black/White)**

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Black/White) | China | 19 Mar 2010 | 8134094 | Registered | Boss & Young |
| | *044225-3-CN066* | *27 Apr 2021* | *28 Apr 2011* | *8134094* | | *Tim Quinlan* |

| | |
|---|---|
| Class | 35 |
| Goods | Sales promotion for others; sales promotion of gift certificates for others; preparation for advertising material; directories of enterprises about shopping guide, summery of shops and maps; fashion shows for advertising or sales promotion; outsourcing services (business assistance); price comparison services; sales promotion of gift certificates for others in Class 35. |

**JULIUS Design (Color)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065561 | Pending | SIPS - Simone IP Services |  |
| | *044225-3-CN092* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 27 |
| Goods | Floor coverings; mats; non-slip mats; automobile carpets; wallpaper; gymnastic mats; and bath mats. |

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065562 | Registered | SIPS - Simone IP Services |
| | *044225-3-CN091* | *13 Dec 2023* | *14 Dec 2013* | *10065562* | | *Tim Quinlan* |

| | |
|---|---|
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 14 Oct 2011 | 10065563 | Pending | SIPS - Simone IP Services |  |
| | *044225-3-CN090* | | | | *opposed* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25. |

| Owner | Trademark | Country | Filing Date | Application No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065564 | Pending | SIPS - Simone IP Services | |
| | 044225-3-CN089 | | | | | Tim Quinlan | |
| Class | 24 | | | | | | |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065565 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN088 | 13 Jan 2024 | 14 Jan 2014 | 10065565 | | Tim Quinlan | |
| Class | 21 | | | | | | |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons), cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065566 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN087 | 13 Jan 2024 | 14 Jan 2014 | 10065566 | | Tim Quinlan | |
| Class | 20 | | | | | | |
| Goods | Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses);picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065567 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN086 | 13 Dec 2023 | 14 Dec 2013 | 10065567 | Published | Tim Quinlan | |
| Class | 18 | | | | | | |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; traveling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065568 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN085 | 13 Dec 2022 | 14 Dec 2012 | 10065568 | | Tim Quinlan | |
| Class | 16 | | | | | | |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies (stationery); stationery; stickers (stationery); ink; seals (stamps); boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens (office requisites); writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets (office requisites); blackboards; pastels (crayons); teaching materials (except apparatus); modeling clay; chaplets in Class 16. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065569 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN084 | 6 Apr 2023 | 7 Apr 2013 | 10065569 | | Tim Quinlan | |
| Class | 15 | | | | | | |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065570 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN083 | 13 Dec 2022 | 14 Dec 2012 | 10065570 | | Tim Quinlan | |
| Class | 12 | | | | | | |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065571 | Registered | SIPS - Simone IP Services | |
| | 044225-3-CN099 | 27 May 2023 | 28 May 2013 | 10065571 | | Tim Quinlan | |
| Class | 43 | | | | | | |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. | | | | | | |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065572 Registered SIPS - Simone IP Services

*044225-3-CN098* ***27 May 2023*** ***28 May 2013*** ***10065572*** *Tim Quinlan*

| | |
|---|---|
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens, operating lotteries in Class 41 |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065573 Registered SIPS - Simone IP Services

*044225-3-CN097* ***19 Jul 2023*** ***20 Jul 2013*** ***10065573*** *Tim Quinlan*

| | |
|---|---|
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065574 Registered SIPS - Simone IP Services

*044225-3-CN096* ***13 Dec 2023*** ***14 Dec 2013*** ***10065574*** *Tim Quinlan*

| | |
|---|---|
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research; sales promotion for others; import-export agencies; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines in Class 35 |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065575 Pending SIPS - Simone IP Services

*044225-3-CN095* *Tim Quinlan*

| | |
|---|---|
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32 |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065576 Pending SIPS - Simone IP Services

*044225-3-CN094* *Tim Quinlan*

| | |
|---|---|
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065577 Registered SIPS - Simone IP Services

*044225-3-CN093* ***20 Sep 2023*** ***21 Sep 2013*** ***10065577*** *Tim Quinlan*

| | |
|---|---|
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens [sports articles] in Class 28. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065591 Registered SIPS - Simone IP Services

*044225-3-CN082* ***13 Dec 2022*** ***14 Dec 2012*** ***10065591*** *Tim Quinlan*

| | |
|---|---|
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065592 Registered SIPS - Simone IP Services

| | | | | | | |
|---|---|---|---|---|---|---|
| 044225-3-CN081 | 6 Nov 2023 | 7 Nov 2013 | 10065592 | | Tim Quinlan | |

| | |
|---|---|
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards (integrated circuit cards); compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optical]; sunglasses; galvanic cells; animated cartoons; cinematographic film [exposed] in Class 09 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065593 | Registered | SIPS - Simone IP Services |  |
| | 044225-3-CN080 | 13 Dec 2022 | 14 Dec 2012 | 10065593 | | Tim Quinlan | |

| | |
|---|---|
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons, pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065594 | Registered | SIPS - Simone IP Services |  |
| | 044225-3-CN079 | 27 Jan 2023 | 28 Jan 2013 | 10065594 | | Tim Quinlan | |

| | |
|---|---|
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters, plasters for medicinal purposes; Preparations to facilitate teething in Class 05. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 14 Oct 2011 | 10065595 | Pending | SIPS - Simone IP Services |  |
| | 044225-3-CN078 | | | | | Tim Quinlan | |

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations, essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations, scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 03. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | China | 23 Dec 2013 | 13782135 | Pending | SIPS - Simone IP Services | |
| | 542 | | | | | Tim Quinlan | |

| | |
|---|---|
| Class | 24 |
| Goods | Fabric; tapestry [wall hangings], of textile; towels of textile, bed covers; bed sheets and pillowcases; bed blankets; furniture coverings of textile; coverings of plastic for furniture; banners; non-woven textile fabrics; felt; tablecloths, not of paper; bath covers; fitted toilet lid covers of fabric; marabouts [cloth]; hada; shrouds. |

## paul frank

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065596 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN121 | 13 Dec 2022 | 14 Dec 2012 | 10065596 | | Tim Quinlan | |

| | |
|---|---|
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals, rental of chairs, tables, table linen and glassware in Class 43. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065597 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN120 | 13 Dec 2022 | 14 Dec 2012 | 10065597 | | Tim Quinlan | |

| | |
|---|---|
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065598 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN119 | 13 Dec 2022 | 14 Dec 2012 | 10065598 | | Tim Quinlan | |

| | |
|---|---|
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38 |

## PAUL FRANK

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC Simone IP Services | PAUL FRANK | China | 14 Oct 2011 | 100... | Pending | PAUL FRANK |

044225-3-CN117 Approved for Reg. Tim Quinlan

| Class | 32 |
|---|---|
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32 |

## paul frank

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065939 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN106 | 13 Dec 2022 | 14 Dec 2012 | 10065939 | Tim Quinlan

| Class | 15 |
|---|---|
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065940 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN105 | 13 Jan 2023 | 14 Jan 2013 | 10065940 | Tim Quinlan

| Class | 12 |
|---|---|
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12 |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065941 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN104 | 6 Dec 2022 | 7 Dec 2012 | 10065941 | Tim Quinlan

| Class | 11 |
|---|---|
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11 |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065942 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN103 | 13 Dec 2022 | 14 Dec 2012 | 10065942 | Tim Quinlan

| Class | 9 |
|---|---|
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software (recorded); computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [integrated circuit cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; electronic notice boards; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles (optics); sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09. |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065943 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN102 | 6 Dec 2022 | 7 Dec 2012 | 10065943 | Tim Quinlan

| Class | 8 |
|---|---|
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08 |

## PAUL FRANK

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065944 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN101 | Approved for Reg. | Tim Quinlan

| Class | 5 |
|---|---|
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters; plasters for medicinal purposes; Preparations to facilitate teething in Class 05. |

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065945 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN100 | opposed | Tim Quinlan

| Class | 3 |
|---|---|
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes ; incense; cosmetics for animals in Class 03 |

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065949 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN116 | Tim Quinlan

| Class | 30 |
|---|---|
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30 |

## paul frank

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065950 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN115 | 13 Jan 2023 | 14 Jan 2013 | 10065950 | Tim Quinlan

| Class | 28 |
|---|---|
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas |

trees [except illumination articles and confectionary]; fishing tackle; camouflage screens (sports articles) in Class 28

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065951 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN114 | 13 Dec 2022 | 14 Dec 2012 | 10065951 | | Tim Quinlan | |

Class 27
Goods Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065952 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN113 | 13 Dec 2022 | 14 Dec 2012 | 10065952 | | Tim Quinlan | |

Class 26
Goods Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065953 | Pending | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN112 | | | | | Tim Quinlan | |

Class 25
Goods Clothing; layettes (clothing); babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; childrens' helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25.

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065955 | Pending | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN110 | | | | Published | Tim Quinlan | |

Class 21
Goods [Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass (receptacles); painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs;] brushes; [toothbrushes; electric toothbrushes ]in Class 21

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065956 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN109 | 13 Dec 2022 | 14 Dec 2012 | 10065956 | | Tim Quinlan | |

Class 20
Goods Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses);picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding [except for linen]; sleeping bags for camping; cushions; pillows in Class 20.

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065958 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN107 | 13 Dec 2022 | 14 Dec 2012 | 10065958 | | Tim Quinlan | |

Class 16
Goods Paper; copying paper (stationery); bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes (stationery); greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites], blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16.

## PAUL FRANK

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 28 Feb 2012 | 10541694 | Registered | SIPS - Simone IP Services | PAUL FRANK |
| | 044225-3-CN153 | 19 Jul 2023 | 20 Jul 2013 | 10541694 | | Tim Quinlan | |

Class 7
Goods Food preparation machines, electromechanical; sewing machines, mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers, washing machines; vacuum cleaners, shoe polishers, electric in Class 7.

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 24 Feb 2014 | 13999631 | Pending | SIPS - Simone IP Services | PAUL FRANK |
| | 536 | | | | | Tim Quinlan | |

Class 35
Goods Retail or wholesale services for pharmaceutical, veterinary and sanitary preparations and medical supplies; retail or wholesale services for pharmaceuticals, retail or wholesale services for pharmaceutical preparations; retail or wholesale services for sanitary preparations; retail or wholesale services for medical supplies; retail or wholesale services for veterinary pharmaceuticals; retail or wholesale services for veterinary preparations

## paul frank

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867865 | Pending | SIPS - Simone IP Services | paul frank |
| | 838 | | | | | Tim Quinlan | |

Class 22
Goods Ropes; bags for washing hosiery; vehicle covers (not fitted); sails; awnings of textile; tarpaulins; sacks [bags] of textile(for packaging); straw wrappers for bottles; packing [cushioning, stuffing] materials(not of rubber or plastics); plastic fibers [fibres] for textile use

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867856 | Pending | SIPS - Simone IP Services | paul frank |
| | 837 | | | | | Tim Quinlan | |

Class 12
Goods Upholstery for vehicles; vehicle covers [shaped]; covers for vehicle steering wheels; anti-dazzle devices for vehicles; gear shift covers; brake linings for vehicles; safety belts for vehicle seats; seat covers for vehicles, head-rests for vehicle seats; trunk organizers for vehicles.

| Owner | Mark | Country | Filing date | App. no. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867864 | Pending | SIPS - Simone IP Services | paul frank |
| | 834 | | | | | Tim Quinlan | |

Class 6
Goods: Clothes hooks of metal; keys (rings of common metal for –); locks of metal for vehicles; safes; hooks [metal hardware]; containers of metal; metal number-plates for automobiles (license plate frames); cattle chains; identification bracelets of metal; works of art of common metal.

---

PAUL FRANK INDUSTRIES LLC | paul frank | 835 | China | 5 Dec 2014 | 15867865 | Pending | SIPS - Simone IP Services, Tim Quinlan | paul frank

Class 9
Goods: Electronic data media; parking meters; reflecting discs for wear (for the prevention of traffic accidents); cellphone bands/cords; digital photo frames; photography bags; eyeglass cords; clothing for protection against accidents, irradiation and fire; magnets (decorative); battery-heated gloves.

---

PAUL FRANK INDUSTRIES LLC | paul frank | 836 | China | 5 Dec 2014 | 15867866 | Pending | SIPS - Simone IP Services, Tim Quinlan | paul frank

Class 11
Goods: Air purifying apparatus and machines; anti-dazzle devices for automobiles [lamp fittings]; ice boxes; ventilation [air-conditioning] installations for vehicles; hair driers [dryers]; heating apparatus; toilets (portable); water filtering apparatus; disposable sterilization pouches; footmuffs (electrically heated).

---

PAUL FRANK INDUSTRIES LLC | paul frank | 817 | China | 5 Dec 2014 | 15897863 | Pending | SIPS - Simone IP Services, Tim Quinlan | paul frank

Class 3
Goods: Soap; windscreen cleaning liquids; wax polish for automobiles & bikes; sandcloth; aromatics (essential oils); scented water; mouth cologne/aromatic mouth wash; potpourris (fragrances); deodorants for pets; air fresheners.

---

## PAUL FRANK

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN022 | China | 10 Jul 2003 / **20 Aug 2015** | 3627275 / 21 Aug 2005 / 3627275 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 14
Goods: Jewelry, imitation jewelry, watches, ornamental pins, precious metals; Alloys of precious metals; imitation gold; household utensils of precious metal; Containers of precious metal; Works of art of precious metal; Boxes of precious metal, bands, chains, buckles all for watches, key rings (trinkets or fobs) in Class 14.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN021 | China | 10 Jul 2003 / **6 Feb 2015** | 3627276 / 7 Feb 2005 / 3627276 | Registered / renewed | Boss & Young, Tim Quinlan | PAUL FRANK

Class 9
Goods: Electronic data media; optical data media; magnetic data media; eyeglasses; sunglasses; protective goggles; protective cases for glasses; frames for glasses; chains for glasses; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks; floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes cassettes; audio magnetic tapes; data processing apparatus; and equipment; cameras; mouse pad in Class 09.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN025 | China | 10 Jul 2003 / **20 Sep 2015** | 3627292 / 21 Sep 2005 / 3627292 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 28
Goods: Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and amusement machines, automatic and coin-operated in Class 28.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN024 | China | 10 Jul 2003 / **6 Jan 2016** | 3627293 / 7 Jan 2006 / 3627293 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 25
Goods: Clothing, footwear, and headgear in Class 25.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN023 | China | 10 Jul 2003 / **6 Jan 2016** | 3627294 / 7 Jan 2006 / 3627294 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 18
Goods: Animal skins; Imitation leather; cases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; cheque book cases, umbrellas in Class 18.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN027 | China | 6 Apr 2006 / **6 Jul 2019** | 5269269 / 7 Jul 2009 / 5269269 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 16
Goods: Children's books; fiction and non-fiction books featuring animated characters; cartoons and biographies featuring animated characters from Julius & Friends; cartoon prints and strips; address books; notebook pads; day planners; stationery, diary journals, posters, cards, calendars, invitation card; greeting card in Class 16.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN026 | China | 6 Apr 2006 / **20 Apr 2019** | 5269270 / 21 Apr 2009 / 5269270 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 12
Goods: Bicycles and motorized scooters in Class 12.

---

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | 044225-3-CN028 | China | 6 Apr 2006 / **20 Jun 2019** | 5269271 / 21 Jun 2009 / 5269271 | Registered | Boss & Young, Tim Quinlan | PAUL FRANK

Class 20
Goods: Non-metal furniture components; mirrors; furniture; wickerwork; wood substitute goods; wood products; cushions; mats; office furniture; picture frames; furniture fittings, not of metal; glass mirrors in Class 20.

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 6 Apr 2006 | 5269272 | Registered | Boss & Young
044225-3-CN029 | 27 Jun 2019 | 28 Jun 2009 | 5269272 | Tim Quinlan | PAUL FRANK

Class 24
Goods: Textile material; fabric; textile fabric; bed covers; table covers; household linen; linen cloths; bed linen; table linen; table cloths; curtains of textile or plastic; pillow shams; sheets; eiderdowns; duvets; covers for eiderdowns and duvets; handkerchiefs of textile; napkins of textile; serviettes; table mats (not of paper); flannels; traced cloth for embroidery; tapestry (wall hangings) of textile; rugs (traveling); pillow cases; shower curtains of textile or plastic; fitted toilet lid covers of fabric; towels in Class 24.

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 6 Apr 2006 | 5269273 | Registered | Boss & Young
044225-3-CN030 | 20 Jul 2019 | 21 Jul 2009 | 5269273 | Tim Quinlan | PAUL FRANK

Class 41
Goods: Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; film production in Class 41

## PAUL FRANK HOME

PAUL FRANK INDUSTRIES LLC | PAUL FRANK HOME | China | 17 Jun 2014 | 14612659 | Pending | SIPS - Simone IP Services
571 | Tim Quinlan

Class 35
Goods: Advertising; business management assistance; sales promotion for others; personnel management consultancy; relocation services for business; computerized file management; business auditing; rental of vending machines; sponsorship search; rental of sales stands; retail or wholesale services for pharmaceutical, veterinary and sanitary preparations and medical supplies

## PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520738 | Registered | Boss & Young
044225-3-CN031 | 13 Oct 2014 | 14 Oct 2004 | 3520738 | Renewal due | Tim Quinlan

Class 9
Goods: Electronic data media, optical data media; magnetic data media; sunglasses, eyeglasses; protective goggles; protective cases for glasses; frames for glasses; cords for glasses; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes; cassettes; audio magnetic tapes; data processing apparatus and equipment; cameras; mouse pad in Class 09.

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520794 | Registered | Boss & Young
044225-3-CN033 | 27 Jul 2018 | 28 Jul 2008 | 3520794 | allow to lapse | Tim Quinlan

Class 18
Goods: Animal skins, imitation leather, suitcases, handbag; beach bags; hold-alls; multi-purpose handbags; waist bags; pouches; traveling trunks, traveling bags, traveling cases, valises, vanity cases (not fitted), attachÃ© cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather); credit card holders (make of leather or imitation leather); backpacks for travel; rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, checkbooks holders (made of leather or imitation leather); umbrellas in Class 18.

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520795 | Registered | Boss & Young
044225-3-CN032 | 27 Nov 2014 | 28 Nov 2004 | 3520795 | Renewal due | Tim Quinlan

Class 14
Goods: Jewelry, imitation jewelry, clocks, watches, ornamental pins; precious metals; alloys of precious metals; imitation gold; household utensils of precious metal; containers of precious metal; works of art of precious metal, boxes of precious metal, brands of watches; chains of watches; buckles of watches; key rings in Class 14.

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520796 | Registered | Boss & Young
044225-3-CN034 | 27 May 2015 | 28 May 2005 | 3520796 | Tim Quinlan

Class 25
Goods: Clothing, footwear and headgear in Class 25.

## PAUL FRANK with House & Trees Design

PAUL FRANK INDUSTRIES LLC | PAUL FRANK with House & Trees Design | China | 13 Apr 1999 | 1423203 | Registered | Boss & Young
044225-3-CN046 | 20 Jul 2020 | 21 Jul 2000 | 1423203 | allow to lapse | Tim Quinlan

Class 25
Goods: Clothing, footwear, hosiery and headgear in Class 25.

## PLANNED PINES

PAUL FRANK INDUSTRIES LLC | PLANNED PINES | China | 6 Apr 2006 | 5269267 | Registered | Boss & Young
044225-3-CN040 | 20 Aug 2019 | 21 Aug 2009 | 5269267 | Tim Quinlan

Class 28
Goods: Toys, namely stuffed toys, action and play figures; stuffed animals, push toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; novelties for parties, dances (party favors); arcade games, board games, card games in Class 28.
Goods: Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41.

PAUL FRANK INDUSTRIES LLC | PLANNED PINES | China | 6 Apr 2006 | 5269268 | Registered | Boss & Young
044225-3-CN041 | 20 Jul 2019 | 21 Jul 2009 | 5269268 | Tim Quinlan

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **PLANNED PINES**<br>*044225-3-CN039* | China<br>***27 Apr 2019*** | 6 Apr 2006<br>***28 Apr 2009*** | 5269363<br>***5269363*** | Registered | Boss & Young<br>*Tim Quinlan* |

| | |
|---|---|
| Class | 9 |
| Goods | Electronic data media, optical data media, magnetic data media, eyeglasses, sunglasses, goggles, protective cases for glasses, frames for glasses, glass chains, cords for glasses, protective goggles, optical disks, disk drives for computers, VCD video compact disks, floppy disks, computer hardware, computer software [recorded] and firmware, videos, videotapes; cassettes, audio magnetic tapes, data processing apparatus and equipment; cameras; mouse pads; cinematographic film [exposed]; computer games; compact disc holders in Class 09. |

## SKURVY Design

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | China | 10 Apr 2003 | 3520801 | Registered | Boss & Young |  |
| | *044225-3-CN045* | ***20 Sep 2018*** | ***21 Sep 2008*** | ***3520801*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing; footwear; headgear [in Class 25]. |

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | China | 10 Apr 2003 | 3520802 | Registered | Boss & Young |
| | *044225-3-CN044* | ***13 May 2018*** | ***14 May 2008*** | ***3520802*** | | *Tim Quinlan* |

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins, imitation leather; suitcases, handbags, beach bags, handbags, waist bags, pouches, traveling bags and traveling cases, valises, vanity cases, attachÃ© cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather); credit card holders (made of leather or imitation leather); backpacks for travel; rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, checkbook holders made of leather or imitation leather; umbrellas in Class 18. |

*TM Administrator - END OF REPORT*

*IPPO WebTMS: printed 2 Mar 2015 19:59*

## Trademark Records By Trademark

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| *Client* | *File Reference* | *Next Renewal Due* | *Reg. Date* | *, No.* | *Sub Status* | *Supervisor* |

### BAOLUO FULANKE in Chinese Characters

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters | Hong Kong | 8 Nov 2011 | 302079531 | Registered | SIPS - Simone IP Services |
| | 044225-3-HK034 | 7 Nov 2021 | 8 Nov 2011 | 302079531 | | Marsha Erickson |

保罗 弗兰克

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 9 |
| Goods | omputer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software (recorded); computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards (IC cards); compact discs (read-only memory); clocks (time-) (time recording devices); reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09 |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); playing cards; garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationary]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modelling clay; chaplets in Class 16 |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18 |
| Class | 25 |
| Goods | Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes (masquerade-); soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25 |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41. |

### Clancy Giraffe Design

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | Hong Kong | 25 Aug 2005 | 300483606 | Registered | SIPS - Simone IP Services |
| | 044225-3-HK001 | 25 Aug 2015 | 11 Jan 2006 | 300483606 | | Marsha Erickson |

| | |
|---|---|
| Class | 18 |
| Goods | Leather, hides, animal skins; sponge leather; artificial fur; polyurethane leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses; walking sticks; credit card cases and holders, backpacks, bookbags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts; umbrellas; cosmetics cases (sold empty); credit card holders and check book covers made of leather, imitation of leather and other materials; parts and fittings for the aforesaid goods in Class 18. |
| Class | 25 |
| Goods | T-shirts, socks, shorts, sweatshirts, sweatpants, pajamas, shirts, pants, skirts, dresses, jackets, coats, raincoats, jumpers, swimwear, underwear; undershirts, underpants, robes, sleepwear, loungewear, camisoles, bras, dress shoes, leather shoes, thongs, slippers, hats, berets, beanies, caps in Class 25. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons and webisodes, distributed over television and the Internet, featuring animated characters in Class 41. |

DA ZUI HOU in Chinese Characters (Series)

PAUL FRANK INDUSTRIES LLC DA ZUI HOU in Chinese Hong Kong 13 Oct 2011 302056897AA Registered SIPS - Simone IP Services

大嘴猴
大嘴猴

Characters (Series)

044225-3-HK037 12 Oct 2021 29 Aug 2013 302056897AA Tim Quinlan

| Class / Goods | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic) ; make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5. |
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; children's helmets; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes in Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |
| Class | 14 |
| Goods | Precious metals (unwrought or semi-wrought); boxes of precious metal; jewelry; bracelets (Jewelry); brooches (Jewelry); chains (Jewelry); charms (Jewelry); earrings; medallions (Jewelry); necklaces (Jewelry); key rings [trinkets or fobs]; ornamental pins; rings (Jewelry); watches; wristwatches; alarm clocks; clocks; clocks and watches (electric); stopwatches; straps for wristwatches in Class 14. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files (office requisites); passport holders; office requisites (except furniture); rubber erasers; school supplies (stationery); stationery; stickers [stationery]; ink; seals stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens (office requisites); writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets (office requisites); blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks, pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (pot of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |
| Class | 24 |
| Goods | Fabrics; tapestry (wall hangings), of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing Internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education); entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and |

television programs; zoological garden services; operating lotteries in Class 41.

| | |
|---|---|
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters (Series) | Hong Kong | 302056897AB | Pending | SIPS - Simone IP Services

456 | Tim Quinlan

大嘴猴
大嘴猴

| | |
|---|---|
| Class | 25 |
| Goods | Clothing; layettes [clothing]; babies pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25. |
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |

**House and Trees Silhouette Design**

PAUL FRANK INDUSTRIES LLC | House and Trees Silhouette Design | Hong Kong | 22 Dec 2006 | 300785061 | Registered | SIPS - Simone IP Services

044225-3-HK006 | 22 Dec 2016 | 17 May 2007 | 300785061 | allow to lapse | Marsha Erickson

| | |
|---|---|
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift wrapping paper, metallic gift wrapping paper, gift boxes made from cardboard, paper gift tags, paper gift bags, paper ribbons for gift wrapping, and paper bows; journals; photographs; adhesives for stationery or household purposes in CLass 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; entertainment services provided by means of video media in Class 41 |

**JULIUS**

PAUL FRANK INDUSTRIES LLC | JULIUS | Hong Kong | 22 Dec 2006 | 300785034 | Registered | SIPS - Simone IP Services

044225-3-HK007 | 22 Dec 2016 | 17 Mar 2008 | 300785034 | Marsha Erickson

JULIUS

| | |
|---|---|
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift wrapping paper, metallic gift wrapping paper, gift boxes made from cardboard, paper gift tags, paper gift bags, paper ribbons for gift wrapping, and paper bows; journals; photographs; adhesives for stationery or household purposes in Class 16. |
| Class | 18 |
| Goods | Cases, including business cases, credit card cases, key cases, traveling cases, briefcases, vanity cases and cosmetics cases sold empty; bags, including, all-purpose carrying bags, beach bags, handbags, holdalls, waist bags, pouches, book bags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, traveling bags; suitcases, valises, portfolios, wallets, billfolds, luggage, purses, walking sticks; backpacks, umbrellas in Class 18. |

**JULIUS Design**

PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 28 Jul 1999 | 200007799 | Registered | SIPS - Simone IP Services

044225-3-HK022 | 28 Jul 2016 | 1 Jun 2000 | 200007799 | Marsha Erickson

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 24 Jun 2003 | 300037520 | Registered | SIPS - Simone IP Services

044225-3-HK020 | 23 Jun 2013 | 18 Nov 2003 | 300037520 | Marsha Erickson

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms; vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09. |
| Class | 14 |
| Goods | Jewelry, imitation jewelry, clocks, watches, ornamental pins; precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; straps, bracelets, buckles, all for watches; key rings in Class 14. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 22 Dec 2006 | 300785043 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK024* | ***22 Dec 2016*** | ***9 May 2007*** | ***300785043*** | | *Marsha Erickson* | |



| | |
|---|---|
| Class | 12 |
| Goods | Bicycles and scooters and parts and fittings therefor in Class 12. |
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift items; journals; photographs; adhesives for stationery or household purpose in Class 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; video media featuring animated characters; motion picture film production and distribution in Class 41. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design** Hong Kong 15 Jan 2003 612/2003 Registered SIPS - Simone IP Services

*044225-3-HK023* ***15 Jan 2020*** ***30 May 2003*** ***200307601*** *Marsha Erickson*

| | |
|---|---|
| Class | 28 |
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design** Hong Kong 4 Jun 2002 8192/2002 Registered SIPS - Simone IP Services

*044225-3-HK021* ***4 Jun 2019*** ***13 May 2003*** ***200305814*** *Marsha Erickson*

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

## Julius Design (Series)

PAUL FRANK INDUSTRIES LLC **Julius Design (Series)** Hong Kong 13 Oct 2011 302056888 Registered SIPS - Simone IP Services

*044225-3-HK036* ***12 Oct 2021*** ***13 Oct 2011*** ***302056888*** *Marsha Erickson*

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-) ; make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5. |
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes in Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |
| Class | 16 |
| Goods | Paper; copying paper (stationery); bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes (stationery); greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers (stationery); document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies (stationery); stationery; stickers [stationery]; ink; seals ~temps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationary and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass (receptacles); painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |

| | |
|---|---|
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors); dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery); fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 35 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages. Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological garden services; operating lotteries in Class 41. |
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

**PAUL FRANK**

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 4 Jul 2003 300042993 Registered SIPS - Simone IP Services PAUL FRANK

044225-3-HK008 3 Jul 2013 12 Mar 2004 300042993 Tim Quinlan

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09. |
| Class | 14 |
| Goods | ; Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, check book cases; umbrellas; parts and fittings for the aforesaid goods; all included in Class 18. |
| Class | 18 |
| Goods | Clothing, footwear and headgear in Class 25. |
| Class | 25 |
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |
| Class | 28 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09.; ; Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, check book cases; umbrellas; parts and fittings for the aforesaid goods; all included in Class 18. ; Clothing, footwear and headgear in Class 25.; Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 22 Dec 2006 300785052 Registered SIPS - Simone IP Services PAUL FRANK

044225-3-HK009 22 Dec 2016 9 May 2007 300785052 Tim Quinlan

| | |
|---|---|
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift items: journals; photographs; adhesives for stationery or household purposes in Class 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; video media featuring animated characters, motion picture film production and distribution in Class 41. |

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 13 Oct 2011 302056905 Registered SIPS - Simone IP Services PAUL FRANK

044225-3-HK035 12 Oct 2021 13 Oct 2011 302056905 Tim Quinlan

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-) ; make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); |

| | |
|---|---|
| | antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5.; |
| Class | 6 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse (data processing equipment); pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes In Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats In Class 12. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes In Class 15. |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals ~tamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 35 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages. Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; department store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in department stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing Internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological garden services; operating lotteries In Class 41. |
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

**PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design**

PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | Hong Kong | 19 Feb 2003 | 2563/2003 | Registered | SIPS - Simone IP Services |
| 044225-3-HK012 | | 19 Feb 2020 | 19 Feb 2003 | 200312354 | allow to lapse | Tim Quinlan |

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | Hong Kong | 19 Feb 2003 | 2564/2003 | Registered | SIPS - Simone IP Services |
| 044225-3-HK013 | | 19 Feb 2020 | 19 Feb 2003 | 200312355 | allow to lapse | Tim Quinlen |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

**PAUL FRANK with House & Trees Design**

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK with House & Trees Design | Hong Kong | 8 Apr 1999 | B1826/2001 | Registered | SIPS - Simone IP Services |
| 044225-3-HK025 | | 8 Apr 2016 | 15 Feb 2001 | B1826/2001 | allow to lapse | Tim Quinlan |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear, headgear in Class 25 |

**PLANNED PINES**

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PLANNED PINES | Hong Kong | 31 Mar 2006 | 300611045 | Registered | SIPS - Simone IP Services |
| 044225-3-HK026 | | 31 Mar 2016 | 1 Nov 2006 | 300611045 | | Marsha Erickson |

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glassese, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts therefor; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cd's, cd-roms, vcd's, dvd's, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mousepads in Class 09. |
| Class | 28 |
| Goods | Toys, such as stuffed toys, stuffed animals, plush toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; action figures; play figures; games, such as adults and children's party games, arcade games, board games, card games; and playthings in Classs 28.; Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41. |
| Class | 41 |
| Goods | Data media, electronic data media, optical data media, magnatic data media; glassese, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts therefor; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cd's, cd-roms, vcd's, dvd's, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mousepads in Class 09.; Toys, such as stuffed toys, stuffed animals, plush toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; action figures; play figures; games, such as adults and children's party games, arcade games, board games, card games; and playthings in Classs 28.; Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41. |

**SKURVY Design**

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | SKURVY Design | Hong Kong | 19 Feb 2003 | 2553/2003 | Registered | SIPS - Simone IP Services |
| 044225-3-HK027 | | 19 Feb 2020 | 19 Feb 2003 | 200310466 | | Tim Quinlan |

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09. |

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | SKURVY Design | Hong Kong | 19 Feb 2003 | 2554/2003 | Registered | SIPS - Simone IP Services |
| 044225-3-HK028 | | 19 Feb 2020 | 19 Feb 2003 | 200310467 | | Tim Quinlan |

| | |
|---|---|
| Class | 14 |
| Goods | Jewellery, imitation jewellery, clocks, watches, ornamental pins; precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; straps, bracelets, buckles, all for watches; key rings in Class 14 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | Hong Kong | 19 Feb 2003 | 2555/2003 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK029* | ***19 Feb 2020*** | ***19 Feb 2003*** | ***200310534*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, travelling bags and cases, valises, vanity cases, briefcases, portfolios, attache cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | SKURVY Design | Hong Kong | 19 Feb 2003 | 2003[illegible] | Registered | SIPS - Simone IP Services | |
| | 044225-3-HK030 | 19 Feb 2020 | 19 Feb 2003 | 200310535 | | Tim Quinlan | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

*TM Administrator - END OF REPORT*

*IPPO WebTMS: printed 2 Mar 2015 18:51*

Trademark Records By Trademark

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| *Client* | *File Reference* | *Next Renewal Due* | *Reg. Date* | *No.* | *Sub Status* | *Supervisor* |

JULIUS Design (Color)

PAUL FRANK INDUSTRIES LLC JULIUS Design (Color) Macau 19 Jan 2015 94932 Pending SIPS - Simone IP Services

825

Tim Quinlan

| Class | 25 |
| --- | --- |
| Goods | Clothing, footwear and headgear |

TM Administrator - END OF REPORT

IPPO WebTMS: printed 2

**EXHIBIT 2**
**TRADEMARK AND COPYRIGHT LEGEND**

Full Notice:
    ™ and © (year of publication*) Paul Frank Industries LLC. Paul Frank and all related logos, characters, names, and distinctive likenesses thereof are the exclusive property of Paul Frank Industries LLC. All Rights Reserved. Used Under Authorization.

Abbreviated Notice
    ™ & © (year of publication*) Paul Frank Industries LLC. All Rights Reserved. Used Under Authorization.

Short Notice (for extremely small items only)
    ™ & © (year of publication*) Paul Frank Industries LLC

    *NOTE: Year of publication = year item is first marketed/shown to retailers

All copyright and trademark notices must be of a sufficient size to be read clearly. All uses of the logo(s) must include ™ immediately adjacent to the logo (until such time as the registered trademarks issue, at which time the logos on new materials must shift from ™ to ®).

If Licensee uses any service mark, trademark, trade dress, logo, representation or identifier of Licensee or any other third party, if and to the extent specifically permitted by Licensor by notice to Licensee (each, a "**Third Party Identifier**") on or in relation to any of Licensed Products, the packaging or advertising, such use shall be made so as to avoid the creation or appearance of joint rights or a joint trademark, service mark or trade dress. Licensee shall utilize Third Party Identifiers solely in a separated context from the Property and any notices therefor and any such use must be specifically approved in writing by Licensor before use.

# EXHIBIT 3

## PART I, ASSIGNED LICENSE AGREEMENTS

| Country | Agreement | Contract ID | Start | End | Categories |
|---|---|---|---|---|---|
| China | PFI Clever Time 9/30/2017 (TEEN WATCHES) | 33400 | 10/1/2014 | 9/30/2017 | Watches |
| | PFI Clever Time Industrial Ltd. 12/31/2017 (KIDS WATCHES) | 31579 | 9/1/2014 | 12/31/2017 | Watches |
| | PFI MAXX International Limited 9/30/2019 | 28018 | 4/1/2014 | 9/30/2019 | Retail Stores |
| | PFI Maxx Intl (Eastern Linkage - online) renewal 12/31/2017 | 6593 | 1/1/2015 | 12/31/2017 | Online Stores |
| | PFI Maxx Intl (Eastern Linkage renewal) 12/31/2017 | 6587 | 1/1/2015 | 12/31/2017 | Home Goods |
| | PFI Maxx Intl (Eastern Linkage-stationery renewal) 12/31/2017 | 6588 | 1/1/2015 | 12/31/2017 | Stationery |
| | PFI MAXX Intl (Kids Bags) 12/31/17 | 6592 | 11/1/2012 | 12/31/2016 | Bags |
| | PFI Maxx Intl (kids home) 12/31/17 | 6589 | 11/1/2012 | 12/31/2016 | Home Goods |
| | PFI Maxx Intl (kids stationery) 12/31/16 | 6590 | 11/1/2012 | 12/31/2016 | Stationery |
| | PFI Pinghu Shuangxi Baby Carrier 9/30/2017 | 29002 | 4/1/2014 | 9/30/2017 | Bicycle |
| | PFI PROTAP (Shanghai) 6/30/2016 | 3940 | 12/1/2011 | 6/30/2017 | Footwear |
| | PFI QingDao Josion Garments Co. (renewal) 6/30/2017 (COLD WEATHER) | 17881 | 7/1/2014 | 6/30/2017 | Apparel |
| | PFI QingDao Josion Garments Co. (renewal) 9/30/2017 (LUGGAGE) | 17880 | 8/1/2014 | 9/30/2017 | Bags - Travel |
| | PFI Qingdao Josion Garments Co. 9/30/2016 (BAGS) | 6776 | 1/1/2013 | 9/30/2016 | Bags |
| | PFI QingDao Josion Garments Co., Ltd. 6/30/17 | 26498 | 3/1/2014 | 6/30/2017 | Jewelry |
| | PFI Shanghai Joye Industrial 12/31/2016 | 18462 | 4/1/2013 | 12/31/2016 | Footwear |
| | PFI Shanghai Joye Industries Co., Ltd. 3/31/2018 | 28994 | 5/1/2014 | 3/31/2018 | Kids Apparel |
| | PFI Shantou Fine Sun Jewelry 6/30/2019 | 23836 | 11/1/2013 | 6/30/2019 | Jewelry |
| | PFI Shenzhen Heze Lianchuang 12/31/2016 | 22960 | 4/1/2014 | 6/30/2017 | Eyeglasses |
| | PFI Zhongshan City Guruio Foods Co., Ltd. 9/30/2017 | 29105 | 4/1/2014 | 9/30/2017 | Food (Baked) |
| | PFI Zunan Cultural 3/31/2016 (GIFT) | 6774 | 11/1/2012 | 3/31/2016 | Dolls-Gifts |
| | PFI Zunan Cultural 3/31/2019 (GIFT) RENEW | 28995 | 4/1/2016 | 3/31/2019 | Dolls-Gifts |
| | PFI Zunan Cultural 9/30/2016 (AUTOMOTIVE) | 17725 | 1/1/2013 | 9/30/2016 | Automotive |
| | PFI Zunan Cultural 9/30/2019 (AUTOMOTIVE) RENEW | 29071 | 10/1/2016 | 9/30/2019 | Automotive |
| Hong Kong | PFI Richever International (renewal) 12/31/2015 | 5461 | 1/1/2013 | 12/31/2015 | Bags |
| | PFI Richever International 12/31/2016 (KIDS) | 18332 | 2/1/2013 | 12/31/2016 | Children's Bags |
| | PFI Richever International 3/31/2015 (RETAIL) | 4345 | 11/1/2011 | 3/31/2015 | Retail |

# EXHIBIT 3
# PART II, LICENSOR'S MULTI-TERRITORY LICENSE AGREEMENTS

| | | | | | |
|---|---|---|---|---|---|
| Worldwide | PFI 26 Bars and a Band | 5361 | 9/2/2012 | 6/30/2015 | Pet |
| | PFI Acme Archives Limited | 4748 | 2/1/2012 | 12/31/2015 | Fine Art |
| | PFI H&M | 6631 | 11/29/2012 | 12/31/2015 | Apparel, Accessories |
| | PFI Marino Andriani, LLC | 23284 | 1/1/2014 | 12/31/2015 | Electronics |
| | PFI Skullcandy | 2513 | 1/1/2011 | 12/31/2015 | Headphones |
| | PFI Spidi International | 5353 | 7/1/2012 | 6/30/2015 | Camera cases and accessories |
| | PFI Thinkplus Co. Ltd. | 24335 | 1/1/2014 | 12/31/2018 | None iPhone mobile cases |
| | PFI Veemee Ltd. 9/30/2016 | 32128 | 11/17/2014 | 9/30/2016 | Digital |
| | PFI Bare Tree Media, Inc. 12/31/2016 | 33004 | 11/1/2014 | 12/31/2016 | Digital |

**EXHIBIT 4**
**CODE OF CONDUCT FOR MANUFACTURERS**

At Paul Frank Industries LLC ("**Paul Frank**"), we are committed to:

- A standard of excellence in every aspect of our business and in every corner of the world;
- Ethical and responsible conduct in all of our operations;
- Respect for the rights of all individuals; and
- Respect for the environment.

We expect these same commitments to be shared by all manufacturers of our merchandise. *At a minimum,* we require that all manufacturers of Paul Frank merchandise meet the following standards:

**Child Labor**

Manufacturers will not use child labor.

The term "child" refers to a person younger than 15 (or 14 where local law allows) or, if higher, the local legal minimum age for employment or the age for completing compulsory education.

Manufacturers employing young persons who do not fall within the definition of "children" will also comply with any local laws and regulations.

**Involuntary Labor**

Manufacturers will not use any forced or involuntary labor, whether prison, bonded indentured or otherwise.

**Coercion and Harassment**

Manufacturers will treat each employee with dignity and respect, and will not use corporal punishment, threats of violence or other forms of physical, sexual, psychological or verbal harassment or abuse.

**Nondiscrimination**

Manufacturers will not discriminate in hiring and employment practices, including salary, benefits, advancement, discipline, termination or retirement, on the basis of race, religion, age, nationality, social or ethnic origin, sexual orientation, gender, political opinion or disability.

**Association**

Within the limitation of local law, manufacturers will respect the rights of employees to associate, organize and bargain collectively in a lawful and peaceful manner, without penalty or interference.

**Health and Safety**

Manufacturers will provide employees with a safe and healthy workplace in compliance with local laws and regulations, ensuring at a minimum, reasonable access to potable water and sanitary facilities, fire safety, and adequate lighting and ventilation.

Manufacturers will also ensure that the same standards of health and safety are applied in any housing that they provide for employees.

**Compensation**

We expect manufacturers to recognize that wages are essential to meeting employees' basic needs. Manufacturers will, at a minimum, comply with all local laws regarding wage and hour laws and regulations, including those relating to minimum wages, overtime, maximum hours, piece rates and other elements of compensation, and provide legally mandated benefits. If local laws do not provide for overtime pay, manufacturers will pay at least regular wages for overtime work. Except in extraordinary business circumstances, manufacturers will not require employees to work more than the lesser of (a) 48 hours per week and 12 hours overtime or (b) the limits on regular and overtime hours allowed by local law or, where local law does not limit the hours of work, the regular work week in such country plus 12 hours overtime. In addition, except in extraordinary business circumstances, employees will be entitled to at least one day off in every seven-day period.

Where local industry standards are higher than applicable legal requirements, we expect manufacturers to meet the higher standards.

**Protection of the Environment**

Manufacturers will comply with all local environmental laws and regulations.

**Other Laws**

Manufacturers will comply with all local laws and regulations, including those pertaining to the manufacture, pricing, sale and distribution of merchandise.

All references to "local law" in this Code of Conduct include local laws, rules and regulations as well as applicable treaties of the jurisdiction where the manufacturer is located.

**Monitoring and Compliance**

Manufacturers will authorize Paul Frank and its designated agents (including third parties), at their own cost, to engage in monitoring activities to confirm compliance with this Code of Conduct, including unannounced on-site inspections of manufacturing facilities and employer-provided housing; reviews of books and records relating to employment matters; and private interviews with employees, provided such monitoring activities are conducted in ordinary business hours and no more than twice a year. Manufacturers will maintain on site all documentation that may be needed to demonstrate compliance with this Code of Conduct.

**Publication**

Manufacturers will take appropriate steps to ensure that the provisions of this Code of Conduct are communicated to employees, including the prominent posting of a copy of this Code of Conduct, in the local language and in a place readily accessible to employees, at all times.

**Foreign Corrupt Practices Act**

Each manufacturer represents and warrants that it has reviewed and understands the provisions of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), and its purposes, and that it has taken no action with respect to this Agreement and the transactions contemplated hereby which would constitute a violation of the applicable laws or which would or might cause Licensee, Paul Frank or the parent or any subsidiary or affiliate of the parent of Paul Frank to violate the FCPA. Each manufacturer further represents and warrants, that manufacturer will not take any action, which would constitute a violation of any PRC or Hong Kong anti-corruption laws as applicable. Each manufacturer undertakes promptly to notify Licensee in writing upon knowing of any fact or circumstance that would render manufacturer's representations herein to no longer be true. If Licensee learns that manufacturer has violated, or has taken any action in connection with this Agreement and the transactions contemplated hereby which if taken by a United States company would violate, or has caused Licensee, Paul Frank or Paul Frank's parent or the subsidiaries or affiliates of Paul Frank's parent to violate, the FCPA in connection with this Agreement, Licensee shall have the right, at their option, to terminate the agreement with manufacturer. The parties agree that full disclosure of the existence and terms of this Agreement may be made at any time and for any reason to such persons, departments, branches or agencies of the Government of the United States of America and/or the government of the Territory, as Paul Frank's legal counsel shall determine has a legitimate need to know such terms.

**Agreed to and Acknowledged**:

Manufacturer Name: ______________________________

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

**EXHIBIT 5**
**APPROVAL OF MANUFACTURER**

Licensee must obtain and submit this executed approval form to Licensor for any third party manufacturer of any of Licensed Products as described in "**Schedule A.**"

MANUFACTURER: ______________________________
TERRITORY OF MANUFACTURE: ______________________
LICENSED PRODUCTS: __________________________
PROPERTY: _________________________________

We are a licensee of Paul Frank Industries LLC ("**Licensor**") and have the right to the use of the Property. You have been engaged by us as a manufacturer for Licensed Products. This letter sets forth and limits your sole authorization for use of the Property in connection with manufacturing of Licensed Products for us.

1. You acknowledge and agree that the intellectual property associated with the marking and sale of Licensed Products accrues solely and exclusively to the Licensor, throughout the universe, and that you shall never attach or contest the validity of Licensor's title to or ownership of the intellectual property anywhere or at any time. You shall not use the Property in any manner whatsoever other than as directed by us in writing You acknowledge and agree that we are not an agent of Licensor and that under no circumstances shall Licensor have any obligation or liability to you hereunder or otherwise in any way arising out of the relationship between you and us, Licensed Products or otherwise.

2. You shall affix or apply the Licensor's marks and any required labels to the products and/or packaging materials strictly in conformity with specifications provided by us, or as otherwise directed by us, including, but not limited to the application and use of all copyright, trademark and other notices in conformance with applicable law. You shall not use any other name, copyright, trademark, service mark or design in connection with Licensed Products and/or packaging materials unless so directed by us in writing.

3. You are not authorized to, and will not, manufacture or distribute any Licensed Product or otherwise use the Property except for us pursuant to our written instructions to you. You represent, warrant and further agree that: (c) all Licensed Products shall be shipped only to us or for us to other locations in accordance with our written instructions and shall be labeled with the correct country of origin and in accordance with the applicable laws and regulations; and (d) except as otherwise specifically permitted by this letter, you shall not manufacture, reproduce, distribute, sell, or otherwise exploit or turn to account any Licensed Product or any other material using any of the Property.

4. If any Licensed Product is rejected by us or by Licensor including, but not limited to, because they are shipped late, the order therefor has been canceled, defects in quality or other defect,

or for any other reason or no reason at all, you immediately shall remove from all such Licensed Products, and any packaging, wrapping and insert materials, all labels, tags and other markings bearing the Property before disposing of them (other than the care label if shipped to the United States). If such markings cannot be removed, you immediately shall notify us in writing that such markings cannot be removed and we may require a means for disposal, at which point you shall either follow our suggestion for disposal or immediately destroy all such Licensed Products and packaging, wrapping and insert materials. You immediately shall supply to us a certificate of destruction, executed under penalty of perjury by a senior executive of your company, attesting to said destruction in accordance herewith.

5. You shall not, directly or indirectly, disclose or use at any time (either during or after the completion of your manufacturing obligations, except to us or Licensor as we or Licensor may direct) any confidential information of ours or of Licensor. All information and supporting materials of any kind (and rights arising therefrom) relating to the production, design, sale or marketing of any Licensed Products are and will be our and/or Licensor's exclusive property and are to be used solely in accordance with our or Licensor's written instructions and under no circumstances shall be used by you, or any or your employees or affiliates or anyone else, in relation to any non-Licensed Products.

6. You shall permit us, Licensor or our or Licensor's designee to visit and inspect your activities and premises including, but not limited to, the premises of any permitted subcontractor, at any time upon reasonable notice.

7. When we cease to require you to manufacture Licensed Products , or if Licensor or its representatives notify you that we no longer have the right to allow you to manufacture Licensed Products, you immediately shall deliver to Licensor, or in accordance with Licensor's written instructions, destroy any molds, plates, engravings or other devices used to reproduce Licensed Products or, at Licensor's sole election, made in writing delivered to you by Licensor, shall give evidence satisfactory to Licensor of the destruction thereof as hereinabove provided.

8. If you fail to abide by any of the foregoing, we and/or Licensor shall have the unrestricted right to enforce, exercise and obtain all legal rights and remedies against you including, but not limited to, compensation for all damages sustained as a result of your actions or omissions, as well as temporary, preliminary and permanent injunctive relief, without any requirement to provide security or any obligation to prove that money damages are an inadequate remedy. All rights and remedies available to us shall also be available to Licensor, in its sole and absolute discretion, with the understanding that Licensor is an intended third party beneficiary of this letter. No delay or omission by us in the exercise of any right or to pursue any remedy shall impair or be construed as a waiver of such right or remedy or any default or acquiescence therein. No waiver of any breach of any provision of

this letter will be deemed a waiver of any prior or subsequent breach thereof, or of any other provision. No extension by us of a time for performance by you will be deemed an extension of time for any other performance by you.

9. This letter shall be construed pursuant to the laws of Hong Kong applicable to agreements entered into and fully performed therein. Hong Kong courts shall have jurisdiction and venue of any action or proceeding related to this letter and you consent to the personal jurisdiction of such courts. Any determination by any such court shall be binding upon you and us and all other courts of the world wherever located. You shall appoint, by written notice to us, immediately upon request, a person located in Hong Kong, on whom service of process may be made in your behalf, failing which you hereby irrevocably agree that service of process or any other paper upon you may be made by certified or registered mail, return receipt requested, at your business address or upon any such agent for service, in addition to any other method authorized by Hong Kong law. This letter shall be interpreted to provide us and Licensor with the maximum control of the Property and the use thereof.

Please execute and return the enclosed copy of this Approval to the undersigned acknowledging your agreement to abide by the foregoing.

ACKNOWLEDGED AND AGREED:

MANUFACTURER:

By: ______________________________
Its: ______________________________
Address: ___________________________
Date: _____________________________

**EXHIBIT 6**
**CODE OF CONDUCT FOR LICENSEES**

At Paul Frank Industries LLC, we are committed to:

- A standard of excellence in every aspect of our business and in every corner of the world;
- Ethical and responsible conduct in all of our operations;
- Respect for the rights of all individuals; and
- Respect for the environment.

We expect these same commitments to be shared by all Paul Frank Industries LLC licensees and the manufacturers with which they work in the production of Paul Frank Industries LLC merchandise. *At a minimum*, we require that all Paul Frank Industries LLC licensees meet the following standards:

**Conduct of Manufacturing**

Licensees that engage directly in the manufacturing of Paul Frank Industries LLC merchandise will comply with all of the standards set forth in Paul Frank Industries LLC's Code of Conduct for Manufacturers, a copy of which is attached.

Licensees will ensure that each manufacturer and its subcontractor also enters into a written commitment with Paul Frank Industries LLC to comply with the standards set forth in Paul Frank Industries LLC's Code of Conduct for Manufacturers.

Licensees will prohibit manufacturers from subcontracting the manufacture of Paul Frank Industries LLC merchandise or components thereof without Paul Frank Industries LLC's express written consent, and only after the subcontractor has entered into a written commitment with Paul Frank Industries LLC to comply with Paul Frank Industries LLC's Code of Conduct for Manufacturers.

**Monitoring and Compliance**

Licensees will take appropriate steps, in consultation with Paul Frank Industries LLC, to develop, implement and maintain procedures to evaluate and monitor manufacturers of Paul Frank Industries LLC merchandise and use best efforts to ensure compliance with Paul Frank Industries LLC's Code of Conduct for Manufacturers, including on-site inspections of manufacturing facilities and employer-provided housing; review of books and records relating to employment matters; and private interviews with employees. Licensor shall use reasonable efforts in scheduling and conducting any such inspection to minimize disruption of the ordinary business of Licensee or manufacturers.

Licensees will authorize Paul Frank Industries LLC and its designated agents (including third parties) to engage in similar monitoring activities to confirm Licensees' compliance with this Code of Conduct. Licensees will maintain on site all documentation that may be needed to demonstrate such compliance.

**EXHIBIT 7**
**PARTIAL REFUND OF LICENSE FEE REGARDING CORE IP**

Licensor and Licensee agree that fifty percent (50%) of the license fee paid by Licensee ("**Attributable License Fee**") is attributable to the license by Licensor to Licensee of the trademarks "Paul Frank," or "Julius design" used individually or in combination, and/or the copyrights in the Julius design (such intellectual property rights shall be referred to as the "**Core IP**").

In the event of a breach of this Agreement by Licensor under Section 13(c)(iii), Licensor shall refund such portion of the Attributable License Fee to Licensee taking into account and based on the following factors ("**Factors**"):

    a.  The remaining term of the License Period compared to the total License Period; and
    b.  The percentage attributable to such lost Core IP determined as a percentage based upon a fraction (i) the numerator of which is the revenue generated in the prior 24 month period from such Core IP that was lost and (ii) the denominator of which is the total revenue generated from the all the Core IP in the same prior 24 month period; and
    c.  Any revenues generated by Licensee from such Core IP for the eighteen (18) month period commencing on the date of the Loss Notice (as defined below) shall offset any amount of refund due to Licensee by Licensor. This offset shall not be applicable if Licensee was required to pay any amounts to acquire or license from a third party the rights that were lost by Licensor.

Upon a breach of this Agreement by Licensor under Section 13(c)(iii), Licensor shall notify Licensee in writing of such loss of rights ("**Loss Notice**"). Within 60 days of receipt of such Loss Notice, Licensee shall provide to Licensor revenue information and reasonable backup documentation to allow Licensor to calculate the Factors. Upon receipt of such information from Licensee, Licensor shall have 60 days to request clarifications and such additional information as Licensor deems reasonably necessary to evaluate the Factors and shall have the right to audit Licensee's books and records with respect to such Factors and Licensor shall compute in its reasonable determination the amount to be refunded, taking into account the available information with respect to paragraph (c) of the criteria for the Factors and shall provide such determination in writing to Licensee ("**Refund Notice**"). Licensee shall have 30 days to reject or accept the amount set forth in the Refund Notice (silence shall be deemed acceptance). If the amount set forth in the Refund Notice is accepted, Licensor shall pay 50% of such amount within 30 days and the remaining 50% eighteen (18) months after the first payment (to allow a final calculation of any amounts under paragraph (c) of the criteria for Factors to be determined) and such payment shall be reduced by such amounts under paragraph (c) of the criteria for Factors. For the avoidance of doubt, in no event shall any amount greater than the Attributable License Fee be refundable by Licensor.

# EXHIBIT 7

## Illustrative Proforma Calculation

Paul Frank Industries

**ILLUSTRATIVE PROFORMA CALCULATION**

as of January 2015

| | Past 24 Months | | | | |
|---|---|---|---|---|---|
| | Paul Frank | Julius | Subtotal | Other Non Core IP | Grand Total |
| **Apparel (1)** | 150,000 | 50,000 | 200,000 | 200,000 | 400,000 |
| **Accessories** | - | - | - | - | - |
| **Footwear** | 75,000 | 75,000 | 150,000 | 150,000 | 300,000 |
| **Subtotal** | 225,000 | 125,000 | 350,000 | 350,000 | 700,000 |
| **other Non Core Categories** | 100,000 | 100,000 | 200,000 | 200,000 | 400,000 |
| **Total** | 325,000 | 225,000 | 550,000 | 550,000 | 1,100,000 |
| **% of Grand Total** | 30% | 20% | 50% | 50% | 100% |

If Licensor looses rights to Paul Frank IP in Apparel & Accessories after 8 full years into 15 year deal, refund would be calculated as follows

(A)

| | | |
|---|---|---|
| Purchase Price | $ | 65,000,000 |
| Term in years | | 15 |
| Remaining term in years | | 7 |
| Atttibutable % to Core IP | | 50% |
| Max Refund for remaining | $ | 15,166,667 |

(B)

last 24 months

| | | |
|---|---|---|
| Lost IP in Core Categories (1) | $ | 150,000 |
| Total Core IP in Core Categories | $ | 350,000 |
| % | | 42.9% |

Refund Amount $ 6,500,000 (offset by any revenue generated during the 18 months after the IP is lost assuming no license was required to be obtained by Licensee from a third party)

(1) assumes that the whole class of apparel is lost, if only a category in apparel is lost (e.g. hats), then only the revenue attributable to such category in the last is 24 months shall be the numerator of the calculation under (B) and the remainder of the revenue for the class would be included in the denominator

# EXHIBIT 3

# FIRST AMENDMENT TO MASTER LICENSE AGREEMENT

This First Amendment ("Amendment") to the Master License Agreement dated January 1, 2015 (the "Agreement") is entered into by and between Paul Frank Industries LLC ("Licensor") and Grand Union International Trading Limited ("Licensee"), as of April 27, 2018 (the "Amendment Date"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS, Licensor and Licensee duly executed the Agreement pursuant to which, inter alia, Licensor granted to Licensee the License as set forth therein; and

WHEREAS, Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

1. Section 9(h) - Right of First Negotiation. Section 9(h) of the Agreement is deleted in its entirety.

2. Section 28 - Dispute Resolution. Section 28 of the Agreement is deleted in its entirety and replaced with the following:

   If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having

jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

3. Section 30 - Governing Law. Section 30 of the Agreement is deleted in its entirety and replaced with the following:

This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law.

4. Waiver of Jury Trial. EACH PARTY TO THE AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THE AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AMENDMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 4.

5. General. The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Amendment Date set forth above.

| PAUL FRANK INDUSTRIES LLC | GRAND UNION INTERNATIONAL TRADING LIMITED |
|---|---|
| By: [signature] | By: [signature] |
| Name: Janet HSU | Name: |
| Title: CEO | Title: |

# EXHIBIT 4

# SECOND AMENDMENT TO MASTER LICENSE AGREEMENT

This Second Amendment (**"Amendment"**) to the Master License Agreement dated January 1, 2015, as previously amended (the **"Agreement"**) is entered into as of **August 19, 2021** (The "Second Amendment Date") by and between Paul Frank Limited (**"Licensor"**) and Grand Union International Trading Limited (**"Licensee"**). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS. The rights and obligations of the Agreement have been assigned by the original licensor under such Agreement, Paul Frank Industries LLC to Paul Frank Limited as of December 10, 2020, and Paul Frank Limited has agreed to assume the rights and obligations of the Agreement and its successive Amendments as Licensor.

WHEREAS. Accordingly, Paul Frank Limited, hereby acting as Licensor under such Agreement is entitled to enforce the applicable terms of such Agreement under this Amendment.

WHEREAS. Licensee acknowledges and agrees that Paul Frank Industries LLC has fulfilled all the communication requirements and any other existing requirements set in Section 24(Assignment) of the Agreement with regard to Licensee for the effective assignment of the Agreement.

WHEREAS. Licensor and Licensee duly executed the Agreement pursuant to which, *inter alia*, Licensor granted Licensee the exclusive, sublicensable and non-transferable license to utilize the Property, solely in connection with the design, development, manufacture, marketing, promotion, distribution, offer for sale and sale of the Licensed Products (the **"License"**); and

WHEREAS. Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

I. **Schedule K: Further Cooperation Terms:** A new Schedule K is added to the Agreement stating the following:

## SCHEDULE K
## Further Cooperation Terms

1. **"PAUL FRANK THE A.NI.MA SERIES" Rights**

Licensor owns all right, title and interest in and to the "PAUL FRANK THE A.NI.MA SERIES" Intellectual Property in Exhibit A (the **"A.NI.MA Property"**) to this Amendment, and Licensee desires to obtain the rights to utilize the A.NI.MA Property pursuing to the terms and conditions specifically set forth herein:

i. Licensor agrees to grant Licensee an exclusive license in the Territory for the "**A.NI.MA Property**" under the same terms of as of the Agreement, in the following Licensed Products: apparel, shoes, bags, accessories(including figures), home furnishing products, personal care products (jointly referred to as the "**A.NI.MA Exclusive Categories**").

ii. In consideration of the above license granted by Licensor to Licensee, Licensee shall pay to Licensor the following royalties for the utilization of "A.NI.MA Property":

a) A non-refundable Guaranteed Minimum Payment of Eight Million Five Hundred Thousand United States Dollars (USD $8,500,000) to be paid by Licensee to Licensor in the following installments:
   - One Million United States Dollars (USD $1,000,000) shall be paid within 7 days upon execution of this Amendment.
   - Seven Million Five Hundred Thousand United States Dollars (USD $7,5000,000) within 30 calendar days from the Second Amendment Date.

b) Twenty percent (20%) of Licensee's net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calender year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year.

iii. In relation to the licensing of other product categories different than the A.NI.MA Exclusive Categories, the total revenue (net invoiced billing) obtained by any Party from any certain sub-licensee under the licensing of the A.NI.MA Property shall be distributed between the Parties as per the following terms and conditions.

(a) Where the sub-licensee is engaged and managed by Licensor, Licensor shall pay Licensee thirty percent (30%) of the total net invoiced billings originating from such sub-licensee.

(b) Where the sub-licensee is engaged and managed by Licensee, Licensee shall pay Licensor thirty percent (30%) of the total net invoiced billings originating from such sub-licensee.

Any payable amounts under this section *1.iii* will be delivered to the other party free and clear of any tax, deduction or withholding in the form of a wire transfer of immediately available funds to the bank account designated by each Party.

iv. Notwithstanding the foregoing, in order to the keep a higher positioning of the "PAUL FRANK THE A.NI.MA SERIES" branding aiming for young audults only, none of the Licensed Products neither the "A.NI.MA Exclusive Categories" stipulated in *1.i* nor the non exclusive categoris stipulated in *1.iii* shall be used on infants and kids products in the Territory, unless otherwise mutually agreed by Licensor and Licensee in writing.

**2. Brand Management**

i. Licensee shall pay annually to Licensor a Brand Management Fee equal to Two Hundred Thousand US Dollars (US$200,000) ("Brand Management Fee"), to be paid on a calendar quarterly basis (or any portion thereof), within seven (7) days before each calendar quarter started.

ii. In consideration of the above Brand Management fee, Licensor agrees to provide support to Licensee's business in the Territory as follows:
(a) For the purpose of efficiency, Licensor will appoint specific personnel located in China in charge of the Licensed Products, Packing, Promotional Materials and Advertising Approvals, as stipulated in Section 7 of the Agreement.
(b) Licensor will provide Licensee with quarterly style guide designed specifically for the Territory.
(c) In order to strengthen communications, Licensor and Licensee agree to hold a monthly meeting to address matters within the scope of the Agreement.
(d) Licensor will facilitate necessary documentations required for the operation of Licensee's business within the scope of the Agreement, provided that Licensee shall

keep full transparency with Licensor for the purpose of the usage of the documentations.

iii. The Brand Management Fee will be delivered to Licensor free and clear of any tax, deduction or withholding in the form of a wire transfer of immediately available funds to the bank account designated by Licensor.

**3. Participation**

i. Licensee shall pay Licensor a participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties.

ii. The Participation Fee shall be paid on a calendar quarterly basis (or any portion thereof), within thirty (30) days following the end of each calendar quarter calculated based on the revenue actually received by Licensee with respect to the preceding calendar quarter.

iii. Licensee shall, on or before the thirtieth (30th) day after the end of each calendar quarter, commencing with the first calendar quarter (or partial calendar quarter) ending after the Second Amendment Date, furnish Licensor, as applicable, complete and accurate statements in Chinese (**"Royalty Statements"**), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time. Licensee shall furnish such Royalty Statements.

**4. Brand Collaboration**

i. Licensor shall inform Licensee in advance of any brand collaborations with third parties pursuant to which the Property maybe utilized in connection with other brands, trademarks, copyrights or property in the Territory. Licensee is entitled to 30% of the net invoiced billing of Licensor's royalty income from such brand collaborations.

ii. Any brand collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property initiated by Licensee shall need to obtain Licensor's prior written consent, which consent shall not be unreasonably withheld. Licensor is entitled to 30% of the net invoiced billing of Licensee's income from such brand collaborations.

**5. Marketing Commitment**

i. Both Parties agree that in order to recover and develop the Paul Frank brand in the Territory, Licensee must put special effort in marketing and promotion activities.

ii. For each year during the remaining Term, Licensee agrees to expend as an Marketing Commitment a cash sum equal to (i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (￥10,000,000), whichever of (i) or (ii) is greater. "Marketing Commitment" shall mean direct, out of pocket costs paid to unaffiliated third parties for: (a) purchase of advertising time and/or space in media (i.e., print, radio, television and online, excluding Licensee's catalog(s) and website(s)) for advertisement of the Licensed Products ("Media"), (b) in-store (e.g., on the premises of retailers) merchandising and point-of-purchase signage, displays, collateral or approved promotions for promotion of the Licensed Products ("Retail Specific Promotions"), and (c) licensing exhibitions and

other offline activities. (For purposes of clarity, any costs associated with product packaging, trade shows, or Licensee's showrooms, catalogs or websites shall not be included as part of the Advertising Commitment).

iii. Licensee acknowledges that any advertising, promotion, publicity, or marketing materials shall be concerning the Trademarks licensed and shall not infringe or diminish the reputation upon the Intellectual Property of Licensor. Licensee shall at all times ensure that the presentation, marketing and advertising of the Licensed Products by Licensee shall conform in image, style and approach to that of Licensor in relation to the Intellectual Property; and Licensee shall consult with Licensor regarding Licensee's marketing policy and approach to any advertising campaign for Licensed Products.

**6. Reporting Obligations**

i. Licensee shall comply regularly with the reporting obligations set in *Section 6.Statements* of the Agreement, which are applicable to the terms set in this Schedule K.

ii. In addition to the terms set in *Section 6.Statements* of the Agreement, Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

**7. Extraordinary Cure Period and Waiver**

i. Licensor hereby agrees to grant Licensee an extraordinary cure period of six (6) months from the Second Amendment Date so that Licensee may undertake whatsoever actions are necessary in order to cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor. The cure period shall be ended on date February 19, 2022 (The "Cure Date").

ii. As consideration of Licensee's obligations under this Second Amendment, upon the payment obligations stipulated in *1.i(a)* are complete and fulfilled by Licensee, Licensor agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known to Licensor as of the Second Amendment Date. Licensor hereby represents and warrants that it has disclosed all known potential breaches of contract to Licensee.

iii. After the Cure Date, Licensor has the right to perform a due diligence in order to ascertain whether there are any uncured breaches. In the event that after the Cure Date Licensee is still in default of such cure obligation, the parties shall collaborate in good faith to resolve such issue. Under the performance of the Due Diligence Licensee shall collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence.

iv. After the Cure Date, if any new breach of the Agreement is identified by either party, the parties agree to work together and the breaching party shall cure such breach.

8. **Licensee's Representations and Warranties**

i. Licensee further represents and warrants that Licensee, and parties controlled directly or indirectly by Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property or attack the validity of the Agreement.

ii. In the event that Licensee, or parties controlled directly or indirectly by Licensee incurs in breach of this section's representation and warranty it shall be deemed as a material breach of the Agreement.

9. **Miscellaneous**

i. Licensee acknowledges and agrees that Licensor would be damaged irreparably, and in a manner for which monetary damages would not be an adequate remedy, in the event any of the provisions of this Schedule K are not performed in accordance with its specific terms or otherwise are breached. Accordingly, Licensee agrees that Licensor shall be entitled to an injunction, specific performance or other equitable relief to prevent a breach of this Agreement by Licensee. None of the provisions of this section shall constitute or be construed to limit or waive any rights and remedies which Licensor may have.

ii. Any payments due from Licensee to Licensor hereunder shall be payable to the bank account designated in to the following bank account:

Bank Name: Bank Of China (Hong Kong) Limited, Hong Kong
Bank Address: Bank Of China Tower 1, Garden Road, Central, Hong Kong
SWIFT BIC Code: BKCHHKHHXXX
Account Name: Futurity Brands Limited
Account Address: Unit 1003 10/F Shanghai Ind Investment Building 48-62 Hennessy Road Wanchai, Hong Kong
Account Number: 012-704-2-007214-8

**II. Schedule L: Third Party Beneficiary:** A new Schedule L is added to the Agreement stating the following:

**SCHEDULE L**
**Third Party Beneficiary**

The parties acknowledge and agree that FUTURITY BRANDS LIMITED is an intended Third Party Beneficiary of this Agreement and will have the right to assert any claims and enforce any provisions that Licensor would have with respect to this Agreement.

FUTURITY BRANDS LIMITED together with its subsidiary FUTURITY BRANDS CHINA CO., LTD shall be responsible for the management of the Property.

**III. Section 29 Notice** is amended as follows:

Notices by either party to the other shall be in writing and shall be given by addressing them as indicated above and sending them by overnight carrier such as FedEx, UPS and SF, or by email with confirmation copy to follow, and shall be effective upon receipt. Unless prior written notice of a change of address is given,

all statements and notices to Licensor must be sent to:

PAUL FRANK LIMITED
Paul Frank Limited
Address: Units 1003, 10/F., Shanghai Industrial Investment Building, 48-62 Hennessy Road, Wanchai, Hong Kong
Attn: Stan Wan (stan@futuritybrands.com)
With a copy to: Hana Mu (hana@futuritybrands.com)

all statements and notices to Licensee must be sent to:
Grand Union International Trading Limited
Address: No.9, 2899 Guangfu West Rd., Shanghai 200062, P.R.China
Attn: Bo Zheng (bo.zheng@chinabrandsgroup.com.cn)
With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)

IV. General. The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of August 19, 2021.

| PAUL FRANK LIMITED | Grand Union International Trading Limited |
| --- | --- |
| By: ______ | By: ______ |
| Name: STANLEY YOOK-LOONG WAN | Name: BO ZHENG |
| Title: DIRECTOR | Title: DIRECTOR |

**Exhibit A. THE A.NI.MA SERIES**



# EXHIBIT 5

## THIRD AMENDMENT TO MASTER LICENSE AGREEMENT

This Third Amendment (**"Amendment"**) to the Master License Agreement dated January 1, 2015, as previously amended (the "**Agreement**") is entered into as of **February 10, 2022** (The "Third Amendment Date") by and between Paul Frank Limited (**"Licensor"**) and Grand Union International Trading Limited (**"Licensee"**). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS, Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

**I.** **Schedule K: Further Cooperation Terms:** Schedule K **Section 2 Brand Management Article i** is deleted in its entirety and replaced with the following:

> Licensee shall pay Licensor an annual Brand Management Fee equal to One Million Three Hundurd Thousand RMB Plus VAT (RMB 1,300,000+ VAT) ("Brand Management Fee"), to be paid on a calendar quarterly basis (or any portion thereof), within seven (7) days before each calendar quarter starts. The payments shall be made by Licensee's operation entity in China namingly "红纺文化有限公司上海分公司" to Licensor's subdidary FUTURITY BRANDS CHINA CO., LTD "弗尼媞（上海）商贸有限公司" designated in to the following bank account:
>
> 名称：弗尼媞（上海）商贸有限公司
> 开户行：中国银行股份有限公司上海市大世界支行
> 人民币帐号：457281543163
>
> Beneficiary: FUTURITY BRANDS (CHINA) CO., LTD
> Name and Address of Bank: BANK OF CHINA, SHANGHAI, DA SHI JIE SUB-BRANCH NO.1 JIN LING ZHONG ROAD, SHANGHAI CN
> RMB A/C No.: 457281543163
>
> FUTURITY BRANDS CHINA CO., LTD "弗尼媞（上海）商贸有限公司" shall issue Special VAT fapiao to "红纺文化有限公司上海分公司" within 7 days upon receiving such payment.

**II.** **Schedule K: Further Cooperation Terms:** Schedule K **Section 9 Miscellaneous Article ii** is deleted in its entirety and replaced with the following:

> Any payments **except the Brand Mangement fee stipulated in Section 2. i** of this Schedule K due from Licensee to Licensor hereunder shall be payable to the Licensor's designated bank account as per invoice.

**III.** **General.** The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as

otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of February 10, 2022.

| PAUL FRANK LIMITED | Grand Union International Trading Limited |
|---|---|
| By: ____________ | By: ____________ |
| Name: STANLEY YOOK-LOONG WAN | Name: BO ZHENG |
| Title: DIRECTOR | Title: DIRECTOR |

| Confirmed by: | Confirmed by: |
|---|---|
| Company Stamp: | Company Stamp: |
| FUTURITY BRANDS CHINA CO., LTD<br>弗尼缇（上海）贸易有限公司 | 红纺文化有限公司上海分公司 |

# EXHIBIT 6

**From:** Hana Mu [hana@futuritybrands.com]
**Sent:** 7/21/2022 2:24:18 AM
**To:** 'bo.zheng' [bo.zheng@chinabrandsgroup.com.cn]
**CC:** 周良锋 [david.zhou@chinabrandsgroup.com.cn]; '郑涛sam' [sam.zheng@chinabrandsgroup.com.cn]; 'jennifer.huang' [jennifer.huang@chinabrandsgroup.com.cn]; Stan Wan [stan@futuritybrands.com]; Tony Chu [tony@futuritybrands.com]
**Subject:** Notice of Material Breaching and Fruther Steps
**Attachments:** 20220721-PAULFRANKLIMITED-Notice of Material Breaching and Further Steps.pdf

Grand Union International Trading Limited,

On behalf of PAUL FRANK LIMITED, I hereby send you the Notice of Material Breaching and Further Steps, attached herein. We look forward to your full cooperation.

The foregoing is not intended as a complete statement of all the facts concerning these matters, and is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved.

Regards,
Hana Mu
**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS

2-F 6-16-7 Jingumae, Shibuya-Ku, Tokyo 150-0001 JAPAN +81 505 534 8517
15-F Soundwill Plaza II Midtown 1-29 Tang Lung St Causeway Bay HONG KONG +852 8174 5950
20-40 Meagher St Chippendale New South Wales 2008 AUSTRALIA +612 800 37564

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

# EXHIBIT 7

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**July 21, 2022**

Via Electronic Mail
Grand Union International Trading Limited
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Material Breaching and Further Steps**

Dear Sirs,

We hereby contact you with regard to the breach of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts that came to our attention which are detailed hereafter.

Despite previously discovered multiple material breaches of the Agreement by Licensee which lead to the agreement reached in the Second Amendment to the Master License Agreement ("Second Amendment") whereby it was agreed between the Parties that an Extraordinary Cure Period (Schedule K Section 7) was granted by Licensor to Licensee to cure any and all existing breaches of the Agreement and misconducts, known or unknown, incurred by February 19, 2022, in order for Licensor to waive liabilities for the breaches by Licensee.

Notwithstanding with the foregoing, Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

However, despite of all the efforts Licensor made during this time in order to help Licensee to rectify such breaches, as of this day of July 21, 2022, such material breaching of the Agreement remain uncured, mainly due to the omissive and passive attitude of Licensee, who until present day has not provided any document or clear statement which can clarify the aforementioned facts.

As per Section 13(b) (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days" shall be deemed to be a material breach of the agreement.

All that in consequence, Licensee's continued misconduct and misrepresentation of Licensor in the Territory has put Licensor in seriously legal risk and has severely damaged the goodwill and market value of Licensor. As a result, Licensor has lost its confidence in Licensee's good faith and willingness to cure any and all breaches of the Agreement and its true intention to perform and honor the Agreement in comply with all the requirements and obligations stipulated therein and applicable laws.

For the abovementioned reasons and pursuant to Schedule K Section 7 (iii) of the Second Amendment, 6(b), 7(f)(ii)(iii), 7(h), 13(b)(iv) of this Agreement, and as a result of Licensee's continuously misconduct and material breaches of the Agreement and that no effective actions have been taken to cure the breaches, therefore Licensor feels forced to take critical measures and hereby notifying you the following decisions:

1. Temporary suspension of the performance of the Agreement until any and all breaches of the Agreement are cured.
2. A third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period.
3. During this period of suspension of the Agreement, in order not to cause an irreparable damage to the market, brand and protect the business interests of Licensee and Sublicensees, Licensor will temporarily take over the management of License in the Territory directly, including without limitation to the management of all sublicensees, coordination of sublicensees with marketplaces, receive royalty payables and future royalty payments to Licensee into an escrow account, issuing authorization letters to sublicensees directly, etc., as well as any other acts that are necessary in order to protect the brand and the business in the Territory.

We look forward to your full cooperation on the above-mentioned measures in order to resume the performance of the Agreement soon, or Licensor may be forced to excise the right stipulated in Section 13 (a)(iii) of the Agreement.

The foregoing is not intended as a complete statement of all the facts concerning these matters.

This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

Sincerely,

*For and on behalf of*
PAUL FRANK LIMITED

Stanley Yook-Yoong Wan
CEO *Authorized Signature(s)*

PAUL FRANK LIMITED

# EXHIBIT 8

**From:** Hana Mu [hana@futuritybrands.com]
**Sent:** 8/24/2022 1:11:10 AM
**To:** 'bo.zheng' [bo.zheng@chinabrandsgroup.com.cn]
**CC:** 周良锋 [david.zhou@chinabrandsgroup.com.cn]; '郑涛sam' [sam.zheng@chinabrandsgroup.com.cn]; 'jennifer.huang' [jennifer.huang@chinabrandsgroup.com.cn]; Stan Wan [stan@futuritybrands.com]; Tony Chu [tony@futuritybrands.com]; LegalDepartment [legal@futuritybrands.com]; Jessica R. Corpuz [JCorpuz@weintraub.com]
**Subject:** Notice of Termination
**Attachments:** 20220824--Notice of Termination_Executed.pdf

Grand Union International Trading Limited,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement.

Considering the continuously non-cooperation and acting in bad faith by Licensee, Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement as of **August 24, 2022**.

Enclosed please our official **Notice of Termination** letter for details.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

**EXHIBIT 9**

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**August 24, 2022**

Via Electronic Mail and EMS Express
Grand Union International Trading Limited
No. 9, 2899 Guangfu West Rd.,Shanghai 200062, P.R. China
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Termination**

Dear Sirs,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts stated below.

Since June 2021, Licensor has made continuous efforts in good faith to discuss and find solutions with Licensee to cure the breaches of the Master License Agreement by Licensee, in the spirit of continuing the contractual relationship between the Parties under the Agreement and preventing further damages to the Property and the goodwill thereof. Notwithstanding with the foregoing, Licensee has continued to repeatedly and materially breach the Master License Agreement and the Amendments thereto, including but not limited to the breaches identified by Licensor on April 19, 2022 by email, and the "Notice of Material Breaching and Further Steps" sent to you on July 21, 2022 ("the Material Breaching Notice"). Despite Licensor's significant efforts, Licensee not only has not made any effort to cure such breaches, but also refused to disclose information and collaborate with Licensor for this purpose, which we deem as acting in bad faith.

Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement. Pursuant to section 13 (a)(iii) and 13(b)(ii), 13(b)(iii), and 13(b)(iv) of this Agreement, Licensor, is hereby notifying you of the termination of the Agreement, due to the following material

breaches committed by Licensee:

a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.

b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.

c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.

d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

This document is regarded as an official Notice of Termination as per Section 13(a)(iii) of the Agreement. The Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor.

Further, as you are aware, Licensor has appointed a third-party auditor Grant Thornton International ("Grant Thornton") pursuant to Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Sections 6 and 7(iii) of the Second Amendment to Master Licensing Agreement. Licensee must immediately cooperate with Grant Thornton in good faith, including promptly responding to Grant Thornton's inquiries and request for documents and information. Pursuant to Schedule K, Section 6(ii), Licensee's books and records shall be put at Licensor's disposal "within a period not longer than five (5) business days from Licensor's written request." Licensee must immediately provide its books and records to Licensor. Licensee's failure to do so within five (5) business days will constitute a separate material breach of the Master Licensing Agreement.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action, or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

Sincerely,

For and on behalf of
PAUL FRANK LIMITED

Authorized Signature(s)

Stanley Yook-Yoong Wan
CEO
PAUL FRANK LIMITED

# EXHIBIT 10

**From:** Hana Mu [hana@futuritybrands.com]
**Sent:** 9/23/2022 1:30:26 AM
**To:** bo.zheng [bo.zheng@chinabrandsgroup.com.cn]
**CC:** 周良祥 [david.zhou@chinabrandsgroup.com.cn]; 'jennifer.huang' [jennifer.huang@chinabrandsgroup.com.cn]; sam.zheng [sam.zheng@chinabrandsgroup.com.cn]; Jessica R. Corpuz [JCorpuz@weintraub.com]; Stan Wan [stan@futuritybrands.com]; Tony Chu [tony@futuritybrands.com]; Legal Department [legal@futuritybrands.com]
**Subject:** Re: 回复：Notice of Termination
**Attachments:** 20220923-Termination of Master License Agreement with Grand Union International Trading Limited.pdf
**Flag:** Flag for follow up

Grand Union International Trading Limited,

Licensee has committed multiple Material Breaches of the Master License Agreement, as set forth in the Notice of Termination dated August 24, 2022 ("Notice of Termination"). Licensee has failed to completely cure such Material Breaches within the thirty (30) day period set forth in the Master License Agreement, Section 13(a)(iii). Therefore, Licensor has exercised its right pursuant to Section 13(a)(iii) to terminate the Master License Agreement.

Enclosed please find our letter of **Termination of Master License Agreement**. The purpose of this letter is to confirm that the Master License Agreement is terminated, effective as of **September 23, 2022 ("Termination Effective Date")**, and to remind Licensee of certain post contractual obligations.

We are looking forward to your full collaboration for a smooth transaction.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

---

**From:** 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>
**Sent:** 16 September 2022 16:57
**To:** Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Hana Mu <hana@futuritybrands.com>
**Cc:** 周良祥 <david.zhou@chinabrandsgroup.com.cn>; bo.zheng <bo.zheng@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; Legal Department <legal@futuritybrands.com>; Jessica R. Corpuz <JCorpuz@weintraub.com>
**Subject:** 回复：Notice of Termination

Dear Sir/Madam,

敬启者：

Your Notice of Termination dated 24 August 2022, issued by Paul Frank Limited as licensor (the "Licensor", "Your Company") (the "Termination Notice"), forwarded by Futurity Brands Ag Ltd was received. We, Grand Union International Trading Limited, as licensee (the "Licensee", "Us", "We"), totally disagree to Your Company's claim against us for material breaches of the Master License Agreement (the "Agreement"), which you claimed in the Termination Notice. Further, we do not agree to nor accept your unilateral termination of the Agreement. Our reasons are:

贵司日期为2022年8月24日，由Paul Frank Limited作为许可方签发、由Futurity Brands Ag Ltd转发的终止通知函（下称"《终止通知函》"）收悉。我司，宏联国际贸易有限公司，作为被许可方（下称"被许可方""我们"），完全不同意贵司在《终止通知函》中有关我司实质性违反主许可协议（下称"《主许可协议》"）的违约指控，并且，我们不同意、也不接受贵司单方对《主许可协议》的终止和解除，理由如下：

1. We never forged Licensor's official stamps or any of Licensor's signatures.
   我司从未伪造过许可方的公章或签名。
2. We never sold or distributed Licensed Product outside the Territory or Channels of Distribution.
   我司从未在许可区域或渠道以外销售许可商品。
3. We have no obligation to get audited by the Licensor.
   我司没有义务接受许可方审计。
4. We committed no breach of contract of the Agreement.
   我司对《主许可协议》没有违约行为。

As Your Company is fully aware, there is no legal nor contractual base for your unilateral termination of the Agreement, as there is no material breach committed by us, on the contrary, there were serious material breaches committed by Your Company instead (please refer to content hereinbelow), as a result, your unilateral termination is totally NOT agreeable nor acceptable. The Agreement remains and continue to be valid and effective, being binding both on Your Company and Us, which shall be respected and performed by both Your Company and us until 28 Feb. 2030, for which we have fully paid up all licensing fees for the complete term since 1 Jan. 2015 through 28 Feb. 2030, as the exclusive licensee for Paul Frank Intellectual Property, and have invested huge money, rich resources and various efforts for the licensing business of the Paul Frank Intellectual Property. If Your Company insists that we have committed any material breach of contract, please provide evidence and supporting materials within three(3) days since the date hereof.

如贵司充分所知，贵司单方终止《主许可协议》没有任何的法律或合同依据，因为我司不存在任何违反《主许可协议》的实质性违约行为，相反地，贵司存在着严重的实质性违约行为（具体请参阅下文内容）。因此，就贵司单方终止解除《主许可协议》的行为，我司不予同意、也不予接受。《主许可协议》依然并将继续有效，对贵我双方具有法律约束力，贵我双方应当尊重并且履行该《主许可协议》，直至2030年2月28日为止。并且，我司作为Paul Frank品牌下知识产权的独占被许可方为此已经全额支付了自2015年1月1日起至2030年2月28日期间全部许可费，并为Paul Frank品牌下知识产权授权许可业务投入了巨额资金、大量资源和各种精力。如贵司坚持指控我司存在实质性违约行为，请在本函签发之日起三（3）日内提供证据及相关材料。

We believe the above clarifies. We hereby request Your Company to continue to perform accord to the Agreement, otherwise, Your Company might expose itself in huge risk of material breaches of the Agreement, for which Your Company shall be fully liable and responsible for all losses, damages and negative impact caused to Us and all relevant third parties. To safeguard and protect ourselves, we, as well as such third parties, will have to take all necessary actions to get our rights and interests fully protected. In addition, as mentioned above, there are serious material breaches committed by Your Company, your designated compan(ies) and/or persons, which have caused various substantial losses, damages and adverse impact to us and our licensing partners, including but not limited to

such as suffered or arising from your refusal to provide necessary supporting licensing documents such as the extended registered trademark certificates, verification of licensing documents or approval on the relevant applications, and your refusal to reply to the E-platforms' licensing inquiries, which as a result caused sale of the E-stores stopped, ceased, and the stores removed from the E-platforms, etc. So, we would strongly request Your Company to immediately take action, to stop, cease, and correct any and all of such breaches of contract under this Agreement.

我司相信上述内容足够清晰。我司在此要求贵司继续履行《主许可协议》。否则，贵司将直接导致贵司实质性严重违反《主许可协议》、并就此承担违约责任，并对我司及所有相关第三方因此所遭受损失、损害和负面影响承担赔偿责任。为保护我们自身权益，我司和该等第三方都将不得不采取所有必要措施，以便全面保护我们的权利和利益。此外，如上所述，贵司、贵司指定公司和/或个人已构成了严重的实质性违约行为，该等行为给我司和我司授权许可合作伙伴造成了各种重大损失、损害和不利影响，包括但不限于因贵司拒绝提供必要的授权许可文件支持如续展商标注册证、授权许可文件证明、因贵司拒绝批准我司相关申请及因贵司拒绝回复电商平台授权许可确认询问而导致线上销售被中止被停止，线上店铺被下架等后果。因此，我司严正要求贵司立即采取行动，立即停止并纠正所有该等实质性违约行为。

B.T.W., to the extent of our knowledge, the senior management of your affiliate in Shanghai was believed to have planned and gotten involved in the forgery Your Company claimed in the Termination Notice, if interested, please feel free to carry out a thorough investigation on it.

此外，就我们所知，贵司上海关联公司有高层管理人员参与了贵司在《终止通知函》中所指控的造假行为的计划和实施活动，如贵司对此感兴趣，可就此展开调查、予以彻查。

We hereby reserve all of our rights and interests entitled and enjoyed under the applicable laws and regulations, as well as under the Agreement.

我司在此保留我们根据相关法律法规以及依据《主许可协议》所享有的所有权利和权益。

Grand Union International Trading Limited

宏联国际贸易有限公司

Best regards,

黄素琴 / Jennifer Huang

上海市普陀区光复西路2899弄9号6楼 200062
NO.9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China
手机/Mob: +86 152-1439-5590

楼
楼

---

发件人：Hana Mu <hana@futuritybrands.com>
发送时间：2022年8月24日(星期三) 16:11
收件人:bo.zheng <bo.zheng@chinabrandsgroup.com.cn>

抄 送:周良锋 <david.zhou@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>; Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Legal Department <legal@futuritybrands.com>; Jessica R. Corpuz <JCorpuz@weintraub.com>
主 题：Notice of Termination

Grand Union International Trading Limited,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement.

Considering the continuously non-cooperation and acting in bad faith by Licensee, Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement as of **August 24, 2022**.

Enclosed please our official **Notice of Termination** letter for details.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

# EXHIBIT 11

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**September 23, 2022**

Via Electronic Mail and EMS Express
Grand Union International Trading Limited
No. 9, 2899 Guangfu West Rd.,
Shanghai 200062, P.R. China
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Termination of Master License Agreement**

Dear Sirs,

Reference is made to the Notice of Termination dated August 24, 2022 ("Notice of Termination"). The purpose of this letter is to confirm that the Master License Agreement is terminated, effective as of **September 23, 2022 ("Termination Effective Date")**.

Licensee has committed multiple Material Breaches of the Master License Agreement, as set forth in the Notice of Termination. Licensee has failed to completely cure such Material Breaches within the thirty (30) day period set forth in the Master License Agreement, Section 13(a)(iii). Therefore, Licensor has exercised its right pursuant to Section 13(a)(iii) to terminate the Master License Agreement.

Licensee's September 16, 2022, email simply provides further evidence of Licensee's refusal to cure the Material Breaches identified by Licensor. Licensee has not taken any steps to cure the Material Breaches, but rather denies (wrongly) that such Material Breaches exist. Licensee also complains that Licensor may not "unilaterally" terminate the Master License Agreement. That complaint is entirely baseless, as Section 13(a)(iii) gives Licensor the sole right to terminate the Master License Agreement. Licensor is not required to obtain Licensee's consent, nor to provide "evidence and supporting materials," as the email states. The Master License Agreement is terminated as of September 23, 2022.

Please be advised that:

1. As provided in the Master License Agreement at Sections 1, 8(f), and 21, upon termination for Licensee's Material Breach, all rights granted to Licensee under the Master License Agreement revert to Licensor and Licensee must refrain from any further use of the Property, the Licensed Products and Licensed Services. All sublicense agreements entered into by Licensee are also hereby terminated pursuant to Section 1(b)(ii) of the Master License Agreement. All licenses and authorization letters issued based on the Master License Agreement are revoked and hereby deemed invalid. Licensee shall return the original "Letter of Authorization" within 3 days from the receipt of this Notice.
2. Licensee must cease and desist immediately any and all activities related to the "Paul Frank" asset, including without limitation to the design, manufacture, sale (except sales of remaining inventories during "Sell-Off" period), or advertisement for sale of Licensed products and offers of Licensed Services, and any marketing activities related to it.
3. Pursuant to Section 17 of the Master License Agreement, Licensee must also submit by October 3, 2022 to Licensor a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Productions that Licensee has on hand and/or in process of manufacture as of the date of such statement" ("Statement of Inventory").
4. Although Licensee is not entitled to any Sell-Off Period as set forth in Section 20(b), because if Licensee is terminated by reason of Material Breach, "Licensee's disposal of any items of Licensed Products which Licensee has remaining in inventory shall be in strict accordance with such instructions as Licensor shall give to Licensee." However, consider the goodwill of bona fide sublicensees, Licensor hereby grants to Licensee a ninety (90) day "Sell-Off" period to dispose the remaining inventory, provided such remaining inventory are presented in the "Statement of Inventory" and verified by Licensor. Furthermore, Licensee must provide Licensor a final statement of the total number of items of Licensed Products distributed and sold by Licensee during the License Period and the Sell-Off Period per Section 20(c) of the Agreement.
5. The Termination of the Master License Agreement is not a relief of Licensee from the liabilities to the Material Breaches of the Agreement. Licensee must cure all the breaches of the Agreement, help to calculate, and indemnify Licensor for all the losses, damages, legal fees, and expenses therefrom.

Should Licensee fail to comply with the instructions set forth above, Licensor is entitled to seek "the remedies of injunction, specific performance or other equitable relief" against Licensee, pursuant to Section 21 of the Master License Agreement. Please be advised that Licensor intends to seek immediate injunctive relief in the event that Licensee violates the instructions set forth above. Furthermore, after the "Sell-Off" period, any product using "Paul Frank" Intellectual Property without Licensor's unique authentication label shall be considered as counterfeits. Licensor will take any and all anti-counterfeiting legal actions available against such activities. Please be advised that sales of counterfeits for over 50K RMB is considered a criminal offense in the Territory of China.

Please also be advised that the Confidentiality and Publicity obligations set forth in Sections 18 and 19 of the Master License Agreement continue to be in full force and effect. Licensee may not make any public announcement or issue any press release related to the termination of the Master License Agreement without Licensor's prior written consent. Licensor will contact all sublicensees and issue appropriate press releases, as Licensor deems necessary.

Licensee has also refused to cooperate with Licensor's appointed third-party auditor Grant Thornton International ("Grant Thorton"). Licensee stated in an email dated September 16, 2022 that it had "no obligation to get audited by the Licensor." This is false. Section 6(b) of the Master License Agreement states that "Licensee shall maintain and make available to Licensor, no more than once during any two year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements." *See* also Section 7(f)(ii) and 7(h). Further, Section 6(ii) of the Second Amendment to Master Licensing Agreement states that "Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request."

Licensor has made multiple written requests to Licensee to conduct an audit, including but not limited to the audit request contained in the Notice of Termination. More than five (5) business days has elapsed since Licensor's written requests and Licensee is therefore in breach of the Master License Agreement.

Please take notice that, if Licensee does not immediately cooperate with Grant Thorton regarding a full and complete audit, Licensor will be forced to initiate the dispute resolution procedures set forth in Section 28 of the Master License Agreement. Licensor also reserves the right set forth in Section 9 of the Second Amendment to Master License Agreement to seek injunctive relief for Licensee's failure to cooperate with the audit. Licensee must immediately confirm its cooperation with Grant Thorton, or Licensor will be forced to take legal action.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action, or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

For and on behalf of
PAUL FRANK LIMITED
Authorized Signature(s)

Sincerely,

Stanley Yook-Yoong Wan
CEO
PAUL FRANK LIMITED

# EXHIBIT 12

**From:** Hana Mu [hana@futuritybrands.com]
**Sent:** 6/20/2021 10:20:02 PM
**To:** dave@roommar.com
**CC:** lilian.he@affluential.com.cn; '郑涛sam' [sam.zheng@chinabrandsgroup.com.cn]; 'bo.zheng' [bo.zheng@chinabrandsgroup.com.cn]; '刘书琴' [susan.liu@chinabrandsgroup.com.cn]; 'jennifer.huang' [jennifer.huang@chinabrandsgroup.com.cn]; peggy.wang [peggy.wang@chinabrandsgroup.com.cn]; Stan Wan [stan@futuritybrands.com]; Michael Puglisi [Michael@futuritybrands.com]
**Subject:** Notice of Termination
**Attachments:** 20210621-Termination Notice to Grand Union.pdf

**Flag:** Flag for follow up

Grand Union International Trading Limited,

On behalf of PAUL FRANK LIMITED, I hereby send you the Termination Notice of the Master License Agreement, attached herein. Furthermore, please stop the said illegal activities immediately.

The foregoing is not intended as a complete statement of all the facts concerning these matters, and is not intended as a waiver or relinquishment of any of Sellers' rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved.

Regards,
Hana Mu
**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS

2-F 6-16-7 Jingumae, Shibuya-Ku, Tokyo 150-0001 JAPAN +81 505 534 8517
15-F Soundwill Plaza II Midtown 1-29 Tang Lung St Causeway Bay HONG KONG +852 8174 5950
20-40 Meagher St Chippendale New South Wales 2008 AUSTRALIA +612 800 37564

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

# EXHIBIT 13

**PAUL FRANK LIMITED**

Units   1003,   10/F.,   Shanghai Industrial Investment Building, 48-62 Hennessy Road, Wanchai, Hong Kong

**June 21, 2021**

Via Electronic Mail

Grand Union International Trading Limited

Attn: Dave Qian

Email: dave@roommar.com

Cc: lilian.he@affluential.com.cn; sam.zheng@chinabrandsgroup.com.cn ;
    bo.zheng@chinabrandsgroup.com.cn ; susan.liu@chinabrandsgroup.com.cn ;
    jennifer.huang@chinabrandsgroup.com.cn

Re:    MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject:  **Notice of Termination**

Dear Sirs,

We hereby contact you with regard to the breach of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts that came to our attention recently which are detailed hereafter.

As per Section 9(b) of the above-referenced Agreement "**Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property**". We have clear evidence proving that you as the Licensee and/or your executive officers or owners have been using entities controlled by you (firstly "泰安优生活服饰有限公司", later "杭州招月文化发展有限公司") to register the Property as trademarks in China (attached herein the list of trademarks), for your private interests. Such act adversely and materially has affected the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value has persisted for more than one hundred and twenty (120) days.

As per Section 9(e) of the above-referenced Agreement "**Without Licensor's express prior written consent, Licensee shall not use the Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property as a corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee**". However, your

Affiliate has incorporated the core IP "大嘴猴" into the company name "大嘴猴食品（杭州）有限公司" since January 28, 2021. Such conduct adversely and materially affected the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value has persisted for more than one hundred and twenty (120) days.

For the abovementioned reasons and pursuant to section 13 (a)(iii) and 13(b)(iii)(iv) of this Agreement, as a result of Licensee's material breaching of the Agreement, Licensor, at its sole and absolute option, is hereby notifying you the decision to terminate the Agreement. This Notification of Termination shall become effective within a thirty (30) day period, unless Licensee completely cures the above said breaches.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

We look forward to your cooperation.

Sincerely,

*For and on behalf of*
PAUL FRANK LIMITED

*Authorized Signature(s)*

Stanley Yook-Loong Wan
Director

PAUL FRANK LIMITED

**Attachment:**

| No. | Registration /Applicagtion No. | Trademark | Class | Application Date | Registration Date |
|---|---|---|---|---|---|
| 1 | 31563894 | JULIUS JR. | 1 | 2018-06-12 | 2019-03-21 |
| 2 | 31552409 | JULIUS JR. | 2 | 2018-06-12 | 2019-03-21 |
| 3 | 31571249 | JULIUS JR. | 3 | 2018-06-12 | 2019-03-21 |
| 4 | 31563643 | JULIUS JR. | 4 | 2018-06-12 | 2019-03-21 |
| 5 | 31549364 | JULIUS JR. | 5 | 2018-06-12 | 2019-03-21 |
| 6 | 31563678 | JULIUS JR. | 7 | 2018-06-12 | 2019-03-21 |
| 7 | 31563689 | JULIUS JR. | 8 | 2018-06-12 | 2019-03-21 |
| 8 | 31572835 | JULIUS JR. | 10 | 2018-06-12 | 2019-03-21 |
| 9 | 31553402 | JULIUS JR. | 11 | 2018-06-12 | 2019-03-21 |
| 10 | 31563494 | JULIUS JR. | 12 | 2018-06-12 | 2019-03-21 |
| 11 | 31557894 | JULIUS JR. | 13 | 2018-06-12 | 2019-03-21 |
| 12 | 31566358 | JULIUS JR. | 14 | 2018-06-12 | 2019-03-21 |
| 13 | 31572875 | JULIUS JR. | 15 | 2018-06-12 | 2019-03-21 |
| 14 | 31553467 | JULIUS JR. | 16 | 2018-06-12 | 2019-03-21 |
| 15 | 31573760 | JULIUS JR. | 17 | 2018-06-12 | 2019-03-21 |
| 16 | 31555123 | JULIUS JR. | 18 | 2018-06-12 | 2019-06-07 |
| 17 | 31564077 | JULIUS JR. | 19 | 2018-06-12 | 2019-03-21 |
| 18 | 31568220 | JULIUS JR. | 20 | 2018-06-12 | 2019-03-21 |
| 19 | 31565311 | JULIUS JR. | 21 | 2018-06-12 | 2019-03-21 |
| 20 | 31568556 | JULIUS JR. | 23 | 2018-06-12 | 2019-03-21 |
| 21 | 31575390 | JULIUS JR. | 24 | 2018-06-12 | 2019-03-21 |
| 22 | 31554064 | JULIUS JR. | 26 | 2018-06-12 | 2019-03-21 |
| 23 | 31553480 | JULIUS JR. | 27 | 2018-06-12 | 2019-03-21 |
| 24 | 31568234 | JULIUS JR. | 28 | 2018-06-12 | 2019-03-21 |
| 25 | 31571368 | JULIUS JR. | 29 | 2018-06-12 | 2019-03-21 |
| 26 | 31551591 | JULIUS JR. | 30 | 2018-06-12 | 2019-03-21 |
| 27 | 31558277 | JULIUS JR. | 32 | 2018-06-12 | 2019-03-21 |
| 28 | 31548863 | JULIUS JR. | 33 | 2018-06-12 | 2019-03-21 |
| 29 | 31548883 | JULIUS JR. | 35 | 2018-06-12 | 2019-06-07 |
| 30 | 31555215 | JULIUS JR. | 36 | 2018-06-12 | 2019-03-21 |
| 31 | 31564503 | JULIUS JR. | 37 | 2018-06-12 | 2019-03-21 |
| 32 | 31560924 | JULIUS JR. | 39 | 2018-06-12 | 2019-03-21 |
| 33 | 31570131 | JULIUS JR. | 40 | 2018-06-12 | 2019-03-21 |
| 34 | 31570138 | JULIUS JR. | 42 | 2018-06-12 | 2019-03-21 |
| 35 | 31570145 | JULIUS JR. | 43 | 2018-06-12 | 2019-03-21 |
| 36 | 31551538 | JULIUSJR. | 44 | 2018-06-12 | 2019-03-21 |
| 37 | 31573368 | JULIUS JR. | 45 | 2018-06-12 | 2019-03-21 |
| 38 | 31575802 |  | 35 | 2018-06-12 | 2019-07-14 |
| 39 | 31574175 |  | 3 | 2018-06-12 | 2019-04-28 |
| 40 | 31573502 |  | 5 | 2018-06-12 | 2019-04-28 |

| 41 | 31573403 | | 35 | 2018-06-12 | 2019-09-07 |
|---|---|---|---|---|---|
| 42 | 31572472 | | 24 | 2018-06-12 | 2019-03-21 |
| 43 | 31569993 | | 25 | 2018-06-12 | 2019-09-28 |
| 44 | 31569980 | | 18 | 2018-06-12 | 2019-10-14 |
| 45 | 31569977 | | 14 | 2018-06-12 | 2019-04-28 |
| 46 | 31569970 | | 3 | 2018-06-12 | 2019-04-28 |
| 47 | 31569947 | | 25 | 2018-06-12 | 2019-04-28 |
| 48 | 31569900 | | 3 | 2018-06-12 | 2019-03-21 |
| 49 | 31568427 | | 5 | 2018-06-12 | 2019-03-21 |
| 50 | 31568393 | | 41 | 2018-06-12 | 2019-08-28 |
| 51 | 31565153 | | 41 | 2018-06-12 | 2019-06-07 |
| 52 | 31564766 | | 14 | 2018-06-12 | 2019-03-21 |
| 53 | 31564397 | | 41 | 2018-06-12 | 2019-06-07 |
| 54 | 31561205 | | 18 | 2018-06-12 | 2019-03-21 |

| | | | | | |
|---|---|---|---|---|---|
| 55 | 31560355 | | 35 | 2018-06-12 | 2019-07-14 |
| 56 | 31560172 | | 41 | 2018-06-12 | 2019-07-21 |
| 57 | 31560110 | | 35 | 2018-06-12 | 2019-06-07 |
| 58 | 31559782 | | 25 | 2018-06-12 | 2019-08-28 |
| 59 | 31557113 | | 14 | 2018-06-12 | 2019-04-28 |
| 60 | 31557097 | | 25 | 2018-06-12 | 2019-06-07 |
| 61 | 31555064 | | 18 | 2018-06-12 | 2019-04-28 |
| 62 | 31553587 | | 5 | 2018-06-12 | 2019-03-21 |
| 63 | 31552055 | | 24 | 2018-06-12 | 2019-04-28 |
| 64 | 31552008 | | 24 | 2018-06-12 | 2019-04-28 |
| 65 | 31550641 | | 5 | 2018-06-12 | 2019-06-07 |
| 66 | 31550629 | | 41 | 2018-06-12 | 2019-08-21 |
| 67 | 31575324 | JULIUS | 28 | 2018-06-12 | 2019-06-07 |
| 68 | 31575350 | JULIUS | 41 | 2018-06-12 | 2019-06-07 |
| 69 | 31573683 | JULIUS | 16 | 2018-06-12 | 2019-06-07 |
| 70 | 31573176 | JULIUS | 7 | 2018-06-12 | 2019-03-21 |
| 71 | 31573084 | JULIUS | 4 | 2018-06-12 | 2019-07-21 |
| 72 | 31567969 | JULIUS | 19 | 2018-06-12 | 2019-06-07 |
| 73 | 31565949 | JULIUS | 21 | 2018-06-12 | 2019-06-07 |

| | | | | | |
|---|---|---|---|---|---|
| 74 | 31563976 | JULIUS | 22 | 2018-06-12 | 2019-06-07 |
| 75 | 31561081 | JULIUS | 20 | 2018-06-12 | 2019-06-07 |
| 76 | 31560519 | JULIUS | 10 | 2018-06-12 | 2019-06-07 |
| 77 | 31559663 | JULIUS | 8 | 2018-06-12 | 2019-06-07 |
| 78 | 31557815 | JULIUS | 26 | 2018-06-12 | 2019-06-07 |
| 79 | 31554746 | JULIUS | 9 | 2018-06-12 | 2019-08-28 |
| 80 | 31550186 | JULIUS | 24 | 2018-06-12 | 2019-03-21 |
| 81 | 56103528 | JULIUS JR. | 1 | 2021-05-17 | |
| 82 | 56109356 | JULIUS JR. | 2 | 2021-05-17 | |
| 83 | 51946169 | | 3 | 2020-12-07 | |
| 84 | 56126203 | JULIUS JR. | 3 | 2021-05-17 | |
| 85 | 56119933 | JULIUS JR. | 4 | 2021-05-17 | |
| 86 | 56089175 | JULIUS JR. | 5 | 2021-05-17 | |
| 87 | 56095400 | JULIUS | 7 | 2021-05-17 | |
| 88 | 56119381 | JULIUS JR. | 7 | 2021-05-17 | |
| 89 | 56121969 | JULIUS JR. | 8 | 2021-05-17 | |
| 90 | 56112336 | JULIUS | 9 | 2021-05-17 | |
| 91 | 56121980 | JULIUS JR. | 10 | 2021-05-17 | |
| 92 | 56116588 | JULIUS JR. | 11 | 2021-05-17 | |
| 93 | 56116599 | JULIUS JR. | 12 | 2021-05-17 | |
| 94 | 56119455 | JULIUS JR. | 13 | 2021-05-17 | |
| 95 | 56087259 | JULIUS JR. | 14 | 2021-05-17 | |
| 96 | 56124371 | JULIUS JR. | 15 | 2021-05-17 | |
| 97 | 56103754 | JULIUS JR. | 16 | 2021-05-17 | |
| 98 | 56108938 | JULIUS JR. | 17 | 2021-05-17 | |
| 99 | 56089458 | JULIUS | 19 | 2021-05-17 | |
| 100 | 56088813 | JULIUS JR. | 19 | 2021-05-17 | |
| 101 | 56086147 | JULIUS JR. | 20 | 2021-05-17 | |
| 102 | 56123148 | JULIUS JR. | 21 | 2021-05-17 | |
| 103 | 56104034 | JULIUS | 21 | 2021-05-17 | |
| 104 | 56115216 | JULIUS JR. | 23 | 2021-05-17 | |
| 105 | 56098259 | JULIUS | 24 | 2021-05-17 | |
| 106 | 56109138 | JULIUS JR. | 24 | 2021-05-17 | |
| 107 | 56130129 | JULIUS JR. | 26 | 2021-05-17 | |
| 108 | 56091961 | JULIUS JR. | 27 | 2021-05-17 | |
| 109 | 56096440 | JULIUS JR. | 28 | 2021-05-17 | |
| 110 | 56089410 | JULIUS | 28 | 2021-05-17 | |
| 111 | 56118597 | JULIUS JR. | 29 | 2021-05-17 | |
| 112 | 56123571 | JULIUS JR. | 30 | 2021-05-17 | |
| 113 | 56104042 | JULIUS JR. | 32 | 2021-05-17 | |
| 114 | 56114985 | JULIUS JR. | 33 | 2021-05-17 | |
| 115 | 56096637 | JULIUS JR. | 36 | 2021-05-17 | |
| 116 | 56103590 | JULIUS JR. | 37 | 2021-05-17 | |
| 117 | 56125433 | JULIUS JR. | 39 | 2021-05-17 | |
| 118 | 56125447 | JULIUS JR. | 40 | 2021-05-17 | |
| 119 | 56129160 | JULIUS | 41 | 2021-05-17 | |
| 120 | 56087911 | JULIUS JR. | 42 | 2021-05-17 | |
| 121 | 56118814 | JULIUS JR. | 43 | 2021-05-17 | |
| 122 | 56103921 | JULIUS JR. | 44 | 2021-05-17 | |
| 123 | 56118839 | JULIUS JR. | 45 | 2021-05-17 | |

# EXHIBIT 14

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Petitioner Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

Petitioner,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Respondent.

JAMS Ref. No. 1220073501

**PAUL FRANK LIMITED DEMAND FOR ARBITRATION – STATEMENT OF CLAIMS**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Claimant Paul Frank Limited ("Paul Frank"), by and through its counsel of record, brings this Demand for Arbitration against Respondent Grand Union International Trading Limited ("Grand Union") and alleges as follows:

## PRELIMINARY STATEMENT

1. Paul Frank, the owner of the world-famous Paul Frank brand, seeks money damages against its former licensee, Grand Union, as a result of Grand Union's repeated material breaches of the license agreement. Despite Paul Frank's exceptional efforts to resolve the dispute, Grand Union's egregious and deliberate conduct forced Paul Frank to terminate the agreement and seek damages for Grand Union's violations of the license agreement.

## THE PARTIES

2. Paul Frank is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

3. Grand Union is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China. Paul Frank and Grand Union are collectively referred to herein as the "Parties."

4. Grand Union acts through its subsidiary ("CBG"), which is a corporation organized under the laws of China with its principal place of business in Shanghai, China. Upon information and belief, CBG is an agent of Grand Union and Grand Union is liable for the acts of CBG, all of which occurred under Grand Union's direction and control and Grand Union directed or otherwise participated in GBG's wrongful actions.

## JURISDICTION AND VENUE

5. The First Amendment to the Master License Agreement, dated April 27, 2018 (the "First Amendment"), attached hereto as Exhibit 2, provides at Section 28 that any dispute between the Parties will be administered by JAMS:

> If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

> parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

6. Pursuant to Section 28, the Parties conducted a mediation on November 7, 2022 at JAMS before Hon. James L. Smith (Ret.). Despite Paul Frank's best efforts, the Parties were unable to resolve their dispute. Therefore, Paul Frank filed this Demand for Arbitration.

7. The First Amendment further provides at Section 30 that the agreement "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law."

## FACTUAL ALLEGATIONS

8. Paul Frank owns the intellectual property associated with, *inter alia*, the Paul Frank® brand.

9. The Paul Frank brand began in 1995 with 28-year-old Paul Frank sewing gifts for friends in his parent's home in Hunting Beach, California. That business eventually became Paul Frank Industries, Inc. ("Paul Frank Industries") and the brand grew to a global pop-culture sensation – in particular its most famous character, Julius the Monkey. In 2010, Saban Brands Entertainment Group ("Saban") purchased Paul Frank Industries from its founders. In 2020, Futurity Brands Switzerland AG purchased the brand from Saban through its subsidiary Paul Frank Limited (the Claimant herein).

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**The Master License Agreement**

10. Effective as of January 1, 2015, Paul Frank Industries (still under the ownership of Saban) granted Grand Union an exclusive license to certain elements of the Paul Frank brand (the "Property"). The Master License Agreement dated January 1, 2015 ("MLA") is attached hereto as Exhibit 1. Paul Frank assumed the rights and obligations of the MLA when it acquired the brand in 2020. Paul Frank Industries and Grand Union later entered into the First Amendment, attached hereto as Exhibit 2, on April 27, 2018.

11. The Parties entered into the Second Amendment to Master License Agreement dated August 19, 2021, attached hereto as Exhibit 3, and the Third Amendment to Master License Agreement dated February 10, 2022, attached hereto as Exhibit 4. The various amendments are collectively referred to herein as the "Amendments."

12. Before its termination, the MLA provided that Grand Union had the exclusive right to manufacture, sell, and distribute certain Paul Frank branded products (the "Licensed Products") and services (the "Licensed Services") within the territory of China, Hong Kong, and Macau (the "Territory"), from January 1, 2015 to February 28, 2030 (the "License Period"). *See* MLA, Schedules A-C. The MLA limited the sale of Licensed Products to certain "Channels of Distribution," including for example department stores and e-commerce retailers. *Id.* at Schedule G. In return, Grand Union paid a license fee of sixty-five million dollars ($65 million). *Id.* at Schedule D.

13. The MLA at Section 1(b) also states that Grand Union had the right to grant sublicenses subject to certain conditions:

> (i) every sublicensee ("Sublicensee") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services; (ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;
>
> (iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;

weintraub tobin chediak coleman grodin LAW CORPORATION

(iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;

(v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

14. Further, Section 2(a) of the MLA states that "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." Sales outside the Territory require prior written approval of Paul Frank and are subject to payment "of a market-rate royalty, to be agreed upon by Licensor and Licensee." Section 2(b).

15. Grand Union must sell Licensed Products "outright at a competitive price" and may not engage in "Dumping," which is defined in the MLA as "the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products." Section 10(b) and (i). Grand Union must also provide annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products. *See* Section 10(i).

16. The MLA at Section 6(a) also states that Grand Union shall submit quarterly statements "specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products" and "report[ing] the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof," as well as "any additional non-financial information reasonably requested by Licensor from time to time."

17. Further, the MLA at Section 6(b) states that Paul Frank may conduct periodic audits of Grand Union: "Licensee shall maintain and make available to Licensor, no more than once during any two year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

18. The MLA at Section 7 also states that Grand Union must obtain approval for "all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

keeping units ("SKU") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)."

19. The MLA at Section 9(c) further states that Grand Union was responsible for identifying "misuses of the Property." Grand Union was required to provide Paul Frank "a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter." In the event that Grand Union identified any significant infringement, it was required to "promptly notify" Paul Frank in writing. Paul Frank had the option, "in its sole discretion" to commence an infringement action, or request that Grand Union do so. In such an event, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements."

20. Lastly, the MLA specifies the result of a breach of the MLA by Grand Union. A "Material Breach" is defined in Section 13(b) as (i) the failure to pay the License Fee (which is not asserted here); (ii) "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee;" (iii) "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days;" or (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission" that similarly materially affects the goodwill and market value of the Property for more than 120 days.

21. Should Grand Union commit a Material Breach, "Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." *See* Section 13(a).

22. In the event that Grand Union breaches the agreement but such breach does not rise to the level of a Material Breach, Section 13(d) of the MLA states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of breach, then such breach shall

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

be an Uncured Breach."

**The 2021 Notice of Termination and the Second Amendment**

23. On June 21, 2021, Paul Frank issued a Notice of Termination to Grand Union (the "2021 Notice of Termination"), a copy of which is attached hereto as Exhibit 5. The 2021 Notice of Termination states that Grand Union, through an entity controlled by Grand Union, had registered the Property as trademarks in China in violation of Section 9(e) of the MLA. It further states that an affiliate of Grand Union had incorporated the Property into its company name. On the basis of such breaches and pursuant to Section 13(a)(iii) and 13(b)(iii)-(iv), Paul Frank notified Grand Union that the agreement would be terminated unless the breaches were completely cured.

24. On July 29, 2021, Paul Frank sent a Notice of Material Breaching to Grand Union ("2021 Notice of Material Breaching"), a copy of which is attached as Exhibit 6. The 2021 Notice of Material Breaching states that Grand Union had authorized an affiliated entity to launch "Paul Frank Beauty" on an e-commerce platform and social media. It further states that Grand Union registered a new trademark derived from the Property.

25. After significant negotiations between the Parties, the Parties agreed to and executed the Second Amendment.

26. The Second Amendment, Schedule K, Section 7(i) states that Grand Union would, by February 19, 2022 (the "Cure Date"), enter into an "Extraordinary Cure Period" during which it would "cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor." Section 7(ii) states that, "in consideration of Licensee's obligations under this Second Amendment," Paul Frank "agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known [sic] to Licensor as of the Second Amendment Date." Paul Frank further represented and warranted that it had disclosed all known potential breaches to Grand Union – i.e. that all breaches were set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching.

27. Section 7(iii) states that Paul Frank has the "right to perform a due diligence in order to ascertain whether there are any uncured breaches." Grand Union was obligated to "collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make

weintraub tobin chediak coleman grodin LAW CORPORATION

available to Licensor any documents requested in relation to the due diligence."

28. Section 6(ii) similarly states:

> Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

29. The Second Amendment also stated at Schedule K, Sections 1-5 that Grand Union had the right to an exclusive license for a limited series of Paul Frank-related intellectual property, the A.NI.MA Series. In return, Grand Union was obligated to pay a royalty of eight million, five hundred thousand dollars ($8,500,000) in addition to twenty percent (20%) of Grand Union's "net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calendar year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year" for the exclusive categories, and thirty percent (30%) of the "net invoiced billings" originating from sublicensees for the non-exclusive categories. Grand Union was also obligated to pay a "participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties." The Participation Fee was to be paid on a quarterly basis, and Grand Union was obligated to provide "complete and accurate statements in Chinese ("Royalty Statements"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time." Grand Union was also obligated to inform Paul Frank of any brand collaborations, and pay Paul Frank a royalty of "30% of the net invoiced billing of Licensor's royalty income from such brand collaborations." Schedule K also states that Grand Union would pay a Brand Management Fee of two hundred thousand dollars ($200,000) per calendar quarter, which amount was amended in the Third Amendment to one million three hundred thousand RMB Plus VAT (which is approximately $181,630 USD at the present exchange rate). Schedule K further states that Grand Union was required to expend "(i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million

weintraub tobin chediak coleman grodin LAW CORPORATION

RMB (¥ 10,000,000), whichever of (i) or (ii) is greater" as a Marketing Commitment.

**Paul Frank Discovers Further Breaches and Terminates the MLA**

30. After the execution of the Second Amendment, the Parties continued to operate under the MLA, as amended. However, Paul Frank discovered – and continues to discover – multiple egregious breaches of the MLA by Grand Union.

31. On July 21, 2022, Paul Frank sent a Notice of Material Breaching and Further Steps to Grand Union ("Notice of Material Breaching"), a copy of which is attached hereto as Exhibit 7. The Notice of Material Breaching states:

> Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

32. Notice of Material Breaching also states that a "third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period."

33. Grand Union did not take any steps to cure the breaches identified by Paul Frank in the Notice of Material Breaching. In fact, Grand Union denied the existence of the breaches in an email dated September 16, 2022, attached hereto as Exhibit 8. Grand Union also stated, "[w]e have no obligation to get audited by the Licensor," which is a clear misrepresentation of the terms of the MLA and the Second Amendment.

34. On August 24, 2022, Paul Frank sent a Notice of Termination to Grand Union ("Notice of Termination"), a copy of which is attached hereto as Exhibit 9. The Notice of Termination identified four major categories of breaches by Grand Union:

> a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur

weintraub tobin chediak coleman grodin LAW CORPORATION

criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.

b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.

c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.

d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

35. Pursuant to Section 13 of the MLA, the Notice of Termination stated that the "Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor."

36. Grand Union did not completely cure the Material Breaches identified in the Notice of Termination – it did not even attempt to cure any of the Material Breaches.

37. Therefore, on September 23, 2022, Paul Frank sent a Termination of Master License Agreement, which is attached hereto as Exhibit 10. The Termination of Master License Agreement confirmed that the MLA terminated effective as of September 23, 2022 (the "Termination Effective Date") and instructed Grand Union to cease and desist from all activities related to the Paul Frank

weintraub tobin chediak coleman grodin LAW CORPORATION

brand, except for a ninety-day (90-day) Sell-Off period. Paul Frank was not obligated to grant Grand Union a Sell Off Period pursuant to Section 20(b) of the MLA, as Grand Union was in Material Breach of the MLA. However, Paul Frank agreed to a Sell-Off period in good faith to permit Grand Union to sell off remaining inventory and to minimize the impact of the termination on the brand.

38. The Termination of Master License Agreement also requested, pursuant to Section 17 of the MLA, a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of the date of such statement ('Statement of Inventory')."

39. On September 29, 2022, Grand Union sent an email responding to the Notice of Termination, again stating that it would not cure the breaches identified in the Notice of Termination. A copy of this email is attached hereto as Exhibit 11.

40. Upon the Termination Effective Date, the following provisions of the MLA immediately went into effect:

a. Pursuant to Section 8(f), "all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement."

b. Pursuant to Section 14, "[n]either the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination."

**Additional Breaches Discovered by Paul Frank**

41. In addition to the Material Breaches identified in the Notice of Termination, Paul Frank is informed and believes that Grand Union and/or CBG acting on behalf of Grand Union have committed the following Material Breaches, Uncured Breaches, and/or other breaches of the MLA:

a. Grand Union and/or CBG have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the

weintraub tobin chediak coleman grodin LAW CORPORATION

forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

b. Grand Union and/or CBG have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

c. Grand Union and/or CBG have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

d. Grand Union and/or CBG have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

e. Grand Union and/or CBG have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

f. Grand Union and/or CBG have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

g. Grand Union and/or CBG have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

h. Grand Union and/or CBG have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

i. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

j. Grand Union and/or CBG have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

k. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

l. Grand Union and/or CBG have engaged in operations outside of the Licensed

weintraub tobin chediak coleman grodin LAW CORPORATION

Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

m. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

n. Grand Union and/or CBG have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

o. Grand Union and/or CBG have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

p. Grand Union and/or CBG have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

q. In particular, Grand Union and/or CBG have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

r. Further, Grand Union and/or CBG have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

s. Grand Union and/or CBG have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

t. Grand Union and/or CBG have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

u. Grand Union and/or CBG have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

v. Grand Union and/or CBG have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

w. Grand Union and/or CBG have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

x. Grand Union and/or CBG have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

y. Grand Union and/or CBG have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

z. Grand Union and/or CBG have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

aa. Grand Union and/or CBG have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

bb. Grand Union and/or CBG have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

cc. Grand Union and/or CBG have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

dd. Grand Union and/or CBG have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's

written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ee. Grand Union and/or CBG have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

ff. Grand Union and/or CBG have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

gg. Grand Union and/or CBG have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

hh. Grand Union and/or CBG have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

ii. Grand Union and/or CBG have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

42. Grand Union and/or CBG have also filed wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

43. Upon information and belief, Grand Union and/or CBG acting on behalf of Grand Union have committed additional Material Breaches, Uncured Breaches, and/or other breaches of the MLA which are presently unknown to Paul Frank.

**<u>Paul Frank is Entitled to Audit Grand Union's Performance Under the MLA and the Amendments</u>**

44. Paul Frank has an unquestionable right to audit Grand Union's compliance with the MLA and the Amendments pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment.

/ / /

45. Because Grand Union has refused to permit Paul Frank to conduct an audit pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment, Paul Frank is unable to determine whether there are any additional violations of the MLA and the Amendments.

46. Paul Frank will ask that the Arbitrator compel an immediate audit of Grand Union once this Arbitration is initiated, by Paul Frank's appointed third-party auditor.

47. Paul Frank reserves the right to amend this Demand for Arbitration and seek damages for any breaches of the MLA and the Amendments, or any other wrongful conduct of any kind, discovered during the audit.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Grand Union)**

48. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 47 as fully set forth herein.

49. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

50. Paul Frank has fully performed its obligations under the MLA and the Amendments.

51. Grand Union and/or CBG acting on behalf of Grand Union have committed numerous material breaches of Grand Union's contractual obligations under the MLA and the Amendments including without limitation that:

a. Grand Union and/or CBG have forged Licensor's official stamps and used Licensor's forged signatures, as set forth in the Notice of Termination;

b. Grand Union and/or CBG have sold and/or distributed Licensed Products outside the Territory and Channels of Distribution, as set forth in the Notice of Termination;

c. Grand Union and/or CBG have failed to or refused to cure the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as set forth in the Notice of Termination;

d. Grand Union and/or CBG have failed to or refused to comply with Paul Frank's request for an audit and have prevented and obstructed Paul Frank's efforts to conduct the due diligence, as set forth in the Notice of Termination;

e. Grand Union and/or CBG have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

f. Grand Union and/or CBG have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

g. Grand Union and/or CBG have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

h. Grand Union and/or CBG have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

i. Grand Union and/or CBG have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

j. Grand Union and/or CBG have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

k. Grand Union and/or CBG have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

l. Grand Union and/or CBG have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

m. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

n. Grand Union and/or CBG have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

o. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b),

weintraub tobin chediak coleman grodin LAW CORPORATION

2(a), 2(c), 8(a), and 10(b) of the MLA;

p. Grand Union and/or CBG have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

q. Grand Union and/or CBG have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

r. Grand Union and/or CBG have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

s. Grand Union and/or CBG have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

t. Grand Union and/or CBG have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

u. In particular, Grand Union and/or CBG have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

v. Further, Grand Union and/or CBG have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

w. Grand Union and/or CBG have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

/ / /

x.    Grand Union and/or CBG have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

y.    Grand Union and/or CBG have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

z.    Grand Union and/or CBG have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

aa.    Grand Union and/or CBG have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

bb.    Grand Union and/or CBG have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

cc.    Grand Union and/or CBG have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

dd.    Grand Union and/or CBG have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

ee.    Grand Union and/or CBG have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

ff.    Grand Union and/or CBG have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

gg.    Grand Union and/or CBG have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

weintraub tobin chediak coleman grodin
LAW CORPORATION

hh. Grand Union and/or CBG have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ii. Grand Union and/or CBG have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

jj. Grand Union and/or CBG have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

kk. Grand Union and/or CBG have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

ll. Grand Union and/or CBG have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

mm. Grand Union and/or CBG have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

52. As a result of Grand Union's material breaches of the MLA and the Amendments, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Grand Union)**

53. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 47 as fully set forth herein.

54. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

55. Paul Frank has fully performed its obligations under the MLA and the Amendments.

56. Grand Union engaged in conduct intended to prevent Paul Frank from receiving the benefits under the MLA and the Amendments, including without limitation by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

57. By doing so, Grand Union did not act fairly and in good faith.

58. As a result of Grand Union's conduct, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**THIRD CAUSE OF ACTION**

**(Violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125) Against Grand Union)**

59. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 47 as fully set forth herein.

60. Paul Frank owns the intellectual property, including without limitation all trademarks, trade dress, and copyrights in the U.S. and China associated with the Paul Frank® brand.

61. As set forth in Sections 1 and 8 of the MLA, Paul Frank gave Grand Union a limited right during the Licensed Period to utilize the Property to design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer the Licensed Products in the specified Territory and Channels of Distribution and provide Licensed Services in the Territory.

62. Paul Frank owns all trademarks, trade dress, and copyrights in the U.S. and China associated with all Licensed Products and Licensed Services. Paul Frank holds multiple registrations over trademarks and/or trade dress in the U.S. and China, some of which have been used by Grand Union. The trademarks and/or trade dress covered by those registrations and others incorporating and/or relating to the Name are actionable under 15 U.S.C. § 1114.

63. Paul Frank also owns the rights in the U.S. and China to valid and protectable trade dress incorporating and/or relating to the Property, at least some of which have been used by Grand Union and not registered. Such trade dress is actionable under 15 U.S.C. § 1125.

64. The Property has great value and consumer recognition associated with Paul Frank.

65. Grand Union has never been authorized to use the Property outside the scope of the

MLA or its Amendments.

66. The MLA terminated on September 23, 2022.

67. Upon information and belief, after the termination of the MLA, Grand Union continued without authority to utilize the Property – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

68. Upon information and belief, Grand Union has also utilized the Property prior to the termination of the MLA without obtaining the approval of Paul Frank – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

69. Upon information and belief, Grand Union has also utilized the Property prior to the termination of the MLA outside the Territory – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

70. Upon information and belief, Grand Union has also utilized the Property prior to the termination of the MLA outside the Channels of Distribution – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

71. In all of these ways, Grand Union has, without authority, used the Property in commerce in a manner that misrepresents and is likely to cause mistake or confusion on the part of consumers as to the existence or nature of Paul Frank's sponsorship of, endorsement of, approval of,

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

affiliation with, or association with such use.

72. Paul Frank has made repeated efforts, over the course of several years, to engage Grand Union in good faith discussions concerning the violations of the MLA and the Amendments. Paul Frank also gave Grand Union ample opportunity to avoid termination of the MLA and the Amendments. Grand Union nonetheless refused to engage in good faith discussions, and continued to act as described above, during the period of the MLA and after its termination. Moreover, Grand Union is a sophisticated entity that should, at all relevant times, have been well aware of its rights and obligations under the MLA and the Amendments. Grand Union's violation of the MLA and the Amendments have, therefore, been willful.

73. As a result of the foregoing violations of its rights in registered and unregistered trademarks and trade dress – i.e. Grand Union's unauthorized use of the valuable Property outside the scope and beyond the life of the MLA and the Amendments, which is likely to cause consumer confusion – Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

74. Pursuant to 15 U.S.C. § 1117, Paul Frank is entitled to recover, without limitation, its damages; Grand Union's profits in connection with Grand Union's use of the Property and, in particular, its violations of Paul Frank's trademark and trade dress rights; and the costs associated with filing this Demand for Arbitration.

**FOURTH CAUSE OF ACTION**

**(Quantum Meruit and/or Unjust Enrichment Against Grand Union)**

75. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 47 as fully set forth herein.

76. Paul Frank pleads that, in the alternative, no agreement ever existed between it and Grand Union as to one or more material terms of the MLA and the Amendments. In that event, Paul Frank nevertheless conferred substantial benefits on Grand Union in connection with Paul Frank's support, goodwill, and intellectual property, including without limitation Grand Union's use of the iconic Paul Frank brand.

/ / /

77. Paul Frank has not been fully compensated for the full and fair value of the benefits conferred upon Grand Union.

78. In the absence of an enforceable contract as to material terms, Paul Frank has no adequate remedy at law.

79. Grand Union accepted and enjoyed the benefits that Paul Frank conferred upon it, deriving significant profit therefrom.

80. Grand Union accepted those benefits knowing that Paul Frank expected to be paid the fair value of those benefits.

81. Under the circumstances, it would be inequitable for Grand Union to retain the benefits Paul Frank conferred without paying Paul Frank the full value for those benefits.

82. As such, Paul Frank is entitled to recover the balance of the value that Grand Union has accepted from Paul Frank under a theory of *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing.

**PRAYER FOR RELIEF**

WHEREFORE, Paul Frank requests relief as follows:

1. For an award of damages, including amounts to be determined at the Arbitration Hearing for the various breached described herein;

2. For an award of damages, in amounts to be determined at the Arbitration Hearing, as a result of Grand Union's violation of Paul Frank's trademark and trade dress rights;

3. For an award of Grand Union's profits associated with the violations of Paul Frank's trademark and trade dress rights;

4. In the alternative, an award of recovery in *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing;

5. For an award of reasonable attorney's fees and costs of suit; and

6. For such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

DATED: November 22, 2022

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**EXHIBIT 1**

# MASTER LICENSE AGREEMENT

This Master License Agreement ("**Agreement**") is made as of the Effective Date between Paul Frank Industries LLC ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Any reference herein to a Schedule or Exhibit shall refer to the applicable Schedules or Exhibits attached to this Agreement, which are incorporated herein and made a part of this Agreement; and any capitalized terms used in this Agreement shall have the meaning ascribed to them in the Schedules or Exhibits or the body of the Agreement, as applicable.

WHEREAS, Licensor owns all right, title and interest in and to the Paul Frank Intellectual Property listed in Exhibit 1 to this Agreement (as amended from time to time to update the status of Intellectual Property applications and registrations) and the Core IP, including all related trademarks, designs, copyrights and other intellectual property as may be designated in writing by Licensor from time to time for use by Licensee under this Agreement (collectively, the "**Property**"); and

WHEREAS, Licensee desires to obtain the right to utilize the Property and modifications to the Core IP in connection with Licensed Products and Licensed Services pursuant to the terms and conditions as specifically set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, Licensor and Licensee hereby agree as follows:

1. License.

(a) Licensor hereby grants to Licensee an exclusive, sublicenseable, and non-transferable license under the Property and modifications to the Core IP to (i) design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer Licensed Products in the Territory and the Channels of Distribution and (ii) provide Licensed Services in the Territory and during the License Period (all together, the "**License**").

(i) The License granted in this Section 1 does not cover any Derivative Property (e.g., Julius Jr.); provided, however, that during the License Period and provided that Licensee is not then in Material Breach of this Agreement, Licensee shall have a forty-five (45)-day right of first negotiation to license the Julius Jr. property, subject to: (A) Licensor making Julius Jr. available in the Territory, which Licensor may do in its sole discretion; and (B) the parties reaching agreement on the license terms within forty-five (45) days of the date that Licensor notifies Licensee of its decision to make Julius Jr. available in the Territory.

(ii) By way of example, and without limitation, modifications to the Core IP include a modification of the Julius design having a frown instead of a smile.

(b) During the License Period, Licensee shall have the right to grant sublicenses to third parties, solely and only in connection with the design, development,

manufacture, marketing, promotion, distribution, advertising, offer for sale of, sale of, providing, and otherwise offering one or more Licensed Products or the provision of Licensed Services in the Territory, subject to the following conditions:

(i) every sublicensee ("**Sublicensee**") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services;

(ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;

(iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;

(iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;

(v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

(c) Every Assigned License Agreement shall be deemed to be a Licensor-approved sublicense agreement and each licensee thereto shall be deemed to be a Sublicensee as of June 1, 2015. Any payments paid by the licensees under those Assigned License Agreements and that arise from actions or sales that occurred prior to June 1, 2015 shall be governed by Schedule J, Paragraph 4.

2. Territory and Channels of Distribution.

(a) The License granted herein is limited to the Territory. Except as otherwise provided in this Agreement, no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory. This Agreement shall not be interpreted and the rights granted herein shall not be exercised in a manner as would contravene any provision of any national anti-trust or restrictive practice legislation in the Territory.

(b) Licensee may sell or distribute Licensed Products to authorized Paul Frank retail stores located outside the Territory with the prior written approval of Licensor and subject to payment to Licensor of a market-rate royalty, to be agreed upon by Licensor and Licensee.

(c) The License granted herein for Licensed Products is limited to the Channels of Distribution.

3.    License Period.  License Period shall have the meaning set forth in Schedule C.

4.    Payment Terms.

(a)    Licensee shall pay to Licensor such sums as set forth, with payment dates, in Schedule D.  Except as otherwise provided herein, no portion of the license fees shall be refundable or returnable to Licensee, regardless of the circumstances.

(b)    To the extent that any Withholding Taxes are imposed in the Territory and if Licensee timely provides Licensor with a Withholding Tax receipt referred to below, then Licensee shall be entitled to deduct Withholding Taxes from the license fees, provided that the total Withholding Tax, if any, applicable to any fees paid under this Agreement shall be capped at 4.5% of the total fees paid. Licensee shall, within a reasonable time after the receipt thereof by Licensee, furnish to Licensor the original or a certified copy of a tax certificate from the governmental authority to which the Withholding Taxes were paid evidencing payment of the Withholding Taxes, sufficient for Licensor to claim a foreign tax credit on its respective U.S. income tax return, if applicable. If the actual Withholding Tax is greater than 4.5%, Licensee shall gross up any payment due hereunder such that Licensor shall have netted and actually received 95.5% of any payment earned or owed hereunder.  Licensee will be responsible for any penalties, interest, charges and damages resulting from Licensee's failure to properly withhold and pay such Withholding Taxes to the applicable taxing authority.  "**Withholding Tax**" means a tax imposed by the taxing authority in the Territory that is levied on Licensee as withholding agent of Licensor for the purpose of paying income taxes due to such taxing authority by Licensor as a result of the license fees payable by Licensee to Licensor pursuant to this Agreement.

(c)    Licensee shall bear all costs and expenses of any currency conversion to U.S. Dollars and the risk of any currency fluctuation. No cost, expense or risk related to a currency conversion shall reduce any amount payable to Licensor pursuant to this Agreement.

5.    Licensor Agent.  Licensor  may, after prior written notification to Licensee, delegate its rights and obligations hereunder to any third party designated by Licensor ("**Licensor's Agent**"), provided that Licensor's Agent shall not be a direct competitor of Licensee.

6.    Statements.

(a)    Licensee shall, on or before the thirtieth (30th) day after the end of each calendar quarter, commencing with the first calendar quarter (or partial calendar quarter) ending after the Effective Date, furnish Licensor complete and accurate statements in English ("**Quarterly Statements**"), specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, during such quarter, and any additional non-financial information reasonably requested by Licensor from time to time.  The Quarterly Statement will also report the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof.

(b) Licensee shall maintain and make available to Licensor, no more than once during any two year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

7. Licensed Products, Packaging, Promotional Material and Advertising Approvals.

(a) Pre-production Concepts, Designs, etc. As early as possible, but in no event later than the date requested by Licensor, Licensee shall submit to Licensor for Licensor's review and written approval all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("**SKU**") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee). Such approval cannot be unreasonably withheld by Licensor, provided that if Licensor does not provide its approval or disapproval of any such concepts, artwork, or SKU within ten (10) Business Days after it is submitted for approval, such concepts, artwork, or SKU shall be deemed disapproved. Thereafter, Licensee may notify Licensor of Licensor's deemed disapproval and Licensor shall then have five (5) Business Days to approve or disapprove such concepts, artwork, or SKU, provided that if Licensor does not provide its approval or disapproval of such concepts, artwork, or SKU within five (5) Business Days thereafter, such concepts, artwork, or SKU shall be deemed approved. Notwithstanding the foregoing, Licensor shall not disapprove of more than twenty percent (20%) of all concepts, artwork, or SKUs submitted for approval in any semi-annual period during the License Period.. Any pre-production approval Licensor may grant will not constitute or imply a representation or belief by Licensor that such materials comply with any applicable laws.

(b) Approvals. Licensee shall ensure that all Licensed Products, as well as packaging, promotional, marketing and advertising material therefor, whether produced by or for Licensor or by or for any Sublicensee maintain the same level of quality and style heretofore associated with Licensed Products and that serve to maintain and uphold the goodwill associated with the Property. In this connection, from time to time, at the reasonable request of Licensor, Licensee shall provide Licensor, at no cost to Licensor, samples of designs, concepts, prototypes, finished Licensed Products as well as packaging, promotional, marketing and advertising material therefor, so that Licensor can confirm that such standards are being upheld by Licensee and all Sublicensees. If Licensor finds any such materials to be deficient in such manner that in Licensor's reasonable discretion the quality or style standards for Licensed Products are not being upheld, or the goodwill associated with the Property is likely to suffer, Licensor shall so inform Licensee and Licensee shall promptly correct, or cause its manufacturers or Sublicensees (as the case may be) to correct, such deficiencies. All Licensed Products, advertising and marketing materials, and packaging shall contain the legends set forth in Exhibit 2 hereto or such other legends approved in writing by Licensor.

(c) Labels, Tags, etc. Licensor has designed character artwork or a brand name logo(s), or both, to be used by all licensees in connection with the packaging of all merchandise using the Property and, if applicable, on hang tags and labels for such merchandise. Licensor will supply Licensee with reproduction artwork thereof, and Licensee agrees to use and to cause Sublicensees to use, such artwork or logo(s) on the packaging of Licensed Products, and, if applicable, on hang tags and garment labels, which Licensee and Sublicensees will have printed and attached to each Licensed Product at Licensee's or Sublicensee's cost. Licensor shall

supply Licensee with new artwork or new brand name logo(s) for the Property, or both, as appropriate; provided, however, that Licensee shall have reasonable time upon receiving Licensor's notice to complete the transition to the use of new packaging, hang tags and garment labels, and shall be entitled to continue to sell all remaining inventory through all Channels of Distribution within such reasonable time.

(d) Certain Licensor Remedies. The rights granted hereunder do not permit Licensee or any of its manufacturers or Sublicensees to sell or otherwise distribute any "seconds" or "irregulars" or any damaged, imperfect/irregular, defective or substandard inventory of Licensed Products.

(e) Deviation or Variation by Licensee. Licensee shall not, after having received Licensor's written approval of any Licensed Products, advertising, promotional and/or packaging materials, cause or permit any deviation or variation in the artwork, design, quality or style of Licensed Products, advertising, promotional and/or packaging materials without Licensor's approval in writing prior to any such deviation or variation. Licensee acknowledges that Licensor may disapprove any SKU of Licensed Products or a production run of any SKU of Licensed Products because the quality, the standard of which shall be established reasonably based on the applicable local laws and regulations, is unacceptable to Licensor. Licensor will not unreasonably object to any change in the design of Licensed Products or in the materials used in the manufacture of Licensed Products or in the process of manufacturing Licensed Products that Licensee advises Licensor in writing is necessary to make Licensed Products safer or more durable.

(f) Certain Representations and Warranties Relating to Quality. Licensee represents and warrants that:

(i) each of the Licensed Products and components thereof shown, marketed, manufactured, distributed or sold shall be of good quality and free of defects in design, materials and workmanship, and shall comply with all applicable laws, and such specifications, if any, as may have been reasonably specified by Licensor, and shall conform to the samples thereof approved by Licensor;

(ii) both before and after Licensee puts Licensed Products on the market, Licensee shall follow reasonable and proper testing procedures for safety testing so that Licensed Products comply with all applicable product safety laws, and shall permit Licensor's designees to inspect testing and quality control records and procedures, including requesting copies of general conformity certificates of Licensee, no more than two (2) times per year. Licensor shall use reasonable efforts in scheduling and conducting any such inspection to minimize disruption of Licensee's ordinary business. Licensee agrees to promptly reimburse Licensor for the actual costs of such testing as to any of the Licensed Products not tested by Licensee. Licensee shall also give due consideration to any recommendations by Licensor that Licensed Products exceed the requirements of applicable laws. Licensed Products not manufactured, packaged or distributed in

accordance with applicable laws shall be deemed deficient and shall not be shipped unless and until they have been brought into full compliance therewith;

(iii) Licensee shall comply with all applicable laws in performing this Agreement, including but not limited to, those pertaining to the manufacture, pricing, sale and distribution of Licensed Products (including, without limitation, such associated with environmental protection, minimum wages, child labor, health and the safety in the work place, and advertising and labeling, and product safety), and upon Licensor's reasonable request, which is no more than two (2) times per year, Licensee shall provide Licensor with all the appropriate documentation related thereto at Licensor's cost. In addition, Licensee shall manufacture, market, distribute and sell Licensed Products in an ethical manner and in accordance with the provisions and the intent of this Agreement, and shall not engage in unfair or anti-competitive business practices.

(g) Code of Conduct for Manufacturers. Licensee shall require all manufacturers to sign and date and covenant to comply with Exhibit 4, the Code of Conduct for Manufacturers, and Exhibit 5, the Approval of Manufacturer, in the manufacturing, packaging and distribution of Licensed Products. The Code of Conduct for Manufacturers as well as the Approval of Manufacturer shall not be interpreted to require Licensee or its manufacturers to violate any applicable law. As provided in the Code of Conduct for Manufacturers and the Approval of Manufacturer, Licensee, for itself and on behalf of its manufacturers, agrees that Licensor and Licensor's designated agents that are not direct competitors of Licensee may engage in monitoring activities to confirm compliance with this Section 7.

(h) Code of Conduct for Licensees. Licensee shall comply with the Code of Conduct for Licensees, attached hereto as Exhibit 6 and incorporated herein by this reference. This includes, but is not limited to, taking appropriate steps, in consultation with Licensor, and as required by Licensor's compliance program for licensees, to develop, implement and maintain procedures to evaluate and monitor the manufacturers it uses to manufacture Licensed Products or components thereof, and to use best efforts to ensure compliance with this sub-clause (h), including but not limited to, unannounced on-site inspections of manufacturing, packaging and distribution facilities and employer-provided housing, reviews of books and records relating to employment matters and private interviews with employees.

(i) Collateral Materials and Works Made for Hire.

(i) To the extent materials, artwork, cover design, photographs, packaging, literary text, advertising and promotional materials, works of authorship, and the goodwill pertaining thereto (**"Collateral Materials"**) concern or incorporate the Property or Derivative Property, as defined in Section 9 below, and are created pursuant to this Agreement, all elements thereof shall be "works made for hire" (as the term is defined in the U.S. Copyright Act of 1976, as amended), or its equivalent under other applicable laws in the Territory, and Licensor shall be the sole owner thereof from creation.

(ii) If Licensee engages one or more parties to create all or any part of any Collateral Materials concerning or incorporating the Property or Derivative

Property, Licensee shall use an appropriate written agreement under which Licensor and/or its designee shall be deemed the sole author of all such Collateral Materials, including the registration of copyrights in such Collateral Materials in the name of Licensor, and all ownership rights therein will be made to vest in Licensor and/or its designee upon creation. Licensee hereby acknowledges that all works made for hire are the sole property of Licensor and/or its designee, and at all times remain in the name and control of Licensor.

(iii)   Any Collateral Materials that concern or incorporate the Property or Derivative Property created by an employee-for-hire shall be under Licensee's sole supervision, responsibility, direction, control and monetary obligation. If any part or element of any such Collateral Materials, or any right, title or interest therein, is acquired by or licensed to Licensee from any other person, or if any non-employee of Licensee contributes to the creation of any such work, or if, for any reason, any such work does not qualify as a "work made for hire," Licensee shall obtain and shall deliver to Licensor, a written assignment, in form and substance satisfactory to Licensor, by which all right, title and interest in and to the applicable Collateral Materials that concern or incorporate the Property or Derivative Property throughout the universe, in perpetuity, in all media now known or hereafter devised, vest in Licensor exclusively, irrevocably, and unconditionally, free and clear of any and all claims, encumbrances, rights, titles or interests of any kind or nature whatsoever. Upon the request of Licensor, at any time and from time-to-time, Licensee shall submit to Licensor, for Licensor's approval, copies of all such agreements prior to use thereof. Licensee shall not permit any such person to obtain or reserve, by any means or method whatsoever, any rights as an "author" or "inventor" of any such work (as such terms are defined in any applicable law).

(j)   Third Party Rights.   If and as applicable, the likenesses and product application of the characters used on or in connection with the Licensed Products are subject to any third party approvals Licensor deems necessary to obtain, Licensor will act as the liaison with such third parties during the approval process.

8.   Use of Property.   Use by Licensee of the Property shall be governed by the following additional conditions:

(a)   Licensee shall limit its use of the Property to the Territory, in the Channels of Distribution and to Licensed Products and the Licensed Services, all in accordance with this Agreement and according to processes, specifications and other quality standards established or approved by Licensor for the Licensed Products in connection with which the Property is used.

(b)   In order that Licensor may be assured that the provisions of this Agreement are being observed, Licensee shall allow Licensor or its designee to enter upon Licensee's premises (as well as the premises of all contract manufacturers and all facilities where Licensed Products and/or packaging are produced or located) during regular business hours, upon not less than five (5) days' notice, for the purpose of inspecting Licensed Products and the facilities in which the Licensed Products are manufactured and packaged. In the event that the quality standards as may be reasonably established by Licensor based on the applicable local

laws and regulations from time-to-time, are not maintained throughout the period of manufacture of any Licensed Products hereunder, then, upon written notice from Licensor, Licensee shall immediately discontinue the manufacture and distribution of those specific Licensed Products that do not meet such quality standards and shall not resume the manufacture and distribution of such Licensed Products until the quality standards are again met and approved by Licensor.

(c) Licensee shall display any trademarks in the Property only in such forms set forth in Exhibit 1, unless otherwise approved by Licensor in writing. Licensee also agrees that it shall cause to appear on all material on or in connection with which the Property is used, such legends, markings and notices as Licensor may reasonably request in order to give appropriate notice of any Property, trademarks, trade name or other rights therein or pertaining thereto.

(d) Licensee shall use no markings other than the legends set forth in Exhibit 2, as appropriate, on and in connection with Licensed Products, advertising and marketing materials, and packaging without first obtaining Licensor's written approval.

(e) All rights in the Property other than those specifically granted herein are reserved to Licensor for its own use and benefit. Licensee acknowledges that it shall not acquire any rights of whatsoever nature in the Property as a result of Licensee's use thereof, and that all use of the Property by Licensee shall inure to the benefit of Licensor. In addition, Licensor shall solely and exclusively own all other rights in, derived from, under or related to the Property.

(f) Upon the termination of the License Period of this Agreement, all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement.

9. Ownership and Protection of Property.

(a) Licensee recognizes the great value of the publicity and goodwill associated with the Property and acknowledges that such goodwill associated with the Property belongs exclusively to Licensor and that the trademarks included within the Property that may at one time have had a non-trademark primary meaning have acquired a secondary meaning in the mind of the purchasing public. Licensee further acknowledges that all rights in any new versions, translations, rearrangements, or derivations, or other changes in any Property that may be created by, for or on behalf of Licensee in connection with the License and/or this Agreement shall be and shall remain the exclusive property of Licensor and such new versions, translations, rearrangements or derivations, if licensed by Licensor to Licensee hereunder, shall be subject to the provisions and conditions of this Agreement.

(b) Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property or attack the validity of this Agreement or breach the confidentiality of the terms of this Agreement.

(c) Licensee, at its cost and in accordance with applicable laws, will be responsible for actively monitoring the Territory to identify misuses of the Property, and shall undertake all actions reasonably necessary or advisable to protect the Property, including

conducting investigations, raids, administrative actions, enforcement actions, anti-counterfeiting actions, litigation, and any other suit, action or proceeding with respect to claims for infringement or imitation of the Property. To this end, Licensee will provide to Licensor a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter. Independently of issuing the quarterly reports, Licensee shall promptly notify Licensor in writing of any significant manufacture, distribution, sale or advertisement for sale of any product of the same general type or class as the Licensed Products that Licensee believes may constitute an infringement upon Licensor's rights or an unauthorized use of the Property. Licensor may, in its sole discretion, and at its cost, commence, prosecute or institute any suit, action or proceeding with respect to claims for infringement or imitation of the Property or instead Licensor may request that Licensee take such action at Licensee's cost, using legal counsel reasonably acceptable to Licensor. The damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements. Licensee shall assist Licensor to such extent as Licensor reasonably requests in protecting the Property. Specifically, Licensee agrees to give testimony, provide exhibits, provide facts and otherwise cooperate with Licensor. Licensee shall not have any rights against Licensor for damages or otherwise by reason of any determination by Licensor not to act or any settlement to which Licensor may agree with respect to any alleged infringements or imitations by others of the Property and/or Licensed Products, nor shall any such determination of Licensor or such settlement by Licensor affect the validity or enforceability of this Agreement. Notwithstanding the foregoing, to the extent necessary to maintain any suit, action or proceeding to enforce the Property, Licensor shall, at Licensee's request join the suit action or proceeding as a party.

(d) Licensor shall use best efforts to: (i) register and maintain the registration for all Core IP in the Territory; (ii) take legal or administrative action to oppose or cancel the application for or registration of trademarks that are confusingly similar to "Paul Frank" or the Julius design; (iii) permit Licensee to take such actions, at Licensee's expense, if Licensor chooses not do so; (iv) provide Licensee with a report each calendar quarter identifying all trademarks in the Territory known to Licensor and that are confusingly similar to the Core IP, describing the actions, if any, taken by Licensor against such trademarks in the Territory.

(e) Without Licensor's express prior written consent, Licensee shall not use the Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property as a corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee or as a URL or social media name or identifier, whether in Western or Chinese characters, except that Licensee is licensed and entitled to use the Property in signage in relation to providing Licensed Services.

(f) Except as expressly authorized by Licensor in writing (and then only to the extent of, and subject to the terms of, such written authorization), Licensee shall not (i) join any names, words, symbols, designs, trademarks, service marks, characters, likenesses, or any other literary or artistic elements, with the Property or Derivative Property so as to form a new or derived trademark, (ii) make, or authorize to be made, any use, directly or indirectly, of any variation of the Property or Derivative Property, or (iii) use the Property or Derivative Property in connection with any cross collaboration or cross licensing programs with third party designs, brands, trademarks, copyrights, properties and/or otherwise.

(g) If Licensee obtains any rights in the Property or Derivative Property for whatever reason, then Licensee shall, at Licensor's expense, execute any instrument and assist Licensor in every proper way in order to fully assign or transfer such rights to Licensor. Licensee hereby irrevocably appoints Licensor as Licensee's attorney-in-fact, with full authority in the place and stead of Licensee and in the name of Licensee, to take any action and/or to execute, acknowledge and/or deliver any instrument that may be necessary to evidence, establish, protect, perfect, record, register, enforce, defend or secure any or all of Licensor's right, title, property and interest with the same legal force and effect as if originally executed by Licensee. Licensee hereby waives and irrevocably quitclaims to Licensor any and all claims for infringement of any and all rights assigned to Licensor.

(h) **Right of First Negotiation.** Prior to selling, assigning, transferring, or otherwise divesting all or substantially all of Licensor's ownership interest in the Property in the Territory apart from the rights in the Property in other jurisdictions, Licensee shall have a thirty (30)-day right of first negotiation to acquire from Licensor such ownership interest on terms and conditions to be negotiated by the parties. For avoidance of doubt, either the direct or indirect sale of the Licensor or a sale of rights in the Property in the Territory together with rights in the Property in other jurisdictions shall not trigger this right of first negotiation. The parties shall begin their negotiations no later than five (5) days following Licensee's receipt of written notice from Licensor that Licensor intends to sell, assign or transfer its ownership interest in the Property in the Territory. If Licensor and Licensee fail to reach agreement on the terms and conditions of Licensee's acquisition of all or substantially all of Licensor's ownership interest in the Property in the Territory within thirty (30) days from the commencement of the negotiations, this right of first negotiation shall terminate and Licensor shall be free to sell, assign, transfer or otherwise divest its ownership interest in the Property to one or more third parties other than Licensee.

10. Distribution and Marketing of Licensed Products.

(a) Licensee shall exercise commercially reasonable best efforts to manufacture sufficient quantities of Licensed Products to meet the market demand for Licensed Products and shall diligently and continuously manufacture, distribute and offer for sale Licensed Products (including all lines or categories thereof) to fulfill orders for Licensed Products. From and after the Marketing Date, Licensee shall diligently market and promote the sale of all Licensed Products (including all lines or categories thereof) continuously during the License Period; provided that Licensee shall not advertise in any publication or communications medium that could damage the goodwill or reputation of the Property in any way or manner.

(b) Except otherwise provided in this Agreement, Licensee shall distribute and sell Licensed Products outright at a competitive price and not on approval, consignment, sale or return basis, and only via authorized Channels of Distribution, and only to retail stores (within the authorized Channels of Distribution) for sale to the public. Unless otherwise provided in this Agreement, Licensee shall not knowingly without the express prior written consent of Licensor distribute or sell Licensed Products to distributors, wholesalers, jobbers, sponsors of a radio or television program or retail stores or merchants whose sales or distribution are or will be made for publicity or promotional tie-in purposes, combination sales, premiums, giveaways or similar methods of merchandising or whose business methods and practices are questionable, or who are not included within the authorized Channels of Distribution.

(c)    Licensee shall use its commercially reasonable best efforts to market and promote Licensed Products during the License Period throughout the Territory and, in doing so, shall ensure that its marketing and advertising efforts are in good taste and will be no less extensive in scope, depth, and quality than any of Licensee's other "top-tier" licensed titles or brands.

(d)    Upon Licensor's request from time-to-time during the License Period, Licensee shall sell to Licensor reasonable quantities, as determined jointly by Licensee and Licensor, at a price equal to Licensee's actual costs; provided, however, that Licensed Products purchased by Licensor pursuant to this subsection (d) shall be used for promotional purposes only and not resold in any way.

(e)    Notwithstanding any other term or provision of this Agreement, Licensor shall be permitted to enter into collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property, whether or not such are in product categories included in Licensed Products hereunder, in the Territory and/or during the License Period, provided that such collaboration does not materially adversely affect Licensee's exclusive rights under Section 5 of Schedule J of this Agreement, or otherwise materially adversely affect Licensee's rights under this Agreement.

(f)    Notwithstanding any other term or provision of this Agreement, Licensee shall be permitted to enter into collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property, in the Territory and/or during the License Period, provided that Licensee obtains Licensor's prior written consent that shall not be unreasonably withheld.

(h)    Other than in Paul Frank-branded stand-alone Premium Retail Stores controlled by Licensee or Sublicensees, Licensee shall not (i) sell or otherwise provide Licensed Products for use as premiums, promotions, giveaways, fund-raisers, or prizes in sweepstakes, (ii) except as otherwise agreed in Schedule G, sell Licensed Products by or use direct mail and marketing methods to sell Licensed Products or sell Licensed Products to third parties that sell by or use direct marketing methods or door-to-door solicitation or unapproved marketing methods or home shopping television programs without the prior written consent of Licensor.

(i)    "Dumping" means the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products; provided however, that nothing contained herein shall be deemed to restrict Licensee's ability to set product prices at Licensee's discretion.  In consideration of the rights granted to Licensee herein and in recognition of Licensor's interest in maintaining a stable and viable market for Licensed Products, Licensee shall use best efforts to avoid Dumping any Licensed Products during the Licensed Period and the Sell-Off Period, and shall provide Licensor with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products; provided, however, that such annual sales reports shall not include information on returns, rebates, or incentives.

11.    Marketing Date.    Licensee shall commence in good faith the manufacture, shipping, marketing and sale in substantial quantities of Licensed Products (including all lines or categories thereof) in the Territory no later than the date set forth in Schedule F..

12.    Music and Other Rights.    Except as specifically designated in writing by Licensor, neither musical compositions, nor musical recordings, nor any video clips, nor any name, voice, or likeness of any actor or musical performer associated with the Property are licensed under this Agreement.  In the event that Licensee wishes to use such materials in connection with Licensed Products and/or the advertising or packaging therefor and Licensor approves such use, Licensee will be solely responsible for securing any and all permissions (e.g., from the appropriate music publisher or collection society, or from the applicable performer for use of name, voice or likeness) required in connection with Licensee's use thereof before manufacturing any of Licensed Products or engaging in any activities hereunder utilizing same, even in cases where Licensor has provided such materials to Licensee.  Licensor may act as the liaison between Licensee and any applicable rights holders in connection with Licensee's license of any such rights, or in some cases may direct Licensee to contact a rights holder directly.  Any charges, fees or royalties payable for music rights or any other rights not covered by this Agreement shall be Licensee's responsibility and shall be additional to the license fee and covered by separate agreement.

13.    Termination, Breaches, and Bankruptcy.

(a)    Termination by Licensor.  If (i) any bankruptcy, insolvency, liquidation, or dissolution, domestic or foreign, is instituted by or against Licensee and is not dismissed within sixty (60) days after the filing date thereof, or (ii) Licensee becomes insolvent or suspends the transaction of all or a substantial portion of its usual business (except in the case that the suspension of business results from a Force Majeure, which shall be governed by Section 23 of this Agreement); or (iii) Licensee commits a Material Breach (as defined below) of this Agreement, Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee (except Licensor shall have the right to immediately terminate this Agreement for breach of Section 13(b)(i) below), and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period.

(b)    The following are deemed to be a Material Breach under this Agreement: (i) the Non-Refundable Extension Fee was not paid by March 20, 2015, or the remainder of the License Fee was not paid by May 31, 2015; or (ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or (iii) Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days; or (iv) Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of

Section 34 = FCPA

Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv)).

(c)    Breach by Licensor.  In the event that (i) Licensor breaches the obligation under Section 3 of Schedule J, or any licensee under an Assigned License Agreement refuses to recognize the assignment of its license agreement to Licensee, Licensor shall (A) use commercially reasonable efforts to terminate such Assigned License Agreement and (B) forward to Licensee any amounts received under such license agreement that arise from actions or sales that occurred on or after June 1, 2015, after deduction of all reasonable costs, including conversion and remittance costs, if any, applicable to such amounts; (ii) Licensor breaches the obligation under Section 5 of Schedule J by granting a (1) multi-territorial license that includes the Territory and covers Core IP in any Core Category or (2) license for the Property that covers only the Territory, it shall be deemed a material breach by Licensor and Licensee shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensor, and such notice of termination shall become effective unless Licensor completely cures such breach within such thirty (30) day period;, or (iii) Licensor loses rights in the Core IP in the Core Categories as specified in Schedule D, Licensee shall be entitled to a partial refund of the license fees as specified in Exhibit 7 to this Agreement.

(d)    Breach by Licensee.  In the event that Licensee commits any breach of this Agreement this is not a Material Breach, Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach.  If a breach is not cured within thirty (30) days after notice of the breach, then such breach shall be an **Uncured Breach**.  Licensee shall pay a fine of $20,000 for each Uncured Breach.

(e)    Bankruptcy of Licensor.  The parties agree that (i) the material obligations of the parties under this Agreement have been performed as of May 31, 2015, (ii) after May 31, 2015 the terms and conditions of this Agreement are non-executory in nature, and (iii) this Agreement shall in no event be deemed an executory contract.  If, notwithstanding the foregoing, a judicial authority (including a U.S. Bankruptcy Court) holds that this Agreement is an executory contract, Licensee shall retain all rights to continued use of the Property in accordance with the terms and conditions of this Agreement pursuant to Section 356(g) of the United States Bankruptcy Code upon any rejection of this Agreement under Section 365(a) of the Bankruptcy Code.

14.    Result of Termination.  Neither the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee.  Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination.

15.    Additional Representations and Warranties.

(a)    Licensor represents and warrants and further agrees that: (i) this Agreement is the valid and binding obligation of Licensor, enforceable in accordance with its terms; (ii) Licensor has the right to license the Property in accordance with the terms of this Agreement; (iii) to Licensor's knowledge, the Property does not infringe upon any Intellectual Property right of any third party; provided, however, that Licensor makes no representation or

warranty concerning any part of the Property at any time acquired by or from, or created by or on behalf of, Licensee (including any Derivative Property); (iv) Licensor has the right to assign to Licensee all of Licensor's current merchandise license agreements under the Property for the Territory; and (v) the execution, delivery and performance of this Agreement will not conflict with or result in any violation of or constitute a default under the organizing or governing documents of Licensor, any stipulation, judgment, writ, injunction, license, permit, decree or order of any governmental authority, any agreement or other instrument by which Licensor may be bound, or any laws. Except for the warranties in this sub-section (a), Licensor grants no warranties, express or implied regarding the Property, including, without limitation, any representation by Licensor or by anyone acting on its behalf concerning the prospects for sales of Licensed Products.

(b) Licensee represents and warrants and further agrees that: (i) this Agreement is the valid and binding obligation of Licensee, enforceable in accordance with its terms; (ii) Licensee has, and at all times will continue to have, the financial and other resources necessary to timely and properly pay, perform and discharge all of its obligations under this Agreement, and has the requisite ability, experience, expertise, to design, manufacture, market and sell Licensed Products in a manner that will enhance the prestige of the Property and to otherwise perform all of its obligations under this Agreement; (iii) Licensee owns and controls all right, title and interest in and to, or has all necessary licenses to use, any and all intellectual and other properties, rights, software, middleware, hardware and other technology that is or may be used in the manufacture, production and distribution of Licensed Products and packaging; (iv) Licensee has the right to grant to Licensor the right in and to the rights and materials contributed by or on behalf of Licensee to Licensed Products, packaging or Property (including Derivative Property) hereunder, with regard to the rights Licensee grants to Licensor under this Agreement; and (v) the execution, delivery and performance of this Agreement will not conflict with or result in any violation of or constitute a default under the organizing or governing documents of Licensee, any stipulation, judgment, writ, injunction, license, permit, decree or order of any governmental authority, any agreement or other instrument by which Licensee may be bound, or any laws.

16. Indemnification.

(a) Licensee hereby indemnifies and agrees to defend and hold harmless Licensor and its parents, direct and indirect equity holders and investors, directors, officers, employees, Affiliates, agents, representatives, and contractors of and from any loss, damage, liability, expenses, claims or suits (including reasonable attorneys' fees and costs) (**"Claims"**) arising out of or in connection with: (i) any breach of Licensee's representations, covenants or obligations under this Agreement; (ii) any alleged defects or violation of law in or related to the Licensed Products, other than any infringement claim for which Licensor is obligated to indemnify Licensee pursuant to Section 16(b); (iii) any infringement or violation of any right of person or entity (including without limitation patent, copyright, trade name, patent or libel, or invasion of the right of privacy or publicity, breach of warranty or contract, or other property rights) resulting from or arising out of any process, method or device utilized by or on behalf of Licensee, or otherwise in connection with the preparation, manufacture, distribution, advertising, promotion and/or sale of Licensed Products, packaging and/or any materials relating thereto, except claims arising only in connection with Licensee's use of the Property or Derivative Property in accordance with this Agreement. With respect to the foregoing indemnification,

Licensee shall defend and hold harmless such Licensor at no cost and expense whatsoever to Licensor, including but not limited to reasonable attorney's fees and court costs. Notwithstanding the foregoing, Licensor shall have the right to defend any such action or proceed with attorneys of its own selection at its own cost.

(b) Licensor hereby indemnifies and agrees to defend and hold harmless Licensee and its parents, direct and indirect equity holders, investors, directors, officers, employees, Affiliates, agents, representatives, and contractors of and from any Claims, arising out of or in connection with (i) any third party claim alleging copyright or trademark infringement out of Licensee's use pursuant to the License of the Property (excluding the Derivative Property, which has not been licensed under this Agreement), or (ii) any breach of Licensor's representations, covenants or obligations under this Agreement, provided that in each case, Licensee shall notify Licensor in writing promptly upon Licensee's acquiring knowledge of any such claim or suit. With respect to the foregoing indemnification, Licensor shall defend and hold harmless such Licensee at no cost and expense whatsoever, including but not limited to reasonable attorney's fees and court costs. Licensor shall have the option to undertake and conduct the defense of, at any time prior to judgment, any claim or suit that may be subject to the indemnification provisions of this sub-section, without Licensee's express consent in writing. Licensor acknowledges that Licensee will conduct a private placement of equity securities and an initial public offering, and Licensee's rights granted by Licensor under this Agreement are significant in the private placement and initial public offering.

17. Remaining Inventory. Licensee shall, sixty (60) days or more prior to the Expiration Date or, if the License is terminated prior to the Expiration Date, ten (10) days after the effective date of any such termination, account to Licensor in a statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of the date of such statement. Licensor shall have the option to conduct a physical inventory of Licensee in order to verify such statement of remaining inventory. If Licensee refuses to permit Licensor to conduct such physical inventory, Licensee shall forfeit its rights to dispose of any of Licensed Products subsequent to the Expiration Date or the effective date of any termination pursuant to the provisions of this Agreement. Nothing contained in this section shall be construed to limit Licensor's rights or remedies.

18. Confidentiality. The parties acknowledge that by reason of their relationship hereunder, they may from time to time disclose information regarding their business, products, Intellectual Property and other proprietary information that is confidential and considered to be of substantial value to the other party, which value might be impaired if such information were disclosed to third parties (including the terms of this Agreement, "**Confidential Information**"). Confidential Information does not include information that: (a) is or becomes generally known to the public through no fault or breach of this Agreement by the receiving party; (b) is known to the receiving party at the time of disclosure without an obligation of confidentiality; (c) is independently developed by the receiving party without use of the disclosing party's Confidential Information; or (d) the receiving party rightfully obtains from a third party without restriction on use or disclosure. Each party shall use at least the same degree of care to avoid disclosure or use of the other party's Confidential Information as it employs with respect to its own Confidential Information of like importance, but in no case use less than a reasonable degree of care; and in any event, during the License Period of this Agreement (as may be

extended or renewed), and after any termination or expiration of this Agreement, each party will not disclose or use the other party's Confidential Information except as permitted herein, and will not disclose such Confidential Information to any third party (other than disclosure to such party's employees, accountants, attorneys, bankers and financial advisers who must have such information in order to advise and perform professional services and who are bound by confidentiality obligations with respect thereto) as is reasonably required in connection with the exercise of its rights and obligations under this Agreement (and only subject to restrictions on use and disclosure at least as protective as those set forth herein and executed in writing by such employees and consultants). Each party may disclose Confidential Information of the other party: (i) with the prior written consent of the party that owns the Confidential Information; and (ii) pursuant to the order or requirement of a court, administrative agency, or other governmental body, provided that the disclosing party gives prompt and reasonable notice to the other party to contest such order or requirement, and such disclosing party agrees to cooperate with the other party in any attempt to obtain a protective order. Each party will comply with any law applicable to the privacy of personal identifying information and data.

19.    Publicity.    Except to the extent necessary under applicable laws, Licensee shall not make any public announcement or issue any press release relating to the existence or terms of this Agreement or the business relationship contemplated herein without Licensor's prior written consent, in Licensor's reasonable discretion.

20.    Sell-Off Period.

(a)    Except as provided in subsection (b) below, Licensee shall have the right to dispose of, on a non-exclusive basis such items of Licensed Products as Licensee has remaining in inventory as of the Expiration Date (or the date of termination of the License, if earlier) for the period of time subsequent to the Expiration Date (or the date of termination of the License, if earlier) set forth in Schedule H, provided that Licensee shall have complied, and shall continue to comply, in all material respects with all of the provisions of this Agreement ("**Sell-Off Period**"), including the reporting of sales. Any Licensed Products not disposed of at the expiration of the Sell-Off Period shall, at Licensor's option, be delivered to Licensor or destroyed, in which case Licensee shall deliver to Licensor a certificate of destruction signed by an officer or director of Licensee.

(b)    If the License is terminated pursuant to a Material Breach by Licensee of this Agreement, Licensee's disposal of any items of Licensed Products which Licensee has remaining in inventory shall be in strict accordance with such instructions as Licensor shall give to Licensee.

(c)    Upon the expiration of the Sell-Off Period, Licensee shall provide to Licensor a final statement of the total number of items of Licensed Products distributed and sold by Licensee during the License Period and the Sell-Off Period.

21.    Remedies for Failure to Cease Manufacture, Distribution, etc. Licensee's failure to cease the manufacture, distribution, sale or advertisement for sale of Licensed Products upon the expiration or termination of the License or relevant Sell-Off Period will result in immediate and irreparable damage to Licensor. Licensee acknowledges that no adequate remedy at law exists for such failure to cease the manufacture, distribution, sale or advertisement for sale of

Licensed Products and Licensee agrees that Licensor shall be entitled to the remedies of injunction, specific performance or other equitable relief to prevent a breach of this Agreement by Licensee. However, Licensee shall be entitled to sell Licensed Products as Licensee has remaining in inventory as of the Expiration Date to Licensor, or any third party as instructed by Licensor or to any other third party in case Licensor or any third party as instructed by Licensor refuses to purchase such Licensed Products or in case Licensee is unable to sell such Licensed Products to Licensor or any third party as instructed by Licensor. None of the provisions of this section shall constitute or be construed to limit or waive any rights and remedies which Licensor may have.

22.    Liquidated Damages.  If Licensee invoices, ships or sells Licensed Products in violation of Section 2 ("**Territory and Channel of Distribution**"), then, in addition to Licensor's other remedies, Licensor may require Licensee by written notice to pay, as liquidated damages and not as a penalty, an amount equal to ten percent (10%) of the total gross sales for all Licensed Products invoiced, shipped, or sold in violation of this Section.  Such liquidated damages shall be due fifteen (15) days after notice by Licensor.  The parties agree that the foregoing liquidated damages are reasonable in light of the anticipated or actual harm caused by a breach of this Section, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  Nothing herein shall preclude Licensor from enforcing the provisions of this Section by pursuing any action or other remedy, all of which shall be cumulative.  However, in no case, shall the liquidated damages exceed US$5,000,000.

23.    Force Majeure.

(a)    Licensee shall be released from its obligations under this Agreement (other than payment obligations) in the event that governmental regulations, or other causes arising out of a state of national emergency, or war, or natural disaster render performance by Licensee impossible, and in such event no portion of the License Fee shall be repayable or returnable to Licensee.

(b)    Licensor shall be released from its obligations under this Agreement in the event that governmental regulations, or other causes arising out of a state of national emergency or war, or natural disaster render performance by Licensor impossible, and in such event no portion of the License Fee shall be repayable or returnable to Licensee.

24.    Assignment.  Licensor may assign its rights and obligations under this Agreement to any person or entity, provided that Licensor gives Licensee prior written notice.

(a)    In the event that Licensor assigns its rights in the Property, Licensor shall (i) cause any agreement assigning such rights to require the assignee to assume all of Licensor's obligations and responsibilities under this Agreement, (ii) remain fully responsible for any act of Licensor prior to the assignment of any Licensor's ownership interest in the Property, and (iii) cause any agreement assigning such rights to require that the assignee shall not adversely affect any and all rights of Licensee under this Agreement as a result of anysuch assignment.

(b)    In the event of any equity interest transfer or any change of corporate structure of Licensor which may lead to an assignment of any or all of its rights and obligations stipulated in this Agreement, Licensor shall (i) cause any agreement with the assignee to require

assignee to assume any or all obligations and responsibilities of Licensor in this Agreement, and (ii) remain fully responsible for any performance by Licensor prior to the assignment under this Agreement; and (iii) cause any agreement assigning such rights to require that the assignee shall not adversely affect any and all rights of Licensee under this Agreement .

(c) Upon prior written notice to Licensor, Licensee may assign its rights and obligations under this Agreement to any of its Affiliates, or (i) in connection with an initial public offering ("IPO") or a private investment during the first five (5) years of the License Period, or (ii) in connection with a private sale, investment, merger, consolidation, reorganization, IPO or as the result of the sale of all or substantially all of Licensee's assets or equity after the first five (5) years of the License Period, provided that:

A. such assignee shall maintain this Agreement in effect for a term at least equal to the remainder of the term (including the Extension Term, if applicable);

B. Licensee shall remain fully responsible for the performance by such assignee of all of Licensee's duties and obligations under this Agreement;

C. Licensee shall ensure that any and all rights of the Licensorr under this Agreement are not adversely affected in any respect as a result of such assignment by Licensee;

D. such assignee is financially and operationally capable of fulfilling all of Licensee's obligations under this Agreement;

E. such assignee has not been "adverse" to Licensor or any of its Affiliates in the five (5) years prior to such assignment ("adverse" means Licensor or any Affiliate asserted a claim against such assignee or such licensee asserted a claim against Licensor or any Affiliate, in either case in an amount exceeding US$5,000,000);

F. Licensee shall remain liable for any claims, liabilities or damages arising from any acts or omissions that occurred prior to Licensee's assignment of this Agreement; and

G. During the License Period, Chunlei (Dave) Qian shall sit on the Board of Directors of any assignee

25. <u>Certain Definitions.</u>

"**Affiliate**" means, with regard to either party, any corporation or other entity that directly or indirectly Controls or is Controlled by or is under common Control with the party.

"**Business Day**" means a day in which the commercial banks are open for business in Los Angeles, California, USA and The People's Republic of China.

"**Control**" means the power of a person to secure that the affairs of another are conducted directly or indirectly in accordance with the wishes of that person whether by means of:

(a)    in the case of a company, being the beneficial owner of more than 50 per cent. of the issued share capital of or of the voting rights in that company, or having the right to appoint or remove a majority of the directors or otherwise control the votes at board meetings of that company or having the right to control the management of that company by virtue of any powers conferred by the articles of association, shareholders' agreement or any other document regulating the affairs of that company; or

(b)    in the case of a partnership, being the beneficial owner of more than 50 per cent. of the capital of that partnership, or having the right to control the composition of or the votes of the management of that partnership by virtue of any powers conferred by the partnership agreement or any other document regulating the affairs of that partnership; and

"**Controlled**" shall be construed accordingly.

"**Derivative Property**" means any Intellectual Property based on or derived from the Property with the exception of modification to Core IP.

"**Intellectual Property**" means trademarks, service marks, trade names, copyrights and copyrightable works, and design rights.

26.    Additional Provisions. Schedule J contains additional provisions that are deemed included herein.

27.    Relationship of Parties. This Agreement does not constitute and shall not be construed to constitute an agency, a partnership, or a joint venture between Licensor and Licensee. Licensee shall have no right to obligate or to bind Licensor in any manner whatsoever, and nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party. In providing any information, approval or materials hereunder, Licensor is acting in an advisory capacity only and shall have no responsibility, obligation or liability to Licensee or any other person for or in connection with the development, manufacture, distribution, advertising, marketing or sales facilities owned or used by Licensee or for any decisions that may be made in connection therewith, whether upon the recommendation of Licensor or otherwise.

28.    Dispute Resolution.

Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration, conducted in English, administered by the Hong Kong International Arbitration Centre ("**HKIAC**") in Hong Kong, under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted ("**HKIAC Rules**"). The arbitration shall be conducted by three (3) arbitrators appointed by the Parties or the Chairman of the HKIAC in accordance with the HKIAC Rules. The arbitration award shall be final and binding upon all parties. Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction in any country, or application may be made to such court for a judicial acceptance of the award or an order of enforcement, as the law of such jurisdiction may require or allow. All expenses of the arbitration, including reasonable attorneys'

fees, shall be borne by the losing party in the arbitration or, as the case may be, shall be pro-rated to properly reflect any partial prevailing or losing of the parties to the arbitration, as determined by the arbitrators under the HKIAC Rules. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of this Agreement.

29.    Notice. Notices by either party to the other shall be in writing and shall be given by addressing them as indicated above and sending them by overnight carrier such as FedEx or UPS, or by email with confirmation copy to follow, and shall be effective upon receipt. Unless prior written notice of a change of address is given,

all statements and notices to Licensor must be sent to:

Paul Frank Industries LLC
10100 Santa Monica Blvd.
Los Angeles, CA 90067
Attn: Elie Dekel  (edekel@sabanbrands.com)

With copy to: Rami S. Yanni (ryanni@sabanbrands.com)

all statements and notices to Licensee must be sent to

Grand Union International Trading Limited
 Flat/rm 1303, 13/F New East Ocean Centre
9 Science Museum Road
Tsim Sha Tsui, Kowloon, Hong Kong
Attention: Dave Qian (dave@roommar.com)

With a copy to:  Lillian He (lillian.he@affluential.com.cn)

30.    Governing Law. This Agreement, including the Dispute Resolution provisions in Section 28, shall be governed by and construed in accordance with the laws of Hong Kong without reference to its conflict of law rules.

31.    Translations. In the event that this Agreement is translated into any language other than English, the English language version of the Agreement will control.

32.    Cumulative Remedies. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing in law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

33.    No Third Party Beneficiary or Broker. This Agreement is made and entered into solely for the benefit of Licensor and Licensee, their successors and permitted assigns, and no other entity shall have any rights hereunder. Licensee hereby represents and warrants to Licensor that it has not engaged a broker or other intermediary in connection with this License.

34.    Foreign Corrupt Practices Act.    Licensee represents and warrants that it has reviewed and understands the provisions of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), and its purposes, and that it has taken no action with respect to this Agreement and the transactions contemplated hereby which, would constitute a violation of the applicable laws or which would or might cause Licensor or the parent or any subsidiary or affiliate of the parent of Licensor to violate the FCPA. Licensee further represents and warrants that Licensee will not take any action in connection with this Agreement that would constitute a violation of any PRC or Hong Kong anti-corruption laws, as applicable. Licensee undertakes promptly to notify Licensor in writing upon knowing of any fact or circumstance that would render Licensee's representations herein to no longer be true. The parties agree that full disclosure of the existence and terms of this Agreement may be made at any time and for any reason to such persons, departments, branches or agencies of the Government of the United States of America and/or the government of the Territory, as Licensor's legal counsel shall determine has a legitimate need to know such terms.

35.    Entire Agreement.    This Agreement, constitutes the complete, final and exclusive statement of the terms of the agreement between Licensee and Licensor pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, communications, promises and discussions of the parties, whether oral or written, with respect to such subject matter. No party has relied on any statement, representation, warranty or promise not expressly contained in this Agreement. The provisions of this Agreement may not be explained, supplemented or qualified through evidence of trade usage or a prior course of dealings. This Agreement may not be modified or amended unless in writing signed by both Licensor and Licensee. The failure of either Licensor or Licensee to enforce, or the delay by Licensor or Licensee in enforcing any of such party's rights under this Agreement shall not be deemed a continuing waiver, and such party may, within such time as is provided by applicable law, commence appropriate suits, actions or proceedings to enforce any or all such rights.

36.    Headings.    The headings of the provisions of this Agreement are inserted for convenience of the parties hereto only and shall not affect the construction or interpretation of any provision hereof.

37.    Counterparts.    This Agreement may be executed in counterparts, each of which when executed shall be deemed an original and all of which together shall constitute one and the same instrument. This Agreement shall be legally binding upon the electronic transmission, including by facsimile or email, by each party of a signed signature page to this Agreement to the other party.

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement as of the Effective Date.

| LICENSOR: | LICENSEE: |
| --- | --- |
| Paul Frank Industries LLC | Grand Union International Trading Limited |
| By: [signature] | By: ____________ |
| Name: ELIE DEKEL | Name: ____________ |
| Title: PRESIDENT | Title: ____________ |

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement as of the Effective Date.

LICENSOR:
Paul Frank Industries LLC

By: ______________________

Name: ______________________

Title: ______________________

LICENSEE:
For and on behalf of
Grand Union International Trading Limited
宏聯國際貿易有限公司

Authorized Signature(s)

Name: Qian Chunlei

Title: Director

## SCHEDULES

The following are the schedules ("**Schedules**") referred to in the attached Master License Agreement ("**Agreement**") dated as of January 1, 2015 ("**Effective Date**") between Paul Frank Industries LLC, a Delaware, U.S.A., limited liability company, located at 10100 Santa Monica Blvd., Suite 600, Los Angeles, CA 90067 ("**Licensor**") and Grand Union International Trading Limited, a Hong Kong limited company, with a registered address at Flat/rm 1303, 13/F New East Ocean Centre, 9 Science Museum Road, Tsim Sha Tsui, Kowloon, Hong Kong ("**Licensee**"). Capitalized terms used in these Schedules shall have the same meaning as defined within these Schedules or the body of the Agreement, as applicable. In the event of a conflict between the Schedules and the body of the Agreement, the Schedules shall govern.

## SCHEDULE A

### Licensed Products and Licensed Services

"**Licensed Products**" means all product categories including apparel, fashion accessories, footwear, cosmetics, fragrances, health & beauty aids, food and non-alcoholic beverages, pet products, leather goods, baby gear, eyewear (prescription and otherwise), jewelry, watches, stationery, paper products, school supplies, home goods, tableware, electronics, phone accessories, computer accessories, plush, bags, luggage, automotive accessories, sporting goods, emoticons/emojis offered only in packs and only for purchase via mobile messaging apps (but excluding use of pictographs or picture characters for any type of content creation, production or distribution), and additional categories as approved by Licensor from time to time that bear any of the Property, provided that such approval may not be unreasonably withheld.

Licensed Products shall not include tobacco products, weapons, firearms, ammunition, fireworks, sexual or adult content, products or services, gambling services or related goods, sweepstakes, virtual currency, alcohol, drugs (illicit or otherwise), drug paraphernalia, medical or therapeutic devices, the exploitation or distribution of entertainment content based on the Property, third party promotional rights related to the Property or goods or services prohibited or regulated within the Territory.

"**Licensed Services**" means the operation of retail stores dedicated to Licensed Products, and the operation of cafes and restaurants.

## SCHEDULE B

### Territory

"**Territory**" means mainland China, Hong Kong and Macau. For the avoidance of doubt and regardless of any geopolitical change that occurs during the License Period, the Territory does not include Taiwan.

Exhibit 3, Part II, identifies all of Licensor's multi-territory license agreements that include the Territory within the territory of such agreements. For the avoidance of doubt, the existence of

such agreements, as they are, does not violate the exclusive license rights granted under this Agreement.

## SCHEDULE C

### License Period

The "**License Period**" shall commence on January 1, 2015 and continue until February 28, 2030 ("**Expiration Date**"), unless terminated earlier pursuant to the terms and conditions of this Agreement.

For the avoidance of doubt, all License and other rights granted under this Agreement revert to Licensor upon expiration of the License Period or earlier termination of this Agreement as provided herein.

## SCHEDULE D

### License Fees

Licensee shall pay to Licensor a license fee of Sixty-Five Million U.S. Dollars (US$65,000,000) ("**License Fee**") as follows: (a) a **Non-Refundable Extension Fee** of Ten Million U.S. Dollars (US$10,000,000) on March 20, 2015 and (b) the remaining Fifty Five Million U.S. Dollars (US$55,000,000) on or before May 31, 2015 as non-recoupable, non-reimbursable, and fully paid-up license fee as consideration for the License and all other rights granted under this Agreement. The Non-Refundable Extension Fee shall be applied towards the License Fee if Licensee pays the remainder of the License Fee on or before May 31, 2015. If Licensee fails to pay the full amount of the License Fee on or before May 31, 2015, then Licensor shall be entitled to retain the Non-Refundable Extension Fee in whole with no obligation to Licensee and Licensee shall have no rights whatsoever under this Agreement.

For the avoidance of doubt, all dates referenced with respect to payments due to Licensor are based on Los Angeles, California time.

**Withholding Tax**

The total Withholding Tax, as such term is defined in Section 4(b) below, applicable to any license fees paid under this Agreement, if any, shall be capped at 4.5% of the total license fees paid. If the actual Withholding Tax is greater than 4.5%, Licensee shall gross up any payment due hereunder such that Licensor shall have netted and actually received 95.5% of any payment earned or owed hereunder.

**Partial Refund of License Fees**

If Licensor loses any meaningful rights in any Core IP (as defined in Exhibit 7 to this Agreement) in any of the "**Core Categories**" (defined as apparel, footwear and accessories), Licensor will grant Licensee a partial refund of the license fees as set forth in Exhibit 7 attached hereto.

## SCHEDULE E

**Intentionally Omitted**

## SCHEDULE F

**Marketing Date**

The "Marketing Date" means the date that Licensee commences manufacture, distribution and sale of Licensed Products in accordance with the terms and conditions of the Agreement, and shall be concurrent with the commencement of the License Period, unless a later date is approved by Licensor.

## SCHEDULE G

**Channels of Distribution**

The sole "**Channels of Distribution**" for Licensed Products are as follows:

1. **Department Stores** (for example, Wanda Plaza, Metro City, Raffles)

2. **eCommerce** - provided that shipment of Licensed Products is limited to consumers residing within the Territory. (for example, www.tmall.com, www.jd.com, www.chjchina.com)

3. **Specialty Retailers** (for example, CHJ Jewelry, Luolai Home Textile, Mujiushi by Shenzhen Heze)

4. **Paul Frank-branded Premium Retail Stores controlled by Licensee or Sublicensees**: Licensee or its Sublicensees shall open a minimum of five hundred (500) Paul Frank-branded stand-alone premium retail stores in the Territory by the fifth (5th) anniversary of the Effective Date; provided, however, that if Licensee and its Sublicensees have opened at least four hundred (400) Paul Frank-branded stand-alone premium retail stores in the Territory by the fifth (5th) anniversary of the Effective Date, Licensee shall use best efforts to open the additional one hundred (100) Paul Frank-branded stand-alone premium retail stores in the Territory by the sixth (6th) anniversary of the Effective Date. At least eighty percent (80%) of the first five hundred (500) Paul Frank-branded premium retail stores shall be at least fifty (50) square meters in size, provided that no Paul Frank-branded retail stores in the first five hundred (500) Paul Frank-branded premium retail stores shall ever be less than thirty (30) square meters in size.

5. TV Shopping Channels

6. Tele-Shopping

Licensee shall position the Property as a premium fashion-lifestyle brand and may not sell or distribute Licensed Products in any Core Categories via mass market channels, or the following list of specified discount retailers and off-price retailers: Walmart, Carrefour, Tesco, Hua Lian Supermarkets, 7-Eleven, Circle K, Family Mart, Lawson, wholesale markets, TV Shopping Channel and Tele-Shopping; provided, however, that Licensee may distribute Licensed Products that are not in Core Categories through mass market channels, discount retailers, off-price

retailers, wholesale markets, TV Shopping Channel and Tele-Shopping, unless otherwise provided in this Agreements.

**SCHEDULE H**

**Sell-Off Period**

Ninety (90) days

**SCHEDULE I**

**Licensee Contact**

**SCHEDULE J**

**Additional Provisions**

1. Licensee shall commit to reasonable marketing of Licensed Products. Any Licensee marketing of Licensed Products must be consistent with Licensor's guidelines and brand-appropriate.

2. Licensor and Licensee acknowledge and shall ensure that all agreements between Licensor, on one hand, and Licensee's Affiliates, on the other hand, existing as of the Effective Date ("**Existing Agreements**") have, to the best knowledge of the Parties, been properly performed and terminated as of the Effective Date. Licensee shall not be liable for obligations of the parties to the Existing Agreements. All royalties, fees or other amounts payable to Licensor or Licensor's Affiliates under the Existing Agreements have been paid on time, the receipts of which are hereby acknowledged by Licensor. Licensee and Licensee's Affiliates shall not be responsible for any claim against third party Licensees (those authorized by Licensor based on the existing license agreements prior to the Effective Date of this Agreement) that Licensor may now or afterwards have arising under the Existing Agreements prior to the Effective Date of this Agreement.

3. Licensor shall assign or cause to be assigned to Licensee all license agreements between Licensor and other licensees of Licensor granting rights in the Property in the Territory and as existing as of the commencement of the License Period, as set forth in Exhibit 3, Part I ("Assigned License Agreements") so that Licensee becomes the sub-licensor to the third party sublicensees under such Assigned License Agreements.

4. Any royalties, fees or other amounts payable to Licensor under the Assigned License Agreements (whether or not assigned to Licensee at that time) and that arise from actions or sales that occurred prior to June 1, 2015 will belong to Licensor and will be paid to Licensor regardless of when received and Licensee shall promptly notify Licensor of any such payments received by Licensee and shall forward to Licensor any such amounts received after deduction of all reasonable costs, including conversion and remittance costs, if any, applicable to such amounts within five (5) Business Days of receipt.

5.   After commencement of the License Period, Licensor shall exclude the Territory from future license agreements under the Property for Licensed Products or Licensed Services. Upon the Effective Date and during the License Period, Licensor shall not grant third party licenses under the Property in the Territory for Licensed Products or Licensed Services or use the Property in violation of Licensee's exclusive rights in the Territory.

6.   Upon Licensee's request, Licensor shall, at Licensee's cost, cooperate with Licensee in obtaining any and all governmental approvals, consents, licenses, permits, certificates, registrations and the like as may be required in respect of the performance of and effecting the purpose of this Agreement, including but not limited to recording this Agreement or the licenses herein granted with applicable governmental authorities.

**EXHIBIT 1**
**TRADEMARKS and COPYRIGHTS**

Paul Frank Industries LLC Characters Julius

**Devil Julius**

**Skurvy**

**Clancy**

**Chachi**

 

Worry Bear

Bunny Girl

Sheree

Pufak

Steve the Krab

Shaka Bra Yeti

Bob

Bride

Vic



Spicoli



Francie



Randolph



Leser



Sir Randolph



Tyrone Bat



William



Sam the Grub

Dic

Ellie

Longshot

Aku(& Tooth Brush)

Cornelius

Mika Cat

Elaine

Cozy molar

Hot cocoa river rapids rider

Isaac

Tyrone

Tooth Brush





大嘴猴

paul frank

保罗 弗兰克

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| *Client* | *File Reference* | *Next Renewal Due* | *Reg. Date* | *, No.* | *Sub Status* | *Supervisor* |

**BAOLUO FULANKE in Chinese Characters**

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN151* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170501<br>*10170501* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 41
**Goods** Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN149* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170503<br>*10170503* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 28
**Goods** Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dollsâ€™ beds; dollsâ€™ houses; dolls; toy masks; scale model vehicles; dollsâ€™ clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens [sports articles] in Class 28

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN148* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170504<br>*10170504* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 25
**Goods** Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; childrens' helmets; socks; gloves (clothing); mittens; scarves; neckties; belts [clothing]; leather belts for wear; bathing caps in Class 25

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN147* | China<br>*13 Jan 2023* | 10 Nov 2011<br>*14 Jan 2013* | 10170505<br>*10170505* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 16
**Goods** Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter, postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN146* | China<br>*6 Jan 2023* | 10 Nov 2011<br>*7 Jan 2013* | 10170506<br>*10170506* | Registered | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 9
**Goods** Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [integrated circuit cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; diversâ€™ apparatus; diversâ€™ masks; diversâ€™ suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film [exposed] in Class 09

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN145* | China | 10 Nov 2011 | 10170507 | Pending | SIPS - Simone IP Services<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 3
**Goods** Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants [toiletries]; sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes ; incense; cosmetics for animals in Class 03.

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN057* | China<br>*20 Nov 2022* | 30 Dec 2008<br>*21 Nov 2012* | 7141291<br>*7141291* | Registered | Boss & Young<br>*Tim Quinlan* | 保罗 弗兰克 |

**Class** 25
**Goods** Shoes, hats, gloves [clothing] scarves, hosiery, straps, caps (shower-), clothing, child cloth, bathing suits, waterproof clothing, costumes [masquerade-] in Class 25

| Owner | Trademark | Country | Appl. Date | No. | Status | Agent | Mark |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE in Chinese Characters<br>*044225-3-CN056* | China<br>*6 Oct 2020* | 30 Dec 2008<br>*7 Oct 2010* | 7141292<br>*7141292* | Registered | Boss & Young<br>*Tim Quinlan* | 保罗 弗兰克 |

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins, imitation leather, cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; check holders made of leather, imitation of leather; umbrellas; credit card cases (made of leather of imitation leather); credit card holders (made of leather of imitation leather) in Class 18. |

## Clancy Giraffe Design

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860419 | Registered | Boss & Young

*044225-3-CN002* | *27 Dec 2020* | *28 Dec 2010* | *4860419* | *Tim Quinlan*

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860420 | Registered | Boss & Young

*044225-3-CN003* | *27 Apr 2019* | *28 Apr 2009* | *4860420* | *Tim Quinlan*

| | |
|---|---|
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons and webisodes, distributed over television and the internet, featuring animated characters in Class 41. |

PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | China | 26 Aug 2005 | 4860476 | Registered | Boss & Young

*044225-3-CN001* | *6 May 2019* | *7 May 2009* | *4860476* | *Tim Quinlan*

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins, imitation leather, leather, unworked or semi-worked, suitcases, bags, beach bags, handbags, multipurpose holdalls, waist bags, pouches, suitcase, traveling bags and cases, valises, vanity cases (not fitted), attachÃ© cases, briefcases, portfolios, pocket wallets, billfolds, key holders, luggage, purses; walking sticks; credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, book bags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; umbrellas; cosmetics cases (empty); credit card holders (made of leather or imitation leather); check book covers (made of leather or imitation leather) in Class 18. |

## DA ZUI HOU in Chinese Characters

PAUL FRANK INDUSTRIES LLC | Characters | China | 14 Oct 2011 | | Registered | IP Services

044225-3-CN129 | 13 Dec 2022 | 14 Dec 2012 | 10065921 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | Services

044225-3-CN127 | 13 Jan 2023 | 14 Jan 2013 | 10065922 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | Services

044225-3-CN126 | 6 Dec 2022 | 7 Dec 2012 | 10065924 | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065925 | Pending | SIPS - Simone IP Services

044225-3-CN125 | | | | Published | Tim Quinlan

大嘴猴

| | |
|---|---|
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs (downloadable software); computer software (recorded); computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse (data processing equipment); pocket calculators; smart cards (integrated circuit cards); compact discs (read-only memory); clocks (time-) (time recording devices); reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks, divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles (optics); sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09. |

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | | Registered | IP Services

044225-3-CN124 | 6 Dec 2022 | 7 Dec 2012 | 10065926 | Tim Quinlan

大嘴猴

Class 8

Goods Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065927 | Registered | SIPS - Simone IP Services
044225-3-CN123 | 6 Jan 2023 | 7 Jan 2013 | 10065927 | Tim Quinlan

大嘴猴

Class 5

Goods Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters; plasters for medicinal purposes; Preparations to facilitate teething in Class 05.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065929 | Pending | SIPS - Simone IP Services
044225-3-CN141 | Tim Quinlan

大嘴猴

Class 35

Goods Business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines in Class 35

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065930 | Pending | SIPS - Simone IP Services
044225-3-CN140 | Tim Quinlan

大嘴猴

Class 32

Goods Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | [illegible] | Registered | IP Services
044225-3-CN138 | 13 Apr 2023 | 14 Apr 2013 | 10065932 | Tim Quinlan

大嘴猴

Class 28

Goods Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building games; novelties for parties, dances (party favors); dominoes; toy pistols; parlor games; dollsâ€™ beds; dollsâ€™ houses; dolls; toy masks; scale model vehicles; dollsâ€™ clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings (parts of sports suits); roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery); fishing tackle; camouflage screens (sports articles) in Class 28.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065935 | Pending | SIPS - Simone IP Services
044225-3-CN135 | opposed | Tim Quinlan

大嘴猴

Class 25

Goods Clothing; layettes (clothing); babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes (masquerade-); soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | [illegible] | Registered | IP Services
044225-3-CN132 | 13 Dec 2022 | 14 Dec 2012 | 10065938 | Tim Quinlan

大嘴猴

Class 20

Goods Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines (statuettes) of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | [illegible] | Registered | IP Services
044225-3-CN143 | 6 Jan 2023 | 7 Jan 2013 | 10065947 | Tim Quinlan

大嘴猴

Class 41

Goods Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services (entertainment or education); entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 14 Oct 2011 | 10065948 | Registered | SIPS - Simone IP Services
044225-3-CN142 | 13 Dec 2022 | 14 Dec 2012 | 10065948 | Tim Quinlan

大嘴猴

Class 38

Goods Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38.

PAUL FRANK INDUSTRIES LLC | DA ZUI HOU in Chinese Characters | China | 28 Feb 2012 | [illegible] | Registered | IP Services
044225-3-CN155 | 6 May 2023 | 7 May 2013 | 10541841 | Tim Quinlan

大嘴猴

Class 7

Goods Food preparation machines, electromechanical; sewing machines; mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers; washing machines; vacuum cleaners; shoe polishers, electric in Class 7.

JULIUS

PAUL FRANK INDUSTRIES LLC **JULIUS** China 31 Dec 2006 5822886 Registered Boss & Young

*044225-3-CN009* *6 Jan 2020* *7 Jan 2010* *5822886* *Tim Quinlan*

JULIUS

Class 16

Goods: Cases; attache cases; credit card cases; key holders; traveling cases; briefcases; handbags; vanity cases (not fitted); bags; multi-purpose carrying bags; beach bags; handbags; hold-alls; waist bags; pouches; book bags; rucksacks; knapsacks; school bags; satchels; tote bags; sport bags; athletic bags; shoulder bags; traveling bags; suitcase; valises; document files (made of leather); purses; billfolds; luggage; pocket wallets; walking sticks; backpacks; umbrellas in Class 18.

PAUL FRANK INDUSTRIES LLC **JULIUS** China 31 Dec 2006 5822887 Registered Boss & Young

*044225-3-CN008* *27 Oct 2019* *28 Oct 2009* *5822887* *Tim Quinlan*

JULIUS

Class 16

Goods: Paper, paperboard products, printed matter; children's books; series of fiction books featuring animated characters; series of non-fiction books featuring animated characters; cartoon prints; cartoon strips; address books; notepads; day planners; stationeries; picture books; periodicals; photographs; card boards; flash cards; gums (adhesives) for stationery or household purpose; books (biography); wrapping gift paper; wrapping gift boxes of cardboard; diaries; wrapping gift bags of paper and plastic; bubble packs for wrapping or packaging in Class 16.

## JULIUS Design

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 28 Feb 2012 10541642 Registered SIPS - Simone IP Services

*044225-3-CN154* *12 Oct 2023* *13 Oct 2013* *10541642* *Tim Quinlan*

Class 7

Goods: Food preparation machines, electromechanical; sewing machines, mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers; washing machines; vacuum cleaners; shoe polishers, electric in Class 7.

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 30 Jul 1999 1469453 Registered Boss & Young

*044225-3-CN017* *6 Nov 2020* *7 Nov 2000* *1469453* *renewed* *Tim Quinlan*

Class 25

Goods: Clothing, footwear, headgear and hosiery in Class 25.

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 5 Dec 2014 15867857 Pending SIPS - Simone IP Services

*829* *Tim Quinlan*

Class 3

Goods: Soap; windscreen cleaning liquids; wax polish for automobiles & bikes; sandcloth; aromatics (essential oils); scented water; mouth cologne/aromatic mouth wash; potpourris (fragrances); deodorants for pets; air fresheners

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 5 Dec 2014 15867859 Pending SIPS - Simone IP Services

*831* *Tim Quinlan*

Class 9

Goods: Electronic data media; parking meters; reflecting discs for wear (for the prevention of traffic accidents); cellphone bands/cords; digital photo frames; photography bags; eyeglass cords; clothing for protection against accidents, irradiation and fire; magnets (decorative); battery-heated gloves.

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 5 Dec 2014 15867860 Pending SIPS - Simone IP Services

*832* *Tim Quinlan*

Class 11

Goods: Air purifying apparatus and machines; anti-dazzle devices for automobiles (lamp fittings); ice boxes; ventilation (air-conditioning) installations for vehicles; hair driers (dryers); heating apparatus; toilets (portable); water filtering apparatus; disposable sterilization pouches; footmuffs (electrically heated).

PAUL FRANK INDUSTRIES LLC **JULIUS Design** China 5 Dec 2014 15867861 Pending SIPS - Simone IP Services

*833* *Tim Quinlan*

Class 12

| | |
|---|---|
| Goods | Upholstery for vehicles; vehicle covers [shaped]; covers for vehicle steering wheels; anti-dazzle devices for vehicles; gear shift covers; brake linings for vehicles; safety belts for vehicle seats; seat covers for vehicles; head-rests for vehicle seats; trunk organizers for vehicles. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867862 | Pending | SIPS - Simone IP Services |  |
| | *816* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 22 |
| Goods | Ropes; bags for washing hosiery; vehicle covers (not fitted); sails; awnings of textile; tarpaulins; sacks [bags] of textile(for packaging); straw wrappers for bottles; packing [cushioning, stuffing] materials(not of rubber or plastics); plastic fibers [fibres] for textile use. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 5 Dec 2014 | 15867864 | Pending | SIPS - Simone IP Services |  |
| | *830* | | | | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 6 |
| Goods | Clothes hooks of metal; keys (rings of common metal for –); locks of metal for vehicles; safes; hooks [metal hardware]; containers of metal; metal number-plates for automobiles (license plate frames); cattle chains; identification bracelets of metal; works of art of common metal. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 6 Jul 2002 | 3235587 | Registered | Boss & Young |  |
| | *044225-3-CN016* | ***6 Feb 2024*** | ***7 Feb 2004*** | ***3235587*** | *renewed* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 18 |
| Goods | Animal skins; imitation leather; suitcases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, cheque book cases; umbrellas in Class 18. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 26 Dec 2002 | 3417966 | Registered | Boss & Young |  |
| | *044225-3-CN018* | ***6 Sep 2014*** | ***7 Sep 2004*** | ***3417966*** | *Renewal due* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 28 |
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals and games, namely card games, board games and amusement machines, automatic and coin-operated in Class 28. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 21 Jul 2003 | 3640318 | Registered | Boss & Young |  |
| | *044225-3-CN014* | ***6 Feb 2015*** | ***7 Feb 2005*** | ***3640318*** | *renewed* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 9 |
| Goods | Electronic data media; optical data media; magnetic data media; eyeglasses; sunglasses; protective goggles; protective cases for glasses; frames for glasses; eyeglass chains; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks; floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes cassettes, magnetic tapes; data processing apparatus; and equipment; cameras; mouse pad in Class 09. |

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | China | 21 Jul 2003 | 3640319 | Registered | Boss & Young |
| | *044225-3-CN015* | ***20 Aug 2015*** | ***21 Aug 2005*** | ***3640319*** | | *Tim Quinlan* |

| | |
|---|---|
| Class | 14 |
| Goods | Jewelry, imitation jewelry, clocks, watches, ornamental pins; precious metals; Alloys of precious metals; imitation gold; household utensils of precious metal; Containers of precious metal; Works of art of precious metal; Boxes of precious metal; bands for watches, chains of watches, buckles; key rings (trinkets or fobs) in Class 14. |

PAUL FRANK INDUSTRIES LLC [illegible] Design China [illegible] [illegible] Registered Boss Cuiqing

044225-3-CN020 27 Mar 2020 28 Mar 2010 5822888 Tim Quinlan

| Class | 41 |
|---|---|
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; video media featuring animated characters; motion picture film production and distribution in Class 41. |

PAUL FRANK INDUSTRIES LLC JULIUS Design China 31 Dec 2004 5822889 Registered Boss & Young

044225-3-CN019 27 Oct 2019 28 Oct 2009 5822889 Tim Quinlan

| Class | 16 |
|---|---|
| Goods | Paper, paperboard products, printed matter; children's books; series of fiction books featuring animated characters; series of non-fiction books featuring animated characters; cartoon prints and strips; address books; notepads; day planners; stationeries; picture books; periodicals; photographs; cardboards; flash cards; gums (adhesives) for stationery or household purposes; books (biography); personal diary journals; wrapping gift paper; wrapping gift bags of paper and plastic; wrapping gift boxes of cardboard; wrapping gift boxes of plastic in Class 16 |

PAUL FRANK INDUSTRIES LLC JULIUS Design China 13 May 2011 9460744 Registered Boss & Young

044225-3-CN076 13 Apr 2023 14 Apr 2013 9460744 Tim Quinlan

| Class | 9 |
|---|---|
| Goods | Calculating machines; Laptop computers; Computer programs [downloadable software]; Computer peripheral devices; Publications (Electronic ) [downloadable]; Electronic pens [visual display units]; Electronic pocket translators; Data processing apparatus; Time recording apparatus; Punched card machines for offices; Measures, Mechanical signs; Portable telephones; Network Communication Equipment, Personal stereos; Microphones; Video game cartridges; Earplug ware; Sound transmitting apparatus; Acoustic player (digital-), MP3/MP4/MP5 players; Cell-phone cover; Monitoring apparatus, electric; Video recorders; Camcorders; Projection apparatus; Measuring instruments; Acoustic [sound] alarms; Chargers for electric batteries; Flat irons, electric; covers for MP3 players; covers for iPads; covers for laptop computers in Class 9. |

## JULIUS Design & Chinese Characters

PAUL FRANK INDUSTRIES LLC JULIUS Design & Chinese Characters China 12 Feb 2009 7196334 Pending opposed SIPS - Simone IP Services Tim Quinlan

044225-3-CN060

| Class | 25 |
|---|---|
| Goods | Clothing, children's garments, swimsuits, waterproof clothing, masquerade costumes, footwear, headgear, gloves, scarfs, hosiery, hoods, shower caps, neckties, football boots, layettes in Class 25 |

PAUL FRANK INDUSTRIES LLC JULIUS Design & Chinese Characters China 12 Feb 2009 7196335 Registered Boss & Young

044225-3-CN059 20 Nov 2020 21 Nov 2010 7196335 Tim Quinlan

| Class | 18 |
|---|---|
| Goods | Animal skins; imitation leather; suit; cases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; cheque book cases (made of leather or imitation leather), umbrellas in Class 18 |

## JULIUS Design (Black/White)

PAUL FRANK INDUSTRIES LLC JULIUS Design (Black/White) China 19 Mar 2010 8134094 Registered Boss & Young

044225-3-CN066 27 Apr 2021 28 Apr 2011 8134094 Tim Quinlan

| Class | 35 |
|---|---|
| Goods | Sales promotion for others; sales promotion of gift certificates for others; preparation for advertising material; directories of enterprises about shopping guide, summary of shops and maps; fashion shows for advertising or sales promotion; outsourcing services (business assistance); price comparison services; sales promotion of gift certificates for others in Class 35. |

## JULIUS Design (Color)

PAUL FRANK INDUSTRIES LLC JULIUS Design (Color) China 14 Oct 2011 10065561 Pending SIPS - Simone IP Services

044225-3-CN092 Tim Quinlan

| Class | 27 |
|---|---|
| Goods | Floor coverings; mats; non-slip mats; automobile carpets; wallpaper; gymnastic mats; and bath mats. |

PAUL FRANK INDUSTRIES LLC JULIUS Design (Color) China 14 Oct 2011 10065562 Registered SIPS - Simone IP Services

044225-3-CN091 13 Dec 2023 14 Dec 2013 10065562 Tim Quinlan

| Class | 26 |
|---|---|
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 14 Oct 2011 | 10065563 | Pending | SIPS - Simone IP Services |  |
| | *044225-3-CN090* | | | | *opposed* | *Tim Quinlan* | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065564 Pending SIPS - Simone IP Services

*044225-3-CN089* *Tim Quinlan*

| | |
|---|---|
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065565 Registered SIPS - Simone IP Services

*044225-3-CN088* ***13 Jan 2024*** ***14 Jan 2014*** ***10065565*** *Tim Quinlan*

| | |
|---|---|
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons), cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065566 Registered SIPS - Simone IP Services

*044225-3-CN087* ***13 Jan 2024*** ***14 Jan 2014*** ***10065566*** *Tim Quinlan*

| | |
|---|---|
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses);picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065567 Registered SIPS - Simone IP Services

*044225-3-CN086* ***13 Dec 2023*** ***14 Dec 2013*** ***10065567*** *Published* *Tim Quinlan*

| | |
|---|---|
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; traveling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065568 Registered SIPS - Simone IP Services

*044225-3-CN085* ***13 Dec 2022*** ***14 Dec 2012*** ***10065568*** *Tim Quinlan*

| | |
|---|---|
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies (stationery); stationery; stickers (stationery); ink; seals (stamps); boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels (crayons); teaching materials (except apparatus); modeling clay; chaplets in Class 16. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065569 Registered SIPS - Simone IP Services

*044225-3-CN084* ***6 Apr 2023*** ***7 Apr 2013*** ***10065569*** *Tim Quinlan*

| | |
|---|---|
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065570 Registered SIPS - Simone IP Services

*044225-3-CN083* ***13 Dec 2022*** ***14 Dec 2012*** ***10065570*** *Tim Quinlan*

| | |
|---|---|
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065571 Registered SIPS - Simone IP Services

*044225-3-CN099* ***27 May 2023*** ***28 May 2013*** ***10065571*** *Tim Quinlan*

| | |
|---|---|
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065572 Registered SIPS - Simone IP Services

*044225-3-CN098* ***27 May 2023*** ***28 May 2013*** ***10065572*** *Tim Quinlan*

| | |
|---|---|
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065573 Registered SIPS - Simone IP Services

*044225-3-CN097* ***19 Jul 2023*** ***20 Jul 2013*** ***10065573*** *Tim Quinlan*

| | |
|---|---|
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065574 Registered SIPS - Simone IP Services

*044225-3-CN096* ***13 Dec 2023*** ***14 Dec 2013*** ***10065574*** *Tim Quinlan*

| | |
|---|---|
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research; sales promotion for others; import-export agencies; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines in Class 35. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065575 Pending SIPS - Simone IP Services

*044225-3-CN095* *Tim Quinlan*

| | |
|---|---|
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065576 Pending SIPS - Simone IP Services

*044225-3-CN094* *Tim Quinlan*

| | |
|---|---|
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (nor for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065577 Registered SIPS - Simone IP Services

*044225-3-CN093* ***20 Sep 2023*** ***21 Sep 2013*** ***10065577*** *Tim Quinlan*

| | |
|---|---|
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens [sports articles] in Class 28. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065591 Registered SIPS - Simone IP Services

*044225-3-CN082* ***13 Dec 2022*** ***14 Dec 2012*** ***10065591*** *Tim Quinlan*

| | |
|---|---|
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11. |

PAUL FRANK INDUSTRIES LLC **JULIUS Design (Color)** China 14 Oct 2011 10065592 Registered SIPS - Simone IP Services

044225-3-CN081 | 6 Nov 2023 | 7 Nov 2013 | 10065592 | Tim Quinlan

| | |
|---|---|
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards (integrated circuit cards); compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optical]; sunglasses; galvanic cells; animated cartoons; cinematographic film [exposed] in Class 09 |

PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 14 Oct 2011 | 10065593 | Registered | SIPS - Simone IP Services

044225-3-CN080 | 13 Dec 2022 | 14 Dec 2012 | 10065593 | Tim Quinlan

| | |
|---|---|
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons, pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08. |

PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 14 Oct 2011 | 10065594 | Registered | SIPS - Simone IP Services

044225-3-CN079 | 27 Jan 2023 | 28 Jan 2013 | 10065594 | Tim Quinlan

| | |
|---|---|
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters, plasters for medicinal purposes; Preparations to facilitate teething in Class 05. |

PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 14 Oct 2011 | 10065595 | Pending | SIPS - Simone IP Services

044225-3-CN078 | Tim Quinlan

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations, essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations, scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 03. |

PAUL FRANK INDUSTRIES LLC | **JULIUS Design (Color)** | China | 23 Dec 2013 | 13782135 | Pending | SIPS - Simone IP Services

542 | Tim Quinlan

| | |
|---|---|
| Class | 24 |
| Goods | Fabric; tapestry [wall hangings], of textile; towels of textile, bed covers; bed sheets and pillowcases; bed blankets; furniture coverings of textile; coverings of plastic for furniture; banners; non-woven textile fabrics; felt; tablecloths, not of paper; bath covers; fitted toilet lid covers of fabric; marabouts (cloth); hada; shrouds. |

## paul frank

PAUL FRANK INDUSTRIES LLC | **paul frank** | China | 14 Oct 2011 | 10065596 | Registered | SIPS - Simone IP Services | paul frank

044225-3-CN121 | 13 Dec 2022 | 14 Dec 2012 | 10065596 | Tim Quinlan

| | |
|---|---|
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals, rental of chairs, tables, table linen and glassware in Class 43. |

PAUL FRANK INDUSTRIES LLC | **paul frank** | China | 14 Oct 2011 | 10065597 | Registered | SIPS - Simone IP Services | paul frank

044225-3-CN120 | 13 Dec 2022 | 14 Dec 2012 | 10065597 | Tim Quinlan

| | |
|---|---|
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41 |

PAUL FRANK INDUSTRIES LLC | **paul frank** | China | 14 Oct 2011 | 10065598 | Registered | SIPS - Simone IP Services | paul frank

044225-3-CN119 | 13 Dec 2022 | 14 Dec 2012 | 10065598 | Tim Quinlan

| | |
|---|---|
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communications by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38 |

## PAUL FRANK

PAUL FRANK INDUSTRIES LLC PAUL FRANK China 14 Oct 2011 10063803 Pending Simone IP Services

044225-3-CN117 Approved for Reg. Tim Quinlan

| | |
|---|---|
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32 |

## paul frank

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065939 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN106 | 13 Dec 2022 | 14 Dec 2012 | 10065939 | Tim Quinlan

| | |
|---|---|
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065940 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN105 | 13 Jan 2023 | 14 Jan 2013 | 10065940 | Tim Quinlan

| | |
|---|---|
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12 |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065941 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN104 | 6 Dec 2022 | 7 Dec 2012 | 10065941 | Tim Quinlan

| | |
|---|---|
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes) in Class 11 |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065942 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN103 | 13 Dec 2022 | 14 Dec 2012 | 10065942 | Tim Quinlan

| | |
|---|---|
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software (recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [integrated circuit cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; telephone wires; divers' apparatus; divers' masks, divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles (optics); sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09. |

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065943 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN102 | 6 Dec 2022 | 7 Dec 2012 | 10065943 | Tim Quinlan

| | |
|---|---|
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas (hand-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools); silver plate (knives, forks and spoons) in Class 08 |

## PAUL FRANK

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065944 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN101 | Approved for Reg. | Tim Quinlan

| | |
|---|---|
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellants; adhesive plasters; plasters for medicinal purposes; Preparations to facilitate teething in Class 05. |

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065945 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN100 | opposed | Tim Quinlan

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes ; incense; cosmetics for animals in Class 03 |

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 14 Oct 2011 | 10065949 | Pending | SIPS - Simone IP Services | PAUL FRANK
044225-3-CN116 | Tim Quinlan

| | |
|---|---|
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (nor for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30 |

## paul frank

PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065950 | Registered | SIPS - Simone IP Services | paul frank
044225-3-CN115 | 13 Jan 2023 | 14 Jan 2013 | 10065950 | Tim Quinlan

| | |
|---|---|
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides [playthings]; toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas |

trees [except illumination articles and confectionery]; fishing tackle; camouflage screens [sports articles] in Class 28

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065951 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN114 | 13 Dec 2022 | 14 Dec 2012 | 10065951 | | Tim Quinlan | |

Class 27
Goods: Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27.

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065952 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN113 | 13 Dec 2022 | 14 Dec 2012 | 10065952 | | Tim Quinlan | |

Class 26
Goods: Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065953 | Pending | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN112 | | | | | Tim Quinlan | |

Class 25
Goods: Clothing; layettes (clothing); babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes [masquerade-]; soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; childrens' helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25.

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065955 | Pending | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN110 | | | | Published | Tim Quinlan | |

Class 21
Goods: [Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass (receptacles); painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs;] brushes; (toothbrushes; electric toothbrushes )in Class 21

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065956 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN109 | 13 Dec 2022 | 14 Dec 2012 | 10065956 | | Tim Quinlan | |

Class 20
Goods: Furniture; beds; baskets (not of metal); chests for toys; mirrors (looking glasses);picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding [except for linen]; sleeping bags for camping; cushions; pillows in Class 20.

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 14 Oct 2011 | 10065958 | Registered | SIPS - Simone IP Services | paul frank |
| | 044225-3-CN107 | 13 Dec 2022 | 14 Dec 2012 | 10065958 | | Tim Quinlan | |

Class 16
Goods: Paper; copying paper (stationery); bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites], blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16.

## PAUL FRANK

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 28 Feb 2012 | 10541694 | Registered | SIPS - Simone IP Services | PAUL FRANK |
| | 044225-3-CN153 | 19 Jul 2023 | 20 Jul 2013 | 10541694 | | Tim Quinlan | |

Class 7
Goods: Food preparation machines, electromechanical; sewing machines, mixing machines; kitchen machines, electric; fruit presses, electric for household purposes; household soybean beverage maker; coffee grinders, other than hand-operated; dishwashers, washing machines; vacuum cleaners; shoe polishers, electric in Class 7.

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 24 Feb 2014 | 13999631 | Pending | SIPS - Simone IP Services | PAUL FRANK |
| | 536 | | | | | Tim Quinlan | |

Class 35
Goods: Retail or wholesale services for pharmaceutical, veterinary and sanitary preparations and medical supplies; retail or wholesale services for pharmaceuticals, retail or wholesale services for pharmaceutical preparations; retail or wholesale services for sanitary preparations; retail or wholesale services for medical supplies; retail or wholesale services for veterinary pharmaceuticals; retail or wholesale services for veterinary preparations

## paul frank

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867865 | Pending | SIPS - Simone IP Services | paul frank |
| | 838 | | | | | Tim Quinlan | |

Class 22
Goods: Ropes; bags for washing hosiery; vehicle covers (not fitted); sails; awnings of textile; tarpaulins; sacks [bags] of textile(for packaging); straw wrappers for bottles; packing [cushioning, stuffing] materials(not of rubber or plastics); plastic fibers [fibres] for textile use

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867856 | Pending | SIPS - Simone IP Services | paul frank |
| | 837 | | | | | Tim Quinlan | |

Class 12
Goods: Upholstery for vehicles; vehicle covers [shaped]; covers for vehicle steering wheels; anti-dazzle devices for vehicles; gear shift covers; brake linings for vehicles; safety belts for vehicle seats; seat covers for vehicles, head-rests for vehicle seats; trunk organizers for vehicles.

| Owner | Mark | Country | Filing Date | App. No. | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank | China | 5 Dec 2014 | 15867864 | Pending | SIPS - Simone IP Services | paul frank |
| | 834 | | | | | Tim Quinlan | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Class | 6 | | | | | | |
| Goods | Clothes hooks of metal; keys (rings of common metal for –); locks of metal for vehicles; safes; hooks [metal hardware]; containers of metal; metal number-plates for automobiles (license plate frames); cattle chains; identification bracelets of metal; works of art of common metal. | | | | | | |

| Owner | Mark / Ref | Country | Date | Number | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | paul frank 835 | China | 5 Dec 2014 | 15867865 | Pending | SIPS - Simone IP Services *Tim Quinlan* | paul frank |
| Class 9 | Goods: Electronic data media; parking meters; reflecting discs for wear (for the prevention of traffic accidents); cellphone bands/cords; digital photo frames; photography bags; eyeglass cords; clothing for protection against accidents, irradiation and fire; magnets (decorative); battery-heated gloves. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | paul frank 836 | China | 5 Dec 2014 | 15867866 | Pending | SIPS - Simone IP Services *Tim Quinlan* | paul frank |
| Class 11 | Goods: Air purifying apparatus and machines; anti-dazzle devices for automobiles [lamp fittings]; ice boxes; ventilation [air-conditioning] installations for vehicles; hair driers [dryers]; heating apparatus; toilets (portable); water filtering apparatus; disposable sterilization pouches; footmuffs (electrically heated). | | | | | | |
| PAUL FRANK INDUSTRIES LLC | paul frank 817 | China | 5 Dec 2014 | 15897863 | Pending | SIPS - Simone IP Services *Tim Quinlan* | paul frank |
| Class 3 | Goods: Soap; windscreen cleaning liquids; wax polish for automobiles & bikes; sandcloth; aromatics (essential oils); scented water; mouth cologne/aromatic mouth wash; potpourris (fragrances); deodorants for pets; air fresheners. | | | | | | |

## PAUL FRANK

| Owner | Mark / Ref | Country | Date | Number | Status | Agent | Image |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN022 | China 20 Aug 2015 | 10 Jul 2003 21 Aug 2005 | 3627275 3627275 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 14 | Goods: Jewelry, imitation jewelry, watches, ornamental pins, precious metals; Alloys of precious metals; imitation gold; household utensils of precious metal; Containers of precious metal; Works of art of precious metal; Boxes of precious metal, bands, chains, buckles all for watches, key rings (trinkets or fobs) in Class 14. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN021 | China 6 Feb 2015 | 10 Jul 2003 7 Feb 2005 | 3627276 3627276 | Registered renewed | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 9 | Goods: Electronic data media; optical data media; magnetic data media; eyeglasses; sunglasses; protective goggles; protective cases for glasses; frames for glasses; chains for glasses; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks; floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes cassettes; audio magnetic tapes; data processing apparatus; and equipment; cameras; mouse pad in Class 09. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN025 | China 20 Sep 2015 | 10 Jul 2003 21 Sep 2005 | 3627292 3627292 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 28 | Goods: Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and amusement machines, automatic and coin-operated in Class 28. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN024 | China 6 Jan 2016 | 10 Jul 2003 7 Jan 2006 | 3627293 3627293 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 25 | Goods: Clothing, footwear, and headgear in Class 25. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN023 | China 6 Jan 2016 | 10 Jul 2003 7 Jan 2006 | 3627294 3627294 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 18 | Goods: Animal skins; Imitation leather; cases, bags, beach bags, handbags, waist bags, pouches, traveling trunks, traveling bags and cases, valises, vanity cases (not fitted), attache cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather), credit card holders (made of leather or imitation leather), backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts; cheque book cases, umbrellas in Class 18. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN027 | China 6 Jul 2019 | 6 Apr 2006 7 Jul 2009 | 5269269 5269269 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 16 | Goods: Children's books; fiction and non-fiction books featuring animated characters; cartoons and biographies featuring animated characters from Julius & Friends; cartoon prints and strips; address books; notebook pads; day planners; stationery, diary journals, posters, cards, calendars, invitation card; greeting card in Class 16. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN026 | China 20 Apr 2019 | 6 Apr 2006 21 Apr 2009 | 5269270 5269270 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 12 | Goods: Bicycles and motorized scooters in Class 12. | | | | | | |
| PAUL FRANK INDUSTRIES LLC | PAUL FRANK 044225-3-CN028 | China 20 Jun 2019 | 6 Apr 2006 21 Jun 2009 | 5269271 5269271 | Registered | Boss & Young Tim Quinlan | PAUL FRANK |
| Class 20 | Goods: Non-metal furniture components; mirrors; furniture; wickerwork; wood substitute goods; wood products; cushions; mats; office furniture; picture frames; furniture fittings, not of metal; glass mirrors in Class 20. | | | | | | |

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 6 Apr 2006 | 5269272 | Registered | Boss & Young
044225-3-CN029 | 27 Jun 2019 | 28 Jun 2009 | 5269272 | Tim Quinlan | PAUL FRANK

Class 24
Goods: Textile material; fabric; textile fabric; bed covers; table covers; household linen; linen cloths; bed linen; table linen; table cloths; curtains of textile or plastic; pillow shams; sheets; eiderdowns; duvets; covers for eiderdowns and duvets; handkerchiefs of textile; napkins of textile; serviettes; table mats (not of paper); flannels; traced cloth for embroidery; tapestry (wall hangings) of textile; rugs (traveling); pillow cases; shower curtains of textile or plastic; fitted toilet lid covers of fabric; towels in Class 24

PAUL FRANK INDUSTRIES LLC | PAUL FRANK | China | 6 Apr 2006 | 5269273 | Registered | Boss & Young
044225-3-CN030 | 20 Jul 2019 | 21 Jul 2009 | 5269273 | Tim Quinlan | PAUL FRANK

Class 41
Goods: Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; film production in Class 41

## PAUL FRANK HOME

PAUL FRANK INDUSTRIES LLC | PAUL FRANK HOME | China | 17 Jun 2014 | 14612659 | Pending | SIPS - Simone IP Services
571 | Tim Quinlan

Class 35
Goods: Advertising; business management assistance; sales promotion for others; personnel management consultancy; relocation services for business; computerized file management; business auditing; rental of vending machines; sponsorship search; rental of sales stands; retail or wholesale services for pharmaceutical, veterinary and sanitary preparations and medical supplies

## PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520738 | Registered | Boss & Young
044225-3-CN031 | 13 Oct 2014 | 14 Oct 2004 | 3520738 | Renewal due | Tim Quinlan

Class 9
Goods: Electronic data media, optical data media; magnetic data media; sunglasses, eyeglasses; protective goggles; protective cases for glasses; frames for glasses; cords for glasses; lenses for eyeglasses; optical disks; disk drives for computers; VCD video compact disks floppy disks; computer hardware; computer software (pre-recorded); computer firmware; videos; video tapes; cassettes; audio magnetic tapes; data processing apparatus and equipment; cameras; mouse pad in Class 09

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520794 | Registered | Boss & Young
044225-3-CN033 | 27 Jul 2018 | 28 Jul 2008 | 3520794 | allow to lapse | Tim Quinlan

Class 18
Goods: Animal skins, imitation leather, suitcases, handbag; beach bags; hold-alls; multi-purpose handbags; waist bags; pouches; traveling trunks, traveling bags, traveling cases, valises, vanity cases (not fitted), attachÃ© cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather); credit card holders (make of leather or imitation leather); backpacks for travel; rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, checkbooks holders (made of leather or imitation leather); umbrellas in Class 18

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520795 | Registered | Boss & Young
044225-3-CN032 | 27 Nov 2014 | 28 Nov 2004 | 3520795 | Renewal due | Tim Quinlan

Class 14
Goods: Jewelry, imitation jewelry, clocks, watches, ornamental pins; precious metals; alloys of precious metals; imitation gold; household utensils of precious metal; containers of precious metal; works of art of precious metal, boxes of precious metal, brands of watches; chains of watches; buckles of watches; key rings in Class 14

PAUL FRANK INDUSTRIES LLC | PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design | China | 10 Apr 2003 | 3520796 | Registered | Boss & Young
044225-3-CN034 | 27 May 2015 | 28 May 2005 | 3520796 | Tim Quinlan

Class 25
Goods: Clothing, footwear and headgear in Class 25.

## PAUL FRANK with House & Trees Design

PAUL FRANK INDUSTRIES LLC | PAUL FRANK with House & Trees Design | China | 13 Apr 1999 | 1423203 | Registered | Boss & Young
044225-3-CN046 | 20 Jul 2020 | 21 Jul 2000 | 1423203 | allow to lapse | Tim Quinlan

Class 25
Goods: Clothing, footwear, hosiery and headgear in Class 25.

## PLANNED PINES

PAUL FRANK INDUSTRIES LLC | PLANNED PINES | China | 6 Apr 2006 | 5269267 | Registered | Boss & Young
044225-3-CN040 | 20 Aug 2019 | 21 Aug 2009 | 5269267 | Tim Quinlan

Class 28
Goods: Toys, namely stuffed toys, action and play figures; stuffed animals, push toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; novelties for parties, dances (party favors); arcade games, board games, card games in Class 28
Goods: Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41

PAUL FRANK INDUSTRIES LLC | PLANNED PINES | China | 6 Apr 2006 | 5269268 | Registered | Boss & Young
044225-3-CN041 | 20 Jul 2019 | 21 Jul 2009 | 5269268 | Tim Quinlan

| | | | | | | |
|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **PLANNED PINES**<br>*044225-3-CN039* | China<br>***27 Apr 2019*** | 6 Apr 2006<br>***28 Apr 2009*** | 5269363<br>***5269363*** | Registered | Boss & Young<br>*Tim Quinlan* |

| Class | 9 |
|---|---|
| Goods | Electronic data media, optical data media, magnetic data media, eyeglasses, sunglasses, goggles, protective cases for glasses, frames for glasses, glass chains, cords for glasses, protective goggles, optical disks, disk drives for computers, VCD video compact disks, floppy disks, computer hardware, computer software [recorded] and firmware, videos, videotapes; cassettes, audio magnetic tapes, data processing apparatus and equipment; cameras; mouse pads; cinematographic film [exposed]; computer games; compact disc holders in Class 09. |

## SKURVY Design

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | China | 10 Apr 2003 | 3520801 | Registered | Boss & Young |  |
| | *044225-3-CN045* | ***20 Sep 2018*** | ***21 Sep 2008*** | ***3520801*** | | *Tim Quinlan* | |

| Class | 25 |
|---|---|
| Goods | Clothing; footwear; headgear [in Class 25]. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | China | 10 Apr 2003 | 3520802 | Registered | Boss & Young |  |
| | *044225-3-CN044* | ***13 May 2018*** | ***14 May 2008*** | ***3520802*** | | *Tim Quinlan* | |

| Class | 18 |
|---|---|
| Goods | Animal skins, imitation leather; suitcases, handbags, beach bags, handbags, waist bags, pouches, traveling bags and traveling cases, valises, vanity cases, attachÃ© cases, briefcases, portfolios, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases (made of leather or imitation leather); credit card holders (made of leather or imitation leather); backpacks for travel; rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, leather shoulder belts, checkbook holders made of leather or imitation leather; umbrellas in Class 18. |

*TM Administrator - END OF REPORT*

*IPPO WebTMS: printed 2 Mar 2015 19:59*

## Trademark Records By Trademark

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| *Client* | *File Reference* | *Next Renewal Due* | *Reg. Date* | *, No.* | *Sub Status* | *Supervisor* |

### BAOLUO FULANKE in Chinese Characters

| PAUL FRANK INDUSTRIES LLC | BAOLUO FULANKE In Chinese Characters | Hong Kong | 8 Nov 2011 | 302079531 | Registered | SIPS - Simone IP Services |
|---|---|---|---|---|---|---|
| | 044225-3-HK004 | 7 Nov 2021 | 8 Nov 2011 | 302079531 | | Marsha Erickson |

保罗 弗兰克

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care (cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 9 |
| Goods | omputer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software (recorded); computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) (time recording devices); reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles (optics); sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 09 |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); playing cards; garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals [stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modelling clay; chaplets in Class 16 |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18 |
| Class | 25 |
| Goods | Clothing; layettes [clothing]; babies' pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes (masquerade-); soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; children's helmets; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); feather belts for wear; bathing caps in Class 25 |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games (small-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances [party favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs (sports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves (accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35 |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services [entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological gardens; operating lotteries in Class 41 |

### Clancy Giraffe Design

| PAUL FRANK INDUSTRIES LLC | Clancy Giraffe Design | Hong Kong | 25 Aug 2005 | 300483606 | Registered | SIPS - Simone IP Services |
|---|---|---|---|---|---|---|
| | 044225-3-HK001 | 25 Aug 2015 | 11 Jan 2006 | 300483606 | | Marsha Erickson |

| | |
|---|---|
| Class | 18 |
| Goods | Leather, hides, animal skins; sponge leather; artificial fur; polyurethane leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses; walking sticks; credit card cases and holders, backpacks, bookbags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts; umbrellas; cosmetics cases (sold empty); credit card holders and check book covers made of leather, imitation of leather and other materials; parts and fittings for the aforesaid goods in Class 18. |
| Class | 25 |
| Goods | T-shirts, socks, shorts, sweatshirts, sweatpants, pajamas, shirts, pants, skirts, dresses, jackets, coats, raincoats, jumpers, swimwear, underwear; undershirts, underpants, robes, sleepwear, loungewear, camisoles, bras, dress shoes, leather shoes, thongs, slippers, hats, berets, beanies, caps in Class 25. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons and webisodes, distributed over television and the internet, featuring animated characters in Class 41. |

**DA ZUI HOU in Chinese Characters (Series)**

PAUL FRANK INDUSTRIES LLC DA ZUI HOU in Chinese Hong Kong 13 Oct 2011 302058097AA Registered SIPS - Science IP Services

Characters (Series)

044225-3-HK037 12 Oct 2021 29 Aug 2013 302058897AA Tim Quinlan

大嘴猴
大嘴猴

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic); make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5. |
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adapted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; children's helmets; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes in Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |
| Class | 14 |
| Goods | Precious metals (unwrought or semi-wrought); boxes of precious metal; jewelry; bracelets (Jewelry); brooches (Jewelry); chains (Jewelry); charms (Jewelry); earrings; medallions (Jewelry); necklaces (Jewelry); key rings (trinkets or fobs); ornamental pins; rings (Jewelry); watches; wristwatches; alarm clocks; clocks; clocks and watches (electric); stopwatches; straps for wristwatches in Class 14. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals stamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks, pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees [except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing Internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and |

television programs; zoological garden services; operating lotteries in Class 41.

| Class | 43 |
|---|---|
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

PAUL FRANK INDUSTRIES LLC DA ZUI HOU in Chinese Characters (Series) Hong Kong 302056897AB Pending SIPS - Simone IP Services

大嘴猴
大嘴猴

456 Tim Quinlan

| Class | 25 |
|---|---|
| Goods | Clothing; layettes [clothing]; babies pants; swimsuits; cyclists' clothing; clothing for gymnastics; wetsuits for waterskiing; waterproof clothing; costumes (masquerade-); soccer shoes; ski boots; gymnastic shoes; running shoes (with metal studs); footwear; boots; shoes; sports shoes; headgear for wear; socks; gloves (clothing); mittens; scarves; neckties; belts (clothing); leather belts for wear; bathing caps in Class 25. |
| Class | 35 |
| Goods | Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |

## House and Trees Silhouette Design

PAUL FRANK INDUSTRIES LLC House and Trees Silhouette Design Hong Kong 22 Dec 2006 300785061 Registered SIPS - Simone IP Services

044225-3-HK006 22 Dec 2016 17 May 2007 300785061 allow to lapse Marsha Erickson

| Class | 16 |
|---|---|
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift wrapping paper, metallic gift wrapping paper, gift boxes made from cardboard, paper gift tags, paper gift bags, paper ribbons for gift wrapping, and paper bows; journals; photographs; adhesives for stationery or household purposes in CLass 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; entertainment services provided by means of video media in Class 41 |

## JULIUS

PAUL FRANK INDUSTRIES LLC JULIUS Hong Kong 22 Dec 2006 300785034 Registered SIPS - Simone IP Services

JULIUS

044225-3-HK007 22 Dec 2016 17 Mar 2008 300785034 Marsha Erickson

| Class | 16 |
|---|---|
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift wrapping paper, metallic gift wrapping paper, gift boxes made from cardboard, paper gift tags, paper gift bags, paper ribbons for gift wrapping, and paper bows; journals; photographs; adhesives for stationery or household purposes in Class 16. |
| Class | 18 |
| Goods | Cases, including business cases, credit card cases, key cases, traveling cases, briefcases, vanity cases and cosmetics cases sold empty; bags, including, all-purpose carrying bags, beach bags, handbags, holdalls, waist bags, pouches, book bags, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, traveling bags; suitcases, valises, portfolios, wallets, billfolds, luggage, purses, walking sticks; backpacks, umbrellas in Class 18. |

## JULIUS Design

PAUL FRANK INDUSTRIES LLC JULIUS Design Hong Kong 28 Jul 1999 200007799 Registered SIPS - Simone IP Services

044225-3-HK022 28 Jul 2016 1 Jun 2000 200007799 Marsha Erickson

| Class | 25 |
|---|---|
| Goods | Clothing, footwear and headgear in Class 25. |

PAUL FRANK INDUSTRIES LLC JULIUS Design Hong Kong 24 Jun 2003 300037520 Registered SIPS - Simone IP Services

044225-3-HK020 23 Jun 2013 18 Nov 2003 300037520 Marsha Erickson

| Class | 9 |
|---|---|
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms; vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment cameras, mouse pads in Class 09. |
| Class | 14 |
| Goods | Jewelry, imitation jewelry, clocks, watches, ornamental pins; precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; straps, bracelets, buckles, all for watches; key rings in Class 14. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 22 Dec 2006 | 300785043 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK024* | ***22 Dec 2016*** | ***9 May 2007*** | ***300785043*** | | *Marsha Erickson* | |



| | |
|---|---|
| Class | 12 |
| Goods | Bicycles and scooters and parts and fittings therefor in Class 12. |
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift items; journals; photographs; adhesives for stationery or household purpose in Class 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; video media featuring animated characters; motion picture film production and distribution in Class 41. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 15 Jan 2003 | 612/2003 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK023* | ***15 Jan 2020*** | ***30 May 2003*** | ***200307601*** | | *Marsha Erickson* | |

| | |
|---|---|
| Class | 28 |
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design | Hong Kong | 4 Jun 2002 | 8192/2002 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK021* | ***4 Jun 2019*** | ***13 May 2003*** | ***200305814*** | | *Marsha Erickson* | |

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

## Julius Design (Series)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAULFRANKINDUSTRIESLLC | Julius Design (Series) | Hong Kong | 13 Oct 2011 | 302056888 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK036* | ***12 Oct 2021*** | ***13 Oct 2011*** | ***302056888*** | | *Marsha Erickson* | |

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-) ; make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5. |
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse [data processing equipment]; pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes in Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |
| Class | 16 |
| Goods | Paper; copying paper (stationery); bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites (except furniture); rubber erasers; school supplies (stationery); stationery; stickers [stationery]; ink; seals ~tamps); boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationary and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass (receptacles); painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |

| | |
|---|---|
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 35 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages. Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; departmental store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in departmental stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological garden services; operating lotteries in Class 41. |
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (rood and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

**PAUL FRANK**

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 4 Jul 2003 300042993 Registered SIPS - Simone IP Services PAUL FRANK

*044225-3-HK008* *3 Jul 2013* *12 Mar 2004* *300042993* *Tim Quinlan*

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09. |
| Class | 14 |
| Goods | ; Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, check book cases; umbrellas; parts and fittings for the aforesaid goods; all included in Class 18. |
| Class | 18 |
| Goods | Clothing, footwear and headgear in Class 25. |
| Class | 25 |
| Goods | Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |
| Class | 28 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09.; ; Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, check book cases; umbrellas; parts and fittings for the aforesaid goods; all included in Class 18. ; Clothing, footwear and headgear in Class 25.; Toys, namely action figures; play figures; stuffed toys, stuffed animals, and games, namely card games, board games, and arcade games in Class 28. |

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 22 Dec 2006 300785052 Registered SIPS - Simone IP Services PAUL FRANK

*044225-3-HK009* *22 Dec 2016* *9 May 2007* *300785052* *Tim Quinlan*

| | |
|---|---|
| Class | 16 |
| Goods | Paper, cardboard and goods made from these materials, not included in other classes; printed matter; children's books; series of fiction and non-fiction books featuring animated characters; biographies; cartoon prints and strips; address books; notepads; day planners; stationery; diary journals; flash cards; picture books; gift items: journals; photographs; adhesives for stationery or household purposes in Class 16. |
| Class | 41 |
| Goods | Entertainment services in the nature of cartoons, webisodes and ongoing comedy and dramatic episodic multimedia programs distributed over the internet, television and satellite with animated characters; video media featuring animated characters, motion picture film production and distribution in Class 41. |

PAUL FRANK INDUSTRIES LLC **PAUL FRANK** Hong Kong 13 Oct 2011 302056905 Registered SIPS - Simone IP Services PAUL FRANK

*044225-3-HK035* *12 Oct 2021* *13 Oct 2011* *302056905* *Tim Quinlan*

| | |
|---|---|
| Class | 3 |
| Goods | Soap; shampoos; liquid soap; cleaning preparations; polishing preparations; grinding preparations; essential oils; perfumery; make-up; lipstick; make-up preparations; hair colorants; cosmetics; pencils (cosmetics); creams (cosmetic-) ; make-up removing preparations; scented water; perfumes; nail-care preparations; skin-care Cosmetic preparations for-); |

| | |
|---|---|
| | antiperspirants (toiletries); sunscreen preparations; deodorants for personal use; dentifrices; mouthwashes; incense; cosmetics for animals in Class 3. |
| Class | 5 |
| Goods | Contact lens cleaning preparations; sunburn ointments; food for babies; air-freshening preparations; veterinary preparations; insect repellents; adhesive plasters; plasters for medicinal purposes; preparations to facilitate teething in Class 5.; |
| Class | 8 |
| Goods | Sharpening instruments; agricultural implements, hand-operated; garden tools hand-operated; instruments and tools for skinning animals; harpoons; pedicure sets; razor blades; razors (electric or non-electric); hair clippers for personal use; nail clippers (electric or non-electric); hand tools (hand-operated); hand pumps; spatulas ~and-tools); tweezers; scissors; knives; swords; table cutlery (knives, forks and spoons); ladles (hand tools) silver plate (knives, forks and spoons) in Class 8.; |
| Class | 9 |
| Goods | Computer game programs; computer peripheral devices; computer programs (recorded); computer programs [downloadable software]; computer software [recorded]; computers; printers for use with computers; optical discs; electronic pocket translators; electronic publications (downloadable); mouse pads; mouse (data processing equipment); pocket calculators; smart cards [IC cards]; compact discs (read-only memory); clocks (time-) [time recording devices]; reflective discs for wear, for the prevention of traffic accidents; bells (signals); portable telephones; hands-free kits for phones; modems; navigation apparatus for vehicles; satellite navigation apparatus; telephone apparatus; video telephones; walkie-talkies; protective sleeves for telephones; network communications equipment; amusement apparatus adopted for use with an external display screen or monitor; compact discs (audio-video); DVD players; headphones; musical jukeboxes; microphones; personal stereos; radios; TV apparatus; video game cartridges; cameras (photography); cases especially made for photographic apparatus and instruments; holograms; projection apparatus; bags for photographic apparatus; audiovisual teaching apparatus; metronomes; apparatus and instruments for astronomy; binoculars; magnifying glasses (optical); microscopes; mirrors (optical); telephone wires; divers' apparatus; divers' masks; divers' suits; goggles for sports; protective helmets; protective helmets for sports; life jackets; riding helmets; water wings (floats for bathing and swimming); eyeglasses; eyeglass cases; eyeglass chains; contact lenses; containers for contact lenses; eyeglass frames; spectacles [optics]; sunglasses; galvanic cells; animated cartoons; cinematographic film (exposed) in Class 9. |
| Class | 11 |
| Goods | Bicycle lights; electric lamps; pocket torches (electric); lampshades; lights, electric, for Christmas trees; vehicle reflectors; lanterns; barbecues; electric fans for personal use; hair driers; bath fittings; electric blankets (not for medical purposes in Class 11. |
| Class | 12 |
| Goods | Seat covers for vehicles; safety seats for children, for vehicles; bicycles; baskets adapted for cycles; bicycle bells; bicycle pumps; tricycles; baby carriages; hand cars; sleighs (vehicles); bicycle tires; boats in Class 12. |
| Class | 15 |
| Goods | Musical instruments; cases for musical instruments; musical boxes in Class 15. |
| Class | 16 |
| Goods | Paper; copying paper [stationery]; bibs of paper; coasters of paper; face towels of paper; mats for beer glasses; place mats of paper; table linen of paper; table napkins of paper; tissues of paper for removing make-up; towels of paper; cardboard articles; albums; loose-leaf binders; booklets; bookmarks; cards; catalogs; charts; envelopes [stationery]; greeting cards; musical greeting cards; note books; writing pads; printed matter; postcards; scrapbooks; calendars; atlases; books; comic books; periodicals; posters; printed publications; songbooks; photographs; pictures; transfers (decals); garbage bags of paper or of plastic; pencils sharpeners (electric or non-electric); clipboards; covers [stationery]; document files; files [office requisites]; passport holders; office requisites [except furniture]; rubber erasers; school supplies [stationery]; stationery; stickers [stationery]; ink; seals ~tamps]; boxes for pens; drawings pens; fountain pens; paintbrushes; pencils; pens [office requisites]; writing brushes; writing materials; adhesive tapes for stationery and household purposes; glue for stationery and household purposes; drawing instruments; drawing materials; portable printing sets [office requisites]; blackboards; pastels [crayons]; teaching materials [except apparatus]; modeling clay; chaplets in Class 16. |
| Class | 18 |
| Goods | Leather (unworked or semi-worked); bags for sports; garment bags for travel; beach bags; briefcases; handbags; haversacks; pocket wallets; purses; school bags; shopping bags; suitcases; travelling bags; fur; umbrellas; parasols; walking sticks; clothing for pets; collars for animals in Class 18. |
| Class | 20 |
| Goods | Furniture; beds; baskets (not of metal);chests for toys; mirrors (looking glasses); picture frames; fans for personal use (non-electric); figurines [statuettes] of wood, wax, plaster or plastic; furniture fittings, not of metal; bedding (except for linen); sleeping bags for camping; cushions; pillows in Class 20. |
| Class | 21 |
| Goods | Kitchen utensils; paper plates; trays for domestic purposes; tableware (other than knives, forks and spoons); cups; pots; jugs; dishes; cups of paper or plastic; cookie jars; containers for household or kitchen use; glass [receptacles]; painted glassware; porcelain ware; mugs; drinking glasses; vases; soap boxes; candlesticks; combs; brushes; toothbrushes; electric toothbrushes in Class 21. |
| Class | 24 |
| Goods | Fabrics; tapestry [wall hangings], of textile; towels of textiles; bed covers; bed linen; bed blankets; furniture coverings of textile; furniture coverings of plastic; banners in Class 24. |
| Class | 26 |
| Goods | Hair bands; ornamental novelty badges [buttons]; barrettes; ribbons [haberdashery]; buttons in Class 26. |
| Class | 27 |
| Goods | Carpets; rugs; mats; automobile carpets; bath mats; floor coverings; gymnastic mats; non-slip mats; wallpaper in Class 27. |
| Class | 28 |
| Goods | Tables for indoor soccer; games; amusement machines, automatic and coin operated; balls for games ~mall-); kites; puppets; conjuring apparatus; ninepins; slides (playthings); toys for domestic pets; play balloons; toys; building blocks [toys]; building games; novelties for parties, dances warty favors]; dominoes; toy pistols; parlor games; dolls' beds; dolls' houses; dolls; toy masks; scale model vehicles; dolls' clothes; scooters (toys); mobiles (toys); Teddy bears; flying discs (toys); soap bubbles (toys); toy vehicles; jigsaw puzzles; radio-controlled toy vehicles; kaleidoscopes; board games; playing cards; balls for games; bats for games; body-building apparatus; archery implements; machines for physical exercise; surf boards; skis; sleighs ~ports articles); surf skis; sailboards; appliances for gymnastic; hunting game calls; swimming pools (play articles); plastic running tracks; batting gloves accessories for games); flippers for swimming; elbow pads (sports articles); protective paddings [parts of sports suits]; roller skates; ice skates; Christmas trees of synthetic materials; ornaments for Christmas trees (except illumination articles and confectionery]; fishing tackle; camouflage screens (sports articles) in Class 28. |
| Class | 30 |
| Goods | Chocolate-based beverages; cocoa-based beverages; coffee-based beverages; chocolate beverages with milk; cocoa beverages with milk; coffee beverages with milk; tea-based beverages; iced tea; sugar cubes; candy for food; chewing gum (not for medical purposes); chocolate; confectionery; fruit jellies (confectionery); lozenges (confectionery); honey; pancakes; oatmeal; bread; cakes; rice cakes; corn flakes; oat flakes; sandwiches; tarts; cookies; pizzas; pies; sushi; cereal preparations; chips (cereal products); pasta; noodles; cereal-based snack foods; rice-based snack foods; popcorn; soybean milk; lobster chips; ice cream; edible ices; frozen yogurt in Class 30. |
| Class | 32 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages in Class 32. |
| Class | 35 |
| Goods | Beer; ginger beer; non-alcoholic beverages; fruit juices; non-alcoholic fruit juice beverages; isotonic beverages; table waters; vegetable juices; whey beverages; preparations for making beverages. Advertising; publication of publicity texts; presentation of goods on commercial media, for retail purposes; demonstration of goods; modeling for advertising or sales promotion; online advertising on computer networks; public relations; business management assistance; professional business consultancy; business information; business investigations; business management of hotels; business research agencies; sales promotion for other; import-export; business management of performing artists; relocation services for business; compilation of information into computer databases; document reproduction; accounting; rental of vending machines; department store retail services; convenience store retailing services; on-line retail services; mail order retail services; the bringing together for the benefit of others, of a variety of goods, enabling customers to conveniently view and purchase those goods in department stores, shopping centers, retail and wholesale outlets, from a general merchandise catalogue by mail order or by means of telecommunications, or from a general merchandise global communications network website in Class 35. |
| Class | 38 |
| Goods | Television broadcasting; cable television broadcasting; news agencies; communication by computer terminals; cellular telephone communications; computer-aided transmission of messages and images; electronic mail; providing access to databases; providing Internet chatrooms; providing user access to a global computer network; satellite transmission; teleshopping services (providing telecommunication channels for) in Class 38. |
| Class | 41 |
| Goods | Educational services; nursery schools; arranging and conducting of concerts; arranging and conducting of beauty contests; organization of sports competitions; lending libraries; providing online electronic publications, not-downloadable; publication of books; publication of electronic books and journals online; providing amusement arcade services; amusement parks; booking of seats for shows; holiday camp services; sports camp services; cinema presentations; circuses; club services entertainment or education]; entertainment; film production; game services provided online from a computer network; health club services; presentation of live performances; movie studios; photography; production of shows; production of radio and television programs; zoological garden services; operating lotteries in Class 41. |
| Class | 43 |
| Goods | Cafes; restaurants; canteens; catering (food and drink); bar services; hotels; snack bars; providing campground facilities; tourist homes; retirement homes; day-nurseries; boarding for animals; rental of chairs, tables, table linen and glassware in Class 43. |

**PAUL FRANK PAUL FRANK INDUSTRIES & Helicopter Design**

| Mark | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| PAUL FRANK PAUL Helicopter Design 044225-3-HK012 | PAUL FRANK INDUSTRIES LLC | FRANK INDUSTRIES & | Hong Kong | 19 Feb 2003 / *19 Feb 2020* | 19 Feb 2003 | 2563/2003 / *200312354* | Registered / *allow to lapse* | SIPS - Simone IP Services / *Tim Quinlan* |

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, traveling bags and cases, valises, vanity cases, briefcases, portfolios, attachÃ© cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

| Mark | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| PAUL FRANK PAUL Helicopter Design 044225-3-HK013 | PAUL FRANK INDUSTRIES LLC | FRANK INDUSTRIES & | Hong Kong | 19 Feb 2003 / *19 Feb 2020* | 19 Feb 2003 | 2564/2003 / *200312355* | Registered / *allow to lapse* | SIPS - Simone IP Services / *Tim Quinlan* |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

**PAUL FRANK with House & Trees Design**

| Mark | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| House & Trees Design 044225-3-HK025 | PAUL FRANK INDUSTRIES LLC | PAUL FRANK with | Hong Kong | 8 Apr 1999 / *8 Apr 2016* | *15 Feb 2001* | B1826/2001 / *B1826/2001* | Registered / *allow to lapse* | SIPS - Simone IP Services / *Tim Quinlan* |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear, headgear in Class 25. |

**PLANNED PINES**

| Reference | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| 044225-3-HK026 | PAUL FRANK INDUSTRIES LLC | PLANNED PINES | Hong Kong | 31 Mar 2006 / *31 Mar 2016* | *1 Nov 2006* | 300611045 / *300611045* | Registered | SIPS - Simone IP Services / *Marsha Erickson* |

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glassese, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts therefor; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cd's, cd-roms, vcd's, dvd's, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mousepads in Class 09. |
| Class | 28 |
| Goods | Toys, such as stuffed toys, stuffed animals, plush toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; action figures; play figures; games, such as adults and children's party games, arcade games, board games, card games; and playthings in Classs 28.; Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41. |
| Class | 41 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glassese, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts therefor; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cd's, cd-roms, vcd's, dvd's, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mousepads in Class 09.; Toys, such as stuffed toys, stuffed animals, plush toys, dolls, bath toys, baby multiple activity toys, children's multiple activity toys, electronic toys; action figures; play figures; games, such as adults and children's party games, arcade games, board games, card games; and playthings in Classs 28.; Entertainment services in the nature of cartoons and webisodes distributed over television, internet, satellite, and video media featuring animated characters; motion picture film production in Class 41. |

**SKURVY Design**

| Reference | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| 044225-3-HK027 | PAUL FRANK INDUSTRIES LLC | SKURVY Design | Hong Kong | 19 Feb 2003 / *19 Feb 2020* | *19 Feb 2003* | 2553/2003 / *200310466* | Registered | SIPS - Simone IP Services / *Tim Quinlan* |

| | |
|---|---|
| Class | 9 |
| Goods | Data media, electronic data media, optical data media, magnetic data media; glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles and cases and parts thereof; protective cases for glasses, eyewear, spectacles, sunglasses, eyeglasses, goggles; cds; cd roms, vcds, dvds, floppy disks; computer hardware, software and firmware; videos, video tapes; cassettes, audio cassettes; data processing apparatus and equipment; cameras, mouse pads in Class 09. |

| Reference | Owner | Mark | Country | Filing / Next Renewal | Date | App / Reg No. | Status | Agent |
|---|---|---|---|---|---|---|---|---|
| 044225-3-HK028 | PAUL FRANK INDUSTRIES LLC | SKURVY Design | Hong Kong | 19 Feb 2003 / *19 Feb 2020* | *19 Feb 2003* | 2554/2003 / *200310467* | Registered | SIPS - Simone IP Services / *Tim Quinlan* |

| | |
|---|---|
| Class | 14 |
| Goods | Jewellery, imitation jewellery, clocks, watches, ornamental pins; precious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; straps, bracelets, buckles, all for watches; key rings in Class 14 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | Hong Kong | 19 Feb 2003 | 2555/2003 | Registered | SIPS - Simone IP Services |  |
| | *044225-3-HK029* | ***19 Feb 2020*** | ***19 Feb 2003*** | ***200310534*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 18 |
| Goods | Articles made of leather or imitations of leather; cases, bags, beach bags, handbags, holdalls, waist bags, pouches, suitcases, travelling bags and cases, valises, vanity cases, briefcases, portfolios, attache cases, wallets, billfolds, key holders, luggage, purses, walking sticks, credit card cases and holders, backpacks, rucksacks, knapsacks, school bags, satchels, tote bags, sport bags, athletic bags, shoulder bags, shoulder belts, cheque book cases; umbrellas; parts and fittings for the aforesaid goods in Class 18. |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | **SKURVY Design** | Hong Kong | 19 Feb 2003 | 200302403 | Registered | SIPS - Simone IP Services | |
| | *044225-3-HK030* | ***19 Feb 2020*** | ***19 Feb 2003*** | ***200310535*** | | *Tim Quinlan* | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear in Class 25. |

***TM Administrator - END OF REPORT***

*IPPO WebTMS: printed 2 Mar 2015 18:51*

# Trademark Records By Trademark

| Owner | Trademark | Country | Appl. Date | , No. | Status | Agent |
|---|---|---|---|---|---|---|
| *Client* | *File Reference* | *Next Renewal Due* | *Reg. Date* | *No.* | *Sub Status* | *Supervisor* |

**JULIUS Design (Color)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL FRANK INDUSTRIES LLC | JULIUS Design (Color) | Macau | 19 Jan 2015 | 94932 | Pending | SIPS - Simone IP Services | |
| | 825 | | | | | Tim Quinlan | |

| | |
|---|---|
| Class | 25 |
| Goods | Clothing, footwear and headgear |

*TM Administrator - END OF REPORT*

*IPPO WebTMS: printed 2*

**EXHIBIT 2**
**TRADEMARK AND COPYRIGHT LEGEND**

Full Notice:
    ™ and © (year of publication*) Paul Frank Industries LLC. Paul Frank and all related logos, characters, names, and distinctive likenesses thereof are the exclusive property of Paul Frank Industries LLC. All Rights Reserved. Used Under Authorization.

Abbreviated Notice
    ™ & © (year of publication*) Paul Frank Industries LLC. All Rights Reserved. Used Under Authorization.

Short Notice (for extremely small items only)
    ™ & © (year of publication*) Paul Frank Industries LLC

    *NOTE: Year of publication = year item is first marketed/shown to retailers

All copyright and trademark notices must be of a sufficient size to be read clearly. All uses of the logo(s) must include ™ immediately adjacent to the logo (until such time as the registered trademarks issue, at which time the logos on new materials must shift from ™ to ®).

If Licensee uses any service mark, trademark, trade dress, logo, representation or identifier of Licensee or any other third party, if and to the extent specifically permitted by Licensor by notice to Licensee (each, a "**Third Party Identifier**") on or in relation to any of Licensed Products, the packaging or advertising, such use shall be made so as to avoid the creation or appearance of joint rights or a joint trademark, service mark or trade dress. Licensee shall utilize Third Party Identifiers solely in a separated context from the Property and any notices therefor and any such use must be specifically approved in writing by Licensor before use.

# EXHIBIT 3

## PART I, ASSIGNED LICENSE AGREEMENTS

| Country | Agreement | Contract ID | Start | End | Categories |
|---|---|---|---|---|---|
| China | PFI Clever Time 9/30/2017 (TEEN WATCHES) | 33400 | 10/1/2014 | 9/30/2017 | Watches |
| | PFI Clever Time Industrial Ltd. 12/31/2017 (KIDS WATCHES) | 31579 | 9/1/2014 | 12/31/2017 | Watches |
| | PFI MAXX International Limited 9/30/2019 | 28018 | 4/1/2014 | 9/30/2019 | Retail Stores |
| | PFI Maxx Intl (Eastern Linkage - online) renewal 12/31/2017 | 6593 | 1/1/2015 | 12/31/2017 | Online Stores |
| | PFI Maxx Intl (Eastern Linkage renewal) 12/31/2017 | 6587 | 1/1/2015 | 12/31/2017 | Home Goods |
| | PFI Maxx Intl (Eastern Linkage-stationery renewal) 12/31/2017 | 6588 | 1/1/2015 | 12/31/2017 | Stationery |
| | PFI MAXX Intl (Kids Bags) 12/31/17 | 6592 | 11/1/2012 | 12/31/2016 | Bags |
| | PFI Maxx Intl (kids home) 12/31/17 | 6589 | 11/1/2012 | 12/31/2016 | Home Goods |
| | PFI Maxx Intl (kids stationery) 12/31/16 | 6590 | 11/1/2012 | 12/31/2016 | Stationery |
| | PFI Pinghu Shuangxi Baby Carrier 9/30/2017 | 29002 | 4/1/2014 | 9/30/2017 | Bicycle |
| | PFI PROTAP (Shanghai) 6/30/2016 | 3940 | 12/1/2011 | 6/30/2017 | Footwear |
| | PFI QingDao Josion Garments Co. (renewal) 6/30/2017 (COLD WEATHER) | 17881 | 7/1/2014 | 6/30/2017 | Apparel |
| | PFI QingDao Josion Garments Co. (renewal) 9/30/2017 (LUGGAGE) | 17880 | 8/1/2014 | 9/30/2017 | Bags - Travel |
| | PFI Qingdao Josion Garments Co. 9/30/2016 (BAGS) | 6776 | 1/1/2013 | 9/30/2016 | Bags |
| | PFI QingDao Josion Garments Co., Ltd. 6/30/17 | 26498 | 3/1/2014 | 6/30/2017 | Jewelry |
| | PFI Shanghai Joye Industrial 12/31/2016 | 18462 | 4/1/2013 | 12/31/2016 | Footwear |
| | PFI Shanghai Joye Industries Co., Ltd. 3/31/2018 | 28994 | 5/1/2014 | 3/31/2018 | Kids Apparel |
| | PFI Shantou Fine Sun Jewelry 6/30/2019 | 23836 | 11/1/2013 | 6/30/2019 | Jewelry |
| | PFI Shenzhen Heze Lianchuang 12/31/2016 | 22960 | 4/1/2014 | 6/30/2017 | Eyeglasses |
| | PFI Zhongshan City Guruio Foods Co., Ltd. 9/30/2017 | 29105 | 4/1/2014 | 9/30/2017 | Food (Baked) |
| | PFI Zunan Cultural 3/31/2016 (GIFT) | 6774 | 11/1/2012 | 3/31/2016 | Dolls-Gifts |
| | PFI Zunan Cultural 3/31/2019 (GIFT) RENEW | 28995 | 4/1/2016 | 3/31/2019 | Dolls-Gifts |
| | PFI Zunan Cultural 9/30/2016 (AUTOMOTIVE) | 17725 | 1/1/2013 | 9/30/2016 | Automotive |
| | PFI Zunan Cultural 9/30/2019 (AUTOMOTIVE) RENEW | 29071 | 10/1/2016 | 9/30/2019 | Automotive |
| Hong Kong | PFI Richever International (renewal) 12/31/2015 | 5461 | 1/1/2013 | 12/31/2015 | Bags |
| | PFI Richever International 12/31/2016 (KIDS) | 18332 | 2/1/2013 | 12/31/2016 | Children's Bags |
| | PFI Richever International 3/31/2015 (RETAIL) | 4345 | 11/1/2011 | 3/31/2015 | Retail |

# EXHIBIT 3
# PART II, LICENSOR'S MULTI-TERRITORY LICENSE AGREEMENTS

| | | | | | |
|---|---|---|---|---|---|
| Worldwide | PFI 26 Bars and a Band | 5361 | 9/2/2012 | 6/30/2015 | Pet |
| | PFI Acme Archives Limited | 4748 | 2/1/2012 | 12/31/2015 | Fine Art |
| | PFI H&M | 6631 | 11/29/2012 | 12/31/2015 | Apparel, Accessories |
| | PFI Marino Andriani, LLC | 23284 | 1/1/2014 | 12/31/2015 | Electronics |
| | PFI Skullcandy | 2513 | 1/1/2011 | 12/31/2015 | Headphones |
| | PFI Spidi International | 5353 | 7/1/2012 | 6/30/2015 | Camera cases and accessories |
| | PFI Thinkplus Co. Ltd. | 24335 | 1/1/2014 | 12/31/2018 | None iPhone mobile cases |
| | PFI Veemee Ltd. 9/30/2016 | 32128 | 11/17/2014 | 9/30/2016 | Digital |
| | PFI Bare Tree Media, Inc. 12/31/2016 | 33004 | 11/1/2014 | 12/31/2016 | Digital |

**EXHIBIT 4**
**CODE OF CONDUCT FOR MANUFACTURERS**

At Paul Frank Industries LLC (“**Paul Frank**”), we are committed to:

- A standard of excellence in every aspect of our business and in every corner of the world;
- Ethical and responsible conduct in all of our operations;
- Respect for the rights of all individuals; and
- Respect for the environment.

We expect these same commitments to be shared by all manufacturers of our merchandise. *At a minimum,* we require that all manufacturers of Paul Frank merchandise meet the following standards:

**Child Labor**

Manufacturers will not use child labor.

The term “child” refers to a person younger than 15 (or 14 where local law allows) or, if higher, the local legal minimum age for employment or the age for completing compulsory education.

Manufacturers employing young persons who do not fall within the definition of “children” will also comply with any local laws and regulations.

**Involuntary Labor**

Manufacturers will not use any forced or involuntary labor, whether prison, bonded indentured or otherwise.

**Coercion and Harassment**

Manufacturers will treat each employee with dignity and respect, and will not use corporal punishment, threats of violence or other forms of physical, sexual, psychological or verbal harassment or abuse.

**Nondiscrimination**

Manufacturers will not discriminate in hiring and employment practices, including salary, benefits, advancement, discipline, termination or retirement, on the basis of race, religion, age, nationality, social or ethnic origin, sexual orientation, gender, political opinion or disability.

**Association**

Within the limitation of local law, manufacturers will respect the rights of employees to associate, organize and bargain collectively in a lawful and peaceful manner, without penalty or interference.

**Health and Safety**

Manufacturers will provide employees with a safe and healthy workplace in compliance with local laws and regulations, ensuring at a minimum, reasonable access to potable water and sanitary facilities, fire safety, and adequate lighting and ventilation.

Manufacturers will also ensure that the same standards of health and safety are applied in any housing that they provide for employees.

**Compensation**

We expect manufacturers to recognize that wages are essential to meeting employees' basic needs. Manufacturers will, at a minimum, comply with all local laws regarding wage and hour laws and regulations, including those relating to minimum wages, overtime, maximum hours, piece rates and other elements of compensation, and provide legally mandated benefits. If local laws do not provide for overtime pay, manufacturers will pay at least regular wages for overtime work. Except in extraordinary business circumstances, manufacturers will not require employees to work more than the lesser of (a) 48 hours per week and 12 hours overtime or (b) the limits on regular and overtime hours allowed by local law or, where local law does not limit the hours of work, the regular work week in such country plus 12 hours overtime. In addition, except in extraordinary business circumstances, employees will be entitled to at least one day off in every seven-day period.

Where local industry standards are higher than applicable legal requirements, we expect manufacturers to meet the higher standards.

**Protection of the Environment**

Manufacturers will comply with all local environmental laws and regulations.

**Other Laws**

Manufacturers will comply with all local laws and regulations, including those pertaining to the manufacture, pricing, sale and distribution of merchandise.

All references to "local law" in this Code of Conduct include local laws, rules and regulations as well as applicable treaties of the jurisdiction where the manufacturer is located.

**Monitoring and Compliance**

Manufacturers will authorize Paul Frank and its designated agents (including third parties), at their own cost, to engage in monitoring activities to confirm compliance with this Code of Conduct, including unannounced on-site inspections of manufacturing facilities and employer-provided housing; reviews of books and records relating to employment matters; and private interviews with employees, provided such monitoring activities are conducted in ordinary business hours and no more than twice a year. Manufacturers will maintain on site all documentation that may be needed to demonstrate compliance with this Code of Conduct.

**Publication**

Manufacturers will take appropriate steps to ensure that the provisions of this Code of Conduct are communicated to employees, including the prominent posting of a copy of this Code of Conduct, in the local language and in a place readily accessible to employees, at all times.

**Foreign Corrupt Practices Act**

Each manufacturer represents and warrants that it has reviewed and understands the provisions of the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), and its purposes, and that it has taken no action with respect to this Agreement and the transactions contemplated hereby which would constitute a violation of the applicable laws or which would or might cause Licensee, Paul Frank or the parent or any subsidiary or affiliate of the parent of Paul Frank to violate the FCPA. Each manufacturer further represents and warrants, that manufacturer will not take any action, which would constitute a violation of any PRC or Hong Kong anti-corruption laws as applicable. Each manufacturer undertakes promptly to notify Licensee in writing upon knowing of any fact or circumstance that would render manufacturer's representations herein to no longer be true. If Licensee learns that manufacturer has violated, or has taken any action in connection with this Agreement and the transactions contemplated hereby which if taken by a United States company would violate, or has caused Licensee, Paul Frank or Paul Frank's parent or the subsidiaries or affiliates of Paul Frank's parent to violate, the FCPA in connection with this Agreement, Licensee shall have the right, at their option, to terminate the agreement with manufacturer. The parties agree that full disclosure of the existence and terms of this Agreement may be made at any time and for any reason to such persons, departments, branches or agencies of the Government of the United States of America and/or the government of the Territory, as Paul Frank's legal counsel shall determine has a legitimate need to know such terms.

**Agreed to and Acknowledged**:

Manufacturer Name: ______________________________

By: ________________________
Name: ______________________
Title: ______________________
Date: ______________________

**EXHIBIT 5**
**APPROVAL OF MANUFACTURER**

Licensee must obtain and submit this executed approval form to Licensor for any third party manufacturer of any of Licensed Products as described in "**Schedule A.**"

MANUFACTURER: ______________________________
TERRITORY OF MANUFACTURE: ______________________
LICENSED PRODUCTS: __________________________
PROPERTY: ___________________________________

We are a licensee of Paul Frank Industries LLC ("**Licensor**") and have the right to the use of the Property. You have been engaged by us as a manufacturer for Licensed Products. This letter sets forth and limits your sole authorization for use of the Property in connection with manufacturing of Licensed Products for us.

1. You acknowledge and agree that the intellectual property associated with the marking and sale of Licensed Products accrues solely and exclusively to the Licensor, throughout the universe, and that you shall never attach or contest the validity of Licensor's title to or ownership of the intellectual property anywhere or at any time. You shall not use the Property in any manner whatsoever other than as directed by us in writing You acknowledge and agree that we are not an agent of Licensor and that under no circumstances shall Licensor have any obligation or liability to you hereunder or otherwise in any way arising out of the relationship between you and us, Licensed Products or otherwise.

2. You shall affix or apply the Licensor's marks and any required labels to the products and/or packaging materials strictly in conformity with specifications provided by us, or as otherwise directed by us, including, but not limited to the application and use of all copyright, trademark and other notices in conformance with applicable law. You shall not use any other name, copyright, trademark, service mark or design in connection with Licensed Products and/or packaging materials unless so directed by us in writing.

3. You are not authorized to, and will not, manufacture or distribute any Licensed Product or otherwise use the Property except for us pursuant to our written instructions to you. You represent, warrant and further agree that: (c) all Licensed Products shall be shipped only to us or for us to other locations in accordance with our written instructions and shall be labeled with the correct country of origin and in accordance with the applicable laws and regulations; and (d) except as otherwise specifically permitted by this letter, you shall not manufacture, reproduce, distribute, sell, or otherwise exploit or turn to account any Licensed Product or any other material using any of the Property.

4. If any Licensed Product is rejected by us or by Licensor including, but not limited to, because they are shipped late, the order therefor has been canceled, defects in quality or other defect,

or for any other reason or no reason at all, you immediately shall remove from all such Licensed Products, and any packaging, wrapping and insert materials, all labels, tags and other markings bearing the Property before disposing of them (other than the care label if shipped to the United States). If such markings cannot be removed, you immediately shall notify us in writing that such markings cannot be removed and we may require a means for disposal, at which point you shall either follow our suggestion for disposal or immediately destroy all such Licensed Products and packaging, wrapping and insert materials. You immediately shall supply to us a certificate of destruction, executed under penalty of perjury by a senior executive of your company, attesting to said destruction in accordance herewith.

5.  You shall not, directly or indirectly, disclose or use at any time (either during or after the completion of your manufacturing obligations, except to us or Licensor as we or Licensor may direct) any confidential information of ours or of Licensor. All information and supporting materials of any kind (and rights arising therefrom) relating to the production, design, sale or marketing of any Licensed Products are and will be our and/or Licensor's exclusive property and are to be used solely in accordance with our or Licensor's written instructions and under no circumstances shall be used by you, or any or your employees or affiliates or anyone else, in relation to any non-Licensed Products.

6.  You shall permit us, Licensor or our or Licensor's designee to visit and inspect your activities and premises including, but not limited to, the premises of any permitted subcontractor, at any time upon reasonable notice.

7.  When we cease to require you to manufacture Licensed Products , or if Licensor or its representatives notify you that we no longer have the right to allow you to manufacture Licensed Products, you immediately shall deliver to Licensor, or in accordance with Licensor's written instructions, destroy any molds, plates, engravings or other devices used to reproduce Licensed Products or, at Licensor's sole election, made in writing delivered to you by Licensor, shall give evidence satisfactory to Licensor of the destruction thereof as hereinabove provided.

8.  If you fail to abide by any of the foregoing, we and/or Licensor shall have the unrestricted right to enforce, exercise and obtain all legal rights and remedies against you including, but not limited to, compensation for all damages sustained as a result of your actions or omissions, as well as temporary, preliminary and permanent injunctive relief, without any requirement to provide security or any obligation to prove that money damages are an inadequate remedy. All rights and remedies available to us shall also be available to Licensor, in its sole and absolute discretion, with the understanding that Licensor is an intended third party beneficiary of this letter. No delay or omission by us in the exercise of any right or to pursue any remedy shall impair or be construed as a waiver of such right or remedy or any default or acquiescence therein. No waiver of any breach of any provision of

this letter will be deemed a waiver of any prior or subsequent breach thereof, or of any other provision. No extension by us of a time for performance by you will be deemed an extension of time for any other performance by you.

9. This letter shall be construed pursuant to the laws of Hong Kong applicable to agreements entered into and fully performed therein. Hong Kong courts shall have jurisdiction and venue of any action or proceeding related to this letter and you consent to the personal jurisdiction of such courts. Any determination by any such court shall be binding upon you and us and all other courts of the world wherever located. You shall appoint, by written notice to us, immediately upon request, a person located in Hong Kong, on whom service of process may be made in your behalf, failing which you hereby irrevocably agree that service of process or any other paper upon you may be made by certified or registered mail, return receipt requested, at your business address or upon any such agent for service, in addition to any other method authorized by Hong Kong law. This letter shall be interpreted to provide us and Licensor with the maximum control of the Property and the use thereof.

Please execute and return the enclosed copy of this Approval to the undersigned acknowledging your agreement to abide by the foregoing.

ACKNOWLEDGED AND AGREED:

MANUFACTURER:

By: ______________________________
Its: ______________________________
Address: __________________________
Date: _____________________________

**EXHIBIT 6**
**CODE OF CONDUCT FOR LICENSEES**

At Paul Frank Industries LLC, we are committed to:

- A standard of excellence in every aspect of our business and in every corner of the world;
- Ethical and responsible conduct in all of our operations;
- Respect for the rights of all individuals; and
- Respect for the environment.

We expect these same commitments to be shared by all Paul Frank Industries LLC licensees and the manufacturers with which they work in the production of Paul Frank Industries LLC merchandise. *At a minimum*, we require that all Paul Frank Industries LLC licensees meet the following standards:

**Conduct of Manufacturing**

Licensees that engage directly in the manufacturing of Paul Frank Industries LLC merchandise will comply with all of the standards set forth in Paul Frank Industries LLC's Code of Conduct for Manufacturers, a copy of which is attached.

Licensees will ensure that each manufacturer and its subcontractor also enters into a written commitment with Paul Frank Industries LLC to comply with the standards set forth in Paul Frank Industries LLC's Code of Conduct for Manufacturers.

Licensees will prohibit manufacturers from subcontracting the manufacture of Paul Frank Industries LLC merchandise or components thereof without Paul Frank Industries LLC's express written consent, and only after the subcontractor has entered into a written commitment with Paul Frank Industries LLC to comply with Paul Frank Industries LLC's Code of Conduct for Manufacturers.

**Monitoring and Compliance**

Licensees will take appropriate steps, in consultation with Paul Frank Industries LLC, to develop, implement and maintain procedures to evaluate and monitor manufacturers of Paul Frank Industries LLC merchandise and use best efforts to ensure compliance with Paul Frank Industries LLC's Code of Conduct for Manufacturers, including on-site inspections of manufacturing facilities and employer-provided housing; review of books and records relating to employment matters; and private interviews with employees. Licensor shall use reasonable efforts in scheduling and conducting any such inspection to minimize disruption of the ordinary business of Licensee or manufacturers.

Licensees will authorize Paul Frank Industries LLC and its designated agents (including third parties) to engage in similar monitoring activities to confirm Licensees' compliance with this Code of Conduct. Licensees will maintain on site all documentation that may be needed to demonstrate such compliance.

**EXHIBIT 7**
**PARTIAL REFUND OF LICENSE FEE REGARDING CORE IP**

Licensor and Licensee agree that fifty percent (50%) of the license fee paid by Licensee ("**Attributable License Fee**") is attributable to the license by Licensor to Licensee of the trademarks "Paul Frank," or "Julius design" used individually or in combination, and/or the copyrights in the Julius design (such intellectual property rights shall be referred to as the "**Core IP**").

In the event of a breach of this Agreement by Licensor under Section 13(c)(iii), Licensor shall refund such portion of the Attributable License Fee to Licensee taking into account and based on the following factors ("**Factors**"):

    a.  The remaining term of the License Period compared to the total License Period; and
    b.  The percentage attributable to such lost Core IP determined as a percentage based upon a fraction (i) the numerator of which is the revenue generated in the prior 24 month period from such Core IP that was lost and (ii) the denominator of which is the total revenue generated from the all the Core IP in the same prior 24 month period; and
    c.  Any revenues generated by Licensee from such Core IP for the eighteen (18) month period commencing on the date of the Loss Notice (as defined below) shall offset any amount of refund due to Licensee by Licensor.  This offset shall not be applicable if Licensee was required to pay any amounts to acquire or license from a third party the rights that were lost by Licensor.

Upon a breach of this Agreement by Licensor under Section 13(c)(iii), Licensor shall notify Licensee in writing of such loss of rights ("**Loss Notice**"). Within 60 days of receipt of such Loss Notice, Licensee shall provide to Licensor revenue information and reasonable backup documentation to allow Licensor to calculate the Factors.  Upon receipt of such information from Licensee, Licensor shall have 60 days to request clarifications and such additional information as Licensor deems reasonably necessary to evaluate the Factors and shall have the right to audit Licensee's books and records with respect to such Factors and Licensor shall compute in its reasonable determination the amount to be refunded, taking into account the available information with respect to paragraph (c) of the criteria for the Factors and shall provide such determination in writing to Licensee ("**Refund Notice**").  Licensee shall have 30 days to reject or accept the amount set forth in the Refund Notice (silence shall be deemed acceptance).  If the amount set forth in the Refund Notice is accepted, Licensor shall pay 50% of such amount within 30 days and the remaining 50% eighteen (18) months after the first payment (to allow a final calculation of any amounts under paragraph (c) of the criteria for Factors to be determined) and such payment shall be reduced by such amounts under paragraph (c) of the criteria for Factors. For the avoidance of doubt, in no event shall any amount greater than the Attributable License Fee be refundable by Licensor.

# EXHIBIT 7

## Illustrative Proforma Calculation

Paul Frank Industries
**ILLUSTRATIVE PROFORMA CALCULATION**
as of January 2015

| | Past 24 Months | | | | |
|---|---|---|---|---|---|
| | Paul Frank | Julius | Subtotal | Other Non Core IP | Grand Total |
| **Apparel (1)** | 150,000 | 50,000 | 200,000 | 200,000 | 400,000 |
| **Accessories** | - | - | - | - | - |
| **Footwear** | 75,000 | 75,000 | 150,000 | 150,000 | 300,000 |
| **Subtotal** | 225,000 | 125,000 | 350,000 | 350,000 | 700,000 |
| **other Non Core Categories** | 100,000 | 100,000 | 200,000 | 200,000 | 400,000 |
| **Total** | 325,000 | 225,000 | 550,000 | 550,000 | 1,100,000 |
| **% of Grand Total** | 30% | 20% | 50% | 50% | 100% |

If Licensor looses rights to Paul Frank IP in Apparel & Accessories after 8 full years into 15 year deal, refund would be calculated as follows

(A)

| | | |
|---|---|---|
| Purchase Price | $ | 65,000,000 |
| Term in years | | 15 |
| Remaining term in years | | 7 |
| Atttibutable % to Core IP | | 50% |
| Max Refund for remaining | $ | 15,166,667 |

(B)

last 24 months

| | | |
|---|---|---|
| Lost IP in Core Categories (1) | $ | 150,000 |
| Total Core IP in Core Categories | $ | 350,000 |
| % | | 42.9% |

Refund Amount $ 6,500,000 (offset by any revenue generated during the 18 months after the IP is lost assuming no license was required to be obtained by Licensee from a third party)

(1) assumes that the whole class of apparel is lost, if only a category in apparel is lost (e.g. hats), then only the revenue attributable to such category in the last is 24 months shall be the numerator of the calculation under (B) and the remainder of the revenue for the class would be included in the denominator

# EXHIBIT 2

**FIRST AMENDMENT TO MASTER LICENSE AGREEMENT**

This First Amendment ("Amendment") to the Master License Agreement dated January 1, 2015 (the "Agreement") is entered into by and between Paul Frank Industries LLC ("Licensor") and Grand Union International Trading Limited ("Licensee"), as of April 27, 2018 (the "Amendment Date"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS, Licensor and Licensee duly executed the Agreement pursuant to which, inter alia, Licensor granted to Licensee the License as set forth therein; and

WHEREAS, Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

1. Section 9(h) - Right of First Negotiation. Section 9(h) of the Agreement is deleted in its entirety.

2. Section 28 - Dispute Resolution. Section 28 of the Agreement is deleted in its entirety and replaced with the following:

   If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having

jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

3. Section 30 - Governing Law. Section 30 of the Agreement is deleted in its entirety and replaced with the following:

> This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law.

4. Waiver of Jury Trial. EACH PARTY TO THE AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THE AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THE AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AMENDMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 4.

5. General. The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Amendment Date set forth above.

| PAUL FRANK INDUSTRIES LLC | GRAND UNION INTERNATIONAL TRADING LIMITED |
|---|---|
| By: [signature] | By: [signature] |
| Name: Janet HSU | Name: |
| Title: CEO | Title: |

# EXHIBIT 3

**SECOND AMENDMENT TO MASTER LICENSE AGREEMENT**

This Second Amendment (**"Amendment"**) to the Master License Agreement dated January 1, 2015, as previously amended (the "**Agreement**") is entered into as of **August 19, 2021** (The "Second Amendment Date") by and between Paul Frank Limited (**"Licensor"**) and Grand Union International Trading Limited (**"Licensee"**). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS. The rights and obligations of the Agreement have been assigned by the original licensor under such Agreement, Paul Frank Industries LLC to Paul Frank Limited as of December 10, 2020, and Paul Frank Limited has agreed to assume the rights and obligations of the Agreement and its successive Amendments as Licensor.

WHEREAS. Accordingly, Paul Frank Limited, hereby acting as Licensor under such Agreement is entitled to enforce the applicable terms of such Agreement under this Amendment.

WHEREAS. Licensee acknowledges and agrees that Paul Frank Industries LLC has fulfilled all the communication requirements and any other existing requirements set in Section 24(Assignment) of the Agreement with regard to Licensee for the effective assignment of the Agreement.

WHEREAS. Licensor and Licensee duly executed the Agreement pursuant to which, *inter alia*, Licensor granted Licensee the exclusive, sublicensable and non-transferable license to utilize the Property, solely in connection with the design, development, manufacture, marketing, promotion, distribution, offer for sale and sale of the Licensed Products (the **"License"**); and

WHEREAS. Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

I. **Schedule K: Further Cooperation Terms:** A new Schedule K is added to the Agreement stating the following:

**SCHEDULE K**
**Further Cooperation Terms**

1. **"PAUL FRANK THE A.NI.MA SERIES" Rights**

Licensor owns all right, title and interest in and to the "PAUL FRANK THE A.NI.MA SERIES" Intellectual Property in Exhibit A (the **"A.NI.MA Property"**) to this Amendment, and Licensee desires to obtain the rights to utilize the A.NI.MA Property pursuing to the terms and conditions specifically set forth herein:

i. Licensor agrees to grant Licensee an exclusive license in the Territory for the "**A.NI.MA Property**" under the same terms of as of the Agreement, in the following Licensed Products: apparel, shoes, bags, accessories(including figures), home furnishing products, personal care products (jointly referred to as the "**A.NI.MA Exclusive Categories**").

ii. In consideration of the above license granted by Licensor to Licensee, Licensee shall pay to Licensor the following royalties for the utilization of "A.NI.MA Property"

a) A non-refundable Guaranteed Minimum Payment of Eight Million Five Hundred Thousand United States Dollars (USD $8,500,000) to be paid by Licensee to Licensor in the following installments:
   - One Million United States Dollars (USD $1,000,000) shall be paid within 7 days upon execution of this Amendment.
   - Seven Million Five Hundred Thousand United States Dollars (USD $7,5000,000) within 30 calendar days from the Second Amendment Date.

b) Twenty percent (20%) of Licensee's net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calender year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year.

iii. In relation to the licensing of other product categories different than the A.NI.MA Exclusive Categories, the total revenue (net invoiced billing) obtained by any Party from any certain sub-licensee under the licensing of the A.NI.MA Property shall be distributed between the Parties as per the following terms and conditions.

(a) Where the sub-licensee is engaged and managed by Licensor, Licensor shall pay Licensee thirty percent (30%) of the total net invoiced billings originating from such sub-licensee.

(b) Where the sub-licensee is engaged and managed by Licensee, Licensee shall pay Licensor thirty percent (30%) of the total net invoiced billings originating from such sub-licensee.

Any payable amounts under this section *1.iii* will be delivered to the other party free and clear of any tax, deduction or withholding in the form of a wire transfer of immediately available funds to the bank account designated by each Party.

iv. Notwithstanding the foregoing, in order to the keep a higher positioning of the "PAUL FRANK THE A.NI.MA SERIES" branding aiming for young adults only, none of the Licensed Products neither the "A.NI.MA Exclusive Categories" stipulated in *1.i* nor the non exclusive categoris stipulated in *1.iii* shall be used on infants and kids products in the Territory, unless otherwise mutually agreed by Licensor and Licensee in writing.

**2. Brand Management**

i. Licensee shall pay annually to Licensor a Brand Management Fee equal to Two Hundred Thousand US Dollars (US$200,000) ("Brand Management Fee"), to be paid on a calendar quarterly basis (or any portion thereof), within seven (7) days before each calendar quarter started.

ii. In consideration of the above Brand Management fee, Licensor agrees to provide support to Licensee's business in the Territory as follows:

(a) For the purpose of efficiency, Licensor will appoint specific personnel located in China in charge of the Licensed Products, Packing, Promotional Materials and Advertising Approvals, as stipulated in Section 7 of the Agreement.

(b) Licensor will provide Licensee with quarterly style guide designed specifically for the Territory.

(c) In order to strengthen communications, Licensor and Licensee agree to hold a monthly meeting to address matters within the scope of the Agreement.

(d) Licensor will facilitate necessary documentations required for the operation of Licensee's business within the scope of the Agreement, provided that Licensee shall

keep full transparency with Licensor for the purpose of the usage of the documentations.

iii. The Brand Management Fee will be delivered to Licensor free and clear of any tax, deduction or withholding in the form of a wire transfer of immediately available funds to the bank account designated by Licensor.

**3. Participation**

i. Licensee shall pay Licensor a participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties.

ii. The Participation Fee shall be paid on a calendar quarterly basis (or any portion thereof), within thirty (30) days following the end of each calendar quarter calculated based on the revenue actually received by Licensee with respect to the preceding calendar quarter.

iii. Licensee shall, on or before the thirtieth (30th) day after the end of each calendar quarter, commencing with the first calendar quarter (or partial calendar quarter) ending after the Second Amendment Date, furnish Licensor, as applicable, complete and accurate statements in Chinese ("**Royalty Statements**"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time. Licensee shall furnish such Royalty Statements.

**4. Brand Collaboration**

i. Licensor shall inform Licensee in advance of any brand collaborations with third parties pursuant to which the Property maybe utilized in connection with other brands, trademarks, copyrights or property in the Territory. Licensee is entitled to 30% of the net invoiced billing of Licensor's royalty income from such brand collaborations.

ii. Any brand collaborations with third parties pursuant to which the Property may be utilized in connection with other brands, trademarks, copyrights or property initiated by Licensee shall need to obtain Licensor's prior written consent, which consent shall not be unreasonably withheld. Licensor is entitled to 30% of the net invoiced billing of Licensee's income from such brand collaborations.

**5. Marketing Commitment**

i. Both Parties agree that in order to recover and develop the Paul Frank brand in the Territory, Licensee must put special effort in marketing and promotion activities.

ii. For each year during the remaining Term, Licensee agrees to expend as an Marketing Commitment a cash sum equal to (i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (￥10,000,000), whichever of (i) or (ii) is greater. "Marketing Commitment" shall mean direct, out of pocket costs paid to unaffiliated third parties for: (a) purchase of advertising time and/or space in media (i.e., print, radio, television and online, excluding Licensee's catalog(s) and website(s)) for advertisement of the Licensed Products ("Media"), (b) in-store (e.g., on the premises of retailers) merchandising and point-of-purchase signage, displays, collateral or approved promotions for promotion of the Licensed Products ("Retail Specific Promotions"), and (c) licensing exhibitions and

other offline activities. (For purposes of clarity, any costs associated with product packaging, trade shows, or Licensee's showrooms, catalogs or websites shall not be included as part of the Advertising Commitment).

iii. Licensee acknowledges that any advertising, promotion, publicity, or marketing materials shall be concerning the Trademarks licensed and shall not infringe or diminish the reputation upon the Intellectual Property of Licensor. Licensee shall at all times ensure that the presentation, marketing and advertising of the Licensed Products by Licensee shall conform in image, style and approach to that of Licensor in relation to the Intellectual Property; and Licensee shall consult with Licensor regarding Licensee's marketing policy and approach to any advertising campaign for Licensed Products.

**6. Reporting Obligations**

i. Licensee shall comply regularly with the reporting obligations set in *Section 6 Statements* of the Agreement, which are applicable to the terms set in this Schedule K.

ii. In addition to the terms set in *Section 6 Statements* of the Agreement, Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

**7. Extraordinary Cure Period and Waiver**

i. Licensor hereby agrees to grant Licensee an extraordinary cure period of six (6) months from the Second Amendment Date so that Licensee may undertake whatsoever actions are necessary in order to cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor. The cure period shall be ended on date February 19, 2022 (The "Cure Date").

ii. As consideration of Licensee's obligations under this Second Amendment, upon the payment obligations stipulated in *1 (a)* are complete and fulfilled by Licensee, Licensor agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known to Licensor as of the Second Amendment Date. Licensor hereby represents and warrants that it has disclosed all known potential breaches of contract to Licensee.

iii. After the Cure Date, Licensor has the right to perform a due diligence in order to ascertain whether there are any uncured breaches. In the event that after the Cure Date Licensee is still in default of such cure obligation, the parties shall collaborate in good faith to resolve such issue. Under the performance of the Due Diligence Licensee shall collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence.

iv. After the Cure Date, if any new breach of the Agreement is identified by either party, the parties agree to work together and the breaching party shall cure such breach.

**8. Licensee's Representations and Warranties**

i. Licensee further represents and warrants that Licensee, and parties controlled directly or indirectly by Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property or attack the validity of the Agreement.

ii. In the event that Licensee, or parties controlled directly or indirectly by Licensee incurs in breach of this section's representation and warranty it shall be deemed as a material breach of the Agreement.

**9. Miscellaneous**

i. Licensee acknowledges and agrees that Licensor would be damaged irreparably, and in a manner for which monetary damages would not be an adequate remedy, in the event any of the provisions of this Schedule K are not performed in accordance with its specific terms or otherwise are breached. Accordingly, Licensee agrees that Licensor shall be entitled to an injunction, specific performance or other equitable relief to prevent a breach of this Agreement by Licensee. None of the provisions of this section shall constitute or be construed to limit or waive any rights and remedies which Licensor may have.

ii. Any payments due from Licensee to Licensor hereunder shall be payable to the bank account designated in to the following bank account:

Bank Name: Bank Of China (Hong Kong) Limited, Hong Kong
Bank Address: Bank Of China Tower 1, Garden Road, Central, Hong Kong
SWIFT BIC Code: BKCHHKHHXXX
Account Name: Futurity Brands Limited
Account Address: Unit 1003 10/F Shanghai Ind Investment Building 48-62 Hennessy Road Wanchai, Hong Kong
Account Number: 012-704-2-007214-8

**II. Schedule L: Third Party Beneficiary:** A new Schedule L is added to the Agreement stating the following:

**SCHEDULE L**
**Third Party Beneficiary**

The parties acknowledge and agree that FUTURITY BRANDS LIMITED is an intended Third Party Beneficiary of this Agreement and will have the right to assert any claims and enforce any provisions that Licensor would have with respect to this Agreement.

FUTURITY BRANDS LIMITED together with its subsidiary FUTURITY BRANDS CHINA CO., LTD shall be responsible for the management of the Property.

**III. Section 29 Notice** is amended as follows:

Notices by either party to the other shall be in writing and shall be given by addressing them as indicated above and sending them by overnight carrier such as FedEx, UPS and SF, or by email with confirmation copy to follow, and shall be effective upon receipt. Unless prior written notice of a change of address is given,

all statements and notices to Licensee must be sent to:

PAUL FRANK LIMITED
Paul Frank Limited
Address: Units 1003, 10/F., Shanghai Industrial Investment Building, 48-62 Hennessy Road, Wanchai, Hong Kong
Attn: Stan Wan (stan@futuritybrands.com)
With a copy to: Hana Mu (hana@futuritybrands.com)

all statements and notices to Licensee must be sent to:
Grand Union International Trading Limited
Address: No 9, 2899 Guangfu West Rd., Shanghai 200062, P.R.China
Attn: Bo Zheng (bo.zheng@chinabrandsgroup.com.cn)
With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)

IV. General. The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of August 19, 2021.

| PAUL FRANK LIMITED | Grand Union International Trading Limited |
|---|---|
| By: ______ | By: ______ |
| Name: STANLEY YOOK-LOONG WAN | Name: BO ZHENG |
| Title: DIRECTOR | Title: DIRECTOR |

Exhibit A. THE A.NI.MA SERIES



# EXHIBIT 4

## THIRD AMENDMENT TO MASTER LICENSE AGREEMENT

This Third Amendment (**"Amendment"**) to the Master License Agreement dated January 1, 2015, as previously amended (the "**Agreement**") is entered into as of **February 10, 2022** (The "Third Amendment Date") by and between Paul Frank Limited (**"Licensor"**) and Grand Union International Trading Limited (**"Licensee"**). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Agreement unless otherwise indicated.

WHEREAS, Licensor and Licensee desire to amend the Agreement.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensor and Licensee agree that the Agreement is amended as follows:

**I.** **Schedule K: Further Cooperation Terms:** Schedule K **Section 2 Brand Management Article i** is deleted in its entirety and replaced with the following:

Licensee shall pay Licensor an annual Brand Management Fee equal to One Million Three Hundurd Thousand RMB Plus VAT (RMB 1,300,000+ VAT) ("Brand Management Fee"), to be paid on a calendar quarterly basis (or any portion thereof), within seven (7) days before each calendar quarter starts. The payments shall be made by Licensee's operation entity in China namingly "红纺文化有限公司上海分公司" to Licensor's subdidary FUTURITY BRANDS CHINA CO., LTD "弗尼媞（上海）商贸有限公司" designated in to the following bank account:

名称：弗尼媞（上海）商贸有限公司
开户行：中国银行股份有限公司上海市大世界支行
人民币帐号：457281543163

Beneficiary: FUTURITY BRANDS (CHINA) CO., LTD
Name and Address of Bank: BANK OF CHINA, SHANGHAI, DA SHI JIE SUB-BRANCH NO.1 JIN LING ZHONG ROAD, SHANGHAI CN
RMB A/C No.: 457281543163

FUTURITY BRANDS CHINA CO., LTD "弗尼媞（上海）商贸有限公司" shall issue Special VAT fapiao to "红纺文化有限公司上海分公司" within 7 days upon receiving such payment.

**II.** **Schedule K: Further Cooperation Terms:** Schedule K **Section 9 Miscellaneous Article ii** is deleted in its entirety and replaced with the following:

Any payments **except the Brand Mangement fee stipulated in Section 2. i** of this Schedule K due from Licensee to Licensor hereunder shall be payable to the Licensor's designated bank account as per invoice.

**III.** **General.** The Agreement, as modified by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Amendment supersedes all prior and contemporaneous agreements between the parties in connection with the subject matter hereof. Except as

otherwise provided in this Amendment, the terms of the Agreement shall remain in full force and effect. This Amendment may be executed in two counterparts, each of which shall be an original and all of which shall constitute one and the same instrument. In case of conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall prevail.

IN WITNESS WHEREOF, the parties have executed this Amendment as of February 10, 2022.

| PAUL FRANK LIMITED | Grand Union International Trading Limited |
|---|---|
| By:________ | By:________ |
| Name: STANLEY YOOK-LOONG WAN | Name: BO ZHENG |
| Title: DIRECTOR | Title: DIRECTOR |

| Confirmed by: | Confirmed by: |
|---|---|
| Company Stamp: | Company Stamp: |
| FUTURITY BRANDS CHINA CO., LTD<br>弗尼媞（上海）商贸有限公司 | 红纺文化有限公司上海分公司 |

# EXHIBIT 5

**PAUL FRANK LIMITED**
Units 1003, 10/F., Shanghai Industrial Investment Building, 48-62 Hennessy Road, Wanchai, Hong Kong

**June 21, 2021**

Via Electronic Mail
Grand Union International Trading Limited
Attn: Dave Qian
Email: dave@roommar.com
Cc: lilian.he@affluential.com.cn; sam.zheng@chinabrandsgroup.com.cn ; bo.zheng@chinabrandsgroup.com.cn ; susan.liu@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Termination**

Dear Sirs,

We hereby contact you with regard to the breach of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts that came to our attention recently which are detailed hereafter.

As per Section 9(b) of the above-referenced Agreement "**Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property**". We have clear evidence proving that you as the Licensee and/or your executive officers or owners have been using entities controlled by you (firstly "泰安优生活服饰有限公司", later "杭州招月文化发展有限公司") to register the Property as trademarks in China (attached herein the list of trademarks), for your private interests. Such act adversely and materially has affected the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value has persisted for more than one hundred and twenty (120) days.

As per Section 9(e) of the above-referenced Agreement "**Without Licensor's express prior written consent, Licensee shall not use the Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property as a corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee**". However, your

Affiliate has incorporated the core IP "大嘴猴" into the company name "大嘴猴食品（杭州）有限公司" since January 28, 2021. Such conduct adversely and materially affected the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value has persisted for more than one hundred and twenty (120) days.

For the abovementioned reasons and pursuant to section 13 (a)(iii) and 13(b)(iii)(iv) of this Agreement, as a result of Licensee's material breaching of the Agreement, Licensor, at its sole and absolute option, is hereby notifying you the decision to terminate the Agreement. This Notification of Termination shall become effective within a thirty (30) day period, unless Licensee completely cures the above said breaches.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

We look forward to your cooperation.

Sincerely,

*For and on behalf of*
PAUL FRANK LIMITED

*Authorized Signature(s)*

Stanley Yook-Loong Wan
Director

PAUL FRANK LIMITED

**Attachment:**

| No. | Registration /Applicagtion No. | Trademark | Class | Application Date | Registration Date |
|---|---|---|---|---|---|
| 1 | 31563894 | JULIUS JR. | 1 | 2018-06-12 | 2019-03-21 |
| 2 | 31552409 | JULIUS JR. | 2 | 2018-06-12 | 2019-03-21 |
| 3 | 31571249 | JULIUS JR. | 3 | 2018-06-12 | 2019-03-21 |
| 4 | 31563643 | JULIUS JR. | 4 | 2018-06-12 | 2019-03-21 |
| 5 | 31549364 | JULIUS JR. | 5 | 2018-06-12 | 2019-03-21 |
| 6 | 31563678 | JULIUS JR. | 7 | 2018-06-12 | 2019-03-21 |
| 7 | 31563689 | JULIUS JR. | 8 | 2018-06-12 | 2019-03-21 |
| 8 | 31572835 | JULIUS JR. | 10 | 2018-06-12 | 2019-03-21 |
| 9 | 31553402 | JULIUS JR. | 11 | 2018-06-12 | 2019-03-21 |
| 10 | 31563494 | JULIUS JR. | 12 | 2018-06-12 | 2019-03-21 |
| 11 | 31557894 | JULIUS JR. | 13 | 2018-06-12 | 2019-03-21 |
| 12 | 31566358 | JULIUS JR. | 14 | 2018-06-12 | 2019-03-21 |
| 13 | 31572875 | JULIUS JR. | 15 | 2018-06-12 | 2019-03-21 |
| 14 | 31553467 | JULIUS JR. | 16 | 2018-06-12 | 2019-03-21 |
| 15 | 31573760 | JULIUS JR. | 17 | 2018-06-12 | 2019-03-21 |
| 16 | 31555123 | JULIUS JR. | 18 | 2018-06-12 | 2019-06-07 |
| 17 | 31564077 | JULIUS JR. | 19 | 2018-06-12 | 2019-03-21 |
| 18 | 31568220 | JULIUS JR. | 20 | 2018-06-12 | 2019-03-21 |
| 19 | 31565311 | JULIUS JR. | 21 | 2018-06-12 | 2019-03-21 |
| 20 | 31568556 | JULIUS JR. | 23 | 2018-06-12 | 2019-03-21 |
| 21 | 31575390 | JULIUS JR. | 24 | 2018-06-12 | 2019-03-21 |
| 22 | 31554064 | JULIUS JR. | 26 | 2018-06-12 | 2019-03-21 |
| 23 | 31553480 | JULIUS JR. | 27 | 2018-06-12 | 2019-03-21 |
| 24 | 31568234 | JULIUS JR. | 28 | 2018-06-12 | 2019-03-21 |
| 25 | 31571368 | JULIUS JR. | 29 | 2018-06-12 | 2019-03-21 |
| 26 | 31551591 | JULIUS JR. | 30 | 2018-06-12 | 2019-03-21 |
| 27 | 31558277 | JULIUS JR. | 32 | 2018-06-12 | 2019-03-21 |
| 28 | 31548863 | JULIUS JR. | 33 | 2018-06-12 | 2019-03-21 |
| 29 | 31548883 | JULIUS JR. | 35 | 2018-06-12 | 2019-06-07 |
| 30 | 31555215 | JULIUS JR. | 36 | 2018-06-12 | 2019-03-21 |
| 31 | 31564503 | JULIUS JR. | 37 | 2018-06-12 | 2019-03-21 |
| 32 | 31560924 | JULIUS JR. | 39 | 2018-06-12 | 2019-03-21 |
| 33 | 31570131 | JULIUS JR. | 40 | 2018-06-12 | 2019-03-21 |
| 34 | 31570138 | JULIUS JR. | 42 | 2018-06-12 | 2019-03-21 |
| 35 | 31570145 | JULIUS JR. | 43 | 2018-06-12 | 2019-03-21 |
| 36 | 31551538 | JULIUSJR. | 44 | 2018-06-12 | 2019-03-21 |
| 37 | 31573368 | JULIUS JR. | 45 | 2018-06-12 | 2019-03-21 |
| 38 | 31575802 |  | 35 | 2018-06-12 | 2019-07-14 |
| 39 | 31574175 |  | 3 | 2018-06-12 | 2019-04-28 |
| 40 | 31573502 |  | 5 | 2018-06-12 | 2019-04-28 |

| 41 | 31573403 | | 35 | 2018-06-12 | 2019-09-07 |
|---|---|---|---|---|---|
| 42 | 31572472 | | 24 | 2018-06-12 | 2019-03-21 |
| 43 | 31569993 | | 25 | 2018-06-12 | 2019-09-28 |
| 44 | 31569980 | | 18 | 2018-06-12 | 2019-10-14 |
| 45 | 31569977 | | 14 | 2018-06-12 | 2019-04-28 |
| 46 | 31569970 | | 3 | 2018-06-12 | 2019-04-28 |
| 47 | 31569947 | | 25 | 2018-06-12 | 2019-04-28 |
| 48 | 31569900 | | 3 | 2018-06-12 | 2019-03-21 |
| 49 | 31568427 | | 5 | 2018-06-12 | 2019-03-21 |
| 50 | 31568393 | | 41 | 2018-06-12 | 2019-08-28 |
| 51 | 31565153 | | 41 | 2018-06-12 | 2019-06-07 |
| 52 | 31564766 | | 14 | 2018-06-12 | 2019-03-21 |
| 53 | 31564397 | | 41 | 2018-06-12 | 2019-06-07 |
| 54 | 31561205 | | 18 | 2018-06-12 | 2019-03-21 |

| | | | | | |
|---|---|---|---|---|---|
| 55 | 31560355 | | 35 | 2018-06-12 | 2019-07-14 |
| 56 | 31560172 | | 41 | 2018-06-12 | 2019-07-21 |
| 57 | 31560110 | | 35 | 2018-06-12 | 2019-06-07 |
| 58 | 31559782 | | 25 | 2018-06-12 | 2019-08-28 |
| 59 | 31557113 | | 14 | 2018-06-12 | 2019-04-28 |
| 60 | 31557097 | | 25 | 2018-06-12 | 2019-06-07 |
| 61 | 31555064 | | 18 | 2018-06-12 | 2019-04-28 |
| 62 | 31553587 | | 5 | 2018-06-12 | 2019-03-21 |
| 63 | 31552055 | | 24 | 2018-06-12 | 2019-04-28 |
| 64 | 31552008 | | 24 | 2018-06-12 | 2019-04-28 |
| 65 | 31550641 | | 5 | 2018-06-12 | 2019-06-07 |
| 66 | 31550629 | | 41 | 2018-06-12 | 2019-08-21 |
| 67 | 31575324 | JULIUS | 28 | 2018-06-12 | 2019-06-07 |
| 68 | 31575350 | JULIUS | 41 | 2018-06-12 | 2019-06-07 |
| 69 | 31573683 | JULIUS | 16 | 2018-06-12 | 2019-06-07 |
| 70 | 31573176 | JULIUS | 7 | 2018-06-12 | 2019-03-21 |
| 71 | 31573084 | JULIUS | 4 | 2018-06-12 | 2019-07-21 |
| 72 | 31567969 | JULIUS | 19 | 2018-06-12 | 2019-06-07 |
| 73 | 31565949 | JULIUS | 21 | 2018-06-12 | 2019-06-07 |

| | | | | | |
|---|---|---|---|---|---|
| 74 | 31563976 | JULIUS | 22 | 2018-06-12 | 2019-06-07 |
| 75 | 31561081 | JULIUS | 20 | 2018-06-12 | 2019-06-07 |
| 76 | 31560519 | JULIUS | 10 | 2018-06-12 | 2019-06-07 |
| 77 | 31559663 | JULIUS | 8 | 2018-06-12 | 2019-06-07 |
| 78 | 31557815 | JULIUS | 26 | 2018-06-12 | 2019-06-07 |
| 79 | 31554746 | JULIUS | 9 | 2018-06-12 | 2019-08-28 |
| 80 | 31550186 | JULIUS | 24 | 2018-06-12 | 2019-03-21 |
| 81 | 56103528 | JULIUS JR. | 1 | 2021-05-17 | |
| 82 | 56109356 | JULIUS JR. | 2 | 2021-05-17 | |
| 83 | 51946169 | | 3 | 2020-12-07 | |
| 84 | 56126203 | JULIUS JR. | 3 | 2021-05-17 | |
| 85 | 56119933 | JULIUS JR. | 4 | 2021-05-17 | |
| 86 | 56089175 | JULIUS JR. | 5 | 2021-05-17 | |
| 87 | 56095400 | JULIUS | 7 | 2021-05-17 | |
| 88 | 56119381 | JULIUS JR. | 7 | 2021-05-17 | |
| 89 | 56121969 | JULIUS JR. | 8 | 2021-05-17 | |
| 90 | 56112336 | JULIUS | 9 | 2021-05-17 | |
| 91 | 56121980 | JULIUS JR. | 10 | 2021-05-17 | |
| 92 | 56116588 | JULIUS JR. | 11 | 2021-05-17 | |
| 93 | 56116599 | JULIUS JR. | 12 | 2021-05-17 | |
| 94 | 56119455 | JULIUS JR. | 13 | 2021-05-17 | |
| 95 | 56087259 | JULIUS JR. | 14 | 2021-05-17 | |
| 96 | 56124371 | JULIUS JR. | 15 | 2021-05-17 | |
| 97 | 56103754 | JULIUS JR. | 16 | 2021-05-17 | |
| 98 | 56108938 | JULIUS JR. | 17 | 2021-05-17 | |
| 99 | 56089458 | JULIUS | 19 | 2021-05-17 | |
| 100 | 56088813 | JULIUS JR. | 19 | 2021-05-17 | |
| 101 | 56086147 | JULIUS JR. | 20 | 2021-05-17 | |
| 102 | 56123148 | JULIUS JR. | 21 | 2021-05-17 | |
| 103 | 56104034 | JULIUS | 21 | 2021-05-17 | |
| 104 | 56115216 | JULIUS JR. | 23 | 2021-05-17 | |
| 105 | 56098259 | JULIUS | 24 | 2021-05-17 | |
| 106 | 56109138 | JULIUS JR. | 24 | 2021-05-17 | |
| 107 | 56130129 | JULIUS JR. | 26 | 2021-05-17 | |
| 108 | 56091961 | JULIUS JR. | 27 | 2021-05-17 | |
| 109 | 56096440 | JULIUS JR. | 28 | 2021-05-17 | |
| 110 | 56089410 | JULIUS | 28 | 2021-05-17 | |
| 111 | 56118597 | JULIUS JR. | 29 | 2021-05-17 | |
| 112 | 56123571 | JULIUS JR. | 30 | 2021-05-17 | |
| 113 | 56104042 | JULIUS JR. | 32 | 2021-05-17 | |
| 114 | 56114985 | JULIUS JR. | 33 | 2021-05-17 | |
| 115 | 56096637 | JULIUS JR. | 36 | 2021-05-17 | |
| 116 | 56103590 | JULIUS JR. | 37 | 2021-05-17 | |
| 117 | 56125433 | JULIUS JR. | 39 | 2021-05-17 | |
| 118 | 56125447 | JULIUS JR. | 40 | 2021-05-17 | |
| 119 | 56129160 | JULIUS | 41 | 2021-05-17 | |
| 120 | 56087911 | JULIUS JR. | 42 | 2021-05-17 | |
| 121 | 56118814 | JULIUS JR. | 43 | 2021-05-17 | |
| 122 | 56103921 | JULIUS JR. | 44 | 2021-05-17 | |
| 123 | 56118839 | JULIUS JR. | 45 | 2021-05-17 | |

# EXHIBIT 6

**PAUL FRANK LIMITED**
Units 1003, 10/F., Shanghai Industrial Investment Building, 48-62 Hennessy Road, Wanchai, Hong Kong

**July 29, 2021**

Via Electronic Mail
Grand Union International Trading Limited
Attn: Dave Qian
Email: dave@roommar.com
Cc: lilian.he@affluential.com.cn; sam.zheng@chinabrandsgroup.com.cn ; bo.zheng@chinabrandsgroup.com.cn ; susan.liu@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Material Breaching**

Dear Sirs,

We hereby contact you with regard to the breach of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts that came to our attention recently which are detailed hereafter.

As per Section 9(b) "**Licensee shall not at any time attack the title to or any rights of Licensor in and to the Property** "; and Section 9(f) "**Except as expressly authorized by Licensor in writing (and then only to the extent of, and subject to the terms of, such written authorization), Licensee shall not (i) join any names, words, symbols designs, trademarks, service marks characters, likenesses, or any other literary or artistic elements, with the Property or Derivation property so as to form a new or derived trademark, (ii) make, or authorize to be made, any use, directly or indirectly, of any variation of the Property or Derivation Property, or (iii) use the Property or Derivative Property in connection with any cross collaboration or cross licensing programs with third party designs, brands trademarks, copyrights, properties and/or otherwise.** " of the above-referenced Agreement, however, despite Licensor's clear denial of the artwork presented to Licensor for approval and rejection of registration of official account in

social media, Licensee deliberately authorized "上海叠芮品牌管理有限公司" to launch "Paul Frank Beauty" (PFB 彩妆) on e-commerce platform and social media public account using unapproved artworks, giving out false information and misrepresenting the brand in connection with cross collaboration with third party designs. Furthermore formed and registered a new trademark derived from the property (attached herein some evidences). Such conduct adversely and materially affected the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value has persisted for more than one hundred and twenty (120) days.

For the abovementioned reasons and pursuant to section 13 (a)(iii) and 13(b)(iii)(iv) of this Agreement, as a result of Licensee's material breaching of the Agreement, Licensor, at its sole and absolute option, is hereby notifying you the decision to terminate the Agreement, unless Licensee completely cures the above said breaches by 6:00 p.m. (Beijing time) on Friday, July 30, 2021. Considering the prior Notification of Termination due to other material breaching reasons sent to you on June 21, 2021, the earlier effective date of the termination of the Agreement shall prevail.

Pursuant to Section 16(a), Section 32 of the Agreement and related Laws and Regulations, Licensor will claim compensation for damages for such material breaching of the Agreement to Licensee and for infringement of rights to 上海叠芮品牌管理有限公司 directly as well.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

We look forward to your cooperation.

Sincerely, For and on behalf of
PAUL FRANK LIMITED

Authorized Signature(s)

Stanley Yook-Loong Wan
Director

PAUL FRANK LIMITED

**Attachments:**

# EXHIBIT 7

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**July 21, 2022**

Via Electronic Mail
Grand Union International Trading Limited
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Material Breaching and Further Steps**

Dear Sirs,

We hereby contact you with regard to the breach of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts that came to our attention which are detailed hereafter.

Despite previously discovered multiple material breaches of the Agreement by Licensee which lead to the agreement reached in the Second Amendment to the Master License Agreement ("Second Amendment") whereby it was agreed between the Parties that an Extraordinary Cure Period (Schedule K Section 7) was granted by Licensor to Licensee to cure any and all existing breaches of the Agreement and misconducts, known or unknown, incurred by February 19, 2022, in order for Licensor to waive liabilities for the breaches by Licensee.

Notwithstanding with the foregoing, Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

However, despite of all the efforts Licensor made during this time in order to help Licensee to rectify such breaches, as of this day of July 21, 2022, such material breaching of the Agreement remain uncured, mainly due to the omissive and passive attitude of Licensee, who until present day has not provided any document or clear statement which can clarify the aforementioned facts.

As per Section 13(b) (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days" shall be deemed to be a material breach of the agreement.

All that in consequence, Licensee's continued misconduct and misrepresentation of Licensor in the Territory has put Licensor in seriously legal risk and has severely damaged the goodwill and market value of Licensor. As a result, Licensor has lost its confidence in Licensee's good faith and willingness to cure any and all breaches of the Agreement and its true intention to perform and honor the Agreement in comply with all the requirements and obligations stipulated therein and applicable laws.

For the abovementioned reasons and pursuant to Schedule K Section 7 (iii) of the Second Amendment, 6(b), 7(f)(ii)(iii), 7(h), 13(b)(iv) of this Agreement, and as a result of Licensee's continuously misconduct and material breaches of the Agreement and that no effective actions have been taken to cure the breaches, therefore Licensor feels forced to take critical measures and hereby notifying you the following decisions:

1.  Temporary suspension of the performance of the Agreement until any and all breaches of the Agreement are cured.

2.  A third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period.

3.  During this period of suspension of the Agreement, in order not to cause an irreparable damage to the market, brand and protect the business interests of Licensee and Sublicensees, Licensor will temporarily take over the management of License in the Territory directly, including without limitation to the management of all sublicensees, coordination of sublicensees with marketplaces, receive royalty payables and future royalty payments to Licensee into an escrow account, issuing authorization letters to sublicensees directly, etc., as well as any other acts that are necessary in order to protect the brand and the business in the Territory.

We look forward to your full cooperation on the above-mentioned measures in order to resume the performance of the Agreement soon, or Licensor may be forced to excise the right stipulated in Section 13 (a)(iii) of the Agreement.

The foregoing is not intended as a complete statement of all the facts concerning these matters.

This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

Sincerely,

*For and on behalf of*
PAUL FRANK LIMITED

Stanley Yook-Yoong Wan
CEO *Authorized Signature(s)*

PAUL FRANK LIMITED

# EXHIBIT 8

**Jessica R. Corpuz**

**From:** 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>
**Sent:** Friday, September 16, 2022 7:57 AM
**To:** Stan Wan; Tony Chu; Hana Mu
**Cc:** 周良锋; bo.zheng; sam.zheng; Legal Department; Jessica R. Corpuz
**Subject:** [EXTERNAL] 回复：Notice of Termination

**Categories:** Saved to Worldox

Dear Sir/Madam,
敬启者：

Your Notice of Termination dated 24 August 2022, issued by Paul Frank Limited as licensor (the “Licensor”, “Your Company”) (the “Termination Notice”), forwarded by Futurity Brands Ag Ltd was received. We, Grand Union International Trading Limited, as licensee (the “Licensee”, “Us”, “We”), totally disagree to Your Company’s claim against us for material breaches of the Master License Agreement (the “Agreement”), which you claimed in the Termination Notice. Further, we do not agree to nor accept your unilateral termination of the Agreement. Our reasons are:
贵司日期为2022年8月24日，由Paul Frank Limited作为许可方签发、由Futurity Brands Ag Ltd转发的终止通知函（下称“《终止通知函》”）收悉。我司，宏联国际贸易有限公司，作为被许可方（下称“被许可方”“我们”），完全不同意贵司在《终止通知函》中有关我司实质性违反主许可协议（下称“《主许可协议》”）的违约指控，并且，我们不同意、也不接受贵司单方对《主许可协议》的终止和解除，理由如下：

1. We never forged Licensor's official stamps or any of Licensor’s signatures.
   我司从未伪造过许可方的公章或签名。
2. We never sold or distributed Licensed Product outside the Territory or Channels of Distribution.
   我司从未在许可区域或渠道以外销售许可商品。
3. We have no obligation to get audited by the Licensor.
   我司没有义务接受许可方审计。
4. We committed no breach of contract of the Agreement.
   我司对《主许可协议》没有违约行为。

As Your Company is fully aware, there is no legal nor contractual base for your unilateral termination of the Agreement, as there is no material breach committed by us, on the contrary, there were serious material breaches committed by Your Company instead (please refer to content hereinbelow), as a result, your unilateral termination is totally NOT agreeable nor acceptable. The Agreement remains and continue to be valid and effective, being binding both on Your Company and Us, which shall be respected and performed by both Your Company and us until 28 Feb. 2030, for which we have fully paid up all licensing fees for the complete term since 1 Jan. 2015 through 28 Feb. 2030, as the exclusive licensee for Paul Frank Intellectual Property, and have invested huge money, rich resources and various efforts for the licensing business of the Paul Frank Intellectual Property. If Your Company insists that we have committed any material breach of contract, please provide evidence and supporting materials within three(3) days since the date hereof.

如贵司充分所知，贵司单方终止《主许可协议》没有任何的法律或合同依据，因为我司不存在任何违反《主许可协议》的实质性违约行为，相反地，贵司存在着严重的实质性违约行为（具体请参阅下文内容）。因此，就贵司单方终止解除《主许可协议》的行为，我司不予同意、也不予接受。《主许可协议》依然并将继续有效，对贵我双方具有法律约束力，贵我双方应当尊重并且履行该《主许可协议》，直至2030年2月28日为止。并且，我司作为Paul Frank品牌下知识产权的独占被许可方为此已经全额支付了自2015年1月1日起至2030年2月28日期间全部许可费，并为Paul Frank品牌下知识产权授权许可业务投入了巨额资金、大量资源和各种精力。如贵司坚持指控我司存在实质性违约行为，请在本函签发之日起三（3）日内提供证据及相关材料。

We believe the above clarifies. We hereby request Your Company to continue to perform accord to the Agreement, otherwise, Your Company might expose itself in huge risk of material breaches of the Agreement, for which Your Company shall be fully liable and responsible for all losses, damages and negative impact caused to Us and all relevant third parties. To safeguard and protect ourselves, we, as well as such third parties, will have to take all necessary actions to get our rights and interests fully protected. In addition, as mentioned above, there are serious material breaches committed by Your Company, your designated compan(ies) and/or persons, which have caused various substantial losses, damages and adverse impact to us and our licensing partners, including but not limited to such as suffered or arising from your refusal to provide necessary supporting licensing documents such as the extended registered trademark certificates, verification of licensing documents or approval on the relevant applications, and your refusal to reply to the E-platforms' licensing inquiries, which as a result caused sale of the E-stores stopped, ceased, and the stores removed from the E-platforms, etc. So, we would strongly request Your Company to immediately take action, to stop, cease, and correct any and all of such breaches of contract under this Agreement.

我司相信上述内容足够清晰。我司在此要求贵司继续履行《主许可协议》。否则，贵司将直接导致贵司实质性严重违反《主许可协议》、并就此承担违约责任，并对我司及所有相关第三方因此所遭受损失、损害和负面影响承担赔偿责任。为保护我们自身权益，我司和该等第三方都将不得不采取所有必要措施，以便全面保护我们的权利和利益。此外，如上所述，贵司、贵司指定公司和/或个人已构成了严重的实质性违约行为，该等行为给我司和我司授权许可合作伙伴造成了各种重大损失、损害和不利影响，包括但不限于因贵司拒绝提供必要的授权许可文件支持如续展商标注册证、授权许可文件证明、因贵司拒绝批准我司相关申请及因贵司拒绝回复电商平台授权许可确认询问而导致线上销售被中止被停止，线上店铺被下架等后果。因此，我司严正要求贵司立即采取行动，立即停止并纠正所有该等实质性违约行为。

B.T.W., to the extent of our knowledge, the senior management of your affiliate in Shanghai was believed to have planned and gotten involved in the forgery Your Company claimed in the Termination Notice, if interested, please feel free to carry out a thorough investigation on it.

此外，就我们所知，贵司上海关联公司有高层管理人员参与了贵司在《终止通知函》中所指控的造假行为的计划和实施活动，如贵司对此感兴趣，可就此展开调查、予以彻查。

We hereby reserve all of our rights and interests entitled and enjoyed under the applicable laws and regulations, as well as under the Agreement.

我司在此保留我们根据相关法律法规以及依据《主许可协议》所享有的所有权利和权益。

Grand Union International Trading Limited

宏联国际贸易有限公司

Best regards,

黃素琴 / **Jennifer Huang**

上海市普陀区光复西路2899弄9号6楼 200062
NO.9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China
手机/Mob: +86 152-1439-5590

楼
楼

---

发件人：Hana Mu <hana@futuritybrands.com>
发送时间：2022年8月24日(星期三) 16:11
收件人：bo.zheng <bo.zheng@chinabrandsgroup.com.cn>
抄 送：周良锋 <david.zhou@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; 黃素琴 <jennifer.huang@chinabrandsgroup.com.cn>; Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Legal Department <legal@futuritybrands.com>; Jessica R. Corpuz <JCorpuz@weintraub.com>
主 题：Notice of Termination

Grand Union International Trading Limited,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement.

Considering the continuously non-cooperation and acting in bad faith by Licensee, Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement as of **August 24, 2022**.

Enclosed please our official **Notice of Termination** letter for details.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

# EXHIBIT 9

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**August 24, 2022**

Via Electronic Mail and EMS Express
Grand Union International Trading Limited
No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Notice of Termination**

Dear Sirs,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement, due to the facts stated below.

Since June 2021, Licensor has made continuous efforts in good faith to discuss and find solutions with Licensee to cure the breaches of the Master License Agreement by Licensee, in the spirit of continuing the contractual relationship between the Parties under the Agreement and preventing further damages to the Property and the goodwill thereof. Notwithstanding with the foregoing, Licensee has continued to repeatedly and materially breach the Master License Agreement and the Amendments thereto, including but not limited to the breaches identified by Licensor on April 19, 2022 by email, and the "Notice of Material Breaching and Further Steps" sent to you on July 21, 2022 ("the Material Breaching Notice"). Despite Licensor's significant efforts, Licensee not only has not made any effort to cure such breaches, but also refused to disclose information and collaborate with Licensor for this purpose, which we deem as acting in bad faith.

Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement, Pursuant to section 13 (a)(iii) and 13(b)(ii), 13(b)(iii), and 13(b)(iv) of this Agreement, Licensor, is hereby notifying you of the termination of the Agreement, due to the following material

breaches committed by Licensee:

a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.

b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.

c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.

d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

This document is regarded as an official Notice of Termination as per Section 13(a)(iii) of the Agreement. The Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor.

Further, as you are aware, Licensor has appointed a third-party auditor Grant Thornton International ("Grant Thornton") pursuant to Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Sections 6 and 7(iii) of the Second Amendment to Master Licensing Agreement. Licensee must immediately cooperate with Grant Thornton in good faith, including promptly responding to Grant Thornton's inquiries and request for documents and information. Pursuant to Schedule K, Section 6(ii), Licensee's books and records shall be put at Licensor's disposal "within a period not longer than five (5) business days from Licensor's written request." Licensee must immediately provide its books and records to Licensor. Licensee's failure to do so within five (5) business days will constitute a separate material breach of the Master Licensing Agreement.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action, or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

Sincerely,

For and on behalf of
PAUL FRANK LIMITED

Authorized Signature(s)

Stanley Yook-Yoong Wan
CEO
PAUL FRANK LIMITED

# EXHIBIT 10

**PAUL FRANK LIMITED**
Units 1331, 13/F, Berveley Commercial Centre, 87-105 Chatham Rd South, Tsim Sha Tsui, KL, Hong Kong

**September 23, 2022**

Via Electronic Mail and EMS Express
Grand Union International Trading Limited
No. 9, 2899 Guangfu West Rd.,
Shanghai 200062, P.R. China
Attn: Mr. Bo Zheng
Email: bo.zheng@chinabrandsgroup.com.cn
Cc: david.zhou@chinabrandsgroup.com.cn; sam.zheng@chinabrandsgroup.com.cn ; jennifer.huang@chinabrandsgroup.com.cn

Re: MASTER LICENSE AGREEMENT (the "**Agreement**"), by and between PAUL FRANK LIMITED ("**Licensor**") and Grand Union International Trading Limited ("**Licensee**").

Subject: **Termination of Master License Agreement**

Dear Sirs,

Reference is made to the Notice of Termination dated August 24, 2022 ("Notice of Termination"). The purpose of this letter is to confirm that the Master License Agreement is terminated, effective as of **September 23, 2022 ("Termination Effective Date")**.

Licensee has committed multiple Material Breaches of the Master License Agreement, as set forth in the Notice of Termination. Licensee has failed to completely cure such Material Breaches within the thirty (30) day period set forth in the Master License Agreement, Section 13(a)(iii). Therefore, Licensor has exercised its right pursuant to Section 13(a)(iii) to terminate the Master License Agreement.

Licensee's September 16, 2022, email simply provides further evidence of Licensee's refusal to cure the Material Breaches identified by Licensor. Licensee has not taken any steps to cure the Material Breaches, but rather denies (wrongly) that such Material Breaches exist. Licensee also complains that Licensor may not "unilaterally" terminate the Master License Agreement. That complaint is entirely baseless, as Section 13(a)(iii) gives Licensor the sole right to terminate the Master License Agreement. Licensor is not required to obtain Licensee's consent, nor to provide "evidence and supporting materials," as the email states. The Master License Agreement is terminated as of September 23, 2022.

Please be advised that:

1. As provided in the Master License Agreement at Sections 1, 8(f), and 21, upon termination for Licensee's Material Breach, all rights granted to Licensee under the Master License Agreement revert to Licensor and Licensee must refrain from any further use of the Property, the Licensed Products and Licensed Services. All sublicense agreements entered into by Licensee are also hereby terminated pursuant to Section 1(b)(ii) of the Master License Agreement. All licenses and authorization letters issued based on the Master License Agreement are revoked and hereby deemed invalid. Licensee shall return the original "Letter of Authorization" within 3 days from the receipt of this Notice.
2. Licensee must cease and desist immediately any and all activities related to the "Paul Frank" asset, including without limitation to the design, manufacture, sale (except sales of remaining inventories during "Sell-Off" period), or advertisement for sale of Licensed products and offers of Licensed Services, and any marketing activities related to it.
3. Pursuant to Section 17 of the Master License Agreement, Licensee must also submit by October 3, 2022 to Licensor a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Productions that Licensee has on hand and/or in process of manufacture as of the date of such statement" ("Statement of Inventory").
4. Although Licensee is not entitled to any Sell-Off Period as set forth in Section 20(b), because if Licensee is terminated by reason of Material Breach, "Licensee's disposal of any items of Licensed Products which Licensee has remaining in inventory shall be in strict accordance with such instructions as Licensor shall give to Licensee." However, consider the goodwill of bona fide sublicensees, Licensor hereby grants to Licensee a ninety (90) day "Sell-Off" period to dispose the remaining inventory, provided such remaining inventory are presented in the "Statement of Inventory" and verified by Licensor. Furthermore, Licensee must provide Licensor a final statement of the total number of items of Licensed Products distributed and sold by Licensee during the License Period and the Sell-Off Period per Section 20(c) of the Agreement.
5. The Termination of the Master License Agreement is not a relief of Licensee from the liabilities to the Material Breaches of the Agreement. Licensee must cure all the breaches of the Agreement, help to calculate, and indemnify Licensor for all the losses, damages, legal fees, and expenses therefrom.

Should Licensee fail to comply with the instructions set forth above, Licensor is entitled to seek "the remedies of injunction, specific performance or other equitable relief" against Licensee, pursuant to Section 21 of the Master License Agreement. Please be advised that Licensor intends to seek immediate injunctive relief in the event that Licensee violates the instructions set forth above. Furthermore, after the "Sell-Off" period, any product using "Paul Frank" Intellectual Property without Licensor's unique authentication label shall be considered as counterfeits. Licensor will take any and all anti-counterfeiting legal actions available against such activities. Please be advised that sales of counterfeits for over 50K RMB is considered a criminal offense in the Territory of China.

Please also be advised that the Confidentiality and Publicity obligations set forth in Sections 18 and 19 of the Master License Agreement continue to be in full force and effect. Licensee may not make any public announcement or issue any press release related to the termination of the Master License Agreement without Licensor's prior written consent. Licensor will contact all sublicensees and issue appropriate press releases, as Licensor deems necessary.

Licensee has also refused to cooperate with Licensor's appointed third-party auditor Grant Thornton International ("Grant Thorton"). Licensee stated in an email dated September 16, 2022 that it had "no obligation to get audited by the Licensor." This is false. Section 6(b) of the Master License Agreement states that "Licensee shall maintain and make available to Licensor, no more than once during any two year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements." *See* also Section 7(f)(ii) and 7(h). Further, Section 6(ii) of the Second Amendment to Master Licensing Agreement states that "Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request."

Licensor has made multiple written requests to Licensee to conduct an audit, including but not limited to the audit request contained in the Notice of Termination. More than five (5) business days has elapsed since Licensor's written requests and Licensee is therefore in breach of the Master License Agreement.

Please take notice that, if Licensee does not immediately cooperate with Grant Thorton regarding a full and complete audit, Licensor will be forced to initiate the dispute resolution procedures set forth in Section 28 of the Master License Agreement. Licensor also reserves the right set forth in Section 9 of the Second Amendment to Master License Agreement to seek injunctive relief for Licensee's failure to cooperate with the audit. Licensee must immediately confirm its cooperation with Grant Thorton, or Licensor will be forced to take legal action.

The foregoing is not intended as a complete statement of all the facts concerning these matters. This letter is not intended as a waiver or relinquishment of any of Licensor's rights, remedies, causes of action, or claims for relief, all of which are hereby expressly reserved. Capitalized terms used herein shall have the meaning ascribed to them in the Agreement.

For and on behalf of PAUL FRANK LIMITED

Sincerely,

Stanley Yook-Yoong Wan
CEO
PAUL FRANK LIMITED

Authorized Signature(s)

# EXHIBIT 11

**Jessica R. Corpuz**

| | |
|---|---|
| **From:** | 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn> |
| **Sent:** | Thursday, September 29, 2022 2:32 AM |
| **To:** | Hana Mu; Stan Wan; Tony Chu |
| **Cc:** | 周良锋; sam.zheng; Jessica R. Corpuz; Legal Department; bo.zheng |
| **Subject:** | [EXTERNAL] 回复：回复：Notice of Termination |

Dear Sir/Madam,

敬启者：

Your Termination of Master License Agreement dated 23 September 2022, issued by Paul Frank Limited as licensor ("Your Company") (the "23 September Termination Notice") was received. We, Grand Union International Trading Limited, as licensee ("We", "Us"), totally disagree to your claims against us for material breaches of the Master License Agreement (the "Agreement") and all content you stated in the 23 September Termination Notice which are NOT true. As a result, we totally disagree to your unilateral termination of the Agreement.

贵司由Paul Frank Limited作为许可方于2022年9月23日签发的《<主许可协议>终止通知函》（下称"《9月23日终止通知函》"）收悉。我司，宏联国际贸易有限公司，作为被许可方（下称"我们"），完全不同意贵司对我司实质性违反主许可协议（下称"《主许可协议》"）的违约指控以及贵司在《9月23日终止通知函》中所述的全部内容，因为该等内容都并非事实。因此我们完全不同意贵司对《主许可协议》的单方解除和终止。

As Your Company is aware, it is Your Company that committed multiple material breaches, not Us. There is no doubt that the Agreement remains and shall remain and continue to be valid and effective, being binding on Your Company and Us.

如贵司所知，实质性违反《主许可协议》的是贵司而非我司。毫无疑问《主许可协议》依然有效并将继续有效，对贵司和我司具有法律约束力。

Based on such, we request Your Company to continue to perform the Agreement, failing in which Your Company shall be fully liable and responsible for all losses, damages and negative impact caused, and shall hold and keep Us and all of our relevant third parties harmless from and indemnified against all losses, damages and negative impact caused. To safeguard and protect ourselves, we, as well as such third parties, will take all necessary actions to protect our rights and interests, in U.S., China and other places in the world.

有鉴于此，我司要求贵司继续履行《主许可协议》，否则，贵司应就我司及我司所有相关第三方所遭受损失、损害和负面影响承担完全责任，应当全额赔偿我司及我司该等所有相关第三方，以使我们免于遭受任何损失、损害和不利影响。为保护我们自身权益，我司和我司该等第三方将在美国、中国和全球其它地方采取所有必要措施全面保护我们的权利和利益。

We hereby reserve all of our rights and interests entitled and enjoyed under the applicable laws and regulations, as well as under the Agreement.

我司在此保留我们根据相关法律法规及依据《主许可协议》所享有的所有权利和权益。

Grand Union International Trading Limited

宏联国际贸易有限公司

Best regards,

黃素琴 / **Jennifer Huang**
授權管理部

上海市普陀区光复西路2899弄9号6楼 200062
NO.9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China
手机/Mob: +86 152-1439-5590

www.chinabrandsgroup.com.cn

楼
楼

---------------------------------------------------------------
发件人：Hana Mu <hana@futuritybrands.com>
发送时间：2022年9月23日(星期五) 16:30
收件人：bo.zheng <bo.zheng@chinabrandsgroup.com.cn>
抄 送：周良锋 <david.zhou@chinabrandsgroup.com.cn>; 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; Jessica R. Corpuz <JCorpuz@weintraub.com>; Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Legal Department <legal@futuritybrands.com>
主 题：Re: 回复：Notice of Termination

Grand Union International Trading Limited,

Licensee has committed multiple Material Breaches of the Master License Agreement, as set forth in the Notice of Termination dated August 24, 2022 ("Notice of Termination"). Licensee has failed to completely cure such Material Breaches within the thirty (30) day period set forth in the Master License Agreement, Section 13(a)(iii). Therefore, Licensor has exercised its right pursuant to Section 13(a)(iii) to terminate the Master License Agreement.

Enclosed please find our letter of **Termination of Master License Agreement**. The purpose of this letter is to confirm that the Master License Agreement is terminated, effective as of **September 23, 2022 ("Termination Effective Date")**, and to remind Licensee of certain post contractual obligations.

We are looking forward to your full collaboration for a smooth transaction.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

---

**From:** 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>
**Sent:** 16 September 2022 16:57
**To:** Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Hana Mu <hana@futuritybrands.com>
**Cc:** 周良锋 <david.zhou@chinabrandsgroup.com.cn>; bo.zheng <bo.zheng@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; Legal Department <legal@futuritybrands.com>; Jessica R. Corpuz <JCorpuz@weintraub.com>
**Subject:** 回复：Notice of Termination

Dear Sir/Madam,
敬启者：

Your Notice of Termination dated 24 August 2022, issued by Paul Frank Limited as licensor (the “Licensor”, “Your Company”) (the “Termination Notice”), forwarded by Futurity Brands Ag Ltd was received. We, Grand Union International Trading Limited, as licensee (the “Licensee”, “Us”, “We”), totally disagree to Your Company’s claim against us for material breaches of the Master License Agreement (the “Agreement”), which you claimed in the Termination Notice. Further, we do not agree to nor accept your unilateral termination of the Agreement. Our reasons are:
贵司日期为2022年8月24日，由Paul Frank Limited作为许可方签发、由Futurity Brands Ag Ltd转发的终止通知函（下称“《终止通知函》”）收悉。我司，宏联国际贸易有限公司，作为被许可方（下称“被许可方”“我们”），完全不同意贵司在《终止通知函》中有关我司实质性违反主许可协议（下称“《主许可协议》”）的违约指控，并且，我们不同意、也不接受贵司单方对《主许可协议》的终止和解除，理由如下：

1. We never forged Licensor's official stamps or any of Licensor’s signatures.
   我司从未伪造过许可方的公章或签名。
2. We never sold or distributed Licensed Product outside the Territory or Channels of Distribution.
   我司从未在许可区域或渠道以外销售许可商品。
3. We have no obligation to get audited by the Licensor.
   我司没有义务接受许可方审计。
4. We committed no breach of contract of the Agreement.
   我司对《主许可协议》没有违约行为。

As Your Company is fully aware, there is no legal nor contractual base for your unilateral termination of the Agreement, as there is no material breach committed by us, on the contrary, there were serious material breaches committed by Your Company instead (please refer to content hereinbelow), as a result, your unilateral termination is totally NOT agreeable nor acceptable. The Agreement remains and continue to be valid and effective, being binding both on Your Company and Us, which shall be respected and performed by both Your Company and us until 28 Feb. 2030, for which we have fully paid up all licensing fees for the complete term since 1 Jan. 2015 through 28 Feb. 2030, as the exclusive licensee for Paul Frank Intellectual Property, and

have invested huge money, rich resources and various efforts for the licensing business of the Paul Frank Intellectual Property. If Your Company insists that we have committed any material breach of contract, please provide evidence and supporting materials within three(3) days since the date hereof.

如贵司充分所知，贵司单方终止《主许可协议》没有任何的法律或合同依据，因为我司不存在任何违反《主许可协议》的实质性违约行为，相反地，贵司存在着严重的实质性违约行为（具体请参阅下文内容）。因此，就贵司单方终止解除《主许可协议》的行为，我司不予同意、也不予接受。《主许可协议》依然并将继续有效，对贵我双方具有法律约束力，贵我双方应当尊重并且履行该《主许可协议》，直至2030年2月28日为止。并且，我司作为Paul Frank品牌下知识产权的独占被许可方为此已经全额支付了自2015年1月1日起至2030年2月28日期间全部许可费，并为Paul Frank品牌下知识产权授权许可业务投入了巨额资金、大量资源和各种精力。如贵司坚持指控我司存在实质性违约行为，请在本函签发之日起三（3）日内提供证据及相关材料。

We believe the above clarifies. We hereby request Your Company to continue to perform accord to the Agreement, otherwise, Your Company might expose itself in huge risk of material breaches of the Agreement, for which Your Company shall be fully liable and responsible for all losses, damages and negative impact caused to Us and all relevant third parties. To safeguard and protect ourselves, we, as well as such third parties, will have to take all necessary actions to get our rights and interests fully protected. In addition, as mentioned above, there are serious material breaches committed by Your Company, your designated compan(ies) and/or persons, which have caused various substantial losses, damages and adverse impact to us and our licensing partners, including but not limited to such as suffered or arising from your refusal to provide necessary supporting licensing documents such as the extended registered trademark certificates, verification of licensing documents or approval on the relevant applications, and your refusal to reply to the E-platforms' licensing inquiries, which as a result caused sale of the E-stores stopped, ceased, and the stores removed from the E-platforms, etc. So, we would strongly request Your Company to immediately take action, to stop, cease, and correct any and all of such breaches of contract under this Agreement.

我司相信上述内容足够清晰。我司在此要求贵司继续履行《主许可协议》。否则，贵司将直接导致贵司实质性严重违反《主许可协议》、并就此承担违约责任，并对我司及所有相关第三方因此所遭受损失、损害和负面影响承担赔偿责任。为保护我们自身权益，我司和该等第三方都将不得不采取所有必要措施，以便全面保护我们的权利和利益。此外，如上所述，贵司、贵司指定公司和/或个人已构成了严重的实质性违约行为，该等行为给我司和我司授权许可合作伙伴造成了各种重大损失、损害和不利影响，包括但不限于因贵司拒绝提供必要的授权许可文件支持如续展商标注册证、授权许可文件证明、因贵司拒绝批准我司相关申请及因贵司拒绝回复电商平台授权许可确认询问而导致线上销售被中止被停止，线上店铺被下架等后果。因此，我司严正要求贵司立即采取行动，立即停止并纠正所有该等实质性违约行为。

B.T.W., to the extent of our knowledge, the senior management of your affiliate in Shanghai was believed to have planned and gotten involved in the forgery Your Company claimed in the Termination Notice, if interested, please feel free to carry out a thorough investigation on it.

此外，就我们所知，贵司上海关联公司有高层管理人员参与了贵司在《终止通知函》中所指控的造假行为的计划和实施活动，如贵司对此感兴趣，可就此展开调查、予以彻查。

We hereby reserve all of our rights and interests entitled and enjoyed under the applicable laws and regulations, as well as under the Agreement.

我司在此保留我们根据相关法律法规以及依据《主许可协议》所享有的所有权利和权益。

Grand Union International Trading Limited

宏联

国际贸易有限公司

Best regards,

黃素琴 / **Jennifer Huang**

上海市普陀区光复西路2899弄9号6楼 200062
NO.9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China
手机/Mob: +86 152-1439-5590

楼
楼

----------------------------------------------------------------
发件人：Hana Mu <hana@futuritybrands.com>
发送时间：2022年8月24日(星期三) 16:11
收件人：bo.zheng <bo.zheng@chinabrandsgroup.com.cn>
抄 送：周良锋 <david.zhou@chinabrandsgroup.com.cn>; sam.zheng <sam.zheng@chinabrandsgroup.com.cn>; 黄素琴 <jennifer.huang@chinabrandsgroup.com.cn>; Stan Wan <stan@futuritybrands.com>; Tony Chu <tony@futuritybrands.com>; Legal Department <legal@futuritybrands.com>; Jessica R. Corpuz <JCorpuz@weintraub.com>
主 题：Notice of Termination

Grand Union International Trading Limited,

We hereby contact you with regard to the numerous material breaches of the Master License Agreement by Grand Union International Trading Limited, as Licensee under this Agreement.

Considering the continuously non-cooperation and acting in bad faith by Licensee, Licensor is therefore forced to exercise the right of Termination stipulated in section 13(a) of this Agreement as of **August 24, 2022**.

Enclosed please our official **Notice of Termination** letter for details.

For and on behalf of
**PAUL FRANK LIMITED**

Regards,

**FUTURITY BRANDS AG LTD**
Hana Mu | DIRECTOR OF LEGAL AND CORPORATE AFFAIRS
T | +852 8174 5950
TOKYO | SINGAPORE | SYDNEY | SHANGHAI | HONG KONG | ZURICH

This message is intended only for the person(s) to which it is addressed and may contain privileged, confidential and/or insider information. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Any disclosure, copying, distribution, or the taking of any action concerning the contents of this message and any attachment(s) by anyone other than the named recipient(s) is strictly prohibited. Although the transmission and any attachments are

believed to be free from any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender or its subsidiaries and affiliates for any loss or damage arising in any way from its use.

# EXHIBIT 15

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

**Los Angeles, California**

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent.*

**JAMS REF. No. 1220073501**

---

# RESPONSE AND COUNTERCLAIMS

---

December 16, 2022

**K&L Gates LLP**

**DHH Washington DC Law Office, PC**

Counsel for Respondent Grand Union Trading Limited

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................1

II. RESPONDENT GRAND UNION ..........................................................................3

III. ARBITRATION AGREEMENT AND GOVERNING LAW .....................................4

IV. SUMMARY OF FACTUAL BACKGROUND .........................................................5

A. Background of the PAUL FRANK Brand and Its Ownership...........................5

1. The PAUL FRANK Brand...............................................................5

2. History of the Ownership of the PAUL FRANK Brand........................6

B. Summary of Grand Union's Involvement with the PAUL FRANK Brand.......7

1. Grand Union's Initial Involvement with the PAUL FRANK Brand..........................................................................................7

2. Grand Union's 15-Year PAUL FRANK Brand License in the MLA...........................................................................................7

C. Summary of the Terms and Amendments to the MLA....................................7

1. The MLA ..........................................................................................7

2. The First Amendment to the MLA ....................................................10

3. The Assignment of the MLA to PF Hong Kong.................................10

4. The Second Amendment to the MLA.................................................10

5. The Third Amendment to the MLA...................................................11

D. Prior to the Assignment to PF Hong Kong, Saban/Paul Frank Industries Cooperated with Grand Union's Licensing Strategy and Had No Notable Complaints with Grand Union's Performance under the MLA.......................12

E. After the Assignment of the MLA, Futurity / PF Hong Kong Actively Pursued a Bad Faith Scheme to Extort Grand Union, and Purported to Wrongfully Terminate the MLA.....................................................................14

1. PF Hong Kong's Refusal to Provide Necessary Support to Grand Union..........................................................................................14

2. In 2021, PF Hong Kong Initiated a Bad Faith Campaign of Harassment and Began to Make Regular, Vague and Unfounded Allegations of Breaches of the MLA and Other Improper Conduct, Threatened Termination of the MLA, and Tortiously Interfered with Grand Union's Sublicensees ....................................16

3. PF Hong Kong Tried to Extort Further Payments from Grand Union in 2022, and Eventually Purported to Terminate the MLA When Grand Union Refused to Again Capitulate to PF Hong Kong Demands for Additional Payments for the License granted in the MLA ...........................................................................20

4. PF Hong Kong Tortiously Interfered and Continues to Interfere with the Grand Union's Business Relations with the Sublicensees.....22

5. PF Hong Kong is Not Entitled to the Audit It Seeks ..........................22

V. ALL OF PF HONG KONG'S CLAIMS ARE BASELESS AND SHOULD BE DENIED ........................................................................................................23

A. PF Hong Kong's Breach of Contract Claim is Baseless ................................23

1. Grand Union Did Not Forge Any Documents ...................................24

2. Grand Union Did Not Engage in Any Prohibited Sales Out of the Territory or Channels of Distribution ...............................................24

3. Grand Union Addressed Alleged Breaches or Issues Raised by PF Hong Kong .......................................................................................25

4. PF Hong Kong Rejected Grand Union's Offer to Participate in an Audit Pursuant to the MLA .........................................................25

5. Grand Union has Properly Managed Sublicenses...............................26

6. Grand Union Provided Quarterly Statements in 2021, and PF Hong Kong Only Raised the Issue as to 2022 When It Was In the Process of Trying to Terminate the MLA ..........................................27

7. Grand Union Has Not Infringed the Intellectual Property Rights or Failed to Obtain Proper Approval ................................................27

8. Grand Union Has Not Improperly Registered PAUL FRANK Domain Names.......................................................................................27

9. Grand Union did not breach Section 9(c) of the MLA in relation.......28

10. Grand Union Set Prices of Licensed Products at Competitive Prices and Did Not Engage in Dumping or Fail to Provide Related Annual Sales Reports .....29

11. Grand Union Has Paid to PF Hong Kong all Royalties or Other Payment Due and Payable .....29

12. PF Hong Kong's Purported Termination Is Invalid and Ineffective, and Therefore There are No Post-Termination Obligations Grand Union Must Comply With .....29

B. PF Hong Kong's Claim for Breach off the Implied Covenant of Good Faith and Fair Dealing is Nonsensical and Baseless .....31

C. Grand Union Cannot Have Committed Trademark Infringement under the Violations of Lanham Act .....31

D. Quantum Meruit and/or Unjust Enrichment .....32

VI. AFFIRMATIVE DEFENSES .....32

VII. NON-ADMISSION AND RESERVATION OF RIGHTS .....33

VIII. GRAND UNION'S COUNTERCLAIMS AGAINST PAUL FRANK .....33

A. Breach of Contract .....33

B. Breach of the Duty of Good Faith and Fair Dealing .....34

C. Tortious Interference .....34

D. Fraud .....35

E. Unjust Enrichment .....36

IX. REQUESTED RELIEF .....36

1. In accordance with Rule 9 of JAMS' Comprehensive Arbitration Rules & Procedures (the "**Rules**"),[1] and the arbitration agreement set out in a certain Master License Agreement dated January 1, 2015, as amended (the "**MLA**"),[2] originally entered into between Respondent Grand Union International Trading Limited ("**Respondent**" or "**Grand Union**") and Paul Frank Industries, LLC ("**Paul Frank Industries**"), Grand Union hereby submits this Response and Counterclaims in his arbitration, in response to the Demand for Arbitration – Statement of Claims dated November 22, 2022 ("**Demand**") submitted by Claimant Paul Frank Limited ("**Claimant**" or "**PF Hong Kong**"), the assignee of Paul Frank Industries.[3]

2. This is a preliminary statement. The Respondent will state its case in full in accordance with the Rules, as applicable, and as may otherwise be directed by the Tribunal.

## I. INTRODUCTION

3. In its Demand, PF Hong Kong claims that despite its "exceptional effort to resolve the dispute, Grand Union's egregious and deliberate conduct forced Paul Frank to terminate the [MLA] and seek damages for Grand Union's violations of the [MLA]."[4] This narrative is so far from the truth that it borders on gaslighting.

---

1 On November 28, 2022, Claimant and Respondent, through their counsel, agreed that the Respondent may submit its responsive pleading by December 16, 2022.

2 The MLA is annexed to the Demand as **Exhibit 1**. The MLA was amended three times: First Amendment to Master License Agreement dated 27 April 2018 ("**First Amendment**"), annexed to the Demand as **Exhibit 2**; Second Amendment to Master License Agreement dated 19 August 2021 ("**Second Amendment**"), annexed to the Demand as **Exhibit 3**; Third Amendment to Master License Agreement dated 10 February 2022 ("**Third Amendment**"), annexed to the Demand as **Exhibit 4**. Unless otherwise specified, this Response adopts the definitions in the MLA in this Response and Counterclaims submission.

3 Grand Union is not in possession of the assignment agreement between Paul Frank Industries and PF Hong Kong, and other relevant documentation, and reserves the right to challenge the standing of PF Hong Kong and/or jurisdiction in this arbitration after discovery.

4 Demand, ¶ 1.

4.    In fact, for around the past two years, PF Hong Kong has perpetrated a scheme to extort further payments from Grand Union and wrongfully seek to terminate Grand Union's license under the MLA.

5.    In 2015, Grand Union made a lump sum payment of $65 million in order to obtain a 15-year license under the MLA.  Around halfway through the license period (around January 2021), PF Hong Kong stopped performing its duties under the MLA, fabricated a tellingly extensive list of breaches by Grand Union, and shortly thereafter threatened to terminate the paid-in-full license over seven years prior to expiration.  PF Hong Kong embarked on a transparent and sustained campaign to bully Grand Union into paying PF Hong Kong additional amounts and/or cutting Grand Union out altogether, even though Grand Union has fully performed.

6.    PF Hong Kong's motive is equally transparent.  PF Hong Kong commenced this scheme directly after its parent company, Futurity, allegedly purchased the PAUL FRANK Brand for an undisclosed amount in around December 2020.  The CEO and Chairman of Futurity, Stan Wan ("**Mr. Wan**"), had worked Paul Frank Industries and had been the main contact of Grand Union since 2017.  Mr. Wan knew that the licensing rights for China had been purchased for a lump sum in 2015 by Grand Union (with no continuing royalties) and that the license would not expire until 2030.  It is plain to see, then, that the PF Hong Kong's purpose was to create new revenue from the license by demanding additional license payments despite the fact that Grand Union has already paid the license in full, or remove Grand Union from the picture altogether.

7.    The contemporaneous record shows that PF Hong Kong's own nonperformance significantly disrupted Grand Union's licensing efforts, and interfered with Grand Union's rights under the MLA.  Blaming the victim, PF Hong Kong then began creating a long list of purported breaches of the MLA out of thin air.  It repeatedly threatened to terminate the licensing agreement without justification, which would have had a devastating impact on Grand Union given the substantial investment it has made in the PAUL FRANK Brand.  PF Hong Kong succeeded at first, and forced Grand Union to pay PF Hong Kong an additional $8.5 million in 2021 under the pretense of licensing

other rights. PF Hong Kong returned in 2022 for another shakedown payment, but Grand Union refused. Accordingly, PF Hong Kong made good on its threats and purported to terminate the MLA, though such purported termination is invalid and ineffective because Grand Union has not breached the MLA, let alone committed a "Material Breach."

8. Therefore, Grand Union *inter alia* requests that the Tribunal declare PF Hong Kong's purported termination is invalid and ineffective, and award it damages in this proceeding due to PF Hong Kong's bad faith scheme and other unlawful conduct.

## II. RESPONDENT GRAND UNION

9. Grand Union is a company incorporated in and existing under the laws of Hong Kong.

10. The contact details of Grand Union are as follows:

Name: Grand Union International Trading Limited
Attn. Bo Zheng; Jennifer Huang

Address: No. 9, 2899 Guangfu West Road
Shanghai 200062, P.R. China
Email: bo.zheng@chinabrandsgroup.com.cn
jennifer.huang@chinabrandsgroup.com.cn

11. Grand Union is part of the China Brands Group ("**CBG**"). Since around 2009, CBG has engaged in the business of developing and managing certain brands and related intellectual property rights in China, including Pancoat, Simpson, Tokidoki, Pucca.

12. In this arbitration, Grand Union is represented by K&L Gates LLP and DHH Washington DC Law Office whose details are set out below.

Name: K&L Gates LLP

Address: Matthew Weldon
Thomas Warns
Cindy Ha
599 Lexington Avenue
New York, NY 10022
Tel: +1 (212) 536-4042
Email: matthew.weldon@klgates.com

thomas.warns@klgates.com
cindy.ha@klgates.com

Name: DHH Washington DC Law Office, PC

Address: Liang Mei
1300 Pennsylvania Avenue, Suite 700
Washington, DC 20004
Email: meiliang@deheng.com

13. All correspondence pertaining to this arbitration should be sent to K&L Gates LLP and DHH Washington DC Law Office at the above email addresses.

## III. ARBITRATION AGREEMENT AND GOVERNING LAW

14. The parties' arbitration agreement, and agreement as to governing law, as amended, is set out in Sections 2 and 3 of the First Amendment to the MLA, which provide as follows:

> 2. Section 28 - Dispute Resolution. Section 28 of the Agreement [MLA] is deleted in its entirety and replaced with the following:
>
> > If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for meditation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (3) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope of applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles Country, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in the State.

> The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at http://jamsadr.com/rules-comprehensive-arbitration/). Judgement on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

3. Section 30 - Governing Law. Section 30 of the Agreement is deleted in its entirety and replaced with the following:

> This Agreement shall be governed by and construed in accordance with the law of the State of California without giving effect to the provisions thereof relating to conflicts of law.[5]

15. Thus, this dispute is subject to JAMS arbitration in Los Angeles, and the MLA is governed by California law.

## IV. SUMMARY OF FACTUAL BACKGROUND

### A. Background of the PAUL FRANK Brand and Its Ownership

#### 1. The PAUL FRANK Brand

16. The PAUL FRANK Brand is a pop culture and character lifestyle brand. It was created by the Paul Frank Sunich in 1995.

17. The PAUL FRANK Brand consists of 150 cartoon characters, the most famous of which is Julius the Monkey, depicted below:

5 Demand, Ex. 2.

### 2.    History of the Ownership of the PAUL FRANK Brand

18.    The PAUL FRANK Brand was originally owned by Paul Frank Industries, Inc., founded in 1997 in California.  Paul Frank Industries, Inc. was owned by Paul Frank Sunich and two partners, Ryan Heuser and John Oswald.

19.    In 2005, Paul Frank Sunich was pushed out of Paul Frank Industries, Inc. by his partners. In a related lawsuit, a U.S. District Judge determined that Paul Frank Sunich could not continue to use his own name to sell products.  This placed control of the PAUL FRANK Brand exclusively with Paul Frank Industries, Inc.

20.    In 2010, Saban Brands Entertainment Group ("**Saban**"), the owner of the Power Rangers franchise, acquired the PAUL FRANK Brand for around US$ 50 million.  Accordingly, Paul Frank Industries Inc. was merged into Paul Frank Industries, LLC ("**Paul Frank Industries**"), a Delaware limited liability company.  Paul Frank Industries thus took over the ownership of the PAUL FRANK Brand.

21.    At the end of 2020, Futurity Brands Switzerland AG ("**Futurity**") notified the Respondent via email that Futurity had purchased the intellectual property rights to the PAUL FRANK Brand and its characters from Paul Frank Industries.  Futurity is the ultimate owner of the Claimant in this arbitration, PF Hong Kong.  However, many trademarks associated with the PAUL FRANK Brand are apparently still owed by Paul Frank Industries.  Respondent was never shown this purchase agreement, or any assignment agreement to PF Hong Kong related to the MLA.  It is not clear what Futurity purchased, and what rights it has in the PAUL FRANK Brand.  It is also not clear if PF Hong Kong has standing to bring the claims alleged in this arbitration.

22.    The CEO and Chairman of Futurity, Mr. Wan, previously worked at Paul Frank Industries, and was in fact the main point of contact between Paul Frank Industries and Gran Union between 2017 and 2020, until Futurity took over the PAUL FRANK Brand from Paul Frank Industries.

### B. Summary of Grand Union's Involvement with the PAUL FRANK Brand

#### 1. Grand Union's Initial Involvement with the PAUL FRANK Brand

23. Grand Union has been involved in managing the PAUL FRANK Brand in China since around 2009. At that time, CBG obtained a license to exploit and manage the PAUL FRANK Brand in China, including the design, manufacturing, distribution, retail, and retail promotion of apparel for adults and children. CBG paid royalties to Paul Frank Industries under such licensing arrangement.

24. Under this initial arrangement, the license was not exclusive, and there were other licensees of the PAUL FRANK Brand in China.

#### 2. Grand Union Enters into the MLA and Receives an Exclusive 15-Year License for a Onetime Upfront Payment of $65 Million

25. After around five years of working with the CBG group, Saban recognized and valued its expertise in managing brands in especially the Chinese market. Therefore, on January 1, 2015, Saban, through Paul Frank Industries, granted Grand Union a 15-year license to exploit the PAUL FRANK Brand, as detailed in the MLA, in Mainland China, Hong Kong, and Macau, for a onetime, upfront licensing fee of US$ 65 million.

26. Demonstrating the great value of the MLA, its signing ceremony to place at the Shangri-La hotel in Shanghai, and it was celebrated as one of the most significant brand licensing relationships between China and the United States.

27. Grand Union's performance under the MLA has been exemplary, and Grand Union's development and management have contributed immense value to the PAUL FRANK Brand.

### C. Summary of the Terms the MLA and Its Amendments

#### 1. The MLA

28. The Effective Date of the MLA is January 1, 2015.

29. Pursuant to Section 1(a) of the MLA, Grand Union received:

> an exclusive, sub-licensable, and non-transferable license under the Property and modifications to the Core IP to (i) design, develop, manufacture, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer Licensed Products in the Territory and the Channels of Distribution, and (ii) provide Licensed Services in the Territory and during the License Period.[6]

30. The "Property" under the MLA includes the Intellectual Property listed in Exhibit 1 to the MLA. It also includes the Core IP (defined as the trademarks "Paul Frank," or "Julius design" used individually or in combination, and/or the copyrights in the Julius design), including all related trademarks, designs, copyrights and other intellectual property as may be designated in writing by the Licensor under the MLA.

31. As noted above, Schedule B of the MLA establishes the Territory as Mainland China, Hong Kong, and Macau.

32. The License Period, or term, as described in Schedule C, is 15 years – i.e., the license expires on February 28, 2030.

33. As consideration for the license, in accordance with Schedule D of the MLA, Grand Union paid a one-time, upfront fee of US$ 65 million. Grand Union was not obligated to make any additional payments under the MLA.

34. Naturally, given the large upfront license fee, the MLA provided Licensor with very limited rights of termination under its Section 13:

> (a) Termination by Licensor. If (i) any bankruptcy, insolvency, liquidation, or dissolution, domestic or foreign, is instituted by or against Licensee and is not dismissed within sixty (60) days after the filing date thereof, or (ii) Licensee becomes insolvent or suspends the transaction of all or a substantial portion of its usual business (except in the case that the suspension of business results from a Force Majeure, which shall be governed by Section 23 of this Agreement); or (iii) Licensee commits a Material Breach (as defined below) of this Agreement, Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee (except Licensor shall have the right to immediately terminate this Agreement for breach of Section 13(b)(i) below), and such notice of

[6] Demand, Ex. 1.

> termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period.
>
> (b) The following are deemed to be a Material Breach under this Agreement: (i) the Non-Refundable Extension Fee is not paid by March 20, 2015, or the remainder of the License Fee is not paid by May 31, 2015; or (ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or (iii) Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than 120 days; or (iv) Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persist for more than 120 days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv)).

35. The MLA further states in section 13(d) that if a breach of the MLA by the Licensee is not a "Material Breach," as defined in the MLA, a notice shall be provided and if it remains uncured for 30 days, a fine of $20,000 is due:

> (d) Breach by Licensee. In the event that Licensee commits any breach of this Agreement this [sic] is not a Material Breach, Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of the breach, then such breach shall be an **Uncured Breach**. Licensee shall pay a fine of $20,000 for each Uncured Breach.

36. Therefore, Licensor may terminate the MLA if and only if there exists an uncured Material Breach, as defined by the MLA, and all other requirements have been met. In the case of any other breach that is uncured for the requisite time period, a payment of $20,000 is due.

### 2. The First Amendment to the MLA

37. The First Amendment was entered into as of April 27, 2018.[7]

38. The First Amendment removes Section 9(h) from the MLA, which was a right of first negotiation. The removal of Section 9(h) does not appear material to this dispute.

39. The First Amendment also change the dispute resolution clause to provide for JAMS arbitration (changed from HKIAC arbitration), and California governing law (which was changed from Hong Kong law).

### 3. The Assignment of the MLA to PF Hong Kong

40. Upon the apparent deal between Saban and Futurity, on around December 8, 2020, Grand Union was notified that the MLA was assigned to PF Hong Kong by Futurity.

41. Grand Union does not have a copy of the agreement relating to the purchase of the PAUL FRANK Brand by Futurity, or any assignment agreement between Paul Frank Industries and PF Hong Kong.

### 4. The Second Amendment to the MLA

42. The Second Amendment was entered into as of August 19, 2021.[8]

43. The Second Amendment was foisted upon Grand Union as part of PF Hong Kong's scheme to extort additional payments from Grand Union. As described in more detail below, PF Hong Kong demanded that the parties enter into the Second Amendment to the MLA in exchange for not terminating the MLA, after fabricating supposed breaches of the MLA by Grand Union. Grand Union refused to concede that it had breached the MLA in any way, but PF Hong Kong insisted that it would terminate the MLA if it was not given an additional payment. Ultimately, in order to move forward under the MLA, Grand Union capitulated to PF Hong Kong's demand for an additional payment of US$

---

[7] Demand, Ex. 2.

[8] Demand, Ex. 3.

8.5 million. In order to create the appearance of legitimacy, PF Hong Kong included a license the A.NI.MA Property, which was a token inclusion that was not worth $8.5 million.

44. Grand Union also agreed to pay a royalty of 20% of Licensee's net invoiced billings on the amount exceeding US$ 550,000 per year relating to the A.NI.MA Property.

45. Schedule K also provides that Grand Union must pay a US$ 200,000 Brand Management Fee to PF Hong Kong.

46. Schedule K also provides the Grand Union must pay a Participation Fee of 20% of all of Licensee's net invoiced billings in relation to the categories of Pets, Beauty and Infant products.

47. Schedule K also permits PF Hong Kong to enter into certain brand collaborations with third parties, and in connection with same PF Hong Kong is required to pay to Grand Union 30% of the net invoiced billings of Licensor's royalty income from such brand collaborations.

48. Schedule K also provides for an "extraordinary cure period" of six months so that Licensee "may undertake whatsoever actions are necessary in order to cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor."

49. Finally, Schedule K expands the definition of "Material Breach" to cover circumstances where Licensee, or parties controlled directly or indirectly by Licensee "attack the title to or any rights of Licenser in and to the Property or attack the validity of the Agreement."

**5. The Third Amendment to the MLA**

50. On or around February 10, 2022, the parties entered into a Third Amendment to the MLA. The Third Amendment is not relevant to this dispute.[9]

[9] Demand, Ex. 4.

### D. Prior to the Assignment to PF Hong Kong, Saban/Paul Frank Industries Cooperated with Grand Union

51. One of the key aspects of the MLA is that it consolidated all rights and authority to grant sublicenses in the Territory to Grand Union. Therefore, after entering into the MLA, Grand Union granted a sublicense to its affiliated company, Shanghai Hong Fang Culture Co. Ltd., d/b/a China Brands Group ("**Hong Fang**"). Hong Fang in turn granted sublicenses to various third parties (the "**Sublicensees**") which sell different categories of Licensed Products and/or provide Licensed Services in the Territory.

52. Since 2015, Grand Union has expended significant resources to develop and manage the PAUL FRANK Brand in the Territory. Grand Union's investment has significantly increased the value of the Brand, and Paul Frank Industries adequately performed its contractual obligations under the MLA and supported Grand Union's management of the Brand and the Sublicensees.

53. The Licensor is obligated under Section 6 of Schedule J (of the MLA) to provide certain necessary documents to Grand Union:

> Upon Licensee's request, Licensor shall, at Licensee's cost, cooperate with Licensee in obtaining any and all governmental approvals, consents, licenses, permits, certificates, registrations and the like as may be required in respect of the performance of and effecting the purpose of this Agreement, including but not limited to recording this Agreement or the licenses herein granted with applicable governmental authorities.[10]

54. This provision, obligating Licensor to provide letters of authorization to Grant Union, is important for two particular reasons. First, Grand Union needed the proper letters in order to take anti-counterfeiting actions, including initiating legal actions against unauthorized dealers and filing applications to invalidate registrations by trademark squatters. Second, Grand Union needed the proper letters in order to provide its Sublicensees with proof of authorization, which was required for the Sublicensees to sell Licensed Products and/or provide Licensed Services in the Territory. In particular, given

[10] Demand, Ex. 1.

the development of eCommerce in recent years, sales on online shopping platforms in China ("**Platforms**", such as www.jd.com, www.tmall.com) became an important source of profit, and these Platforms require proof of authorization in order for Sublicensees to operate and sell products on the Platforms.

55.    Prior to the involvement of PF Hong Kong, Saban/Paul Frank Industries worked with Grand Union and CBG to provide the necessary documentation. This included: (i) notarized letters of authorization ("**LOA**(s)") evidencing Grand Union's authority as the exclusive licensee; and (ii) notarized powers of attorney ("**POA**(s)") authorizing Grand Union to act on behalf of the owner of the intellectual property in legal proceedings. Further, Saban/Paul Frank Industries also regularly applied for and obtained the relevant trademark certificates for new registrations (the "**Trademark Certificate**s") that were also needed in connection with the above.  These were also provided to Grand Union.

56.    These LOAs, POAs, and Trademarks were necessary in order for Grand Union to perform its own obligations under the MLA.  Prior to the assignment, Saban/Paul Frank Industries performed under the MLA in this respect, and Grand Union also performed its obligations.  In fact, Grand Union performed so well it was awarded more than 20 Best Licensee awards from various institutions between 2016 and 2019.

57.    Grand Union made all contractually required payments under the MLA, as amended, including those required under the Second Amendment, even though the Property licensed under the Second Amendment was not worth US$ 8.5 million.  All told, since 2015, Grand Union has paid to the PF Hong Kong and to Paul Frank nearly US$ 80 million.

58.    Grand Union entered into the MLA, and made significant investments in developing and marketing the PAUL FRANK Brand with the expectation that it would enjoy the benefits of the license for the entire 15-year License Period, to recoup those substantial investments.  Grand Union expects its investments to pay high dividends during the remainder of the License Period.

**E.    After the Assignment of the MLA, Futurity / PF Hong Kong Actively Pursued a Bad Faith Scheme to Extort Grand Union, and Purported to Wrongfully Terminate the MLA**

59.    Around December 10, 2020, Grand Union was notified that the MLA had been assigned to PF Hong Kong.

60.    Soon after Grand Union learned of this, it began to engage with PF Hong Kong on routine aspects of the MLA that required the Licensor's cooperation, including the LOAs and POAs mentioned above.  Not only did PF Hong Kong refuse to provide the necessary authorizations that Grand Union's Sublicensees needed (and that it was obligated to provide), but it also actively sabotaged Grand Union's rights under the MLA.  In fact, almost immediately after the assignment, PF Hong Kong undertook a sustained and relentless campaign of harassment directed toward Grand Union, falsely accusing Grand Union of Material Breaches of the MLA, and threatening to terminate the MLA, until Grand Union made what amounted to ransom payments to PF Hong Kong.

61.    As noted above, Grand Union did pay PF Hong Kong an additional US$ 8.5million in connection with the Second Amendment.  However, PF Hong Kong tried to pull the same stunt again one year later, and demanded additional payments from Grand Union for no consideration.  This time, Grand Union firmly stated that it was not going to re-negotiate the deal, and declined to pay PF Hong Kong's ransom.  As a result, in 2022, PF Hong Kong purported to terminate the MLA when it had no right to do so.  Since then, PF Hong Kong has been interfering with Grand Union's rights under the MLA, and intentionally and maliciously damaging Grand Union's relationships with the Sublicensees and its business.

**1.    PF Hong Kong Refused to Provide Necessary Documentation to Grand Union**

62.    In connection with the sale of the PAUL FRANK Brand to Futurity, intellectual property rights needed to be transferred from Paul Frank Industries to Futurity/PF Hong Kong. Accordingly, the change in ownership must be registered with the China National Intellectual Property Administration.

63.  As a result of these changes, the Sublicensees needed proof of authorization from PF Hong Kong in order to continue selling PAUL FRANK Branded products on the Platforms.  The Platforms required the authorizations to be signed and notarized by PF Hong Kong as the owner of the Trademarks.  Without these properly prepared authorizations, the Sublicensees are unable to do business on the Platforms.

64.  Accordingly, beginning in early 2021, Grand Union requested that PF Hong Kong provide LOAs to it so its Sublicensees could market PAUL FRANK Branded goods on the Platforms.  PF Hong Kong delayed, obfuscated, and eventually flat-out refused to provide the authorizations to Grand Union that the Sublicensees needed.

65.  In particular, PF Hong Kong argued about the wording of the LOAs, and sought to narrow the scope of the authorization.  After considerable delay, PF Hong Kong signed a revised version of the LOA in March 2021 but refused to notarize it.  At first, their excuses for the lack of notarization focused on difficulties relating to COVID, but it became clear that these excuses were pretextual.  PF Hong Kong had no problem notarizing other authorizations for other parties when they were needed to pursue legal actions in defense of the PAUL FRANK Brand in China (for example, PF Hong Kong's legal counsel in China).  Quite astonishingly, PF Hong Kong insisted that a LOA that was not notarized would suffice when it became apparent that it was in fact possible to have the LOA notarized, despite COVID restrictions.

66.  In May 2021, PF Hong Kong pursued its scheme with increased vigor.  At around that time, the change in ownership of the PAUL FRANK Brand was registered with the Chinese authorities.  Therefore, businesses in China could see that Paul Frank Industries was no longer the owner of relevant intellectual property.  A notarized authorization from the new owners of the intellectual property, PF Hong Kong, was urgently needed so that the Sublicensees could continue selling goods on the Platforms.  However, PF Hong Kong refused to provide such notarized authorization despite persistent and multiple requests.  PF Hong Kong fundamentally argued that notarized authorizations from PF Hong Kong were not needed to market Licensed Products, which was not correct and failed to address the issue.

67. This refusal to provide the notarized authorizations violated PF Hong Kong's duty under Section 2(ii)(d) the MLA, and Section 6 of Schedule J (Second Amendment), to "facilitate necessary documentation[] required for the operation of Licensee's business within the scope of the Agreement." It also directly impacted the businesses of the Sublicensees, who could only properly continue their business with a notarized authorization.

68. Further, due to the transfer of the PAUL FRANK Brand to PF Hong Kong, Grand Union requested that PF Hong Kong, as the registered owner of the intellectual property rights, issue it a notarized POA so that it could continue certain anti-counterfeiting actions and commence new infringement actions to manage the market. However, PF Hong Kong refused to comply with Grand Union's requests.

69. All of the above caused significant difficulties for Grand Union and its Sublicensees, and damaged Grand Union's business and its relationships with the Sublicensees.

**2. PF Hong Kong Initiated a Bad Faith Campaign of Harassment in 2021, and Began to Make Regular, Vague and Unfounded Allegations of Breaches of the MLA Against Grand Union, Threatened Termination of the MLA, and Tortiously Interfered with Grand Union's Sublicensees**

70. In addition to its failure to provide necessary documentation and support in the months after the assignment, PF Hong Kong also began making unreasonable, unprecedented complaints against Grand Union. Tellingly, PF Hong Kong began threating to terminate the MLA almost immediately.

71. During 2021, at the same time it was no providing Grand Union with the documentation needed to police the PAUL FRANK Brand (for example, the certifications), PF Hong Kong apparently began to conduct its own investigation relating to licensing activities in the Territory. PF Hong Kong began to research various sellers on the Platforms, and in beginning in June 2021, emailed Grand Union to inquire whether certain sellers were associated with Grand Union or its Sublicensees. PF Hong Kong requested

confirmations relating to at least ten sellers at around that time.  PF Hong Kong began to also reach out to the Sublicensees directly, and side-line Grand Union.

72.    PF Hong Kong also began interacting directly with the Platforms without coordinating with Grand Union, and began to conduct its own policing activities, all the while refusing to give Grand Union a general POA, which it needed in order to address infringers on various Platforms in a seamless and effective manner.

73.    Then, out of the blue, on June 21, 2021, PF Hong Kong issued a Notice of Termination to Grand Union, accusing Grand Union of "attacking the title to or rights of Paul Frank in and to the Property," in violation of Section 9(b) of the MLA.  In particular, PF Hong Kong claimed that Grand Union had incorporated companies in China which used certain PAUL FRANK trademarks in the name of the companies.  PF Hong Kong claimed that such conduct adversely and materially affected the good will and market value associated with the Property and that this had persisted for more than 120 days.

74.    This was bewildering on multiple levels.  PF Hong Kong did not give any warning to Grand Union, apparently found certain trademarks in the legal name of two entities, and accordingly issued a termination notice on Grand Union. PF Hong Kong was searching desperately for a reason to terminate the MLA, or a basis to threaten Grand Union with termination.  In other words, PF Hong Kong was transparently trying to create a Material Breach under Section 13(b)(iii) of the MLA out of whole cloth, where Grand Union did not even have proper notice of an issue.  In any event, within days of learning of these issues, Grand Union had resolved them issue.

75.    Having been unable to create a breach out of those two issues, let alone a Material Breach under the MLA, PF Hong Kong pivoted, and started to heap complaints on Grand Union. For example, later in July 2021, PF Hong Kong made various complaints, and demanded an astonishing amount of US$ 5,585,000 in damages from Grand Union, as well as an additional "Brand Management Fee" of US$50,000 for PF Hong Kong.  Thus, PF Hong Kong revealed it motive quite quickly.  It was using its complaints and various allegations as a way of pressuring Grand Union with the hope of creating further commercial value

out of the license granted to Grand Union, even though Grand Union has already paid in full for the entire License Period.

76. In order to increase pressure on Grand Union, on July 21, 2021, PF Hong Kong stated that there were other material breaches of the MLA that had not "been completely cured," although PF Hong Kong's correspondence did not make clear what alleged breaches PF Hong Kong was referring. PF Hong Kong reiterated its claim for so-called "indemnification" for costs or other damages relating to sending the Notice of Termination to Grand Union, and stated that it was extending the "cure period" to July 30, 2021, even though it was unclear what needed to be cured.

77. Ironically, at that time Grand Union was trying to get certain required Trademark Certificates from PF Hong Kong that it needed in order to take certain additional steps to police the Property under the MLA. However, PF Hong Kong refused to provide the certificates. Further, PF Hong Kong unilaterally declared that Grand Union's license was temporarily suspended. PF Hong Kong was significantly disrupting Grand Union's business.

78. Despite PF Hong Kong's obvious bad faith and its continued baseless complaints, Grand Union tried to be productive, and kept PF Hong Kong informed about how Grand Union was dealing with certain complaints. PF Hong Kong, however, simply tried to cut Grand Union out. For example, in August 2021, PF Hong Kong informed Grand Union that it was going to take up direct communication with Platforms concerning authorizations instead of permitting Grand Union to manage it. This was contrary to the MLA.

79. Nonetheless, as PF Hong Kong was significantly interfering with Grand Union's business, Grand Union tried to move forward in peace, and between August 6-18, 2021, Grand Union negotiated with PF Hong Kong. PF Hong Kong continued to threaten to terminate the MLA with more and more urgency, and gave Grand Union a final deadline of August 19, 2021, in order to pay PF Hong Kong additional amounts to continue under with the license. If it would not agree by August 19, 2021, PF Hong Kong credibly threated that the MLA would be terminated and Grand Union's business would be further disrupted and damaged.

80.   In order to resolve the situation, on August 19, 2021, the Second Amendment was signed. The Second Amendment provided PF Hong Kong the additional revenue that it was looking for, with Grand Union agreeing to pay PF Hong Kong an additional US$ 8.5 million.  In order to bring perceived legitimacy to the Second Amendment, the Second Amendment framed the payment of US$ 8.5 million as consideration  for certain "A.NI.MA Property," even though such property was worth nothing close to US$ 8.5 million.  Grand Union also agreed to pay to PF Hong Kong an additional US$ 200,000 annually as a Brand Management Fee.  At that time, PF Hong Kong stated that the "A.NI.MA Property" was being registered in China (and that it would successfully be registered in China) and it was portrayed as an upscale brand aimed at young adults only.

81.   PF Hong Kong's bad faith is also evident from its conduct related to the Trademark Certificates Grand Union had been requesting for month, but that PF Hong Kong refusing to provided.  It was only after the Second Amendment was signed, and after Grand Union had paid it US$ 8.5 million more, that PF Hong Kong start providing many of the Trademark Certificates.  PF Hong Kong was holding the Trademark Certificates hostage until Grand Union paid the additional money.

82.   In the process, PF Hong Kong also forced Grand Union to give up part of its autonomy and control over the management of the PAUL FRANK Brand in China.  PF Hong Kong informed Grand Union:

> Licensor will take over the brand protection, anti-infringement work in China, litigations, disputes will be handled directly by Futurity Brands legal team. If we need assistance from CBG, we will discuss with you.  As licensee, you can report to us the targets, we will take actions therefore.

83.   Further, PF Hong Kong used this unilateral declaration to justify its decision to not provide the notarized POA to Grand Union.

84.   Through this strategy, PF Hong Kong took further control over the licensing activities under the MLA and left Grand Union in a vulnerable position where it did not have the necessary documentation from PF Hong Kong to pursue brand protection and anti-infringement work.  PF Hong Kong was slowly sidelining Grand Union.

### 3. PF Hong Kong Tried to Extort Further Payments from Grand Union in 2022, and Eventually Purported to Terminate the MLA When Grand Union Refused to Again Capitulate to PF Hong Kong's Wrongful Demands for Additional Payments

85. In 2022, Grand Union continued to request the notarized LOA for its Sublicensees, but it was not provided by PF Hong Kong. PF Hong Kong took the position that it would deal with the Sublicensees itself, and that the notarized LOAs were not needed. PF Hong Kong stated that the Second Amendment was sufficient to prove that Grand Union had the right to sublicense the rights. This was incorrect, and it led to further problems because Sublicensees did not have the proper documentation to present to the Platforms in order to continue their businesses.

86. For example, on June 24, 2022, PF Hong Kong informed Grand Union that it had found apparently forged LOAs that had been submitted to Platforms, and it immediately accused Grand Union of violation Section 1(b)(iii) of the MLA because it was responsible for ensuring that the Sublicensees complied with the "obligations under the Agreement." Again, PF Hong Kong leaped at the chance to try to frame up an alleged Material Breach under the MLA.

87. Trying to remain productive, Grand Union called for a meeting on June 28, 2022 to address a variety of issues, including:

> 1. Relating to Paul Frank brand: (a) Original LOA letter, (b) On line channel/platform authorized letter, (c) VIP Store, (d) Business development plan, (e) Quarterly Report, (f) the work flow for platform confirming the authorization letter, and (g) Paul Frank's marketing plan for international market.
>
> 2. Relating to A.NI.MA.: (a) LOA letter for A.NI.MA. Series Paul Frank, (b) A.NI.MA trade mark register, (c) Business development plan, and (d) A.NI.MA. marketing plan for international market.

88. In response, PF Hong Kong responded in bad faith on multiple occasions. For example, when Grand Union reported that certain issues raised by PF Hong Kong were resolved, PF Hong Kong bizarrely responded by aggressively and threateningly asking Grand Union to identify all of Grand Union's breaches of the MLA. Further, PF Hong Kong

began sending notices to Platforms, notifying them that Grand Union's Sublicensees were not authorized to sell PAUL FRANK products.

89.    In order to try to create more breaches, on July 21, 2022, and advance its scheme, PF Hong Kong then accused Grand Union of breaches the Second Amendment, alleging that unidentified breaches had not been cured by February 19, 2022 (six month prior to these discussions).  PF Hong Kong, without any basis, accused Grand Union of creating the forged documents, similar to a year prior, stated that it was suspending the MLA, and was taking over all management of the Sublicensees and coordination with marketplaces. Indeed, PF Hong Kong informed Grand Union that it was going to start taking future royalty payments from Sublicensees and divert them directly to PF Hong Kong.  PF Hong Kong was effectively shutting down Grand Union's business related to the PAUL FRANK Brand, seeking to increase financial pressure by depriving Grand Union of royalties.

90.    Not done yet, on August 24, 2022, PF Hong Kong sent another Notice of Termination to Grand Union, relating to Grand Union's alleged "numerous material breaches" of the MLA.  Specifically, PF Hong Kong claimed that (a) Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands; (b) Licensee has sold and/or distributed Licensed Products outside the Territory and the Channels of Distribution; (c) Licensee has not cured the "existing or potential" breaches of the MLA during the Extraordinary Cure Period;  (d) Licensee has refused Licensor's request for an audit.

91.    PF Hong Kong has never substantiated any of these allegations, all of which Grand Union denies.  Further, these complaints certainly do not qualify as "Material Breaches" under the MLA, and cannot be used to try to justify termination of the MLA.

92.    On September 23, 2022, PF Hong Kong delivered a "Termination of Master License Agreement" to Grand Union.  Again, that Notice referred to vague allegations of "material" breaches.  In truth, the Notice was baseless under the facts, as well as the terms

of the MLA. Immediately thereafter, Grand Union rejected the purported termination as invalid and ineffective.

93. Definitively revealing it rue motives, and validating the existence of the scheme, during this time, PF Hong Kong again demanded additional money from Grand Union, and informed Grand Union that if it paid the additional money, PF Hong Kong would let Grand Union continue forward under the MLA.

**4. PF Hong Kong Tortiously Interfered and Continues to Interfere with Grand Union's Business and its Sublicensee Relationships**

94. Not only has PF Hong Kong purported to terminate the MLA, but it has also pursued a bad faith campaign to ruin Grand Union's reputation and destroy Grand Union's contractual relationships with its Sublicensees.

95. PF Hong Kong has communicated with Grand Union's Sublicensees, maliciously spreading lies about Grand Union, and notifying the Sublicensees that Grand Union is breaching the MLA and no longer has a license to the PAUL FRANK Brand.

96. This has damaged and continues to damage Grand Union, including destroying its relationships with its Sublicensees.

**5. PF Hong Kong is Not Entitled to the Audit It Seeks**

97. On July 27, 2022, PF Hong Kong notified Grand Union that Grant Thornton was appointed as its auditor.

98. This would be of little import to Grand Union, except that PF Hong King decided to create, from whole cloth, a right by PF Hong Kong to subject Grand Union to an audit of unlimited scope. That reading of the terms of the MLA is clearly wrong. The audit rights set out in the MLA are limited, and PF Hong Kong had no right to demand the audit that it was demanding.

99. PF Hong Kong never provided any clear protocol from Grant Thornton as to what the audit would entail, other than that it would far exceed any good faith reading of the MLA. PF Hong Kong's request for an audit was simply another part of PF Hong Kong's bad

faith scheme to exert pressure on Grand Union and wrongfully claw back the license from Grand Union and/or extract further payments from Grand Union.

## V.    ALL OF PF HONG KONG'S CLAIMS ARE BASELESS AND SHOULD BE DENIED

100.  PF Hong Kong, through a mindless recitation of conclusory statements, asserts four claims in the case: (1) Breach of Contract, (2) Breach of Implied Covenant of Good Faith and Fair Dealing, (3) Trademark Infringement under the Lanham Act, and (4) Quantum Meruit and/or Unjust Enrichment.  Grand Union denies all these claims, and provides the following summary responses to them.

### A.    PF Hong Kong's Breach of Contract Claim is Baseless

101.  PF Hong Kong's breach of contract claim is based upon 39 allegations of breach (see Demand, ¶¶ 39 and 51).  As noted above, each time Grand Union has engaged with PF Hong Kong, it simply adds to the list of purported breaches.  For example, since the last time Grand Union interacted with PF Hong Kong, PF Hong Kong has added at least 20 new alleged breaches to its list.  This is true even though during that time, PF Hong Kong has been taking the (incorrect) position that the MLA has been effectively terminated.

102.  In truth, PF Hong Kong's allegations are vague and false, and are simply part of its bad faith scheme to wrestle the license away from Grand Union.  The sheer number of these alleged breaches shows that PF Hong Kong has no real claim, and is simply trying to create the illusion of a material breach by alleging a large number of breaches.

103.  Further, PF Hong Kong has failed to follow the notice and cure procedure set out in Section 13 of the MLA, especially with respect to all of its new alleged breaches.  This alone defeats PF Hong Kong's claims that are based upon all of the new alleged breaches.

104.  In any event, Grand Union provides the following responses to some of the more serious breaches alleged by PF Hong Kong.

### 1.    Grand Union Did Not Forge Any Documents

105.  Grand Union categorically denies the allegations in paragraph 51(a) and (e) of the Demand that Grand Union has forged the Licensor's official stamps or signatures.

106.  Despite its frustration over the lack of necessary documentation from PF Hong Kong, and PF Hong Kong's failures to support the operation of the business under the MLA, Grand Union has never forged any documents.  Grand Union notified PF Hong Kong of this fact immediately upon learning about the issue, and yet, with no factual support or basis, PF Hong Kong has simply sought to malign Grand Union and continues to levy this very damaging and false allegation against Grand Union.

107.  Further, the fact is, PF Hong Kong created these issues for itself.  It is possible that since PF Hong Kong refused to provide the properly notarized authorization documentation that Grand Union requested since early 2021 that Sublicensees took matters into their own hands and created authorizations for themselves so that they could continue to conduct their business.  Indeed, Grand Union believes that PF Hong Kong appreciated this dynamic, and refused to provide the authorizations in order to create issues for Grand Union in furtherance of PF Hong Kong's scheme.

### 2.    Grand Union Did Not Engage in Any Prohibited Sales Outside of the Territory or Channels of Distribution

108.  PF Hong Kong has accused Grand Union of engaging in prohibited sales outside the Territory or Channels of Distribution, and yet has never provided evidence to Grand Union related to these accusations.  Grand Union submits that PF Hong Kong does not have any such evidence, and categorically denies the allegations made in paragraph 51 (b), (l), (m), (n), (o), (p), and (q) of the Demand in relation to the sales of Licensed Products out of the Territory and Channels of Distribution.

109.  The Territory is defined in Schedule B of the MLA.  Grand Union has not engaged in the sale of Licensed Products to customers outside of the Territory or granted a sublicense to Sublicensee whom Grand Union knows or has reason to believe will export to parties outside the Territory.

110. The Channels of Distribution are specified in Schedule G of the MLA and are applicable to the Core Categories of the Licensed Products. Schedule G also specifically prohibits sales of Core Categories via mass market channels or the list of specified discount retailers and off-price retailers (the "**Prohibited Channels**"). Grand Union has never engaged in sales of Core Categories in the Prohibited Channels.

### 3. Grand Union Has Addressed Alleged Breaches or Issues Raised by PF Hong Kong

111. In paragraph 51(c), (ii) and (jj) of the Demand, Paul Frank accuses Grand Union of failing to or refused to cure breaches of the MLA.

112. However, in each instance Grand Union was made aware of an alleged issue related to the MLA, it properly addressed the issue and resolved it to the extent it was authorized to do so under the MLA. Grand Union also timely provided reports to PF Hong Kong about its actions in addressing issues raised by PF Hong Kong.

113. Likely due to the fact that Grand Union was very responsive and addressed issues raised by PF Hong Kong immediately, PF Hong Kong began accusing Grand Union of deliberately vague and/or unidentified breaches of the MLA. Obviously, Grand Union cannot solve issues that PF Hong Kong does not identify specifically.

### 4. PF Hong Kong Rejected Grand Union's Offer to Participate in an Audit Pursuant to the MLA

114. Grand Union denies breaching Sections 6(ii) and 7(iii) of Schedule K to the MLA, which relate to inspections to verify the accuracy of information provided in Quarterly Statements.[11]

115. On 27 July 2022, PF Hong Kong abruptly informed Grand Union that it had engaged Grant Thornton, an external auditor, "for the performance of forensic due diligence." However, such a request did not make reference to the contractual provisions PF Hong

[11] See paragraphs 51 (d), (hh) and (kk) of the Demand.

Kong is now citing, and it did not contain the proposed scope of such "forensic due diligence."

116. Grand Union is not obligated to agree to such an audit. Section 6(b) of the MLA permits Licensor to inspect records to verify the accuracy of information provided in the Quarterly Statements, and the information in the Quarterly Statement is very limited. Further, Section (6)(ii) of the Second Amendment must be read to be consistent with the intent and spirit of Section 6(b) of the MLA – i.e., limited to the same kind of verification.

117. In any event, PF Hong Kong has abandoned its "audit" related accusations and requests.

**5. Grand Union has Properly Managed Sublicenses**

118. In paragraph 51 (subparts (f), (g) , (h), and (i)) of the Demand, PF Hong Kong accuses Grand Union of violating Sections 1(a), 1(b), 1(b)(ii), and 2(a) of the MLA in relation to the sublicenses it executed. These allegations are denied.

119. The sublicenses granted by Grand Union do not contain terms less protective of Property than the terms and conditions of the MLA; do not fail to provide that they are subordinate to the MLA; do not contain territory terms that are outside of the Territory; and do not contain channels of distribution terms that are outside of the Channels of Distribution.

120. In paragraph 51 (j) of the Demand, PF Hong Kong accuses Grand Union of violating Section 1(b)(iii) of the MLA for failing to ensure Sublicensee's compliance with the Sublicensee's obligations under the sublicense agreement. It is not clear what PF Hong Kong means by this, but Grand Union has properly ensured that Sublicensees are compliant with the obligations under the relevant sublicense agreement. For example, if sublicensees do not comply with the obligations under the sublicense, Grand Union makes sure they bring themselves into compliance, or deals with them accordingly.

121. Further, in paragraph 51 (k) of the Demand, PF Hong Kong accused Grand Union of violating Section 1(b)(v) of the MLA for failing or refusing to provide PF Hong Kong with information in relation to the Sublicensees. This is untrue. While there has been delay to the reporting at times due to COVID-19-related restrictions in various cities,

Grand Union has provided PF Hong Kong with the information it has requested as quickly as it could given the circumstances.

### 6. Grand Union Provided Quarterly Statements in 2021, and PF Hong Kong Only Raised the Issue as to 2022 When It Was In the Process of Trying to Terminate the MLA

122. In paragraph 51 (r) and (s) of the Demand, PF Hong Kong alleges that Grand Union breached Sections 6(a) and (b) of the MLA by failing to deliver Quarterly Statements. This is denied.

123. After the assignment to PF Hong Kong, Grand Union provided PF Hong Kong with Quarterly Statements every quarter in 2021. In 2022, there has been lockdowns and other restrictions under the zero-Covid policy in various cities of China, including a complete lockdown in Shanghai from March to May, and this caused delay to the collation of information and reporting. PF Hong Kong knew this, and did not complain.

124. Further, by the time Grand Union was ready to provide a Quarterly Statement to PF Hong Kong, even though PF Hong Kong has not given proper notice to cure, PF Hong Kong already threated to terminate the MLA, and did purport to terminate the MLA.

### 7. Grand Union Has Not Infringed the Intellectual Property Rights or Failed to Obtain Proper Approval

125. In paragraph 51 (t), (u), (v), (w) of the Demand, PF Hong Kong alleges that Grand Union breached Sections 7(a) and (b). However, PF Hong Kong failed to plead any particulars.

126. This category of alleged breach was not made prior to the Demand. Grand Union is unable to respond further because PF Hong has utterly failed to support it. This is likely because it is completely fabricated.

### 8. Grand Union Has Not Improperly Registered PAUL FRANK Domain Names

127. In paragraph 51(y) of the Demand, PF Hong Kong has accused Grand Union of registering one or more domain names containing the PAUL FRANK name in breach of

Section 9(b) of the MLA. This is another new allegation that was never made prior to the Demand.

128. In any event, Paul Frank has failed to provide any specifics in relation to the alleged breaches. Further, the registration of domain names containing the Paul Frank would not result in a breach of Section 9(b) of the MLA. Section 9(b) of the MLA provides that, among other things, the Licensee shall not attack the title to or any rights of Licensor in and to the Property or attack the validity of the MLA or breach of the confidentiality of the terms of the MLA.

**9. Grand Union Did Not Breach Section 9(c) of the MLA**

129. PF Hong Kong alleges in paragraph 51(z), (aa) (bb), and (cc) of the Demand, that Grand Union breached Section 9(c) of the MLA. PF Hong Kong has not provided any particulars in relation to these allegations, and Grand Union denies them. It is also noted that this is another new allegation made in the arbitration for this first time.

130. As discussed above, taking anti-counterfeiting actions is an important aspect of protecting the Brand in the Territory and Grand Union has been empowered under the MLA to do so on behalf of the Licensor. Since 2015, Grand Union and/or CBG have been involved in a multitude of legal proceedings to protect its commercial rights as an exclusive licensee.

131. Contrary to what PF Hong Kong alleges in paragraph 51(z) and (aa), Grand Union has been providing updates on the significant infringement of the Property and the legal actions it was taking to monitor and protect the Property on a weekly or a bi-weekly basis. It is PF Hong Kong which has failed to provide feedback on these reports.

132. Under Section 9(c) of the MLA, Grand Union has the right and obligation to "undertake all actions reasonably necessary or advisable to protect the Property, including conducting investigations, raids, administrative actions, enforcement actions, anti-counterfeiting actions; litigation, and any other suit, action, or proceeding with respect to claims for infringement or imitation of the Property." Contrary to what Paul Frank is

suggesting in paragraph 51 (bb), Grand Union does not need to inform Paul Frank or seek its approval before taking any such action.

**10. Grand Union Set Prices of Licensed Products at Competitive Prices and Did Not Engage in Dumping or Fail to Provide Related Annual Sales Reports**

133. In paragraph 51(dd), (ee), and (ff) of the Demand, Paul Frank alleges that Grand Union (a) failed and/or refused to sell Licensed Products outright at a competitive price in breach of Section 10(b) of the MLA, (b) engaged in Dumping in violation Section 10(i) of the MLA; and (c) failed and/or refused to provide annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale price in violation of Section 10(i) of the MLA.

134. These allegations are conclusory and lack any details. In any event, Grand Union denies selling Licensed Products below a competitive price or engaged in Dumping as defined.

**11. Grand Union Has Paid to PF Hong Kong all Royalties or Other Payment Due and Payable**

135. In paragraph 51 (gg) of the Demand, PF Hong Kong alleges without any evidence that Grand Union failed to or refused to pay royalties, participation fees, and market commitments as set forth in the Second Amendment. This is another new allegation, which was made for the first time in the Demand.

136. Notably, PF Hong Kong has failed to specify the amount in question or the date in which it became due in the Demand. That is because Grand Union has paid PF Hong Kong all royalties or other payments due and payable under the MLA.

**12. PF Hong Kong's Purported Termination Is Invalid and Ineffective, and Therefore There are No Post-Termination Obligations With Which Grand Union Must Comply**

137. In paragraph 51(x), (ll) and (mm) of the Demand, PF Hong Kong alleges that Grand Union failed to or refused to comply with the contractual obligations under the MLA after the termination, namly: (a) discontinue the use of the Property in accordance with

Section 8(f); (b) pay future payments within ten (10) days of the so-called Termination Effective date pursuant to Section 14; and (c) provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products pursuant to Section 17.

138. Grand Union cannot be in breach of Sections 14 and 17 of the MLA because PF Hong Kong's purported termination of the MLA is invalid and ineffective.

139. Section 13 of the MLA clearly states that PF Hong Kong may only terminate the MLA in the case of a Material Breach, as defined in the MLA, which has not been cured during the applicable timeframe.  The only "Material Breaches" under the MLA are as follows:

- MLA, Section 13(b)(i): "the Non-Refundable Extension Fee is not paid by March 20, 2015, or the remainder of the License Fee is not paid by May 31, 2015; or"

- MLA, Section 13(b)(ii): "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or"

- MLA, Section 13(b)(iii): "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than 120 days; or"

- MLA, Section 13(b)(iv): "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persist for more than 120 days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv))."

- Section Amendment, Section 8(i) and (ii): Licensee, or parties controlled directly or indirectly by Licensee "attach the title to or any rights of Licensor in and to the Property or attack the validity of the Agreement."

140. For all other breaches by Licensee, under Section 13(d), Licensee would owe a "fine of $20,000 for each Uncured Breach."

141. No "Material Breach" has been even properly pleaded by PF Hong Kong, and there is none.

**B.    PF Hong Kong's Claim for Breach off the Implied Covenant of Good Faith and Fair Dealing is Ironic and Baseless**

142. PF Hong Kong alleges in paragraph 56 that "Grand Union has engaged in conduct intended to prevent PF Hong Kong from receiving the benefits under the MLA and the Amendments, including by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate (sic) and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights."

143. Grand Union denies PF Hong Kong's claim for breach of the implied covenant of good faith and fair dealing.  Grand Union has not filed any false complaints.  PF Hong Kong makes no connection to the MLA, or even identifies what in particular it is referring.  Grand Union has exercised its rights good faith, while PF Hong Kong has done the opposite and has acted in bad faith and pursued it unlawful scheme to extort further payments from Grand Union and/or forcibly take back the license.

**C.    Grand Union Cannot Have Committed Trademark Infringement under the Lanham Act**

144. PF Hong Kong claims trademark and trade dress infringement in paragraphs 62-74, alleging that the MLA was terminated on September 23, 2022.  This claim is denied.

145. As noted above, any purported termination of the MLA by PF Hong Kong is invalid and ineffective.  This is a complete defense to this claim, because the MLA is still in effect.

146. Further, PF Hong Kong claims in paragraph 72 that it made "repeated efforts, over the course of several years, to engage Grand Union in good faith discussions concerning the violation of the MLA and the Amendments.  Paul Frank also gave Grand Union ample

opportunity to avoid termination of the MLA and the Amendments. Grand Union nonetheless refused to engage in good faith discussions…"

147. This allegation is plainly wrong. PF Hong Kong has been on a two-year crusade against Grand Union, and operated in transparent bad faith. PF Hong Kong has extorted, and sought to extort, additional revenue from Grand Union, and otherwise infringe on Grand Union's rights under the MLA. PF Hong Kong has acted in complete disregard of Grand Union's rights, and done everything it can to try to create an excuse to terminate it.

### D. Quantum Meruit and/or Unjust Enrichment

148. PF Hong Kong finally asserts a claim for quantum meruit and/or unjust enrichment. Grand Union denies this claim as well.

149. PF Hong Kong has not conferred any substantial benefits on Grand Union. PF Hong Kong has done nothing but harm Grand Union and its licensing operations under the MLA. Indeed, PF Hong Kong has intentionally and maliciously harmed Grand Union in this regard.

150. The only party has had acted unjustly is PF Hong Kong.

## VI. AFFIRMATIVE DEFENSES

151. Grand Union asserts the following affirmative defenses:

    a.  PF Hong Kong fails to state a claim for which relief can be granted.

    b.  The Demand is vague and ambiguous, and it is unclear what facts PF Hong Kong is alleging as the basis of its pleading.

    c.  Grand Union has not breached the MLA and has not failed to cure within the time required by the MLA.

    d.  Grand Union has substantially complied with the MLA.

    e.  Grand Union has not committed any "Material Breach," as defined by the MLA; alternatively, it has not failed to cure any Material Breach within the time required by the MLA.

   f.   Grand Union was not provided the proper notice and cure opportunity under the MLA.

   g.   PF Hong Kong waived any rights to terminate the MLA, even if it had such rights.

   h.   PF Hong Kong has been unjustly enriched.

   i.   PF Hong Kong has unclean hands and is barred from recovering in equity.

   j.   PF Hong Kong has breached the MLA itself in numerous ways.

   k.   PF Hong Kong has committed a fraud against Grand Union with respect to the Second Amendment, and its scheme.

   l.   PF Hong Kong has not suffered any damages.

   m.   The doctrine of frustration of purpose applies because of the issues registering the "A.NI.MA Property" in China, and therefore Grand Union is entitled to rescission of the Second Amendment and the return of the $8.5 million license fee.

## VII.  NON-ADMISSION AND RESERVATION OF RIGHTS

152.  Save where otherwise expressly stated, Respondent denies each and every allegation made by the Claimant in its Demand.  Respondent reserves its right to further provide details, supplement of and/or amend its defense and counterclaims, especially with respect to various vague and conclusory allegations that PF Hong Kong has made in its Demand, which are not properly particularized.

## VIII. GRAND UNION'S COUNTERCLAIMS AGAINST PAUL FRANK

153.  As set out above, PF Hong Kong has violated Grand Union's rights in various ways.  As its counterclaims in this arbitration, Grand Union asserts the following.

### A.    Breach of Contract

154.  Grand Union performed all its obligations under the MLA.

155.  Pursuant to Section 9(d)(i) of the MLA, PF Hong Kong was obligated to use its best efforts to register and maintain the registration for all Core IP in the Territory.  Further, pursuant to Section 6 of Schedule J of the Second Amendment, PF Hong Kong was

obligated to cooperate with Grand Union in obtaining any and all governmental approvals, consents, licenses, permits, certificates, registrations and the like as may be required in respect of the performance of and effecting the purpose of the MLA. Finally, pursuant to Section 13 of the MLA, PF Hong Kong may not seek to terminate the MLA except in the event of the stipulated "Material Breaches," as defined by the MLA.

156. As described above, PF Hong Kong systematically breached its obligations by *inter alia* (i) failing to provide the notarized LOAs to Grand Union as requested, (ii) failing to provide the notarized POAs to Grand Union as requested, (iii) failing to provide the trademark registration certificates to Grand Union in a timely fashion, (iv) failing to register and maintain the "A.NI.MA Property" under the Second Amendment in the Territory, (v) threating to terminate, and purporting to terminate, the MLA, in the absence of a Material Breach, as defined by the MLA.

157. PF Hong Kong's breaches of the MLA have damaged Grand Union in an amount to be determined at the hearing.

**B. Breach of the Duty of Good Faith and Fair Dealing**

158. Beginning in 2021, PF Hong Kong put into motion a wrongful scheme in order to deprive Grand Union the benefits of the MLA, and manufacture alleged breaches of the MLA which PF Hong Kong could use to (i) assert wrongful threats (including of termination) to bully and harass Grand Union, (ii) extract substantial additional payments from Grand Union, including specifically the $8,500,000 paid under the Second Amendment, and (iii) use same as pretence to interfere with Grand Union's Sublicensees and purport to terminate the MLA.

159. These actions were all taken by PF Hong Kong in bad faith, and as a result Grand Union suffered damages in the amount to be determined at the hearing.

**C. Tortious Interference**

160. Grand Union operates under the MLA by entering into business relationships (through CBG) with Sublicensees. From 2021 through the present day, PF Hong Kong has reached out directly to Grand Union's Sublicensees and entered into competing

agreements with the Sublicensees to create direct revenue from these entities for PF Hong Kong, informed the Sublicensees that Grand Union is not authorized to sublicense to them the PAUL FRANK Brand, and made other false and disparaging statements about Grand Union to the Sublicensees.

161. This interference has caused economic and reputational harm to Grand Union, and damaged Grand Union's relationships with its Sublicensees.

**D. Fraud**

162. Prior to entering into the Second Amendment, in meetings, including during the time period of August 6-15, 2021, PF Hong Kong represented falsely that the "A.NI.MA Property," was a valuable, upscale brand aimed at young adults which PF Hong Kong was in the process of registering in China, and was assured to be registered in China so that it could be exploited in China. PF Hong Kong understood and knew, however, that the "A.NI.MA Property" was not currently in the process of being registered in China at that time, that it was not a valuable brand, and that a license to that property was not worth anywhere near $8,500,000. In fact, the A.NI.MA Property has had great difficulties getting registered, and Grand Union has not been able to exploit same.

163. In fact, this payment of $8,500,000 was simply an additional payment relating to the MLA and PF Hong Kong's extortionate scheme. The reference to the "A.NI.MA Property" was a token to present the appearance of propriety.

164. PF Hong Kong made its false statements to Grand Union intentionally and with the intent that Grand Union rely on them into entering into the Second Amendment, and specifically to induce Grand Union to pay it the $8,500,000 license fee. Grand Union did in fact rely on these false statements in agreeing to pay PF Hong Kong the $8,500,000 license fee for the "A.NI.MA Property." Further, the $8,500,000 payment was procured through PF Hong Kong's unlawful scheme, and PF Hong Kong's false allegations of various breaches.

165. Therefore, Grand Union is entitled to recover the $8,500,000 payment and its attorneys' fees.

### E. Unjust Enrichment

37. Under the terms of the Second Amendment, Grand Union paid PF Hong Kong a license fee of $8,500,000 for the "A.NI.MA Property," and PF Hong Kong was supposed to provide Grand Union with trademark registrations for the "A.NI.MA Property" so that Grand Union could exploit it in China.

38. In fact, this payment of $8,500,000 was simply an additional payment relating to the MLA and PF Hong Kong's extortionate scheme. The reference to the "A.NI.MA Property" was only a token to present the appearance of propriety. The $8,500,000 payment was procured through PF Hong Kong's unlawful scheme.

39. PF Hong Kong accepted the $8,500,000 knowing that Grand Union expected to have the ability to exploit the trademark registrations for the "A.NI.MA Property," and was only paying the $8,500,000 because of PF Hong Kong's threats and extortionate scheme. Further, as it turned out, PF Hong Kong was unable to deliver to Grand Union the trademark registrations for the "A.NI.MA Property." In the absence of an enforceable contract as to material terms, Grand Union has no adequate remedy at law.

40. Under the circumstances, it would be inequitable for PF Hong Kong to retain the $8,500,000 without PF Hong Kong providing the full value for that payment. Indeed, it would be inequitable for PF Hong Kong to retain a payment that obtain through an extortionate scheme. Grand Union is thus entitled to recover the $8,500,000.

## IX. REQUESTED RELIEF

41. For all the reasons set out above, Grand Union respectfully requests that the Tribunal enter an award in its favor as follows:

(a) Denying each and every claim for relief asserted by PF Hong Kong in this arbitration;

(b) Declaring that Grand Union has not committed a "Material Breach," as defined in the MLA;

(c)    Declaring that PF Hong Kong's purported termination of the MLA is invalid and ineffective (or in the alternative, wrongful);

(d)    Granting Grand Union its counterclaims against PF Hong Kong, and awarding Grand Union its damages in an amount to be determined in these proceedings, including interest;

(e)    Ordering PF Hong Kong to refrain from interfering with Grand Union's relationships with the Sublicensees, and to only contact the Sublicensees through Grand Union;

(f)    Granting  Grand Union its costs of arbitration, including its attorneys' fees; and

(g)    Granting  Grand Union any further or other relief as the Tribunal deems fair and just.


**Submitted for and on behalf of the Respondent**

**K&L GATES LLP**
**Attorneys for the Respondent**
**December 16, 2022**

# EXHIBIT 16

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

Los Angeles, California

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent.*

**JAMS REF. No. 1220073501**

---

# RESPONDENT'S APPLICATION FOR INTERIM RELIEF

---

March 24, 2022

**K&L Gates LLP**

**DHH Washington DC Law Office, PC**

Counsel for Respondent Grand Union Trading Limited

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................1

II. FACTUAL BACKGROUND .....................................................................3

A. General facts of underlying dispute ..................................................3

1. Paul Frank Licensing activities prior to the MLA ................................4

2. The exclusive license granted by the MLA and limited termination rights ....................................................................................4

3. Grand Union's substantial investment and efforts to develop the Paul Frank Brand, creating a valuable network of Sublicensees and substantially increasing the value of the brand ....................................6

4. Grand Union's cooperation with Paul Frank Industries under the MLA generally worked well before it was assigned to PF Hong Kong....................................................................................8

5. After the MLA was assigned to PF Hong Kong, it refused to cooperate with Grand Union with respect to necessary documentation.........................................................................9

6. Only six months after the assignment to PF Hong Kong, PF Hong Kong was demanding substantial additional payment from Grand Union in connection with the MLA, and forced Grand Union to pay it additional amounts under threat of termination.........................10

7. After the Second Amendment, PF Hong Kong continued to refuse to cooperate with Grand Union..........................................................11

B. PF Hong Kong's allegations of breaches of the MLA are vague, meritless and void of any factual support.........................................................13

1. Alleged forgery .......................................................................13

2. PF Hong Kong's demand for an audit ...............................................13

3. PF Hong Kong's allegations of mismanagement of Sublicensees.......14

4. PF Hong Kong's allegation of failure to provide Quarterly Statements ..........................................................................14

5. PF Hong Kong's accusations relating to anti-counterfeiting actions ........................................................................................15

6. PF Hong Kong's other vague allegations ....................................... 15

C. PF Hong Kong has undertaken a systematic campaign to subvert and destroy Grand Union's business and its relationships with the Sublicensees and the Platforms ....................................... 16

1. PF Hong Kong's disruption of Grand Union's relationships with the Sublicensees and Platforms. ....................................... 16

2. PF Hong Kong's new licensee agreements and blatant violations of Grand Union's exclusive rights ....................................... 18

III. REQUEST FOR INTERIM RELIEF ....................................... 19

A. The Tribunal has the power to order the requested interim relief ....................................... 20

B. Standards for granting interim relief ....................................... 22

C. PF Hong Kong is entitled to the interim relief it requests ....................................... 24

1. There is a reasonable possibility that Respondent will prevail on the merits ....................................... 24

2. The interim relief is needed to avoid likely irreparable harm, or at least harm not adequately reparable by an award of damages ....................................... 27

3. The harm to the Grand Union substantially outweighs the harm that is likely to result to PF Hong Kong if the Application is granted ....................................... 29

IV. REQUESTED RELIEF ....................................... 30

1. In accordance with Rule 24 of JAMS' Comprehensive Arbitration Rules & Procedures (the "**Rules**"), and the Tribunal's order, Respondent Grand Union International Trading Limited ("**Respondent**" or "**Grand Union**") hereby submits this Application for Interim Relief (the "**Application**").

2. This Application is submitted with the following supporting documentation:

   (a) The First Witness Statement of Zheng Tao (**RWS-1**);

   (b) The First Witness Statement of Jennifer Huang (**RWS-2**)

   (c) Fact Exhibits 1-21 ( **R-IR-1** through **R-IR-21**); and

   (d) Legal Authorities 1-12 (**RL-IR-1** through **RL-IR-12**).

## I. INTRODUCTION

3. Grand Union applies for the Interim Relief in order to avoid suffering serious and preventable harm at the hands of the Claimant, Paul Frank Limited ("**Claimant**" or "**PF Hong Kong**"). As laid out in Grand Union's Response and Counterclaims dated December 16, 2022 (the "**Counterclaims**"), PF Hong King deliberately breached the Master License Agreement dated January 1, 2015 ("**MLA**") and has tortiously interfered with Grand Union's business relationships with its sublicensees (the "**Sublicensees**"). Since Grand Union filed its Counterclaims, PF Hong Kong has doubled down on its breaches of the MLA, causing a risk of serious harm to Grand Union which would not be able to be adequately reparable by an award of damages if Grand Union prevails in this arbitration.

4. There is one consistent and manifest thread that runs through this dispute: Having taken over the MLA from Saban Brands Entertainment Group ("**Saban**") in 2020,[1] PF Hong Kong is trying to perpetrate a scheme to monetize a 15-year exclusive license which Saban already sold to Grand Union in 2015 in exchange for a onetime, upfront, license fee of US$65 million, which Grand Union paid in full.

[1] *See* Email of December 9, 2020 attached with Notice of Assignment dated December 8, 2020 (**R-IR-3**).

5.    This scheme is transparent on the factual record, especially in light of PF Hong Kong's peculiar conduct vis-a-vis Grand Union. When PF Hong Kong became the Licensor under the MLA, it refused to cooperate with Grand Union in a basic way. It refused to provide documents and authorizations necessary for the license to work as it should, which created numerous difficulties for Grand Union's Sublicensees. PF Hong Kong then sent multiple notices of purported breaches to Grand Union, which offered no details or specific allegations about how Grand Union had breached the MLA. To the extent that any specific issues were identified, these issues were caused by PF Hong Kong's own wrongful conduct. Importantly, almost immediately, PF Hong Kong also threatened to terminate the MLA.

6.    In this context, PF Hong Kong in essence demanded a payment of substantial additional compensation to "resolve" the issue. However, PF Hong Kong made it clear that if Grand Union would not pay, PF Hong Kong would relentlessly pursue its objective to disrupt Grand Union's business and manufacture a MLA termination. Grand Union, which spent seven years heavily investing in the license and building up a network of Sublicensees throughout mainland China, was largely at PF Hong Kong's mercy because PF Hong Kong refused to provide necessary documents and authorizations, and was thus interfering with its business, and it was also seriously threaten to pursue a termination strategy.

7.    Understandably, Grand Union caved the first time, and in 2021, Grand Union agreed to pay PF Hong Kong an additional amount of US$8,500,000, plus certain further royalties and other fees. That result was memorialized in the Second Amendment. But that did not satiate PF Hong Kong's greed. Perhaps it only emboldened PF Hong Kong.

8.    PF Hong Kong returned a second time in 2022. While continuing to withhold necessary authorizations and documentation from Grand Union, PF Hong Kong once again began to send Grand Union barebones notices of termination, which contained vague and unspecified allegations of wrongdoing. Of central importance, PF Hong Kong identified dubious paperwork that it asserted was "forged," and without any evidence accused Grand Union of creating false documentation for Sublicensees. But Grand Union had no knowledge of such documentation and certainly did not create it.  It was classic extortion, and all of these purported issues raised by PF Hong Kong were plainly pretext.

9.     Grand Union vigorously objected, but PF Hong Kong refused to back down. This time, however, Grand Union did not cave in to PF Hong Kong's wrongful demands, knowing full well that negotiating with PF Hong Kong would only reward its abusive and unjustified behavior, and result in still further extortionate demands. Grand Union's decision not to pay PF Hong Kong another ransom led to this arbitration.

10.    PF Hong Kong initiated this arbitration and asserted its conclusory allegations of wrongdoing in its Demand for Arbitration and Statement of Claims ("**Demand**"), claiming it validly terminated the MLA. In its Counterclaims, Grand Union denies that PF Hong Kong had any right under the MLA to terminate it, and that any purported notice of termination was ineffective and void.  That is the core of the dispute, and the Tribunal will eventually resolve that central issue in these proceedings.

11.    However, since this arbitration has commenced, Grand Union has come to require interim relief to preserve its business while this dispute is resolved. During the early stages of this arbitration, PF Hong Kong has engaged in a pattern of misconduct, designed to interfer with Grand Union's relationships with its Sublicensees, designed to destroy Grand Union's business whatever the outcome of the case. Indeed, PF Hong Kong openly admits that it has begun contacting Grand Union's Sublicensees in order to directly enter into business arrangements with them, and that it has begun to engage its own sublicensees to infringe upon Grand Union's exclusive rights under the MLA. PF Hong Kong is trying to move on under its own view of the world, and render any award in Grand Union's favour a Pyrrhic victory.

12.    The interim relief requested by Grand Union is thus necessary.  Absent this Interim Relief, PF Hong Kong will continue to irreparably harm Grand Union and its business, and will only further aggravate the parties' dispute. In addition, there is no risk of serious harm to PF Hong Kong in the event that the Interim Relief is granted. The Tribunal should grant Grand Union this relief.


## II.    FACTUAL BACKGROUND

### A.    General facts of underlying dispute

### 1. Paul Frank Licensing activities prior to the MLA

13. China Brands Group ("**CBG**") has been involved in the development and licensing of the Paul Frank brand since around the late 2000s. In around 2010, Saban took over the Paul Frank Brand, when it purchased Paul Frank Industries, LLC ("**Paul Frank Industries**"). Several companies within the CBG group held licenses from Saban, including Shanghai Romma Apparel Ltd ("**Romma**").[2]

14. Saban wanted to reposition it to be more high-end in mainland China, and CBG had a plan to achieve that goal. In around 2014, Saban began negotiating with CBG, and the MLA between Paul Frank Industries and Grand Union was signed as of January 1, 2015.[3]

### 2. The exclusive license granted by the MLA and limited termination rights

15. Under the MLA, Grand Union paid a one-time, upfront lump sum payment of US$65 million to Paul Frank Industries for a 15-year exclusive license to exploit the Paul Frank Brand in mainland China, Hong Kong, and Macau (the "**Territory**"), or through the year 2030.

16. Given the large upfront license fee, the MLA provided Licensor with very limited rights of termination under its Section 13:

> (a) Termination by Licensor. If (i) any bankruptcy, insolvency, liquidation, or dissolution, domestic or foreign, is instituted by or against Licensee and is not dismissed within sixty (60) days after the filing date thereof, or (ii) Licensee becomes insolvent or suspends the transaction of all or a substantial portion of its usual business (except in the case that the suspension of business results from a Force Majeure, which shall be governed by Section 23 of this Agreement); or (iii) Licensee commits a Material Breach (as defined below) of this Agreement, Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee (except Licensor shall have the right to immediately terminate this Agreement for breach of Section 13(b)(i) below), and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period.

---

2 First Witness Statement of Zheng Tao dated March 24, 2023 ("**RWS-1")**, ¶ 5.

3 **RWS-1**, ¶ 7-8.

> (b) The following are deemed to be a Material Breach under this Agreement: (i) the Non-Refundable Extension Fee is not paid by March 20, 2015, or the remainder of the License Fee is not paid by May 31, 2015; or (ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or (iii) Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than 120 days; or (iv) Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persist for more than 120 days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv)).

17. The MLA further states in section 13(d) that if a breach of the MLA by the Licensee is not a "Material Breach," as defined in the MLA, a notice shall be provided and if it remains uncured for 30 days, a fine of $20,000 is due:

> (d) Breach by Licensee. In the event that Licensee commits any breach of this Agreement this [sic] is not a Material Breach, Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of the breach, then such breach shall be an **Uncured Breach**. Licensee shall pay a fine of $20,000 for each Uncured Breach.

18. Therefore, Licensor may terminate the MLA if and only if there exists an uncured Material Breach, as defined by the MLA, and all other requirements have been met. In the case of any other breach that is uncured for the requisite time period, a payment of $20,000 is due.

19. This limitation on termination is an important protection for Grand Union under the MLA. CBG was required to inject long-term, sustained investment to develop the Paul Frank Brand in the Territory and achieve the objectives of the licensing program. Further, Grand Union was required to pre-pay the license fee of US$65 million for the entire 15-year period, and would need many years to recoup that investment and earn a profit.

20. Under the MLA, Grand Union took over the entire management of the Paul Frank Brand in China, and was solely charged with setting the strategic vision for the brand and executing all necessary steps in order to grow the value of the brand in the Territory. In exchange for its at-risk investment and efforts, Grand Union anticipated reaping the benefits of this deal for the entire 15-year period. Grand Union trusted that the Licensor would not interfere with its rights, or interfere with its ability to recoup its investment in the development of the brand or reap the financial benefits of its investment and efforts.[4]

**3. Grand Union's substantial investment and efforts to develop the Paul Frank Brand, creating a valuable network of Sublicensees and substantially increasing the value of the brand**

21. Beginning in 2015, Grand Union, with the full power of CBG behind it, invested heavily in the development and repositioning the Paul Frank Brand, and took over the management of the brand in the Territory.[5]

22. Grand Union has, over the years, made the following investments and pursued various efforts to develop the Paul Frank Brand in the Territory:

(a) Grand Union paid $65 million, the entire license fee for the 15-year period, upfront in 2015 for the license.

(b) Grand Union has and continues to

(i) Use its prior, in-depth experience in China to identify and implement advertising strategies to elevate the Paul Frank Brand in the market, and it purchases advertising from various channels, including in the areas of events, exhibitions, and films.

(ii) Leverage its existing relationships and brand management expertise to select and maintain hundreds of sublicensees under the MLA ("**Sublicensees**"). Many of the Sublicensees are sources from previous

---

4 **RWS-1**, ¶¶ 11-12.

5 **RWS-1**, ¶ 13.

manufacturing and commercial contacts from CBG, and are built on the reputation and goodwill of CBG.

(iii) Design, manage and coordinate efforts to expand and capitalize on various eCommerce platforms ("**Platforms**") in China, including selecting and directing Sublicensees for pursuing sales through the Platforms, unlocking value.

(iv) Design and implement training programs for Sublicensees, and assists Sublicensees with directional support relating to seasonal product for each quarter.

(v) Support Sublicensees with the design of new products, identifying market trends and opportunities.

(vi) Manage the parameters for prices of products, conducts quality control of products, including through inspections of samples and factory production lines.

(vii) Manage anti-counterfeiting actions, for example, commencing legal proceedings against unauthorised dealers and invalidating registration by trademark squatters.[6]

23. Grand Union has contracted with hundreds of Sublicensees to distribute the Paul Frank Brand Products.

24. Grand Union has diligently pursued all of these activities since 2015 (i.e., for over seven years now), and developed a strong network of Sublicensees, which have increased the value of the Paul Frank brand in the Territory in a substantial way.[7]

25. Further, in order to perform these activities, Grand Union has invested in and grown its own business to meet the needs of the MLA. Grand Union has made an investment in its own business to facilitate the activities needed under the MLA, including by hiring

---

6 **RWS-1**, ¶ 12.

7 **RWS-1**, ¶¶ 21-22.

personnel and expanding the Licensing Operation Department, the Licensing Management Department, the Intellectual Property Department, the Merchandise Department, eCommerce Department, the Brand Marketing Centre, and the Finance Department.[8]

26. Grand Union has paid at least US$73.5 million for the exclusive license under the MLA, including the US$8.5 million additional payment made to PF Hong Kong in 2021. The total cost of the other activities set out above is not easily quantified.[9] Based upon total revenue under the MLA, Grand Union has not even recouped in investment of the $73.5 million license fee yet.[10]

**4. Grand Union's cooperation with Paul Frank Industries under the MLA generally worked well before it was assigned to PF Hong Kong**

27. Prior to the assignment of the MLA to PF Hong Kong, Grand Union was able to regularly obtained necessary documentation from Paul Frank Industries to conduct its business and support its Sublicensees under the MLA.[11] This documentation includes a number of types of documents.

28. First, Grand Union needs notarized letters of authorization evidencing Grand Union's authority as licensee of the Paul Frank Brand ("**LOA**"),[12] and the relevant trademark registration certificates in relation to the categories of products that our Sublicensees (the "**Trademark Certificates**").

29. Second, Grand Union needs a notarized power of attorney ("**POA**") authorising Grand Union to act on behalf of the owner of the intellectual property in legal proceedings to enforce the licensed trademarks and police the brand.

30. The need for the LOAs and Trademark Certificates relates to doing business through ecommerce Platforms: in order to open and maintain stores on the Platforms, Platforms

---

8 **RWS-1**, ¶ 15.

9 **RWS-1**, ¶ 19.

10 **RWS-1**, ¶ 20.

11 First Witness Statement of Jennifer Huang dated March 24, 2023 ("**RWS-2")**, ¶ 11.

12 Notarised Letter of Authorisation provided by Saban (**R-IR-1**).

require certain documentation from the owners of the stores to show that the store has the proper authorisation and trademark registrations to sell the products offered through the Platform.[13]

31. In response to requests from Sublicensees, Grand Union thus needed to make requests to the Licensor for LOAs and Trademark Certificates. Prior to PF Hong Kong taking ownership of the Paul Frank Brand, Grand Union was able to obtain such documentation from Paul Frank Industries, including notarised LOAs evidencing Grand Union's authority as the exclusive licensee.[14]

**5. After the MLA was assigned to PF Hong Kong, it refused to cooperate with Grand Union with respect to necessary documentation**

32. Beginning in early 2021, Grand Union asked the new brand owner, PF Hong Kong, for LOAs and Trademark Certificates. However, PF Hong Kong delayed, disagreed with Grand Union, and eventually refused to provide the LOAs and Trademark Certificates.[15]

33. Although PF Hong Kong at first made the excuse that it was due to COVID-19-related restrictions, when the COVID-19 restrictions were lifted, PF Hong Kong still refused to provide the notarized LOA.[16]

34. As a result of PF Hong Kong's refusal to provide a notarised LOA, and the delay in providing even an un-notarised LOA, the Sublicensees were unable to open stores and there was substantial disruption in the ability to do business on the Platforms. This resulted in a decrease in Sublicensees' sales, which in turn translated into a decrease in the Grand Union's revenue from such Sublicensees. Perhaps most importantly, however, it also led to disputes and disruptions between Grand Union and the Sublicensees, and damaged (and

---

13 **RWS-2**, ¶ 14-16.

14 **RWS-2**, ¶ 17.

15 **RWS-2**, ¶ 24.

16 **RWS-2**, ¶ 25.

threatened to continue to damage) that important elements of the business under the MLA.[17]

**6. Only six months after the assignment to PF Hong Kong, PF Hong Kong was demanding substantial additional payment from Grand Union in connection with the MLA, and forced Grand Union to pay it additional amounts under threat of termination**

35. On June 21, 2021, PF Hong Kong issued a Notice of Termination of Grand Union, accusing Grand Union of "attacking the title to or rights of Paul Frank in and to the Property," in violation of Section 9(b) of the MLA. In particular, without any proof or basis, PF Hong Kong claimed that Grand Union itself had incorporated companies which used certain Paul Frank trademarks in the names of those companies.[18]

36. While it was not Grand Union that had done anything wrong, that did not seem to matter to PF Hong Kong. Indeed, even though this issue was rectified in a matter of days, PF Hong Kong transparently claimed that it was entitled to US$5,585,000 in damages, and that it had to be paid an additional "Brand Management Fee" of US$50,000.[19] PF Hong Kong was clearly pursuing a strategy of trying to use these complaints, and threats of termination, to create a justification for claiming additional money from Grand Union.

37. PF Hong Kong continued to vaguely complain about other issues and stated that there were other "material breaches" of the MLA that had not "been completely cured." In this context, PF Hong Kong continued to press its claim for "indemnification" for costs of sending the notice of termination to Grand Union at that time. It was an odd situation because PF Hong Kong stated that it was extending the "cure period" to July 23, 2021, even though it was unclear what the exact issues were.

---

17 **RWS-2**, ¶ 27.

18 **RWS-2**, ¶ 33-34; *see also* Notice of Termination dated June 21, 2021 (**R-IR-4**).

19 **RWS-2**, ¶ 35; *see also* Letter from Paul Frank Limited to Grand Union dated July 15, 2021 (**R-IR-5**).

38. PF Hong Kong's threats of termination intensified during July and August 2021, and PF Hong Kong gave Grand Union a final deadline to "cure" its complaints. In order to resolve these issues, and to move on, Grand Union paid US$8.5 million related to the Second Amendment.[20]

**7. After the Second Amendment, PF Hong Kong continued to refuse to cooperate with Grand Union**

39. Grand Union's payment of the additional US$8.5 million did not satiate PF Hong Kong for long, and did not have a positive impact on PF Hong Kong's performance (or lack of performance) under the MLA.

40. PF Hong Kong continued to refuse to provide the notarized LOAs after the Second Amendment was signed, and into the first half of 2022.[21] Further, PF Hong Kong raised the stakes in June of 2022.

41. At that time it informed Grand Union that it had found allegedly forged LOAs that have been submitted to Platforms, and it immediately accused Grand Union of violating Section 1(b)(iii) of the MLA because it was responsible for ensuring that the Sublicensee complied with the "obligations under the Agreement." PF Hong Kong leapt at the chance to frame this as an alleged Material Breach under the MLA. PF Hong Kong strangely, and accusatorily, demanded that Grand Union identify all of Grand Union's breaches of the MLA.[22]

42. In addition, trying to manufacture more breaches, on July 21, 2022, PF Hong Kong then accused Grand Union of breaches of the Second Amendment, alleging that unidentified breaches had not been cured by February 19, 2022 (six month prior to these discussions). Without any proof that Grand Union had created such "forged" document, PF Hong Kong stated that it was suspending the MLA and was taking over all management of the Sublicensees and coordination with marketplaces. Indeed, PF Hong Kong informed Grand

---

20 **RWS-2**, ¶ 37-38.

21 **RWS-2**, ¶ 39.

22 **RWS-2**, ¶ 40.

Union that it was going to start taking future royalty payments from Sublicensees and divert them directly to PF Hong Kong.[23]

43. On August 24, 2022, PF Hong Kong sent another Notice of Termination to Grand Union, relating to Grand Union's alleged "numerous material breaches" of the MLA. Specifically, PF Hong Kong claimed that (a) Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands; (b) Licensee has sold and/or distributed Licensed Products outside the Territory and the Channels of Distribution; (c) Licensee has not cured the "existing or potential" breaches of the MLA during the Extraordinary Cure Period; (d) Licensee has refused Licensor's request for an audit. However, all these allegations were untrue and unsubstantiated.[24] PF Hong Kong did not provide particulars or any evidence to support these allegations.

44. Without knowing exactly what PF Hong Kong was referring to, Grand Union nevertheless wrote back on September 16, 2022 and made its position clear to PF Hong Kong. It had not done any of these things PF Hong Kong was accusing it of doing.[25]

45. Despite Grand Union's explanation and assurances, on September 23, 2022, PF Hong Kong sent Grand Union a "Termination of Master License Agreement" based on the allegations in the Notice of Termination dated August 24, 2022.[26]

46. Tellingly, in conversations with Mr. Wan, the owner of PF Hong Kong, he clearly stated that he was looking for "commercial value" from the MLA. .[27]

---

23 **RWS-2**, ¶ 41; *see also* Notice of Material breaching and Further Steps dated July 21, 2022 (**R-IR-6**).

24 **RWS-2**, ¶ 43; *see also* Notice of Termination dated August 24, 2022 (**R-IR-7**).

25 **RWS-2**, ¶ 44; *see also* Email from Grand Union to PF Hong Kong dated September 16, 2022 (**R-IR-8**).

26 **RWS-2**, ¶ 45; *see also* Notice of termination of the MLA dated September 23, 2022 (**R-IR-9**).

27 **RWS-2**, ¶ 42.

47. This makes manifestly clear that PF Hong Kong's conduct was simply in furtherance of its scheme to force Grand Union to pay additional license fees, even though Grand Union had paid in full for the license in 2015.

**B. PF Hong Kong's allegations of breaches of the MLA are vague, meritless and void of any factual support**

48. Since the time PF Hong Kong took over the Licensor role under the MLA, it has regularly accused Grand Union of breaching the MLA. These allegations are vague, meritless and factually unsupportable. Each area of alleged breaches is discussed below.

**1. Alleged forgery**

49. Grand Union has never forged any documentation. What appears to have happened, however, is that because PF Hong Kong refused to provide the properly notarized authorization documentation that Grand Union had requested, some Sublicensees took matters into their own hands and created the documents so that they could continue to conduct their business on the Platforms.[28]

50. Each time that Grand Union learned about this kind of behavior, it promptly addressed the issues and resolved them as quickly as it is could, and as it was able. Grand Union also timely provided reports to PF Hong Kong about its actions in addressing such issues.[29]

51. There is no basis for PF Hong Kong's allegation of forgery.

**2. PF Hong Kong's demand for an audit**

52. In around July 2022, PF Hong Kong demanded free access to Grand Union's business and alleged that it could investigate and review any material it wished. PF Hong Kong announced that this was to discover all the breaches of Grand Union. In other words, PF Hong Kong's argument is that under the MLA's audit provisions, it has open access to all of Grand Union's records and information.[30]

---

28 **RWS-2**, ¶ 48

29 **RWS-2**, ¶ 49.

30 Notice of Material breaching and Further Steps dated July 21, 2022 (**R-IR-6**).

53. This is baseless. PF Hong Kong did not provide any basis for this request, and cannot point to any contractual provision which would give it this right. Grand Union never agreed to being investigated in this manner by PF Hong Kong. Further, PF Hong Kong also refused to provide any protocol for such an audit, and thus cannot maintain this pretextual complaint.[31]

**3. PF Hong Kong's allegations of mismanagement of Sublicensees**

54. PF Hong Kong accused Grand Union of mismanaging its Sublicensees. Again, PF Hong Kong does not explain its basis for making such an accusation, but Grand Union did not mismanage the Sublicensees.

55. Further, whenever Grand Union became aware of any non-compliance by any Sublicensee, Grand Union would communicate with the Sublicensee and ensures they brought themselves into compliance.[32]

56. This allegation is baseless and unsupported.

**4. PF Hong Kong's allegation of failure to provide Quarterly Statements**

57. PF Hong Kong also complained about Grand Union's delivery of Quarterly Statements. Grand Union provided PF Hong Kong with Quarterly Statements every quarter in 2021 after the Second Amendment was signed. However, in 2022, there has been intermittent lockdowns and other restrictions under the zero-Covid policy in various cities of China which caused delays to the collation of information and reporting, including a complete lockdown in Shanghai from March to May.[33]

58. PF Hong Kong did not mention this issue until it was seeking to terminate MLA, and did not give proper notice or opportunity to cure. This is just another example of PF Hong Kong hunting for any basis to claim breach to try to extort additional payments from Grand Union.

---

31 **RWS-2**, ¶ 50-51.

32 **RWS-2**, ¶ 53.

33 **RWS-2**, ¶ 55.

### 5. PF Hong Kong's accusations relating to anti-counterfeiting actions

59. Since 2015, Grand Union has been involved in a multitude of legal proceedings to protect its commercial rights as an exclusive licensee. The parties would generally reach an agreement on how to deal with the damage awards and other compensation resulting from any anti-counterfeiting actions. These activities are permitted under the MLA, and PF Hong Kong has no legitimate complaint in this regard.[34]

60. There is no basis for PF Hong Kong's accusations that Grand Union is somehow breaching the MLA relating to anti-counterfeiting actions.

### 6. PF Hong Kong's other vague allegations

61. PF Hong Kong made a number of new allegations in the arbitration, including:

(a) infringement of Intellectual Property or failure to obtain proper approval;

(b) breach of Section 9(b) by way of registration of domain names containing the Paul Frank name;

(c) breach of Section 9(c);

(d) sales of products outside the Territory;

(e) sale of Licensed Products below a competitive price or engaged in Dumping;

(f) failure or refusal to pay royalties, participation fees, and market commitments as set forth in the Second Amendment.

62. When PF Hong Kong filed the arbitration, this was in general the first time that these issues were raised.[35] No particulars relating to these allegations have been disclosed.

63. In any event, **none of these complaints amount to a "Material Breach" of the MLA**, and cannot be relied upon to justify a termination of the MLA.

---

34 **RWS-2**, ¶¶ 57-59.

35 **RWS-2**, ¶¶ 60-61.

**C. PF Hong Kong has undertaken a systematic campaign to subvert and destroy Grand Union's business and its relationships with the Sublicensees and the Platforms**

64. PF Hong Kong, and Mr. Wan, throughout 2022 and now 2023, have been perpetrating a scheme to destroy Grand Union's business and rights under the MLA. This has occurred in two main ways.

65. First, PF Hong Kong has disrupted and destroyed Grand Union's relationships with some of its Sublicensees, wrongfully informing them that Grand Union is no longer authorized because the MLA was terminated. This has caused various disputes and confusion.

66. Second, PF Hong Kong, in disregard of Grand Union's exclusive rights, PF Hong Kong is simply entering into sublicense agreements in the Territory with various third parties, and has now recently publically announced that it is the new license manager for the Terrritory.

**1. PF Hong Kong's disruption of Grand Union's relationships with the Sublicensees and Platforms.**

67. On July 6, 2022, PF Hong Kong emailed Tiktok and attached a letter alleging an unauthorized use of Paul Frank trademark on the Tiktok platform. In both the email and letter, PF Hong Kong alleged that all documents evidencing the authority granted by PF Hong Kong were forged.[36]

68. On July 22, 2022, PF Hong Kong emailed the Sublicensees of Grand Union, telling the Sublicensees that all of Grand Union's rights under the MLA, including Grand Union's power to grant sublicenses, was suspended. Further, PF Hong Kong informed the Sublicensees that PF Hong Kong itself would take over the management of the Sublicensees.[37]

---

[36] Letter from PF Hong Kong dated July 6, 2022 (**R-IR-12**).

[37] Email from PF Hong Kong dated July 22, 2022 attached a letter of notification dated July 21, 2022 (**R-IR-13**).

69. On September 30, 2022, PF Hong Kong again wrote to all sublicensees in the Territory, claiming that the MLA had been terminated and that all sublicensees through Grand Union and the relevant proof of authorisation immediately ceases to be effective.[38]

70. This interference continued. In relation to Vipshop, a Platform targeting more high-end customers, this caused a serious impact on Grand Union's business.[39] Due to this interference, all adult apparel stores of Grand Union's Sublicensees have been suspended by Vipshop, including those of 上海新红纺品牌管理有限公司(Shanghai New Hongfang Brand Management Company Limited) ("**SH New Hongfang**"), which only opened a store on the Platform on October 18, 2022.[40]

71. PF Hong Kong's continuing efforts to ruin Grand Union's relationship with its Sublicensees manifested in other circumstances as well, including relating to Shanghai Xiyaqi and Jinjiang Yuanqi, who were both Sublicensees.

72. Shanghai Xiyaqi received the email of July 22, 2022 from PF Hong Kong containing its baseless attempt to take over the management of the Sublicensees. On October 17, 2022, Hong Fang received an email from Pinduoduo (a Platfrom) seeking to verify the LOA dated August 1, 2022 issued by PF Hong Kong. On November 2, 2022, Shanghai Xiyaqi wrote to Grand Union and Hong Fang attempting to terminate the agreements and claiming for the damages for the related economic loss incurred since July 21, 2022. This relationship has ended up in a dispute.[41]

73. As to Jinjiang Yuanqi, it owed outstanding amounts to Grand Union. However, in 2022, Jinjiang Yuanqi complained that it was not able to obtain the LOAs and claimed that it did

---

[38]  **RWS-2**, ¶ 65; *see also* Letter from Paul Frank Limited to Sublicensees dated September 30, 2022 (**R-IR-14**).

[39]  **RWS-2**, ¶ 66.

[40]  **RWS-2**, ¶ 66.

[41]  **RWS-2**, ¶¶ 68-70.

not know who to pay, PF Hong Kong or Grand Union.[42] This led to a dispute with JinJiang Yuanqui, and the relationship ended.

74. However, strikingly, it was discovered that Jinjiang Yuanqi continued to operate and even opened two new Paul Frank stores on Tmall. Given Tmall's policies to prevent trademark infringement, this could only be because PF Hong Kong has interfered and engaged with Jinjiang Yuanqi, and provided the necessary documents to Jinjiang Yuanqi.

75. Subsequently CBG / Grand Union also received a request from Tiktok to verify the letter of authorisation purportedly issued by Jinjiang Yuanqi. This again shows that Jinjiang Yuanqi provided TikTok with a letter of authorization, which it must have received from PF Hong Kong.[43]

**2. PF Hong Kong's new licensee agreements and blatant violations of Grand Union's exclusive rights**

76. PF Hong Kong has also begun openly licensing the Paul Frank Brand to other entities, in violation of Grand Union's exclusive rights.

77. Between January and February 2023, Grand Union and CBG received multiple requests from various Platforms seeking verification of the authority of different entities to use the Paul Frank Brand. These entities are not Sublicensees of Grand Union yet they were able to produce LOAs from PF Hong Kong.

78. Grand Union has received notice of at least 17 parties that appear to have been licensed by PF Hong Kong. These are set out in the witness statement of Ms. Huang.[44] Grand Union has also recently conducted a search and found 54 stores on Platforms which was not authorised by Grand Union or its Sublicensees.[45]

---

42 **RWS-2**, ¶ 71.

43 **RWS-2**, ¶¶ 73.

44 **RWS-2**, ¶ 75.

45 **RWS-2**, ¶ 76.

79. The fact that these entities received the necessary LOAs is confirmation that PF Hong Kong has always been able to provide them if it wished, but it withheld them from Grand Union deliberately. Further, it is confirmation that PF Hong Kong is working to subvert Grand Union's exclusive rights under the MLA.

80. Grand Union also recently learned that PF Hong Kong made a public announcement a few weeks ago that Grand Union is no longer licensed.[46] This has caused significant confusion and harm in the market, as an increasing number of Sublicensees refuse to work with Grand Union. In addition, these articles reported that PF Hong Kong plans to rework its distribution in the Chinese market and to upgrade mechanism for distributing proof of its authorisation.[47]

## III. REQUEST FOR INTERIM RELIEF

81. In these circumstances, and in order to maintain the status quo, Respondent respectfully requests that the Tribunal grant the following interim relief:

(a) declare that the MLA remains in force pending the conclusion of this arbitration or by further order the Tribunal;

(b) order Respondent to perform under the MLA pending the conclusion of this arbitration or until further order of the Tribunal;

(c) order Claimant to cease all contact with Respondent's Sublicensees, absent permission from Respondent, except to inform the Sublicensees that Grand Union retains the right to sublicense the Paul Frank Brand while this arbitration is pending;

(d) order Claimant to refrain from, directly or indirectly through its affiliates, disparaging Respondent and disrupting its business, including by making public statements or press releases about this arbitration and/or dispute between Claimant and Respondent, or approaching Respondent's business associates and other third parties including, but not limited to, the Sublicensees, customers, suppliers, content

---

46 News Article dated February 22, 2022 (**R-IR-19**).

47 *Id.*

and service providers, and/or regulatory authorities, in respect of complaints or any other matters that are to be addressed in arbitration under the MLA; and

(e) grant any further injunctive relief that the Tribunal deems appropriate.

**A. The Tribunal has the power to order the requested interim relief**

82. The Tribunal has the authority to grant the Interim Relief requested in this Application.

83. Rule 24(e) of the Rules states in relevant part:

> Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures.

84. Moreover, U.S. courts, including California courts, have repeatedly affirmed the authority of a Tribunal to grant interim relief.[48]

85. Indeed, courts have affirmed the importance of a Tribunal's ability to grant interim relief to enforce performance of an agreement where, absent relief, a final award becomes a Pyrrhic victory.[49]

---

48 *See*, *e.g.*, *Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67, 70 (1st Cir. 2010) ("Arbitrators normally have the power to grant interim relief unless the parties specify otherwise in the contract.") (**RL-IR-1**); *Hightower v. Superior Court*, 86 Cal.App.4th 1415, 1419 (2001) (finding interim award was "not precluded by nor offensive to the California Arbitration Act (Code Civ. Proc., § 1280, et seq.)…") (**RL-IR-2**); *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) ("an arbitrator generally has the authority to enter injunctive relief against a party that has entered into an arbitration agreement.") (**RL-IR-3**).

49 *See Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022–23 (9th Cir. 1991) ("Temporary equitable relief in arbitration may be essential to preserve assets or enforce performance which, if not preserved or enforced, may render a final award meaningless.") (**RL-IR-4**); *see also* Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][4][c] (Kluwer Law International, Updated August 2022) ("Arbitral tribunals frequently order what common law practitioners refer to as 'specific performance,' requiring a party to perform specified acts pursuant to a preexisting contractual or other legal obligation.") (**RL-IR-5**).

86. Furthermore, authorities are in agreement that interim relief to preserve the *status quo* are fairly typical in arbitration.[50] Even if this Tribunal were to credit PF Hong Kong's arguments that it terminated the MLA, this Tribunal would still have the authority to order interim relief which restores the *status quo ante*, i.e. the period just prior to PF Hong Kong's purported termination.[51]

87. In addition, the MLA implies that the parties can obtain interim relief in these circumstances because it expressly authorizes either party to initiate an arbitration to pursue a "provisional remedy" even during the initial dispute resolution stage, where the parties have agreed to mediate their dispute and otherwise forego arbitration for thirty days.[52]

88. Finally, international arbitration tribunals may also grant applications for interim relief to avoid further aggravation of a dispute.[53] Such interim relief "may be directed towards forbidding…interference with contractual performance or property rights, or exacerbating

---

50 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][4][a] ("the prime examples of interim protection are measures that serve to preserve the status quo until the final decision on the merits is rendered (preservation order).") (internal quotations omitted) (**RL-IR-5**); *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am. Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) ("[W]e conclude that a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process…") (**RL-IR-12**).

51 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][4][a] ("both the UNCITRAL Model Law and the UNCITRAL Rules expressly empower tribunals to order interim measures **restoring** the status quo.") (emphasis added) (citing UNCITRAL Model Law, 2013 Revisions, Art. 26(2)(a)) (**RL-IR-5**). Grand Union notes, however, that PF Hong Kong's recent representations that the MLA was terminated run entirely counter to their request in the Demand for Arbitration that it is still entitled to audit Grand Union's compliance with the MLA pursuant to Section 6(b) of the MLA. *See* Demand for Arbitration ¶ 44. It also runs counter to PF Hong Kong's representations in correspondence which post-dates PF Hong Kong's purported termination.

52 First Amendment to MLA dated April 27, 2018, § 28 (**R-IR-20**).

53 *See Armed Activities on the territory of Congo (Democratic Republic of the Congo v. Uganda*), Provisional Measures, Order 1 (1 July 2000) ("both Parties must, forthwith, prevent and refrain from any action … which might prejudice the rights of the other Party in respect of whatever judgment the Court may render in the case, or which might aggravate or extend the dispute before the Court or make it more difficult to resolve.") (**RL-IR-6**).

the parties' dispute through actions that result in increased or more extensive damage to a counter-party."[54]

89. There is no question that pursuant to Rule 24(e) of the Rules, U.S. court precedent, and the MLA, the Tribunal has the authority to issue the Interim Relief requested in this Application.[55]

**B. Standards for granting interim relief**

90. At noted by Robert Davidson, Executive Director of JAMS Arbitrator Practice, the prevailing view is that the standard to be applied is not the law of the forum (*lex arbitri*) or the chosen law of the contract, but rather the rules of the provider organization, here JAMS.[56]

91. Rule 24(e) of the Rules provides only that the Arbitrator "may grant whatever interim measures are deemed necessary." There is no other guidance as to the applicable standard, but "the prevailing rules [including the JAMS Rules] generally provide arbitral tribunals with wide discretion to consider different factories when granting interim measures" through the use of this discretionary language.[57]

---

54 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][4][b] (Kluwer Law International, Updated August 2022) (**RL-IR-5**).

55 It is well-settled law in the Second Circuit that an arbitrator has wide discretion to craft interim relief, including interim relief that would be unavailable in a court of law. *Sperry Int'l Trade v. Gov't of Israel*, 689 F.2d 301, 306 (2d Cir. 1982) (**RL-IR-7**).

56 Robert B. Davidson and Cliff Bloomfield, "Interim and Emergency Measures in International Commercial Arbitration: Time to Say Goodbye to Irreparable Harm and Likelihood of Success on the Merits?", New York Law Journal, Vol. 259, No. 27 (February 8, 2018) (**RL-IR-8**).

57 Christel Tham, Lisa Wang Lachowicz, and Jane Tien, "New York Arbitration Week 2022 Redux: Who's in Charge? -- The Post-Pandemic Meaning of 'Public Interest' in Interim Applications," Kluwer Arbitration Blog, *available at* https://arbitrationblog.kluwerarbitration.com/2022/12/04/new-york-arbitration-week-2022-redux-whos-in-charge-the-post-pandemic-meaning-of-public-interest-in-interim-applications/ (**RL-IR-9**).

92. Rule 31.2 of the JAMS' International Arbitration Rules provides further insight into a possible applicable standard for interim relief in the international context, as it expressly incorporates UNCITRAL Model Law:

> **31.2** The party requesting an interim measure shall satisfy the Tribunal that (a) harm not adequately reparable by an award of damages is likely to result if the measure is not ordered and such harm substantially outweighs the harm that is likely to result to the party against whom the measure is directed if the measure is granted; and (b) there is a reasonable possibility that the requesting party will succeed on the merits of the claim.

93. Even Rule 31.2 embodies a lower standard for obtaining interim relief than is typical in U.S courts. A party seeking interim relief must only show a "reasonably possibility" of success on the merits of the claim, rather than a likelihood of success on the merits.

94. The international standard for interim relief embodied in the Model Law is consistent with the view of Gary Born, who noted that "most international arbitral tribunals require showings of (a) a risk of serious or irreparable harm to the claimant; (b) urgency; and (c) no prejudgment of the merits, while some tribunals also require the claimant to establish a prima facie case on the merits, a prime facie case on jurisdiction, and to establish that the balance of hardships weighs in its favor."[58]

95. A "risk of irreparable harm" does not require that the harm be literally irreparable, only that the potential harm is serious or will be difficult to remedy.[59] Indeed, Tribunals will often order a party to continue licensing intellectual property, even in the absence of truly

---

58 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][3][b] (**RL-5**).

59 *PNG Sustainable Dev. Program Ltd v. Papua New Guinea*, Decision on Provisional Measures in ICSID Case No. ARB/13/33 of 21 January 2015, ¶109 (citing G. Born, International Commercial Arbitration 2511-40, 3387-90 (2d ed. 2014) ("In the Tribunal's view, the term 'irreparable' harm is properly understood as requiring a showing of a material risk of serious or grave damage to the requesting party, and not harm that is literally 'irreparable' in what is sometimes regarded as the narrow common law sense of the term.") (**RL-IR-10**).

irreparable harm, so long as the provisional relief will minimize the damages that accrue during the arbitral process.[60]

96. Respondent thus proposes that the Tribunal apply the following elements:

(a) There is a reasonable possibility that the requesting party will succeed on the merits of the claim;

(b) Harm not adequately reparable by an award of damages is likely to result if the measure is not ordered; and

(c) The harm to the applicant substantially outweighs the harm (if any) that is likely to result to the party against whom the measure is directed, should the measure be granted.

**C. PF Hong Kong is entitled to the interim relief it requests**

97. Here, PF Hong Kong is entitled to the interim relief it requests as it can make out each of the elements above.

**1. There is a reasonable possibility that Respondent will prevail on the merits**

98. Grand Union has demonstrated that there is a reasonable possibility that it will prevail on the merits in this arbitration. As described in both Grand Union's Counterclaims, the witness statement of Jennifer Huang, the witness statement of Zheng Tao, and above, PF Hong Kong has embarked on a coordinated campaign (based upon pretextual complaints of over 35 claimed breaches described vaguely in the Demand) to extort additional

60 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][4][b] ("Some tribunals appear prepared to issue provisional relief designed simply to ensure that the commercial damage resulting from the arbitral process is, insofar as possible, minimized. Thus, there are instances where tribunals will require specified actions (e.g., **continued licensing of intellectual property**, continued sales of products) even where the requesting party cannot show irreparable or even serious harm, merely because ordering these actions reduces the overall damages to the respondent and claimant in the arbitration.") (emphasis added) (**RL-IR-5**).

payments from Grand Union – under the threat of termination – from the minute that PF Hong Kong took over as Licensor under the MLA.

99. In 2021, PF Hong Kong was able to extort an US$8,500,000 payment from Grand Union, along with certain recurring "Brand Management Fees," "Participation Fees," and a percentage of net invoiced billings by the sublicenses.[61] When PF Hong Kong attempted the same extortion scheme a second time in 2022, Grand Union resisted.

100. The playbook that PF Hong Kong has followed from that point forward is simple. PF Hong Kong failed to provide notarized LOAs and the trademark registration certificates that Grand Union's Sublicensees needed to market the Paul Frank Products. PPF Hong Kong then threatened to terminate the MLA due to purported breaches by Grand Union, even though none existed.

101. These actions were clearly done in breach of the MLA, and in breach of the implied covenant of good faith and fair dealing. In addition, PF Hong Kong has tortuously interfered with Grand Union's sublicense arrangements, telling TikTok on July 6th that Grand Union had forged authorization documents from PF Hong, and then later emailing sublicensees of Grand Union to state that PF Hong Kong would take over the management of those sublicenses.[62]

102. Two specific examples highlight breaches by PF Hong Kong, as well as the continuing harm being inflicted on Grand Union. One Sublicensee, Shanghai Xiyaqi, received PF Hong Kong's July 22, 2022 email which claimed that PF Hong Kong was taking over management of the sublicenses, and that Grand Union no longer had authority to sublicense the Paul Frank Brand. Shanghai Xivagi ultimately attempted to terminate its sublicense with Grand Union, and has stopped working with Grand Union altogether.[63]

---

61 **RWS-2,** ¶ 38; *see also* Second Amendment to MLA dated August 19, 2021 (**R-IR-21**).

62 **RWS-2,** ¶¶ 63-64; Letter from PF Hong Kong dated July 6, 2022 (**R-IR-12**)**;** Email from PF Hong Kong dated July 22, 2022 attached a letter of notification dated July 21, 2022 (**R-IR-13**)**.**

63 **RWS-2,** ¶¶ 68-70.

103. Another example concerns Jinjiang Yuanqi. Grand Union had entered into a sublicense agreement with Jinjiang Yuanqi in 2020, but Jinjiang Yuanqui had not paid certain outstanding fees, and Grand Union had been engaged in ongoing efforts to collect the outstanding amount. PF Hong Kong sent the same July 22, 2022 email to Jinjiang Yuanqi that it sent to other Sublicensees, alleging that PF Hong Kong was taking over management of the Paul Frank Brand for Grand Union. As a result, Jinjiang Yuanqi claimed that it did not know who to pay, and has continued to withhold payment from Grand Union.[64]

104. PF Hong Kong has also interfered with the Platforms. Vipshop has closed all adult apparel stores of Grand Union's Sublicensees because of communications from PF Hong Kong. If Grand Union is unable to sell Paul Frank Brand Products on the Platforms, its ability to effectively market and distribute the Paul Frank Products is severely reduced.[65] All of these wrongful acts threaten to destroy the business that Grand Union has built from the ground up starting in 2015. Grand Union had grown its network throughout mainland China.

105. By contrast, PF Hong Kong's purported Notices of Termination, and its Demand for Arbitration, offer little beyond a conclusory laundry list of purported breaches by Grand Union, supported by no specific allegations or details.[66] It is telling that PF Hong Kong's various purported Notices of Termination[67] contain no detail whatsoever about the purported breaches: no dates when purported breaches occurred, no documentation reflecting or supporting the supposed breaches, and no specific details describing the breaches (such as describing where the Licensed Products were supposedly sold out the Territory, PF Hong Kong's basis for believing that Grand Union forged PF Hong Kong's official stamps and signatures for documentation needed by the Platform, when Grand

---

64 **RWS-2,** ¶¶ 71-73.

65 **RWS-2,** ¶ 66.

66 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][2][b][iv] (Kluwer Law International, Updated August 2022) ("if the claimant licensee has advanced a very thorough case as to wrongful termination, countered by no serious argument or evidence from the respondent licensor, provisional measures should be much more readily granted.") (**RL-IR-5**).

67 *See* Demand for Arbitration, Exs. 7-9.

Union was already contractually entitled to such things, and no details whatsoever to corroborate PF Hong's allegations of fraud).[68] This has not only complicated Grand Union's efforts to defend itself, but it is short of even demonstrating the mere possibility of prevailing on the merits of its claims.

106. Further, PF Hong Kong seeks to rely on alleged breaches that do not amount to a "Material Breach" as defined in the MLA. Without a "Material Breach" PF Hong Kong obviously has no right to terminate the MLA. Since there is no "Material Breach" for PF Hong Kong to rely on, it cannot succeed on its claims.

107. Moreover, to the extent that PF Hong Kong alleges that it no longer has any obligations under the MLA because it sent notices of termination to Grand Union, that argument is meritless. The mere act of sending a notice of termination is ineffective to actually terminate a contract where no right to termination exists.[69] For all of the reasons stated above, Grand Union did not breach the MLA, nor did PF Hong Kong identify with any degree of specificity how Grand Union had breached the MLA. Thus, the notices of termination did not serve to terminate the MLA.

108. Grand Union has easily demonstrated likelihood of success on the merits, not just a possibility of success on the merits.

**2. The interim relief is needed to avoid likely irreparable harm, or at least harm not adequately reparable by an award of damages**

109. Grand Union is likely to suffer irreparable harm, or at least adequately reparable by an award of damages, if the Application is not granted. As described in great detail above, Grand Union spent significant time and resources building its network of Sublicensees in mainland China. Over the course of the last seven plus years, and in reliance on a 15-year exclusive license period, Grand Union has entered into sublicense agreements across

---

68 Tellingly, PF Hong Kong has not advanced a cause of action for fraud in this arbitration.

69 *See, e.g., Irwin v. Carpenters Health and Welfare Trust Fund for California*, 745 F.2d 553 (9th Cir. 1984) ("The time and manner of exercising a power of termination [of a contract] may be specified in the contract; in such case an attempt to exercise it otherwise will be ineffective.") (citation omitted) (**RL-IR-11**).

China. Already, that number has dropped precipitously, and will inevitably drop to zero if the Application is not granted.

110. Further, the type of potential harm described above is serious and will be difficult to remedy. For example, as set out above Grand Union is facing potential harm of the following sort:

(a) harm to its business relationships with the Platforms;

(b) harm to its business relationships with Sublicensees;

(c) harm to Grand Union's business reputation;

(d) harm to the value (and growth in value) of the license and goodwill under the MLA going forward; and

(e) harm to Grand Union's ability to recoup its various investments it has made in connection to the MLA, and harm to Grand Union's ability to realize whatever profits it would realize over the next 7 years.

111. All of these kinds of harms will at very least be very difficult to quantify in the event that Grand Union prevailed in this arbitration. Indeed, even if Grand Union's counterclaims were vindicated at the conclusion of this arbitration, the Tribunal found that PF Hong Kong breached the MLA, and the Tribunal found that PF Hong Kong's purported termination of the MLA was ineffective, it would be extremely difficult, costly, and time consuming for Grand Union to rebuild its sprawling network of sublicense agreements for the remainder of the MLA's term.

112. Finally, even if it may be possible to recompense Grand Union's damages at the conclusion of this arbitration by, *inter alia*, approximating its damages based on the license fees that PF Hong Kong collects from its new sublicensees,[70] interim relief would still be

---

70 Gary B. Born, International Commercial Arbitration (Third Edition), §17.02[G][3][b] (Kluwer Law International, Updated August 2022) ("where the applicant, asserting a prima facie credible claim, appears likely to suffer serious (but not necessarily irreparable) injury as a consequence of steps threatened by the respondent to alter the existing status quo, provisional measures are likely; that is particularly true where the respondent's actions appear designed to make ultimate enforcement of an award more difficult (e.g., transferring

appropriate because it would serve to prevent further aggravation of the dispute, and minimize the ongoing damages that will continue to accrue during this arbitration, including the significant reputational harm that Grand Union is suffering.

**3. The harm to the Grand Union substantially outweighs the harm that is likely to result to PF Hong Kong if the Application is granted**

113. The harm to Grand Union if this Application is not granted substantially outweighs the harm that is likely to result to PF Hong Kong if the Application is granted. As detailed above, Grand Union will suffer significant and likely irreparable harm if the Application is not granted. PF Hong Kong's openly admits that it considers the MLA terminated, and is entering into separate license agreements with other sublicensees. PF Hong Kong has even publicly announced that it had terminated the MLA, and was going to create its own distribution network in mainland China.[71] Thus, every day that goes by, PF Hong Kong is aggravating the dispute and increasing the damages suffered by Grand Union.

114. If the Application is not granted, but Grand Union were to succeed on the merits at the conclusion of this arbitration, Grand Union would face the daunting task of trying to rebuild a massive network of sublicensees created across mainland China over a seven-year period. Grand Union would also suffer economic damage that would be extremely difficult to quantify.

115. In addition, absent interim relief, Grand Union will continue to suffer reputational harm.[72] Grand Union's inability to provide the necessary documents to sell the Paul Frank Brand Products on the Platforms, due to PF Hong Kong's failure to cooperate, has frustrated the Sublicensees and has undoubtedly caused the Sublicensees to question their business arrangements with PF Hong Kong. In other cases, PF Hong Kong has directly contacted the Sublicensees and baselessly criticized Grand Union.

---

disputed property outside the ordinary course of business) and/or the respondent does not appear likely to suffer material harm from a grant of provisional measures.") (**RL-IR-5**).

71 **RWS-2**, ¶ 78.

72 **RWS-1,** ¶ 34.

116. There is little likelihood of harm that PF Hong Kong will suffer if this Application is granted. PF Hong Kong is ultimately a licensor; whether the Paul Frank Brand is marketed by Grand Union or another licensee, PF Hong Kong is indifferent, so long as its license fee is paid in full. Grand Union of course has paid the license fee required by the MLA in full. Grand Union will pay all fees due and owing under the Second Amendment to the MLA. Thus, the significant harm that Grand Union will suffer significantly outweighs the miniscule possibility that PF Hong Kong will suffer if the Application is granted.

## IV.    REQUESTED RELIEF

117. For all of the reasons listed above, this Tribunal should grant the application. Grand Union respectfully reiterates its request that the Tribunal enter an interim award in its favor as follows:

(a)    declare that the MLA remains in force pending the conclusion of this arbitration or until further order of the Tribunal;

(b)    order Respondent to perform under the MLA pending the conclusion of this arbitration or until further order of the Tribunal;

(c)    order Claimant to cease all contact with Respondent's Sublicensees, absent permission from Respondent, except to inform the Sublicensees that Grand Union retains the right to sublicense the Paul Frank Brand while this arbitration is pending;

(d)    order Claimant to refrain from, directly or indirectly through its affiliates, disparaging Respondent and disrupting its business, including by making public statements or press releases about this arbitration and/or dispute between Claimant and Respondent, or approaching Respondent's business associates and other third parties including, but not limited to, the Sublicensees, customers, suppliers, content and service providers, and/or regulatory authorities, in respect of complaints or any other matters that are to be addressed in arbitration under the MLA; and

(e)    grant any further relief that the Tribunal deems appropriate.

Dated: March 24, 2023.

**Submitted for and on behalf of the Respondent**

**K&L GATES LLP**

**Attorneys for the Respondent**

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

**[EXHIBITS 17 – 28]**

weintraub tobin chediak coleman grodin
LAW CORPORATION

{4002658.DOCX:}
1
DECLARATION OF STANLEY YOOK-LOONG WAN IN SUPPORT OF PAUL FRANK LIMITED'S PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION

# EXHIBIT 17

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent*

**JAMS REF. No. 1220073501**

---

# FIRST WITNESS STATEMENT OF ZHENG TAO 郑涛的第一份证人证词

---

March 24, 2023

I, ZHENG TAO, declare: 本人，**郑涛**，将陈述如下：

**INTRODUCTION 简介**

1. I provide this Witness Statement in support of Respondent's Application for Interim Relief (the "**Application**") in its arbitration against Paul Frank Limited ("**PF Hong Kong**").我提交这份证人证词以支持被诉人在其对保罗弗兰克有限公司（"**香港保罗弗兰克**"）的仲裁中提出的初步禁令救济申请（"**申请书**"）。

2. I am currently the Vice Chairman within the China Brands Group ("**CBG**"), and have worked at CBG since 1999. I am responsible for the business development and strategic planning of CBG. I am also the person-in-charge of the intellectual property affairs department. 我目前是红纺集团（"**红纺 / CBG**"）副主席。自 1999 年以来，我一直受雇于红纺集团。

3. I hold an undergraduate degree in Economics and Administration from PLA Nanjing Political College.我拥有中国人民解放军南京政治学院经济与行政管理的本科学位。

4. I have prepared this witness statement with the assistance of counsel for style and grammar but this statement is my own. The contents of this witness statement are based upon my personal knowledge, as well as documents I have reviewed and referenced herein. I affirm this statement is true to the best of my knowledge and belief, and I am willing and able to participate in the hearing in this matter if required. My first language is Mandarin, and I will need to be assisted by an interpreter when giving oral evidence. 律师在这份证人证词的风格和语法上给予了本人协助，但这份证词是本人自己的。本证人证词的内容基于我的个人知识，以及我在本文中审阅和引用的文件。我确认，就我所知和所信，这证人证词是真实的，如果需要，我愿意并能够参加本事项的听证会。我母语是普通话，作证将需要翻译员的协助。

**THE MLA 主许可协议**

5. CBG has been involved in the Paul Frank Brand's Chinese business since the late 2000s. In around 2010, Saban Brands Entertainment Group ("**Saban**") took over the Paul Frank

Brand. Several companies within the CBG held licenses from Saban, including Shanghai Romma Apparel Ltd ("**Romma**"). I worked at Romma at that time. 自 2000 年代末以来，CBG 一直参与 Paul Frank 品牌的中国业务。在 2010 年左右，Saban Brands Entertainment Group（"Saban"）接管了 Paul Frank 品牌。CBG 的几家公司持有 Saban 的授权，包括上海若玛服饰有限公司。我当时在上海若玛服饰有限公司工作。

6. At that point in time, CBG was already an established brand management group in China, with a growing team servicing its sublicensees, existing business relationships and connections in the industry. CBG understood that in order to increase the value of the Paul Frank Brand, it had to be repositioned as a more high-end brand in mainland China, and CBG had a plan to achieve that goal. 当时 CBG 在国内已经是一家成熟的品牌管理集团，拥有一支正在壮大的团队，为其许可方以及行业中现有的商业关系提供服务。CBG 明白，为提升 Paul Frank 品牌价值需将其在中国大陆重新定位为更高端的品牌，并已有实现这目标的计划。

7. Such a plan requires long-term capital investment and operational investment, and the stable development of the brand name. This is why, in around 2012, CBG (through Romma, which had been a sublicensee), informed Saban that it would like to take over all the management of Paul Frank Brand in China, and it made an offer to Saban for an exclusive license. 这个计划的实施需要长期的资金投入和经营，维持品牌稳定发展。因此，在 2012 年左右开始，CBG 通过 Romma（作为当时已有授权的被授权方）告知 Saban CBG 希望接管 Paul Frank 品牌在中国的所有管理权，并向 Saban 提出了独家许可的提议。

8. In around 2014, Saban began negotiating with CBG on what would become the MLA. The MLA between Grand Union and Paul Frank Industries was signed as of January 1, 2015. The signing of the MLA took place at the Shangri-La hotel in Shanghai and it was celebrated as one of the most significant brand licensing relationships between China and the United States. 大約在 2014 年，Saban 开始与 CBG 进行對主许可协议 條款的商討，而宏联和 Paul Frank Industries 之间的主许可协议于 2015 年 1 月 1 日签署。合

約双方在上海香格里拉酒店签署主许可协议，被誉为中美之间最重要的品牌授权关系之一。

9. Under the MLA, Grand Union paid a one-time, upfront lump sum payment of US$65 million to Paul Frank Industries for a 15-year exclusive license to exploit the Paul Frank Brand in mainland China, Hong Kong, and Macau (the "**Territory**"). 根据主许可协议，宏联向 Paul Frank Industries 一次性支付 6,500 万美元的款项，以获得在中国大陆、香港和澳门（"**该地区**"）开发 Paul Frank 品牌為期 15 年的独家许可证。The MLA in particular grants Grand Union an **exclusive** right to use the Paul Frank Intellectual Property (the "**Property**") in the Territory until 2030. 主许可协议特别授予宏联在 2030 年之前在该地区内使用 Paul Frank 知识产权（"**该知识产权**"）的**独家**权利。

10. The MLA permits termination for cause only, and under limited circumstances as described in the MLA. This is an important protection for Grand Union. CBG was required to inject long-term, sustained investment to develop the Paul Frank Brand in the Territory and achieve the objectives of the licensing program. Further, Grand Union was required to pre-pay the license fee of US$65 million for the entire 15-year period, and would need many years to recoup that investment and earn a profit. 主许可协议只允许在其所述的有限情况下出于正当理由終止协议。这对宏联来说是一个重要的保障，CBG 需要长期和持续的投资来实现许可计划的目标和 Paul Frank 品牌在该地区的发展。宏联需预付為期 15 年的 6500 万美元许可费，要很多年才能收回投资并挣的利润。

11. Under the MLA, Grand Union took over the entire management of the Paul Frank Brand in China. Grand Union assumed responsibility for creating the strategic vision for the Paul Frank Brand and executing all necessary steps and investments in order to grow the value of the Paul Frank Brand in the Territory. In exchange for its significant investment of time and money, Grand Union anticipated reaping the benefits of this deal for the entire 15-year period. Grand Union trusted that the Licesnor would not interfere with its rights and execution of the MLA, or interfere with its ability to recoup its investment in the development of the brand and to reap the financial benefits of its investment and efforts. 根据主许可协议，宏联接管了 Paul Frank 品牌在中国的全部管理工作。宏联承担了制定品牌战略愿景并采取必要步骤和投资的责任，以提高 Paul Frank 品牌在该地区

的价值。作为对宏联投资金錢及時間的交换，宏联的预期是在整个 15 年期间都能从这笔交易中获益，并相信品牌方不会干涉宏联对于主许可协议下权利和执行、在品牌发展中的收回投资，并从投资和努力中获得利益。

**GRAND UNION'S SUBSTANTIAL INVESTMENT IN THE DEVELOPMENT OF THE PAUL FRANK BRAND 宏联對 PAUL FRANK 品牌发展的重大投资**

12. Beginning in 2015, CBG / Grand Union invested heavily into the development and repositioning of the Paul Frank Brand, and took over the management of the brand in the Territory. Below is a partial list of the investments and development efforts undertaken by CBG/Grand Union in the Territory: 从 2015 年开始，CBG/宏联為 Paul Frank 品牌的开发和重新定位进行了重大投资，并接管了该品牌在该地区的管理。以下是 CBG/宏联在该地区进行的投资和发展工作：

(a) Grand Union paid $65 million, the entire license fee for the 15-year period, upfront in 2015. 宏联在 2015 年付了 6500 万美元，即為期 15 年的全部许可费。

(b) Grand Union has and continues to use its prior, in-depth experience in China to identify and implement advertising strategies to elevate the Paul Frank Brand in the market, and purchases advertising from various channels, including in the areas of events, exhibitions, and films. 宏联一直持续利用其在中国的丰富经验来制定和实施广告策略，以提升 Paul Frank 品牌在市场上的地位，并从各种渠道购买广告，包括活动、展览和电影领域的广告。

(c) Grand Union has and continues to leverage its existing relationships and brand management expertise to select and maintain hundreds of sublicensees under the MLA ("**Sublicensees**"). Many of the Sublicensees are sourced from previous manufacturing and commercial contacts from Grand Union/CBG, and are built on the reputation and goodwill of CBG. 宏联一直持续利用其现有关系和品牌管理专业，在主许可协议下选择和维护数百个许可方（"**许可方**"）。许多许可方来自於宏联/CBG 之前已有的制造商和商业联系，并建立在 CBG 的商誉之上。

(d) Grand Union has and continues to design, manage and coordinate efforts to expand and capitalize on various eCommerce platforms (“**Platforms**”) in China, including selecting and directing Sublicensees for pursuing sales through the Platforms. 宏联一直持续设计、管理和协调努力，以扩大和利用中国的各种电商平台（“**平台**”），包括选择和指导许可方通过平台进行销售。

(e) Grand Union has and continues to design and implement training programs for Sublicensees, and assists Sublicensees with directional support relating to seasonal product for each quarter. 宏联一直持续设计及实施培训计划予许可方，并协助及提供定向支持予许可方在每个季度推出季节性产品。

(f) Grand Union has and continues to support Sublicensees with the design of new products, identifying market trends and opportunities. 宏联一直持续支持许可方设计新产品，掌握市场趋势和机会。

(g) Grand Union has and continues manage the parameters for prices of products, and conducts quality control of products, including through inspections of samples and factory production lines. 宏联一直持续管理产品价格参数，对产品进行质量控制，包括对样品和工厂生产线进行检查。

(h) Grand Union has and continues to manage anti-counterfeiting actions, for example, commencing legal proceedings against unauthorised dealers and invalidating registration by trademark squatters. 宏联一直并将继续管理防伪打假行动，例如，对未经授权的经销商提起法律诉讼，并使商标非法占有者的注册无效。

13. Grand Union has diligently pursued all of the activities since 2015 (i.e., for over seven years now). 宏联自 2015 年起一直在努力开展所有工作，已然七年有余。

14. Further, in order to perform these activities, Grand Union has invested in and grown its own business to meet the needs of the MLA. Grand Union has made an investment in its own business to facilitate the activities needed under the MLA, including by hiring personnel and expanding various departments, including the Licensing Operation Department, Licensing Management Department, Intellectual Property Department, Merchandise Department, eCommerce Department, the Brand Marketing Centre, and the

Finance Department. 此外，为了开展这些工作，宏联投资及发展了自家的业务以满足主许可协议的需求。宏联为促进主许可协议下所需的活动对业务的投资包括人員的聘用以壮大各业务部门：许可运营部、许可管理部、知识产权部、商品部、电子商务部、品牌营销中心和财务部。

15. These parts of our business service the MLA in various ways, including as follows: The Licensing Operation Department develops relationships with potential sublicensees and assists in their business plan; the Merchandise Department is responsible for setting prices of products and conducting quality control; the Licensing Management Department provides the necessary documentations to open new stores (physical or on eCommerce Platforms) and conduct their business. 我们业务的这部分以各种方式为主许可协议提供服务，包括以下内容：许可运营部与潜在许可方发展关系，并协助其制定商业计划；商品部负责制定产品价格并进行质量控制；许可管理部則为开设新店（实体店或电商平台店）和开展业务提供必要的文件。

16. In recognition of Grand Union's exemplary work in its licensing business, it has been awarded many Best Licensee awards from various institutions. 为了表彰宏联出色的授权工作，宏联获得了多个来自不同机构的最佳被授权方奖。

17. The total amount and value of this investment of time, money and efforts in executing all of the above activities is very difficult to quantify. 宏联执行上述所有活动所投入的时间、金钱和精力的总量皆难以量化。

18. Grand Union has paid at least US$73.5 million for the exclusive license under the MLA, including the US$8.5 million additional payment made to PF Hong Kong in 2021. The total cost of the other activities set out above is not easily quantified. 宏联已支付至少7,350 万美元，以獲取主许可协议下的独家授权，包括 2021 年支付给香港保罗弗兰克的 850 万美元的额外费用。上述其他活动的总费用不易量化。

19. Based upon total revenue under the MLA, Grand Union has not even recouped in investment of the $73.5 million license fee yet. 根据主许可协议的总收入，宏联甚至还未收回 7350 万美元的许可费投资成本。

20. Grand Union, in entering into the MLA, depended on the 15-year license period in order to gain the returns it expected on this business. 宏联在簽訂主许可协议时，是信赖該 15 年的许可期来获得有关业务的预期回报。

**GROWTH AND INCREASE IN THE VALUE OF THE PAUL FRANK BRAND DUE TO GRAND UNION'S EFFORTS UNDER THE MLA 在宏联於主许可协议下的努力，PAUL-FRANK 品牌的价值增長**

21. Grand Union's management and development of the Paul Frank Brand has increased the value of the brand, and strengthened the brand in the Territory in many tangible and intangible ways. 宏联的管理和发展使得 Paul Frank 品牌价值增長，并在该地区以许多有形和无形的方式对 Paul Frank 品牌有所强化。

22. Because of our efforts, the Paul Frank brand, an obscure brand in the Chinese market in 2015, has become a well-known luxury brand "Big Mouth Monkey", even surpassing the positioning and popularity of the Brand in the United States. 在我们的努力下， 2015 年在中国市场默默无闻的 Paul Frank 品牌已然变成了如今家喻户晓的大嘴猴名牌，甚至超越了品牌在美国的定位和知名度。

**HARM TO GRAND UNION IF PF HONG KONG IS PERMITTED TO CONTINUE ITS MISCONDUCT DURING THE PENDENCY OF PROCEEDINGS 若香港保罗弗兰克被允许在仲裁未决期间继续行为，將对宏联造成损害**

23. Due to PF Hong Kong's failure to perform its obligations under the MLA, and efforts to disrupt and destroy Grand Union's business under the MLA, Grand Union's business is harmed in a number of ways, and in a manner which is at least extremely difficult, if not impossible, to quantify with precision. 由于香港保罗弗兰克未能履行其在主许可协议下的义务，以及试图扰乱和破坏宏联在主许可协议下的业务，宏联的业务受到了多方面的损害，这种损害即使不是不可能，也是难以精确地量化的。

24. Grand Union's business under the MLA involves managing hundreds of Sublicensees, and policing the market in order to protect the value of Grand Union's exclusive rights under

the MLA. The severely disruptive and damaging conduct of PF Hong Kong is not only causing monetary harm to Grand Union, but it fundamentally affects its existing relationships with its Sublicensees as well as the major ecommerce Platforms. 宏联在主许可协议下的业务包括管理数百个许可方，并监管市场，以保护宏联在主许可协议下独家许可的价值。香港保罗弗兰克的严重破坏性行为不仅给宏联带来了金钱上的损失，而且从根本上影响了其与许可方以及主要电商平台之间的现有关系。

25. The damage to the relationships between Grand Union and the Sublicensees is not easily quantified. Given PF Hong Kong's conduct, there has been a breakdown of trust between Sublicensees with whom we have cultivated long-term relationships. We now have multiple disputes with Sublicensees, who question whether Grand Union is authorized to grant them a sublicense. 宏联与许可方关系的损害不易量化。香港保罗弗兰克的行为对我们与许可方建立的长期关系和信任造成了破裂。我们现在与许可方有多起纠纷，他们质疑宏联是否有权授予他们的许可。

26. The damage to Grand Union's relationship with the Platforms is also not easily quantified. CBG / Grand Union have other business with the Platforms, and there has been damage to the trust and goodwill between CBG / Grand Union and the Sublicensees as well as the Platforms. 宏联与平台关系的损害也不易量化。CBG/宏联与平台有其他业务来往，CBG/宏联的商誉以及和被许可方和平台之间的互信都受到了损害。

27. As explained above, Grand Union's ability to successfully manage the Paul Frank Brand is due to its business relationships and connections in the industry. These connections and relationships built on trust will be irreversibly damaged if Grand Union's exclusive rights continue to be questioned, and if PF Hong Kong continues to target Grand Union's Sublicensees, and flood the market with other sublicensees of its own. This also damages the goodwill under the MLA and value of the brand's business. 如上所述，宏联之所以能够成功管理 Paul Frank 品牌，是因为其在行业中的业务关系和联系。如果宏联的独家许可继续受到质疑，以及如果香港保罗弗兰克继续針對干擾宏联的许可方，并用自己其他的被授权方充斥市场，这些建立在信任基础上的联系和关系将受到不可逆转的损害。这也损害了主许可协议下的商誉。

28. In reliance on the MLA, Grand Union through its licensee in the CBG group has concluded licensing arrangements with hundreds of Sublicensees on the assumption that PF Hong Kong would continue to honour the terms of the MLA and that Grand Union would be able to exploit the Property to "*design, develop, manufacture, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer*" Licensed Products and provide Licensed Services. 根据主许可协议，并基于香港保罗弗兰克将继续遵守主许可协议的条款的前設下，宏联通过红纺与数百名许可方签订了授权書，并且宏联将能够利用该知识产权"*设计、开发、制造、推广、分销、宣传、提议销售、销售、提供和以其他方式提供*"许可产品，并提供许可服务。

29. The Sublicensees of CBG have also made business decisions in reliance of Grand Union's status as the exclusive licensee in the Territory, e.g. granting further sublicenses to downstream sublicensees, and made their own investments in their own business activities. CBG 的许可方依据宏联作为该地区的独家许可证持有人做出了商业决策，例如向下游被授权方授予进一步的分许可，并在其商业活动中进行投资。

30. Among other things, PF Hong Kong's deliberate refusal to provide the necessary documentation pursuant to the MLA is harming Grand Union. PF Hong Kong's continuous interference with Grand Union's relationships with its Sublicensees and various Platforms sows confusion in the market and has caused a significant number of Sublicensees to stop working with Grand Union altogether. 當中，香港保罗弗兰克故意拒绝 根据主许可协议提供必要的文件，损害了宏联的利益。香港保罗弗兰克持续干预宏联与其许可方和各种平台的关系，在市场上造成混乱，并导致大量许可方停止与宏联的合作。

31. Given the disruption caused by PF Hong Kong, in 2022, the Sublicensees of Respondent opened only 149 new stores, which is significantly lower than what we expected and anticipated. 鉴于香港保罗弗兰克造成的干擾，於 2022 年，被诉人的许可方仅开设了 149 家新店，这大大低于我们的预期。

32. As an example of the harm to Grand Union's rights and business under the MLA, out of the 344 stores operating in 2022, only 175 stores successfully applied to continue their operation on the Platforms (excluding those of Shanghai Xiyaqi and Jinjiang Yuanqi given that those sublicensees were terminated by Grand Union) and 15 stores have been rejected

by the Platforms.宏联在主许可协议下的权利和业务受到损害，其中一个例子是，在 2022 年运营的 344 家店铺中，只有 175 家店铺成功申请继续在平台上运营（不包括上海希亚其和晋江元祺，因为其授权已被宏联终止），15 家店铺已被平台拒绝。

33. This kind of impact on the goodwill associated with the brand and the licensing rights under the MLA are precisely the type of harm that will destroy Grand Union's business under the MLA. It will also destroy the reputation of Grand Union (and CBG) when it negotiates with distributors even on unrelated business deals involving different brands. 对与品牌商誉及主许可协议下的许可权的影响正是属于会摧毁宏联在主许可协议下业务的伤害类别。当宏联（和 CBG）的声誉受到破坏，也会影响其与分销商的谈判，即使分销商是涉及不同品牌、与 Paul Frank 品牌无关的商业交易。

34. Unless PF Hong Kong ceases its extremely damaging conduct during the course of this arbitration, PF Hong Kong will have seriously damaged, if not complete destroyed, Grand Union's reputation and goodwill in the industry. Even if Grand Union ultimately prevails in this arbitration, and this misconduct continues, it is likely that Grand Union will not be able to rebuild its network of Sublicensees nor repair all of the relationships with the Sublicensees that have been damaged by PF Hong Kong's misconduct. 除非香港保罗弗兰克在仲裁期间停止其极具损害性的行为，否则香港保罗弗兰克将严重损害甚至彻底摧毁宏联在业界的商誉。即使宏联最终在本次仲裁中获胜，香港保罗弗兰克破坏的被授权方网络，以及与许可方的所有关系，也很可能无法重建，也无法修复。

Dated: March 24, 2023

日期：2023 年 3 月 24 日

ZHENG TAO 郑涛

# EXHIBIT 18

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

Los Angeles, California

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent.*

**JAMS REF. No. 1220073501**

---

# FIRST WITNESS STATEMENT OF JENNIFER HUANG

---

March 24, 2023

I, JENNIFER HUANG, declare:

**INTRODUCTION**

1.      I provide this Witness Statement in support of Respondent's Application for Interim Relief (the "**Application**") in its arbitration against Paul Frank Limited ("**PF Hong Kong**").

2.      I hold an undergraduate degree in Administration from the Providence University of Taiwan. I have over 30 years of experience in the licensing industry, including at Disney Consumer Product Limited and Megakids Publishing Ltd.

3.      I have been involved in the development of the Paul Frank Brand since it was first introduced to the Asia-Pacific region in around late 2000s. Between 2004 and 2018, I worked at Click Licensing Asia, LLC ("**Click**").  Click was the agent of various foreign brands and managed the Asian licenses for a number of brands. These brands included Marvel, Universal, and Dreamworks, as well as the Paul Frank Brand.  Since February 2019, I became associated with the China Brand Group ("**CBG**"), where I continued to work on the management of the Paul Frank Brand in China.

4.      I am currently the General Manager of the Licensing Management Department within CBG.  As part of my role, I am responsible for Grand Union's management of the Paul Frank Brand and the main liaison with PF Hong Kong relating to the activities under the Master License Agreement dated January 1, 2015 (the "**MLA**").

5.      I have prepared this witness statement with the assistance of counsel for style and grammar but this statement is my own. The contents of this witness statement are based upon my personal knowledge, as well as documents I have reviewed and referenced herein. I affirm this statement is true to the best of my knowledge and belief and I am willing and able to participate in the hearing in this matter if required. My first language is Mandarin, and I will need to be assisted by an interpreter when giving oral evidence.

**THE LICENSING OF THE PAUL FRANK BRAND IN CHINA PRIOR TO THE MLA**

6.      Beginning around 2010, Saban Brands Entertainment Group ("**Saban**") took over Paul Frank Industries, LLC ("**Paul Frank Industries**"), which owned the Paul Frank Brand.

7.      I am aware of this fact because at that time Click was engaged as an agent to manage Paul Frank Industries' licensees in the Greater China Region, including mainland China, Hong Kong, Macau and Taiwan.

8.      Around 2013, Saban decided to manage the Brand in mainland China and Hong Kong itself and opened an office in Shanghai. Licensing in Taiwan was and is still being dealt with through Click, and I was personally involved in that part of the management of the Paul Frank Brand up until the time I left Click in 2018.

9.      After only around two year, I understand that Saban decided it no longer wished to directly manage the Paul Frank Brand in mainland China and Hong Kong. I believe that Saban's plan to directly manage this licensing did not work out because Saban underestimated the costs needed to manage hundreds of sublicensees in mainland China and Hong Kong.

10.     I understand that for this reason, Saban decided to license out the management of the Paul Frank Brand in mainland China, Hong Kong and Macau, to a centralized and experienced brand management company founded in China, and thus ultimately the MLA was signed with Grand Union.

**THE GOOD WORKING RELATIONSHIP UNDER THE MLA BEFORE IT WAS ASSIGNED TO PF HONG KONG**

11.     Prior to the assignment of the MLA to PF Hong Kong, Grand Union regularly obtained necessary documentation from Paul Frank Industries to conduct its business and support its Sublicensees under the MLA. This documentation includes a number of types of documents.

12.     First, Grand Union needed notarized letters of authorization evidencing Grand Union's authority as licensee of the Paul Frank Brand ("**LOA**"),[1] and the relevant trademark registration certificates in relation to the categories of products that our Sublicensees (the "**Trademark Certificates**").[2]

---

[1] Notarised Letter of Authorisation provided by Saban (**R-IR-1**).

[2] A sample of the Trademark Certificate provided by Saban (**R-IR-2**). China Trademark Classification is divided into 45 classes. For example, Class 25 is for clothing, footwear, and headgear. Each class is further categorised into sub-classes. The Licensor as the intellectual

13.     Second, Grand Union needed a notarized power of attorney ("**POA**") authorising Grand Union to act on behalf of the owner of the intellectual property in legal proceedings to enforce the licensed trademarks and police the brand.

14.     The need for the LOAs and Trademark Certificates relates to doing business through ecommerce Platforms.[3]

15.     Platforms have policies in order to ensure that the stores on the Platforms do not infringe on third-party intellectual property rights. Therefore, they require this documentation from the owners of the stores on the Platform to show that the store has the proper authorisation and trademark registrations to sell the products offered through the Platform.

16.     Accordingly, in response to requests from Sublicensees, Grand Union made requests to the Licensor for LOAs and Trademark Certificates.  In order to capture revenues from the Platforms, and realize the growth anticipated through ecommerce, Grand Union must engage with its Sublicensees who do business on the Platforms, and quickly, in order to capture and maintain market share on the Platform.

17.     Prior to PF Hong Kong taking ownership of the Paul Frank Brand, Grand Union was able to obtain such documentation from Paul Frank Industries, including a notarised LOA evidencing Grand Union's authority as its exclusive licensee. This was required for Sublicensees to comply with the requirements of the Platforms. It was understood, particularly from interactions with Sublicensees, that the notarization on the LOAs and Trademark Certificates were needed to fully qualify as proof that the Sublicensee was

---

property owner can register the trademark for all the classes. In practice, Saban obtained the Trademark Certificate for all the categories and sub-categories that Grand Union and its Sublicensee would develop products in.

[3] Sales on Platforms have become an important source of revenue for brand managers like Grand Union. Sales on Platforms in China have increased from around RMB 3.24 trillion in 2015 to around RMB 9.76 in 2020. The stores opened by Grand Union's Sublicensees on these Platforms increased over the last three years from around 175 in 2020 to around 442 in 2022. For example, Tiktok is mainly a short video hosting social media platform, but it has also evolved into an important channel for selling merchandise in China in connection with livestreamed videos on the site.

authorized, so that they would be permitted to commence or continue their business on the Platforms.

**AFTER THE MLA WAS ASSIGNED TO PF HONG KONG, PF HONG KONG STOPPED COOPERATING WITH GRAND UNION**

18.    We came to learn in late 2020 that the MLA was assigned to PF Hong Kong, and PF Hong Kong took over the role of Licensor under the MLA.[4]  We also came to understand that the owner of PF Hong Kong is Futurity, which is controlled by Mr. Stan Wan.

19.    Mr. Wan had previously worked at Paul Frank Industries and was the main point of contact between Paul Frank Industries and Grand Union between 2017 and 2020. I expected the business relationship under the MLA to continue smoothly after the assignment.  Mr. Wan was personally involved in the parties' prior performance under the MLA, the license was pre-paid until 2030, and Mr. Wan and Paul Frank Industries had never complained about Grand Union's performance under the MLA since the time it was signed in 2015.  Mr. Wan was fully familiar with the parties' activities related to the MLA.

20.    However, to our surprise, the relationship under the MLA changed significantly, and PF Hong Kong began to undertake a course of conduct which has and continues to severely damage Grand Union's business. This manifested itself in three main ways.

21.    First, PF Hong Kong began to refuse to perform its fundamental role under the MLA: to provide authorizations and other documentation to Grand Union in order that the property covered by the MLA could be exploited.

22.    Second, PF Hong Kong began to make baseless complaints about Grand Union's performance under the MLA, almost immediately threatening to terminate the MLA in a flippant manner.  PF Hong Kong later used these baseless complaints to seek to terminate the MLA, and bully Grand Union.

---

[4] Email of December 9, 2020 attached with Notice of Assignment dated December 8, 2020 (**R-IR-3**).

23. Third, PF Hong Kong undertook a campaign of activities vis-à-vis third parties that have disrupted and destroyed Grand Union's relationships with its Sublicensees and the Platforms, fundamentally harming Grand Union's business related to the MLA.

24. Beginning in early 2021, when Grand Union asked the new owner, PF Hong Kong, to provide LOAs and Trademark Certificates, PF Hong Kong delayed, disagreed with Grand Union, and eventually refused to provide the LOAs and Trademark Certificates. As stated above, this documentation was needed so that the Sublicensees could do business on certain Platforms.

25. More specifically, with regard to the LOAs, PF Hong Kong initially claimed that it could not provide a notarised LOA as the signatory could not travel due to COVID-19-related restrictions. However, PF Hong Kong still refused to provide a notarised version of the document even when it could no longer use COVID-19 as an excuse.

26. Further, around April 202l, one of the Platforms, Tiktok, started requiring proof of the complete authorisation chain from the store owners. For a Sublicensee or its subsequent sublicensee to apply for a new store on a Platform, it needs to provide the whole chain of authorisation starting from the holder of the intellectual property rights (i.e. PF Hong Kong at the time) including (i) a letter of authorization evidencing Grand Union's authority as the exclusive licensee, and (ii) a letter of authorisation from Grand Union to the Sublicensee. After receiving documents from the applicants, the Platforms appoints third parties to verify them by sending the documents to the issuing party (i.e., in this case to PF Hong Kong).

27. As a result of PF Hong Kong's refusal to provide a notarised LOA and the substantial delays in providing even an un-notarised LOA, the Sublicensees were not being able to open stores and there was substantial disruption in the ability to do business on the Platforms. This resulted in a significant decrease in Sublicensees' sales, which in turn translated into a decrease in the Grand Union's revenue from such Sublicensees, and led to disputes and disruptions in the business under the MLA.

28. By mid-2021, after repeated requests and months after PF Hong Kong took over as Licensor under the MLA, it still had not provided the relevant Trademark Certificates to Grand Union. We begged for each Trademark Certificate as the situation became

increasingly pressing, but PF Hong Kong only provided certain certificates, and slowly. Between July and September 2021, we obtained around a batch of 90 Trademark Certificates with still around 87 outstanding.

**PF HONG KONG COERCED GRAND UNION INTO SIGNING THE SECOND AMENDMENT TO THE MLA AND PAYING AN ADDITIONAL FEE**

29. PF Hong Kong deliberately withheld important documents that Grand Union and its Sublicensees needed in order to market and distribute the Paul Frank Brand Products. As mentioned above, we had fully paid the US$65 million license fee to use the Property for a 15-year period, and owed no further payments under the MLA.

30. PF Hong Kong also sent several letters which vaguely alleged that Grand Union had breached the MLA, though PF Hong Kong never provided any specific details or evidence to corroborate their accusations. It became very apparent that PF Hong Kong was making up breaches of the MLA in order to extort money from Grand Union.

31. Grand Union's representative spoke with Mr. Wan, who controls PF Hong Kong, about the supposed breaches of the MLA. It became clear that Mr. Wan could not identify any breaches of the MLA to Grand Union, but he demanded that Grand Union pay off PF Hong Kong or else PF Hong Kong would terminate the MLA. Ultimately, Mr. Wan demanded that Grand Union pay $8.5 million to PF Hong Kong, and in exchange he promised that PF Hong Kong would not terminate the MLA.

32. As I mentioned above, PF Hong Kong also began threatening to terminate the MLA in mid-2021. To this day, PF Hong Kong has levied numerous vague, unsubstantiated, and plainly false complaints against Grand Union related to purported breaches of the MLA, which to the best of my understanding were simply being used to get Grand Union to pay additional monies to PF Hong Kong related to the MLA. In part, this understanding was based upon by the peculiar nature of PF Hong Kong's conduct and accusations.

33. For example, out of the blue, on June 21, 2021, PF Hong Kong issued a Notice of Termination of Grand Union, accusing Grand Union of "attacking the title to or rights of Paul Frank in and to the Property," in violation of Section 9(b) of the MLA. In particular, without any proof or basis, PF Hong Kong claimed that Grand Union had incorporated

companies in China which used certain Paul Frank trademarks in the names of those companies. PF Hong Kong claimed that such conduct adversely and materially affected the good will and market value associated with the Property and that this had persisted for more than 120 days.[5]

34.    This was very surprising.  PF Hong Kong had not given any warning to us before, or discussed this with us.  It simply sent us a notice of termination.  When notified of the issues, although it was not Grand Union, we contacted these companies and almost immediately (within days) these issues had been rectified.

35.    Given that that these complaints were resolved, PF Hong Kong then simply manufactured other complaints. For example, PF Hong Kong complained that in essence because it had to identify these issues to Grand Union, it was entitled to US$5,585,000 in damages, and that it had to be paid an additional "Brand Management Fee" of US$50,000. PF Hong Kong, in our view, was clearly using its complaints to try to create a justification for claiming additional payments from Grand Union.

36.    It did not stop there. PF Hong Kong continued to vaguely complain about other issues and stated that there were other "material breaches" of the MLA that had not "been completely cured."[6] In this context, PF Hong Kong continued to press its claim for "indemnification" for costs described directly above. It was an odd situation because PF Hong Kong stated that it was extending the "cure period" to July 23, 2021, even though it was unclear to us at Grand Union what needed to be cured in the first place.

37.    PF Hong Kong's threats related to these various complaints intensified during July 2021, and in August 2021, PF Hong Kong threatened again to terminate the MLA with high urgency, and gave Grand Union until August 19, 2021 as a final deadline to "cure" the complaints.

38.    In reality, the "cure" that PF Hong Kong required was an additional payment. On August 19, 2021, the situation was "resolved" by Grand Union agreeing to make a US$8.5 million

---

[5] Notice of Termination dated June 21, 2021(**R-IR-4**).

[6] Letter from PF Hong Kong to Grand Union dated July 15, 2021 (**R-IR-5**).

payment to PF Hong Kong. In order to "save face," and justify the payment with the CBG organization, the Second Amendment added the "A.NI.MA Property" to the MLA, even though this IP was not worth nearly US$ 8.5 million. Additionally, Grand Union agreed to pay PF Hong Kong an additional US$200,000 annually as a Brand Management Fee to satisfy PF Hong Kong's demands. From Grand Union's perspective, these payments were required in order to simply keep PF Hong Kong from disrupting and interfering with its rights under the MLA for the remainder of the license period.

**PF HONG KONG CONTINUED TO REFUSE TO COOPERATE WITH GRAND UNION AFTER THE SECOND AMENDMENT, AND IN 2022 DEMANDED YET ANOTHER ADDITIONAL PAYMENT**

39.     Even after the payment of the additional $8.5 million was made related to the Second Amendment, however, PF Hong Kong still did not provide us with any Trademark Certificates for new products. Further, throughout 2021, and during 2022, Grand Union continued to request a notarized LOA for its Sublicensees, but PF Hong Kong continued to refuse to provide them.  PF Hong Kong took the position that the notarized LOAs were not needed, arguing incorrectly that the Sublicensees could simply use the Second Amendment to prove they had the right to use the intellectual properly.  In addition, PF Hong Kong began telling Grand Union that it would just deal with the Sublicensees itself. To this day, PF Hong Kong has refuses to provide Grand Union with Trademark Certificates so that the Sublicensees may market and sell Paul Frank Branded products on the Platforms.  This serious undermines Grand Union's relationship with the Sublicensees, and we believe is a strategy to cut out Grand Union.

40.     In that context, PF Hong Kong raised the stakes in June of 2022.  At that time it informed Grand Union that it had found allegedly forged LOAs that have been submitted to Platforms, and it immediately accused Grand Union of violating Section 1(b)(iii) of the MLA because it was responsible for ensuring that the Sublicensee complied with the "obligations under the Agreement." PF Hong Kong leapt at the chance to frame this as an alleged Material Breach under the MLA. Indeed, PF Hong Kong strangely, and accusatorily, demanded that Grand Union identify all of Grand Union's breaches of the MLA.

41.    In addition, trying to manufacture more breaches, on July 21, 2022, PF Hong Kong accused Grand Union of breaches of the Second Amendment, alleging that unidentified breaches had not been cured by February 19, 2022 (six month prior to these discussions). Without any proof that Grand Union had created such "forged" document, PF Hong Kong stated that it was suspending the MLA and was taking over all management of the Sublicensees and coordination with marketplaces. Indeed, PF Hong Kong informed Grand Union that it was going to start taking future royalty payments from Sublicensees and divert them directly to PF Hong Kong.[7] PF Hong Kong was effectively trying to shut down Grand Union's business under the MLA, and divert the financial benefits of the MLA back to PF Hong Kong.

42.    Despite his previous promise that PF Hong Kong would not terminate the MLA if Grand Union paid $8.5 million under Second Amendment, PF Hong Kong began harassing Grand Union again in 2022. I reached out to Mr. Wan to discuss the issues. Mr. Wan clearly stated that he wanted "commercial value" out of the MLA. It was clear to me that he just wanted to be paid again by Grand Union in exchange for PF Hong Kong not terminating the MLA. This time, we knew that Mr. Wan could not be trusted and that his promises meant nothing, so we declined to make the payment.

43.    On August 24, 2022, PF Hong Kong sent another Notice of Termination to Grand Union, relating to Grand Union's alleged "numerous material breaches" of the MLA. Specifically, PF Hong Kong claimed that (a) Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands; (b) Licensee has sold and/or distributed Licensed Products outside the Territory and the Channels of Distribution; (c) Licensee has not cured the "existing or potential" breaches of the MLA during the Extraordinary Cure Period;  (d) Licensee has refused Licensor's request for an audit. However, all these allegations were untrue and unsubstantiated.[8] PF Hong Kong did not provide particulars or any evidence supporting these allegations.

---

[7] Notice of Material breaching and Further Steps dated July 21, 2022 (**R-IR-6**).

[8] Notice of Termination dated August 24, 2022 (**R-IR-7**).

44. Without knowing exactly what PF Hong Kong was referring to, Grand Union nevertheless wrote back on September 16, 2022 and made its position clear to PF Hong Kong, including that:

(a) Grand Union never forged PF Hong Kong's official stamps or signatures;

(b) Grand Union never sold or distributed Licensed Product outside of the Territory or Channels of Distribution;

(c) Grand Union committed no breach of the MLA.[9]

45. Despite Grand Union's explanation, on September 23, 2022, PF Hong Kong sent Grand Union a "Termination of Master License Agreement" based on the allegations in the Notice of Termination dated August 24, 2022.[10] Upon receiving this letter, Grand Union wrote back on September 29, 2022 making clear that the unilateral termination was not permitted by the MLA, and was without basis and not valid.[11] Grand Union reiterated its position that it was in fact PF Hong Kong who was in breach of the MLA. Grand Union also demanded that PF Hong Kong continue to perform the MLA failing which it should be fully liable and responsible for all losses, damages, and negative impact resulting from its non-performance.

## GRAND UNION'S MERITLESS CLAIMS OF MATERIAL BREACH

46. I understand that PF Hong Kong made further vague and baseless allegations in this dispute. These claims are baseless, which I explained below.

### A. PF Hong Kong's allegation of forgery

47. As set out herein, Grand Union's business has been significantly disrupted by PF Hong Kong's failure and/or delay to provide certain necessary documentation. Grand Union has never forged any such documentation.

---

[9] Email from Grand Union to PF Hong Kong dated September 16, 2022 (**R-IR-8**).

[10] Notice of termination of the MLA dated September 23, 2022 (**R-IR-9**).

[11] Email from Grand Union PF Hong Kong dated September 29, 2022 (**R-IR-10**).

48. We can only speculate, but we believe that since PF Hong Kong refused to provide the properly notarized authorization documentation to Grand Union for Sublicensees, some Sublicensees appear to have taken matters into their own hands and created the documents so that they could continue to conduct their business.

49. Grand Union never condoned or authorized any such behaviour. In each instance when Grand Union was made aware of an alleged issue by PF Hong Kong related to the MLA, it addressed the issues and resolved them to the extent possible as quickly as it was able.

**B. PF Hong Kong's demand for an audit**

50. On 27 July 2022, PF Hong Kong told Grand Union it had engaged an external auditor, "*for the performance of forensic due diligence*" without any details on the proposed scope of extent of the due diligence.[12] In other words, PF Hong Kong took the position that it must be given unlimited access to Grand Union's business and could investigate and review any material it wished. PF Hong Kong also refused to provide any protocol for such an audit.

51. PF Hong Kong had no right to conduct such an investigation with unlimited access.

**C. PF Hong Kong's allegation of mismanagement of Sublicensees**

52. PF Hong Kong accused Grand Union of mismanaging its Sublicensees. Again, PF Hong Kong does not explain its basis for making such an accusation, but Grand Union did not mismanage the Sublicensees.

53. Whenever Grand Union became aware of any non-compliance by any Sublicensee, Grand Union would communicate with the Sublicensee and ensures they brought themselves into compliance, otherwise Grand Union would take other necessary steps to address theissue.

54. Again, Grand Union has no knowledge of any Sublicensee that is out of compliance with its obligations.

**D. PF Hong Kong's allegation of failure to provide Quarterly Statements**

[12] Email from PF Hong Kong to Grand Union dated July 27, 2022 (**R-IR-11**).

55. Grand Union provided PF Hong Kong with Quarterly Statements every quarter in 2021 after the Second Amendment was signed. PF Hong Kong has accused Grand Union of failing to provide Quarterly Statements in 2022. In 2022, however, there has been intermittent lockdowns and other restrictions under the zero-Covid policy in various cities of China which caused delays to the collation of information and reporting, including a complete lockdown in Shanghai from March to May 2022. This has been known to PF Hong Kong, and they did not give proper notice to cure. Grand Union had no objection to providing the Quarterly Statement to PF Hong Kong, but did not want to provide an incomplete report.

56. By the time Grand Union was ready to provide a Quarterly Statement to PF Hong Kong, PF Hong Kong had already threatened to, and then did purport to terminate, the MLA.

**E. PF Hong Kong's accusations relating to anti-counterfeiting actions**

57. Under the MLA, Grand Union has the right and obligation to take necessary action to protect the brand. Taking anti-counterfeiting actions is an important aspect of protecting the Brand in the Territory and Grand Union has been empowered under the MLA to do so on behalf of the Licensor. Since 2015, Grand Union has been involved in a multitude of legal proceedings to protect its commercial rights as an exclusive licensee. The parties would generally reach an agreement on how to deal with the damage awards and other compensation resulting from any anti-counterfeiting actions.

58. These activities are permitted under the MLA.

59. In any event, Grand Union has been providing updates on a weekly or bi-weekly basis concerning its efforts, including taking legal action, to protect the Paul Frank Brand from infringement. Grand Union denies any wrongdoing, and does not understand any particulars as to what Grand Union is claiming.

**F. PF Hong Kong's other vague allegations**

60. I understand PF Hong Kong made a number of additional allegations in the arbitration, including:

(a) infringement of Intellectual Property or failure to obtain proper approval;

(b)     breach of Section 9(b) by way of registration of domain names containing the Paul Frank name;

(c)     breach of Section 9(c);

(d)     sales outside the Territory;

(e)     sale of Licensed Products below a competitive price or engaged in Dumping; and

(f)     failure or refusal to pay royalties, participation fees, and market commitments as set forth in the Second Amendment.

61.    We do not know any of the particulars relating to these allegations but there have been no such violations that we are aware of.

**PF HONG KONG'S CAMPAIGN TO SUBVERT AND DESTROY GRAND UNION'S BUSINESS AND ITS RELATIONSHIPS WITH THE SUBLICENSEES AND PLATFORMS, WHICH CONTINUES TO THIS DAY**

62.    PF Hong Kong's improper campaign to destroy Grand Union's business continued throughout 2022 and now 2023.

63.    For example, on July 6, 2022, PF Hong Kong emailed Tiktok and attached a letter alleging an unauthorized use of Paul Frank trademark on the Tiktok platform.[13] In both the email and letter, PF Hong Kong alleged that all documents evidencing the authority granted by PF Hong Kong were forged.

64.    On July 22, 2022, PF Hong Kong emailed the Sublicensees of Grand Union[14] attached with a letter of notification dated July 21, 2022. In both the email and letter, PF Hong Kong unilaterally declared:

(a)     the suspension of Grand Union's rights under the MLA, including Grand Union's power to grant sublicenses;

---

[13] Letter from PF Hong Kong dated July 6, 2022 (**R-IR-12**).

[14] Email from PF Hong Kong dated July 22, 2022 attached a letter of notification dated July 21, 2022 (**R-IR-13**).

(b) that PF Hong Kong would take over the management of the Subliencees.

65. Further, on September 30, 2022, PF Hong Kong again wrote to all sublicensees in the Territory,[15] claiming that the MLA had been terminated and that all sublicensees through Grand Union and the relevant proof of authorisation immediately ceases to be effective.

66. This interference has continued, and gotten even worse. In relation to Vipshop, a Platform targeting more high-end customers, this caused a serious impact on Grand Union's business. On December 27, 2022, we were notified by Vipshop that they received an email from PF Hong Kong claiming that the relationship with Grand Union had been terminated. We immediately clarified that Grand Union has an exclusive license until 2030.[16] Still, all adult apparel stores of Grand Union's Sublicensees have been suspended by Vipshop, including those of 上海新红纺品牌管理有限公司(Shanghai New Hongfang Brand Management Company Limited) ("**SH New Hongfang**"), which only opened a store on the Platform on October 18, 2022.[17]

67. Further, the following two specific examples evidence PF Hong Kong's continuing efforts to ruin Grand Union's relationship with its Sublicensees.

**A. Shanghai Xiyaqi**

68. Shanghai Xiyaqi is a Sublicensee. Shanghai Xiyaqi received the email of July 22, 2022 from PF Hong Kong containing its baseless attempt to take over the management of the Sublicensees.[18]

---

[15] Letter from PF Hong Kong dated September 30, 2022 (**R- IR-14**).

[16] Messages between CBG and Vipshop dated December 27, 2022 (**R- IR-15**).

[17] Emails between CBG and Vipshop (**R- IR-16**) On January 13, 2023, CBG wrote to Vipshop (i) informing them that PF Hong Kong's unilateral termination of the MLA is subject to dispute and arbitration in the United States; and (ii) demanding that the Vipshop allow SH New Hongfang to resume its sales on the Platform. On January 16, 2023, Vipshop wrote to Futurity asking for a clarification on the situation and copied CBG. CBG had not received a reply from Futurity.

[18] Shanghai Xiyaqi became a Sublicensee of Grand Union (via Hong Fang) in 2020. In 2020, Grand Union entered into a licensing agreement with Shanghai Xiyaqi and a supplementary agreement with Shanghai Xiyaqi and Hong Fang. Under these agreements, Shanghai Xiyaqi paid Grand Union for the right to use the property right of Paul Frank Brand in connection with adult shoes.

69. On November 2, 2022, Shanghai Xiyaqi wrote to Grand Union and Hong Fang attempting to terminate the agreements and claiming for the damages for the related economic loss incurred since July 21, 2022. On November 11, 2022, Grand Union and Hong Fang wrote to Shanghai Xiyaqi denying all allegations, which has led to a dispute.

70. On October 17, 2022, Hong Fang received an email from Pinduoduo (a Platfrom) seeking to verify the LOA dated August 1, 2022 issued by PF Hong Kong. This leads us to infer that Shanghai Xiyaqi provided a letter of authorization it received from PF Hong Kong, in violation of Grand Union's exclusive rights to grant sublicenses. Furthermore, this must have happened before Hong Fang terminated its agreement with Shanghai Xiyaqi, evidencing PF Hong Kong's interference with the Sublicensees of Grand Union.

**B. Jinjiang Yuanqi**

71. Shanghai Xiyaqi became a Sublicensee in 2020.[19] During the time of COVID-19 lockdown, Jinjiang Yuanqi failed to pay its licensing fee in the total amount of RMB 11,660,000. Grand Union was in the process of demanding the outstanding licensing fee owed Jinjiang Yuanqi.[20] However, having also received the email of July 22, 2022 from PF Hong Kong, Jinjiang Yuanqi wrote to Grand Union and Hong Fang on July 28, 2022 on the following:

(a) Jinjiang Yuanqi claimed to have the funds to pay the outstanding fee but, having received the letter of notification from PF Hong Kong (see above), was confused as to whom they should pay.

(b) Jinjiang Yuanqi reiterated the need for proof of authorisation after the registration of trademark certificates was changed after the assignment.

---

[19] In 2020, Jinjiang Yuanqi entered into a licensing agreement with Hong Fang (as subsequently supplemented). The agreement provided for a monthly licensing fee of RMB 35 million in exchange for the right to use Paul Frank property rights in connection with children's clothing and shoes.

[20] Letters dated June 16, 2022 and July 28, 2022 from Grand Union to Jinjiang Yuanqi (**R- IR-17** and **R-IR-18**)

(c)    Jinjiang Yuanqi repeated concerns over the delay in obtaining the LOA necessary for three new stores and the continued operation of a store on Tmall (a Platform associated with Taobao).

72.    This led to a dispute with JinJiang Yuanqui, and the relationship ended. However, it was discovered that Jinjiang Yuanqi continued to operate and even opened two new Paul Frank stores on Tmall. Given Tmall's policies to prevent trademark infringement, this could only be because PF Hong Kong has interfered and engaged with Jinjiang Yuanqi, and provided the necessary documents to Jinjiang Yuanqi in violation of Grand Union's exclusive license.

73.    Subsequently, CBG / Grand Union also received a request from Tiktok to verify the letter of authorisation purportedly issued by Jinjiang Yuanqi. This again leads us to infer that Jinjiang Yuanqi provided TikTok with a letter of authorization it received from PF Hong Kong, in violation of Grand Union's exclusive rights to grant sublicenses.

**PF HONG KONG IS AUTHORIZING NUMEROUS OTHER ENTITIES IN VIOLATION OF GRAND UNION'S EXCLUSIVE RIGHTS, AND HAS JUST ANNOUNCED PUBLICALLY THAT GRAND UNION NO LONGER HAS ANY RIGHTS UNDER THE MLA**

74.    PF Hong Kong has begun openly licensing the Paul Frank Brand to other entities, in violation of Grand Union's exclusive rights. Grand Union is just becoming aware of the full extent of PF Hong Kong's wrongful conduct.

75.    Between January and February 2023, Grand Union and CBG received multiple requests from various Platforms seeking verification of the authority of different entities to use the Paul Frank Brand. These entities are not Sublicensees of Grand Union (as the exclusive Licensee in the Territory) yet they were able to produce LOAs from PF Hong Kong and use the Property related to the Paul Frank Brand:

| *Email for Verification* | *Company name and transliterated English name* | *Date of LOA* |
|---|---|---|
| Email from Pinduoduo dated | 泉州市科雷登贸易有限公司 Quanzhou Keleiden Trade Co., Ltd. | October 1, 2022 |

| | | |
|---|---|---|
| December 19, 2022 | 泉州臻梦贸易有限公司 Quanzhou Zhenmeng Trading Co., Ltd. | October 1, 2022 |
| | 泉州腾朗鞋服有限公司 Quanzhou Tenglang Shoes and Clothing Co., Ltd. | October 1, 2022 |
| | 宁波百弘元家居用品有限公司 Ningbo Baihongyuan Household Products Co., Ltd. | October 11, 2022 |
| | 常熟金誉电子商务有限公司 Changshu Jinyu E-commerce Co., Ltd. | December 8, 2022 |
| | 江西道文贸易有限公司 Jiangxi Daowen Trading Co., Ltd. | Undated |
| Email from Pinduoduo dated December 29, 2022 | 保定帽掌柜服饰制造有限公司 Baoding Hat Shopkeeper Clothing Manufacturing Co., Ltd. | December 23, 2022 |
| | 宁波市前川鞋业有限公司 Ningbo QianChuan Shoes Co., Ltd. | December 20, 2022 |
| Email from Pinduoduo dated January 5, 2023 | 慈溪市宝弘贸易有限公司 Cixi Baohong Trading Co., Ltd. | December 17, 2022 |
| | 莆田市创豆贸易有限公司 Putian Chuangdou Trading Co., Ltd. | October 1, 2022 |
| | 广州战地鸟服饰有限公司 Guangzhou Battlefield Bird Clothing Co., Ltd. | December 20, 2022 |
| Email from Pinduoduo dated January 6, 2023 | 盐城步生花贸易有限公司 Yancheng Bushenghua Trading Co., Ltd. | October 11, 2022 |
| | 温州市鹏客贸易有限公司 Wenzhou Pengke Trading Co., Ltd. | December 2, 2022 |
| Email from JD dated January 31, 2023 | 保定蝶行商贸有限公司 Baoding Diehang Trading Co., Ltd. | December 20, 2022 |
| Email from JD dated February 2, 2023 | 新干县振升箱包配件有限公司 Xingan County Zhengsheng Case & Bag Accessories Co., Ltd | January 1, 2023 |

| Email from Pinduoduo dated February 6, 2023 | 义乌市小余儿服饰有限公司 Yiwu Xiaoyu'er Clothing Co., Ltd. | January 1, 2023 |
|---|---|---|
| | 温州市华创鞋业有限公司 Wenzhou Huachuang Shoes Co., Ltd. | January 1, 2023 |

76. Based upon these notifications from Platforms, Grand Union recently conducted a search and found that, as of around March 14, 2023, there were 54 stores on Platforms which were not authorised by Grand Union or its Sublicensees.

77. The fact that these entities received the LOAs (presumably from PF Hong Kong) is confirmation that PF Hong Kong has always been able to provide them if it wished, but it withheld them from Grand Union deliberately. Further, it is confirmation that PF Hong Kong is working to subvert Grand Union's exclusive rights under the MLA, and starting to engage its own sublicensees in the Territory.

78. This plan was just a few weeks ago make clear. Grand Union discovered an Internet news article in which PF Hong Kong made a public announcement on February 22, 2023 about the alleged termination of its contract with Grand Union.[21] This has caused significant confusion and harm in the market, and causes Sublicensees to refuse to work with Grand Union. In addition, these articles reported that PF Hong Kong plans to rework its distribution in the Chinese market and to upgrade mechanism for distributing proof of its authorisation. Too us, this further shows PF Hong Kong has had a plan all along to deprive Grand Union of its exclusive licenses and fabricated the allegation of breaches on the part of Grand Union.

[21] News articles (**R-IR-19**).

Dated: March 24, 2023

JENNIFER HUANG

# EXHIBIT 19

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

| | |
|---|---|
| PAUL FRANK LIMITED,<br><br>Claimant,<br><br>v.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Respondent.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Counter-Claimant,<br><br>v.<br><br>PAUL FRANK LIMITED,<br><br>Counter-Respondent. | JAMS Ref. No. 5220002118<br><br>**PAUL FRANK LIMITED'S MOTION FOR LEAVE TO AMEND DEMAND FOR ARBITRATION** |

weintraub tobin chediak coleman grodin
LAW CORPORATION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ 3

I. INTRODUCTION ........ 5

II. FACTual HISTORY ........ 6

A. CBG Negotiated the MLA and the Amendments, Including the Arbitration Clause ........ 6

B. Grand Union Acts Only Through CBG ........ 7

C. CBG has Filed a Lawsuit in China in an Attempt to Avoid the Jurisdiction of this Arbitration ........ 11

III. PAUL FRANK SHOULD BE GRANTED LEAVE TO AMEND ITS DEMAND FOR ARBITRATION TO INCLUDE A CLAIM AGAINST CBG ........ 14

A. The Arbitrator Has Authority to Allow a Party to Amend Any Pleading at Any Time Before or After the Commencement of the Hearing ........ 14

B. Amendments of Pleadings Are Liberally Allowed So that Cases are Determined on Their Merits. ........ 15

C. CBG Should Be Added as a Party to This Action Because it is the Alter Ego of Grand Union and Bound by the Arbitration Agreement ........ 16

1. CBG is Grand Union's alter ego ........ 16

2. As Grand Union's alter ego and/or agent, CBG is bound by the arbitration agreement ........ 18

D. Grand Union / CBG Will not be Prejudiced if Paul Frank is Granted Leave to File an Amended Demand for Arbitration. ........ 20

IV. CONCLUSION ........ 21

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Austin v. Massachusetts Bonding & Ins. Co.*,
56 Cal. 2d 596 (1961)....................20

*Bank of America v. Superior Court*,
20 Cal. 2d 697 (1942)....................14

*Berman v. Dean Witter & Co., Inc.*,
44 Cal. App. 3d 999 (1975)....................19

*Boucher v. All. Title Co., Inc.*,
127 Cal. App. 4th 262 (2005)....................19

*Board of Trustees of Leland Stanford, Jr. University v. Superior* Court, 149 Cal. App. 4th 1154 (2004) ....................15

*Cohen v. TNP 2008 Participating Notes Program, LLC*,
31 Cal. App. 5th 840 (2019)....................20

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006)....................18

*Desny v. Wilder*,
46 Cal. 2d 715 (1956)....................15

*Guidery v. Green*,
95 Cal. 630 (1892)....................15

*Harris v. Superior Court*,
188 Cal. App. 3d 475 (1986)....................19

*Hernandez v. Meridian Management Services, LLC*,
87 Cal. App. 5th 1214 (2023)....................20

*Higgins v. Del Faro*,
123 Cal. App. 3d 558 (1981)....................16

*Honig v. Fin. Corp. of Am.*,
6 Cal. App. 4th 960 (1992)....................16

*Kittredge Sports Co. v. Superior Court*,
213 Cal. App. 3d 1045 (1989)....................15

*Klajic v. Castaic Lake Water Agency*,
90 Cal. App. 4th 987 (2001)....................17

*Klopstock v. Superior Court of S.F.*,
17 Cal. 2d 13 (1941) ........ 15

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
235 Cal. App. 3d 1220 (1991) ........ 17

*Lebastchi v. Superior Court*,
33 Cal. App. 4th 1465 (1995) ........ 16

*Letizia v. Prudential Bache Secur., Inc.*,
802 F.2d 1185 (9th Cir. 1986) ........ 18

*Morgan v. Superior Court*,
172 Cal. App. 2d 527 (1959) ........ 16

*Redevelopment Agency v. Herrold*,
86 Cal. App. 3d 1024 (1978) ........ 15, 16

*RN Sol., Inc. v. Catholic Healthcare W.*,
165 Cal. App. 4th 1511 (2008) ........ 19

*Zoran Corp. v. Chen*,
185 Cal. App. 4th 799 (2010) ........ 17, 18

**Statutes**

California Code of Civil Procedure § 473(a)(1) ........ 14

California Code of Civil Procedure § 576 ........ 14

**Other Authorities**

2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416 ........ 17

9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, pp. 524-525 ........ 16

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

## I. INTRODUCTION

Claimant Paul Frank Limited ("Paul Frank") seeks leave to amend its Demand for Arbitration to join China Brands Group ("CBG") as a party to this Arbitration on the grounds that it is an alter ego of Respondent Grand Union International Trading Limited ("Grand Union"). CBG has exerted such control and dominance over Grand Union that CBG should be directly and vicariously liable to Paul Frank under an alter ego theory.

It is clear that CBG is the alter ego of Grand Union. Grand Union has no employees, no offices, and does no business. All of the actions alleged by Paul Frank in its Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction ("Combined Opposition and Motion for Preliminary Injunction"), filed concurrently herewith and incorporated herein by reference, were undertaken by CBG. CBG has already effectively appeared in this action, through the filing of the Counterclaim and Witness Statement clearly showing that CBG is in control of this Arbitration, not Grand Union.

As Grand Union's alter ego and agent, CBG is bound by the terms of the MLA, including the arbitration agreement contained therein. Yet CBG secretly filed a lawsuit in China, purportedly against Grand Union and Paul Frank, in order to obstruct Paul Frank's intellectual property and seek damages against Paul Frank. Grand Union / CBG then jointly "agreed" that the Chinese court had jurisdiction over the dispute. Such actions are a breach of the MLA and subject Grand Union / CBG to liability.

Therefore, Paul Frank seeks leave amend its Demand for Arbitration to assert claims directly against CBG as the alter ego of Grand Union. Attached as Exhibit 1 to the Declaration of Jessica R. Corpuz filed concurrently herewith ("Corpuz Decl.") is an Amended Demand for Arbitration Paul Frank seeks to file in this action. Attached as Exhibit 2 is a redline version showing the changes from the original Demand for Arbitration to the Amended Demand for Arbitration.

Paul Frank respectfully requests that it be granted leave to file the Amended Demand for Arbitration and seek redress from CBG as alter ego of Grand Union.

/ / /

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

## II. FACTUAL HISTORY

### A. CBG Negotiated the MLA and the Amendments, Including the Arbitration Clause

On January 1, 2015, the Parties entered into the Master License Agreement ("MLA"), pursuant to which Grand Union was granted the right to certain elements of the Paul Frank brand (the "Property"). *See* MLA, Ex. 1 to Paul Frank Limited's Appendix of Exhibits ("Appendix") filed concurrently herewith. The MLA was negotiated on behalf of Paul Frank by Saban Brands Entertainment Group ("Saban"), which held the rights to the Property at the time of the MLA. *See* Declaration of Stanley Yook-Loong Wan ("Wan Decl."), filed concurrently herewith, at ¶ 26.

CBG negotiated the MLA on behalf of Grand Union. *See* Respondent's Application for Interim Relief ("Application") at p. 4, ¶ 14; *see also* First Witness Statement of Tao Zheng ("Zheng Statement") at p. 2, ¶ 8 ("In around 2014, Saban began negotiating with CBG on what would become the MLA."). According to Grand Union's filings in this case, it was CBG's "plan" to help Saban "achieve [the] goal" of repositioning the Property to be more "high-end in mainland China." Application at p. 4, ¶ 14. Therefore, "[i]n around 2014, Saban began negotiating with CBG." *Id.* Qian Chunlei signed the MLA in his capacity as Director of Grand Union. MLA, Ex. 1 to Appendix, at p. 23.

The MLA originally provided that any disputes between the Parties would be submitted to arbitration in Hong Kong. *See* MLA, Ex. 1 to Appendix, at Section 28. However, on April 27, 2018, the Parties agreed that any disputes "shall be determined by arbitration in Los Angeles, California before a single arbitrator… [and] administered by JAMS pursuant to its Comprehensive Arbitration Rules." *See* First Amendment to Master License Agreement ("First Amendment"), Ex. 3 to Appendix, at Section 28. The First Amendment was negotiated and signed by Bo Zheng, Director of Grand Union. *See id.* at p. 2; *see also* Wan Decl. at ¶ 28. Bo Zheng also negotiated and signed the Second Amendment in 2021 and the Third Amendment in 2022. *See* Second Amendment to Master License Agreement ("Second Amendment"), Ex. 4 to Appendix; *see also* Third Amendment to Master License Agreement ("Second Amendment"), Ex. 5 to Appendix; *see also* Wan Decl. at ¶¶ 29-30. In the correspondence related to the Second Amendment, a CBG employee repeatedly refers to

weintraub tobin chediak coleman grodin
LAW CORPORATION

CBG's changes to the draft agreement. For example, he states, "[c]ompared with CBG's version, there are many big changes in your version, so CBG need to hold a shareholder meeting to discuss it." Email dated August 11, 2021 in Email Chain at Ex. 19 to Appendix, p. 8-9.

**B. Grand Union Acts Only Through CBG**

There is no dispute that Grand Union and CBG are related entities and that Grand Union exclusively acts through CBG. Grand Union is simply a shell corporation set up to hold the intellectual property rights under the MLA. Grand Union has admitted in this action that it acts only through CBG. *See* Counterclaim at ¶ 160 ("Grand Union operates under the MLA by entering into business relationships (through CBG) with Sublicensees."). Grand Union does not conduct any business itself.

Grand Union does not have any employees. Paul Frank dealt exclusively with employees of CBG. *See* Wan Decl. at ¶ 28. Bo Zheng (who signed the contracts and serves as the main legal representative of Grand Union) is not just a Director of Grand Union, he is also a shareholder and officer of CBG, along with his brother Tao Zheng. *See* Printout of National Enterprise Credit Information Publicity System for China Brands Group, Ex. 165 (original) and Ex. 166 (translation). Bo Zheng is the Chairman of CBG and Tao Zheng is the Vice Chairman. *See* Article at Ex. 78 (original) and Ex. 79 (translation); *see also* Article at Ex. 80 (original) and Ex. 81 (translation); *see also* Zheng Statement at p. 1, ¶ 2.

Thus, formal notice under the MLA must be provided to Bo Zheng at the email address bo.zheng@chinabrandsgroup.com.cn with a copy to David Zhou at the email address david.zhou@chinabrandsgroup.com.cn. Second Amendment, Ex. 5 to Appendix, at Section 29. In this very action, Grand Union's Counterclaims lists the contact person for Grand Union as Bo Zheng, via his CBG email address, and Jennifer Huang, via the email address jennifer.huang@chinabrandsgroup.com.cn. Counterclaim at ¶ 10. The only parties to provide witness statements in support of Grand Union's Application for Interim Relief are Ms. Huang and Tao Zheng. Ms. Huang states that she is the "General Manager of the Licensing Management Department within CBG. As part of my role, I am responsible for Grand Union's management of the Paul Frank brand and the main liaison with PF Hong Kong relating to the activities under the Master

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Licensing Agreement." First Witness Statement of Jennifer Huang ("Huang Statement") at p. 1, ¶ 4. Tao Zheng states that he is the "Vice Chairman within the China Brands Group." Zheng Statement at p. 1, ¶ 2. Both individuals use the terms Grand Union and CBG interchangeably in their witness statements.

All of the email communications between Paul Frank and Grand Union / CBG were with CBG employees. *See*, *e.g.*, Grand Union Ex. R- IR-15 and R- IR-16; *see also*, *e.g.*, Emails at Ex. 6, 8, 10, 12, and 14 to Appendix. It appears that Grand Union does not maintain an email server. As Bo Zheng testified recently, "[t]here is no website" for Grand Union. *See* Investigation Transcript, Ex. 186 (original) and Ex. 187 (translation) to Appendix. All communications are through CBG's domain name and email server. All of the actions alleged by Paul Frank in its Combined Opposition and Motion for Preliminary Injunction (incorporated herein by reference) were undertaken by CBG, not Grand Union.

Grand Union does not maintain any physical offices. The physical address specified in Section 29 of the Second Amendment, No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by CBG. *See* Wan Decl. at ¶ 29.

There is no distinction between the funds, assets, and debts of Grand Union and CBG. Grand Union admits that CBG paid royalties to Saban under the license agreement that predated the MLA. *See* Counterclaim at p. 7, ¶ 23 ("CBG paid royalties to Paul Frank Industries under such licensing arrangement."). Grand Union also admits that CBG funded the development of the brand after it obtained the rights. *See* Respondent's Application for Interim Relief at ¶ 19 ("CBG was required to inject long-term, sustained investment to develop the Paul Frank Brand in the Territory and achieve the objectives of the licensing program."). Ms. Huang, an employee of CBG, uses the term "we" when discussing the payment of the license fee to Paul Frank. *See* Huang Witness Statement at p. 6, ¶ 29. She also states that the Second Amendment was negotiated in part to "justify the payment with the CBG organization," despite the fact that Grand Union was supposed to be paying the license fee under the Second Amendment. *Id.* at p. 7-8, ¶ 38.

In fact, CBG has directly held itself out as liable for the responsibilities of Grand Union. Pursuant to the Second Amendment, Grand Union was required to pay a minimum guarantee to Paul

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Frank on September 18, 2021. On August 23, 2021, a CBG employee wrote to Paul Frank stating, "Pls. do me a favor, CBG is preparing the first payment of Royalty in the amendment, that is USD 1 million, could you send me the invoice of FUTURITY BRANDS LTD and its color scanning copy, thanks." *See* Email dated August 21, 2021 in Email Chain at Ex. 19 to Appendix, p. 3. On August 24 that same employee said, "CBG has paid it this morning." *Id.* at p. 2.

Bo Zheng later emailed Mr. Wan on September 17, 2021, stating

> According to the amendment 2 to the Master License Agreement, CBG needs to pay the second installment by September 18, 2021. But now due to CBG don't have enough US dollar in GU's bank account, we can pay USD 200,000 in advance today. and the reason is our main provider of this funds, that is CBG's key shareholder –Qingdao construction investment （Hongkong ） company, while its board of directors has approved internally to provide this funds, but due to the amount is more than $five million, which need to be approved by its Group Board of Directors and Group Party Committee, Therefore, it takes a relatively long time….
>
> Based on the above reasons, CBG hereby applies for postponing the payment of the second installment to October 25, 2021.

Email dated September 17, 2021, Ex. 150 to Appendix.

CBG has also held out to the public that CBG holds the rights to the Paul Frank Property in China, not Grand Union. In an interview with China International Licensing Expo on September 23, 2021, Bo Zheng is identified only as the Chairman of Hongfang Culture (another name for CBG[1]) and bragged that "we started to transform into a brand operation and management company, and made Paul Frank Big Mouth Monkey brand a hit in China, and then started a multi-brand operation model." Interview at Ex. 78 (original) and Ex. 79 (translation), p. 1. Grand Union is not mentioned in the article at all. A 2016 article featured Bo Zheng and Tao Zheng together. The article states, "Hongfang Culture, led by these two [former] students [of the business school sponsoring the article], has signed a 15-year exclusive image and brand licensing agreement with Paul Frank USA in June last year by spending a huge amount of money…. Hongfang Culture, which is the Chinese brand operator of Paul Frank, owns all rights of its merchandise, cross-border and content development as well as the rights to fight against counterfeit goods…." Interview at Ex. 80 (original) and Ex. 81

[1] CBG also uses the name Hongfang Culture Co., Ltd. or "Hongfang." *See* Wan Decl. at ¶ 160; *see also* Articles at Ex. 78 and 80 (originals) and Ex. 79 and 81 (translations).

weintraub tobin chediak coleman grodin
LAW CORPORATION

(translation) to Appendix, p. 2, 3.  Once again, Grand Union is never mentioned.

Grand Union itself uses the names Grand Union, CBG, and Hongfang interchangeably.  For example, just in its filings in this case alone, Grand Union has stated:

- "Grand Union has been involved in managing the PAUL FRANK Brand in China since around 2009. At that time, CBG obtained a license to exploit and manage the PAUL FRANK Brand in China, including the design, manufacturing, distribution, retail, and retail promotion of apparel for adults and children. CBG paid royalties to Paul Frank Industries under such licensing arrangement." Counterclaim at ¶ 23.

- "After around five years of working with the CBG group, Saban recognized and valued its expertise in managing brands in especially the Chinese market. Therefore, on January 1, 2015, Saban, through Paul Frank Industries, granted Grand Union a 15-year license to exploit the PAUL FRANK Brand…." Counterclaim at ¶ 25.

- "One of the key aspects of the MLA is that it consolidated all rights and authority to grant sublicenses in the Territory to Grand Union. Therefore, after entering into the MLA, Grand Union granted a sublicense to its affiliated company, Shanghai Hong Fang Culture Co. Ltd., d/b/a China Brands Group ('Hong Fang'). Hong Fang in turn granted sublicenses to various third parties (the 'Sublicensees') which sell different categories of Licensed Products and/or provide Licensed Services in the Territory." Counterclaim at ¶ 51.

- "Prior to the involvement of PF Hong Kong, Saban/Paul Frank Industries worked with Grand Union and CBG to provide the necessary documentation…." Counterclaim at ¶ 55.

- "Since 2015, Grand Union and/or CBG have been involved in a multitude of legal proceedings to protect its commercial rights as an exclusive licensee." Counterclaim at ¶ 130.

- "Beginning in 2015, Grand Union, with the full power of CBG behind it, invested heavily in the development and repositioning the Paul Frank Brand, and took over the management of the brand in the Territory." Respondent's Application for Interim Relief at ¶ 21.

- "Grand Union has and continues to… Leverage its existing relationships and brand management expertise to select and maintain hundreds of sublicensees under the MLA ("Sublicensees"). Many of the Sublicensees are sources from previous manufacturing and commercial contacts from CBG, and are built on the reputation and goodwill of CBG." Respondent's Application for Interim Relief at ¶ 22(b)(ii).

- "On October 17, 2022, Hong Fang received an email from Pinduoduo (a Platfrom) seeking to verify the LOA dated August 1, 2022 issued by PF Hong Kong. On November 2, 2022, Shanghai Xiyaqi wrote to Grand Union and Hong Fang attempting to terminate the agreements and claiming for the damages for the related economic loss incurred since July 21, 2022." Respondent's Application for Interim Relief at ¶ 72.

- "Subsequently CBG / Grand Union also received a request from Tiktok to verify the letter of authorisation purportedly issued by Jinjiang Yuanqi." Respondent's Application for Interim Relief at ¶ 75.

- "Between January and February 2023, Grand Union and CBG received multiple requests from various Platforms seeking verification of the authority of different entities to use the Paul Frank Brand." Respondent's Application for Interim Relief

weintraub tobin chediak coleman grodin
LAW CORPORATION

at ¶ 77.

Thus, all actions nominally by Grand Union were actually conducted by CBG and there was no distinction between CBG and Grand Union.

**C. <u>CBG has Filed a Lawsuit in China in an Attempt to Avoid the Jurisdiction of this Arbitration</u>**

As set forth in detail in Paul Frank's Motion, incorporated herein by reference, Paul Frank recently discovered that CBG filed a lawsuit in China against *Grand Union itself* and against Paul Frank. CBG and its affiliate filed a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province. *See* Civil Statement of Claim, Ex. 124 (original) and Ex. 125 (translation) to Appendix. CBG and Hong Fang ask the Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." *Id.* at 1. CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." *Id.* at 2. CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products. *Id.* at 2-3.

CBG is alleging that it asked Grand Union – its alter ego which has no employees, no offices, and serves as a mere holding company for intellectual property – to act and that Grand Union failed to act to protect CBG's interests. CBG states: "With regard to the Defendants' infringing acts mentioned above, the Plaintiffs once contacted Grand Union, requesting it to address the dispute between the parties. But Grand Union failed to properly deal with those infringing acts." *Id.* at 3.

In what would be a shocking move for any other litigant, Grand Union and CBG then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from

weintraub tobin chediak coleman grodin LAW CORPORATION

California. *See* Ex. 184 (original) and Ex. 185 (translation) to Appendix. This Agreement on Jurisdiction is between Grand Union as "Party A" and CBG as "Party B." *Id*. It states:

> Whereas Party B has repeatedly claims to Party A for the acts by Paul Frank Limited, the proprietor of [Paul Frank] trademark, which affects Party B's ordinary business related to [Paul Frank] brand. Party B claims that Party A and Paul Frank Limited have constituted joint infringement to Party B, therefore requesting Party A to bear the infringement liability to Party B. Party A considers that the aforesaid joint infringement is not established. Party A is not obliged to bear the compensation liability to Party B.
>
> In order to protect the legal interests of both Parties, **the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A or Party B can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate**.

Ex. 184 (original) and Ex. 185 (translation) to Appendix (emphasis added).

In short, CBG sued its own alter ego Grand Union and then CBG and Grand Union, acting as if they were parties on the opposite ends of the lawsuit, "agreed" that any dispute with Paul Frank could be brought in CBG's local courthouse in order to deceive the Chinese court into retaining jurisdiction over the case.

Paul Frank has of course contested the jurisdiction of the Chinese court. Yet Grand Union / CBG persists in seeking to retain jurisdiction in China. On March 15, 2023, just days after the Preliminary Hearing in this matter in which Grand Union / CBG agreed to jurisdiction in this Arbitration, Bo Zheng testified before the Chinese court in order to support CBG's claims of jurisdiction. *See* Investigation Transcript, Ex. 186 (original) and Ex. 187 (translation) to Appendix. He testified that he is the "sole Director" in Grand Union" and the "legal representative" of CBG. He describes himself as the "main decision-making person." *Id.* at 1. He claims that it has three other employees (whom he does not actually identify), but that their work is entirely "assisting China Brands Group in approval and stamping." *Id.* In other words, Grand Union only exists to rubber stamp the actions of CBG. "The main business partner is China Brands Group, to help submitting relevant stamped materials." *Id.* He testified that Grand Union has three offices – Tsingdao, Shanghai, and Hong Kong. However, neither the Shanghai office nor the Hong Kong office have any employees. *Id.* The Shanghai office is "using a cubicle from an affiliated company" and that the Hong Kong location was only opened "for the convenience of signing contracts and making payments

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

to foreign companies." *Id.* at 2. He admits that Grand Union does not have a website or "address used for marketing." *Id* at 1.

Once again, Grand Union has no business outside of CBG. It's only purpose is as a holding company for intellectual property and to stamp documents prepared and negotiated by CBG. The only actual work being done is by CBG, Grand Union is a mere shell.

The lawsuit by CBG is a plain attempt to circumvent the dispute resolution provisions in the First Amendment, which clearly states that any dispute which "arises out of or relates to this Agreement" shall be resolved by JAMS in Los Angles, California and "in accordance with the laws of the State of California for agreements made in and to be performed in that state." First Amendment, Section 28, Ex. 3 to Appendix. Of course, Grand Union / CBG made no mention of this lawsuit when it filed its Counterclaim, which quotes the First Amendment and states, "this dispute is subject to JAMS arbitration in Los Angeles, and the MLA is governed by California law." Counterclaim at p. 5, ¶ 15. Yet secretly it was scheming to have this dispute heard in a friendly court in China.

This completely baseless and inappropriate lawsuit has already resulted in severe harm to Paul Frank. Shortly after the bogus claim was filed, CBG filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard. *See* Civil Ruling, Ex. 126 (original) and Ex. 127 (translation) to Appendix at 1; *see also* Declaration of Hana Mu ("Mu Decl."), filed concurrently herewith, at ¶ 24. The Civil Ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. *Id.* at 2-3. While the trademarks and copyrights are blocked, Paul Frank is "prohibited from assigning, deregistering, changing the registration… over any such registered trademarks or copyright or from assigning any of such pending trademarks." *Id.* at 3. Paul Frank's intellectual property is severely compromised by this ruling.

In addition, if the Court agrees with CBG, it could issue a major damages finding against Paul Frank, including potential punitive damages, which may conflict with the ruling of the Arbitrator in this case. Such a finding could even lead to the loss of the trademarks themselves.

CBG's lawsuit is an improper attempt to interfere with the jurisdiction of this Arbitration.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

CBG is hoping that the Chinese court will issue a favorable ruling so that it can ignore the ruling of the Arbitrator (which will surely be in Paul Frank's favor). Thus, Grand Union / CBG's conduct in filing this lawsuit is also a breach of the MLA, which provides for disputes to be resolved solely in this Arbitration.

## III. PAUL FRANK SHOULD BE GRANTED LEAVE TO AMEND ITS DEMAND FOR ARBITRATION TO INCLUDE A CLAIM AGAINST CBG

### A. The Arbitrator Has Authority to Allow a Party to Amend Any Pleading at Any Time Before or After the Commencement of the Hearing.

JAMS Comprehensive Arbitration Rules & Procedures, Rule 10 "Changes of Claims," states as follows: "After the Arbitrator is appointed, no new or different claim may be submitted, except with the Arbitrator's approval. A party may request a hearing on this issue." JAMS Comprehensive Arbitration Rules & Procedures, Rule 10. Here, in the preliminary hearing on March 13, 2023, Paul Frank's counsel informed the Arbitrator and opposing counsel of its plan to seek to amend the demand for arbitration to include CBG as a party. The Arbitrator therefore set a hearing to address certain threshold issues, including the "potential addition of a related third party." Report of Preliminary Hearing and Scheduling order No. 1 dated March 24, 2023.

The Arbitrator, in her discretion, may allow an amendment to any pleading in the furtherance of justice and on such terms as may be proper. *See* Cal. Civ. Proc. Code § 473(a)(1) ("The court may likewise, in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars."); *see also* Cal. Civ. Proc. Code § 576 ("Any judge, at any time before or after commencement of trial, in the furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order."). In fact, amendment of pleadings can be allowed at any time before entry of final judgment. *See Bank of America v. Superior Court*, 20 Cal. 2d 697, 702 (1942). Here, per JAMS Rule 10 and the California Code of Civil Procedure, the Arbitrator has the authority to allow Paul Frank to amend its operative pleading to add CBG as a party to this Action.

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**B. Amendments of Pleadings Are Liberally Allowed So that Cases are Determined on Their Merits.**

The power to allow amendment of pleadings is to be liberally exercised so that cases may be decided on their merits. "Great liberality is indulged in matters of amendment to the end that lawsuits may be determined upon their merits." *Desny v. Wilder*, 46 Cal. 2d 715, 751 (1956). Cal. Civ. Proc. Code § 473 "giving the courts the power to permit amendments in furtherance of justice has received a very liberal interpretation by the courts of this state." *Klopstock v. Superior Court of S.F.*, 17 Cal. 2d 13, 19 (1941). As set forth by the court in *Board of Trustees of Leland Stanford, Jr. University v. Superior* Court, 149 Cal. App. 4th 1154, 1163 (2004) (emphasis added):

> "It is well established that "**California courts 'have a policy of great liberality in allowing amendments at any stage of the proceeding** so as to dispose of cases upon their substantial merits where the authorization does not prejudice the substantial rights of others.' [Citation.] **Indeed, 'it is a rare case in which "a court will be justified in refusing a party leave to amend** his [or her] pleading so that he [or she] may properly present his [or her] case."' Thus, absent a showing of prejudice to the adverse party, **the rule of great liberality in allowing amendment of the pleadings will prevail**."

A court's "discretion should be exercised liberally in favor of amendments, for judicial policy favors resolution of all disputed matters in the same lawsuit." *Kittredge Sports Co. v. Superior Court*, 213 Cal. App. 3d 1045, 1047 (1989).

A court will very rarely be justified in refusing a party leave to amend so that he or she may properly present the case. *See Guidery v. Green*, 95 Cal. 630, 633-34 (1892) ("It can very rarely happen that a court will be justified in refusing a party leave to amend his pleading so that he may properly present his case, and obviate any objection that the facts which constitute his cause of action or his defense are not embraced within the issues, or properly presented by his pleading."); *see also Redevelopment Agency v. Herrold*, 86 Cal. App. 3d 1024, 1031 (1978) ("it is a rare case in which a court will be justified in refusing a party leave to amend his pleadings so that he may properly present his case"). In fact, it is an abuse of the court's discretion to deny a timely motion to amend when the refusal deprives a party of the right to assert a meritorious claim if granting leave to amend will not prejudice the opposing party. "If the motion to amend is timely made and the granting of the motion will not prejudice the opposing party, it is error to refuse permission to amend and where the refusal

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

also results in a party being deprived of the right to assert a meritorious cause of action or a meritorious defense, it is not only error but an abuse of discretion." *Id.* at 1031, citing *Morgan v. Superior Court*, 172 Cal. App. 2d 527, 530 (1959). Even if "the motion to amend [comes] on the day of trial," leave to amend should be granted when the prejudice is "delay[ing] [the trial] only a few days." *Higgins v. Del Faro,* 123 Cal. App. 3d 558, 563-64, 566 (1981) (reversing the trial court and holding that leave to amend the complaint should have been granted); *Honig v. Fin. Corp. of Am*., 6 Cal. App. 4th 960, 965-67 (1992) (reversing the trial court; holding that the motion for leave to amend the complaint filed after a summary judgment motion and more than two years after the complaint should have been granted because there was "no prejudice").

Here, Paul Frank has meritorious claims against CBG as the alter ego of the currently named Respondent and which is itself engaged in wrongdoing. As such, the Arbitrator should allow Paul Frank an opportunity to amend its demand for arbitration to include CBG rather than forcing Paul Frank to file an entirely separate claim against CBG.

**C. <u>CBG Should Be Added as a Party to This Action Because it is the Alter Ego of Grand Union and Bound by the Arbitration Agreement</u>**

**1. <u>CBG is Grand Union's alter ego</u>**

When assessing alter ego, "[t]he issue is not whether the corporate entity should be disregarded for all purposes, nor whether its very purpose was to defraud the plaintiff. Rather, the issue is whether in the particular case presented and for the purpose of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Lebastchi v. Superior Court*, 33 Cal. App. 4th 1465, 1470 (1995), citing 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, pp. 524-525. It can be applied so as to impose liability on corporation for the acts of its parent or affiliated companies:

> Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: "In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity

weintraub tobin chediak coleman grodin
LAW CORPORATION

with the assets of both, and charged it with the liabilities of one or both."

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249-50 (1991) (citing 2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416.

Whether the alter-ego doctrine applies is a question of fact. *See Klajic v. Castaic Lake Water Agency*, 90 Cal. App. 4th 987, 1000 (2001). Two conditions must exist: "(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010).

In determining whether the alter ego doctrine, a Court or arbitrator looks to the following factors: (1) the commingling of funds and other assets, the failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; (2) the treatment by an individual of the assets of the corporation as his/her own; (3) the failure to issue or subscribe to stock and the failure to obtain authority to issue or subscribe to stock; (4) the representation by an individual that he/she is personally liable for the debts of the corporation; (5) the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; (6) the identical equitable ownership in the two entities; (7) the identification of the equitable owners thereof with the domination and control of the two entities; (8) the identification of the directors and officers of the two entities in the responsible supervision and management; (9) the failure to adequately capitalize the corporation; (10) the absence of corporate assets, and undercapitalization; (11) the use of a corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation; (12) the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest or concealment of personal business activities; (13) the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; (14) the use of the corporate entity to procure labor, services, or merchandise for another person or entity; (15) the diversion of assets from a corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; (16) the contracting with another with intent to avoid performance by use of a

corporation as a subterfuge for illegal transactions; and (17) the formation and use of a corporation to transfer to it the existing liability of another person or entity. *Zoran*, 185 Cal. App. 4th at 81-812. "This long list of factors is not exhaustive. The enumerated factors may be considered among others under the particular circumstances of each case. No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Id.* at 812 (2010) (internal citations and quotations omitted).

Here, there is no question that CBG is the alter ego to Grand Union. Grand Union has no employees, no offices, and no business. It is merely a holding company for the rights that are entirely exercised by CBG. CBG controls the business of Grand Union entirely. It negotiates the agreements, pays the royalties, and holds itself out to the public as the holder of the Paul Frank intellectual property in China. These facts demonstrate a clear unity of interest and ownership between CBG and Grand Union.

Further, failure to disregard the corporate entity of Grand Union and consider CBG an alter ego would promote injustice, as CBG was clearly the entity acting under the MLA through its employees and perpetrating the breaches of contract alleged by Paul Frank, as set forth in the Motion filed concurrently herewith and incorporated herein. In addition, should CBG's lawsuit in China proceed, there is a serious risk of conflicting rulings between this Arbitration and the Chinese action. This was clearly CBG's intent in filing the Chinese case, which is manifestly unjust to Paul Frank.

For these reasons, Paul Frank should be permitted to amend its Demand for Arbitration to include CBG as the alter ego of Grand Union.

**2. As Grand Union's alter ego and/or agent, CBG is bound by the arbitration agreement.**

Under both federal and California law, a non-signatory party may be compelled to arbitration under ordinary contract principles. "[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Letizia v. Prudential Bache Secur., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) (holding that employee defendants could enforce an arbitration agreement signed by their employer). "Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Comer v. Micor, Inc.*, 436 F.3d

weintraub tobin chediak coleman grodin
LAW CORPORATION

1098, 1101 (9th Cir. 2006). "The focus is on the nature of the claims asserted by the plaintiff against the nonsignatory defendant…. The fundamental point is that a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate by defining the forum in which the dispute will be resolved." *Boucher v. All. Title Co., Inc.*, 127 Cal. App. 4th 262, 272 (2005). Thus, under federal law, CBG's role as an alter ego and agent of Grand Union is sufficient to bind them to the arbitration clause.

Under California law, it is clear that a nonsignatory who is the agent of a signatory can be compelled to arbitrate claims against its will. In *Harris v. Superior Court*, 188 Cal. App. 3d 475, 477–478 (1986), the plaintiffs were patients in a health services program that required arbitration of disputes. After the patients sued the hospital, a physician, and others for malpractice, the hospital's motion to compel arbitration was granted. The plaintiffs then sought to compel the physician to arbitrate as well. The trial court denied the motion because the physician had not signed the enrollment form containing the arbitration provision. The Court of Appeal reversed, holding that the physician's relationship as an employee of the corporation was "sufficient to bind [him] to the arbitration agreement which named [the corporation]." *Harris*, 188 Cal. App. 3d at 478. "Acting as [Hospital's] employee and on its behalf, [Physician] rendered medical care to plaintiffs. In so doing he was subject to [Hospital's] obligations under the arbitration agreement. *Id*. at 479. "Further, the voluntary acceptance of the benefit of a transaction constitutes consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." *Id.*, citing Cal. Civ. Code, § 1589. "Here, [Physician] obtained patients through enrollments in the [Hospital] health plan. His acceptance of this benefit necessarily entailed acceptance of the agreement that members' claims would be subject to binding arbitration." *Id.* Similarly, in *Berman v. Dean Witter & Co., Inc.*, 44 Cal. App. 3d 999, 1004 (1975), a husband was compelled to arbitrate his dispute with a securities broker despite his objection that he was not a party to the arbitration agreement signed by his wife when she opened her account with the broker. The husband's claim against the broker arose from a purchase he made for the wife's account; the court held that in making the purchase he was acting as the wife's agent, a status which bound him to the arbitration agreement. In *RN Sol., Inc. v. Catholic Healthcare W.*, 165 Cal. App. 4th 1511, 1520 (2008), the nonsignatory was the employee who signed

the arbitration agreement against her employer. She "benefited financially and professionally from the recruitment agreement between RNS and CHW, as alleged in her complaint." *RN*, Cal. App. 4th at 1520. Thus, she was bound by the arbitration agreement contained therein.

Agency is the fiduciary relationship that arises when a person or Company consents to an agent acting on the principal's behalf and subject to the principal's control, and the agent agrees as such. *See Hernandez v. Meridian Management Services, LLC*, 87 Cal. App. 5th 1214, 1214 (2023). "In a parent-subsidiary relationship, the agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises **sufficient control** over the subsidiary's activities such that the subsidiary becomes a mere agent or instrumentality of the parent." *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal. App. 5th 840, 840 (2019) (emphasis added.)

Here, Grand Union is shell corporation with no real employees or involvement in the agreements in which it entered into. Grand Union relied upon CBG, as its agent, to conduct its business under the licensing agreements it entered into, as demonstrated by the fact that it was CBG's director that signed the key agreements, which are directly at issue in this case. Agency is also shown by the fact that CBG demonstrated sufficient control over the business dealings stemming from the MLA, as CBG employees were the ones carrying out all communications related to the Paul Frank brand and controlled all actions and decisions related to the brand. Here, as Grand Union's agent as it relates to the Master License Agreement with Claimant, CBG should be included as a party to this action.

**D. Grand Union / CBG Will not be Prejudiced if Paul Frank is Granted Leave to File an Amended Demand for Arbitration.**

Grand Union / CBG will not be prejudiced if Paul Frank is granted leave to file an amended demand for arbitration. Courts have repeatedly held that adding a defendant to an action where the defendant was undoubtedly aware of the action prior to being added does not result in prejudice. *Austin v. Massachusetts Bonding & Ins. Co.*, 56 Cal. 2d 596, 602 (1961). Here, this action has only recently begun, the arbitration hearing is not set to take place for seven more months, and Paul Frank raised its intent to seek leave to file an amended demand to add CBG as a party at the initial

weintraub tobin chediak coleman grodin LAW CORPORATION

Preliminary Hearing.

Further, as the alter ego and/or agent of Grand Union, CBG has undoubtedly been aware of this arbitration from its onset. Its employees have already submitted Witness Statements in this action and are actively participating in the litigation. Grand Union's own filings identify CBG as the proper contact party for this action. There can be no question that CBG is already a party to this case in reality, if not in name.

For these reasons, neither Grand Union nor CBG can establish any prejudice resulting from the inclusion of CBG as a party to this action.

## IV. CONCLUSION

For the reasons set forth herein, Paul Frank respectfully requests that the Arbitrator grant it leave to file the Amended Demand for Arbitration attached as Ex. 1 to the Corpuz Decl.

DATED: April 27, 2023

**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Claimant and Counter-Respondent Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

# EXHIBIT 20

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

| | |
|---|---|
| PAUL FRANK LIMITED,<br><br>Claimant,<br><br>v.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Respondent.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Counter-Claimant,<br><br>v.<br><br>PAUL FRANK LIMITED,<br><br>Counter-Respondent. | JAMS Ref. No. 5220002118<br><br>**DECLARATION OF JESSICA R. CORPUZ**<br><br>Hearing Date: June 1, 2023 |

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**DECLARATION OF JESSICA R. CORPUZ**

I, Jessica R. Corpuz, declare as follows:

1. I am an attorney licensed to practice before all courts in the State of California and am a shareholder with Weintraub Tobin Chediak Coleman Grodin Law Corporation, attorneys of record for Claimant and Counter-Respondent Paul Frank Limited ("Paul Frank"). I am familiar with the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts under oath.

2. This Declaration is made in support of Paul Frank's Motion for Leave to Amend Demand for Arbitration.

3. Attached as Exhibit 1 hereto is a true and correct copy of Paul Frank's proposed Amended Demand for Arbitration, excluding the Exhibits thereto. Paul Frank will attach the Exhibits when it files the Amended Demand for Arbitration once leave to amend is granted.

4. Attached as Exhibit 2 hereto is a true and correct copy of a redline comparison of Paul Frank's original Demand for Arbitration to Paul Frank's proposed Amended Demand for Arbitration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 27, 2023 at Los Angeles, California.

Jessica R. Corpuz

# EXHIBIT 1

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

Claimant,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED and CHINA BRANDS GROUP,

Respondents.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Counter-Claimant,

v.

PAUL FRANK LIMITED,

Counter-Respondent.

JAMS Ref. No. 5220002118

**PAUL FRANK LIMITED'S AMENDED DEMAND FOR ARBITRATION – STATEMENT OF CLAIMS**

weintraub tobin chediak coleman grodin LAW CORPORATION

Claimant Paul Frank Limited ("Paul Frank"), by and through its counsel of record, brings this Demand for Arbitration against Respondents Grand Union International Trading Limited ("Grand Union") and China Brands Group ("CBG") alleging as follows:

**PRELIMINARY STATEMENT**

1. Paul Frank, the owner of the world-famous Paul Frank brand, seeks money damages against its former licensee, Grand Union, and CBG, Grand Union's alter ego, as a result of Grand Union's and CBG's repeated material breaches of the license agreement. Despite Paul Frank's exceptional efforts to resolve the dispute, Grand Union and CBG's egregious and deliberate conduct forced Paul Frank to terminate the agreement and seek damages for Grand Union and CBG's violations of the license agreement.

**THE PARTIES**

2. Paul Frank is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

3. Grand Union is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

4. CBG is a corporation organized under the laws of China with its principal place of business in Shanghai, China. Upon information and belief, CBG is an agent of Grand Union and Grand Union is liable for the acts of CBG, all of which occurred under Grand Union's direction and control and Grand Union directed or otherwise participated in CBG's wrongful actions.

5. Upon information and belief, at all times relevant hereto, there existed a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union. Upon information and belief, CBG created and continue to use Grand Union to shield CBG from liability for the actions alleged in this Demand for Arbitration. Upon information and belief, CBG shares a unity of ownership, control, and management with Grand Union such that any activities attributed to Grand Union are in fact activities of CBG and the activities attributed to CBG are in fact activities of Grand Union. Adherence to the fiction of existence of each as an entity separate and distinct from the other would permit an abuse of the corporate privilege and would

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

promote injustice and fraud in that it would enable Grand Union CBG to continue to commit the actions complained of herein while being shielded from liability.

6. Paul Frank is informed and believes that there is a unity of interest and control between Grand Union and CBG, including but not limited to the following actions:

a. CBG has and continues to commingle and fail to segregate Grand Union's funds and other assets from those of CBG, and diverts corporate funds of Grand Union to other than corporate uses.

b. CBG has held out that it is liable for the debts of Grand Union.

c. CBG and Grand Union use the same office and employ the same employees.

d. Grand Union has inadequate capitalization and functions as a mere shell, instrumentality, and/or conduit for the business ventures of CBG.

e. CBG has concealed and misrepresented the identity of its responsible ownership, management, and financial interest and the responsible ownership, management, and financial interest of Grand Union.

f. CBG and Grand Union have disregarded legal formalities and failed to maintain arm's length relationships between them.

g. CBG has diverted the assets of Grand Union to the detriment of creditors, and/or has manipulated assets and liabilities so as to concentrate the assets in one and the liabilities in the other.

h. CBG and Grand Union have acted with an intent to avoid performance of contract by use of one corporation as a shield against personal liability, and as a subterfuge of illegal transactions.

i. CBG treat assets nominally belonging to Grand Union as belonging to CBG.

j. Grand Union exclusively acts through CBG.

7. Grand Union and CBG are collectively referred to herein as "Respondents." Paul Frank and Respondents are collectively referred to herein as the "Parties."

**JURISDICTION AND VENUE**

8. The First Amendment to the Master License Agreement, dated April 27, 2018 (the

"First Amendment"), attached hereto as Exhibit 2, provides at Section 28 that any dispute between the Parties will be administered by JAMS:

> If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

9. Pursuant to Section 28, Paul Frank and Grand Union conducted a mediation on November 7, 2022 at JAMS before Hon. James L. Smith (Ret.). Despite Paul Frank's best efforts, the Parties were unable to resolve their dispute. Therefore, Paul Frank filed this Demand for Arbitration.

10. The First Amendment further provides at Section 30 that the agreement "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law."

## FACTUAL ALLEGATIONS

11. Paul Frank owns the intellectual property associated with, *inter alia*, the Paul Frank® brand.

12. The Paul Frank brand began in 1995 with 28-year-old Paul Frank sewing gifts for

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

friends in his parent's home in Hunting Beach, California. That business eventually became Paul Frank Industries, Inc. ("Paul Frank Industries") and the brand grew to a global pop-culture sensation – in particular its most famous character, Julius the Monkey. In 2010, Saban Brands Entertainment Group ("Saban") purchased Paul Frank Industries from its founders. In 2020, Futurity Brands Switzerland AG purchased the brand from Saban through its subsidiary Paul Frank Limited (the Claimant herein).

**The Master License Agreement**

13. Effective as of January 1, 2015, Paul Frank Industries (still under the ownership of Saban) granted Grand Union an exclusive license to certain elements of the Paul Frank brand (the "Property"). The Master License Agreement dated January 1, 2015 ("MLA") is attached hereto as Exhibit 1. Paul Frank assumed the rights and obligations of the MLA when it acquired the brand in 2020. The Parties later entered into the First Amendment, attached hereto as Exhibit 2, on April 27, 2018. The First Amendment was negotiated and signed on behalf of Grand Union by Bo Zheng, Director of Grand Union and shareholder and Chairman of CBG.

14. Upon information and belief, Grand Union granted a sublicense to CBG whereby Grand Union gave CBG authority to act on its behalf in all matters related to the MLA and the Property. At all times relevant herein, Grand Union was a shell corporation set up to hold the intellectual property rights under the MLA. Grand Union acts exclusively through its agent and alter ego CBG. Grand Union does not conduct any business other than entering into the MLA. Rather, Grand Union is a mere conduit for CBG's operations. All actions nominally by Grand Union were actually conducted by CBG and there was no distinction between CBG and Grand Union.

15. The Parties entered into the Second Amendment to Master License Agreement dated August 19, 2021, attached hereto as Exhibit 3, and the Third Amendment to Master License Agreement dated February 10, 2022, attached hereto as Exhibit 4. The Second and Third Amendments were also signed by Bo Zheng. The various amendments are collectively referred to herein as the "Amendments."

16. Before its termination, the MLA provided that Respondents had the exclusive right to manufacture, sell, and distribute certain Paul Frank branded products (the "Licensed Products") and

services (the "Licensed Services") within the territory of China, Hong Kong, and Macau (the "Territory"), from January 1, 2015 to February 28, 2030 (the "License Period"). *See* MLA, Schedules A-C. The MLA limited the sale of Licensed Products to certain "Channels of Distribution," including for example department stores and e-commerce retailers. *Id*. at Schedule G. In return, Respondents paid a license fee of sixty-five million dollars ($65 million). *Id.* at Schedule D.

17. The MLA at Section 1(b) also states that Respondents had the right to grant sublicenses subject to certain conditions:

> (i) every sublicensee ("Sublicensee") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services; (ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;
>
> (iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;
>
> (iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;
>
> (v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

18. Further, Section 2(a) of the MLA states that "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." Sales outside the Territory require prior written approval of Paul Frank and are subject to payment "of a market-rate royalty, to be agreed upon by Licensor and Licensee." Section 2(b).

19. Respondents must sell Licensed Products "outright at a competitive price" and may not engage in "Dumping," which is defined in the MLA as "the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products." Section 10(b) and (i). Respondents must also provide annual sales reports

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products. *See* Section 10(i).

20. The MLA at Section 6(a) also states that Respondents shall submit quarterly statements "specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products" and "report[ing] the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof," as well as "any additional non-financial information reasonably requested by Licensor from time to time."

21. Further, the MLA at Section 6(b) states that Paul Frank may conduct periodic audits of Respondents: "Licensee shall maintain and make available to Licensor, no more than once during any two-year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

22. The MLA at Section 7 also states that Respondents must obtain approval for "all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("SKU") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)."

23. The MLA at Section 9(c) further states that Respondents were responsible for identifying "misuses of the Property." Respondents were required to provide Paul Frank "a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter." In the event that Respondents identified any significant infringement, they were required to "promptly notify" Paul Frank in writing. Paul Frank had the option, "in its sole discretion" to commence an infringement action, or request that Respondents do so. In such an event, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements."

24. Lastly, the MLA specifies the result of a breach of the MLA by Respondents. A "Material Breach" is defined in Section 13(b) as (i) the failure to pay the License Fee (which is not asserted here); (ii) "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Licensee;" (iii) "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days;" or (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission" that similarly materially affects the goodwill and market value of the Property for more than 120 days.

25. Should Respondents commit a Material Breach, "Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." *See* Section 13(a).

26. In the event that Respondents breach the agreement but such breach does not rise to the level of a Material Breach, Section 13(d) of the MLA states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of breach, then such breach shall be an Uncured Breach."

**The 2021 Notice of Termination and the Second Amendment**

27. On June 21, 2021, Paul Frank issued a Notice of Termination to Respondents (the "2021 Notice of Termination"), a copy of which is attached hereto as Exhibit 5. The 2021 Notice of Termination states that Respondents, through an entity controlled by Respondents, had registered the Property as trademarks in China in violation of Section 9(e) of the MLA. It further states that an affiliate of Respondents had incorporated the Property into its company name. On the basis of such breaches and pursuant to Section 13(a)(iii) and 13(b)(iii)-(iv), Paul Frank notified Respondents that the agreement would be terminated unless the breaches were completely cured.

28. On July 29, 2021, Paul Frank sent a Notice of Material Breaching to Respondents ("2021 Notice of Material Breaching"), a copy of which is attached as Exhibit 6. The 2021 Notice of Material Breaching states that Respondents had authorized an affiliated entity to launch "Paul Frank Beauty" on an e-commerce platform and social media. It further states that Respondents registered a new trademark derived from the Property.

weintraub tobin chediak coleman grodin LAW CORPORATION



29. After significant negotiations between the Parties, the Parties agreed to and executed the Second Amendment. Bo Zheng negotiated and signed the Second Amendment on behalf of Respondents.

30. The Second Amendment, Schedule K, Section 7(i) states that Respondents would, by February 19, 2022 (the "Cure Date"), enter into an "Extraordinary Cure Period" during which it would "cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor." Section 7(ii) states that, "in consideration of Licensee's obligations under this Second Amendment," Paul Frank "agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known [sic] to Licensor as of the Second Amendment Date." Paul Frank further represented and warranted that it had disclosed all known potential breaches to Respondents – i.e. that all breaches were set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching.

31. Section 7(iii) states that Paul Frank has the "right to perform a due diligence in order to ascertain whether there are any uncured breaches." Respondents were obligated to "collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence."

32. Section 6(ii) similarly states:

> Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

33. The Second Amendment also stated at Schedule K, Sections 1-5 that Respondents had the right to an exclusive license for a limited series of Paul Frank-related intellectual property, the A.NI.MA Series. In return, Respondents were obligated to pay a royalty of eight million, five hundred thousand dollars ($8,500,000) in addition to twenty percent (20%) of Grand Union's "net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calendar year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year" for the exclusive categories, and thirty percent (30%) of the

weintraub tobin chediak coleman grodin LAW CORPORATION

"net invoiced billings" originating from sublicensees for the non-exclusive categories. Respondents were also obligated to pay a "participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties." The Participation Fee was to be paid on a quarterly basis, and Respondents were obligated to provide "complete and accurate statements in Chinese ("Royalty Statements"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time." Respondents were also obligated to inform Paul Frank of any brand collaborations, and pay Paul Frank a royalty of "30% of the net invoiced billing of Licensor's royalty income from such brand collaborations." Schedule K also states that Respondents would pay a Brand Management Fee of two hundred thousand dollars ($200,000) per calendar quarter, which amount was amended in the Third Amendment to one million three hundred thousand RMB Plus VAT (which is approximately $181,630 USD at the present exchange rate). Schedule K further states that Respondents were required to expend "(i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (¥ 10,000,000), whichever of (i) or (ii) is greater" as a Marketing Commitment.

34. Lastly, the Second Amendment provides updated notice provisions for both Grand Union and Paul Frank. For Grand Union, all notices were to be provided to "Bo Zheng (bo.zheng@chinabrandsgroup.com.cn) With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)."

**<u>Paul Frank Discovers Further Breaches and Terminates the MLA</u>**

35. After the execution of the Second Amendment, the Parties continued to operate under the MLA, as amended. However, Paul Frank discovered – and continues to discover – multiple egregious breaches of the MLA by Respondents.

36. On July 21, 2022, Paul Frank sent a Notice of Material Breaching and Further Steps to Respondents ("Notice of Material Breaching"), a copy of which is attached hereto as <u>Exhibit 7</u>. The Notice of Material Breaching states:

weintraub tobin chediak coleman grodin LAW CORPORATION

> Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

37. The Notice of Material Breaching also states that a "third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period."

38. Respondents did not take any steps to cure the breaches identified by Paul Frank in the Notice of Material Breaching. In fact, Respondents denied the existence of the breaches in an email dated September 16, 2022, attached hereto as Exhibit 8. Respondents also stated, "[w]e have no obligation to get audited by the Licensor," which is a clear misrepresentation of the terms of the MLA and the Second Amendment.

39. On August 24, 2022, Paul Frank sent a Notice of Termination to Respondents ("Notice of Termination"), a copy of which is attached hereto as Exhibit 9. The Notice of Termination identified four major categories of breaches by Respondents:

> a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.
>
> b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.

weintraub tobin chediak coleman grodin LAW CORPORATION

c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.

d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

40. Pursuant to Section 13 of the MLA, the Notice of Termination stated that the "Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor."

41. Respondents did not completely cure the Material Breaches identified in the Notice of Termination – they did not even attempt to cure any of the Material Breaches.

42. Therefore, on September 23, 2022, Paul Frank sent a Termination of Master License Agreement, which is attached hereto as Exhibit 10. The Termination of Master License Agreement confirmed that the MLA terminated effective as of September 23, 2022 (the "Termination Effective Date") and instructed Respondents to cease and desist from all activities related to the Paul Frank brand, except for a ninety-day (90-day) Sell-Off period. Paul Frank was not obligated to grant Respondents a Sell Off Period pursuant to Section 20(b) of the MLA, as Respondents were in Material Breach of the MLA. However, Paul Frank agreed to a Sell-Off period in good faith to permit Respondents to sell off remaining inventory and to minimize the impact of the termination on the brand.

43. The Termination of Master License Agreement also requested, pursuant to Section 17 of the MLA, a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of

weintraub tobin chediak coleman grodin LAW CORPORATION

the date of such statement ('Statement of Inventory')."

44. On September 29, 2022, Respondents sent an email responding to the Notice of Termination, again stating that they would not cure the breaches identified in the Notice of Termination. A copy of this email is attached hereto as Exhibit 11.

45. Upon the Termination Effective Date, the following provisions of the MLA immediately went into effect:

a. Pursuant to Section 8(f), "all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement."

b. Pursuant to Section 14, "[n]either the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination."

**Additional Breaches Discovered by Paul Frank**

46. In addition to the Material Breaches identified in the Notice of Termination, Paul Frank is informed and believes that Respondents have committed the following Material Breaches, Uncured Breaches, and/or other breaches of the MLA:

a. Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

b. Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

c. Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

d. Respondents have executed sublicenses that contain territory terms that are

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

e. Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

f. Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

g. Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

h. Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

i. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

j. Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

k. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

l. Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

m. Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

n. Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

o. Respondents have failed to or refused to maintain and make available to Paul

Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

p. Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

q. In particular, Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

r. Further, Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

s. Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

t. Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

u. Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

v. Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

w. Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

x. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

y. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

z. Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

aa. Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

bb. Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

cc. Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

dd. Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ee. Respondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

ff. Respondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

gg. Respondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

hh. Respondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

ii. Respondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

47. Respondents have also filed wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

48. Upon information and belief, Respondents acting on behalf of Grand Union have committed additional Material Breaches, Uncured Breaches, and/or other breaches of the MLA which are presently unknown to Paul Frank.

**Respondents' Attempt to Circumvent the Jurisdiction of this Arbitration**

49. CBG has filed a lawsuit in lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China against Paul Frank and Grand Union. CBG asks the Chinese Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products.

50. Respondents then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from California, stating (in English translation): "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A [Grand Union] or Party B [CBG] can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate." Upon information and belief, Respondents filed this Agreement on Jurisdiction

weintraub tobin chediak coleman grodin
LAW CORPORATION

in order to deceive the Chinese court into retaining jurisdiction over the case.

51. CBG also filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard. The Court's ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. While the trademarks and copyrights are blocked, Paul Frank is prohibited from the use of its own trademarks and copyrights in China.

52. Respondents' actions in filing this lawsuit are in violation of the First Amendment, which states, "If a dispute arises out of or relates to this Agreement, or the breach hereof… such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator… in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/)." First Amendment at Section 28.

53. Upon information and belief, Respondents filed this lawsuit in order to interfere with the jurisdiction of this Arbitration and prevent the potential effect of this Arbitrator's rulings in the future.

**Paul Frank is Entitled to Audit Respondents' Performance Under the MLA and the Amendments**

54. Paul Frank has an unquestionable right to audit Respondents' compliance with the MLA and the Amendments pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment.

55. Because Respondents have refused to permit Paul Frank to conduct an audit pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment, Paul Frank is unable to determine whether there are any additional violations of the MLA and the Amendments.

56. Paul Frank will ask that the Arbitrator compel an immediate audit of Respondents once this Arbitration is initiated, by Paul Frank's appointed third-party auditor.

weintraub tobin chediak coleman grodin LAW CORPORATION

57. Paul Frank reserves the right to amend this Demand for Arbitration and seek damages for any breaches of the MLA and the Amendments, or any other wrongful conduct of any kind, discovered during the audit.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Grand Union and CBG)**

58. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

59. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

60. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

61. Paul Frank has fully performed its obligations under the MLA and the Amendments.

62. Respondents have committed numerous material breaches of their contractual obligations under the MLA and the Amendments including without limitation that:

a. Respondents have forged Licensor's official stamps and used Licensor's forged signatures, as set forth in the Notice of Termination;

b. Respondents have sold and/or distributed Licensed Products outside the Territory and Channels of Distribution, as set forth in the Notice of Termination;

c. Respondents have failed to or refused to cure the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as set forth in the Notice of Termination;

d. Respondents have failed to or refused to comply with Paul Frank's request for an audit and have prevented and obstructed Paul Frank's efforts to conduct the due diligence, as set forth in the Notice of Termination;

e. Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

f. Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

g. Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

h. Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

i. Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

j. Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

k. Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

l. Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

m. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

n. Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

o. Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

p. Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

q. Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

r. Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

s. Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

t. Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

u. In particular, Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

v. Further, Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

w. Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

x. Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

y. Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

z. Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c)

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

of the MLA;

aa. Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

bb. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

cc. Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

dd. Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

ee. Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

ff. Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

gg. Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

hh. Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ii. Respondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

jj. Respondents have failed to or refused to cure the breaches of the MLA set forth

weintraub tobin chediak coleman grodin
LAW CORPORATION

in the 2021 Notice of Termination and the 2021 Notice of Material Breaching;

kk. Respondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

ll. Respondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date, in violation of Section 14 of the MLA;

mm. Respondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA; and

nn. Respondents engaged in conduct intended to interfere with this Arbitration, including but not limited to the filing of a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China.

63. As a result of Respondents' material breaches of the MLA and the Amendments, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Grand Union and CBG)**

64. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

65. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

66. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

67. Paul Frank has fully performed its obligations under the MLA and the Amendments.

68. Respondents engaged in conduct intended to prevent Paul Frank from receiving the benefits under the MLA and the Amendments, including without limitation by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank

and its Counsel and prevent Paul Frank from exercising its legal rights.

69. By doing so, Respondents did not act fairly and in good faith.

70. As a result of Respondents' conduct, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**THIRD CAUSE OF ACTION**

**(Violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125) Against Grand Union and China Brands Group)**

71. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

72. Paul Frank owns the intellectual property, including without limitation all trademarks, trade dress, and copyrights in the U.S. and China associated with the Paul Frank® brand.

73. As set forth in Sections 1 and 8 of the MLA, Paul Frank gave Respondents a limited right during the Licensed Period to utilize the Property to design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer the Licensed Products in the specified Territory and Channels of Distribution and provide Licensed Services in the Territory.

74. Paul Frank owns all trademarks, trade dress, and copyrights in the U.S. and China associated with all Licensed Products and Licensed Services. Paul Frank holds multiple registrations over trademarks and/or trade dress in the U.S. and China, some of which have been used by Grand Union. The trademarks and/or trade dress covered by those registrations and others incorporating and/or relating to the Name are actionable under 15 U.S.C. § 1114.

75. Paul Frank also owns the rights in the U.S. and China to valid and protectable trade dress incorporating and/or relating to the Property, at least some of which have been used by Respondents and not registered. Such trade dress is actionable under 15 U.S.C. § 1125.

76. The Property has great value and consumer recognition associated with Paul Frank.

77. Respondents has never been authorized to use the Property outside the scope of the MLA or its Amendments.

78. The MLA terminated on September 23, 2022.

79. Upon information and belief, after the termination of the MLA, Respondents

continued without authority to utilize the Property – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

80. Upon information and belief, Respondents has also utilized the Property prior to the termination of the MLA without obtaining the approval of Paul Frank – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

81. Upon information and belief, Respondents have also utilized the Property prior to the termination of the MLA outside the Territory – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

82. Upon information and belief, Respondents have also utilized the Property prior to the termination of the MLA outside the Channels of Distribution – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

83. In all of these ways, Respondents have, without authority, used the Property in commerce in a manner that misrepresents and is likely to cause mistake or confusion on the part of consumers as to the existence or nature of Paul Frank's sponsorship of, endorsement of, approval of, affiliation with, or association with such use.

84. Paul Frank has made repeated efforts, over the course of several years, to engage Respondents in good faith discussions concerning the violations of the MLA and the Amendments.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Paul Frank also gave Respondents ample opportunity to avoid termination of the MLA and the Amendments. Respondents nonetheless refused to engage in good faith discussions, and continued to act as described above, during the period of the MLA and after its termination. Moreover, Respondents are sophisticated entities that should, at all relevant times, have been well aware of its rights and obligations under the MLA and the Amendments. Respondents' violation of the MLA and the Amendments have, therefore, been willful.

85. As a result of the foregoing violations of its rights in registered and unregistered trademarks and trade dress – i.e. Respondents' unauthorized use of the valuable Property outside the scope and beyond the life of the MLA and the Amendments, which is likely to cause consumer confusion – Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

86. Pursuant to 15 U.S.C. § 1117, Paul Frank is entitled to recover, without limitation, its damages; Respondents' profits in connection with Respondents' use of the Property and, in particular, its violations of Paul Frank's trademark and trade dress rights; and the costs associated with filing this Demand for Arbitration.

**FOURTH CAUSE OF ACTION**

**(Quantum Meruit and/or Unjust Enrichment Against Grand Union and CBG)**

87. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 57 as fully set forth herein.

88. Paul Frank pleads that, in the alternative, no agreement ever existed between it and Grand Union as to one or more material terms of the MLA and the Amendments. In that event, Paul Frank nevertheless conferred substantial benefits on Respondents in connection with Paul Frank's support, goodwill, and intellectual property, including without limitation Respondents' use of the iconic Paul Frank brand.

89. Paul Frank has not been fully compensated for the full and fair value of the benefits conferred upon Respondents.

90. In the absence of an enforceable contract as to material terms, Paul Frank has no adequate remedy at law.

weintraub tobin chediak coleman grodin LAW CORPORATION

91. Respondents accepted and enjoyed the benefits that Paul Frank conferred upon it, deriving significant profit therefrom.

92. Respondents accepted those benefits knowing that Paul Frank expected to be paid the fair value of those benefits.

93. Under the circumstances, it would be inequitable for Respondents to retain the benefits Paul Frank conferred without paying Paul Frank the full value for those benefits.

94. As such, Paul Frank is entitled to recover the balance of the value that Respondents has accepted from Paul Frank under a theory of *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing.

## PRAYER FOR RELIEF

WHEREFORE, Paul Frank requests relief as follows:

1. For an award of damages, including amounts to be determined at the Arbitration Hearing for the various breached described herein;

2. For an award of damages, in amounts to be determined at the Arbitration Hearing, as a result of Respondents' violation of Paul Frank's trademark and trade dress rights;

3. For an award of Respondents' profits associated with the violations of Paul Frank's trademark and trade dress rights;

4. In the alternative, an award of recovery in *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing;

5. For an award of reasonable attorney's fees and costs of suit; and

6. For such other and further relief as the Court deems just and proper.

DATED: April 27, 2023

**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

# EXHIBIT 2

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for ~~Petitioner~~ Claimant and Counter-Respondent~~Paul Frank Limited~~ Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

~~Petitioner~~Claimant,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED and CHINA BRANDS GROUP,

Respondents.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Counter-Claimant,

v.

PAUL FRANK LIMITED,

Counter-Respondent.

JAMS Ref. No. ~~1220073501~~ 5220002118

**PAUL FRANK ~~LIMITED~~LIMITED'S AMENDED DEMAND FOR ARBITRATION – STATEMENT OF CLAIMS**

weintraub tobin chediak coleman grodin LAW CORPORATION

Claimant Paul Frank Limited ("Paul Frank"), by and through its counsel of record, brings this Demand for Arbitration against Respondents Grand Union International Trading Limited ("Grand Union") and ~~alleges~~China Brands Group ("CBG") alleging as follows:

## PRELIMINARY STATEMENT

1. Paul Frank, the owner of the world-famous Paul Frank brand, seeks money damages against its former licensee, Grand Union, and CBG, Grand Union's alter ego, as a result of Grand Union's and CBG's repeated material breaches of the license agreement. Despite Paul Frank's exceptional efforts to resolve the dispute, Grand ~~Union's~~Union and CBG's egregious and deliberate conduct forced Paul Frank to terminate the agreement and seek damages for Grand ~~Union's~~Union and CBG's violations of the license agreement.

## THE PARTIES

2. Paul Frank is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China.

3. Grand Union is a corporation organized under the laws of Hong Kong, China with its principal place of business in Hong Kong, China. ~~Paul Frank and Grand Union are collectively referred to herein as the "Parties."~~

4. ~~Grand Union acts through its subsidiary ("CBG"), which~~CBG is a corporation organized under the laws of China with its principal place of business in Shanghai, China. Upon information and belief, CBG is an agent of Grand Union and Grand Union is liable for the acts of CBG, all of which occurred under Grand Union's direction and control and Grand Union directed or otherwise participated in ~~G~~CBG's wrongful actions.

5. Upon information and belief, at all times relevant hereto, there existed a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union. Upon information and belief, CBG created and continue to use Grand Union to shield CBG from liability for the actions alleged in this Demand for Arbitration. Upon information and belief, CBG shares a unity of ownership, control, and management with Grand Union such that any activities attributed to Grand Union are in fact activities of CBG and the activities attributed to CBG

weintraub tobin chediak coleman grodin
LAW CORPORATION

are in fact activities of Grand Union. Adherence to the fiction of existence of each as an entity separate and distinct from the other would permit an abuse of the corporate privilege and would promote injustice and fraud in that it would enable Grand Union CBG to continue to commit the actions complained of herein while being shielded from liability.

6. Paul Frank is informed and believes that there is a unity of interest and control between Grand Union and CBG, including but not limited to the following actions:

a. CBG has and continues to commingle and fail to segregate Grand Union's funds and other assets from those of CBG, and diverts corporate funds of Grand Union to other than corporate uses.

b. CBG has held out that it is liable for the debts of Grand Union.

c. CBG and Grand Union use the same office and employ the same employees.

d. Grand Union has inadequate capitalization and functions as a mere shell, instrumentality, and/or conduit for the business ventures of CBG.

e. CBG has concealed and misrepresented the identity of its responsible ownership, management, and financial interest and the responsible ownership, management, and financial interest of Grand Union.

f. CBG and Grand Union have disregarded legal formalities and failed to maintain arm's length relationships between them.

g. CBG has diverted the assets of Grand Union to the detriment of creditors, and/or has manipulated assets and liabilities so as to concentrate the assets in one and the liabilities in the other.

h. CBG and Grand Union have acted with an intent to avoid performance of contract by use of one corporation as a shield against personal liability, and as a subterfuge of illegal transactions.

i. CBG treat assets nominally belonging to Grand Union as belonging to CBG.

j. Grand Union exclusively acts through CBG.

7. Grand Union and CBG are collectively referred to herein as "Respondents." Paul Frank and Respondents are collectively referred to herein as the "Parties."

weintraub tobin chediak coleman grodin LAW CORPORATION

## JURISDICTION AND VENUE

5.8. The First Amendment to the Master License Agreement, dated April 27, 2018 (the "First Amendment"), attached hereto as Exhibit 2, provides at Section 28 that any dispute between the Parties will be administered by JAMS:

> If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement.

6.9. Pursuant to Section 28, the PartiesPaul Frank and Grand Union conducted a mediation on November 7, 2022 at JAMS before Hon. James L. Smith (Ret.). Despite Paul Frank's best efforts, the Parties were unable to resolve their dispute. Therefore, Paul Frank filed this Demand for Arbitration.

7.10. The First Amendment further provides at Section 30 that the agreement "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law."

## FACTUAL ALLEGATIONS

8.11. Paul Frank owns the intellectual property associated with, *inter alia*, the Paul Frank®

weintraub tobin chediak coleman grodin LAW CORPORATION

brand.

~~9.~~12. The Paul Frank brand began in 1995 with 28-year-old Paul Frank sewing gifts for friends in his parent's home in Hunting Beach, California. That business eventually became Paul Frank Industries, Inc. ("Paul Frank Industries") and the brand grew to a global pop-culture sensation – in particular its most famous character, Julius the Monkey. In 2010, Saban Brands Entertainment Group ("Saban") purchased Paul Frank Industries from its founders. In 2020, Futurity Brands Switzerland AG purchased the brand from Saban through its subsidiary Paul Frank Limited (the Claimant herein).

~~///~~

**The Master License Agreement**

~~10.~~13. Effective as of January 1, 2015, Paul Frank Industries (still under the ownership of Saban) granted Grand Union an exclusive license to certain elements of the Paul Frank brand (the "Property"). The Master License Agreement dated January 1, 2015 ("MLA") is attached hereto as Exhibit 1. Paul Frank assumed the rights and obligations of the MLA when it acquired the brand in 2020. ~~Paul Frank Industries and Grand Union~~ The Parties later entered into the First Amendment, attached hereto as Exhibit 2, on April 27, 2018. The First Amendment was negotiated and signed on behalf of Grand Union by Bo Zheng, Director of Grand Union and shareholder and Chairman of CBG.

14. Upon information and belief, Grand Union granted a sublicense to CBG whereby Grand Union gave CBG authority to act on its behalf in all matters related to the MLA and the Property. At all times relevant herein, Grand Union was a shell corporation set up to hold the intellectual property rights under the MLA. Grand Union acts exclusively through its agent and alter ego CBG. Grand Union does not conduct any business other than entering into the MLA. Rather, Grand Union is a mere conduit for CBG's operations. All actions nominally by Grand Union were actually conducted by CBG and there was no distinction between CBG and Grand Union.

~~11.~~15. The Parties entered into the Second Amendment to Master License Agreement dated August 19, 2021, attached hereto as Exhibit 3, and the Third Amendment to Master License Agreement dated February 10, 2022, attached hereto as Exhibit 4. The Second and Third

weintraub tobin chediak coleman grodin
LAW CORPORATION

Amendments were also signed by Bo Zheng. The various amendments are collectively referred to herein as the "Amendments."

~~12.~~16. Before its termination, the MLA provided that ~~Grand Union~~Respondents had the exclusive right to manufacture, sell, and distribute certain Paul Frank branded products (the "Licensed Products") and services (the "Licensed Services") within the territory of China, Hong Kong, and Macau (the "Territory"), from January 1, 2015 to February 28, 2030 (the "License Period"). *See* MLA, Schedules A-C. The MLA limited the sale of Licensed Products to certain "Channels of Distribution," including for example department stores and e-commerce retailers. *Id*. at Schedule G. In return, ~~Grand Union~~Respondents paid a license fee of sixty-five million dollars ($65 million). *Id.* at Schedule D.

~~13.~~17. The MLA at Section 1(b) also states that ~~Grand Union~~Respondents had the right to grant sublicenses subject to certain conditions:

> (i) every sublicensee ("Sublicensee") shall possess the requisite experience and human and financial resources to undertake the design, development, manufacture, marketing, promotion, and distribution of Licensed Products and/or the operation of Licensed Services; (ii) all sublicense agreements shall (A) be in writing and shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein; (B) provide that all sublicensed rights being granted thereunder are subordinate to this Agreement, such that when this Agreement expires or if Licensor terminates this Agreement, all rights under the sublicense agreement, at the option of Licensor, shall also terminate;
>
> (iii) Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement;
>
> (iv) no sublicensing of rights shall relieve Licensee of its obligations to Licensor hereunder, including, without limitation, its obligation to maintain and protect the goodwill associated with the Property;
>
> (v) Licensee shall provide to Licensor the identity of each sub-licensee along with the product category covered by each sublicense and the term of the sublicense.

~~14.~~18. Further, Section 2(a) of the MLA states that "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." Sales outside the Territory require prior written approval of Paul Frank and are subject to payment "of a market-rate royalty, to be agreed upon by Licensor and Licensee." Section 2(b).

weintraub tobin chediak coleman grodin LAW CORPORATION

15.19. Grand UnionRespondents must sell Licensed Products "outright at a competitive price" and may not engage in "Dumping," which is defined in the MLA as "the distribution of Licensed Products at volume levels significantly above Licensee's prior sales practices with respect to Licensed Products, and at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products." Section 10(b) and (i). Grand UnionRespondents must also provide annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products. *See* Section 10(i).

16.20. The MLA at Section 6(a) also states that Grand UnionRespondents shall submit quarterly statements "specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products" and "report[ing] the number of Licensee-owned or controlled Paul Frank-branded Premium Retail Stores in operation during the quarter in question, together with their locations, and photographs thereof," as well as "any additional non-financial information reasonably requested by Licensor from time to time."

17.21. Further, the MLA at Section 6(b) states that Paul Frank may conduct periodic audits of Grand UnionRespondents: "Licensee shall maintain and make available to Licensor, no more than once during any two--year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements.

18.22. The MLA at Section 7 also states that Grand UnionRespondents must obtain approval for "all pre-production concepts, all preliminary and proposed final artwork, and all final versions of each stock keeping units ("SKU") of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)."

19.23. The MLA at Section 9(c) further states that Grand Union wasRespondents were responsible for identifying "misuses of the Property." Grand Union wasRespondents were required to provide Paul Frank "a report, within 30 days after the end of each calendar quarter, detailing the activities that Licensee has taken in this regard during the immediately preceding quarter." In the event that Grand UnionRespondents identified any significant infringement, it wasthey were required to "promptly notify" Paul Frank in writing. Paul Frank had the option, "in its sole discretion" to

weintraub tobin chediak coleman grodin LAW CORPORATION

commence an infringement action, or request that ~~Grand Union~~Respondents do so. In such an event, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements."

~~20.~~24. Lastly, the MLA specifies the result of a breach of the MLA by ~~Grand Union~~Respondents. A "Material Breach" is defined in Section 13(b) as (i) the failure to pay the License Fee (which is not asserted here); (ii) "Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee;" (iii) "Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days;" or (iv) "Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission" that similarly materially affects the goodwill and market value of the Property for more than 120 days.

~~21.~~25. Should ~~Grand Union~~Respondents commit a Material Breach, "Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." *See* Section 13(a).

~~22.~~26. In the event that ~~Grand Union breaches~~Respondents breach the agreement but such breach does not rise to the level of a Material Breach, Section 13(d) of the MLA states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of breach, then such breach shall be an Uncured Breach."

**The 2021 Notice of Termination and the Second Amendment**

~~23.~~27. On June 21, 2021, Paul Frank issued a Notice of Termination to ~~Grand Union~~Respondents (the "2021 Notice of Termination"), a copy of which is attached hereto as Exhibit 5. The 2021 Notice of Termination states that ~~Grand Union~~Respondents, through an entity controlled by ~~Grand Union~~Respondents, had registered the Property as trademarks in China in violation of Section 9(e) of the MLA. It further states that an affiliate of ~~Grand Union~~Respondents had

weintraub tobin chediak coleman grodin LAW CORPORATION

incorporated the Property into its company name. On the basis of such breaches and pursuant to Section 13(a)(iii) and 13(b)(iii)-(iv), Paul Frank notified Grand UnionRespondents that the agreement would be terminated unless the breaches were completely cured.

24.28. On July 29, 2021, Paul Frank sent a Notice of Material Breaching to Grand UnionRespondents ("2021 Notice of Material Breaching"), a copy of which is attached as Exhibit 6. The 2021 Notice of Material Breaching states that Grand UnionRespondents had authorized an affiliated entity to launch "Paul Frank Beauty" on an e-commerce platform and social media. It further states that Grand UnionRespondents registered a new trademark derived from the Property.

25.29. After significant negotiations between the Parties, the Parties agreed to and executed the Second Amendment. Bo Zheng negotiated and signed the Second Amendment on behalf of Respondents.

26.30. The Second Amendment, Schedule K, Section 7(i) states that Grand UnionRespondents would, by February 19, 2022 (the "Cure Date"), enter into an "Extraordinary Cure Period" during which it would "cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor." Section 7(ii) states that, "in consideration of Licensee's obligations under this Second Amendment," Paul Frank "agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known [sic] to Licensor as of the Second Amendment Date." Paul Frank further represented and warranted that it had disclosed all known potential breaches to Grand UnionRespondents – i.e. that all breaches were set forth in the 2021 Notice of Termination and the 2021 Notice of Material Breaching.

27.31. Section 7(iii) states that Paul Frank has the "right to perform a due diligence in order to ascertain whether there are any uncured breaches." Grand Union wasRespondents were obligated to "collaborate with Licensor and/or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence."

28.32. Section 6(ii) similarly states:

> Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such

weintraub tobin chediak coleman grodin LAW CORPORATION

books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request.

29.33. The Second Amendment also stated at Schedule K, Sections 1-5 that Grand UnionRespondents had the right to an exclusive license for a limited series of Paul Frank-related intellectual property, the A.NI.MA Series. In return, Grand Union wasRespondents were obligated to pay a royalty of eight million, five hundred thousand dollars ($8,500,000) in addition to twenty percent (20%) of Grand Union's "net invoiced billings on the amount exceeding Five Hundred Thousand United States Dollars (USD $550,000) per calendar year for the remaining Term of the Agreement shall be paid by Licensee to Licensor yearly by end of January of the following year" for the exclusive categories, and thirty percent (30%) of the "net invoiced billings" originating from sublicensees for the non-exclusive categories. Grand Union wasRespondents were also obligated to pay a "participation amount equal to twenty percent (20%) ("Participation Fee") of Licensee's net invoiced billings engaged in relation to the categories of Pets, Beauty and Infant products for all the Properties." The Participation Fee was to be paid on a quarterly basis, and Grand Union wasRespondents were obligated to provide "complete and accurate statements in Chinese ("Royalty Statements"), certified by Licensee to be accurate and specifying gross sales, Net Invoiced Billings and Allowable Deductions given by Licensee during such quarter as well as any additional sales information requested by Licensor from time to time." Grand Union wasRespondents were also obligated to inform Paul Frank of any brand collaborations, and pay Paul Frank a royalty of "30% of the net invoiced billing of Licensor's royalty income from such brand collaborations." Schedule K also states that Grand UnionRespondents would pay a Brand Management Fee of two hundred thousand dollars ($200,000) per calendar quarter, which amount was amended in the Third Amendment to one million three hundred thousand RMB Plus VAT (which is approximately $181,630 USD at the present exchange rate). Schedule K further states that Grand Union wasRespondents were required to expend "(i) one percent (1%) of such year's total turnover obtained from Licensee's operations under the Agreement, or (ii) Ten Million RMB (¥ 10,000,000), whichever of (i) or (ii) is greater" as a Marketing Commitment.

weintraub tobin chediak coleman grodin LAW CORPORATION

34. Lastly, the Second Amendment provides updated notice provisions for both Grand Union and Paul Frank. For Grand Union, all notices were to be provided to "Bo Zheng (bo.zheng@chinabrandsgroup.com.cn) With a copy to: David Zhou (david.zhou@chinabrandsgroup.com.cn)."

**Paul Frank Discovers Further Breaches and Terminates the MLA**

~~30.~~35. After the execution of the Second Amendment, the Parties continued to operate under the MLA, as amended. However, Paul Frank discovered – and continues to discover – multiple egregious breaches of the MLA by ~~Grand Union~~Respondents.

36. On July 21, 2022, Paul Frank sent a Notice of Material Breaching and Further Steps to ~~Grand Union~~Respondents ("Notice of Material Breaching"), a copy of which is attached hereto as Exhibit 7. The Notice of Material Breaching states:

> Licensee has not only not cured all the breaches and misconducts within the granted Extraordinary Cure Period, but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents in order to open online stores on certain platforms by unqualified store operators, which not only constitutes a clear material breach of the Agreement but it might also allegedly incur in criminal liability from Licensee and/or Licensee's executive officers. With this regard, Licensor had immediately notified Licensee on April 19, 2022 when discovered the forged "Licensor Flagship Store Authorization Letter" (dated November 1, 2021) which had been used on Tiktok store.

~~31.~~37. The Notice of Material Breaching also states that a "third-party Auditor has been appointed to perform a forensic due diligence with the following scope: analyze the performance of Agreement and the effort made by Licensee for the cure of breaches of the Agreement during the extraordinary cure period."

~~32.~~38. ~~Grand Union~~Respondents did not take any steps to cure the breaches identified by Paul Frank in the Notice of Material Breaching. In fact, ~~Grand Union~~Respondents denied the existence of the breaches in an email dated September 16, 2022, attached hereto as Exhibit 8. ~~Grand Union~~Respondents also stated, "[w]e have no obligation to get audited by the Licensor," which is a clear misrepresentation of the terms of the MLA and the Second Amendment.

weintraub tobin chediak coleman grodin LAW CORPORATION

33.39. On August 24, 2022, Paul Frank sent a Notice of Termination to Grand UnionRespondents ("Notice of Termination"), a copy of which is attached hereto as Exhibit 9. The Notice of Termination identified four major categories of breaches by Grand UnionRespondents:

> a. Licensee has forged Licensor's official stamps and used Licensor's forged signatures on documents provided to certain platforms/marketplaces misrepresenting Licensor and the brands, which not only constitutes a clear material breach of the Agreement and potential fraud, but also may incur criminal liability from Licensee and/or Licensee's executive officers. Licensee's actions have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches. Licensor has already notified Licensee of such breaches through email as of April 19, 2022, and through further Material Breaching Notice delivered to Licensee as of July 21, 2022. However, Licensee has been unable or unwilling to cure such breach.
>
> b. Licensee has sold and/or distributed of Licensed Products outside the Territory and the Channels of Distribution, as per Schedule B and Schedule G of the Master Licensing Agreement. Such activities constitute a violation of Section 13(b)(ii) of the Master Licensing Agreement.
>
> c. Licensee has not cured the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as required by Schedule K, Section 7 of the Second Amendment to Master Licensing Agreement. Licensee's breaches have adversely and materially affected the goodwill and market value associated with the Property and have persisted for more than one hundred and twenty (120) days. As per Section 13(b)(iii) and 13(b)(iv) of the Master License Agreement, such actions constitute material breaches.
>
> d. Licensee has refused Licensor's request for an audit, which is a violation of Sections 6(b), 7(f)(ii), and 7(h) of the Master License Agreement and Schedule K, Section 6 of the Second Amendment to Master Licensing Agreement. Licensee has also refused and prevented Licensor's efforts to conduct the due diligence set forth in Schedule K, Section 7(iii) of the Second Amendment to Master Licensing Agreement. Licensor reserves the right to identify any further material breaches discovered during any audit and/or due diligence conducted in the future.

34.40. Pursuant to Section 13 of the MLA, the Notice of Termination stated that the "Termination of the Agreement and further Amendments shall become effective thirty (30) days from the date of this Notice, unless Licensee completely cures all the material breaches stated herein and provides Licensor with evidence thereof, which must be further verified by third-party forensic auditor."

35.41. Grand UnionRespondents did not completely cure the Material Breaches identified in

weintraub tobin chediak coleman grodin LAW CORPORATION

the Notice of Termination – ~~it~~they did not even attempt to cure any of the Material Breaches.

~~36.~~42. Therefore, on September 23, 2022, Paul Frank sent a Termination of Master License Agreement, which is attached hereto as Exhibit 10. The Termination of Master License Agreement confirmed that the MLA terminated effective as of September 23, 2022 (the "Termination Effective Date") and instructed ~~Grand Union~~Respondents to cease and desist from all activities related to the Paul Frank brand, except for a ninety-day (90-day) Sell-Off period. Paul Frank was not obligated to grant ~~Grand Union~~Respondents a Sell Off Period pursuant to Section 20(b) of the MLA, as ~~Grand Union was~~Respondents were in Material Breach of the MLA. However, Paul Frank agreed to a Sell-Off period in good faith to permit ~~Grand Union~~Respondents to sell off remaining inventory and to minimize the impact of the termination on the brand.

~~37.~~43. The Termination of Master License Agreement also requested, pursuant to Section 17 of the MLA, a "statement certified by Licensee's chief executive officer, indicating the number and description of Licensed Products that Licensee has on hand and/or in process of manufacture as of the date of such statement ('Statement of Inventory')."

~~38.~~44. On September 29, 2022, ~~Grand Union~~Respondents sent an email responding to the Notice of Termination, again stating that ~~it~~they would not cure the breaches identified in the Notice of Termination. A copy of this email is attached hereto as Exhibit 11.

~~39.~~45. Upon the Termination Effective Date, the following provisions of the MLA immediately went into effect:

a. Pursuant to Section 8(f), "all rights to use Property in the manner provided for and licensed in this Agreement shall revert automatically to Licensor, and Licensee shall immediately discontinue all use of the Property except as may be expressly provided in this Agreement."

b. Pursuant to Section 14, "[n]either the license fee nor any other payments made or due to Licensor in accordance with the provisions of this Agreement shall be refundable to Licensee in the event this Agreement is terminated by Licensor due to an uncured Material Breach by Licensee. Any future payments that were due at the time the termination is effective shall be immediately due and payable to Licensor within ten (10) days after the effective date of any such termination."

weintraub tobin chediak coleman grodin
LAW CORPORATION

**Additional Breaches Discovered by Paul Frank**

~~40.~~46.  In addition to the Material Breaches identified in the Notice of Termination, Paul Frank is informed and believes that ~~Grand Union and/or CBG acting on behalf of Grand Union~~Respondents have committed the following Material Breaches, Uncured Breaches, and/or other breaches of the MLA:

a.  ~~Grand Union and/or CBG~~Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

b.  ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

c.  ~~Grand Union and/or CBG~~Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

d.  ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

e.  ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

f.  ~~Grand Union and/or CBG~~Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

g.  ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

h.  ~~Grand Union and/or CBG~~Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

i.  ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and

weintraub tobin chediak coleman grodin
LAW CORPORATION

encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

j. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

k. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

l. ~~Grand Union and/or CBG~~Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

m. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

n. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

o. ~~Grand Union and/or CBG~~Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

p. ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

q. In particular, ~~Grand Union and/or CBG~~Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

weintraub tobin chediak coleman grodin
LAW CORPORATION

r.      Further, ~~Grand Union and/or CBG~~Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

s.      ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

t.      ~~Grand Union and/or CBG~~Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

u.      ~~Grand Union and/or CBG~~Respondents have registered one or more domain names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

v.      ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

w.      ~~Grand Union and/or CBG~~Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

x.      ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

y.      ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

z.      ~~Grand Union and/or CBG~~Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

aa.     ~~Grand Union and/or CBG~~Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

weintraub tobin chediak coleman grodin
LAW CORPORATION

bb. Grand Union and/or CBGRespondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

cc. Grand Union and/or CBGRespondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

dd. Grand Union and/or CBGRespondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ee. Grand Union and/or CBGRespondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

ff. Grand Union and/or CBGRespondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination -and the 2021 Notice of Material Breaching;

gg. Grand Union and/or CBGRespondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

hh. Grand Union and/or CBGRespondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date , in violation of Section 14 of the MLA; and

ii. Grand Union and/or CBGRespondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA.

41.47. Grand Union and/or CBGRespondents have also filed wrongful and false complaints

weintraub tobin chediak coleman grodin LAW CORPORATION

against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

42.48. Upon information and belief, Grand Union and/or CBGRespondents acting on behalf of Grand Union have committed additional Material Breaches, Uncured Breaches, and/or other breaches of the MLA which are presently unknown to Paul Frank.

**Respondents' Attempt to Circumvent the Jurisdiction of this Arbitration**

49. CBG has filed a lawsuit in lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China against Paul Frank and Grand Union. CBG asks the Chinese Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products.

50. Respondents then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from California, stating (in English translation): "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A [Grand Union] or Party B [CBG] can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate." Upon information and belief, Respondents filed this Agreement on Jurisdiction in order to deceive the Chinese court into retaining jurisdiction over the case.

51. CBG also filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard.

weintraub tobin chediak coleman grodin LAW CORPORATION

The Court's ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. While the trademarks and copyrights are blocked, Paul Frank is prohibited from the use of its own trademarks and copyrights in China.

52. Respondents' actions in filing this lawsuit are in violation of the First Amendment, which states, "If a dispute arises out of or relates to this Agreement, or the breach hereof… such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator… in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensive-arbitration/)." First Amendment at Section 28.

53. Upon information and belief, Respondents filed this lawsuit in order to interfere with the jurisdiction of this Arbitration and prevent the potential effect of this Arbitrator's rulings in the future.

**Paul Frank is Entitled to Audit ~~Grand Union's~~Respondents' Performance Under the MLA and the Amendments**

~~43.~~54. Paul Frank has an unquestionable right to audit ~~Grand Union's~~Respondents' compliance with the MLA and the Amendments pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment.

~~44.~~55. Because ~~Grand Union has~~Respondents have refused to permit Paul Frank to conduct an audit pursuant to Section 6(b) of the MLA and Schedule K, Section 6(i) of the Second Amendment, Paul Frank is unable to determine whether there are any additional violations of the MLA and the Amendments.

~~45.~~56. Paul Frank will ask that the Arbitrator compel an immediate audit of ~~Grand Union~~Respondents once this Arbitration is initiated, by Paul Frank's appointed third-party auditor.

~~46.~~57. Paul Frank reserves the right to amend this Demand for Arbitration and seek damages for any breaches of the MLA and the Amendments, or any other wrongful conduct of any kind, discovered during the audit.

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Grand Union and CBG)**

~~47.~~58. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

~~48.~~59. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

60. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

~~49.~~61. Paul Frank has fully performed its obligations under the MLA and the Amendments.

~~50.~~62. ~~Grand Union and/or CBG acting on behalf of Grand Union~~ Respondents have committed numerous material breaches of ~~Grand Union's~~their contractual obligations under the MLA and the Amendments including without limitation that:

a. ~~Grand Union and/or CBG~~Respondents have forged Licensor's official stamps and used Licensor's forged signatures, as set forth in the Notice of Termination;

b. ~~Grand Union and/or CBG~~Respondents have sold and/or distributed Licensed Products outside the Territory and Channels of Distribution, as set forth in the Notice of Termination;

c. ~~Grand Union and/or CBG~~Respondents have failed to or refused to cure the existing or potential breaches of the Master Licensing Agreement during the Extraordinary Cure Period, as set forth in the Notice of Termination;

d. ~~Grand Union and/or CBG~~Respondents have failed to or refused to comply with Paul Frank's request for an audit and have prevented and obstructed Paul Frank's efforts to conduct the due diligence, as set forth in the Notice of Termination;

e. ~~Grand Union and/or CBG~~Respondents have themselves forged, or authorized the forgery of, authorization letters to e-commerce platforms purporting to be from Paul Frank, in addition to the forgery referred to in the Notice of Termination, in violation of Section 2(b) of the MLA;

f. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain

weintraub tobin chediak coleman grodin LAW CORPORATION

terms less protective of Paul Frank's rights to the Property than the terms and conditions of the MLA, in violation of Section 1(b)(ii) of the MLA;

g. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that fail to provide that such sublicense is subordinate to the MLA, in violation of Section 1(b)(ii) of the MLA;

h. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain territory terms that are outside of the Territory, in violation of Section 1(b) and 2(a) of the MLA;

i. ~~Grand Union and/or CBG~~Respondents have executed sublicenses that contain channels of distribution terms that are outside of the Channels of Distribution, in violation of Section 1(b) and 2(a) of the MLA;

j. ~~Grand Union and/or CBG~~Respondents have failed to or refused to ensure sublicensee's compliance with the sublicensee's obligations under the sublicense agreement, in violation of Section 1(b)(iii) of the MLA;

k. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide to Paul Frank the identity of each sublicensee, the product category covered by each sublicensee, and the term of each sublicense, in violation of Section 1(b)(v) of the MLA;

l. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Territory, in violation of Sections 1(a), 2(a), and 8(a) of the MLA;

m. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Territory, in violation of Sections 1(b), 2(a), and 8(a) of the MLA;

n. ~~Grand Union and/or CBG~~Respondents have sold products outside of the Channels of Distribution, in violation of Sections 1(a), 2(a), 2(c), 8(a), and 10(b) of the MLA;

o. ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to sell products outside of the Channels of Distribution, in violation of Sections 1(b), 2(a), 2(c), 8(a), and 10(b) of the MLA;

p. ~~Grand Union and/or CBG~~Respondents have engaged in operations outside of the Licensed Services, including without limitation fashion shows, the creation of emojis, and Paul Frank-themed hotel rooms, in violation of Sections 1(a) and 8(a) of the MLA;

weintraub tobin chediak coleman grodin LAW CORPORATION

q.     ~~Grand Union and/or CBG~~Respondents have allowed, permitted, and encouraged sublicensees to engage in operations outside of the Licensed Services, in violation of Sections 1(b) and 8(a) of the MLA;

r.     ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Statements specifying the volume of wholesale sales of Licensed Products by Licensee, by category of Licensed Products, and any additional financial information requested by Licensor, in violation of Section 6(a) of the MLA;

s.     ~~Grand Union and/or CBG~~Respondents have failed to or refused to maintain and make available to Paul Frank and Paul Frank's appointed third-party auditor books and records sufficient for Paul Frank to verify the accuracy of information provided in the Quarterly Statements, in violation of Section 6(b) of the MLA;

t.     ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval and have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

u.     In particular, ~~Grand Union and/or CBG~~Respondents have engaged in the sale of Licensed Products which infringe upon the intellectual property of other entities or brands, for which they did not obtain approval from Paul Frank, and when Paul Frank directed Grand Union to cease sales, Grand Union refused;

v.     Further, ~~Grand Union and/or CBG~~Respondents have engaged in a fashion show and the sale of Licensed Products related to the fashion show without the approval of Paul Frank;

w.     ~~Grand Union and/or CBG~~Respondents have failed to or refused to obtain product approval for Licensed Products sold by sublicensees and sublicensees have sold Licensed Products which were not approved by Paul Frank, in violation of Section 7(a) and (b) of the MLA;

x.     ~~Grand Union and/or CBG~~Respondents have failed to or refused to discontinue the use of the Property (except as permitted by Paul Frank in connection with the Sell-Off period), in violation of Section 8(f) of the MLA;

y.     ~~Grand Union and/or CBG~~Respondents have registered one or more domain

weintraub tobin chediak coleman grodin
LAW CORPORATION

names containing the Paul Frank name, in violation of Section 9(b) of the MLA;

z. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide a report detailing the activities it has taken with regard to the monitoring and protection of the Property, in violation of Section 9(c) of the MLA;

aa. ~~Grand Union and/or CBG~~Respondents have failed to or refused to notify Paul Frank of any significant infringement of the Property, in violation of Section 9(c) of the MLA;

bb. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property without Paul Frank's knowledge or approval, in violation of Section 9(c) of the MLA;

cc. ~~Grand Union and/or CBG~~Respondents have prosecuted suits, actions, or proceedings with respect to claims of infringement of the Property and has received damages awards or other compensation from such activities without entering into an agreement with Paul Frank regarding the disposition of the damages awards or other compensation, in violation of Section 9(c) of the MLA;

dd. ~~Grand Union and/or CBG~~Respondents have failed to or refused to sell Licensed Products outright at a competitive price, in violation of Section 10(b) of the MLA;

ee. ~~Grand Union and/or CBG~~Respondents have engaged in Dumping, both during the Term of the MLA and during the Sell-Off Period, in violation of Section 10(i) of the MLA;

ff. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide Paul Frank with annual sales reports identifying the total number of Licensed Products sold at a price that is seventy percent (70%) or more below the lowest listed wholesale sales price for such Licensed Products, in violation of Section 10(i) of the MLA;

gg. ~~Grand Union and/or CBG~~Respondents have failed to or refused to pay royalties, Participation Fees, and Marketing Commitments as set forth in the Second Amendment, Schedule K, Sections 1 through 5;

hh. ~~Grand Union and/or CBG~~Respondents have failed to or refused to permit the examination by Paul Frank or Paul Frank's appoint third-party auditor the books and records of Grand Union and CBG related to the terms and obligations of Schedule K within five (5) business days from

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Licensor's written request, in violation of the Second Amendment, Schedule K, Section 6(ii);

ii. ~~Grand Union and/or CBG~~Respondents have failed to or refused to cure any and all potential breaches of the MLA as set forth in the Second Amendment, Schedule K, Section 7(i) and the 2021 Notice of Termination;

jj. ~~Grand Union and/or CBG~~Respondents have failed to or refused to cure the breaches of the MLA set forth in the 2021 Notice of Termination ~~-~~and the 2021 Notice of Material Breaching;

kk. ~~Grand Union and/or CBG~~Respondents have obstructed and prevented Paul Frank from performing a due diligence in order to ascertain whether there are any uncured breaches, in violation of the Second Amendment, Schedule K, Section 7(iii);

ll. ~~Grand Union and/or CBG~~Respondents have failed to or refused to pay all future payments due within ten (10) days of the Termination Effective Date~~-~~, in violation of Section 14 of the MLA;~~ and~~

mm. ~~Grand Union and/or CBG~~Respondents have failed to or refused to provide a statement certified by Grand Union's chief executive officer indicating the number and description of the Licensed Products that license has on hand and/or in the process of manufacture, in violation of Section 17 of the MLA~~.~~; and

nn. Respondents engaged in conduct intended to interfere with this Arbitration, including but not limited to the filing of a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province in China.

~~51.~~63. As a result of ~~Grand Union's~~Respondents' material breaches of the MLA and the Amendments, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**SECOND CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Grand Union and CBG)**

~~52.~~64. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

weintraub tobin chediak coleman grodin
LAW CORPORATION

~~53.~~65. The MLA, both in its original form and as amended, was a valid and binding contract between Paul Frank and Grand Union.

~~///~~

66. There exists a unity of interest and ownership between Grand Union, on the one hand, and CBG, on the other, such that any individuality and separateness of Grand Union ceased or never existed, and CBG is the alter ego of Grand Union

~~54.~~67. Paul Frank has fully performed its obligations under the MLA and the Amendments.

~~55.~~68. ~~Grand Union~~Respondents engaged in conduct intended to prevent Paul Frank from receiving the benefits under the MLA and the Amendments, including without limitation by filing wrongful and false complaints against Paul Frank's legal Counsel in an attempt to intimate and harass Paul Frank and its Counsel and prevent Paul Frank from exercising its legal rights.

~~56.~~69. By doing so, ~~Grand Union~~Respondents did not act fairly and in good faith.

~~57.~~70. As a result of ~~Grand Union's~~Respondents' conduct, Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

**THIRD CAUSE OF ACTION**

**(Violation of the Lanham Act (15 U.S.C. §§ 1114 and 1125) Against Grand Union and China Brands Group)**

~~58.~~71. Paul Frank incorporates and restates the allegations of Paragraphs 1 through ~~47~~57 as fully set forth herein.

~~59.~~72. Paul Frank owns the intellectual property, including without limitation all trademarks, trade dress, and copyrights in the U.S. and China associated with the Paul Frank® brand.

~~60.~~73. As set forth in Sections 1 and 8 of the MLA, Paul Frank gave ~~Grand Union~~Respondents a limited right during the Licensed Period to utilize the Property to design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer the Licensed Products in the specified Territory and Channels of Distribution and provide Licensed Services in the Territory.

~~61.~~74. Paul Frank owns all trademarks, trade dress, and copyrights in the U.S. and China associated with all Licensed Products and Licensed Services. Paul Frank holds multiple registrations

weintraub tobin chediak coleman grodin LAW CORPORATION

over trademarks and/or trade dress in the U.S. and China, some of which have been used by Grand Union. The trademarks and/or trade dress covered by those registrations and others incorporating and/or relating to the Name are actionable under 15 U.S.C. § 1114.

~~62.~~75. Paul Frank also owns the rights in the U.S. and China to valid and protectable trade dress incorporating and/or relating to the Property, at least some of which have been used by ~~Grand Union~~Respondents and not registered. Such trade dress is actionable under 15 U.S.C. § 1125.

~~63.~~76. The Property has great value and consumer recognition associated with Paul Frank.

~~64.~~77. ~~Grand Union~~Respondents has never been authorized to use the Property outside the scope of the MLA or its Amendments.

~~65.~~78. The MLA terminated on September 23, 2022.

~~66.~~79. Upon information and belief, after the termination of the MLA, ~~Grand Union~~Respondents continued without authority to utilize the Property – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

~~67.~~80. Upon information and belief, ~~Grand Union~~Respondents has also utilized the Property prior to the termination of the MLA without obtaining the approval of Paul Frank – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

~~68.~~81. Upon information and belief, ~~Grand Union has~~Respondents have also utilized the Property prior to the termination of the MLA outside the Territory – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

~~69.~~82. Upon information and belief, ~~Grand Union has~~Respondents have also utilized the Property prior to the termination of the MLA outside the Channels of Distribution – including Paul Frank's registered and unregistered trademarks and trade dress incorporating and/or relating to the Property – in connection with the design, development, manufacture, marketing, promotion, distribution, advertising, offering to sell, selling, providing, and otherwise offering the Licensed Products and providing Licensed Services.

~~70.~~83. In all of these ways, ~~Grand Union has~~Respondents have, without authority, used the Property in commerce in a manner that misrepresents and is likely to cause mistake or confusion on the part of consumers as to the existence or nature of Paul Frank's sponsorship of, endorsement of, approval of, affiliation with, or association with such use.

~~71.~~84. Paul Frank has made repeated efforts, over the course of several years, to engage ~~Grand Union~~Respondents in good faith discussions concerning the violations of the MLA and the Amendments. Paul Frank also gave ~~Grand Union~~Respondents ample opportunity to avoid termination of the MLA and the Amendments. ~~Grand Union~~Respondents nonetheless refused to engage in good faith discussions, and continued to act as described above, during the period of the MLA and after its termination. Moreover, ~~Grand Union is a~~Respondents are sophisticated entit~~y~~ies that should, at all relevant times, have been well aware of its rights and obligations under the MLA and the Amendments. ~~Grand Union's~~Respondents' violation of the MLA and the Amendments have, therefore, been willful.

~~72.~~85. As a result of the foregoing violations of its rights in registered and unregistered trademarks and trade dress – i.e. ~~Grand Union's~~Respondents' unauthorized use of the valuable Property outside the scope and beyond the life of the MLA and the Amendments, which is likely to cause consumer confusion – Paul Frank has incurred damages in an amount to be determined at the Arbitration Hearing.

~~73.~~86. Pursuant to 15 U.S.C. § 1117, Paul Frank is entitled to recover, without limitation, its damages; ~~Grand Union's~~Respondents' profits in connection with ~~Grand Union's~~Respondents' use of the Property and, in particular, its violations of Paul Frank's trademark and trade dress rights; and the costs associated with filing this Demand for Arbitration.

## FOURTH CAUSE OF ACTION

## (Quantum Meruit and/or Unjust Enrichment Against Grand Union and CBG)

74.87. Paul Frank incorporates and restates the allegations of Paragraphs 1 through 4757 as fully set forth herein.

75.88. Paul Frank pleads that, in the alternative, no agreement ever existed between it and Grand Union as to one or more material terms of the MLA and the Amendments. In that event, Paul Frank nevertheless conferred substantial benefits on Grand UnionRespondents in connection with Paul Frank's support, goodwill, and intellectual property, including without limitation Grand Union'sRespondents' use of the iconic Paul Frank brand.

///

76.89. Paul Frank has not been fully compensated for the full and fair value of the benefits conferred upon Grand UnionRespondents.

77.90. In the absence of an enforceable contract as to material terms, Paul Frank has no adequate remedy at law.

78.91. Grand UnionRespondents accepted and enjoyed the benefits that Paul Frank conferred upon it, deriving significant profit therefrom.

79.92. Grand UnionRespondents accepted those benefits knowing that Paul Frank expected to be paid the fair value of those benefits.

80.93. Under the circumstances, it would be inequitable for Grand UnionRespondents to retain the benefits Paul Frank conferred without paying Paul Frank the full value for those benefits.

81.94. As such, Paul Frank is entitled to recover the balance of the value that Grand UnionRespondents has accepted from Paul Frank under a theory of *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing.

## PRAYER FOR RELIEF

WHEREFORE, Paul Frank requests relief as follows:

1. For an award of damages, including amounts to be determined at the Arbitration Hearing for the various breached described herein;

2. For an award of damages, in amounts to be determined at the Arbitration Hearing, as

weintraub tobin chediak coleman grodin LAW CORPORATION

a result of Grand Union'sRespondents' violation of Paul Frank's trademark and trade dress rights;

3. For an award of Grand Union'sRespondents' profits associated with the violations of Paul Frank's trademark and trade dress rights;

4. In the alternative, an award of recovery in *quantum meruit* and/or unjust enrichment, in an amount to be determined at the Arbitration Hearing;

5. For an award of reasonable attorney's fees and costs of suit; and

6. For such other and further relief as the Court deems just and proper.

///

///

///

DATED: April 27, 2023

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Petitioner Claimant and Counter-Respondent
Paul Frank Limited

# EXHIBIT 21

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

Claimant,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Respondent.

---

GRAND UNION INTERNATIONAL TRADING LIMITED,

Counter-Claimant,

v.

PAUL FRANK LIMITED,

Counter-Respondent.

JAMS Ref. No. 5220002118

**PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: June 1, 2023

{00248874.DOCX:} 1
PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................4

I. INTRODUCTION AND PROCEDURAL HISTORY ..................................................... 6

II. THE STANDARD ON PRELIMINARY INJUNCTIONS IN CALIFORNIA........................ 7

A. California Law Applies to this Arbitration ............................................................ 7

B. Mandatory Preliminary Injunctions are Issued only in Extreme Cases Where the Moving Party has Clearly Established its Right to an Injunction ..................................... 9

III. THE TERMINATION OF THE MLA WAS ENTIRELY PROPER AND PAUL FRANK WILL PREVAIL ON ITS CLAIMS AGAINST GRAND UNION / CBG............................ 13

A. Paul Frank Terminated the MLA on the Basis of Grand Union's Multiple Material Breaches and is Entitled to Damages ................................................................ 13

1. Paul Frank's Right of Termination................................................................ 13

2. Grand Union / CBG Forged or Authorized the Forging of Official Paul Frank Documents............................................................................................ 15

3. Licensed Products Were Sold Outside the Territory.......................................... 22

4. Licensed Products Were Sold Outside the Channels of Distribution........................ 26

5. Grand Union / CBG's Breaches of the MLA Resulting in the Second Amendment ........................................................................................... 29

a. Registration of Paul Frank trademarks, copyrights, and domain names ............. 31

b. Paul Frank Beauty ..................................................................................... 34

c. Big Mouth Monkey Food.............................................................................. 35

d. Ctrip hotel rooms........................................................................................ 36

6. Grand Union / CBG's Refusal to Permit Paul Frank to Conduct an Audit................ 37

B. Paul Frank Has Discovered Additional Material Breaches of the MLA Which Separately give Paul Frank the Right to Terminate the MLA and Seek Damages .......... 39

1. Paul Frank Milk Tea.................................................................................... 39

2. Sale of Unapproved Products ........................................................................ 42

3. Grand Union / CBG Has Filed Thousands of Anti-Counterfeiting Lawsuits in violation of the MLA.................................................................................. 46

C. Grand Union / CBG's Claims Regarding Letters of Authorization are Entirely Meritless ................................................................................................... 48

IV. GRAND UNION / CBG CANNOT CLEARLY ESTABLISH A RIGHT TO AN INJUNCTION OR IRREPARABLE HARM........................................................... 49

weintraub tobin chediak coleman grodin LAW CORPORATION

{00248874.DOCX:}

2

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

V. PAUL FRANK IS ENTITLED TO A PRELIMINARY INJUNCTION PROHIBITING GRAND UNION / CBG FROM INTERFERING WITH THIS ARBITRATION AND PROSECUTING BASELESS LEGAL ACTIONS ........ 54

A. The Arbitrator Should Order Grand Union / CBG to Dismiss the Chinese Action Filed by Grand Union / CBG to Interfere with the Jurisdiction of This Arbitration ........ 54

B. The Arbitration Should Order Grand Union / CBG to Cease and Desist the Submission of Criminal Complaints against Paul Frank and its Related Parties ........ 57

C. The Arbitration Should Order Grand Union / CBG to Cease and Desist the Signing of New Sublicense Agreements ........ 59

VI. CONCLUSION ........ 60

weintraub tobin chediak coleman grodin
LAW CORPORATION

{00248874.DOCX:}

3

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AK Futures LLC v. Boyd St. Distro, LLC*, 35 F. 4th 682 (9th Cir. 2022) ..... 31

*Amgen, Inc. v. California Correctional Health Care Services*, 47 Cal.App.5th 716 (2020) ..... 10

*Bd. of Supervisors v. McMahon*, 219 Cal. App. 3d 286 (1990) ..... 12

*Butt v. State of California*, 4 Cal. 4th 668 (1992) ..... 9, 10

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir. 1986) ..... 52

*Coll. Hosp. Inc. v. Superior Court*, 8 Cal. 4th 704 (1994) ..... 10

*Common Cause v. Board of Supervisors*, 49 Cal. 3d 432 (1989) ..... 10

*Davenport v. Blue Cross of Cal.*, 52 Cal. App. 4th 435 (1997) ..... 10. 12

*Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179 (2008) ..... 14

*Hagen v. Beth*, 118 Cal. 330 (1897) ..... 11

*Hollywood Athletic Club Licensing Corp. v. Ghac-Citywalk*, 938 F. Supp. 612 (C.D. Cal. 1996) ..... 53, 59

*IT Corp. v. County of Imperial*, 35 Cal. 3d 63 (1983) ..... 10

*Korean Philadelphia Presbyterian Church v. California Presbytery* 77 Cal. App. 4th 1069 (2000) ..... 51

*Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968) ..... 36

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ..... 51

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

*Oiye v. Fox*, 211 Cal. App. 4th 1036 (2012) .......... 10

*Paisa, Inc. v. N & G Auto, Inc.*, 928 F. Supp. 1009 (C.D. Cal. 1996) .......... 53

*Professional Golfers Ass'n v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. 1975) .......... 53

*Shoemaker v. Cty. of L.A.*, 37 Cal. App. 4th 618 (1995) .......... 10, 11

*Vineyard House, LLC v. Constellation Brands United States Operations, Inc.*, 515 F. Supp. 3d 1061 (N.D. Cal. 2021) .......... 31

*Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609 (9th Cir. 1989) .......... 53

*White v. Davis* 30 Cal. 4th 528 (2003) .......... 9, 10

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) .......... 51

**Other Authorities**

Judicial Council of California Civil Jury Instructions, No. 4410 .......... 14

Judicial Council of California Civil Jury Instructions, No. 303 .......... 14

Weil & Brown *et al*, *California Practice Guide: Civil Procedure Before Trial* (The Rutter Group 2022), §§9:500, 9:506, 9:508 .......... 10, 50

Rudolf Callmann, *Law of Unfair Competition, Trademarks & Monopolies* § 22.37 (4th ed. 1995) .......... 53

weintraub tobin chediak coleman grodin
LAW CORPORATION

## I. INTRODUCTION AND PROCEDURAL HISTORY

Claimant Paul Frank Limited ("Paul Frank") hereby submits this Opposition to the Application for Interim Relief ("Application") filed by Respondent Grand Union International Trading Limited ("Grand Union") and further submits this affirmative Motion for Preliminary Injunction ("Motion for Preliminary Injunction"). For the reasons set forth in Paul Frank's Motion for Leave to Amend the Demand for Arbitration ("Motion for Leave to Amend"), filed concurrently herewith and incorporated herein by reference, Grand Union and its affiliate China Brands Group ("CBG") are alter egos of each other, and each is liable for the acts of the other asserted herein. Therefore, Paul Frank will refer to them herein collectively as "Grand Union / CBG" and will refer to Paul Frank and Grand Union / CBG as the "Parties."

The Parties entered into the Master License Agreement ("MLA") on January 1, 2015. *See* Ex. 1 to Paul Frank Limited's Appendix of Exhibits ("Appendix") filed concurrently herewith. After Paul Frank discovered multiple material breaches by Grand Union / CBG, Paul Frank terminated the MLA effective as of September 23, 2022 and filed this Arbitration proceeding. *See* Termination of Master License Agreement, Ex. 11 to Appendix; *see also* Paul Frank Demand for Arbitration – Statement of Claims filed on November 22, 2022. Grand Union / CBG filed a Counterclaim on December 16, 2022. *See* Grand Union / CBG Response and Counterclaims.

In the Application, Grand Union / CBG claims that Paul Frank's termination of the MLA was improper and that Paul Frank should be compelled by means of a mandatory injunction to resurrect the MLA and perform pursuant to its terms. However, Grand Union / CBG cannot meet the high burden to obtain such an extreme injunction. Paul Frank's termination of the MLA was entirely valid and Paul Frank has adduced significant additional evidence of material breaches by Grand Union / CBG. Further, the harm to Paul Frank in reversing an MLA terminated more than seven months ago would be tremendous and irreparable, while Grand Union / CBG's harm is negligible and entirely outweighed by the harm to Paul Frank.

In fact, Paul Frank is the only party entitled to a preliminary injunction in this case. Grand Union / CBG has adopted an underhanded and fraudulent campaign to interfere with the Arbitrator's jurisdiction over this dispute by filing baseless lawsuits, "agreeing" to jurisdiction in Chinese courts,

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

and by initiating a criminal investigation into Paul Frank and its employees in an attempt to intimidate and harass Paul Frank into dropping its claims. The Arbitrator should issue an order compelling Grand Union / CBG to drop its lawsuit and cease and desist any further legal action outside this Arbitration. Further, Grand Union / CBG has continued to enter into new sublicense agreements and fraudulently collect license fees despite the fact that the MLA has been terminated for months and the new sublicensees cannot, by definition, sell Licensed Products. The Arbitrator should also therefore issue an order prohibiting Grand Union / CBG from entering into new sublicense agreements and causing further harm to the Paul Frank brand.

For the reasons set forth herein, Paul Frank respectfully requests that the Arbitrator reject Grand Union / CBG's Application and instead grant Paul Frank's Motion for Preliminary Injunction.

## II. THE STANDARD ON PRELIMINARY INJUNCTIONS IN CALIFORNIA

### A. California Law Applies to this Arbitration

In analyzing the parties' cross-motions for a preliminary injunction, the proper law to apply is California law and the proper arbitration rules are the JAMS Comprehensive Arbitration Rules and Procedures. The First Amendment to the Master License Agreement, effective April 27, 2018 ("First Amendment"), addresses the procedures to be followed to resolve disputes. The First Amendment contains only four substantive provisions: it deletes a section in the original MLA entitled "Right of First Negotiation," deletes and replaces section 28 entitled "Dispute Resolution," deletes and replaces section 30 entitled "Governing Law," and adds a section entitled "Waiver of Jury Trial." *See* Ex. 3 to Appendix. It also includes an integration clause. *Id*. at Section 5.

The new Section 28 "Dispute Resolution" states that disputes arising out of or related to the MLA shall be determined by arbitration in Los Angeles, California before a single arbitrator "in accordance with the laws of the State of California for agreements made in and to be performed in that State." *Id.* at Section 28. New Section 28 further states that "The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time …" *Id*.

/ / /

weintraub tobin chediak coleman grodin LAW CORPORATION

{00248874.DOCX:} 7

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

The new Section 30 states: "This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the provisions thereof relating to conflicts of law." *Id.* at Section 30.

Yet Grand Union / CBG contends that the arbitrator should apply international law (UNCITRAL) and the JAMS International Arbitration Rules, which incorporate the UNCITRAL Model Law on International Commercial Arbitration, as the standard to determine whether Grand Union / CBG is entitled to a preliminary injunction. *See* Application at p. 22-23, ¶¶ 90–92. In particular, Grand Union / CBG contends that, under the JAMS International Arbitration Rules, a showing of a "reasonable possibility" of success on the merits is sufficient for the Arbitrator to order a preliminary injunction. *Id.* at p. 23, ¶¶ 92–93.

Grand Union / CBG is simply incorrect. The Master License Agreement is governed by California law as clearly set forth in Sections 28 and 30 of the First Amendment. The proper rules for the Arbitration are the JAMS Comprehensive Arbitration Rules and Procedures as clearly set forth in Section 28. There is no ambiguity in these provisions. In the First Amendment, the parties expressly changed the dispute resolution and governing law provisions. Original Section 28 states that disputes will be resolved by arbitration "administered by the Hong Kong International Arbitration Centre in Hong Kong, under the HKIAC Administered Arbitration Rules." *See* MLA, Ex. 1 to Appendix, at Section 28. The original Section 28 further states that the arbitration will be conducted by three arbitrators under the HKIAC rules. *Id.* Original Section 30 states that the MLA is governed by the laws of Hong Kong without reference to its conflict of law rules. *Id.* at Section 30.

Thus, it is clear that the parties specifically intended to modify the dispute resolution procedures of the original MLA by entering into the First Amendment. It is also clear that the parties were rejecting arbitration under the HKIAC rules and chose instead to conduct the arbitration under the JAMS Comprehensive Arbitration Rules and Procedures. It is further clear that the parties were rejecting the applicability of Hong Kong law, and chose instead to apply California law. These choices are expressly stated in the First Amendment.

Grand Union / CBG cannot now escape the provisions to which it agreed. Grand Union / CBG cannot backtrack into using international rules or international law to govern its request for a

**weintraub tobin** chediak coleman grodin LAW CORPORATION

preliminary injunction. It is undisputed that the MLA is governed by California law and that the JAMS Comprehensive Arbitration Rules and Procedures are to be applied. Grand Union / CBG's citations to authorities on international law and procedure are therefore irrelevant.[1] Grand Union / CBG persists in referring to this action as a "Tribunal" and an "international arbitration" as if those terms have some meaning or application to this matter. They do not. The request for a preliminary injunction should be analyzed under California law, and the JAMS Comprehensive Arbitration Rules and Procedures should be applied. This is what the parties agreed.

In fact, this question has already been raised and resolved by the Arbitrator. The Report of Preliminary Hearing and Scheduling Order No. 1, Section 6, states, "[t]he substantive law of the State of California and the JAMS Comprehensive Arbitration Rules and Procedures ('Rules') shall apply in this proceeding." Grand Union / CBG had every opportunity to object to this language, which appeared in the draft Scheduling Order circulated by the Arbitrator and was discussed at the Preliminary Hearing. Yet Grand Union / CBG said nothing.

This is a straightforward Arbitration proceeding in Los Angeles, California pursuant to California law and the JAMS Comprehensive Arbitration Rules and Procedures. The trivia of the location of the Parties' headquarters has no bearing on this case, pursuant to the Parties' own agreement. The question of whether a preliminary injunction should issue must be resolved under California law.

### B. Mandatory Preliminary Injunctions are Issued only in Extreme Cases Where the Moving Party has Clearly Established its Right to an Injunction

Under California law, as set forth in a long line of California Supreme Court cases:

> In deciding whether to issue a preliminary injunction, a court must weigh two "interrelated" factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction.

*Butt v. State of California*, 4 Cal. 4th 668, 677-678 (1992); *see also White v. Davis* 30 Cal. 4th 528,

[1] Grand Union / CBG's citation to *Armed Activities on the territory of Congo (Democratic Republic of the Congo v. Uganda*), Provisional Measures, Order 1 (1 July 2000) is particularly preposterous. An order by the International Court of Justice sitting in the Hague prohibiting nations from engaging in armed conflict in violation of international law is outrageously inapposite in this contract dispute.

weintraub tobin chediak coleman grodin LAW CORPORATION

554 (2003); *see also Common Cause v. Board of Supervisors*, 49 Cal. 3d 432, 441-442 (1989); *see also IT Corp. v. County of Imperial*, 35 Cal. 3d 63, 69-70 (1983). The Court explained that "[t]he trial court's determination must be guided by a "mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." *Butt, supra,* at 678. The first factor is met if there is a reasonable probability that the moving party will prevail on the merits. Weil & Brown *et al*, *California Practice Guide: Civil Procedure Before Trial* (The Rutter Group 2022), §§9:500, 9:506. The second factor is met if the moving party will suffer a greater injury from a denial of the injunction than the defendant will suffer if the injunction is granted. *Id*. In addition, the trial court should consider two other, related factors: whether the moving party will suffer irreparable harm if the injunction is denied and whether damages are an adequate remedy for the moving party. *See White*, *supra*, at 554; *see also Amgen, Inc. v. California Correctional Health Care Services*, 47 Cal.App.5th 716, 731 (2020); *see also Civil Procedure Before Trial, supra,* at §§9:504, 9:508.

There is no question that a preliminary injunction is an extreme remedy. *See*, *e.g.*, *Coll. Hosp. Inc. v. Superior Court*, 8 Cal. 4th 704, 715 (1994) ("the trial court may indeed have to predict a 'reasonable probability' of success on the merits before granting the extraordinary remedy of a preliminary injunction."). The threshold for granting a preliminary injunction is extremely high, especially where the applicant seeks a mandatory injunction, as compared to a prohibitory injunction.

"[T]he general rule is that an injunction is prohibitory if it requires a person to refrain from a particular act and mandatory if it compels performance of an affirmative act that changes the position of the parties. An injunction designed to preserve the status quo as between the parties and to restrain illegal conduct is prohibitory, not mandatory, and does not require heightened appellate scrutiny." *Oiye v. Fox*, 211 Cal. App. 4th 1036, 1048 (2012). "The substance of the injunction, not the form, determines whether it is mandatory or prohibitory." *Davenport v. Blue Cross of Cal.*, 52 Cal. App. 4th 435, 447 (1997)

Where "the preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion. The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts." *Shoemaker v. Cty. of*

weintraub tobin chediak coleman grodin LAW CORPORATION

{00248874.DOCX:} 10

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

*L.A.*, 37 Cal. App. 4th 618, 625 (1995) (internal citations omitted). "A preliminary mandatory injunction is rarely granted, and is subject to stricter review on appeal. The granting of a mandatory injunction pending trial 'is not permitted except in extreme cases where the right thereto is clearly established.'" *Id.*, citing *Hagen v. Beth*, 118 Cal. 330, 331 (1897).

Grand Union / CBG's Application repeatedly uses terminology like "status quo" in an effort to make their injunction appear to be prohibitory. However, the "status quo" here is not as Grand Union / CBG represents it. Grand Union / CBG expressly seeks to "restor[e] the *status quo ante*, i.e. the period just prior to PF Hong Kong's purported termination." Application at p. 21, ¶ 86. The MLA was terminated on September 23, 2022, more than seven months ago (and more than eight months will have passed since the termination by the time the Arbitrator issues a decision). Since then, Paul Frank has acted accordingly. As set forth in more detail in Section IV, *infra*, Paul Frank is now managing licensees in China directly, including coordinating a new product approval process, a new process for approving advertising designs and marketing campaigns, and processing letters of authorization allowing licensees to do business on e-commerce platforms. *See* Section IV, *infra*. Paul Frank would have to reverse all of the work it has already performed if the MLA is put back into effect.

It is clear that, if granted, this injunction would compel Paul Frank to completely reverse course. In returning to performance under the MLA, Paul Frank would be required to complete many affirmative acts. Grand Union / CBG is seeking an order "declar[ing] that the MLA remains in force" and requiring Paul Frank to "perform under the MLA pending the conclusion of this arbitration or until further order of the Tribunal."[2] Application at p. 30, ¶ 117(a) and (b). Thus, Grand Union / CBG actually seeks to reverse the current status quo and turn back the clock by many months to force Paul Frank to continue performing as if Grand Union / CBG's breaches had never occurred.

If the MLA were resurrected, Paul Frank would necessarily be required to undertake

---

[2] Once again, this is an Arbitration, not a Tribunal. Further, Paul Frank presumes that the Application at p. 30, ¶ 117(b) contains a typo in that Grand Union / CBG seeks an order compelling *Claimant* Paul Frank to "perform under the MLA," not *Respondent* as stated therein. However, even if this was the intended text, the Application still seeks to resuscitate the terminated MLA during the pendency of this action, which would necessarily require the same acts by Paul Frank.

weintraub tobin chediak coleman grodin
LAW CORPORATION

substantial efforts to permit the sale of Licensed Products. In particular, Paul Frank would be required to review and either approve or disapprove each and every SKU of Licensed Product and "all preliminary and proposed final artwork" for all Licensed Products sold by Grand Union / CBG or its sublicensees. *See* MLA at Section 7(a), Ex. 1 to Appendix. Paul Frank would also be required to furnish Grand Union / CBG with the necessarily authorizations and documents affirmatively stating that Grand Union / CBG and its sublicensees have the right to sell Licensed Products. *See*, *e.g.*, Application at p. 8, ¶ 28 ("Grand Union needs notarized letters of authorization evidencing Grand Union's authority as licensee of the Paul Frank Brand ('LOA'), and the relevant trademark registration certificates in relation to the categories of products that our Sublicensees (the 'Trademark Certificates') [sic]." These are affirmative acts that Paul Frank would be required to perform if the Arbitrator grants Grand Union / CBG's Application.

Thus, the Application necessarily seeks a mandatory injunction. The order sought by Grand Union / CBG would require Paul Frank to perform under the MLA, not just refrain from certain acts. *See Bd. of Supervisors v. McMahon*, 219 Cal. App. 3d 286, 295 n.3 (1990) (injunction was mandatory where the State was required to provide financing for the program in question); *see also Davenport v. Blue Cross of Cal.*, 52 Cal. App. 4th 435, 447 (1997) (injunction was mandatory where it compelled Blue Cross to "authorize and pay for plaintiff's treatment. It has been held an injunction which compels a party to perform some physical act or surrender property is mandatory").

In order to prevail on its Application, Grand Union / CBG must therefore demonstrate that it fits within one of those "extreme" cases where an injunction is appropriate. It must "clearly establish" that it will succeed on the merits of its claim *and* that "irreparable injury" will result if the injunction is not granted. Grand Union / CBG cannot meet this this high burden.

The only party which can establish a likelihood of succeeding on the merits is Paul Frank. Paul Frank is also the only party whose intellectual property is at risk, and which can demonstrate actual irreparable injury. If any party is entitled to a preliminary injunction, it is Paul Frank, not Grand Union / CBG.

/ / /

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

## III. THE TERMINATION OF THE MLA WAS ENTIRELY PROPER AND PAUL FRANK WILL PREVAIL ON ITS CLAIMS AGAINST GRAND UNION / CBG

Paul Frank is entitled to a preliminary injunction, and Grand Union / CBG is not entitled to an injunction, because Paul Frank's termination of the MLA was entirely valid under California law and Paul Frank has adduced evidence of multiple material breaches by Grand Union which will result in a finding in favor of Paul Frank and against Grand Union in this Arbitration.

### A. Paul Frank Terminated the MLA on the Basis of Grand Union's Multiple Material Breaches and is Entitled to Damages

#### 1. Paul Frank's Right of Termination

The MLA provides that Paul Frank had the right terminate if Grand Union / CBG committed a "Material Breach" "upon thirty (30) days' notice in writing to Licensee… and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period." MLA, Section 13(a), Ex. 1 to Appendix. A "Material Breach" is defined in Section 13(b) as:

> (i) [Grand Union / CBG's failure to pay the License Fee]; or (ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or (iii) Licensee engages in conduct beyond the scope of rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days; or (iv) Licensee or any of Licensees executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days….

Ex. 1 to Appendix.

In summary, Paul Frank may terminate the MLA if there is a **Material Breach** of the MLA (*i.e.*, (1) Licensed Products are sold or distributed outside the Territory; (2) Licensed Products are sold or distributed outside the Channels of Distribution; (3) Grand Union / CBG engages in conduct beyond the scope of rights in the MLA which affects the goodwill and market value of the Property for more than 120 days; or (4) Grand Union / CBG or any of its executive officers or owners commits fraud or any other act or omission that affects the goodwill and market value of the Property for more

weintraub tobin chediak coleman grodin LAW CORPORATION

than 120 days), Paul Frank gives **notice** of the breach to Grand Union / CBG, and Grand Union / CBG **fails to completely cure** the breach within the thirty-day notice period.

To be clear, Grand Union / CBG is liable to Paul Frank for any material breach regardless of whether Paul Frank exercised its rights of termination. Paul Frank need only establish the elements of a claim of breach of contract (*see* Judicial Council of California Civil Jury Instructions ("CACI"), No. 303), violation of the Lanham Act by demonstrating sales of Paul Frank branded products without the consent of Paul Frank (*see* 15 U.S.C. §§ 1114 and 1125), or of unjust enrichment (*see* CACI No. 4410) in order to prevail in this Arbitration. Section 13(d) of the MLA also states that "Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of breach, then such breach shall be an Uncured Breach. Licensee shall pay a fine of $20,000 for each Uncured Breach." Ex. 1 to Appendix. Thus, even a non-material breach may result in finding of damages in favor of Paul Frank and against Grand Union / CBG in this Arbitration.

Further, Grand Union / CBG's opportunity to cure any one material breach must be balanced against the futility of such a cure. "California law allows for equitable excusal of contractual conditions causing forfeiture in certain circumstances, including circumstances making performance futile." *Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179, 1186 (2008) (arbitrator did not exceed his powers by excusing compliance with the notice-and-cure provision in the parties' contract where arbitrator concluded that notice would have been futile); *see also* Restat 2d of Contracts, § 242 ("[I]n some instances timely performance is so essential that any delay immediately results in discharge and there is no period of time during which the injured party's duties are merely suspended and the other party can cure his failure."). Thus, the termination by Paul Frank was valid if there is a **Material Breach**, **notice**, and **failure to completely cure**, unless such **cure was futile**.

On August 24, 2022, Paul Frank issued a Notice of Termination to Grand Union / CBG. *See* Ex. 9 to Appendix. It identifies four **Material Breaches** of the MLA: (1) the forgery of Paul Frank's signatures and official stamps on authorization letters to certain e-commerce platforms; (2) the sale of goods outside the Territory limitation in the MLA; (3) the sale of goods outside the Channels of Distribution set forth in the MLA; and (4) Grand Union / CBG's failure to cure the breaches of the

{00248874.DOCX:} 14

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

weintraub tobin chediak coleman grodin LAW CORPORATION

MLA identified by Paul Frank in 2021 which resulted in the Second Amendment. *Id.* at p. 2. The Notice of Termination further states that Grand Union / CBG's refusal of Paul Frank's request for an audit is an additional breach of the MLA.

Grand Union / CBG made no effort whatsoever to cure any of the breaches identified by Paul Frank (and, as discussed further below, such breaches were largely incapable of being cured). Therefore, on September 23, 2022, Paul Frank issued a Termination of Master License Agreement. *See* Ex. 11 to Appendix. As of September 23, 2022, the MLA was terminated and is no longer in force. Paul Frank demanded that Grand Union / CBG immediately cease and desist any activities related to the Property, except that Paul Frank permitted Grand Union / CBG a short sell-off period (which it was not contractually required to do) so that Grand Union / CBG could sell-off remaining inventory. *Id.* at 2.

As set forth in detail below, Paul Frank was entirely justified in terminating the MLA. Further, Paul Frank has adduced significant evidence of multiple additional **Material Breaches** of the MLA since the Termination of Master License Agreement was issued, many of which are incapable of being cured. Even if Paul Frank had not terminated the MLA in 2022, it would be entirely justified in doing so today based on the new evidence discovered.

**2. <u>Grand Union / CBG Forged or Authorized the Forging of Official Paul Frank Documents</u>**

Perhaps the most egregious and damning breach of the MLA by Grand Union / CBG is the forging of Paul Frank official documents, including Paul Frank's signature and stamp on Letters of Authorization to third parties.

In April 2022, Paul Frank was contacted by an agent of TikTok (the global social media company). The agent informed Paul Frank that TikTok had received two "brand authorization letters issued by your company." Ex. 128 (original) and Ex. 129 (translation) to Appendix. It is standard practice for TikTok and other e-commerce platforms to require authorization letters from major brand holders in order to open official branded flagship stores on the platform. This ensures that only the true rightsholders may open flagship stores. *See* Declaration of Stanley Yook-Loong Wan ("Wan Decl."), filed concurrently herewith, at ¶ 14. Here, TikTok's agent identified two suspicious

weintraub tobin chediak coleman grodin LAW CORPORATION

authorization letters purportedly signed by Paul Frank, including a letter dated November 1, 2021 authorizing Hong Tong Fang (Shanghai) Cultural Development Co., Ltd. ("Hong Tong Fang") to open flagship stores on TikTok for "daily cosmetics and personal care products." *See* Ex. 129 to Appendix; *see also* Authorization Letters, Exs. 130 and 132 (originals) and Exs. 131 and 133 (translations) to Appendix. The purported Authorization Letter to Hong Tong Fang (the "Forged Authorization Letter") appears to have a Paul Frank stamp and an "Authorized Signature." *See* Ex. 130. However, Paul Frank did not sign the Forged Authorization Letter – it is a forgery. *See* Declaration of Hana Mu ("Mu Decl."), filed concurrently herewith, at ¶ 9.

Hana Mu, former China local Counsel for Paul Frank Limited, sent the Forged Authorization Letter to Grand Union / CBG on April 19, 2022, stating "[c]an you please explain the attached authorization letter? I have never signed this document, it is obviously forged." Exs. 33 and 34 to Appendix. On April 21, 2022, she again informed Grand Union / CBG that the Forged Authorization Letter "is a forgery… our company has never issued this authorization letter." Ex. 134 (original) and Ex. 135 (translation) to Appendix.

Grand Union / CBG admitted that the Forged Authorization Letter was in fact a forgery. On April 20, 2022, Jennifer Huang of CBG stated, "[t]he authorization letter provided by your company is not the authorization letter provided by our company to Hong Tong Fang, so please further verify…." Email dated April 20, 2022 in Email Chain at Ex. 35 (original) and Ex. 36 (translation), at p. 8. Ms. Huang also attempted to shift blame for the forged document from CBG to Hong Tong Fang. She stated, "[o]ur company cannot know which materials Hong Tong Fang uploaded, and we are not the platform and have no right to see all the uploaded files." *Id.*

Ms. Mu responded on June 24, 2022 that Paul Frank had "discovered more forged documents been [sic] used in different places either by your affiliate companies, or your sublicensees. Per 1.(b)(iii) of the MLA, Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under the Agreement. Such illegal conducts are clearly a direct violation of Licensor's rights that putting [sic] the asset and the reputation of the brand at risk, not to mention it is also a very serious breaching of the MLA." Email dated June 24, 2022 in Email Chain at Ex. 35 (original) and Ex. 36 (translation), at p. 6.

Yet on June 27, 2022, Ms. Huang once again attempted to disclaim responsibility. She stated, "[r]egarding the forged documents, as mentioned earlier, they are not legitimate documents provided by CBG. Like you, we cannot accept forged documents and we had to address this serious issue. In order to address this issue, we sent them a warning letter telling them that this is illegal and damages the brand value, and asked them to solve the problem. We could close this store or ask for a fine." Email dated June 27, 2022 in Email Chain at Ex. 35 (original) and Ex. 36 (translation), at p. 3-5.

CBG's response was a sham. As was stated by Ms. Mu on July 5, 2022:

> We are aware that CBG is a shareholder of "Hong Tong Fang (Shanghai) Cultural Development Co., Ltd.", and CBG's shareholder and Director Sam Zheng (Tao Zheng), who is always copied in all of our communications, is also a Director of "Hong Tong Fang (Shanghai) Cultural Development Co., Ltd.". Based on which, it is fair to say this is a direct act of CBG, not to mention Per 1.(b)(iii) of the MLA, Licensee shall be responsible for ensuring that each Sublicensee complies with its obligations under the Agreement.
>
> So far, we have not seen CBG taking the responsibility, and proactively trying to cure such material breaches of the MLA.

Email dated June 27, 2022 in Email Chain at Ex. 35 (original) and Ex. 36 (translation), at p. 5.

The individual Tao Zheng referred to by Ms. Mu is same Tao Zheng who submitted the First Witness Statement of Zheng Tao in support of Grand Union / CBG's Application in this Arbitration. He identifies himself as the Vice Chairman of CBG and the "person-in-charge of the intellectual property affairs department." *See* Witness Statement at ¶ 2.

On July 5, 2022, Ms. Huang responded to Ms. Mu, but did not deny the relationship between CBG and Hong Tong Fang. *See* Email dated June 27, 2022 in Email Chain at Ex. 35 (original) and Ex. 36 (translation), at p. 1-2. She claimed that CBG had directed Hong Tong Fang to close one of its flagship stores. *Id.* The next day, Ms. Mu asked about the other stores also with forged authorization letters. *Id.* at p. 1. On July 13, 2022, Ms. Huang had still not responded and Ms. Mu followed up again. *Id.* Paul Frank never received a response. The forgery was reported to the police on July 30, 2022. *See* Police Report, Ex. 55 (original) and Ex. 56 (translation) to Appendix.

In another email chain on the same topic, Ms. Huang provided Ms. Mu a list of thirteen TikTok flagship stores carrying Paul Frank branded goods, including Hong Tong Fang. *See* Email dated June 23, 2022 in Email Chain at Ex. 51 (original) and Ex. 52 (translation), at p. 5-6. Ms. Mu

weintraub tobin chediak coleman grodin
LAW CORPORATION

asked how these stores were able to open on TikTok (*id*. at p. 4-5), and Ms. Huang confirmed that each would have to "prepare an exclusive authorization letter and related documents" (*id*. at p. 3-4). Ms. Huang also confirmed that the stores had all been open since 2020 or 2021. *Id.* at 1-2. Ms. Mu responded on June 23, 2022, "How many of these stores used forged documents to open a flagship store on Tiktok? What measures has CBG taken for such illegal activities?" *Id.* at 1. Ms. Mu received no response. In fact, Paul Frank has never issued any authorization letters for any of the entities listed by CBG to open a Paul Frank branded store on TikTok. *See* Mu Decl. at ¶ 9. Thus, each of the stores reported by CBG must have been opened with forged authorization letters.

In August 2022, Ms. Mu reiterated the damage done by CBG:

> Your side's China operating company, Hong Fang Culture Co., Ltd. ("Hong Fang") is an affiliated company of the subordinate authorized business operator, Hong Tong Fang (Shanghai) Cultural Development Co., Ltd. ("Hong Tong Fang"), not only does Hong Fang indirectly hold shares in Hong Tong Fang, but also Tao Zheng who is the principal and director of Hong Fang is also serving as the director of Hong Tong Fang. All the communication emails between the brand and the authorized party were sent to Tao Zheng in the CC list. Your side and Hong Fang knew, or should have known, the behaviors of Hong Tong Fang, and directly instructed the actions of Hong Tong Fang. Your side said that you "did not know" and that "third parties did it," which is a reversal of right and wrong, and a shirking of responsibility.

Email dated August 18, 2022, Ex. 54 to Appendix. CBG did not respond to this email.

There is no question that Hong Tong Fang is an affiliate of CBG. According to the Chinese National Enterprise Credit Information Publicity System, Hong Tong Fang's shareholders are CBG Original Culture (Shanghai) Co., Ltd. and Tao Zheng, among others. *See* Ex. 171 (original) and Ex. 172 (translation). CBG Original Culture (Shanghai) Co., Ltd.'s shareholder is CBG, and its legal representative is Tao Zheng. *See* Ex. 169 (original) and Ex. 170 (translation). Tao Zheng is also a shareholder of CBG. *See* Ex. 165 (original) and Ex. 166 (translation).

It is clear that CBG's own affiliate Hong Tong Fang created the Forged Authorization Letter and submitted it to TikTok in order to open its own flagship Paul Frank store. It is not clear how many other entities did the same, with or without CBG's permission and approval.

Grand Union / CBG's response to this allegation is deliberately misleading. In its Application, Grand Union / CBG states only that it "appears" that "some Sublicensees took matters into their own hands and created the documents so that they could continue to conduct their business on the

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Platforms." Application at p. 13, ¶ 49. This is not the work of some rogue sublicensee – this is Grand Union / CBG's own affiliate which is owned and managed by Tao Zheng, a witness for Grand Union / CBG in this case. Grand Union / CBG need not "assume" anything, Grand Union / CBG knows exactly what happened and never responded to Ms. Mu's statements alleging the facts. It is therefore undisputed that Grand Union / CBG knew of and condoned the forgery by Hong Tong Fang.

Forged documents permitting online stores are a serious risk to any brand. Much like the United States, the sale of goods in China takes place largely online. *See* Wan Decl. at ¶ 13. E-commerce and social media sites like TikTok are extremely popular with consumers. Maintaining an official flagship store on an e-commerce or social media site allows a brand to engage directly with consumers and control and target their marketing to specific consumer groups. *Id*. All brands, including Paul Frank, tightly control which licensees or sublicensees can maintain flagship stores. A brand should only have one flagship store in each category to minimize confusion and duplication of sales to the same consumer. Some platforms actually require that each brand have only one flagship store, or one in each category. *Id.* In China, because the market is so large and there are so many consumers, the categories are very carefully controlled. For example, in the United States there is generally one "footwear" category." In China there are separate categories for indoor slippers, rainboots, sneakers, and more. *Id*. Thus, each brand must carefully plan which licensee will have the right to maintain the flagship store on a particular e-commerce or social media site to avoid consumer confusion and dilution of the brand. *Id*.

When a fake flagship Paul Frank store is opened on an otherwise reputable e-commerce or social media site, the damage to the brand is immense. *Id.* at ¶ 15. Paul Frank did not authorize the Hong Tong Fang flagship store, and did not authorize any of the products sold on the flagship store. It is a counterfeit store selling counterfeit products. Yet consumers believe that the store is legitimate because it is an "official" store sanctioned by TikTok. *Id*.

Consumers have bought the counterfeit products, which are usually cheaply made with very low-quality materials. Counterfeit goods are generally of extremely low quality. *Id.* at ¶ 8. They are not made of high-quality materials, they are made cheaply and quickly because there is no brand limiting the quality of the materials used by the manufacturer. The manufacturer will use the cheapest

weintraub tobin chediak coleman grodin LAW CORPORATION

materials and methods in order to maximize profits. *Id.* Further, counterfeit good are often sold at extremely low prices. *Id.* at ¶ 9. The manufacturer was not required to purchase the rights to the goods from the brand owner, and thus can sell the goods at a lower cost. The counterfeit manufacturer does not care about maintaining a brand's image with the market, it is only interested in selling the goods quickly and easily. *Id.*

Yet the consumers believe they are purchasing legitimate Paul Frank products when they purchase a good from an "authorized" flagship store. *Id.* at ¶ 15. This will necessarily damage the brand because the consumers will believe that Paul Frank products are cheap and low quality after purchasing "official" products from Hong Tong Fang's infringing store. *Id.*

The creation and submission of the Forged Authorization Letter, along with untold numbers of other forged letters, is a clear **Material Breach** of the MLA. Such conduct substantially harms the goodwill and market value associated with the Property, and has been occurring since at least November 2021. Such conduct is not just outside the scope of the rights granted in the MLA, but the forging of documents constitutes fraud and misrepresentation, triggering Sections 13(b)(iii) and (iv) of the MLA. Therefore, Paul Frank issued the 2022 Notice of Termination and gave Grand Union / CBG **notice** of the Material Breach. *See* Ex. 9 to Appendix at 2. Grand Union / CBG took no efforts whatsoever to cure this breach; in fact, Grand Union / CBG denied that any breach had occurred. *See* Email dated September 16, 2022 in Email Chain at Ex. 10 to Appendix, p. 2 ("We never forged Licensor's official stamps or any of Licensor's signatures."). It is also likely that any cure would have been futile, given that the Hong Tong Fang store had been up and running for nearly a year and sold an unknown number of goods to unsuspecting consumers during that time. The damage had already been done by the time Paul Frank discovered the store. Grand Union / CBG thus **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone.

Not only has Grand Union / CBG failed to cure this **Material Breach**, Paul Frank has discovered even more forged authorization letters. On September 14, 2022, an agent of TikTok again reached out to Paul Frank to confirm a letter of authorization. *See* Email dated September 14, 2022 in the Notarized Printouts of Emails at Ex. 136, p. 16 (original) and p. 29 (translation). The agent

{00248874.DOCX:}

20

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

attached a "Trademark Authorization Statement" dated April 21, 2022 purportedly by Paul Frank affirming the rights of Ningbo Houhou Trading Co., Ltd. ("Ningbo") to sell Paul Frank merchandise on TikTok (the "Forged Trademark Authorization Statement"). *Id.* at p. 18 (original) and p. 31 (translation). However, the Forged Trademark Authorization Statement was not created, signed, or stamped by Paul Frank. *See* Mu Decl. at ¶ 13. Further, Ningbo was not on the list of TikTok stores provided by Ms. Huang in June 2022. *See* Email dated June 23, 2022 in Email Chain at Ex. 51 (original) and Ex. 52 (translation), at p. 5-6. Thus, there are likely many more stores operating online with forged authorization credentials that Paul Frank has yet to discover.

When asked about this Forged Trademark Authorization Statement, Ms. Huang admitted that Ningbo was a distributor of CBG's licensee Ningbo Zhonglei Shoes Co., Ltd. ("Zhonglei") and stated that CBG had asked Zhonglei to investigated it. *See* Email dated September 16, 2022 in Email Chain at Ex. 188 (original) and Ex. 189 (translation) at p. 2. Ms. Mu responded on September 20, 2022 that CBG must bring Zhonglei and all of its subordinate parties into compliance, and that "[p]rivately engraving the authorized party's official seal and forging the power of attorney has violated the relevant provisions of the 'Criminal Law' of the place of conduct, and seriously violated our intellectual property rights, property rights and other related rights…." *Id.* at p. 1. Grand Union / CBG never responded to this email.

The Forged Trademark Authorization Statement is a clear violation of the MLA, which has already materially damaged Paul Frank's goodwill and market value in the same manner as the Forged Authorization Letter by Hong Tong Fang. *See* Wan Decl. at ¶ 15. The Forged Trademark Authorization Statement was dated April 21, 2022, so the harm to the brand has been accruing for far more than 120 days. Thus, the Forged Trademark Authorization Statement constitutes a further, separate **Material Breach** of the MLA. Paul Frank gave Grand Union / CBG **notice** of the forgery in September 2022, yet Grand Union / CBG has not, or cannot, cure this **Material Breach**, and Paul Frank believes that this Arbitration will reveal many further forged documents. Grand Union / CBG thus **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone.

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{00248874.DOCX:}

21

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

Further, it appears that other sublicensees are being shut out of e-commerce platforms because of defective letters of authorization. On April 3, 2023, Paul Frank received an email from a former employee of CBG (whose identifying information is being redacted for their privacy). The former employee states that a "licensee of adult apparel has taken the PF license from CBG and paid a lot of money to CBG without knowing some important information…. [T]heir online store has been closed by the e-commerce platform in China because the authorization letters that CBG issued don't work at all. The licensee is very disappointed in CBG." Ex. 32 to Appendix. Presumably, the sublicensee was provided with forged credentials by CBG and has been kicked off of the e-commerce platform as a result. Paul Frank will adduce further evidence in discovery in this Arbitration.

Grand Union / CBG has not merely committed some small, technical violation of the MLA. It has worked through its affiliate entity to commit a fraud against TikTok and Paul Frank's consumers by forging the official documentation of Paul Frank. Grand Union / CBG's actions are a clear breach of the MLA and Paul Frank has demonstrated an apparent likelihood of success on the merits of its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

### 3. <u>Licensed Products Were Sold Outside the Territory</u>

The MLA limits the "Territory" to "mainland China, Hong Kong and Macau." Schedules to MLA, Schedule B, Ex. 2 to Appendix; *see also* MLA, Section 8(a), Ex. 1 to Appendix ("Licensee shall limit its use of the Property to the Territory"). Further, "no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory." MLA, Section 2(a), Ex. 1 to Appendix. And even if Grand Union / CBG were to claim that it was wholly unaware that its sublicensees were selling or distributing goods outside of the Territory, the MLA also provides that all sublicense agreements must "contains terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein" and that Grand Union / CBG is "responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement." MLA, Section 1(b)(ii) and (iii), Ex. 1 to Appendix.

/ / /

The sale or distribution of Licensed Product outside the Territory is an immediate **Material Breach** pursuant to Section 13(b)(ii) of the MLA. There is no obligation that the sale or distribution of the goods affect the goodwill or market value of the Property, nor that it persists for 120 days. *Compare* MLA, Section 13(b)(ii) to Section 13(b)(iii) and (iv), Ex. 1 to Appendix. The MLA is clear that a single Licensed Product sold outside the Territory is a de facto **Material Breach**.

Paul Frank has discovered evidence that Grand Union / CBG's sublicensee had been selling Licensed Products outside of the Territory. The sublicensee in question is 镇江阿瑞斯眼镜有限公司 - Zhenjiang Ares Optical Co., Ltd., previously known as 上海平凡眼镜有限公司 - Shanghai Pingfan Glasses Co., Ltd. ("Shanghai Pingfan"). See List of Sublicensees, Ex. 114 to Appendix (listing Zhenjiang); see also Email dated December 6, 2021, Ex. 137 to Appendix (confirming Zhenjiang as a sublicensee and its prior name Shanghai Pingfan). Paul Frank's authorized licensee in Jakarta, Indonesia discovered that Shanghai Pingfan was selling eyeglasses in Jakarta and complained to Paul Frank that a competitor was selling Paul Frank products in its territory. *See* Wan Decl. at ¶ 83. The licensee provided photographic evidence of the eyeglasses being sold and the location of the store. *See* Exs. 57-60 to Appendix. In particular, Ex. 57 to the Appendix shows the tag with the name Shanghai Pingfan ("上海平凡眼镜有限公司") in plain view. *See* Wan Decl. at ¶ 84.

Sales outside the Territory are extremely harmful to the Paul Frank brand. Paul Frank already has a licensee in Indonesia and these products necessarily compete with the products sold by that licensee. *Id.* at ¶ 16. Such sales harm the licensee by reducing their potential sales. *Id.* They also strain the relationship between Paul Frank and its licensee. Local licensees will refuse to do business with Paul Frank if there are too many counterfeit goods in the local market, or will demand a very low licensee fee or minimum guarantees because they are unable to sell their goods. Paul Frank therefore loses revenue when counterfeit goods flood local markets. *Id.*

Paul Frank would never approve such products to be sold outside of the Territory. *Id.* at ¶ 17. These products are counterfeit goods sold without approval, and therefore of low quality and cheaply made. *Id.* at ¶¶ 8-9. Thus, not only do the products compete with those sold by local licensees, they also harm the brand's reputation by passing off inferior goods as legitimate. *Id.* at ¶ 17.

weintraub tobin chediak coleman grodin LAW CORPORATION

The sale of Licensed Products outside of the Territory by a sublicensee of Grand Union / CBG is a **Material Breach** of the MLA. *See* Section 13(b)(ii), Ex. 1 to Appendix. Therefore, Paul Frank issued the 2022 Notice of Termination and gave Grand Union / CBG **notice** of the Material Breach. *See* Ex. 9 to Appendix at 2. Grand Union / CBG took no efforts whatsoever to cure this breach; in fact, Grand Union / CBG denied that any breach had occurred. *See* Email dated September 16, 2022 in Email Chain at Ex. 10 to Appendix, p. 2 ("We never sold or distributed Licensed Product outside the Territory or Channels of Distribution."). Grand Union / CBG thus **failed to completely cure** the Material Breach, and Paul Frank was entitled to terminate the MLA on the basis of this Material Breach alone. Further, any possible attempt at a cure by Grand Union / CBG was likely **futile** given the fact that the sales had already occurred and the damages to the brand had already been done.

In addition, Paul Frank has discovered three additional instances of sales of Licensed Products outside of the Territory. Each of these instances constitutes entirely new **Material Breaches** of the MLA which provide grounds to terminate the agreement and seek damages from Grand Union / CBG.

First, Paul Frank has adduced evidence of sales by CBG to Singapore. In January 2018, Zhengqi Qu in the Sales Department of CBG sent an email to representatives of Clubman Singapore Pte Ltd ("Clubman"), an apparel company in Singapore, stating "[a]ttached is the detailed list of your external purchase order for Shanghai Qunyi Company (PF)…." *See* Email dated January 16, 2018 in the Email Chain at Ex. 141 (original) and Ex. 142 (translation) to Appendix; *see also* Wan Decl. at ¶ 146; *see also* Purchase Order, Ex. 143 to Appendix. The subject line of Mr. Qu's email translates to "CM External Purchase Order Sales Detail.xls." *See* Ex. 142 to Appendix. Per CBG's instruction, the sale was made through CBG's subsidiary **上海群易服**饰有限公司 – Shanghai Qunyi Clothing Co., Ltd. ("Qunyi"). *Id.* In July 2018, Corrine Ji, Business Development Manager of CBG, sent an email to representatives of Clubman with the subject line "2018SS Order_Clubman," stating "Pls confirm the order quotation as the attachment. If no problem, please arrange the payment to our company Alipay Account details as below: Alipay Account: weiwen.ji@chinabrandsgroup.com.cn Alipay Account Name:上海群易服饰有限公司." *See* Email dated July 24, 2018 in the Email Chain at Ex. 173 to Appendix; *see also* Order Quotation, Ex. 174 to Appendix. Ms. Ji refers to the account as "ours" – i.e. CBG's – but uses the account name

weintraub tobin chediak coleman grodin LAW CORPORATION

of Qunyi. This sale by CBG to Clubman was for Paul Frank-branded Licensed Products in Singapore. *See* Wan Decl. at ¶ 146.

Singapore is unquestionably outside the Territory. *See* Schedules to MLA, Schedule B, Ex. 2 to Appendix. Thus, this sale constitutes a further, separate **Material Breach** of the MLA.

Second, Paul Frank has adduced evidence of sales by CBG to Taiwan. In December 2018, Ms. Ji of CBG sent an email to Tony Tung of Wuco Trading (H.K.) Company Limited ("Wuco") stating that "your company's order has been full packed and the packing list is attached." *See* Email dated December 7, 2018 in the Email Chain at Ex. 138 (original) and Ex. 139 (translation) to Appendix. Ms. Ji attached an Invoice made out to Wuco from an entity called "Shanghai CIIC Science & Technology Development Co., Ltd." ("CIIC"). Ex. 140 to Appendix. The subject line of Ms. Ji's email translates to "Final confirmation of Taiwan external purchase orders." *See* Ex. 139 to Appendix. Lower in the email chain, Ms. Ji states that the beneficiary of the payment by Wuco should be "Shanghai CIIC Science & Technology Development Co., Ltd." ("CIIC") instead of CBG, despite the fact that CBG processed the order and sent the invoice. *See id.*, email dated November 5, 2018. Presumably, Ms. Ji attempted to obfuscate the source of the order in an effort to hide CBG's breach of the MLA from Paul Frank.

This sale by CBG to Wuco was for Paul Frank-branded Licensed Products in the territory of Taiwan. *See* Wan Decl. at ¶ 143. Not only is Taiwan outside of the Territory specified in the MLA, it is specifically excluded: "[f]or the avoidance of doubt and regardless of any geopolitical change that occurs during the License Period, the Territory does not include Taiwan." Schedules to MLA, Schedule B, Ex. 2 to Appendix. Thus, this sale constitutes a further, separate **Material Breach** of the MLA.

Third, Paul Frank has adduced evidence of global sales by CBG of "Paul Frank Mecha Julius." CBG's own website advertises a series of co-branded Paul Frank Mecha Julius toys with its sublicensee 乐之宝(东莞)文化创意有限公司 – Lamtoy (Dongguan) Cultural Creativity Co. Ltd. *See* Ex. 204 to Appendix. Paul Frank has located identical toys for sale by "Lam Toys" on the following websites: (1) Mindzai.com, which describes itself in its "About Us" page as "open to the world" (Exs. 193 and 194 to Appendix); Plastic Crack, a Canadian online shop (Ex. 195 to Appendix);

weintraub tobin chediak coleman grodin
LAW CORPORATION

Carousell, which describes itself as a "community marketplace/classifieds platform in Singapore, Hong Kong, the Philippines, Malaysia, Taiwan and Indonesia" (Exs. 205 and 196 to Appendix); and Lazada, which describes itself has having "a presence in six countries – Indonesia, Malaysia, the Philippines, Singapore, Thailand and Vietnam" (Exs. 197 and 198 to Appendix). The MLA specifically prohibits Grand Union / CBG from doing business with e-commerce retailers that do business outside of the Territory. *See* Schedules to MLA, Schedule G(1), Ex. 2 to Appendix (listing e-commerce retailers under the Channels of Distribution "provided that shipment of Licensed Products is limited to consumers residing within the Territory").

The sale of goods via global e-commerce retailers is a violation of the MLA's Territory and Channel of Distribution limitations (as discussed further below). Such sales constitute a further, separate **Material Breach** of the MLA.

This is not some accidental immaterial breach that can be corrected by a sharp word to a sublicensee. Grand Union / CBG is intentionally selling goods outside of the Territory in violation of the MLA, and has been doing so since 2018. Paul Frank expects that there were many other sales outside the Territory that will be adduced in discovery in this action. Since these sales occurred years ago, the damage is done and Grand Union / CBG could not cure such breaches even if it desired to do so. Thus, Grand Union / CBG **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of these **Material Breaches** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

### 4. Licensed Products Were Sold Outside the Channels of Distribution

The MLA limits the Channels of Distribution to certain types of stores – for example, department stores and e-commerce retailers (so long as those e-commerce retailers are limited to consumers residing in the Territory). *See* Schedules to MLA, Schedule G, Ex. 2 to Appendix. The MLA further states, "[t]he License granted herein for Licensed Products is limited to the Channels of Distribution" and that "Licensee shall limit its use of the Property to the Territory, in the Channels of Distribution and to Licensed Products and the Licensed Services." MLA, Sections 2(c) and 8(a), Ex. 1 to Appendix. And, again, even if Grand Union / CBG were to claim that it was wholly unaware

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

that its sublicensees were selling or distributing goods outside of the specified Channels of Distribution, the MLA also provides that all sublicense agreements must be as protective of the Property as the MLA and that Grand Union / CBG is responsible for "ensuring that each Sublicensee complies with its obligations under its sublicense agreement." MLA, Section 1(b)(ii) and (iii), Ex. 1 to Appendix.

The sale or distribution of Licensed Product outside the Channels of Distribution is an immediate **Material Breach** pursuant to Section 13(b)(ii) of the MLA. Like a sale outside the Territory, there is no obligation that the sale or distribution of the goods affect the goodwill or market value of the Property, nor that it persists for 120 days. *Compare* MLA, Section 13(b)(ii) to Section 13(b)(iii) and (iv), Ex. 1 to Appendix. The MLA is clear that a single Licensed Product sold outside the Channels of Distribution is a de facto **Material Breach**.

However, Grand Union / CBG has entirely ignored these limitations. Paul Frank has discovered Licensed Products being sold in the Liqun Life Supermarket in Shanghai. An agent of Paul Frank documented the sale of Paul Frank goods in September 2022, but Paul Frank believes that the sales had been occurring for some months or years prior to Ms. Liu's visit. *See* Ex. 61 to Appendix; *see also* Wan Decl. at ¶ 85. Supermarkets are prohibited in the Channels of Distribution for core categories of apparel, footwear, and accessories. *See* Schedules to MLA, Schedule G, Ex. 2 to Appendix. In fact, the approved Channels of Distribution are all "premium" outlets such as department stores and specialty retailers: "Licensee shall position the Property as a premium fashion-lifestyle brand and may not sell or distributed Licensed Products in any Core Categories via mass market channels [including supermarkets]." *Id.*

This distinction is critical to maintain the quality of the brand. Paul Frank is a high-end or "premium" brand. In China, Paul Frank is the equivalent to a brand like Calvin Klein in the United States. *See* Wan Decl. at ¶ 5. It is sold in upscale stores and at a price point which is high but not unreasonable for the average middle-class consumer. Calvin Klein would never allow its shoes to be sold in a supermarket; neither would Paul Frank. Consumers associate brands with the location in which they can buy them. Brands available in high-end stores will always have a higher reputation than brands sold in low end stores. *Id.* at ¶ 6. A good available in a supermarket is necessarily cheap

and low quality, especially compared to a good available in a boutique or elegant department store. Paul Frank specifically brands itself as a "premium fashion-lifestyle brand" so that consumers will regard it as such. *Id.* By selling products in supermarkets, Grand Union / CBG has directly harmed the reputation of the brand.

The sale of Licensed Products outside the Channels of Distribution is a **Material Breach** of the MLA. *See* Section 13(b)(ii), Ex. 1 to Appendix. Therefore, Paul Frank issued the 2022 Notice of Termination and gave Grand Union / CBG **notice** of the Material Breach. *See* Ex. 9 to Appendix at 2. Grand Union / CBG took no efforts whatsoever to cure this breach; in fact, Grand Union / CBG denied that any breach had occurred. *See* Email dated September 16, 2022 in Email Chain at Ex. 10 to Appendix, p. 2 ("We never sold or distributed Licensed Product outside the Territory or Channels of Distribution."). Grand Union / CBG thus **failed to completely cure** the Material Breach, and Paul Frank was entitled to terminate the MLA on the basis of this Material Breach alone. Further, any attempted cure by Grand Union / CBG was likely **futile**, as the sales had already occurred by the time Paul Frank discovered the breach and the damage had been done. Thus, Grand Union / CBG **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

Further, as stated above, the sale of the Paul Frank Mecha Julius toys through Grand Union / CBG's sublicensee Lamtoys is a violation of the Channels of Distribution. The MLA specifically prohibits Grand Union / CBG from doing business with e-commerce retailers that do business outside of the Territory. *See* Schedules to MLA, Schedule G(1), Ex. 2 to Appendix (listing e-commerce retailers under the Channels of Distribution "provided that shipment of Licensed Products is limited to consumers residing within the Territory." Such sales constitute a further, separate **Material Breach** of the MLA.

In addition, Paul Frank has adduced evidence that Grand Union / CBG has intentionally entered into sublicenses which allow sales of core categories of products in supermarkets and other discount stores. On October 1, 2020, Grand Union / CBG issued a Letter of Authorization certifying

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

that 晋江市元琪儿童服饰有限公司 - Jinjiang Yuanqi Children's Clothing Co., Ltd. ("Jinjiang Yuanqi") is the exclusive sublicensee for children's clothes and footwear. *See* Ex. 144 to Appendix (original) and Ex. 145 to Appendix (translation). On the second page of the Letter of Authorization, Grand Union / CBG lists the "channels of the exclusive license" as including "chain stores, discount stores, supermarkets and other physical store channels." *Id.*

The authorization to Jinjiang Yuanqi to sell children's clothes and footwear to department stores is a clear violation of the Channels of Distribution limitation in the MLA. Thus, this sale constitutes a further, separate **Material Breach** of the MLA.

There can be no question that Paul Frank has established its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

### 5. Grand Union / CBG's Breaches of the MLA Resulting in the Second Amendment

In 2021, Paul Frank became aware of multiple Material Breaches of the MLA by Grand Union / CBG.[3] Paul Frank gave notice to Grand Union / CBG and prepared to terminate the MLA on the basis of these breaches. *See* June 21, 2021 Notice of Termination ("2021 Notice of Termination), Exs. 12 and 13 to Appendix; *see also* July 15, 2021 Indemnification Claim, Exs. 15 and 16 to Appendix; *see also* July 29, 2021 Notice of Material Breaching ("2021 Notice of Material Breaching), Exs. 17 and 18 to Appendix. Paul Frank identified three key breaches of the MLA: (1) the registration of trademarks containing Paul Frank intellectual property by a company controlled by Grand Union / CBG called Taian Youshenghuo Clothing Co., Ltd and an affiliate of Grand Union / CBG called 上海海叠芮品牌管理有限公 or Shanghai Dierui Brand Management Co., Ltd. ("Dierui") ("Dierui"); (2) Dierui's launch of "Paul Frank Beauty" on e-commerce and social media accounts and registration of a "Paul Frank Beauty" trademark after Paul Frank rejected approval of "Paul Frank Beauty;" and (3) the use of Paul Frank Intellectual property in the name of Grand Union / CBG's affiliate 大嘴猴

[3] Grand Union / CBG's recitation of the factual history between the parties, in particular the history leading up to the Second Amendment, is entirely wrong, misleading, and completely unsupported by any actual documentary evidence. Paul Frank will not undertake the substantial time and effort to refute each misrepresentation by Grand Union, except as set forth herein. However, Paul Frank disputes the retelling of history by Grand Union and reserves the right to submit additional evidence on such points in the future.

weintraub tobin chediak coleman grodin LAW CORPORATION

食品 (杭州) 有限公司 or Big Mouth Monkey Food (Hangzhou) Limited ("Big Mouth Monkey Food"). *Id.*

In response to Paul Franks' notices identifying the material breaches, Grand Union / CBG represented to Paul Frank that they intended to cure the breaches and would come into compliance with the MLA. In reliance on that representation, Paul Frank extended the Cure Period while the Parties negotiated what would become the Second Amendment. *See*, *e.g.*, Email dated August 11, 2021 in Email Chain at Ex. 19 to Appendix, p. 8. The Second Amendment provided, among other things, that Grand Union / CBG would be granted an "extraordinary cure period of six (6) months from the Second Amendment Date so that Licensee may undertake whatsoever actions are necessary to cure any potential breaches of the Agreement and misconduct incurred currently…" and set a Cure Date of February 19, 2022. *See* Second Amendment, Section 7(i), Ex. 4 to Appendix. Grand Union / CBG further agreed that Paul Frank "has the right to perform a due diligence in order to ascertain whether there are any uncured breaches." *Id.* at Section 7(iii). Once Grand Union / CBG fully cured all breaches of the MLA, Paul Frank agreed to "waive any and all liabilities of the Licensee…." *Id.* at Section 7(ii). The Second Amendment also gave Grand Union / CBG the rights to the intellectual property for Paul Frank the A.NI.MA Series ("A.NI.MA"), in consideration for a licensee fee. *Id.* at Section 1. The A.NI.MA property is focused on streetwear and pop culture and was intended to help reinvigorate the brand with a more youthful, modern aesthetic. *See* Wan Decl. at ¶ 24.

Unfortunately, the breaches identified by Paul Frank were not cured by Grand Union / CBG. When Paul Frank asked Grand Union to confirm that all the breaches had been cured, Grand Union / CBG refused to do so, and even identified a fourth breach of the MLA – that a travel agent company called Ctrip was promoting Paul Frank themed hotel rooms, which were not approved by Paul Frank. *See* Email dated July 5, 2022 in Email Chain at Ex. 21 to Appendix, p. 2.

As set forth in detail below, Grand Union / CBG did not cure the breaches by the Cure Date – the breaches persist to this day. Further, Grand Union / CBG refused to permit Paul Frank to perform the contractually-required due diligence to confirm that the breaches had been cured (presumably because any investigation would quickly reveal that the breaches continued).

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**a. Registration of Paul Frank trademarks, copyrights, and domain names**

The 2021 Notice of Termination states Dierui had "register[ed] the Property as trademarks in China" and attaches an extensive list of trademarks registered by Dierui beginning in 2018. *Id.* The MLA provides that Grand Union "shall not at any time attack the title to or any rights of Licensor in and to the Property" and that Grand Union "shall not use the Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property…." MLA, Sections 9(b) and (e), Ex. 1 to Appendix. And, even if Dierui were not an affiliate of Grand Union / CBG, the MLA provides that all sublicense agreements "shall contain terms and conditions no less protective of Licensor's rights to the Property than the terms and conditions contained herein" and that Grand Union / CBG "shall be responsible for ensuring that each Sublicensee complies with its obligations under its sublicense agreement." *Id.* at Sections 1(b)(ii) and (iii). Thus, the registration of trademarks by Dierui containing Paul Frank intellectual property constitutes a breach of the MLA by Grand Union / CBG.

As stated in the 2021 Notice of Termination, such acts affect the goodwill and market value associated with the Property. *See* Ex. 13 to Appendix. The registration of false trademarks seriously harms the Paul Frank brand. *See* Wan Decl. at ¶ 11. The purpose of registering a fake trademark is to intentionally confuse the market and the consumer into believing that counterfeit goods are legitimate. The consumer has no way to differentiate fake goods from legitimate goods, because the fake goods appear to be properly registered and authorized by the brand holder. The brand is then forever associated in the consumer's mind with the counterfeit good. *Id.* For this reason, the use of another's trademark creates a presumption of irreparable harm. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F. 4th 682, 694 (9th Cir. 2022); *see also Vineyard House, LLC v. Constellation Brands United States Operations, Inc.*, 515 F. Supp. 3d 1061 (N.D. Cal. 2021).

Paul Frank did not approve any products to be sold by Dierui under these fake Paul Frank trademarks. *See* Wan Decl. at ¶ 38. The goods sold by Dierui are therefore counterfeit goods, which are generally of low quality and cheaply made because they did not go through the formal approval process required by the MLA. *Id.* at ¶¶ 8-9.

weintraub tobin chediak coleman grodin LAW CORPORATION

Because Dierui began registering for trademarks in 2018, the harm to Paul Frank's goodwill and market value existed for more than 120 days. Therefore, this conduct is a **Material Breach** pursuant to Section 13(b)(iii) of the MLA and Paul Frank was entitled to terminate the MLA upon thirty days-notice to Grand Union / CBG. Further, any attempted cure by Grand Union / CBG was likely **futile**, as the sales had already occurred by the time Paul Frank discovered the breach and the damage had been done.

Grand Union / CBG represented to Paul Frank that it was working with Dierui to cure the breaches of the MLA. Paul Frank only agreed to the terms of the Second Amendment with the understanding that Grand Union / CBG would cure all of the breaches identified by Paul Frank. *See* Wan Decl. at ¶ 39. However, the Cure Period came and went without any information from Grand Union / CBG. In June 2022, Paul Frank asked Grand Union / CBG to confirm that it had cured all of the material breaches. *See* Email dated June 21, 2022 in Email Chain at Ex. 21 to Appendix, p. 3-4. Grand Union / CBG initially did not respond and Paul Frank was forced to follow up again. *Id.* at p. 3. When Grand Union / CBG finally responded, they claimed that they had negotiated a new sublicense agreement with Dierui to for beauty products under the A.NI.MA property in order to bring them into compliance with the MLA. *Id.* at 2. However, no sublicense agreement with Dierui was ever presented to Paul Frank for approval, nor has Paul Frank ever seen a sublicense agreement with Dierui. *See* Wan Decl. at ¶ 38.

Not only did Grand Union / CBG never actually sign a valid sublicense with Dierui, Dierui has persisted in using Paul Frank intellectual property in its trademarks. As discussed in more detail below, Dierui trademarked the name Paul Frank Beauty and has been using it in commerce since 2018. Dierui has trademarked at least two logos related to Paul Frank Beauty. *See* Exs. 162 and 163 to Appendix. Thus, Grand Union / CBG did not cure this Material Breach prior to the Cure Date as required by the Second Amendment.

Therefore, Paul Frank gave **notice** in the 2022 Notice of Termination that Grand Union / CBG was in Material Breach of the MLA for failing to comply with the cure provisions of the Second Amendment. *See* Ex. 9 to Appendix. Thus, Grand Union / CBG **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA

weintraub tobin chediak coleman grodin LAW CORPORATION

on the basis of this **Material Breach** alone

Further, Paul Frank has discovered that Grand Union / CBG has itself registered other forms of Paul Frank intellectual property. According to the website for the China National Intellectual Property Administration, Grand Union / CBG registered a number of patents using the phrase "Paul Prime" in 2021. *See* Ex. 164 to Appendix.[4] This is a direct violation of Sections 9(b) and (e) of the MLA, and have persisted for more than 120 days. Therefore, such conduct is a **Material Breach** of the MLA which provides Paul Frank a further, separate ground on which to terminate the MLA.

Grand Union / CBG has also copyrighted a series of Paul Frank emojis available for use via WeChat. *See* Notarized Printouts of WeChat Search for Paul Frank Emoji, Ex. 25 to Appendix, at p. 1-2 (original) and 19-20 (translation). The Paul Frank emojis state "Copyright © CBG" at the bottom of the page. *Id*. at p. 11 (original) and 29 (translation). The copyright by CBG is a violation of the MLA, which prohibits Grand Union / CBG from itself trademarking or copyrighting the Property. *See* MLA at Section 9(b) and (f), Ex. 1 to Appendix. Further, the creation of emojis by CBG is a violation of the MLA. The definition of Licensed Products includes limitations on emojis: "emojis offered only in packs and only for purchase via mobile messaging apps (but excluding use of pictographs or picture characters for any type of content creation, production or distribution." Schedules to MLA, Schedule A, Ex. 2 to Appendix. Thus, the creation and copyrighting of emojis by Grand Union / CBG is a **Material Breach** of the MLA and a third separate ground on which to terminate the MLA.

Lastly, a sublicensee of Grand Union / CBG has registered Paul Frank trademarks in the United States. 泉州中澳商贸有限公司 or Quanzhou Zhongao Trading Co Ltd. ("Quanzhou Zhongao") is a sublicensee of Grand Union / CBG. *See* List of Sublicensees, Ex. 114 to Appendix. According to the United States Patent and Trademark Office, Trademark Status and Document Retrieval System, Quanzhou Zhongao registered the words "Paul Frank" as a trademark in January 2022. *See* Exs. 191 and 192 to Appendix. Its current status is "under examination." *Id.* The MLA,

---

[4] The Registrant's name is 红纺文化有限公司, which translates to Hongfang Culture Co., Ltd., another name for Grand Union / CBG. *See* Wan Decl. at ¶ 160.

weintraub tobin chediak coleman grodin LAW CORPORATION

of course, provides no rights whatsoever in the United States and, again, the registration of marks with the Property name is a violation of the MLA. *See* MLA at Section 9(b) and (f), Ex. 1 to Appendix. This is a fourth separate **Material Breach** and grounds to terminate the MLA.

Lastly, Paul Frank has discovered that Grand Union / CBG has also registered other domain names using the Paul Frank intellectual property. Qunyi, a subsidiary of Grand Union / CBG, registered the domain name paulfrankchina.cn on June 20, 2022. *See* Notarized Printouts at p. 21-22, 30, Ex. 26 to Appendix. This is a fifth separate **Material Breach** and grounds to terminate the MLA.

In short, not only has Grand Union / CBG failed to cure Dierui's registration of trademarks of Paul Frank intellectual property, since Paul Frank gave Grand Union / CBG of this Material Breach, Paul Frank has discovered *even more material breaches of the same nature.* Thus, Grand Union / CBG **failed to completely cure** the original **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

**b. Paul Frank Beauty**

The 2021 Notice of Material Breaching states that Grand Union / CBG authorized Dierui to launch PFB彩的 or "Paul Frank Beauty" on e-commerce platforms and social media accounts, despite the fact that Paul Frank had already rejected artwork related to Paul Frank Beauty presented to Paul Frank by Grand Union / CBG for approval. *See* Ex. 17 to Appendix. Further, Dierui registered a trademark for Paul Frank Beauty. *Id.*

The MLA prohibits Grand Union / CBG from "attack the title to or any rights of Licensor in and to the Property" and from using the Property in connection with any trade mark or "corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee or as a URL or social media name or identifier." MLA, Sections 9(b) and (e), Ex. 1 to Appendix. Section 9(f) also provides that Grand Union / CBG may not "join any names, words, symbols, designs… with the Property or Derivative Property so as to form a new or derived trademark." Yet Grand Union / CBG authorized Dierui to open Paul Frank Beauty, use the name in commerce, use the name on social

{00248874.DOCX:} 34
PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

weintraub tobin chediak coleman grodin LAW CORPORATION

media, and register the name as a trademark. The harm to Paul Frank's goodwill and market value existed for more than 120 days. Therefore, this conduct is a **Material Breach** pursuant to Section 13(b)(iii) of the MLA and Paul Frank was entitled to terminate the MLA upon thirty days-notice to Grand Union / CBG.

Grand Union / CBG represented to Paul Frank that it was working with Dierui to cure the breaches of the MLA. Paul Frank only agreed to the terms of the Second Amendment with the understanding that Grand Union / CBG would cure the breaches. *See* Wan Decl. at ¶ 39. However, Dierui has continued selling Paul Frank Beauty products. The website paulfrankbeauty.com remains active to this day, according to the website WhoIs.com. *See* Printout of WhoIs.com, Ex. 22 to Appendix. The Ministry of Industry and Information Technology ("MIIT") (responsible for the regulation and development of the internet in China), shows that Dierui still maintains the website paulfrankbeauty.com. *See* Printout of MIIT.gov.cn, Ex. 23-2 to Appendix. Paul Frank Beauty remains active on WeChat, a Chinese social media platform. *See* Exs. 153-161 to Appendix. Julius, Paul Frank's most recognizable character, is prominently displayed. *See*, *e.g.*, Ex. 159 to Appendix. And Dierui maintains trademarks for at least two logos for Paul Frank Beauty. *See* Exs. 162-163 to Appendix. Thus, Grand Union / CBG did not cure this Material Breach prior to the Cure Date as required by the Second Amendment.

Therefore, Paul Frank gave **notice** in the 2022 Notice of Termination that Grand Union / CBG was in **Material Breach** of the MLA for failing to comply with the cure provisions of the Second Amendment. *See* Ex. 9 to Appendix. Thus, Grand Union / CBG **failed to completely cure** the **Material Breach**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

**c. <u>Big Mouth Monkey Food</u>**

The 2021 Notice of Termination states that Big Mouth Monkey Food, an affiliate of Grand Union / CBG, used the name 大嘴猴 or "Big Mouth Monkey" (which is a common Chinese wording for the Paul Frank brand due to the image of Paul Frank's most famous character, Julius) in the name of its company. *See* Ex. 13 to Appendix. The MLA prohibits Grand Union / CBG from "us[ing] the

weintraub tobin chediak coleman grodin LAW CORPORATION

Property (in whole or in part) or any name, mark or symbol incorporating all or any part of the Property as a corporate or trade name of Licensee's business or any division thereof or of any Affiliate of Licensee." MLA at Section 9(e), Ex. 1 to Appendix. And, again, even if Big Mouth Monkey Food were not an affiliate of Grand Union / CBG, such conduct by a sublicensee of Grand Union / CBG would also be a violation of the MLA. MLA, Sections 1(b)(ii) and (iii), Ex. 1 to Appendix.

The use of Paul Frank intellectual property in Big Mouth Monkey Food's name affects goodwill and market value associated with the Property. The purpose of using the brand name is to intentionally confuse the market and the consumer into believing that counterfeit goods are legitimate. The consumer has no way to differentiate counterfeit goods from legitimate goods, because the counterfeit goods appear to be sold by the brand holder. The brand is then forever associated in the consumer's mind with the counterfeit good. See Wan Decl. at ¶ 11. "Fortunes are spent in publicizing a name, often with only slight reference to the real utility of the product. The theory behind this modern advertising is that once the name or trade-mark of a product is firmly associated in the mind of the buying public with some desired characteristic -- quality, social status, etc. -- the public will buy that product." *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 122 (9th Cir. 1968). The use of another's business name unquestionably causes harm to such business.

Thus, Grand Union / CBG **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

**d. <u>Ctrip hotel rooms</u>**

Grand Union / CBG itself identified "merchandise selling into Ctrip" as a breach of the MLA and represented that it was attempting to cure the breach as part of the Cure Period in the Second Amendment. *See* Email dated July 5, 2022 in Email Chain at Ex. 21 to Appendix, p. 2.

Grand Union / CBG did nothing to cure this breach. Paul Frank has found several Paul Frank-themed hotel rooms listed on Ctrip.com to this day. *See* Printouts from Ctrip.com, Exs. 96-105 to Appendix. The hotel rooms are shown with Paul Frank pillows, bedding, and toys. *See*, *e.g.*, Ex. 99 to Appendix. These hotels appear to have been advertised for some time, but Grand Union / CBG's

weintraub tobin chediak coleman grodin LAW CORPORATION

acknowledgement confirms that the hotel rooms have been advertised since at least July 2022. *See* Email dated July 5, 2022 in Email Chain at Ex. 21 to Appendix, p. 2.

Thus, Grand Union / CBG's failure to cure this breach during the Second Amendment's Cure Period is a **Material Breach** of the MLA which has persisted for more than 120 days. Grand Union / CBG **failed to completely cure** the **Material Breach** and/or or such **cure was futile**, and Paul Frank was entitled to terminate the MLA on the basis of this **Material Breach** alone. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG.

**6. <u>Grand Union / CBG's Refusal to Permit Paul Frank to Conduct an Audit</u>**

The MLA at Section 6(b) states that Paul Frank may conduct periodic audits of Grand Union: "Licensee shall maintain and make available to Licensor, no more than once during any two-year period during the License Term, books and records sufficient for Licensor to verify, at Licensor's expense, the accuracy of information provided in the Quarterly Statements." Ex. 1 to Appendix. The Second Amendment at Section 6(ii) similarly states: "Licensor may request and examine any time, without the limitation set in Section 6(b) of the Agreement, the Licensee's books and records related to the terms and obligations set in this Schedule K. All that in consequence, such books and records shall be examined on written request by Licensor and Licensee shall put such documents at disposal within a period not longer than five (5) business days from Licensor's written request." Ex. 4 to Appendix. Licensors routinely audit licensees in order to ensure that the licensee is complying with the requirements of the license agreement. "One of the most common provisions of a license agreement is a provision giving the licensor the right to verify or otherwise confirm running royalty reports (or other promised performance) of the licensee." 3 Milgrim on Licensing § 18.64 (2023). An audit is a routine request performed regularly in the industry.

Pursuant to the 2022 Notice of Material Breaching, on July 27, 2022, Ms. Mu sent CBG an email stating that the accounting firm Grant Thornton had been appointed to perform the forensic due diligence specified in the Second Amendment. *See* Email dated July 27, 2022 in Email Chain at Ex. 62 to Appendix, p. 2. Grant Thornton reached out to Grand Union / CBG on August 4, 2022 to begin the audit process. *See* Email dated August 4, 2022, Ex. 64 to Appendix. Grant Thornton received no

weintraub tobin chediak coleman grodin
LAW CORPORATION

response. Ms. Mu followed up again on August 2 after receiving no response from CBG (Ex. 62 to Appendix at 1) and again on August 9, 2022 (*id.*). Still, Ms. Mu received no response. On August 18, 2022, Ms. Mu again reiterated the need for an audit: "an audit of the correction of prior breaches are the fundamental rights of our company as the Authorizing Party and also the fundamental obligations of your side as the Authorized Party." Ex. 54 to Appendix. Again, no response.

In the 2022 Notice of Termination, Paul Frank again demanded that Grand Union / CBG comply with the audit provisions of the MLA and the Second Amendment, and reserves the right to assert any further breaches discovered as a result of the audit. *See* Ex. 9 to Appendix. On September 19, 2022, Grant Thornton again reached out to CBG. *See* Ex. 65 to Appendix. Again, there was no response.

On September 16, 2022, Grand Union / CBG finally set forth their position, stating "We have no obligation to get audited by the Licensor." *See* Email dated September 16, 2022 in Email Chain at Ex. 10 to Appendix, p. 1-2. In the Application, Grand Union / CBG similarly states "PF Hong Kong did not provide any basis for this request, and cannot point to any contractual provision which would give it this right. Grand Union never agreed to being investigated in this manner by PF Hong Kong." Again, Grand Union / CBG's position is a deliberate misstatement of the MLA. The MLA and the Second Amendment contain clear audit provisions, and neither requires that Paul Frank provide a "basis" for conducting an audit.

Grand Union / CBG is well aware of this contractual obligation, it simply does not want to be audited. Given the breaches that Paul Frank has already identified, it is highly likely that Paul Frank will discover many, many more during an audit and during this Arbitration. Grand Union / CBG's refusal to conduct an audit is a further violation of the MLA and clear grounds for a claim of breach of contract by Paul Frank.[5]

/ / /

[5] Grand Union also claims that it should be excused from its breach of the MLA for its failure to deliver quarterly statements because there was a COVID-19 lockdown in Shanghai from March to May 2022. *See* Application at p. 14, ¶ 57. However, Grand Union / CBG does not explain why the lockdown prevented it from sending electronic reporting, nor why no reporting was generated once the lockdown was lifted. This is a separate breach of the MLA, as admitted by Grand Union / CBG.

weintraub tobin chediak coleman grodin LAW CORPORATION

**B. Paul Frank Has Discovered Additional Material Breaches of the MLA Which Separately give Paul Frank the Right to Terminate the MLA and Seek Damages**

Since Paul Frank issued the 2022 Notice of Termination and terminated the MLA, it has discovered even more **Material Breaches** of the MLA by Grand Union / CBG such that it has additional grounds to terminate the MLA and pursue damages from Grand Union/ CBG.

**1. Paul Frank Milk Tea**

Perhaps the most damaging breach of the MLA discovered by Paul Frank is Grand Union / CBG's outright defrauding of innocent parties in connection with the Paul Frank Milk Tea franchises. In most of the breaches discussed herein, the harm is largely to the Paul Frank brand and to the consumer who purchased inferior or counterfeit goods. Here, Grand Union / CBG has left actual victims in its wake.

Paul Frank has discovered that Grand Union / CBG entered into an agreement with Nanjing Enjiu Catering Management Co., Ltd. ("Nanjing Enjiu") to open a series of milk tea shops under the name Paul Frank Milk Tea. Nanjing Enjiu entered into hundreds of franchise agreements with individuals who hoped to run Paul Frank Milk Tea shops. A television news program named "Law on the Spot" or "V-laws" (法治现场) by Nanjing TV Station Education and Science Channel (南京电视台教育科技频道) aired a segment entitled "Paul Frank Raked in the Bucks" ("大嘴猴" 如此 "大嘴" 吸金) describing the bait-and-switch carried out by Grand Union / CBG and Nanjing Enjiu in great detail. *See* Video, Ex. 73 to Appendix; *see also* Transcription and Translation, Ex. 74 to Appendix. In the video, the reporters speak to franchisees who were decimated by the actions of Grand Union / CBG and Nanjing Enjiu. The franchisees say that that Nanjing Enjiu told them that it had purchased the Paul Frank Milk Tea rights from Grand Union / CBG at a "high price" and promised to give them a "lot of publicity" for the milk tea shops. *See* Transcription and Translation, Ex. 74 to Appendix, p. 1-2. Nanjing Enjiu said that it would provide them with a model of the catering industry and equipment to operate. *Id.* at 2. About 500 franchisees signed up with Nanjing Enjiu, paying total franchise fees of more than ¥100 million RMB (about $14.5 million USD). *Id.* But when the franchisees started to open the franchises, they did not get the model of the catering industry and the equipment ended up being two to three times the market price. *Id.*

weintraub tobin chediak coleman grodin LAW CORPORATION

After backlash by the franchisees, Grand Union / CBG tried to do damage control. It announced that it was terminating Nanjing Enjiu for poor management and instead the license was transferred to Shanghai Leyouyou Catering Management Co., Ltd. ("Leyouyou"). However, Leyouyou required the franchisees to sign entirely new contracts and pay it an additional franchise fee. As one franchisee stated to the reporters:

> Now, it has completely different content, and franchisees have to pay additional money, pay 60,000 yuan [about $8,650 USD]. The contract is completely different from the one I signed before, and it has to be signed forcibly. Why does it have to be signed forcibly? In case you do not sign, though we signed a lifelong contract previously, that is, we can be a franchisee of Big Mouth Monkey (Paul Frank), all the time. Now, if you do not sign, the contract with Enjiu is valid for 1 year, and will be null and void after 1 year. So, the money that we invested, 270,000 yuan [about $39,000 USD], in a third-tier city will become 0.

*Id.* at 3. The same franchisee later confronted a representative of Grand Union / CBG on camera:

> After paying the money, you did not contact me, and did not contact me to create the large chat group. Then just a few months later, you suddenly came to me, asking for transfer of the contract. The 270,000 yuan [about $39,000 USD] is really not easy to collect. A few tens of thousands of CNY is my saving for many years and more than 200,000 yuan [about $29,000 USD] is borrowed. I tell you, I think I earn less money than you? I think you should not entrap common people in such a way, I tell you.

*Id.* at 4. While this franchisee spoke, the Grand Union / CBG representative was just "playing with his cell phone, and killing time with everyone." *Id.* The video includes images of the franchisees' contracts and interviews with other franchisees as well.

The journalist then looked into the relationship between Nanjing Enjiu and Leyouyou. They found that the majority owner of Nanjing Enjiu is an individual named Feijun (Kevin) Huang. Mr. Huang is also a shareholder of Leyouyou. *Id.* at 4-5. Mr. Huang also gave an interview in 2019 promoting his "innovative" approach to "IP + catering." He said that "In just two months, Paul Frank Tea already has nearly 400 agents covering 23 provinces, four municipalities and five autonomous regions across China, and the hot momentum speaks for itself." Ex. 75 to Appendix. As the journalist speculated, it appears that the transfer from Nanjing Enjiu to Leyouyou was simply a sham in order to squeeze additional franchise fees out of people who had already sacrificed their life savings to open a Paul Frank Milk Tea store. *See* Transcription and Translation, Ex. 74 to Appendix, p. 5-6.

/ / /

weintraub tobin chediak coleman grodin LAW CORPORATION

Paul Frank has also discovered that at least sixty-seven lawsuits have been filed against Nanjing Enjiu and Grand Union / CBG as a result of the Paul Frank Milk Tea debacle. *See* Mu Decl. at ¶ 20. At least twenty-one lawsuits resulted in the courts confirming the franchise contracts and requiring Nanjing Enjiu and/or Grand Union / CBG to return the fees paid by the franchisees and to compensate the franchisees for their litigation fees. *Id.* at ¶ 21. Dozens of other cases are still pending. *Id.* One of the franchisees sent a "whistleblowing letter" to Paul Frank describing the need for the lawsuits. The whistleblower claims that "in the process of obstructing the whistleblowers from defending their legitimate rights and interests, Hongfang,[6] its legal representative Bo Zheng and other senior executives have used their connections with gangs to beat and threaten the whistleblowers with gang tactics. The whistleblowers have reported the case to the local police station (Changfeng Police Station), and since the whistleblowers believe that the actions of Hongfang, its legal representative Bo Zheng and other senior executives have been involving gang-related activities." *See* Ex. 218 and 220 (originals) and Ex. 219 and 221 (translations). The whistleblower detailed an altercation between the franchisees and representatives of Leyouyou and CBG. A Leyouyou employee "threatened to break our legs if the whistleblowers came back to defend their rights again and that a CBG senior executive said "'Let them taste your fists.'" *Id.* The police were called multiple times as a result of the chaos. *Id.* After detailing the run-ins with CBG, the whistleblower stated, "[i]n light of the above facts, whistleblowers believe that Hongfang, its legal representative Bo Zheng and related seniors executives, have been involved in fraudulent and illegal acts such as the use of a vehicle with a fake license plate, and have used violence to threaten and beat the victims after their crimes were revealed. Hongfang, its legal representative Bo Zheng, and other senior executives were organized in a stable manner, with a clear division of labor, and used violence to threaten law enforcement officers, which had the characteristics of a gang." *Id.*

This was all news to Paul Frank, as Paul Frank never approved the opening of any milk tea stores. Grand Union / CBG never applied to Paul Frank for approval, as is required under Section 7(a) of the MLA. *See* Wan Decl. at ¶ 25. Thus, the milk tea stores were counterfeit *and* a scam to

[6] CBG also uses the name Hongfang Culture Co., Ltd. or "Hongfang." *See* Wan Decl. at ¶ 160; *see also* Articles at Ex. 78 and 80 (originals) and Ex. 79 and 81 (translations).

weintraub tobin chediak coleman grodin LAW CORPORATION

defraud licensees.

This is an entirely separate **Material Breach** of the MLA. Grand Union / CBG's conduct in opening the stores was well outside of the scope of rights granted under the agreement, and is also the commission of a fraud against the franchisees. The effect on the goodwill and market value has persisted since 2019, and thus for more than 120 days. The effect on the brand is disastrous. The fact that a journalist began an investigation into the franchises creates serious negative publicity for the brand. The franchisees spoke at length about how they were relying on the brand and were excited to open franchise stores, and how they are now frustrated with the brand and with Grand Union / CBG.

In this instance, any cure attempted by Grand Union / CBG would be entirely futile. No efforts could remove the news articles or the lawsuits, nor the damage already done to the brand. This is a **Material Breach** of the MLA and Paul Frank would be entitled to terminate the MLA on this basis alone, if it were not already terminated, because any attempted **cure would be futile**. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG on these facts.

**2. Sale of Unapproved Products**

Paul Frank has also adduced evidence that Grand Union / CBG, itself or through its sublicensees, has sold enormous amounts of unapproved products into the market. The MLA requires that Grand Union / CBG to "submit to Licensor for Licensor's review and written approval all pre-production concepts, all preliminary and proposed final artwork, and all final version of each stock keeping units ('SKU') of all Licensed Products (including those to be produced by Licensee or by any Sublicensee)." MLA, Section 7(a), Ex. 1 to Appendix. Thus, each and every SKU sold by Grand Union / CBG or it sublicensees must be proposed to Paul Frank and approved in advance of sale. Any unapproved product is necessarily counterfeit and in violation of the MLA.

Below is a selection of unapproved products discovered by Paul Frank, although Paul Frank suspects that there are many more examples which it has not yet discovered or which it has not yet connected to Grand Union / CBG or one of its sublicensees:

- In August 2022, Paul Frank discovered that Grand Union / CBG had created "PAUL

weintraub tobin chediak coleman grodin LAW CORPORATION

FRANK RAW," a clothing and accessories collection already available for sale in stores. *See* Notarized Photographs, Ex. 66 (original) and Ex. 67 (translation) to Appendix. On September 16, 2022, Paul Frank sent a cease and desist letter to Grand Union / CBG demanding that the collection be taken down because Paul Frank never approved any of the "RAW" products and that Grand Union / CBG stop any potential infringement of "G-STAR RAW," a competing brand. *See* Ex. 68 (email) and Ex. 69 (attachment) to Appendix. Grand Union / CBG never responded to this cease and desist letter.

- In September 2022, Paul Frank discovered that Grand Union / CBG had been promoting a marketing campaign / sales event entitled "PAUL FRANK'S ENCORE" despite the fact that Paul Frank had never authorized any "ENCORE" products or any advertising or marketing relating to "ENCORE." Paul Frank sent a cease and desist letter to Grand Union / CBG on September 16, 2022. *See* Ex. 70 (email) and Ex. 71 (attachment) to Appendix. Grand Union / CBG never responded to the cease and desist letter, and posts related to Paul Frank ENCORE are still available on WeChat today. *See* Ex. 72 to Appendix.
- Grand Union / CBG has bragged about releasing unauthorized products. In an interview with China Licensing Expo, Bo Zheng, Chairman of CBG, stated: "we also cooperated with airlines to create the first Big Mouth Monkey [i.e. Paul Frank] airplane in China, which was also the first IP airplane to fly in the sky. Now, there are tens of thousands of SKUs for the licensed products of Big Mouth Monkey, and in the past two years, we also opened the Big Mouth Monkey Happy Burger Restaurant, so that the IP of Big Mouth Monkey can gradually penetrate into all areas of life step by step." Ex. 78 (original) and Ex. 79 (translation) to Appendix. Grand Union / CBG promoted the Paul Frank airplane through a video (Ex. 77 to Appendix) and an interview with Bo Zheng and Tao Zheng of CBG (Ex. 80 (original) and Ex. 81 (translation) to Appendix).
- Paul Frank has discovered Paul Frank themed credit cards currently available for sale

weintraub tobin chediak coleman grodin LAW CORPORATION

through China Everbright Bank and "Guangzhou Zezhan Marketing Co Ltd (广州泽展市场营销有限公司) ("ZMarketing"). *See* Ex. 82 (original) and Ex. 83 (translation) to Appendix; *see also* Ex. 84 (original) and Ex. 85 (translation) to Appendix. China Everbright Bank has advertised the card as "co-branded" and promised that customers who sign up for the card will receive a Paul Frank branded thermal cup and handbag. *See* Ex. 86 (original) and Ex. 87 (translation) to Appendix.

- Paul Frank has discovered that CBG signed an agreement with Shanghai Lucheng International Travel Service Co Ltd (上海路骋国际旅行社股份有限公司) ("Lucheng") to create a theme park called "Lucheng IP Town." *See* Ex. 88 (original) and Ex. 89 (translation) to Appendix. CBG also signed an agreement with Lucheng to allow CBG to invest in Lucheng's subsidiary Shanghai Lucheng Culture Communication Co Ltd (上海路骋文化传播有限公司) (currently known as Shanghai Yishu Culture Co Ltd (上海壹枢文化有限公司)) ("Lucheng Culture"). *See* Ex. 90 (original) and Ex. 91 (translation) to Appendix.

- Paul Frank themed mineral oil products are currently available on the Yunji app, an e-commerce platform in China. *See* Exs. 106, 108, and 109 (originals) and Ex. 107 (translation of Ex. 106) to Appendix. The products are advertised by Shanghai Goldpartner Biotech Co Ltd (上海黄金搭档生物科技有限公司), which is a sublicensee of Grand Union / CBG. *See* List of Sublicensees, Ex. 114 to Appendix.

- Paul Frank themed mooncakes are currently available for sale and co-branded with Hersey's. *See* Articles at Ex. 111 (original), Ex. 112 (translation), Ex. 115 (original), Ex. 116 (translation), Exs. 117-118 (images) to Appendix.

- Paul Frank themed beauty products are currently available for sale online through the website Tmall (formerly called Taobao Mall). Paul Frank has purchased products from Tmall, including a Paul Frank branded Body Lotion. *See* Notarized Photographs at Ex. 175 to Appendix; *see also* Photos at Exs. 176-182 to Appendix.

- Paul Frank themed eye masks are also available for sale on Tmall. *See* Ex. 199 to Appendix.

weintraub tobin chediak coleman grodin
LAW CORPORATION

- In January 2021, Grand Union / CBG, together with Shanghai Public Transportation Card Co Ltd (上海公共交通卡股份有限公司) ("SPTCC"), issued several Paul Frank-themed virtual covers for Shanghai Public Transportation Card on the namesake application launched by SPTCC. *See* Ex. 206 to Appendix.
- Grand Union / CBG and Shanghai Linx Royal Members' Club (Linx 皇室会员俱乐部), a famous bar in Shanghai, held a Paul Frank-themed electronic music and released co-branded limited-edition t-shirts. *See* Exs. 200 and 207 to Appendix.
- In 2019, CBG and Songyang Art & Rui IP Art Museum (宋洋美术/睿艺美术馆) ("SYART") held an event entitled "2019 Art Crossover" between Paul Frank and "Bad Girl," another cartoon character. *See* Exs. 209-210 to Appendix.
- CBG announced the release of a partnership with Giant Interactive Group Inc (上海巨人网络科技有限公司), the developer of the game Battle of Balls, including Paul Frank branded t-shirts. *See* Exs. 211 and 201 to Appendix.
- Paul Frank has discovered Paul Frank-themed hospital rooms at the Nanning Century Modern Gynecology Hospital (南京世纪现代妇产医院). *See* Exs. 214 and 215. The rooms contain images of Paul Frank on the walls and Paul Frank bedding and toys, and a person dressed as Julius attended some events for the hospital. *Id.*
- In 2020 and 2021, CBG released Paul Frank-themed covers of digital red packets for lunar new year on WeChat. The covers contain the Paul Frank character "Julius." *See* Exs. 212 and 213 to Appendix.

Grand Union / CBG did not seek approval of, and Paul Frank therefore did not approve, any of these products or services. *See* Wan Decl. at ¶ 25.

This is just the tip of the iceberg. The more Paul Frank digs, the more it discovers. It is clear that Grand Union / CBG saw the MLA as an unfettered right to release any Paul Frank product or service it liked, without any discussion or approval by the actual rights holder. Grand Union / CBG never sought product approval from Paul Frank, it merely did as it pleased in the hopes that Paul Frank would never find out.

Each of these unauthorized products is a counterfeit good or service, which necessarily affects

weintraub tobin chediak coleman grodin
LAW CORPORATION

the goodwill and market value of Paul Frank. Each sale is a **Material Breach** of the MLA and Paul Frank would be entitled to terminate the MLA on this basis alone, if it were not already terminated, because any attempted **cure would be futile**. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG on these facts.

**3. Grand Union / CBG Has Filed Thousands of Anti-Counterfeiting Lawsuits in violation of the MLA**

The MLA gives Grand Union / CBG the right to undertake certain anti-counterfeiting actions, including the filing of lawsuits against infringers. *See* MLA at Section 9(c), Ex. 1 to Appendix. However, the MLA also requires that Grand Union / CBG provide a quarterly notice to Paul Frank of all anti-counterfeiting activity and "promptly notify" Paul Frank in writing of any "significant manufacture, distribution, sale or advertisement for sale of any product of the same general type or class as the Licensed Products that Licensee believes may constitute an infringement upon Licensor's rights or an unauthorized use of the Property." *Id.* Paul Frank has the right "in its sole discretion, and at its cost, commence, prosecute or institute any suit, action or proceeding with respect to claims for infringement or imitation of the Property or instead Licensor may request that Licensee take such action at Licensee's cost, using legal counsel reasonably acceptable to Licensor." *Id.* Further, "[t]he damage awards and other compensation resulting from such actions shall be subject to the parties' further agreements." *Id.* In other words, the existence of any anti-counterfeiting lawsuit must be reported to Paul Frank, Paul Frank must be given the option to conduct the litigation on its own behalf, and the proceeds of any such action should be discussed between the parties.

Grand Union / CBG completely ignored this provision. Not only did it fail to provide quarterly reports to Paul Frank, it actively obstructed Paul Frank's efforts to shut down infringing stores. *See*, *e.g.*, Ex. 119 to Appendix (CBG's employee claiming that CBG could not cooperate because of the COVID-19 lockdown in Shanghai even after the lockdown was lifted.). Once, when pressed, Grand Union / CBG reported to Paul Frank a list of "outstanding cases of Paul Frank brand rights protection and counterfeiting." *See* Ex. 27 (original) and Ex. 28 (translation) to Appendix. The attachment provided by Grand Union / CBG identified over 10,000 infringement lawsuits filed by

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Grand Union / CBG. *See* List of Infringement Cases, Ex. 31 to Appendix.

Paul Frank itself searched for infringement cases filed by Grand Union / CBG using the database China Judgments Online. Paul Frank found 15,470 litigation records for Grand Union / CBG. *See* Mu Decl. at ¶ 22. Attached as Ex. 183 to the Appendix is a list of 1,000 cases filed by Grand Union (only 1,000 were selected due to size). It appears that many of these cases have proceeded to judgment, yet Grand Union / CBG has never attempted to discuss the splitting of the proceeds of such actions with Paul Frank. *See* Mu Decl. at ¶ 22. Grand Union / CBG claims in its Application that "the parties would generally reach an agreement on how to deal with the damage awards and other compensation resulting from any anti-counterfeiting actions." Application at p. 15, ¶ 59. Yet Grand Union does not attach any correspondence evidencing any agreement between it and Paul Frank. That is because it never occurred. Grand Union has never paid any proceeds of any infringement case to Paul Frank. *See* Mu Decl. at ¶ 22. Apparently, Grand Union / CBG is filing thousands of lawsuits and holding all of the proceeds for themselves.

This campaign of infringement lawsuits by Grand Union / CBG has resulted in substantial negative publicity to Paul Frank. A news report entitled "The 'Big Mouth Monkey' bites people. Dozens of supermarkets are crying out about injustice" states that 50 local supermarkets in Ningxiang City, Hunan Province received court summonses showing that Grand Union / CBG sued them for selling products that contain Paul Frank images and asked for compensation ranging from ¥20,000 RMB [about $2,800 USD] to ¥80,000 RMB [about $11,500 USD], with a total amount of around ¥1 million RMB [about $144,000 USD]. *See* Ex. 120 (original) and Ex. 121 (translation) to Appendix. In another article entitled "Team of professional extortioners for fighting fraud is aiming at urban and rural small supermarkets, for making a profit or defending rights?" speculates that the anti-counterfeiting lawsuits are really about generating revenue, not to protect intellectual property. *See* Ex. 122 (original) and Ex. 123 (translation) to Appendix.

By conducting such aggressive anti-counterfeiting actions for revenue generation purposes, Grand Union / CBG has created a substantial harm to the Paul Frank brand. It has already caused public outcry which is impossible to cure. This is a **Material Breach** of the MLA and Paul Frank would be entitled to terminate the MLA on this basis alone, if it were not already terminated, because

{00248874.DOCX:} 47

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

**weintraub tobin** chediak coleman grodin LAW CORPORATION

any attempted **cure would be futile**. Paul Frank has clearly established a likelihood of succeeding on its claims of breach of contract, violation of the Lanham Act, and unjust enrichment by Grand Union / CBG on these facts.

### C. Grand Union / CBG's Claims Regarding Letters of Authorization are Entirely Meritless

Grand Union / CBG argues that Paul Frank failed to perform under the MLA by failing to provide letters of authorization ("LOAs") and other authorization documents for sublicensees. This claim is entirely baseless. Grand Union / CBG vaguely claims that Paul Frank delayed in providing LOAs but never actually attaches proof of a request for a LOA or a single refusal by Paul Frank. In fact, Grand Union / CBG even admits that in mid-2021, it received "batch of 90 Trademark Certificates." Witness Statement of Jennifer Huang at p. 5-6, ¶ 28. It is not clear which documents were supposedly refused or delayed, or whether such refusals or delays were entirely the fault of Grand Union / CBG.

More interestingly, Grand Union / CBG does not actually explain precisely why it needs the documents it claims were withheld. For example, in February 2021, Grand Union / CBG asked Paul Frank for a power of attorney ("POA") so that Grand Union / CBG could "push forward our current and following contentious and non-contentions matters of 'Paul Frank' brand." Email dated February 3, 2021 in Email Chain at Ex. 147 to Appendix, p. 1-2. In other words, Grand Union / CBG wanted a broad POA to use in connection with the anti-counterfeiting lawsuits it had filed (which Paul Frank would later learn number in the thousands). Paul Frank responded the next day, stating "[w]e greatly appreciate all the effort from CBG for brand protection of PAUL FRANK in China. As Stan have mentioned, to give our licensees better support, Futurity Brands will take a much stronger position in fighting infringement worldwide. So, we will implement IP protection measures by ourselves. In the case we need any assistant from your side, PoA will be given on a case-by-case basis." *Id.* at p. 1.

Normally, a licensee would appreciate such a response from a licensor. However, given what Paul Frank now knows about the vast number of anti-counterfeiting actions filed by Grand Union (*see* Section II(B)(iii), *supra*), it appears that Grand Union / CBG did not want Paul Frank to handle any infringement actions on its own. Grand Union / CBG wanted to continue to pursue the revenue

weintraub tobin chediak coleman grodin LAW CORPORATION

stream of anti-counterfeiting lawsuits and Paul Frank's refusal to provide unlimited authorization letters threatened Grand Union / CBG's scheme.

Grand Union / CBG cannot establish a single wrongful act by Paul Frank. In comparison, Paul Frank has established dozens of material breaches of the MLA by Grand Union / CBG. Grand Union / CBG simply cannot meet its burden to show that it will prevail in this Arbitration and is therefore entitled to an injunction.

## IV. GRAND UNION / CBG CANNOT CLEARLY ESTABLISH A RIGHT TO AN INJUNCTION OR IRREPARABLE HARM

As discussed above, Grand Union / CBG is has not met its high burden to "clearly establish" that it is entitled to a mandatory preliminary injunction because it is likely to succeed on the merits of its claims in this Arbitration. The Application is not clear as to whether Grand Union / CBG is arguing that it is likely to succeed on the merits of its affirmative claims or defenses in this action. Regardless, it has been unable to establish a single breach by Paul Frank, and cannot defend any of the breaches alleged by Paul Frank. *See* Section III, *supra*.

Grand Union / CBG is also unable to establish that it will suffer greater irreparable harm if the injunction is not granted as compared to the harm that will occur to Paul Frank if the injunction is granted.

Grand Union / CBG asserts that it would suffer three types of harm. First, Grand Union claims that it "would face the daunting task of trying to rebuild a massive network of sublicensees created across mainland China over a seven-year period." Application at p. 29, ¶114. This argument is entirely baseless, as there is nothing preventing Grand Union / CBG from continuing to do business with its sublicensees, so long as Grand Union / CBG refrains from using the Property. Grand Union / CBG also maintains licenses for at least nine other major intellectual property brands, including but not limited to *The Simpsons*, *Sesame Street*, and the video game *Assassin's Creed*. *See* Printout of CBG Website, Ex. 146 to Appendix at 3. Grand Union / CBG is free to continue working with any sublicensee it chooses and enter into agreements for any of its other brands. There is absolutely no reason that Grand Union / CBG's network of sublicensees need wither on the vine while it has many

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

other properties to exploit.

Second, Grand Union / CBG claims that it "would also suffer economic damage that would be extremely difficult to quantify." Apart from the total lack of evidence of any actual economic harm, economic damages are necessarily not "irreparable harm." Where damages are an adequate remedy for the moving party, injunctions are usually denied. *See Civil Procedure Before Trial, supra,* at § 9:508. A vague claim to unquantifiable yet "economic" damages is certainly not sufficient to obtain a preliminary injunction.

Third, Grand Union / CBG claims that it will suffer reputational harm because it has been unable to provide authorization letters to its sublicensees, which has "frustrated the Sublicensees and undoubtedly caused the Sublicensees to question their business arrangements with PF Hong Kong" and that Paul Frank has "directly contacted the Sublicensees and baselessly criticized Grand Union." Application at p. 29, ¶ 115.

This is entirely meritless. Paul Frank has gone above and beyond to assist the former sublicensees of Grand Union / CBG in the transition to the post-MLA market. Paul Frank reached out to each sublicensee disclosed by Grand Union to inform them of the termination and the fact that the rights had reverted to Paul Frank (which they did once Paul Frank terminated the MLA). *See* Wan Decl. at ¶ 19. Paul Frank has made it clear to each and every sublicensee that Paul Frank would work with them to put new arrangements into place so that they could continue selling Licensed Products. Paul Frank has even agreed not to seek any further license fees or minimum guarantees from these parties, even though Paul Frank would be well within its rights to do so given that all sublicense agreements terminated when Paul Frank terminated the MLA. *See id*; *see also* MLA at Section 1(b)(ii), Ex. 1 to Appendix. Paul Frank has also informed the sublicensees that it will happily issue letters of authorization to any party who wishes to continue selling Paul Frank products, so long as they do so through Paul Frank, not Grand Union / CBG. *See* Wan Decl. at ¶ 19. Paul Frank has made enormous efforts to protect the former sublicensees affected by the termination of the MLA.

The harm alleged by Grand Union / CBG is entirely speculative and insufficient to obtain a mandatory injunction. "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with courts' characterization of injunctive relief as an extraordinary remedy that

may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008), citing *Mazurek v. Armstrong*, 520 U.S. 968, 872 (1997) (emphasis added); *see also Korean Philadelphia Presbyterian Church v. California Presbytery* 77 Cal. App. 4th 1069 (2000), 1084 (injunction "must be supported by actual evidence"). Vague speculation and implication are not enough.

In comparison, the damage to Paul Frank if the MLA were revived is immense and clearly demonstrated. Grand Union / CBG claims that Paul Frank is "indifferent, so long as its licensee fee is paid in full." Application at p. 30, ¶ 116. Nothing could be further from the truth. Paul Frank's utmost concern at all times is the protection of its intellectual property, which Grand Union / CBG has put at risk.

Since the MLA was terminated, Paul Frank has been managing its new licensees (some of which, but not all, are former Grand Union / CBG licensees) directly. *See* Wan Decl. at ¶ 18. Dozens of licensees have established new relationships with Paul Frank. Despite the fact that all of the sublicenses terminated when the MLA was terminated, Paul Frank has chosen to honor the terms of any sublicense made with Grand Union / CBG if the sublicensee agreed to do business directly with Paul Frank. *Id.*

Paul Frank has spent more than seven months setting up a direct licensing business in China. *Id*. at ¶ 20. Paul Frank has established a new product approval process and has approved many new products sold by the new licensees. It has also established a new process for the approval of advertising and marketing of Licensed Products and has worked closely with the new licensees to promote their products. *Id.* If the MLA were to be restored, all of the products already approved by Paul Frank and the advertising and marketing already approved by Paul Frank would be moot, and all of the licensees would again have to change course and begin doing business with Grand Union / CBG. Paul Frank would have to sever the relationships that it has worked so hard to create over the last seven months. *Id.*

Paul Frank has also sent out hundreds of letters of authorization for licensees since the MLA was terminated. *Id*. at ¶ 21. Paul Frank's licensees are already selling Licensed Products in many e-commerce stores under the new authorization letters. If the MLA were to be restored, all of those

weintraub tobin chediak coleman grodin LAW CORPORATION

letters of authorization would be invalid and the licensees would be unable to sell their product. *Id.*

Paul Frank has also been forced to expend substantial time and resources repairing the damage caused by Grand Union. *Id*. at ¶ 22. Paul Frank branded product is currently available for sale online at extremely low cost. In particular, the cost of the products available online has plummeted in recent months (i.e. after the termination went into effect). For example, a former sublicensee of Grand Union / CBG is still selling Paul Frank apparel, but at an incredibly low cost. Paul Frank has found products for sale by this former sublicensees for less than $.10 USD per unit. *Id.*

In short, Paul Frank has become a cheap product that you can get anywhere. It has lost much of the glamour associated with the brand and Paul Frank has been forced to expend substantial resources in marketing the brand to repair its image and correct the market perception of the property. *Id*. at ¶ 23. One of the ways that Paul Frank had intended to repair the brand's image was through the A.NI.MA. property, which is focused on streetwear and pop culture. *Id*. at ¶ 24. The Second Amendment was intended to allow Grand Union / CBG to expand into this category to reinvigorate the brand. Grand Union / CBG never took advantage of the A.NI.MA. property, but Paul Frank is doing so now. Paul Frank has entered into new license agreements for this property and is preparing a large marketing push. Paul Frank and its new licensees are focused on a more modern, youthful aesthetic. If Grand Union / CBG is allowed to once again control the market, the brand's reputation will revert to the cheap, easily available, low-end products and will unquestionably suffer. *Id.*

If the MLA were restored, Grand Union / CBG would have full rights and authority to the Paul Frank brand within China. It would continue to engage in all the conduct set forth herein, including the forging of documents, sales outside the Territory and Channels of Distribution, attacking Paul Frank's intellectual property by registering trademarks, copyrights, and domain names, selling unapproved products, engaging in fraudulent anti-counterfeiting activities, and causing even more public outcry against its unfair business practices.

The only party that is suffering harm is Paul Frank. "In a licensor/licensee case, the reasons for issuing a preliminary injunction for trademark infringement are even more compelling than in the ordinary case." *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 42 (2d Cir. 1986). "The licensor need not prove that the unauthorized licensee is damaging the

licensor's reputation, but need only show that it has lost control over its reputation, which 'is the very thing that constitutes irreparable harm in the licensing context.' *Id.* at 44; *see also* Rudolf Callmann, *Law of Unfair Competition, Trademarks & Monopolies* § 22.37 (4th ed. 1995) ("It can hardly be overemphasized that the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are presently of high quality, the plaintiff can properly insist that his reputation should not be in the hands of another."). "Once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm." *Hollywood Athletic Club Licensing Corp. v. Ghac-Citywalk*, 938 F. Supp. 612, 615 (C.D. Cal. 1996) citing *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n.3 (9th Cir. 1989); *see also Paisa, Inc. v. N & G Auto, Inc.,* 928 F. Supp. 1009, 1012 (C.D. Cal. 1996) (finding irreparable harm where defendant continued unauthorized use of franchisor's trademarks after franchisor terminated franchise for failure to pay royalty and advertising fees); *Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir. 1975) (finding that use of trademarks after the termination of a licensing arrangement resulted in irreparable harm to the trademark owner). Paul Frank has clearly demonstrated the harm that Grand Union / CBG has caused and will continue to cause if it is permitted to continue operating under the MLA. Paul Frank has more than met its burden under the preliminary injunction standard.

The harm to Paul Frank if Grand Union / CBG's requested injunction is granted far outweighs the harm to Grand Union / CBG. Because Grand Union / CBG cannot clearly establish its right to a preliminary injunction and cannot establish irreparable harm, Paul Frank respectfully request that the Arbitrator deny Grand Union / CBG's Application.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{00248874.DOCX:}

53

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

**V. PAUL FRANK IS ENTITLED TO A PRELIMINARY INJUNCTION PROHIBITING GRAND UNION / CBG FROM INTERFERING WITH THIS ARBITRATION AND PROSECUTING BASELESS LEGAL ACTIONS**

**A. The Arbitrator Should Order Grand Union / CBG to Dismiss the Chinese Action Filed by Grand Union / CBG to Interfere with the Jurisdiction of This Arbitration**

As set forth above, preliminary injunctions which compel parties to act are difficult to obtain and require a high showing by the moving party. Here, Paul Frank clearly meets this high burden. Paul Frank can "clearly establish" its rights to an injunction because the conduct by Grand Union / CBG is so egregious and inappropriate. Since Paul Frank initiated this Arbitration in November 2022, Grand Union / CBG has undertaken a campaign to interfere with Paul Frank's termination of the MLA and this arbitration.

In January 2023, Paul Frank attempted to update some contact information for one of its trademarks in China. *See* Mu Decl. at ¶ 23. It was informed by the trademark office that it could not do so because the trademark was blocked. Paul Frank investigated to determine why the trademarked was blocked, and discovered that CBG had filed a lawsuit against it in Chinese court. *Id.*

In fact, CBG – Grand Union's alter ego as set forth in the Motion for Leave to Amend – had filed a lawsuit in China against *Grand Union itself* and against Paul Frank. CBG and its affiliate "Shanghai Hong Fang Culture Co., Ltd. ("Hong Fang")[7] filed a lawsuit in the Intermediate People's Court of Tsingdao City of Shandong Province. *See* Civil Statement of Claim, Ex. 124 (original) and Ex. 125 (translation) to Appendix. CBG and Hong Fang ask the Court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…" and ordering that "Defendants make a public statement extending a formal apology to the Plaintiffs." *Id.* at 1.

Just for clarity, CBG and Hong Fang are asking the Chinese court to compel *Grand Union* to

[7] *See* Civil Statement of Claim at 2, Ex. 125 to Appendix, describing Hong Fang as a "branch of CBG."

weintraub tobin chediak coleman grodin LAW CORPORATION

stop its infringing acts and that *Grand Union* make a public formal apology. CBG claims that it was "granted an exclusive sub-license" to Paul Frank (presumably from Grand Union, although CBG does not specify the grantor) and that CBG has "devoted a great amount of financial, material and human resources to the development of the brand and have developed a great number of sub-licensees to promote the operation of the brand…." *Id.* at 2. CBG accuses Paul Frank of demanding that TikTok remove all Paul Frank-branded stores, contacting CBG's sublicensees and "inducing them to conspire with the Defendants in making a false allegation of illegal business conduct against the Plaintiffs," and sending letters to CBG's sublicensees stating that CBG no longer had a sublicense for Paul Frank products. *Id.* at 2-3.

At first glance, CBG's decision to name Grand Union appears bizarre. In hindsight, it was a deliberate and strategic move. In an impressive feat of mental gymnastics, CBG states: "With regard to the Defendants' infringing acts mentioned above, the Plaintiffs once contacted Grand Union, requesting it to address the dispute between the parties. But Grand Union failed to properly deal with those infringing acts." *Id.* at 3. To reiterate, CBG is alleging that it asked Grand Union – its alter ego which has no employees, no offices, and serves as a mere holding company for intellectual property – to act and that Grand Union failed to act to protect CBG's interests.

In what would be a shocking move for any other litigant, Grand Union and CBG then filed an "Agreement on Jurisdiction" with the Chinese court in an attempt to remove jurisdiction from California. *See* Ex. 184 (original) and Ex. 185 (translation) to Appendix. This Agreement on Jurisdiction is between Grand Union as "Party A" and CBG as "Party B." *Id.* It states:

> Whereas Party B has repeatedly claims to Party A for the acts by Paul Frank Limited, the proprietor of [Paul Frank] trademark, which affects Party B's ordinary business related to [Paul Frank] brand. Party B claims that Party A and Paul Frank Limited have constituted joint infringement to Party B, therefore requesting Party A to bear the infringement liability to Party B. Party A considers that the aforesaid joint infringement is not established. Party A is not obliged to bear the compensation liability to Party B.
>
> In order to protect the legal interests of both Parties, **the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either Party A or Party B can file lawsuits to the court with jurisdiction at Party B China Brands Group domiciliate**.

Ex. 184 (original) and Ex. 185 (translation) to Appendix (emphasis added).

weintraub tobin chediak coleman grodin LAW CORPORATION

In short, CBG sued its own alter ego Grand Union and then CBG and Grand Union, acting as if they were parties on the opposite ends of the lawsuit, "agreed" that any dispute with Paul Frank could be brought in CBG's local courthouse in order to deceive the Chinese court into retaining jurisdiction over the case.

Paul Frank has of course contested the jurisdiction of the Chinese court. Yet Grand Union / CBG persists in seeking to retain jurisdiction in China. On March 15, 2023, just days after the Preliminary Hearing in this matter in which Grand Union / CBG agreed to jurisdiction in this Arbitration, Bo Zheng testified before the Chinese court in order to support CBG's claims of jurisdiction. *See* Investigation Transcript, Ex. 186 (original) and Ex. 187 (translation) to Appendix. He testified that he is the "sole Director" in Grand Union" and the "legal representative" of CBG. As set forth more fully in Paul Franks' Motion for Leave to Amend, there is no question that CBG is the alter ego of Grand Union and that the acts of one are the acts of the other. Mr. Zheng's testimony makes this crystal clear.

This is a plain attempt to circumvent the dispute resolution provisions in the First Amendment, which clearly states that any dispute which "arises out of or relates to this Agreement" shall be resolved by JAMS in Los Angles, California and "in accordance with the laws of the State of California for agreements made in and to be performed in that state." First Amendment, Section 28, Ex. 3 to Appendix. Of course, Grand Union / CBG made no mention of this lawsuit when it filed its Counterclaim, which quotes the First Amendment and states, "this dispute is subject to JAMS arbitration in Los Angeles, and the MLA is governed by California law." Counterclaim at p. 5, ¶ 15. Yet secretly it was scheming to have this dispute heard in a friendly court in China.

This completely baseless and inappropriate lawsuit has already resulted in severe harm to Paul Frank. Shortly after the bogus claim was filed, CBG filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard. *See* Civil Ruling, Ex. 126 (original) and Ex. 127 (translation) to Appendix at 1; *see also* Mu Decl. at ¶ 24. The Civil Ruling blocked 400 trademarks and 7 copyrights registered to Paul Frank. *Id.* at 2-3. While the trademarks and copyrights are blocked, Paul Frank is "prohibited

**weintraub tobin** chediak coleman grodin LAW CORPORATION

from assigning, deregistering, changing the registration… over any such registered trademarks or copyright or from assigning any of such pending trademarks." *Id.* at 3. Paul Frank's intellectual property is severely compromised by this ruling.

In addition, if the Court agrees with CBG, it could issue a major damages finding against Paul Frank, including potential punitive damages, which may conflict with the ruling of the Arbitrator in this case. *See* Mu Decl. at ¶ 25. Such a finding could even lead to the loss of the trademarks themselves.

Paul Frank therefore respectfully requests that the Arbitrator issue an order compelling Grand Union / CBG to dismiss the action pending in China, including its Petition for Property Preservation, and to instead address all issues related to the MLA in this forum.

In comparison, the harm to Grand Union / CBG as a result of such an order will be nonexistent. Grand Union / CBG can (and has) brought a claim in this action seeking redress of its perceived wrongs. It still maintains that right. It still has a venue for airing all of its allegations and for vindication of its rights, should it actually establish any valid claims. Grand Union / CBG will still have a forum for addressing its disputes, it will just be this Arbitration instead of a friendly Chinese court.

Therefore, the Arbitrator should act to protect the jurisdiction of this Arbitration and prohibit CBG from further interfering in the orderly process of this proceeding.

**B. <u>The Arbitration Should Order Grand Union / CBG to Cease and Desist the Submission of Criminal Complaints against Paul Frank and its Related Parties</u>**

Sadly, this is not the only legal action Grand Union / CBG has undertaken to obstruct this Arbitration. Grand Union / CBG has filed a criminal complaint for fraud and defamation against Paul Frank, Futurity, Ms. Mu, Mr. Wan, and Tony Chu, an employee of Paul Frank. The basis for the criminal complaint was the Second Amendment and the termination of the MLA. *See* Mu Decl. at ¶ 26. Mr. Chu learned about the criminal complaint when he was contacted by an investigator from the local police department. *Id.* Paul Frank and Futurity have been forced to retain counsel for all of the parties at significant expense and Ms. Mu and others have been forced to spend significant amounts of time defending against this criminal complaint. *Id.* If charged, the individuals involved

weintraub tobin chediak coleman grodin LAW CORPORATION

face serious reputational harm and, if convicted, a large fine or jail time. *Id.* Ms. Mu has already been forced to step down as local counsel for Paul Frank and eventually stopped practicing as a Chinese attorney in order to avoid any potential negative impact on the Law Firm she worked for, and other clients she represented. *Id.*

It appears that the criminal complaint has been dropped for lack of evidence. *Id.* at ¶ 28. However, Grand Union / CBG continue to pursuing it by filling appeals and through different police departments. These proceedings and investigations are therefore still ongoing. *Id.* The financial and emotional toll of the criminal charge is also still proceeding.

Thus, Paul Frank respectfully requests that the Arbitrator enter an order prohibiting Grand Union / CBG from submitting any criminal, civil, or other complaints against Paul Frank, its affiliates, or their employees.

Because this is a prohibitory injunction (i.e. compelling Grand Union / CBG to refrain from acting rather than compelling them to act), the lower standard applies. All Paul Frank must demonstrate is a likelihood of prevailing on the merits and the relative interim harm to the parties from the issuance or nonissuance of an injunction.

Here, Paul Frank has unquestionably demonstrated its likelihood of succeeding on the merits in this action. However, the potential harm to Ms. Mu and others contemplated here is extreme, outweighing any question of the likelihood of success of the merits.

This is a contract dispute. Parties may reasonably disagree as to the performance of contractual obligations and file lawsuits in the proper venue to pursue their rights. They may not file criminal charges against the individuals involved in an attempt to force the other side to drop their claims. The risk to Paul Franks' employees of criminal actions against them is extreme, including time, expense, and potential criminal penalties. Paul Frank is concerned for its employees and their families if Grand Union / CBG continues this campaign of harassment and intimidation.

On the other hand, the harm to Grand Union / CBG in refraining from filing complaints outside of this Arbitration is nonexistent. As stated above, Grand Union / CBG can and has assert whatever claims it likes in the Arbitration. This is the proper forum for this contract dispute; not a criminal court and certainly not a criminal case against an individual employee. Grand Union / CBG

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{00248874.DOCX:}
58

PAUL FRANK LIMITED'S COMBINED OPPOSITION TO RESPONDENT'S APPLICATION FOR INTERIM RELIEF AND AFFIRMATIVE MOTION FOR PRELIMINARY INJUNCTION

will suffer no harm whatsoever in refraining from seeking redress outside of this action.

### C. The Arbitration Should Order Grand Union / CBG to Cease and Desist the Signing of New Sublicense Agreements

Paul Frank has recently received approximately fifty inquiries from TikTok and other platforms asking Paul Frank to verify the authenticity of various letters of authorization. *See* Wan Decl. at ¶ 208. Paul Frank believes that Grand Union / CBG must be entering into new license agreements and that the new sublicensees are attempting to sell goods through TikTok and other channels. *Id.* Paul Frank is currently investigating this issue, but certainly did not approve any products for any of these sublicensees, as the MLA has been terminated since September. Thus, any sales by any of these sublicensees are necessarily counterfeit goods. *Id.*

Paul Frank therefore respectfully requests that the Arbitrator issue an order prohibiting Grand Union / CBG from entering into any new license agreements and approving any new product sales by any purported sublicensee during the pendency of this Arbitration.

Irreparable harm is clearly established where a party has demonstrated trademark infringement, or harm to its reputation in the context of a license. *See Hollywood Athletic Club Licensing Corp. v. Ghac-Citywalk*, 938 F. Supp. 612, 615 (C.D. Cal. 1996). That is exactly what will occur if Grand Union / CBG continues to sign up new licensees. Here, Grand Union / CBG is conspiring to enter into new agreements and sign up new unsuspecting sublicensees who likely have no idea that their goods are unapproved and counterfeit. Grand Union / CBG is causing the manufacture and sale of counterfeit goods against the express wishes of the trademark holder, Paul Frank.

The potential harm to Grand Union / CBG from this injunction is irrelevant. Grand Union / CBG cannot lawfully act without the approval of its licensor Paul Frank. Every new sublicensees is invalid and every new product sold is a counterfeit good. Thus each sublicense and each good sold is direct harm to Paul Frank's trademarks and reputation, which constitutes irreparable harm to Paul Frank. The acts that Grand Union / CBG would be required to refrain from are the very acts that would cause the irreparable harm to Paul Frank.

Therefore, the Arbitrator should enter an order prohibiting Grand Union / CBG from further

weintraub tobin chediak coleman grodin
LAW CORPORATION

harming Paul Frank by signing invalid license agreements and selling unlicensed products.

## VI. CONCLUSION

For the reasons set forth herein, Paul Frank respectfully requests that the Arbitrator reject Grand Union / CBG's Application and deny the mandatory preliminary injunction it seeks. Paul Frank further respectfully requests that the Arbitrator issue an Order (1) compelling Grand Union / CBG to dismiss the action pending in China, including its Petition for Property Preservation; (2) prohibiting Grand Union / CBG from submitting any criminal, civil, or other complaints against Paul Frank, its affiliates, or their employees; and (3) prohibiting Grand Union from signing any new sublicense agreements or selling any Licensed Products, through itself or any sublicensee, during the pendency of this Arbitration.

DATED: April 27, 2023

JESSICA R. CORPUZ
KATIE A. COLLINS
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

# EXHIBIT 22

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

| | |
|---|---|
| PAUL FRANK LIMITED,<br>Claimant,<br>v.<br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br>Respondent.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br>Counter-Claimant,<br>v.<br>PAUL FRANK LIMITED,<br>Counter-Respondent. | JAMS Ref. No. 5220002118<br><br>**DECLARATION OF STANLEY YOOK-LOONG WAN**<br><br>Hearing Date: June 1, 2023 |

weintraub tobin chediak coleman grodin
LAW CORPORATION

**DECLARATION OF STANLEY YOOK-LOONG WAN**

I, Stanley Yook-Loong Wan, declare and state as follows:

1. I am the Director of Paul Frank Limited, Claimant and Counter-Respondent in the above-captioned case ("Paul Frank") and the Chief Executive Officer of Futurity Brands Switzerland AG ("Futurity"), the parent company of Paul Frank. This declaration is based upon facts within my knowledge, and I could competently testify to such facts if called upon to do so as a witness.

2. This Declaration is made in support of Paul Frank's Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction and in support of Paul Frank's Motion for Leave to Amend Demand for Arbitration.

3. Paul Frank's primary goal at all times is the protection of the Paul Frank brand, including the trademarks, copyrights, and other intellectual property owned by the company.

4. The Master License Agreement ("MLA") provides that Grand Union / China Brands Group ("CBG") is required to submit all products to Paul Frank for approval, along with any artwork for advertising or marketing of products. Paul Frank closely monitors the products submitted by all of its licensees in order to assure that each product reflecting the Paul Frank name is of good quality, is at the correct price point, and fits within the brand's overall strategy for the relevant category. It is critical for any brand holder to strictly control the products sold by any licensees in order to ensure that the brand stays consistent.

5. Paul Frank is a high-end or "premium" brand. In China, Paul Frank is the equivalent to a brand like Calvin Klein in the United States. It is sold in upscale stores and at a price point which is high but not unreasonable for the average middle-class consumer.

6. Consumers associate brands with the location in which they can buy them. Brands available in high-end stores will always have a higher reputation than brands sold in low end stores. For example, Calvin Klein can be purchased in the United States in an upscale department store or on a premium branded website. Calvin Klein would never allow its goods to be sold in a supermarket in the United States; neither would Paul Frank in China. A good available in a supermarket is necessarily cheap and low quality, especially compared to a good available in a boutique or elegant department store. Paul Frank specifically brands itself as a "premium fashion-lifestyle brand" so that

weintraub tobin chediak coleman grodin
LAW CORPORATION

consumers will regard it as such.

7. All over the world Paul Frank monitors and attempts to prevent the sale of counterfeit goods. It is important for any brand to police counterfeit goods. Counterfeit goods are, by definition, not sold by the brand or an authorized licensee. That means that the brand did not approve the good before it was offered for sale. The brand was not able to ensure the quality of the good, the price point, or the good's position within the market and the category. This includes goods sold by outside parties who have no relationship to Paul Frank or its licensees, but it also includes the situation where a licensee or sublicensee sells a good that has not been approved by Paul Frank. Even if the manufacturer is licensed, if the product is not approved it is a de facto counterfeit good.

8. Counterfeit goods are generally of extremely low quality. They are not made of high-quality materials, they are made cheaply and quickly because there is no brand limiting the quality of the materials used by the manufacturer. The manufacturer will use the cheapest materials and methods in order to maximize profits.

9. Counterfeit good are often sold at extremely low prices. The manufacturer was not required to purchase the rights to the goods from the brand owner, and thus can sell the goods at a lower cost. The counterfeit manufacturer does not care about maintaining a brand's image with the market, it is only interested in selling the goods quickly and easily.

10. Thus, when a consumer unknowingly purchases a counterfeit good, the consumer is getting an unapproved, low quality, cheap product. The consumer then believes that the rest of the brand's products are low quality and cheap because of the consumer's experience with the counterfeit good. The consumer is therefore unlikely to make future purchases of the brand's products, and will forever associate the brand with the unsatisfactory counterfeit good. This seriously harms the brand holder, whose brand is now tarnished by the consumer's confusion between the counterfeit good and the legitimate goods approved and sold by the brand.

11. This also applies where a party registers trademarks in the name of a brand. The purpose of registering a fake trademark is to intentionally confuse the market and the consumer into believing that counterfeit goods are legitimate. The consumer has no way to differentiate counterfeit goods from legitimate goods, because the counterfeit goods appear to be properly registered and

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

authorized by the brand holder. The brand is then forever associated in the consumer's mind with the counterfeit good.

12. Similarly, the brand is harmed when a party uses the brand's name without approval. The purpose of using the brand name is to intentionally confuse the market and the consumer into believing that counterfeit goods are legitimate. The consumer has no way to differentiate counterfeit goods from legitimate goods, because the counterfeit goods appear to be sold by the brand holder. The brand is then forever associated in the consumer's mind with the counterfeit good.

13. Much like the United States, the sale of goods in China today takes place largely online. E-commerce and social media sites like TikTok are extremely popular with consumers. Maintaining an official flagship store on an e-commerce or social media site allows a brand to engage directly with consumers and control and target their marketing to specific consumer groups. All brands, including Paul Frank, tightly control which licensees or sublicensees can maintain flagship stores. A brand should only have one flagship store in each category to minimize confusion and duplication of sales to the same consumer. Some platforms actually require that each brand have only one flagship store, or one in each category. In China, because the market is so large and there are so many consumers, the categories are very carefully controlled. For example, in the United States there is generally one "footwear" category." In China there are separate categories for indoor slippers, rainboots, sneakers, and more. Thus, each brand must carefully plan which licensee will have the right to maintain the flagship store on a particular e-commerce or social media site to avoid consumer confusion and dilution of the brand.

14. It is standard practice for TikTok and other e-commerce platforms to require authorization letters from major brand holders in order to open official branded flagship stores on the platform. This ensures that only the true rightsholders may open flagship stores.

15. When a fake flagship Paul Frank store is opened on an otherwise reputable e-commerce or social media site, the damage to the brand is immense. Paul Frank did not authorize the Hong Tong Fang flagship store, and did not authorize any of the products sold on the flagship store. It is a counterfeit store selling counterfeit products. Yet consumers believe that the store is legitimate because it is an "official" store sanctioned by TikTok. Consumers have therefore bought

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

the counterfeit products, yet believe they are legitimate Paul Frank products. This will necessarily damage the brand because the consumers will believe that Paul Frank products are cheap and low quality after purchasing "official" products from Hong Tong Fang's infringing store.

16. Sales outside the Territory are also extremely harmful to the Paul Frank brand. Paul Frank already has licensees all over the world and across Asia. Products sold outside their specified Territory necessarily compete with the products sold by local licensees. Such sales harm the local licensee by reducing their potential sales. They also strain the relationship between Paul Frank and its licensee. Local licensees will refuse to do business with Paul Frank if there are too many counterfeit goods in the local market, or will demand a very low licensee fee or minimum guarantees because they are unable to sell their goods. Paul Frank therefore loses revenue when counterfeit goods flood local markets.

17. Paul Frank would never approve such products to be sold outside of the Territory. These products are counterfeit goods sold without approval, and therefore of low quality and cheaply made. Thus, not only do the products compete with those sold by local licensees, they also harm the brand's reputation by passing off inferior goods as legitimate.

18. Since the MLA was terminated, Paul Frank has been managing its new licensees (some of which, but not all, are former Grand Union / CBG licensees) directly. Dozens of licensees have established new relationships with Paul Frank. Despite the fact that all of the sublicenses terminated when the MLA was terminated, Paul Frank has chosen to honor the terms of any sublicense made with Grand Union / CBG if the sublicensee agreed to do business directly with Paul Frank.

19. Paul Frank has gone above and beyond to assist the former sublicensees of Grand Union / CBG in the transition to the post-termination market. Paul Frank reached out to each sublicensee disclosed by Grand Union to inform them of the termination and the fact that the rights had reverted to Paul Frank. Paul Frank has made it clear to each and every sublicensee that Paul Frank would work with them to put new arrangements into place so that they could continue selling Licensed Products. Paul Frank has even agreed not to seek any further license fees or minimum guarantees from these parties, even though Paul Frank would be well within its rights to do so given that all sublicense agreements terminated when Paul Frank terminated the MLA. Paul Frank has also

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

informed the sublicensees that it will happily issue letters of authorization to any party who wishes to continue selling Paul Frank products, so long as they do so through Paul Frank, not Grand Union / CBG.

20. Paul Frank has spent more than seven months setting up a direct licensing business in China. Paul Frank has established a new product approval process and has approved many new products sold by the new licensees. It has also established a new process for the approval of advertising and marketing of Licensed Products and has worked closely with the new licensees to promote their products. If the MLA were to be restored, all of the products already approved by Paul Frank and the advertising and marketing already approved by Paul Frank would be moot, and all of the licensees would again have to change course and begin doing business with Grand Union / CBG. Paul Frank would have to sever the relationships that it has worked so hard to create over the last seven months.

21. Paul Frank has also sent out hundreds of letters of authorization for licensees since the MLA was terminated. Paul Frank's licensees are already selling Licensed Products in many e-commerce stores under the new authorization letters. If the MLA were to be restored, all of those letters of authorization would be invalid and the licensees would be unable to sell their product.

22. Paul Frank has also been forced to expend substantial time and resources repairing the damage caused by Grand Union. Paul Frank branded product is currently available for sale online at extremely low cost. In particular, the cost of the products available online has plummeted in recent months (i.e. after the termination went into effect). For example, a former sublicensee of Grand Union / CBG is still selling Paul Frank apparel, but at an incredibly low cost. Paul Frank has found products for sale by this former sublicensees for less than $.10 USD per unit.

23. In short, Paul Frank has become a cheap product that you can get anywhere. It has lost much of the glamour associated with the brand and Paul Frank has been forced to expend substantial resources in marketing the brand to repair its image and correct the market perception of the property.

24. One of the ways that Paul Frank had intended to repair the brand's image was through the A.NI.MA property, which is focused on streetwear and pop culture. The Second Amendment

weintraub tobin chediak coleman grodin
LAW CORPORATION

was intended to allow Grand Union / CBG to expand into this category to reinvigorate the brand. Grand Union / CBG never took advantage of the A.NI.MA. property, but Paul Frank is doing so now. Paul Frank has entered into new license agreements for this property and is preparing a large marketing push. Paul Frank and its new licensees are focused on a more modern, youthful aesthetic. If Grand Union / CBG is allowed to once again control the market, the brand's reputation will revert to the cheap, easily available, low-end products and will unquestionably suffer.

25.    Grand Union / CBG did not seek approval of, and Paul Frank therefore did not approve, any of the following products or services:

a.    Paul Frank Milk Tea shops;

b.    PAUL FRANK RAW clothing and accessories;

c.    PAUL FRANK'S ENCORE products or marketing;

d.    Paul Frank-branded airplanes;

e.    Big Mouth Monkey Happy Burger Restaurant;

f.    Paul Frank themed credit cards;

g.    Paul Frank theme park;

h.    Mineral oil products;

i.    Mooncakes;

j.    Beauty products;

k.    Eye masks;

l.    Shanghai Public Transportation Card

m.    Electronic music event with Shanghai Linx Royal Members' Club or t-shirts related thereto;

n.    Art museum crossover with Songyang Art & Rui IP Art Museum;

o.    Partnership with Battle of Balls, including Paul Frank branded t-shirts;

p.    Paul Frank themed hotel rooms; and

q.    Digital red packets for lunar new year.

26.    Attached to Paul Frank Limited's Appendix of Exhibits filed concurrently herewith (the "Appendix") as Exhibit 1 is a true and correct copy of the Master License Agreement dated

weintraub tobin chediak coleman grodin
LAW CORPORATION

January 1, 2015. The MLA was negotiated on behalf of Paul Frank by Saban Brands Entertainment Group ("Saban"), which held the rights to the Property at the time of the MLA.

27. Attached to the Appendix as Exhibit 2 is a true and correct copy of the Schedules and Exhibits to the Master License Agreement dated January 1, 2015.

28. Attached to the Appendix as Exhibit 3 is a true and correct copy of the First Amendment to Master License Agreement dated April 27, 2018. The First Amendment was negotiated by Bo Zheng on behalf of Grand Union / CBG. Grand Union itself does not have any employees. Paul Frank dealt exclusively with employees of CBG.

29. Attached to the Appendix as Exhibit 4 is a true and correct copy of the Second Amendment to Master License Agreement dated August 19, 2021. The Second Amendment was negotiated by Bo Zheng on behalf of Grand Union / CBG. The physical address specified in Section 29 of the Second Amendment, No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by CBG.

30. Attached to the Appendix as Exhibit 5 is a true and correct copy of the Third Amendment to Master License Agreement dated February 10, 2022. The Third Amendment was negotiated by Bo Zheng on behalf of Grand Union / CBG.

31. Attached to the Appendix as Exhibit 6 is a true and correct copy of an email I received on July 21, 2022 with the subject line "Notice of Material Breaching and Fruther [sic] Steps."

32. Attached to the Appendix as Exhibit 7 is a true and correct copy of an attachment to Exhibit 6, a Letter dated July 21, 2022 with the subject "Notice of Material Breaching and Further Steps."

33. Attached to the Appendix as Exhibit 8 is a true and correct copy of an email I received on August 24, 2022 with the subject line "Notice of Termination."

34. Attached to the Appendix as Exhibit 9 is a true and correct copy of an attachment to Exhibit 8, Letter dated August 24, 2022 with the subject "Notice of Termination."

35. Attached to the Appendix as Exhibit 10 is a true and correct copy of an email I received on September 23, 2022 with the subject line "Re: Notice of Termination."

36. Attached to the Appendix as Exhibit 11 is a true and correct copy of an attachment to

Exhibit 10, a Letter dated September 23, 2022 with the subject "Termination of Master License Agreement."

37.    Attached to the Appendix as Exhibit 12 is a true and correct copy of an email I received on June 20, 2021 with the subject line "Notice of Termination."

38.    Attached to the Appendix as Exhibit 13 is a true and correct copy of an attachment to Exhibit 12, a Letter dated June 21, 2021 with the subject "Notice of Termination."  Paul Frank did not approve any products to be sold by 上海海叠芮品牌管理有限公 or Shanghai Dierui Brand Management Co., Ltd. ("Dierui") under the fake Paul Frank trademarks identified in the Notice of Termination.  Grand Union / CBG represented to Paul Frank that it was working with Dierui to cure the breaches of the MLA.  No sublicense agreement with Dierui was ever presented to Paul Frank for approval, nor has Paul Frank ever seen a sublicense agreement with Dierui.

39.    Paul Frank only agreed to the terms of the Second Amendment with the understanding that Grand Union / CBG would cure all of the breaches identified by Paul Frank in the 2021 Notice of Termination (Exhibit 13).

40.    Attached to the Appendix as Exhibit 14 is a true and correct copy of an email I received on July 14, 2021 with the subject line "Re: Notice of Termination – Indemnification Claim."

41.    Attached to the Appendix as Exhibit 15 is a true and correct copy of an attachment to Exhibit 14, Letter dated July 15, 2021 with the subject "Indemnification for Breaching."

42.    Attached to the Appendix as Exhibit 16 is a true and correct copy of an email I received on July 29, 2021 with the subject line "Re: Notice of Material Breaching – July 29, 2021."

43.    Attached to the Appendix as Exhibit 17 is a true and correct copy of an attachment to Exhibit 16, Letter dated July 29, 2021 with the subject "Notice of Material Breaching."

44.    Attached to the Appendix as Exhibit 18 is a true and correct copy of an email I received on July 30, 2021 with the subject line "Notice of Material Breaching – July 30, 2021."

45.    Attached to the Appendix as Exhibit 19 is a true and correct copy of an email I received on September 1, 2021 with the subject line "Notice of Termination – Indemnification Claim."

46.    Attached to the Appendix as Exhibit 20 is an attachment to Exhibit 19, Second Amendment to Master License Agreement dated August 19, 2021.

weintraub tobin chediak coleman grodin
LAW CORPORATION

47. Attached to the Appendix as Exhibit 21 is a true and correct copy of an email I received on July 13, 2022 with the subject line "Notice of Termination – Indemnification Claim."

48. Attached to the Appendix as Exhibit 22 is a true and correct copy of the Whois Record for PaulFrankBeauty.com, accessed at https://whois.domaintools.com/paulfrankbeauty.com on March 29, 2023.

49. Attached to the Appendix as Exhibit 23 is a true and correct copy of the Ministry of Industry and Information Technology ("MIIT") Registration for Shanghai Dierui Brand Management Co., Ltd. accessed at https://beian.miit.gov.cn/#/Integrated/recordQuery on March 29, 2023.

50. Attached to the Appendix as Exhibit 24 is a true and correct copy of a translation of Exhibit 23, a MIIT Registration for Shanghai Dierui Brand Management Co., Ltd. accessed at https://beian.miit.gov.cn/#/Integrated/recordQuery on March 29, 2023.

51. Attached to the Appendix as Exhibit 25 is a true and correct copy of notarized screenshots of Paul Frank emojis on the WeChat app taken on September 22, 2022 by Huiyan Liu, attorney for Paul Frank. Ms. Liu completed Notarial Certificates on September 29, 2022. *See* p. 1-2 (original) and p. 19-20 (translation)).

52. Attached to the Appendix as Exhibit 26 is a true and correct copy of notarized screenshots of the National Enterprise Credit Information Publicity System Official Registration for Shanghai Qunyi Clothing Co., Ltd. taken on October 13, 2022 by Ms. Liu, attorney for Paul Frank. Ms. Liu completed Notarial Certificates on October 17, 2022. *See* p. 1-2 (original) and p. 21-22 (translation)).

53. Attached to the Appendix as Exhibit 27 is a true and correct copy of an email I received on March 5, 2021 with the subject line "Paul Frank**品牌商**标维护和维权打假报告事宜."

54. Attached to the Appendix as Exhibit 28 is a true and correct copy of a translation of Exhibit 27, an email I received on March 5, 2021 with the subject line "Paul Frank**品牌商**标维护和维权打假报告事宜."

55. Attached to the Appendix as Exhibit 29 is a true and correct copy of an attachment to Exhibit 27, an Excel Spreadsheet entitled 已监测'待处理的Paul Frank品牌商标维护事项.xls.

56. Attached to the Appendix as Exhibit 30 is a true and correct copy of an attachment to

weintraub tobin chediak coleman grodin
LAW CORPORATION

Exhibit 27, an Excel Spreadsheet entitled 正在处理中的Paul Frank品牌商标维护案件.xls.

57. Attached to the Appendix as Exhibit 31 is a true and correct copy of an attachment to Exhibit 27, an Excel Spreadsheet entitled Paul Frank维权打假未结案件汇总表.xls.

58. Attached to the Appendix as Exhibit 32 is a true and correct copy of an email I received on April 3, 2023 with the subject line "FW: adult apparel licensee in China."

59. Attached to the Appendix as Exhibit 33 is a true and correct copy of an email I received on April 19, 2022 with the subject line "Forged Document."

60. Attached to the Appendix as Exhibit 34 is a true and correct copy of an attachment to Exhibit 33, a document entitled "旗舰店授权书."

61. Attached to the Appendix as Exhibit 35 is a true and correct copy of an email I received on July 13, 2022 with the subject line "Re: Forged Document."

62. Attached to the Appendix as Exhibit 36 is a true and correct copy of a translation of Exhibit 35, an email I received on July 13, 2022 with the subject line "Re: Forged Document."

63. Attached to the Appendix as Exhibit 37 is a true and correct copy of an attachment to Exhibit 35, a Screenshot of document entitled "官方旗舰店授权模板."

64. Attached to the Appendix as Exhibit 38 is a true and correct copy of a translation of Exhibit 37, a Screenshot of document entitled "Official Flagship Store Authorization Template."

65. Attached to the Appendix as Exhibit 39 is a true and correct copy of an attachment to Exhibit 35, a Screenshot of document entitled "专卖店授权模板."

66. Attached to the Appendix as Exhibit 40 is a true and correct copy of a translation of Exhibit 39, a Screenshot of document entitled "Specialty Store Authorization Template."

67. Attached to the Appendix as Exhibit 41 is a true and correct copy of an attachment to Exhibit 35, Screenshot of a document entitled "旗舰店授权模板."

68. Attached to the Appendix as Exhibit 42 is a true and correct copy of a translation of Exhibit 41, a Screenshot of a document entitled "Flagship Store Authorization Template."

69. Attached to the Appendix as Exhibit 43 is a true and correct copy of an attachment to Exhibit 35, a Screenshot of a document entitled "专营店授权模板."

70. Attached to the Appendix as Exhibit 44 is a true and correct copy of a translation of

Exhibit 43, a Screenshot of a document entitled "Franchise Store Authorization Template."

71. Attached to the Appendix as Exhibit 45 is a true and correct copy of an attachment to Exhibit 35, a Screenshot of a document entitled "品牌企业店授权模板."

72. Attached to the Appendix as Exhibit 46 is a true and correct copy of a translation of Exhibit 45, a Screenshot of a document entitled "Brand Enterprise Store Authorization Template."

73. Attached to the Appendix as Exhibit 47 is a true and correct copy of an attachment to Exhibit 35, Screenshot of a document entitled "品牌个体店授权模板."

74. Attached to the Appendix as Exhibit 48 is a true and correct copy of a translation of Exhibit 47, a Screenshot of a document entitled "Branded Individual Store Authorization Template."

75. Attached to the Appendix as Exhibit 49 is a true and correct copy of an attachment to Exhibit 35, a screenshot of a Spreadsheet.

76. Attached to the Appendix as Exhibit 50 is a true and correct copy of a translation of Exhibit 49, a screenshot of a Spreadsheet.

77. Attached to the Appendix as Exhibit 51 is a true and correct copy of an email I received on June 23, 2022 with the subject line "Re: 回复：回复：回复：Tiktok - store list."

78. Attached to the Appendix as Exhibit 52 is a true and correct copy of a translation of Exhibit 51, an email I received on June 23, 2022 with the subject line line "Re: Re: Re: Re: Tiktok - store list."

79. Attached to the Appendix as Exhibit 53 is a true and correct copy of an email I received on August 18, 2022 with the subject line "Re: 对贵方2022年8月10日、题为"Notice of Material Breaching and Further Steps"的电邮之回复."

80. Attached to the Appendix as Exhibit 54 is a true and correct copy of a translation of Exhibit 53, an email I received on August 18, 2022 with the subject line "Re: Reply to your email dated August 10, 2022 entitled 'Notice of Material Breaching and Further Steps.'"

81. Attached to the Appendix as Exhibit 55 is a true and correct copy of a Police Report dated July 30, 2022.

82. Attached to the Appendix as Exhibit 56 is a true and correct copy of a translation of Exhibit 56, a Police Report dated July 30, 2022.

weintraub tobin chediak coleman grodin LAW CORPORATION

83. Attached to the Appendix as Exhibits 57 through 59 are true and correct copies of photographs of Paul Frank branded eyeglasses provided to me by Paul Frank's licensee in Jakarta, Indonesia. Exhibit 60 is a true and correct copy of a photograph of the store selling Paul Frank branded eyeglasses provided to me by Paul Frank's licensee in Jakarta, Indonesia. Paul Frank's licensee in Jakarta complained to Paul Frank that a competitor was selling Paul Frank branded eyeglasses in its territory. The licensee provided the photographs contained in Exhibits 57 through 60 as evidence of the sales of Paul Frank products in their territory.

84. Exhibit 57 shows the eyeglasses in close-up including the tag. In plain view is the name上海平凡眼镜有限公司 - Shanghai Pingfan Glasses Co., Ltd.:

85. Attached to the Appendix as Exhibit 61 is a true and correct copy of notarized photographs of Paul Frank branded products purchased at the Liqun Life Supermarket on September 22, 2022. Exhibit 61 includes a notarized description by Paul Frank's lawyer Huiyan Liu describing her visit to the Liqun Life Supermarket in Shanghai. An English translation of the Notarial Certificate is on p. 41-42 of the document. Ms. Liu took photographs of Paul Frank merchandise for sale at the Supermarket on September 22, 2022, but Paul Frank believes the sales had been occurring for some months or years prior to Ms. Liu's visit.

86. Attached to the Appendix as Exhibit 62 is a true and correct copy of an email I received on August 9, 2022 with the subject line "Re Notice of Material Breaching and Further Steps."

87. Attached to the Appendix as Exhibit 63 is a true and correct copy of an email I received on August 10, 2022 with the subject line "Re: 回复：回复：回复：Tiktok - store list."

88. Attached to the Appendix as Exhibit 64 is a true and correct copy of an email I received

weintraub tobin chediak coleman grodin
LAW CORPORATION

on August 4, 2022 with the subject line "[OFFICIAL] Forensic Due Diligence Notification from Grant Thornton."

89. Attached to the Appendix as Exhibit 65 is a true and correct copy of an email I received on September 19, 2022 with the subject line "答复: [OFFICIAL] Forensic Due Diligence Notification from Grant Thornton."

90. Attached to the Appendix as Exhibit 66 is a true and correct copy of a notarized copy of photographs taken on August 28, 2022. Exhibit 66 includes a notarized description by Paul Frank's lawyer Huiyan Liu describing the photographs. An English translation of the Notarial Certificate is in Exhibit 67.

91. Attached to the Appendix as Exhibit 67 is a true and correct copy of a translation of Exhibit 66, a notarized copy of photographs taken on August 28, 2022.

92. Attached to the Appendix as Exhibit 68 is a true and correct copy of an email I received on September 16, 2022 with the subject line "Cease and Desist Letter 勒令禁止函-'PAUL FRANK RAW.'"

93. Attached to the Appendix as Exhibit 69 is an attachment to Exhibit 68, a Letter dated September 15, 2022 with the subject "CEASE AND DESIST – Unauthorized Sales and Marketing of 'PAUL FRANK RAW' Collection."

94. Attached to the Appendix as Exhibit 70 is a true and correct copy of an email I received on September 16, 2022 with the subject line "Cease and Desist Letter 勒令禁止函-'PAUL FRANK ENCORE.'"

95. Attached to the Appendix as Exhibit 71 is a true and correct copy of an attachment to Exhibit 70, Letter dated September 15, 2022 with the subject "CEASE AND DESIST – Unauthorized marketing campaign/sales event 'PAUL FRANK'S ENCORE.'"

96. Attached to the Appendix as Exhibit 72 is a true and correct copy of screenshots from the WeChat app

97. Attached to the Appendix as Exhibit 73 is a true and correct copy of a video entitled "Paul Frank Raked in the bucks" available online at https://baijiahao.baidu.com/s?id=1653783900107952108&wfr=spider&for=pc.

98. Attached to the Appendix as Exhibit 74 is a true and correct copy of a transcription and translation of Exhibit 73, a video entitled "Paul Frank Raked in the bucks" available online at https://baijiahao.baidu.com/s?id=1653783900107952108&wfr=spider&for=pc.

99. Attached to the Appendix as Exhibit 75 is a true and correct copy of an article entitled 专访Paul Frank Tea创始人：IP+茶饮模式背后的秘诀！, accessible at https://mp.weixin.qq.com/s/I6MOpsfHlq7k0m6T86OiGg.

100. Attached to the Appendix as Exhibit 76 is a true and correct copy of a translation of Exhibit 75, an article entitled "Exclusive Interview with Paul Frank Tea founder: the secret behind the IP + tea drink model!" accessible at https://mp.weixin.qq.com/s/I6MOpsfHlq7k0m6T86OiGg.

101. Attached to the Appendix as Exhibit 77 is a true and correct copy of a video entitled "Paul Frank大嘴猴 海航集团首都航空合作全主题飞," available online https://www.bilibili.com/video/BV1ds411t7ZL/.

102. Attached to the Appendix as Exhibit 78 is a true and correct copy of an article entitled "专访红纺文化 **IP运营从"引进来"到"走出去"** | **CLE中国授**权展", accessible at http://www.chinalicensingexpo.com/exponews/1414.html.

103. Attached to the Appendix as Exhibit 79 is a true and correct copy of a translation of an article entitled "Exclusive Interview with Hongfang Culture IP Operation from 'Import' to 'Go Out,'" accessible at http://www.chinalicensingexpo.com/exponews/1414.html.

104. Attached to the Appendix as Exhibit 80 is a true and correct copy of an article entitled "EMBA**学**员 | 26**期**郑波 & 27**期**郑涛：Paul Frank**携手海航集**团首都航空，开启奇幻梦想之旅," accessible at https://www.ckgsb.edu.cn/emba/story/detail?storyid=327.

105. Attached to the Appendix as Exhibit 81 is a true and correct copy of a translation of Exhibit 80, an article entitled "EMBA students | 26th Zheng Bo & 27th Zheng Tao: Paul Frank joins hands with Capital Airlines of HNA Group," accessible at https://www.ckgsb.edu.cn/emba/story/detail?storyid=327.

106. Attached to the Appendix as Exhibit 82 is a true and correct copy of an article entitled "光大银行大嘴猴玩味街头主题信用卡," accessible at https://www.cardbaobao.com/card/cardinfo/guangdaxinyongka_3725.shtml.

weintraub tobin chediak coleman grodin LAW CORPORATION

107. Attached to the Appendix as Exhibit 83 is a true and correct copy of a translation of Exhibit 82, an article entitled "Everbright Bank Big Mouth Monkey Fun Street Themed Credit Card.", accessible at https://www.cardbaobao.com/card/cardinfo/guangdaxinyongka_3725.shtml.

108. Attached to the Appendix as Exhibit 84 is a true and correct copy of an article entitled "Zmarketing以"海外优势+跨界营销"布局境外消费服务市场," accessible at http://www.dzwww.com/xiaofei/gdxw/201808/t20180806_17693505.htm.

109. Attached to the Appendix as Exhibit 85 is a true and correct copy of a translation of Exhibit 85, an article entitled "Zmarketing Lays Out Overseas Consumer Service Market with 'Overseas Advantages + Cross-border Marketing,'" accessible at https://www.cardbaobao.com/card/cardinfo/guangdaxinyongka_3725.shtml.

110. Attached to the Appendix as Exhibit 86 is a true and correct copy of an article entitled 卡片簡介," accessible at https://xyk.cebbank.com/clob2html/card_wap/cardinfo19960.html.

111. Attached to the Appendix as Exhibit 87 is a true and correct copy of a translation of Exhibit 86, an article entitled "Card Introduction," accessible at https://xyk.cebbank.com/clob2html/card_wap/cardinfo19960.html.

112. Attached to the Appendix as Exhibit 88 is a true and correct copy of an announcement entitled "上海路骋国际旅行社股份有限公司 关于公司与红纺文化有限公司签订 共同建设路骋 IP 小镇的战略合作协议的公告," accessible at https://www.neeq.com.cn/disclosure/2017/2017-10-10/1507629193_759481.pdf.

113. Attached to the Appendix as Exhibit 89 is a true and correct copy of a translation of Exhibit 88, an announcement entitled Shanghai Lucheng International Travel Agency Co., Ltd. Announcement on the signing of the Strategic Cooperation Agreement for the joint construction of Lucheng IP Town between the Company and Hongfang Culture Co., Ltd., accessible at https://www.neeq.com.cn/disclosure/2017/2017-10-10/1507629193_759481.pdf.

114. Attached to the Appendix as Exhibit 90 is a true and correct copy of an attachment entitled "上海路骋国际旅行社股份有限公司关于公司与上海红纺元意文化发展有限公司签订《IP 主题小镇战略合作协议》的公告," accessible at https://www.neeq.com.cn/disclosure/2017/2017-07-24/1500889631_726486.pdf.

weintraub tobin chediak coleman grodin LAW CORPORATION

115. Attached to the Appendix as Exhibit 91 is a true and correct copy of a translation of Exhibit 90, an announcement entitled "Shanghai Lucheng International Travel Agency Co., Ltd. Announcement on the signing of the 'IP Theme Town Strategic Cooperation Agreement' between the Company and Shanghai Hongfang Yuanyi Culture Development Co., Ltd.," accessible at https://www.neeq.com.cn/disclosure/2017/2017-07-24/1500889631_726486.pdf.

116. Attached to the Appendix as Exhibit 92 is a true and correct copy of an article entitled, "红纺圆桌论坛：IP产业如何撬动全产业链的模式" accessible at http://www.chinalicensingexpo.com/exponews/616.html.

117. Attached to the Appendix as Exhibit 93 is a true and correct copy of a translation of Exhibit 93, an article entitled "Hongfang Rountable: How will the IP industry pry open the whole industry chain model?" accessible at http://www.chinalicensingexpo.com/exponews/616.html.

118. Attached to the Appendix as Exhibit 94 is a true and correct copy of an article entitled "2019中国文化IP产业观察," accessible at https://freewechat.com/a/MjM5OTM1NzY2Mg==/2650458537/1.

119. Attached to the Appendix as Exhibit 95 is a true and correct copy of a translation of Exhibit 94, an article entitled "2019 China Cultural IP Industry Observation" accessible at https://freewechat.com/a/MjM5OTM1NzY2Mg==/2650458537/1.

120. Attached to the Appendix as Exhibits 96-105 are true and correct copies of printouts from the website Ctrip.com, accessible online at https://www.ctrip.com/?sid=155952&allianceid=4897&ouid=index.

121. Attached to the Appendix as Exhibit 106 is a true and correct copy of a screenshot of the Yunji App.

122. Attached to the Appendix as Exhibit 107 is a true and correct copy of a translation of Exhibit 106, a screenshot of the Yunji App.

123. Attached to the Appendix as Exhibit 108 is a true and correct copy of a screenshot of the Yunji App.

124. Attached to the Appendix as Exhibit 109 is a true and correct copy of a screenshot of the Yunji App.

125. Attached to the Appendix as Exhibit 110 is a true and correct copy of a translation of Exhibit 109, a screenshot of the Yunji App.

126. Attached to the Appendix as Exhibit 111 is a true and correct copy of an article entitled "#热征#中秋#月饼界的妖艳贱？晒PAUL FRANK猴子登 月月饼." accessible online at https://post.smzdm.com/p/603525/.

127. Attached to the Appendix as Exhibit 112 is a true and correct copy of a translation of Exhibit 111, an article entitled "The coquettish cheap in the moon cake world? Bask in PAUL FRANK monkey moon cakes" accessible online at https://post.smzdm.com/p/603525.

128. Attached to the Appendix as Exhibit 113 is a true and correct copy of an email I received on July 12, 2022 with the subject line "PinDouDou – store list/ Sublicensee list."

129. Attached to the Appendix as Exhibit 114 is a true and correct copy of an attachment to Exhibit 113 above, List of Sublicensees.

130. Attached to the Appendix as Exhibit 115 is a true and correct copy of an article entitled "好时巧克力要出月饼了，你敢信" accessible online at https://www.foodaily.com/articles/17971.

131. Attached to the Appendix as Exhibit 116 is a true and correct copy of a translation of Exhibit 115, an article entitled "Hershey's Chocolate is about to release mooncakes, can you believe it?" accessible online at https://www.foodaily.com/articles/17971.

132. Attached to the Appendix as Exhibit 117 is a true and correct copy of a printout from FoodDaily.com accessible online at https://product.suning.com/0070082356/10579451954.html.

133. Attached to the Appendix as Exhibit 118 is a true and correct copy of a printout from FoodDaily.com accessible online at https://product.suning.com/0070082356/10579451954.html.

134. Attached to the Appendix as Exhibit 119 is a true and correct copy of an email I received on June 8, 2022 with the subject line "Re: 回复：烦请对未授权抖音店铺进行投诉 /Request to Take Action."

135. Attached to the Appendix as Exhibit 120 is a true and correct copy of an article entitled "'大嘴猴' 咬人 数十家超市喊冤," accessible at https://baijiahao.baidu.com/s?id=1618534676221650969&wfr=spider&for=pc.

136. Attached to the Appendix as Exhibit 121 is a true and correct copy of a translation of

weintraub tobin chediak coleman grodin
LAW CORPORATION

an article entitled "The Big Mouth Monkey bites people. Dozens of supermarkets are crying out about injustice," accessible at https://baijiahao.baidu.com/s?id=1618534676221650969&wfr=spider&for=pc.

137. Attached to the Appendix as Exhibit 122 is a true and correct copy of an article entitled "专业打假团队盯上城乡小超市 牟利还是维权?" accessible at http://www.rmzxb.com.cn/c/2018-10-22/2195799.shtml.

138. Attached to the Appendix as Exhibit 123 is a true and correct copy of a translation of article entitled "Team of professional extorters for fighting fraud is aiming at urban and rural small supermarkets, for making a profit or defending rights?" accessible at http://www.rmzxb.com.cn/c/2018-10-22/2195799.shtml.

139. Attached to the Appendix as Exhibit 124 is a true and correct copy of a Civil Statement of Claim.

140. Attached to the Appendix as Exhibit 125 is a true and correct copy of a translation of Exhibit 124, a Civil Statement of Claim.

141. Attached to the Appendix as Exhibit 126 is a true and correct copy of an Intermediate People's Court of Tsingdao City of Shandong Province, Civil Ruling.

142. Attached to the Appendix as Exhibit 127 is a true and correct copy of a translation of Exhibit 126, Intermediate People's Court of Tsingdao City of Shandong Province, Civil Ruling.

143. Attached to the Appendix as Exhibit 138 is a true and correct copy of an email I received on March 24, 2023 with the subject line "Fwd: 台湾外购订单最终确认." Marilu Corpus, the sender of the email, and Tony Tung of Wuco Trading (H.K.) Company Limited ("Wuco") informed me that this order from CBG was for Paul Frank-branded Licensed Products in the territory of Taiwan.

144. Attached to the Appendix as Exhibit 139 is a true and correct copy of a translation of Exhibit 138, an email I received on March 24, 2023 with the subject line "FWD: Final confirmation of Taiwan external purchase orders."

145. Attached to the Appendix as Exhibit 140 is a true and correct copy of an attachment to Exhibit 138, an invoice from Shanghai CIIC Science and Technology Development Ent. Co., Ltd.

weintraub tobin chediak coleman grodin LAW CORPORATION

146.    Attached to the Appendix as Exhibit 141 is a true and correct copy of an email I received on April 2, 2023 with the subject line "[EXTERNAL] Fw: CM外采单销售明细.xls." Clubman Singapore Pte Ltd ("Clubman") is an apparel company in Singapore.  Representatives of Clubman informed me that this order from CBG was for Paul Frank-branded Licensed Products in Singapore.

147.    Attached to the Appendix as Exhibit 142 is a true and correct copy of a translation of Exhibit 141, an email I received on April 2, 2023 with the subject line "Fwd: CM External Purchase Order Sales Detail.xls."

148.    Attached to the Appendix as Exhibit 143 is a true and correct copy of an attachment to Exhibit 141 above, Excel Spreadsheet.

149.    Attached to the Appendix as Exhibit 144 is a true and correct copy of an Authorization dated October 1, 2020.

150.    Attached to the Appendix as Exhibit 145 is a true and correct copy of a translation of Exhibit 144, Authorization dated October 1, 2020.

151.    Attached to the Appendix as Exhibit 146 is a true and correct copy of a printout of the CBG website located at https://www.chinabrandsgroup.com.cn.

152.    Attached to the Appendix as Exhibit 147 is a true and correct copy of an email I received on February 2, 2021 with the subject line "Re: Update authorization letter."

153.    Attached to the Appendix as Exhibit 148 are true and correct copies of documents from the lawsuit filed by CBG in China.

154.    Attached to the Appendix as Exhibit 150 is a true and correct copy of an email I received on September 17, 2021 with the subject line "Re: Notice of Termination – Indemnification Claim."

155.    Attached to the Appendix as Exhibit 151 is a true and correct copy of an email I received on June 18, 2021 with the subject line "Sub-licenses & Statement."

156.    Attached to the Appendix as Exhibit 152 is a true and correct copy of an email I received on July 4, 2022 with the subject line "Re: Quarterly Statements."

157.    Attached to the Appendix as Exhibits 153-161 are true and correct copies of

weintraub tobin chediak coleman grodin
LAW CORPORATION

screenshots from the WeChat app.

158. Attached to the Appendix as Exhibit 162 is a Screenshot of a Trademark Registration. The trademark is for a logo with the letters PFB, for Paul Frank Beauty. The text "申请人名称（中文） 上海叠芮品牌管理有限公司" translates to "Applicant name (Chinese) Shanghai Dierui Brand Management Co., Ltd."

159. Attached to the Appendix as Exhibit 163 is a Screenshot of a Trademark Registration. The trademark is for a logo with the letters PFB, for Paul Frank Beauty. The text "申请人名称（中文） 上海叠芮品牌管理有限公司" translates to "Applicant name (Chinese) Shanghai Dierui Brand Management Co., Ltd."

160. Attached to the Appendix as Exhibit 164 is a true and correct copy of China National Intellectual Property Administration Record Registration of "Paul Prime" trademarks by CBG, accessible at http://wcjs.sbj.cnipa.gov.cn/txnRead01.do?b9La8sqW=bysUzqlqEle…8fUN0nCfK5KiEc2rREWsAsntwSn3PU2R8ucJ2GqVwH8g_CSizGbONOFI59Xnf. The Registrant's name is 红纺文化有限公司, which translates to Hongfang Culture Co., Ltd., another name for Grand Union / CBG.

161. Attached to the Appendix as Exhibit 165 is a true and correct copy of a printout of the National Enterprise Credit Information Publicity System for China Brands Group.

162. Attached to the Appendix as Exhibit 166 is a true and correct copy of a translation of Exhibit 165, a printout of the National Enterprise Credit Information Publicity System for China Brands Group.

163. Attached to the Appendix as Exhibit 167 is a true and correct copy of a Supplementary Agreement to Paul Frank Adult Shoes License Agreement.

164. Attached to the Appendix as Exhibit 168 is a true and correct copy of a translation of Exhibit 167, a Supplementary Agreement to Paul Frank Adult Shoes License Agreement.

165. Attached to the Appendix as Exhibit 169 is a true and correct copy of printout of National Enterprise Credit Information Publicity System for CBG Original Culture (Shanghai) Co., Ltd.

166. Attached to the Appendix as Exhibit 170 is a true and correct copy of a translation of

weintraub tobin chediak coleman grodin
LAW CORPORATION

Exhibit 169, a printout of National Enterprise Credit Information Publicity System for CBG Original Culture (Shanghai) Co., Ltd.

167. Attached to the Appendix as Exhibit 171 is a true and correct copy of a printout of National Enterprise Credit Information Publicity System for Hongtongfang (Shanghai) Culture Development Co., Ltd.

168. Attached to the Appendix as Exhibit 172 is a true and correct copy of a translation of Exhibit 171, a printout of National Enterprise Credit Information Publicity System for Hongtongfang (Shanghai) Culture Development Co., Ltd.

169. Attached to the Appendix as Exhibit 173 is a true and correct copy of an email I received on April 7, 2023 with the subject line "Fwd: 2018SS Order_Clubman."

170. Attached to the Appendix as Exhibit 174 is a true and correct copy of an attachment to Exhibit 173 above, an Excel spreadsheet.

171. Attached to the Appendix as Exhibit 175 is a true and correct copy of a notarized photographs of Paul Frank products. A Notarial Certificate is attached at p. 1.

172. Attached to the Appendix as Exhibits 176-181 are true and correct copies of photographs of Paul Frank products purchased with the products shown in Exhibit 175.

173. Attached to the Appendix as Exhibit 182 is a true and correct copy of screenshots of Paul Frank products.

174. Attached to the Appendix as Exhibit 183 is a true and correct copy of a list of infringement cases filed by Grand Union / CBG, from the database pkulaw.com.

175. Attached to the Appendix as Exhibit 184 is a true and correct copy of an Agreement on Jurisdiction dated October 9, 2022.

176. Attached to the Appendix as Exhibit 185 is a true and correct copy of a translation of Exhibit 184, an Agreement on Jurisdiction dated October 9, 2022.

177. Attached to the Appendix as Exhibit 186 is a true and correct copy of an Investigation Transcript dated March 15, 2023.

178. Attached to the Appendix as Exhibit 187 is a true and correct copy of a translation of Exhibit 186, an Investigation Transcript dated March 15, 2023.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

179. Attached to the Appendix as Exhibit 188 is a true and correct copy of an email I received on September 20, 2022 with the subject line “Re: 致品牌方邮件（伪造商标授权书）-宁波猴猴 （7650抖音授权核实）.”

180. Attached to the Appendix as Exhibit 189 is a true and correct copy of an email I received on September 20, 2022 with the subject line “Re: Email to the brand (forged trademark authorization letter) - Ningbo Houhou (7650 TikTok authorization verification).”

181. Attached to the Appendix as Exhibit 191 is a true and correct copy of a Printout of the Trademark Electric Search System re the Paul Frank trademark Serial No. 97238210.

182. Attached to the Appendix as Exhibit 192 is a true and correct copy of a Printout of the Trademark Electric Search System re the Paul Frank trademark Serial No. 97238210.

183. Attached to the Appendix as Exhibit 193 is a true and correct copy of a printout of the Mindzai website at https://www.mindzai.com/products/paul-frank-mecha-julius-blind-box-series-by-lam-toys.

184. Attached to the Appendix as Exhibit 194 is a true and correct copy of a printout of the Mindzai website at https://www.mindzai.com/pages/about-us.

185. Attached to the Appendix as Exhibit 195 is a true and correct copy of a printout of the Carousell website at https://www.carousell.sg/p/mecha-julius-x-lam-toys-paul-frank-full-set-of-6-1-secret-1162885206/.

186. Attached to the Appendix as Exhibit 196 is a true and correct copy of a printout of the Carousell website at https://play.google.com/store/apps/details?id=com.thecarousell.Carousell&hl=en_US.

187. Attached to the Appendix as Exhibit 197 is a true and correct copy of a printout of the Lazada website entitled “Mecha Paul Frank Series vol. 01 Blind Box by Lam Toys | Lazada.co.th” accessible at https://www.lazada.co.th/products/1-mecha-julius-paul-frank-series-vol01-blind-box-by-lam-toys-i3335197647.html.

188. Attached to the Appendix as Exhibit 198 is a true and correct copy of a printout of the Lazada website entitled “Setting the Pace for a Retail Revolution” accessible at https://group.lazada.com/en/about/.

189. Attached to the Appendix as Exhibit 199 is a true and correct copy of a printout of the TMall website accessible at https://detail.tmall.com/item.htm?app=chrome&bxsign=scdQv1Q-6Xh6Uh3dGu1wsVgCwqfvO4uBwtWX3xl7a0PUkZ-3xxb-EwRXR_1IX7uyqMJLcAVT.

190. Attached to the Appendix as Exhibit 200 is a true and correct copy of a printout of the CBG website at https://www.chinabrandsgroup.com.cn/News/news_inner/id/18.

191. Attached to the Appendix as Exhibit 201 is a true and correct copy of a printout of the Qieyou website at http://www.qieyou.com/qqdzz/201706/44766.html.

192. Attached to the Appendix as Exhibit 202 is a true and correct copy of a printout of the China Judgments Online website at https://wenshu.court.gov.cn/.

193. Attached to the Appendix as Exhibit 203 is a true and correct copy of a printout of the PKULaw.com website at https://www.pkulaw.com/.

194. Attached to the Appendix as Exhibit 204 is a true and correct copy of a printout of the CBG website at https://www.chinabrandsgroup.com.cn/News/news_inner/id/145.

195. Attached to the Appendix as Exhibit 205 is a true and correct copy of a printout of the Carousell website at https://www.carousell.sg/p/mecha-julius-x-lam-toys-paul-frank-full-set-of-6-1-secret-1162885206/.

196. Attached to the Appendix as Exhibit 206 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/GYi9oc1hJVzTPmWf7DyU2.

197. Attached to the Appendix as Exhibit 207 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/s7iPO51WZAoc7vFsan9z9w.

198. Attached to the Appendix as Exhibit 208 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/-Yi1EsZtVtpEg-yWxuEf4A.

199. Attached to the Appendix as Exhibit 209 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/JgBCAY72xG3-VCZnYzCklw.

200. Attached to the Appendix as Exhibit 210 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/JgBCAY72xG3-VCZnYzCklw.

201. Attached to the Appendix as Exhibit 211 is a true and correct copy of a printout of the CBG website at https://www.chinabrandsgroup.com.cn/News/news_inner/id/113.

202. Attached to the Appendix as Exhibit 212 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/NCC3NMHKX-8nBpWZo1xlzg.

203. Attached to the Appendix as Exhibit 213 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s/CruzfMlDxhxAel-N_2inTw.

204. Attached to the Appendix as Exhibit 214 is a true and correct copy of a printout of the Weixin website at https://mp.weixin.qq.com/s?__biz=MzA5MjU1NjQxNA.

205. Attached to the Appendix as Exhibit 215 is a true and correct copy of a Printout of the Weixin website at http://mp.weixin.qq.com/s?__biz=MzA5MjU1NjQxNA."

206. Attached to the Appendix as Exhibit 216 is a true and correct copy of a printout of the CBG website at https://www.chinabrandsgroup.com.cn/business/business_inner?id=2

207. Attached to the Appendix as Exhibit 217 is a true and correct copy of a translation of an excerpt of Exhibit 216, printout of the website at https://www.chinabrandsgroup.com.cn/business/business_inner?id=2.

208. Paul Frank has recently received approximately 50 inquiries from TikTok and other platforms asking Paul Frank to verify the authenticity of various letters of authorization. Paul Frank believes that Grand Union / CBG must be entering into new license agreements and that the new sublicensees are attempting to sell goods through TikTok and other channels. Paul Frank is currently investigating this issue, but certainly did not approve any products for any of these sublicensees, as the MLA has been terminated since September. Thus, any sales by any of these sublicensees are necessarily counterfeit goods.

Executed on Apr 26, 2023 | 6:03 PM PDT, at Tokyo, Japan.

Stanley Yook-Loong Wan

**EXHIBIT 23**

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

| | |
|---|---|
| PAUL FRANK LIMITED,<br><br>Claimant,<br><br>v.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Respondent.<br><br>GRAND UNION INTERNATIONAL TRADING LIMITED,<br><br>Counter-Claimant,<br><br>v.<br><br>PAUL FRANK LIMITED,<br><br>Counter-Respondent. | JAMS Ref. No. 5220002118<br><br>**DECLARATION OF HANA MU**<br><br>Hearing Date: June 1, 2023 |

weintraub tobin chediak coleman grodin
LAW CORPORATION

**DECLARATION OF HANA MU**

I, Hana Mu, declare and state as follows:

1. I was the China local Counsel for Paul Frank Limited, Claimant and Counter-Respondent in the above-captioned case ("Paul Frank"), and currently am on the independent Board of Directors for Futurity Brands Switzerland AG ("Futurity"), the parent company of Paul Frank. This declaration is based upon facts within my knowledge, and I could competently testify to such facts if called upon to do so as a witness.

2. This Declaration is made in support of Paul Frank's Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction and in support of Paul Frank's Motion for Leave to Amend Demand for Arbitration.

3. Attached to Paul Frank Limited's Appendix of Exhibits filed concurrently herewith (the "Appendix") as Exhibit 128 is a true and correct copy of an email I received on April 19, 2022 with the subject line "抖音平台商家品牌授权核实—"大嘴猴"品牌."

4. Attached to the Appendix as Exhibit 129 is a true and correct copy of a translation of Exhibit 128, an email dated April 18, 2022 with the subject line "Verification of Brand Authorization for TikTok Platform Merchants – 'Paul Frank (Big Mouth Monkey)' Brand."

5. Attached to the Appendix as Exhibit 130 is a true and correct copy of an attachment to Exhibit 128, a Flagship Store Authorization Letter dated November 1, 2021.

6. Attached to the Appendix as Exhibit 131 is a true and correct copy of a translation of Exhibit 130, Flagship Store Authorization Letter dated November 1, 2021.

7. Attached to the Appendix as Exhibit 132 is a true and correct copy of an attachment to Exhibit 128, an Authorization Letter dated April 2022.

8. Attached to the Appendix as Exhibit 133 is a true and correct copy of a translation of Exhibit 132, an Authorization Letter dated April 2022.

9. In my capacity as the China local Counsel for Paul Frank with Power of Attorney for signing all legal documents of the Company related to China, I routinely sign authorization letters where appropriate. I did not sign the Flagship Store Authorization Letter attached as Exhibit 130 (original) and Exhibit 131 (translation), nor did anyone else at Futurity or Paul Frank. The Flagship

Store Authorization Letter is a forgery. Paul Frank has never issued any authorization letters for any of the entities listed by Grand Union / China Brands Group ("CBG") in Jennifer Huang's email dated June 22, 2022 at Exhibit 51 (original) and Exhibit 52 (translation) to the Appendix.

10. Attached to the Appendix as Exhibit 134 is a true and correct copy of an email I received on April 21, 2022 with the subject line "Re: 抖音平台商家品牌授权核实—"大嘴猴"品牌."

11. Attached to the Appendix as Exhibit 135 is a true and correct copy of a translation of Exhibit 134, an email dated April 21, 2022 with the subject line "Fw: Verification of Brand Authorization for TikTok Platform Merchants – 'Paul Frank (Big Mouth Monkey)' Brand."

12. Attached to the Appendix as Exhibit 136 is a true and correct copy of notarized screenshots of emails taken on October 13, 2022 by Huiyan Liu, attorney for Paul Frank. Ms. Liu completed Notarial Certificates on October 17, 2022. *See* p. 1-2 (original) and p. 19-20 (translation)).

13. I did not sign the Trademark Authorization Statement attached as p. 18 (original) and p. 31 (translation) to Exhibit 136. I did not affix Paul Frank's chop (stamp) to the Trademark Authorization Statement attached as p. 18 (original) and p. 31 (translation) to Exhibit 136. Prior to receiving the email at p. 16 (original) and p. 29 (translation), I had never seen this Trademark Authorization Statement.

14. Attached to the Appendix as Exhibit 137 is a true and correct copy of an email I received on December 7, 2021 with the subject line "回复：回复：回复： Sublicensee."

15. Attached to the Appendix as Exhibit 219 is a true and correct copy of an attachment to an email from an anonymous email address to legal@futuritybrands.com on February 24, 2023.

16. Attached to the Appendix as Exhibit 220 is a true and correct copy of a translation of Exhibit 219, an attachment to an email from an anonymous email address to legal@futuritybrands.com on February 24, 2023.

17. Attached to the Appendix as Exhibit 221 is a true and correct copy of an attachment to an email from an anonymous email address to legal@futuritybrands.com on February 24, 2023.

18. Attached to the Appendix as Exhibit 222 is a true and correct copy of a translation of Exhibit 221, an attachment to an email from an anonymous email address to

weintraub tobin chediak coleman grodin
LAW CORPORATION

legal@futuritybrands.com on February 24, 2023.

19. Attached to the Appendix as Exhibit 221 is a true and correct copy of a translation of Exhibit 219, an attachment to an email from an anonymous email address to legal@futuritybrands.com on February 24, 2023.

20. The database China Judgements Online (中国裁判文书网) lists verdicts from courts of all levels. The database and website are maintained by the Supreme People's Court of China. Paul Frank searched China Judgments Online for the name Nanjing Enjiu Catering Management Co Ltd (南京蒽久餐饮管理有限公司) ("Nanjing Enjiu") and found sixty-seven lawsuits filed against Nanjing Enjiu.

21. According to China Judgments Online, in twenty-one of those cases, the courts confirmed the franchise contracts and required Nanjing Enjiu and/or Grand Union / CBG to return the fees paid by the franchisees and to compensate the franchisees for their litigation fees. Dozens of other cases are still pending.

22. Paul Frank also searched for infringement cases filed by Grand Union / CBG using the database China Judgment Online. Paul Frank found 15,470 litigation records for Grand Union / CBG. It appears that many of these cases have proceeded to judgment, yet Grand Union / CBG has never attempted to discuss the splitting of the proceeds of such actions with Paul Frank.

23. In January 2023, Paul Frank attempted to update license information for one of its trademarks. It was informed by the trademark office that it could not do so because the trademark was blocked. Paul Frank investigated to determine why the trademarked was blocked, and discovered that CBG had filed a lawsuit against it in Chinese court.

24. Shortly after the lawsuit was filed, CBG filed a Petition for Property Preservation with the Chinese court seeking an order blocking all trademarks and copyrights owned by Paul Frank in China for the pendency of CBG's lawsuit. The Petition was granted without any notice to Paul Frank or opportunity to be heard.

25. In addition, if the Court agrees with CBG, it could issue a major damages finding against Paul Frank, including potential punitive damages. Such a finding could even lead to the loss of the trademarks themselves.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

26. On or about December 5th 2022, Tony Zhu, a former employee of Futurity Brands China was contacted by an investigator from the local police department. He was informed that Grand Union / CBG had filed a criminal complaint against Paul Frank, Futurity Brands China, me, Stan Wan, and Tony Chu for fraud and defamation. The basis for the criminal complaint was the Second Amendment and termination of the MLA.

27. Futurity and Paul Frank have been forced to expend significant resources to retain counsel to protect our rights in this criminal investigation. I and others at Futurity have been forced to expend significant time providing evidence to the investigator to demonstrate our innocence. If myself or any of the other individuals involved were charged with the crime of fraud, our reputations in the legal and business communities would be severely harmed and our future opportunities would be extremely limited. If any of us were convicted of fraud or defamation, we could be forced to pay a substantial fine or even be sentenced to prison. I had to step down from the China local Counsel capacity for Paul Frank Limited and eventually stopped practicing as a Chinese attorney, in order not to create any potential negative impact on the Law Firm I worked for, and other clients I represented.

28. I am informed that the initial criminal complaint has been dropped for lack of evidence. However, Grand Union / CBG continue to pursuing it by filling appeals and through different police departments. These proceedings/ investigations are still ongoing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 4 27, 2023 | 9:25 上午 PDT, at Barcelona, Spain.

Hana Mu

weintraub tobin chediak coleman grodin
LAW CORPORATION

# EXHIBIT 24

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

**Los Angeles, California**

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent.*

**JAMS REF. No. 1220073501**

---

# OPPOSITION TO MOTION FOR LEAVE TO AMEND

---

May 23, 2023

**K&L Gates LLP**

**DHH Washington DC Law Office, PC**

Counsel for Respondent Grand Union Trading Limited

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................1

II. BACKGROUND ....................................................................................................2

III. RELEVANT PROVISIONS IN THE MLA ...........................................................5

IV. ARGUMENT ....................................................................................................5

A. The Motion to Amend Must be Dismissed Because the Tribunal Does Not Have the Authority to Add CBG, A Nonsignatory to the MLA, as a Party to this Arbitration ....................................................................5

1. Legal Principles ....................................................................5

2. Under Clear Legal Principles, PF Hong Kong's Motion Must be Denied as a Matter of Law ....................................................9

B. Even If the Tribunal Had the Authority to Grant the Relief Requested by Claimant, Claimant Has Not Demonstrated that CBG Is An Alter Ego of Grand Union....................................................................10

1. Legal Principles ....................................................................11

2. Relevant Facts....................................................................12

a. Grand Union Was Established In 2013 to Enter Into License Agreements with Overseas Entities ........................................12

b. Grand Union Has A Separate and Distinct Corporate Identity from CBG....................................................................13

c. The CBG Litigation in China....................................................16

C. Respondent Would Be Prejudiced If the Motion to Amend is Granted ..........17

V. CONCLUSION....................................................................................................18

1. In accordance with JAMS' Comprehensive Arbitration Rules & Procedures (the "**Rules**") and the Arbitrator's scheduling order dated May 15, 2023, Respondent Grand Union International Trading Limited ("**Respondent**" or "**Grand Union**") hereby submits this Opposition to Claimant's Application for Leave to Amend (the "**Motion to Amend**").

## I. INTRODUCTION

2. Claimant Paul Frank Limited ("**Claimant**" or "**PF Hong Kong**")'s Motion to Amend is fundamentally flawed in myriad ways. PF Hong Kong requests that the Arbitrator add China Brands Group ("**CBG**") as a party to this arbitration, although it has not agreed to arbitrate with Claimant, and it is not a party to the Master License Agreement (**"MLA**").[1] Claimant seeks to convince this Tribunal, however, that "CBG has exerted such control and dominance over Grand Union that CBG should be directly and vicariously liable to Paul Frank under an alter ego theory." While this is not true as a matter of law, it is irrelevant—California law could not be clearer: only **a court** can compel a nonsignatory to arbitrate under an arbitration agreement.

3. Aside from this fundamental procedural flaw, which dooms the Motion to Amend out of the gate, in substance the motion fares no better. While Grand Union relies on CBG to assist it in carrying out the MLA, Grand Union observes the relevant corporate formalities, and there is nothing improper (or nefarious) about the close relationship between a parent and an affiliate. In fact, almost all of the arguments that Claimant advances in favor of alter ego liability are completely normal business practices in the context of a parent-subsidiary relationship, and are common practice when it comes to structuring licensing activities.

4. Claimant has not demonstrated (and cannot demonstrate) that Grand Union was created as a sham entity, or that CBG has used Grand Union to perpetrate a fraud. Claimant's extreme

---

[1] Claimant seeks to add CBG as a party to the arbitration, even though CBG has not been served with a demand for arbitration, and is not represented in the proceeding. Even if CBG were added to this arbitration (presumably it would object vociferously), CBG would have clear grounds to vacate the Award.

reading of California's alter ego doctrine would vitiate the corporate form, and should be rejected entirely.

5. Against these clear shortcomings, Claimant's Motion to Amend is revealed to be just another part of PF Hong Kong's all-out campaign to harass Grand Union and try to force Grand Union into giving up its pre-paid 15-year license 7 years early. It is entirely consistent with Claimant's decision to intentionally breach the MLA, and tortiously interfere with Respondent's sublicense arrangements.

6. While Respondent (and Respondent's counsel) do not represent CBG, Respondent submits this opposition to the Motion to Amend in order to ensure that this arbitration proceeds efficiently and expeditiously. This belated attempt to derail these proceedings and harass Grand Union through vexatious filings must be denied.

## II. BACKGROUND

7. This arbitration arises from a dispute between Respondent Grand Union and Claimant PF Hong Kong related to the MLA, under which Grand Union paid $65 million to Paul Frank Industries for a fully-paid 15-year license to exploit the Paul Frank Brand. Grand Union entered into the MLA in 2015 with a third-party, Paul Frank Industries, LLC ("**Paul Frank Industries**").

8. In the ensuing years, Grand Union spent significant time and energy to build up the Paul Frank Brand in China, and created a network of sublicensees throughout China to market the brand. By 2019, Grand Union's yearly revenue due to the MLA was over $20 million.

9. In 2020, Futurity Brands Switzerland AG ("**Futurity**") notified Respondent Grand Union that Futurity had acquired the rights to the Paul Frank Brand.[2] Pursuant to the transaction by which Futurity acquired the rights to the Paul Frank Brand, Paul Frank Industries' rights under the MLA were assigned to Futurity's subsidiary, PF Hong Kong. In other words, the

[2] **R-IR-3.**

Claimant itself is simply an affiliate within the Futurity group, which Futurity uses to execute its rights under the MLA.

10. Given that Grand Union had prepaid the licensing fee under the MLA in 2015, Futurity could not monetize the Paul Frank Brand in the MLA's Territory. Accordingly, Futurity and PF Hong Kong initiated a scheme to extort additional payments from Grand Union, and/or to gin up a pre-textual basis to terminate the MLA so that it could license the Paul Frank Brand directly for royalties. Futurity and PF Hong Kong therefore almost immediately after the acquisition began sending threatening letters to Grand Union containing extremely vague allegations of breaches, and demanding additional payments from Grand Union.

11. At the same time, PF Hong Kong stopped providing Grand Union with important documentation (authorization letters and powers of attorney) that was required for Grand Union and its sublicensees to exploit the rights granted in the MLA. Grand Union therefore agreed in 2021 to pay an additional $8.5 million to PF Hong Kong (and a monthly "Brand Management Fee")[3] in connection with the Second Amendment, hoping to encourage PF Hong Kong to provide required documents, and stop harassing Grand Union and Grand Union's sublicensees.

12. Despite Grand Union's efforts to keep the peace, the payments from Grand Union to PF Hong Kong only emboldened PF Hong Kong. In 2022, PF Hong Kong dusted off its old playbook and re-ran the same play: claim numerous but vague and unsubstantiated "material breaches," threaten to terminate the MLA if the breaches were not cured, and demand additional money (while refusing to explain what the breaches were so they could be cured) from Grand Union.[4] Grand Union, now familiar with PF Hong Kong's tactics, did not to make another ransom payment to PF Hong Kong. PF Hong Kong then purported

---

3 This fee was ostensibly for rights to a related brand, but that brand was worthless and merely included as a token to provide some legitimacy to this payment.

4 *See, e.g.*, Email from Futurity on behalf of PF Hong Kong to Grand Union re: Notice of Termination dated September 23, 2023 (**Claimant's Exhibit 10**); September 23, 2023 Letter from PF Hong Kong to Grand Union (**Claimant's Exhibit 11**).

to terminate the MLA. Claimant's own Motion for a Preliminary Injunction has since laid bare how baseless PF Hong Kong's grounds were which purported to justify termination of the MLA. This will be explained in more detail in Respondent's responsive pleading related to the requests for interim relief.

13.    In any event, Claimant initiated this arbitration with a Demand for Arbitration dated November 22, 2022. On December 16, 2022, Grand Union filed its Response and Counterclaims.

14.    The Arbitrator issued Scheduling Order No. 1 on March 22, 2023. Under Scheduling Order No. 1, fact discovery is to conclude by August 15, 2023. A hearing is to be conducted between November 6 and November 8, 2023.

15.    On March 24, 2023, Respondent applied to the Arbitrator for Interim Relief, specifically seeking a preliminary injunction ordering Claimant to comply with the MLA while the arbitration is pending. Respondent continues to be irreparably harmed as Claimant continues to undermine Respondent's sublicense agreements, and instead contract directly with Respondent's sublicensees to market the Paul Frank Brand in the MLA's Territory.

16.    On April 27, 2023, in retaliation for Respondent filing the application for interim relief, Claimant filed an opposition to Respondent's Application for Interim Relief, and purported to cross-move for its own preliminary injunction, a maneuver which appears to have served no purpose besides extending the briefing schedule.  The Claimant included 221 exhibits in its Application, wherein it plainly admits that it is:

- breaching the MLA and intentionally harming Grand Union's business by providing the required authorization documentation (it refused to provide to Grand Union) directly to Grand Union's sublicensees;
- entering into agreements directly with Grand Union's sublicensees; and
- proclaiming that Grand Union has no right to the remaining 7 years of its 15-year license, including to Platforms through which Grand Union and/or Grand Union's sublicensees did business related to exploiting Grand Union's rights under the MLA.

## III. RELEVANT PROVISIONS IN THE MLA

17. While CBG employees negotiated parts of the MLA with Futurity, CBG is not a signatory to the MLA. The signatories to the original MLA, and the First Amendment thereto, are Grand Union and Paul Frank Industries. The Second Amendment to the MLA was executed by and between Grand Union and PF Hong Kong.[5]

18. The second paragraph of the First Amendment to the MLA replaced "Section 28 - Dispute Resolution" in the MLA in its entirety. In relevant part, this operative dispute resolution section states:

> If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California…in accordance with the laws of the State of California for agreements made in and to be performed in the State.[6]

19. The third paragraph of the First Amendment to the MLA replaced Section 30 of the MLA, and states in its entirety that the MLA "shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to the conflicts of law."[7]

## IV. ARGUMENT

### A. The Motion to Amend Must be Dismissed Because the Tribunal Does Not Have the Authority to Add CBG, A Nonsignatory to the MLA, as a Party to this Arbitration

#### 1. Legal Principles

20. Rule 6(f) of the JAMS Comprehensive Arbitration Rules & Procedures states "Where a third party seeks to participate in an Arbitration already pending under these Rules or where

---

5 Second Amendment to the MLA (**R-IR-21)**; Email from Saban to Grand Union re: Notice of Assignment of MLA dated December 9, 2020 (**R-IR-3**).

6 First Amendment to the MLA, § 2 (**R-IR-20**).

7 First Amendment to the MLA, § 3 (**R-IR-20**).

a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator shall determine such request, taking into account all circumstances he or she deems relevant and applicable."[8]

21. It is well established that "an amendment (or counterclaim) may only be permitted if it is within the scope of the tribunal's jurisdiction under the parties' arbitration agreement and otherwise."[9] Arbitration is a creature of contract, so "[g]enerally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it."[10] "While arbitration is a favored method of resolving disputes, the policy favoring arbitration cannot displace the necessity for an agreement to arbitrate and does not extend to those who are not parties to such an agreement."[11]

22. CBG is not a signatory to the MLA, so Claimant must find another basis to compel CBG to arbitrate.

---

8 JAMS Comprehensive Arbitration Rules & Procedures, Rule 6(f) (**RL-IR-13**).

9 Gary B. Born, International Commercial Arbitration (Third Edition), § 15.08[X] (Kluwer Law International, Updated August 2022) (**RL-IR-14**).

10 *Pac. Fertility Cases*, 85 Cal. App. 5th 887, 892, 301 Cal. Rptr. 3d 611, 615 (2022) (**RL-IR-15**); *see also* Gary B. Born, International Commercial Arbitration (Third Edition), § 10.01[A] (Kluwer Law International, Updated August 2022) ("The principle that the rights and obligations of an arbitration agreement apply only to the agreement's parties is a straightforward application of the doctrine of privity of contract, recognized in both civil and common law jurisdictions.") (**RL-IR-16**).

The United States Supreme Court has found that nonsignatories to an arbitration agreement may be compelled to arbitrate based upon traditional principles of state law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S. Ct. 1896, 1902, 173 L. Ed. 2d 832 (2009) ("traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel…") (internal quotations omitted) (**RL-IR-17**); *see Jenks v. DLA Piper Rudnick Gray Cary U.S. LLP*, 2015 WL 8959445 (Cal. App. 1st Dist. 2015) ("There are six theories by which a nonsignatory to an arbitration agreement may be bound to arbitrate: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing or alter ego, (5) estoppel, and (6) third-party beneficiary; these circumstances also serve as grounds for an eligible nonsignatory to enforce an arbitration agreement against a signatory.") (**RL-IR-18**).

11 *Boys Club of San Fernando Valley, Inc. v. Fid. & Deposit Co.*, 6 Cal. App. 4th 1266, 1271, 8 Cal. Rptr. 2d 587, 589 (Cal. Ct. App. 1992) (citation omitted) (**RL-IR-19)**.

23.    Claimant argues the question must be analyzed under California law.[12] Respondent does not disagree.  Unfortunately for Claimant, California has a long-standing public policy that a nonsignatory cannot be compelled to arbitrate *by an arbitrator*. Only a court has the authority to compel a nonsignatory to arbitrate.

24.    In *Benaroya v. Willis*,[13] Appellant Benaroya Pictures contracted with Westside Corporation to have Bruce Willis perform in a movie that Benaroya Pictures was developing. After a dispute about payment arose, Willis and Westside Corporation commenced an arbitration against Benaroya Pictures pursuant to an arbitration clause in the parties' contract. Willis and Westside Corporation then sought to amend their arbitration demand to add Michael Benaroya, a nonsignatory to the relevant arbitration agreement, on the grounds that Mr. Benaroya was an alter ego of Benaroya Pictures. The arbitrator granted the request, over the objection of Mr. Benaroya, and added Mr. Benaroya as a party to the arbitration.[14]

25.    At the conclusion of the arbitration, the arbitrator found that Benaroya Pictures was an alter ego of Mr. Benaroya, that Benaroya Pictures and Mr. Benaroya were liable, and awarded damages to Willis and Westside Corporation. The trial court confirmed the award, and denied Mr. Benaroya's petition to vacate the award. On appeal, the California Court of Appeal reversed the trial court. The Court of Appeal stated that "while it is true that the language of an arbitration agreement determines the scope of the arbitrator's powers granted by the signatories, the agreement cannot bind nonsignatories, absent a **judicial determination** that that nonsignatory falls within the limited class of third-parties who can be compelled to arbitrate."[15]

26.    The *Benaroya v. Willis* court explained the strong public policy supporting the outcome:

---

[12]    *See* Motion to Amend, § III (citing California Code of Civil Procedure and California precedent).

[13]    23 Cal. App. 5th 462 (Cal. Ct. App. 2018) (**RL-IR-20**).

[14]    *Id*. at 464 (**RL-IR-20**).

[15]    *Id*. at 468 (emphasis added) (**RL-IR-20**).

> Although California has a strong policy favoring arbitration, our courts also recognize that the right to pursue claims in a judicial forum is a substantial right and one not lightly to be deemed waived. Because the parties to an arbitration clause surrender this substantial right, the general policy favoring arbitration cannot replace an agreement to arbitrate. Thus, the right to compel arbitration depends upon the contract between the parties, and a party can be compelled to submit a dispute to arbitration only where he has agreed in writing to do so.[16]

27. The California Court of Appeal continued, in no uncertain terms, "although a nonsignatory can be compelled to arbitrate, California case law is clear that an arbitrator has no power to determine the rights and obligations of one who is not a party to the arbitration agreement. The question of whether a nonsignatory is a party to an arbitration agreement is a question reserved for the trial court in the first instance."[17]

28. The First Amendment to the MLA, Section 28, states that "such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator…" Claimant may argue (although it has not yet) that the parties thus delegated any issues of arbitrability and enforceability of the arbitration clause to the arbitrator, and that the arbitrator can determine whether CBG can be added as a party to this arbitration. But this position is incorrect.

---

16 *Id*. at 468-69 (quotations omitted) (**RL-IR-20**).

17 *Id*. at 469 (**RL-IR-20**); *see also American Builder's Assn. v. Au-Yang*, 226 Cal.App.3d 170, 179, 276 Cal.Rptr. 262 (Cal. Ct. App. 1990) ("If an arbitrator, rather than a trial court, were to determine whether an arbitration provision were operative against a nonsignatory, a stranger to the agreement might be subjected to and be bound by an arbitration to which such stranger had not consented and would be without effective review.") (**RL-IR-21**); *Boys Club of San Fernando Valley*, 6 Cal. App. 4th at 1271 ("Whether or not an arbitration agreement is operative against a person who has not signed it involves a question of 'substantive arbitrability' which is to be determined by the court.") (**RL-IR-19**); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) (finding that only district court had jurisdiction to decide whether dispute was arbitrable between signatory and nonsignatory absent "clear and unmistakable evidence" that signatory agreed arbitrate arbitrability with a nonsignatory) (**RL-IR-22**); *Jorgens v. Janke*, 77 Fed. Appx. 420 (9th Cir. 2003) (finding whether non-signatory agent for corporation had authority to invoke the arbitration clause in a merger agreement between investors and corporation was required to be decided by the court, rather than the arbitrator, under California law) (**RL-IR-23**).

29. California courts have held that "the threshold issue of whether the delegation clause is even applicable to a certain party must be decided by the Court."[18] Again, while a delegation clause may bind parties that have agreed to arbitrate a dispute, it cannot bind a nonsignatory, such as CBG.

### 2. Under Clear Legal Principles, PF Hong Kong's Motion Must be Denied as a Matter of Law

30. PF Hong Kong's Motion to Amend fails as a matter of law.

31. PF Hong Kong admits that CBG is not a party to the MLA. Accordingly, CBG cannot be forced to submit, to the Arbitrator, the threshold question of whether it can be forced to arbitrate under the MLA in the first place. This is the clear law of California. The Motion to Amend is thus procedurally improper, and must be denied out of pocket.

32. PF Hong Kong must have known that it's Motion to Amend was meritless, as it also did not even bother to actually serve CBG with a demand for arbitration or any other document. PF Hong Kong ignores proper procedural norms (including the basic notion of serving a pleading), vexatiously seeking to increase Grand Union's costs, and frustrate Grand Union's request for interim relief.[19]

---

18 *Scott v. Windsor Sacramento Ests., LLC*, No. C091077, 2021 WL 5563499, at *1 (Cal. Ct. App. Nov. 29, 2021) (quotations omitted) (unpublished/noncitable) (**RL-IR-24**); *Jurosky v. BMW of North America, LLC*, 441 F.Supp.3d 963, 969 (S.D. Cal. 2020) ("[A] delegation clause granting authority to an arbitrator to decide issues of application, enforceability, or interpretation are [sic] only applicable to the parties of the agreement.") (**RL-IR-25**); *American Builder's Assn.*, 226 Cal.App.3d at 179 (**RL-IR-21**); *Theresa D. v. MBK Senior Living LLC*, 73 Cal. App. 5th 18, 27, 288 Cal. Rptr. 3d 87, 93 (Cal. Ct. App. 2021), *review denied* (Mar. 9, 2022) (finding that in the absence of an agreement to arbitrate, there was no basis to require plaintiff to submit any issue to the arbitrator) (**RL-IR-26**); *Soto v. Am. Honda Motor Co.*, 946 F. Supp. 2d 949, 954 (N.D. Cal. 2012) ("The provisions granting authority to the arbitrator to decide issues of scope are by definition are [sic] only applicable to the parties of the agreement. Thus, the Court must first decide which parties are bound by delegation clause, before the arbitrator can decide the interpretation and scope of the arbitration clause.") (**RL-IR-27**).

19 Under Rule 5 of the JAMS Comprehensive Arbitration Rules and Procedures, a demand for arbitration must be made in order to commence arbitration against a party. JAMS Comprehensive Arbitration Rules and Procedures, Rule 5 (stating that arbitration shall commence once, among

33. In order to try sidestep this clear law and procedural requirements, PF Hong Kong also falsely claims that "CBG has already effectively appeared in this action, through the filing of the Counterclaim and Witness Statement clearly showing that CBG is in control of this Arbitration, not Grand Union."[20] This conclusory claim is ultimately without merit. *First*, the Counterclaim is clearly submitted on behalf of Grand Union, as stated in the Response and Counterclaims itself. This is beyond dispute. *Second*, while CBG employees did submit witness statements in support of Respondent's Application for Interim Relief, Claimant submits no authority to support the contention that an employer has *appeared* in an arbitration, or otherwise consented to arbitrate, merely because its employee submits a witness statement in support of a separate party's claims in an action.

34. Such a rule does not exist, and it would be illogical. It would undermine the very essence of judicial/arbitral proceedings and legal personage in those proceedings.  It would also hinder proper evidence-gathering and the role of witnesses in such proceedings. Simply because a witness have relevant information and submits such evidence in a proceeding does not mean that his/her employer appears in such proceedings or submits to arbitration.

35. PF Hong Kong's arguments in support of its Motion to Amend plainly violate applicable law, and are outlandish.  The Motion to Amend simply shows the extremely to which PF Hong Kong will go to try to destroy Grand Union's business and rights under the MLA, and it should be denied without the Tribunal need to go any further into the analysis.

   **B.    Even If the Tribunal Had the Authority to Grant the Relief Requested by Claimant, Claimant Has Not Demonstrated that CBG Is An Alter Ego of Grand Union**

36. Subject to its procedural objections and arguments above, even if the Tribunal did decide to go further into the analysis, the Motion to Amend fails on the merits as well.  PF Hong Kong does not even come close in this preliminary filing of proving that "CBG has exerted such control and dominance over Grand Union that CBG should be **directly and**

---

other requirements, claimant provides evidence "the Demand for Arbitration has been served on all Parties.") (**RL-IR-13**).

[20]    Motion to Amend, p. 5.

**vicariously liable to Paul Frank under an alter ego theory**."  Seeking such an extreme remedy at this point in the proceeding is bizarre and unnecessary.  Further, the facts simply do not support PF Hong Kong's case.

### 1.    Legal Principles

37.    "Alter ego is an extreme remedy, sparingly used.  The standards for the application of alter ego principles are high, and the imposition of [alter ego] liability...is to be exercised reluctantly and cautiously."[21]

38.    "Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds."[22] A finding of alter ego liability requires, in other words, that the corporate form was improperly used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose.

39.    Before the alter ego doctrine may be invoked, two additional elements must be established: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow."[23]

---

[21]    *JPV I L.P. v. Koetting*, 88 Cal. App. 5th 172, 189, 304 Cal. Rptr. 3d 550, 564 (2023), *review denied* (May 17, 2023) (internal quotations omitted) (**RL-IR-28**); *see also Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal.App.3d 1220, 1249, 1 Cal.Rptr.2d 301 (1991) ("sound public policy dictates that imposition of alter ego liability be approached with caution.") (**RL-IR-29**).

[22]    *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538, 99 Cal. Rptr. 2d 824, 836 (2000) (**RL-IR-30**).

[23]    *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 326 (C.D. Cal. 2004) (internal quotations omitted) (**RL-IR-31**).

40. A finding of alter ego liability thus requires at least the following three findings: (1) that the corporate form was used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose; (2) that there is a sufficient unity of interest and ownership that the separate personalities of the entity and its alter ego no longer exist; and (3) that if the acts of the entity are attributed to the entity alone, and not the alter ego, an inequitable result will follow.

41. Additional factors to consider when evaluating whether to apply the doctrine include: (1) commingling of funds and other assets of the two entities; (2) the holding out by one entity that it is liable for the debts of the other; (3) identical equitable ownership in the two entities; (4) use of the same offices and employees; (5) use of one as a mere shell or conduit for the affairs of the other; (6) inadequate capitalization; (7) disregard of corporate formalities; (8) lack of segregation of corporate records; and (9) identical directors and officers.[24]

**2. The Motion to Amend Fails on the Facts**

42. Claimant's arguments fall short of demonstrating that (1) CBG used the corporate form to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose; (2) that there is a sufficient unity of interest and ownership of Grand Union and CBG that the separate personalities of the entity and its alter ego no longer exist; and (3) that if the acts of the Grand Union are attributed to Grand Union alone, and not CBG, an inequitable result will follow.

**a. Grand Union Was Established In 2013 to Enter Into License Agreements with Overseas Entities**

---

24 *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538–39 (**RL-IR-30**).

43. CBG was founded in 2010, and manages a number of brands in China, including The Simpsons, Sesame Street and Paul Frank.[25] CBG is authorized by Grand Union to manage the Paul Frank Brand, as is commonplace in the licensing business.[26]

44. Claimant baselessly asserts that "Grand Union is simply a shell corporation set up to hold the intellectual property rights under the MLA."[27] This is not true. Grand Union was founded in 2013 as an indirect, wholly-owned subsidiary of CBG in order to facilitate CBG's efforts to enter into contracts with overseas entities.[28] **There are two other entities / levels of ownership between CBG and Grand Union**.[29] Ultimately, Grand Union entered into the MLA in 2015, and Grand Union commercializes the rights under the MLA.[30]

**b. Grand Union Has A Separate and Distinct Corporate Identity from CBG**

45. At the core of Claimant's Motion to Amend is the claim that CBG "has exerted such control and dominance over Grand Union" that it should be subject to alter ego liability.[31] But this is, by itself, far short of what Claimant must demonstrate in order to pierce the corporate veil, let along three levels of corporate veils: "[a]s the Ninth Circuit and California courts have routinely observed…a parent's complete control of a subsidiary does not show that there is an alter ego relationship between the two."[32]

---

25 First Witness Statement of Zheng Bo dated May 23, 2023 ("First Zheng Bo WS") ¶¶ 4, 7 (**RWS-3**).

26 First Zheng Bo WS, ¶ 8 (**RWS-3**).

27 Motion to Amend, p. 7.

28 First Zheng Bo WS, ¶ 9 (**RWS-3**).

29 First Zheng Bo WS, ¶ 9 (**RWS-3**).

30 First Zheng Bo WS, ¶ 10 (**RWS-3**).

31 Motion to Amend, p. 5.

32 *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1138 (C.D. Cal. 2015) (**RL-IR-32**); *see also Katzir's Floor & Home Design, Inc. v. M–MLS.com*, 394 F.3d 1143, 1149 (9th Cir.2004) ("[The] mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law") (**RL-IR-33**).

46. Claimant alleges in the Motion to Amend that Grand Union "does no business," and that it is a mere shell of CBG.[33] These conclusory allegations are not true, and no real evidence is presented to support the allegation. Further, ironically, Claimant assumes based upon its own claims that Grand Union no longer has any rights under the MLA. In this sense, Claimants actually relies on its own wrongful conduct and tortious interference with Grand Union's sublicensees, seeking to effectively destroy Grand Union's business at present.

47. However, prior to Claimant's wrongful conduct, Grand Union had hundreds of sublicense agreements in place, which it used to market the Paul Frank Brand under the MLA. Grand Union's yearly revenues increased to over $20 million in 2019, which will be shown in these proceedings, and were many millions even in 2022, despite Claimant's efforts to destroy Grand Union's business.[34] Far from a "mere shell,"[35] Grand Union has a legitimate and substantial business.

48. Claimant also states that Grand Union and CBG have no separate assets or bank accounts. This is simply not true. Grand Union and CBG have segregated bank accounts, and Grand Union maintains separate financial statements and business records which are audited separately from CBG.[36] Grand Union maintains its own bank account, which it uses to receive payments under the MLA from the Sublicensees, and it also engages its own lawyers, accounts, and other professionals when necessary.[37]

49. Grand Union does not commingle assets with CBG, another factor in the alter ego analysis,[38] as Claimant alleges. Grand Union also made an $8.5 million payment, as required under the Second Amendment to the MLA, from Grand Union's bank account.[39]

---

33 Motion to Amend, p. 7.

34 **RWS-1**, ¶

35 *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538–39 (**RL-IR-30**).

36 First Zheng Bo WS, ¶ 14, 16 (**RWS-3**)

37 First Zheng Bo WS, ¶ 15, 16 (**RWS-3**)

38 *Sonora Diamond Corp.*, 83 Cal. App. 4th at 538–39 (**RL-IR-30**).

39 First Zheng Bo WS, ¶ 16 (**RWS-3**)

At the instruction of PF Hong Kong and its parent, Futurity, Grand Union made that payment to Futurity.

50. Claimant's Motion to Amend asserts that Grand Union has no employees,[40] but this is not true. Grand Union has three employees that work solely for Grand Union to provide the authorizations and certifications that allow Grand Union's sublicensees to market the Paul Frank Brand.[41] Further, Claimant blatantly misconstrues the facts by alleging that "approval and stamping" tasks amount to "rubber stamp[ing] the actions of CBG." Anyone that has ever been exposed to business in China understands that "stamping" or to "stamp" something (sometimes referred to as "chopping") is a process of signing and managing documentation which carries great significance.

51. Contrary to Claimant's allegations in the Motion to Amend, Claimant has physical offices in Tsingdao and Hong Kong.[42] Claimant tries to make something of the fact that the Shanghai office is a "cubicle from an affiliated company." Claimant does not even allege that the cubicle is from Grand Union's alleged alter ego, CBG, but in any event, sharing office space does not necessarily demonstrate abuse of the corporate form or an alter ego relationship.[43] This is completely normal in the context of a parent-subsidiary relationship.

52. Claimant cherry picks a handful of quotes from Bo Zheng, an executive at CBG who stated that CBG had entered into an agreement to license the Paul Frank Brand and had built it into a thriving brand in China.[44] But these cherry-picked quotes, which are completely

---

40 Motion to Amend, p. 7.

41 First Zheng Bo WS, ¶ 12 (**RWS-3**); *see also* Transcript of March 15, 2023 Hearing (**Claimant's Exhibits 186 and 187**).

42 First Zheng Bo WS, ¶ 13 (**RWS-3**); *see also* Transcript of March 15, 2023 Hearing (**Claimant's Exhibits 186 and 187**).

43 *Gerritsen*, 116 F. Supp. 3d at 1139 ("the fact that a parent and subsidiary share the same office location, or the same website and telephone number, does not necessarily reflect an abuse of the corporate form and existence of an alter ego relationship.") (**RL-IR-32**).

44 Motion to Amend, p. 9.

ordinary in the context of a parent-subsidiary relationship, cannot support the extreme remedy of piercing the corporate veil.[45]

53. Claimant also tries to make much of the fact that in a litigation filed in China, Bo Zheng stated that he is the "sole Director" of Grand Union and the "legal decisionmaking person."[46] is not enough to sustain an alter ego finding. As stated by one California court, "[o]verlap between a parent's and a subsidiary's directors or executive leadership alone…is not suggestive of a unity of interest and ownership…because [it] is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary."[47]

54. In sum, Claimant's conclusory allegations fail to demonstrate a sufficient unity of interest and ownership of Grand Union and CBG that the separate personalities of the entity and its alter ego no longer exist. CBG has separate employees, separate offices, segregates its assets, and observes all relevant corporate formalities. Despite Claimant's attempts to characterize their relationship nefariously, Grand Union and CBG have a relatively straightforward and proper parent-subsidiary relationship, which does not justify piercing the corporate veil. Claimant cannot meet the exacting standard that it would be required to show.

**c. The CBG Litigation in China**

55. The infringement claim that CBG filed in China against Grand Union and PF Hong Kong under Chinese law does not support Claimant's Motion for Leave to Amend either. Claimant appears to argue that the Chinese litigation is an example of CBG abusing the corporate form to accomplish some wrongful or inequitable purpose. That is incorrect for a variety of reasons.

---

45 *See Gerritsen*, 116 F. Supp. 3d at 1140 (parent issuing press releases on behalf of subsidiary in parent's name is a "common aspect[] of parent-subsidiary relationship[].") (**RL-IR-32**).

46 Motion to Amend, p. 12.

47 *Sonora Diamond Corp.*, 83 Cal.App.4th at 548–49 (citations omitted) (**RL-IR-30**).

56. First, CBG misconstrues the lawsuit, and apparently does not know the first thing about trademark law. As clarified in the "Ruling" submitted as Claimant's Exhibit 127, the action is a trademark infringement action. This relates to trademark law in China, and relates to "property preservation" relating to certain trademarks, registered or pending, and copyrights "in the Chinese mainland." Further, there is another Petitioner in that lawsuit, Shanghai Hong Fang Culture Co., Ltd. The Tribunal would not have jurisdiction over how the IP registry in China deals with the trademark and copyright registration relating to that infringement action. Grand Union is a party to the case as a nominal "respondent." Claimant has admitted as much by asserting claims under the Lanham Act in this case, even though the Lanham Act would also clearly not apply to trademarks registered in China.

57. CBG has not agreed to arbitrate any dispute with PF Hong Kong, nor are CBG's claims under Chinese law arbitrable in the first place. PF Hong Kong has contested jurisdiction in the Chinese court, and the Chinese court is perfectly capable of determining its own jurisdiction to hear CBG's claims relating to certain IP registrations in China. The Chinese court is also perfectly capable of determining infringement claims under Chinese law between PF Hong Kong, a company based in Hong Kong, and various entities in China that never agreed to arbitrate with Grand Union or PF Hong Kong.

**C. Respondent Would Be Prejudiced If the Motion to Amend is Granted**

58. Claimant alleges that neither Grand Union nor CBG would be prejudiced if the Motion to Amend is granted. But Grand Union would be prejudiced by such a late amendment, over six months after Claimant initiated this arbitration.

59. Discovery is slated to end in less than three months, and a hearing is scheduled less than three months after. Claimant's procedural gambit will only serve to delay a final hearing, and disrupt discovery in this procedure. It is already disrupting and delaying the presentation of Grand Union's application for interim relief.

60.    Moreover, Claimant offers no excuse or explanation for why it waited this long to add CBG as a party to the arbitration, even though Claimant has been aware of CBG's role as the corporate parent of Grand Union for several years. Such delay operates as waiver.

## V.    CONCLUSION

61.    For all the reasons above, Grand Union respectfully requests that the Motion for Leave to Amend be denied in its entirety, and Grand Union be awarded its costs.

Dated: May 23, 2023.

**Submitted for and on behalf of the Respondent**

**K&L GATES LLP**
**Attorneys for the Respondent**
**May 23, 2023**

# EXHIBIT 25

**JUDICIAL ARBITRATION AND MEDIATION SERVICES**

Los Angeles, California

**Paul Frank Limited**

*Claimant*

v.

**Grand Union International Trading Limited**

*Respondent.*

**JAMS REF. No. 1220073501**

---

# FIRST WITNESS STATEMENT OF ZHENG BO 郑波的第一份证人证词

---

May 23, 2023

I, ZHENG BO, declare: 本人郑波陈述如下：

**INTRODUCTION 简介**

1. I provide this Witness Statement in support of Respondent Grand Union International Trading Limited ("**Grand Union**")'s opposition to Claimant Paul Frank Limited ("**PF Hong Kong**")'s Motion for Leave to Amend Demand for Arbitration.

   我提交这份证人证词，以支持被诉人宏联国际贸易有限公司（ "**宏联**" ）反对保罗·弗兰克有限公司（ "**PF 香港**" ）提出的修改仲裁要求的许可申请。

2. I am currently the sole director of Grand Union, and have worked at Grand Union since 2013. I am also the chairman and chief executive officer of China Brands Group ("**CBG**").

   我目前是宏联的唯一董事。我自 2013 年以来一直于宏联工作。我也是红纺文化有限公司（"**红纺 / CBG**"）的董事长兼总经理。

3. I have prepared this witness statement with the assistance of counsel for style and grammar but this statement is my own. The contents of this witness statement are based upon my personal knowledge, as well as documents I have reviewed and referenced herein. I affirm this statement is true to the best of my knowledge and belief. 律师在这份证人证词的风格和语法上给予了本人协助，但这份证词是本人自己的。本证人证词的内容基于我的个人知识，以及我在本文中审阅和引用的文件。我确认，就我所知和所信，这证人证词是真实的。

**INFORMATION RELATING TO CBG'S AND GRAND UNION'S CORPORATE STRUCTURE AND BUSINESS 红纺和宏联的公司结构和业务**

4. CBG was founded in 2010.

   红纺成立于 2010 年。

5. CBG's primary place of business (i.e. headquarters) is located at 196 Tianjingshan 1st Road, Jimo District, Qingdao City, Shandong Province.

红纺的主要营业地（总部）位于山东省青岛市即墨区天井山一路 196 号。

6. The directors and officers of CBG include myself, Liang Hong, Liu Peng, Hu Yu, Zheng Gang, Wang Fu, Wu Xinming, Wu Hao, Yuan Zhi and Zheng Tao.

红纺的董事和高级职员包括本人、梁红、刘朋、胡钰、郑刚、王傅、武新明、吴昊、袁治及郑涛。

7. CBG manages many different brands in China, including The Simpson, Sesame Street and Paul Frank.

红纺在中国管理着许多不同的品牌，包括辛普森一家、芝麻街及和大嘴猴。

8. CBG is authorised by Grand Union to manage the Paul Frank brand, which is common in the licensing business.

红纺获宏联授权管理 Paul Frank 品牌，这在授权业务中很常见。

9. Grand Union is an indirect wholly-owned subsidiary of CBG. There are two other entities between Grand Union and CBG. Grand Union was formed in 2013 in order to facilitate CBG group to enter into contracts with overseas entities. CBG is the agent responsible for the Grand Union's business in the People's Republic of China.

宏联是红纺的间接全资附属公司，宏联及红纺之间有两家公司。宏联成立于 2013 年，成立目的是为了方便集团与海外个体签订合约 ，而红纺是负责宏联在国内业务的代理公司。

10. Grand Union is the counterparty to the Master License Agreement ("**MLA**") relevant to this case, and commercialize the rights under the MLA.

宏联是与本案相关的主许可协议("**MLA**") 的合约一方，并将 MLA 下的权利商业化。

11.    As the sole director of Grand Union, I pass resolutions regularly to direct Grand Union's business at a high level. Apart from me, the employees of Grand Union do not work for CBG.

本人作为宏联的唯一董事会定期通过决议来指导宏联的业务。除了我以外，宏联人员并没在红纺任职。

12.    Grand Union directly enters into employment contracts with its employees. Grand Union has three employees.

宏联直接和其雇员签署雇佣协议。宏联有三名员工。

13.    The registered office of Grand Union is at Room 1303, 13/D, New East Ocean Centre, 9 Science Museum Road, Tsim Sha Tsui, Kowloon, Hong Kong. At the same time, Grand Union has rented an independent office in Tsingdao.

宏联的注册办公室在香港九龙尖沙咀科学馆道 9 号新东海中心 13 楼 1303 室。同时，宏联在青岛市租赁了独立办公室。

14.    The assets of Grand Union are independent from CBG. Grand Union has its own financial statements and business records.  In addition, Grand Union's finances are audited each year by independent auditors, and separate from CBG.

宏联的资产独立于红纺。宏联有自己的财务报表和业务记录。此外，宏联的财务状况每年都由独立审计机构进行审计，并与红纺分开。

15.    Grand Union engages law firms, accountants, and other professional in its own right to advise Grand Union's business. For example, Grand Union hired O'Melveny & Myers LLP to negotiate and close the MLA with Paul Frank Industries LLC.  Grand Union itself also hired K&L Gates LLP to represent it in this arbitration.

宏联聘请律师事务所、会计师和其他专业人士就宏联业务提供咨询。例如，宏联聘请 O’Melveny 与 Paul Frank Industries LLC 谈判并完成 MLA。宏联本身也聘请了 K&L Gates 在本次仲裁中代表它。

16. Grand Union has an independent bank account. Under the MLA, the license fee payable to PF Hong Kong is made through the bank account of Grand Union. The quarterly management fee payable to PF Hong Kong is paid through the bank account of CBG in accordance with the third amendment to the MLA dated February 10, 2022.

宏联拥有独立的银行账户。根据 MLA，支付给 PF Hong Kong 的版权金是透过宏联帐户支付，而依据 2022 年 2 月 10 日的第三补充协议，支付给 PF Hong Kong 的季度管理费是由红纺帐户支付。

ZHENG BO 郑波

| | |
|---|---|
| Dated: | May 23, 2023 |
| 日期： | 2023 年 5 月 23 日 |
| Place of signature: | Shanghai, People's Republic of China |
| 签字地点： | 中华人民共和国上海 |

# EXHIBIT 26

JESSICA R. CORPUZ (SBN 279237)
KATIE A. COLLINS (SBN 309475)
KAVAN J. JEPPSON (SBN 327547)
WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN
**LAW CORPORATION**
jcorpuz@weintraub.com
kcollins@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**ARBITRATION BEFORE JAMS**

**LOS ANGELES, CALIFORNIA**

PAUL FRANK LIMITED,

Claimant,

v.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Respondent.

GRAND UNION INTERNATIONAL TRADING LIMITED,

Counter-Claimant,

v.

PAUL FRANK LIMITED,

Counter-Respondent.

JAMS Ref. No. 5220002118

**PAUL FRANK LIMITED'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND DEMAND FOR ARBITRATION**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..... 4

II. PAUL FRANK SHOULD BE GRANTED LEAVE TO AMEND THE DEMAND FOR ARBITRATION ..... 5

A. Grand Union / CBG's Response Misstates the Issue to be Decided by the Arbitrator ..... 5

B. The Arbitrator Has Authority to Allow Paul Frank to Amend the Demand for Arbitration ..... 6

C. There is no Dispute that CBG is the Alter Ego of Grand Union ..... 9

III. CONCLUSION ..... 12

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021 (9th Cir. 2022)........ 8

*Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201 (9th Cir. 2016)........ 7

**STATE CASES**

*Board of Trustees of Leland Stanford, Jr. University v. Superior* Court, 149 Cal. App. 4th 1154, 1163 (2004)........ 6

*Kittredge Sports Co. v. Superior Court*, 213 Cal. App. 3d 1045 (1989)........ 6

*Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 30 Cal. App. 5th 970 (2018)........ 7

*Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096 (2018)........ 7

*Redevelopment Agency v. Herrold*, 86 Cal. App. 3d 1024 (1978)........ 6

*Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231 (2014)........ 7

*Zakarian v. Bekov*, 98 Cal. App. 4th 316 (2002)........ 8

**RULES**

JAMS Comprehensive Arbitration Rules & Procedures, Rule 6(e)........ 6

JAMS Comprehensive Arbitration Rules & Procedures, Rule 6(f)........ 8

JAMS Comprehensive Arbitration Rules & Procedures, Rule 10........ 5

JAMS Comprehensive Arbitration Rules & Procedures, Rule 11(b)........ 8

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

## I. INTRODUCTION

Paul Frank[1] seeks the Arbitrator's leave to amend its Demand for Arbitration in order to allege a claim against CBG on the grounds that it is the alter ego of Grand Union. Paul Frank's Motion set forth the grounds for its alter ego allegations in order to establish the validity of Paul Frank's claims against CBG and the basis on which Paul Frank would seek to hold CBG liable.

Grand Union has filed a heated "Opposition" in an effort to defend its alter ego CBG against a claim in this Arbitration, including a series of ad hominem attacks on Paul Frank's motivation and integrity. In fact, the majority of the Opposition is dedicated to litigating the ultimate issues in the Arbitration and the respective injunctions each party has requested via separate motion. Although Paul Frank vehemently disputes the facts set forth in the Opposition, this is not the proper venue for such questions.

The frenzied Opposition demonstrates with absolute clarity that Grand Union is unquestionably the alter ego of CBG. Only an alter ego would file such an Opposition in order to advance its own interests. A true third party is perfectly capable of defending itself. Yet the Opposition makes arguments that should belong to CBG, not Grand Union. Grand Union is trying to have its cake and eat it too. In the same breath it is arguing CBG's defenses and then claiming CBG is a distinct third party. Grand Union's arguments make it abundantly clear that there is no distinction between its interest and CBG.

Further, the Opposition seeks to have the Arbitrator reject Paul Frank's motion for leave to Amend on (baseless) procedural grounds that CBG may or may not assert in the future. While Paul Frank disagrees with the Opposition's statement of the law, the question is simply not before the Arbitrator. The only issue the Arbitrator must resolve is whether Paul Frank may allege claims and proceed with service on CBG. There is no question that the Arbitrator has the authority to decide this threshold question, and that leave to amend is liberally allowed. Paul Frank should have the ability to proceed with its (unquestionably meritorious) claims, and save the issues of the hypothetical

[1] Capitalize terms herein have the same meaning as set forth in Paul Frank's Motion for Leave to Amend Demand for Arbitration ("Motion").

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

arguments of third parties for future disputes.

Paul Frank respectfully requests that it be granted leave to file the Amended Demand for Arbitration and seek redress from CBG as alter ego of Grand Union.

## II. PAUL FRANK SHOULD BE GRANTED LEAVE TO AMEND THE DEMAND FOR ARBITRATION

### A. Grand Union / CBG's Response Misstates the Issue to be Decided by the Arbitrator

Grand Union entirely misrepresents the relief Paul Frank is seeking in its effort to avoid any risk of CBG being held ultimately liable in this case. Paul Frank is not asking the Arbitrator to determine the ultimate fact of whether Grand Union and CBG are alter egos. Paul Frank is not even asking the Arbitrator to determine whether CBG can assert any defenses in this Arbitration, including as to arbitrability of its disputes with Paul Frank. CBG is perfectly entitled to raise any defenses it likes in response to Paul Frank's Amended Demand for Arbitration. But those defenses are for CBG to raise, not Grand Union.

Paul Frank merely seeks leave to amend its Demand for Arbitration, *as it is required to do under the Rules*. JAMS Comprehensive Arbitration Rules & Procedures, Rule 10 states, "After the Arbitrator is appointed, no new or different claim may be submitted, except with the Arbitrator's approval. A party may request a hearing on this issue." JAMS Comprehensive Arbitration Rules & Procedures, Rule 10. Paul Frank is therefore *required* to seek the Arbitrator's leave to amend before proceeding with its claims against CBG. Its factual allegations as to alter ego liability are included to demonstrate Paul Frank's good cause in seeking to amend and establish the valid factual and legal basis on which Paul Frank should be able to proceed against CBG.

The Opposition nonsensically argues that Paul Frank should have served CBG with the original Demand for Arbitration. Of course, that would be pointless as CBG was not a party to the original Demand and would have nothing to respond to. And Paul Frank may not amend its Demand for Arbitration without the Arbitrator's leave per JAMS Rules, so it would be improper for Paul Frank to serve CBG with an Amended Demand for Arbitration that has not been filed.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

It would also be nonsensical for Paul Frank to file a separate Demand for Arbitration against CBG on theories of alter ego and agency liability. The claims are so intertwined that it would be impossible for the claims to proceed separately. JAMS Rule 6(e) provides that, in such cases, the claims would be consolidated into a single arbitration regardless and the parties would end up in exactly the same position. An Amended Demand for Arbitration is undoubtedly the proper procedural mechanism for joining CBG to this action.

Once the Arbitrator grants Paul Frank leave to amend, Paul Frank will then proceed with service of the Amended Demand for Arbitration on CBG. At this point, CBG may then represent its own interests rather than speaking through Grand Union. Should CBG continue arguing that it is not bound to arbitrate this action, Paul Frank has a variety of procedural mechanisms available to it to compel CBG to do so. But that question is not before the Arbitrator on this motion.

The Opposition's focus on CBG's potential procedural defenses is a red herring and entirely improper. The issue before the Arbitrator is whether Paul Frank should be allowed to amend its pleading and begin the process of serving CBG. That is the only question for the Arbitrator to decide.

### B. The Arbitrator Has Authority to Allow Paul Frank to Amend the Demand for Arbitration

The only matter actually before the Arbitration is a motion for leave to amend. California law (which the Opposition concedes applies to this motion) is clear that there is a rule of "great liberality" in allowing parties to amend their pleadings. *Board of Trustees of Leland Stanford, Jr. University v. Superior* Court, 149 Cal. App. 4th 1154, 1163 (2004); *see also Kittredge Sports Co. v. Superior Court*, 213 Cal. App. 3d 1045, 1047 (1989) ("discretion should be exercised liberally in favor of amendments, for judicial policy favors resolution of all disputed matters in the same lawsuit"); *see also* Motion at 15-16. Where a party has meritorious claims, it is reversible error for a trial court to deny leave to amend. "If the motion to amend is timely made and the granting of the motion will not prejudice the opposing party, it is error to refuse permission to amend and where the refusal also results in a party being deprived of the right to assert a meritorious cause of action or a meritorious defense, it is not only error but an abuse of discretion." *Redevelopment Agency v. Herrold*, 86 Cal. App. 3d 1024, 1031 (1978), citing *Morgan v. Superior Court*, 172 Cal. App. 2d 527, 530 (1959).

This is especially true where the agreement at issue contains a delegation clause giving the Arbitrator the power to determine certain issues regarding the Arbitration. The First Amendment states: "If a dispute arises out of or relates to this Agreement, or the breach hereof, … such dispute, including the determination of the *scope or applicability* of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator… administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures." First Amendment, Section 28 (emphasis added), Ex. 3 to Appendix. Thus, any question as to the scope or applicability of this Arbitration is solely for the Arbitrator to decide.

Such a delegation clause removes the question from the courts and puts it firmly in the hands of the Arbitrator. "[C]hallenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance. An exception to this rule applies when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator. Such delegation clauses are generally enforceable according to their terms." *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1108 (2018) (internal citations omitted). "These so-called 'delegation clauses' are generally enforceable according to their terms, requiring the issue of arbitrability to be submitted to the arbitrator for decision." *Luxor Cabs, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 30 Cal. App. 5th 970, 979 (2018). For example, in *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231 (2014), the delegation clause in that arbitration agreement stated that the arbitrator would have authority to resolve "any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement…." *Tiri*, 226 Cal. App. 4th at 237. The Court of Appeal reversed the trial court's denial of a petition to compel arbitration and specifically ordered that the arbitrator decide the question of whether the agreement as a whole was enforceable. *Id.* at 250 ("Having determined that the delegation clause was valid, we conclude that the trial court's denial of Lucky Chance's petition to compel arbitration was improper. Thus, it will be for the arbitrator to consider the conscionability of the agreement as a whole and its other severable provisions."); see also *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (delegation clause required the Arbitrator to decide threshold questions of arbitrability). "A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway

questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022).

This is underlined by JAMS' own rules. JAMS Comprehensive Arbitration Rules and Procedures, which the parties expressly agreed to in the First Amendment, states at Rule 11(b): "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." Further, Rule 6(f) states that the Arbitrator has specific authority over the question of bringing in third parties: "Where a third party seeks to participate in an Arbitration already pending under these Rules or where a Party to an Arbitration under these Rules seeks to compel a third party to participate in a pending Arbitration, the Arbitrator shall determine such request, taking into account all circumstances he or she deems relevant and applicable." In *Zakarian v. Bekov*, 98 Cal. App. 4th 316 (2002), the relevant arbitration rules contained a very similar provision.[2] The Court of Appeal held that the question of joinder of necessary third parties was specifically reserved for the arbitrator, reversed the trial court's denial of the motion to compel arbitration, and referred the question to the arbitrator for decision.

Thus, per the express terms of the First Amendment, the Arbitrator is the proper venue for determining the scope and applicability of the Arbitration itself, which would of course extend to the scope of the pleadings and the parties' rights to assert any valid claims. The Arbitrator undoubtedly has authority to determine whether a party has leave to amend its operative pleading.

[2] The rules provided, "Prior to the date set for the arbitration hearing, any person . . . whose participation is considered by the neutral arbitrator to be material or relevant to a complete resolution of the dispute may intervene in the arbitration. Similarly, any party to the arbitration may make a written request that additional persons . . . be joined in the arbitration. If the neutral arbitrator considers the participation of the requested new party to be material or relevant to a complete resolution of the dispute, then the request shall be approved. . . . All parties to the arbitration are deemed to have consented to the joinder or intervention of any person when the joinder or intervention is allowed pursuant to this rule. . . . All parties agree to stay any judicial proceeding against the new party which arises out of the same transaction or occurrence." *Zakarian v. Bekov*, 98 Cal. App. 4th 316, 324 (2002).

### C. There is no Dispute that CBG is the Alter Ego of Grand Union

Far from disproving the merit of Paul Frank's claims that Grand Union and CBG are alter egos, the Opposition merely serves to reinforce the legitimacy of Paul Frank's allegations. The Opposition doesn't even attempt to contradict the substantial evidence presented by Paul Frank of alter ego liability. It offers only a handful of conclusory, and often demonstrably false, statements in its defense.

The Opposition actually admits that CBG set up Grand Union solely to "facilitate CBG's efforts to enter into contracts with overseas entities." Opposition at p. 13, ¶ 44. Bo Zheng also admits that "CBG is the agent responsible for the [sic] Grand Union's business in the People's Republic of China" – effectively, the Territory of the MLA – and that CBG pays the quarterly management fee on behalf of Grand Union. First Witness Statement of Bo Zheng ("Bo Zheng Statement") at ¶¶ 9, 16. In other words, Grand Union is a mere shell through which CBG does business.

The Opposition also admits that CBG "negotiated parts of the MLA with Futurity." Opposition at p. 5, ¶ 17. The implication is that some other entity – possibly Grand Union's phantom employees – negotiated the "other" parts of the MLA. However, this is contradicted by the First Witness Statement of Tao Zheng ("Tao Zheng Statement"), which states at p. 2, ¶ 7 that "in around 2012, CBG (through Romma, which had been a sublicensee), informed Saban that it would like to take over all the management of Paul Frank brand in China, and it made an offer to Saban for an exclusive license" and at ¶ 8 that "[i]n around 2014, Saban began negotiating with CBG on what would become the MLA." Grand Union cannot now back away from the statements made under oath by Tao Zheng – CBG's own Vice Chairman and the brother of Bo Zheng.

Similarly, the Opposition states that "Grand Union had hundreds of sublicense agreements in place, which it used to market the Paul Frank Brand under the MLA." Opposition at p. 14, ¶ 47. The implication is that Grand Union itself had direct business relationships with the sublicensees. Yet, in the Counterclaim, Grand Union previously stated that "Grand Union operates under the MLA by entering into business relationships (*through CBG*) with Sublicensees." Counterclaim at p. 34, ¶ 60 (emphasis added). Thus, only CBG dealt with Sublicensees – Grand Union is merely a rightsholder. Further, Grand Union / CBG disclosed only 39 licensees to Paul Frank as of July 12, 2022. *See* Email

weintraub tobin chediak coleman grodin LAW CORPORATION

dated July 12, 2022, Ex. 113 to Appendix, and attached List of Subicensees, Ex. 114 to Appendix. Either the Opposition misrepresents the number of sublicensees, or Grand Union / CBG misrepresented the number to Paul Frank in July 2022. Notably, CBG is not listed among the sublicensees disclosed to Paul Frank. In fact, CBG is the sublicensor entering into agreements with sublicensees. *See*, *e.g.*, Supplementary Agreement to Paul Frank Adult Shoes License Agreement, Ex. 167 to Appendix (original) and Ex. 168 to Appendix translation) (amending the agreement to swap CBG for Grand Union as the party to the sublicense agreement and providing that the sublicensee must make all payments to CBG).

The Opposition also claims that "Grand Union also made an $8.5 million payment, as required under the Second Amendment to the MLA, from Grand Union's bank account." Opposition at p. 14, ¶ 49. The Opposition cites to ¶ 16 of the Bo Zheng Statement in support of that claim. Yet Bo Zheng states only that "[u]nder the MLA, the license fee payable to PF Hong Kong is made through the bank account of Grand Union." In other words, the MLA provides payments are *supposed* to be made from Grand Union's bank accounts. He does not state that they actually *were* made from Grand Union's accounts. The Opposition offers no evidence whatsoever in response to the emails Paul Frank submitted showing that CBG made royalty payments to Paul Frank, controlled Grand Union's bank accounts, and itself invested in the supposed "development" of the Paul Frank brand. *See* Motion at 8-9.

Other statements by Bo Zheng are obviously false. He claims that the "registered office of Grand Union" is at Room 1303, 13/F,[3] New East Ocean Centre, 9 Science Museum Road, Tsim Sha Tsui, Kowloon, Hong Kong. Bo Zheng Statement at ¶ 13. Yet on a visit to this address on May 25, 2023, Paul Frank found no trace of Grand Union. *See* Mu Decl. at ¶ 3-7. Attached as Exhibits 1 to 12 to the Mu Decl. are photos taken by Ms. Mu of the address in question. There is no sign of an office for Grand Union. Room 1303 is actually occupied by an entity named "China Outfitters

[3] The Bo Zheng Statement at ¶ 13 states that the address is at "13/D," not "13/F." Paul Frank believes this to be a typo or translation error, as the Notice provision of the MLA specifies "13/F." *See* MLA, Section 29, Ex. 1 to Appendix; *see also* Civil Statement of Claim, p. 1, Ex. 124 (original) and Ex. 125 (translation) to Appendix. "13/F" refers to the 13th floor of the building, which is where Room 1303 is located. *See* Mu Decl. at ¶ 3.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Holdings Limited." *Id.* Grand Union does not maintain an office because it has no need for one – it does not do any business. It is simply a shell for CBG.

Bo Zheng also claims that Grand Union has employees. Yet he does not name them or provide any information about them, their job titles, or their supposed roles within the company. Grand Union did not submit declarations of any so-called employee. The Opposition does not explain how Grand Union supposedly has employees, but Paul Frank – Grand Union's main business relationship – has somehow never once interacted with these purported Grand Union employees in the entire course of their relationship. *See* Wan Decl., ¶ 28 ("Grand Union itself does not have any employees. Paul Frank dealt exclusively with employees of CBG"). In fact, the employee with the most contact with Paul Frank – Jennifer Huang – testified that she is an employee of CBG, not Grand Union. *See* Huang Witness Statement at p. 1, ¶ 4.

Bo Zheng never even attempts to refute Paul Frank's assertions that Grand Union does not maintain an email server, website, or that all of the actions alleged by Paul Frank were actually undertaken by CBG, not Grand Union. He cannot explain why he gave interviews discussing CBG's rights to the Paul Frank brand without even mentioning Grand Union. The Opposition cannot point to a single act of Grand Union that was not actually conducted by CBG.

Finally, neither the Opposition nor Bo Zheng even attempt to defend Grand Union / CBG's actions in "agreeing" to the jurisdiction of Chinese courts over the very disputes at issue in this case. Grand Union / CBG's secret plan to circumvent the jurisdiction of this Arbitration failed once Paul Frank finally learned of the lawsuit filed in China. The Opposition does not even address this clear evidence of fraud by these alter egos.

It is clear that Paul Frank has a factual and legal basis to assert an alter ego claim against CBG. All Paul Frank is asking is permission to pursue this valid claim, which should be liberally permitted in order to allow the parties to assert any permissible claim or defense. The Arbitrator should permit Paul Frank to amend its Demand for Arbitration and proceed with its valid claims.

/ / /

/ / /

/ / /

**III. CONCLUSION**

For the reasons set forth herein, Paul Frank respectfully requests that the Arbitrator grant it leave to file the Amended Demand for Arbitration.

DATED: May 30, 2023

**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Katie A. Collins
Kavan J. Jeppson
Attorneys for Claimant and Counter-Respondent
Paul Frank Limited

weintraub tobin chediak coleman grodin
LAW CORPORATION

{00250352.DOCX:}
12
PAUL FRANK LIMITED'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND DEMAND FOR ARBITRATION

# EXHIBIT 27

# EXHIBIT D

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

Reserved for Clerk's File Stamp

FILED
Superior Court of California
County of Los Angeles
09/11/2023
David W. Slayton, Executive Officer / Clerk of Court
By: Y. Tarasyuk Deputy

# NOTICE OF CASE ASSIGNMENT
# UNLIMITED CIVIL CASE

**Your case is assigned for all purposes to the judicial officer indicated below.**

CASE NUMBER:
23STCP03323

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Joseph Lipner | 72 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on 09/12/2023 (Date)

David W. Slayton, Executive Officer / Clerk of Court

By Y. Tarasyuk, Deputy Clerk

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

**APPLICATION**
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

**COMPLAINTS**
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

**CROSS-COMPLAINTS**
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

**STATUS CONFERENCE**
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

**Class Actions**
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

***Provisionally Complex Cases**
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

# EXHIBIT E

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jessica R. Corpuz / Kavan J. Jeppson (SBN 279237 / 327547)
Weintraub Tobin Chediak Coleman Grodin Law Corporation
10250 Constellation Boulevard, Suite 2900
Los Angeles, CA 90067
TELEPHONE NO.: (310) 858-7888 FAX NO. *(Optional):* (310) 550-7191
E-MAIL ADDRESS: jcorpuz@weintraub.com / kjeppson@weintraub.com
ATTORNEY FOR *(Name):* Petitioner Paul Frank Limited

*FOR COURT USE ONLY*

**Electronically FILED by Superior Court of California, County of Los Angeles 9/11/2023 6:37 PM David W. Slayton, Executive Officer/Clerk of Court, By Y. Tarasyuk, Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: --
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk

CASE NAME: Paul Frank Limited v. China Brands Group

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: 23STCP03323 |
|---|---|---|
| ☒ **Unlimited** (Amount demanded exceeds $25,000) ☐ **Limited** (Amount demanded is $25,000) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☒ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. ☐ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify):* Not applicable.
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 11, 2023

Jessica R. Corpuz
(TYPE OR PRINT NAME) ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET** **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
- Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
- Confession of Judgment *(non-domestic relations)*
- Sister State Judgment
- Administrative Agency Award *(not unpaid taxes)*
- Petition/Certification of Entry of Judgment on Unpaid Taxes
- Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| PAUL FRANK LIMITED V. CHINA BRANDS GROUP | 23STCP03323 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| **Applicable Reasons for Choosing Courthouse Location (Column C)** | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| PAUL FRANK LIMITED V. CHINA BRANDS GROUP | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| Contract | Breach of Contract / Warranty (06)<br>(not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE<br>PAUL FRANK LIMITED V. CHINA BRANDS GROUP | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels ________ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☑ 1101 Petition to Compel/Confirm/Vacate Arbitration | (2), 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| PAUL FRANK LIMITED V. CHINA BRANDS GROUP | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

| SHORT TITLE<br>PAUL FRANK LIMITED V. CHINA BRANDS GROUP | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS:<br>1925 Century Park East, 14th Floor<br>The Watt Plaza |
|---|---|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90067 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the Stanley Mosk District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 09/11/2023

(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

# EXHIBIT F

2019-GEN-014-00

FILED
Superior Court of California
County of Los Angeles

MAY 03 2019

Sherri R. Carter, Executive Officer/Clerk
By [signature], Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT – MANDATORY ELECTRONIC FILING FOR CIVIL

FIRST AMENDED GENERAL ORDER

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

a) **"Bookmark"** A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

b) **"Efiling Portal"** The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

c) **"Electronic Envelope"** A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

d) **"Electronic Filing"** Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4). Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked. Examples include, but are not limited to, the following:

i) Depositions;

ii) Declarations;

iii) Exhibits (including exhibits to declarations);

iv) Transcripts (including excerpts within transcripts);

v) Points and Authorities;

vi) Citations; and

vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

Multiple documents relating to one case can be uploaded in one envelope transaction.

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

   i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted. (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

   ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

i) Any printed document required pursuant to a Standing or General Order;

ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

iii) Pleadings and motions that include points and authorities;

iv) Demurrers;

v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

vi) Motions for Summary Judgment/Adjudication; and

vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019

KEVIN C. BRAZILE
Presiding Judge

# EXHIBIT G

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS

**Superior Court of California County of Los Angeles**

**Los Angeles County Bar Association Litigation Section**

**Los Angeles County Bar Association Labor and Employment Law Section**

**Consumer Attorneys Association of Los Angeles**

**Southern California Defense Counsel**

**Association of Business Trial Lawyers**

**California Employment Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

**◆Los Angeles County Bar Association Litigation Section◆**

**◆ Los Angeles County Bar Association Labor and Employment Law Section◆**

**◆Consumer Attorneys Association of Los Angeles◆**

**◆Southern California Defense Counsel◆**

**◆Association of Business Trial Lawyers◆**

**◆California Employment Lawyers Association◆**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | | CASE NUMBER: |

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to ____________________ (INSERT DATE) for the complaint, and ____________________ (INSERT DATE) for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at www.lacourt.org under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR PLAINTIFF)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR DEFENDANT)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR ____________________)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR ____________________)

Date:

________________________ (TYPE OR PRINT NAME) ➢ ________________________ (ATTORNEY FOR ____________________)

Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION – DISCOVERY RESOLUTION** | | CASE NUMBER: |

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| | |

iii. Be filed within two (2) court days of receipt of the Request; and

iv. Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c. No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d. If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e. If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

   It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|

**The following parties stipulate:**

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR PLAINTIFF)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR DEFENDANT)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR ______________________)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR ______________________)

Date:

➢ ______________________ ______________________

(TYPE OR PRINT NAME) (ATTORNEY FOR ______________________)

Print Save Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | | CASE NUMBER: |

1. This document relates to:

   ☐ Request for Informal Discovery Conference
   ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _______________ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _______________ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES** | | |
| COURTHOUSE ADDRESS: | | |
| PLAINTIFF: | | |
| DEFENDANT: | | |
| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | | CASE NUMBER: |

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

    a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

    b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR PLAINTIFF)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR DEFENDANT)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ____________________)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ____________________)

Date:

(TYPE OR PRINT NAME) ➢ (ATTORNEY FOR ____________________)

**THE COURT SO ORDERS.**

Date: ____________________

JUDICIAL OFFICER

**Print** **Save** **Clear**

FILED
LOS ANGELES SUPERIOR COURT
MAY 11 2011
JOHN A. CLARKE, CLERK
N. Navarro
BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| General Order Re Use of Voluntary Efficient Litigation Stipulations | ORDER PURSUANT TO CCP 1054(a), EXTENDING TIME TO RESPOND BY 30 DAYS WHEN PARTIES AGREE TO EARLY ORGANIZATIONAL MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation. This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: May 11, 2011

Carolyn B. Kuhl, Supervising Judge of the Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

# EXHIBIT H



Superior Court of California, County of Los Angeles

# ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or decision by a judge or jury.

## Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may <u>not</u> be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish.  Options include:

    a.  **The Civil Mediation Vendor Resource List**
        If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

- **ADR Services, Inc.** Assistant Case Manager Janet Solis, janet@adrservices.com (213) 683-1600
- **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

        **These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept.  Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

        **NOTE:  The Civil Mediation Vendor Resource List program does not accept family law, probate, or small claims cases.**

    b.  **Los Angeles County Dispute Resolution Programs.**  Los Angeles County-funded agencies provide mediation services on the day of hearings in small claims, unlawful detainer (eviction), civil harassment, and limited civil (collections and non-collection) cases. https://dcba.lacounty.gov/countywidedrp/

        **Online Dispute Resolution (ODR).**  Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.  https://my.lacourt.org/odr/

    c.  Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3.  **Arbitration:**  Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome.  In "binding" arbitration, the arbitrator's decision is final; there is no right to trial.  In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.  For more information about arbitration, visit https://www.courts.ca.gov/programs-adr.htm

4.  **Mandatory Settlement Conferences (MSC):**  MSCs are ordered by the Court and are often held close to the trial date or on the day of trial.  The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement.  For information about the Court's MSC programs for civil cases, visit https://www.lacourt.org/division/civil/CI0047.aspx

Los Angeles Superior Court ADR website:  https://www.lacourt.org/division/civil/CI0109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

# EXHIBIT I

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 9/19/2023 11:11 AM David W. Slayton, Executive Officer/Clerk of Court, By P. Muro, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**PAUL FRANK LIMITED'S NOTICE OF PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP AND STAY LITIGATION PENDING ARBITRATION**

Date: November 21, 2023
Time: 8:30 a.m.
Dept. 72

Reservation No.: 364426462361

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 21, 2023, at 8:30 a.m., or as soon thereafter as this matter may be heard in Department 72 of the above-entitled court, located at 111 N. Hill Street, Los Angeles, CA 90012, Petitioner Paul Frank Limited ("Paul Frank") will, and hereby does, petition the Court for an order (1) compelling Respondent China Brands Group ("CBG") to arbitrate Paul Frank's claims against CBG in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 between Paul Frank and CBG's alter ego Grand Union Trading Limited ("Grand Union"); and (2) staying the improper lawsuit filed by CBG against Paul Frank and Grand Union in the Intermediate People's Court of Court of Tsingdao City of Shandong Province., Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") during the pendency of the Arbitration.

This Petition is brought pursuant to California Code of Civil Procedure §§ 1297.81 and 1297.82 on the grounds that CBG is the agent and alter ego of Grand Union and therefore bound by the arbitration clause in the Master License Agreement ("MLA") between Paul Frank and Grand Union. Further, CBG has filed the China Lawsuit alleging that Paul Frank has violated CBG's rights, which were obtained through a sublicense of the rights granted to Grand Union under the MLA. CBG should be compelled to arbitrate such claims, and the China Lawsuit should be stayed until the Arbitration is complete.

This Petition is based on this Notice, the accompanying Petition to Compel Arbitration, the Declaration of Stanley Yook-Loong Wan and the Exhibits attached thereto, the Declaration of Jessica R. Corpuz and the Exhibits attached thereto, and all pleadings, recordings, and papers on file in this action, and such other evidence and argument as may be presented at the time of the hearing on this matter.

DATED: September 19, 2023

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

Journal Technologies Court Portal

# Make a Reservation

PAUL FRANK LIMITED vs CHINA BRANDS GROUP

Case Number: 23STCP03323 Case Type: Civil Unlimited Category: Other Civil Petition
Date Filed: 2023-09-11 Location: Stanley Mosk Courthouse - Department 72

## Reservation

| | |
|---|---|
| Case Name:<br>PAUL FRANK LIMITED vs CHINA BRANDS GROUP | Case Number:<br>23STCP03323 |
| Type:<br>Motion to Compel Arbitration | Status:<br>RESERVED |
| Filing Party:<br>PAUL FRANK LIMITED (Petitioner) | Location:<br>Stanley Mosk Courthouse - Department 72 |
| Date/Time:<br>11/21/2023 8:30 AM | Number of Motions:<br>1 |
| Reservation ID:<br>364426462361 | Confirmation Code:<br>CR-QUXNI9TZXGO7QXCHU |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Compel Arbitration | 60.00 | 1 | 60.00 |
| Credit Card Percentage Fee (2.75%) | 1.65 | 1 | 1.65 |
| TOTAL | | | **$61.65** |

## Payment

| | |
|---|---|
| Amount:<br>$61.65 | Type:<br>Visa |
| Account Number:<br>XXXX1311 | Authorization:<br>08641C |
| Payment Date:<br>1969-12-31 | |

Print Receipt | Reserve Another Hearing

Chat

# EXHIBIT J

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 11/15/2023 3:33 PM David W. Slayton, Executive Officer/Clerk of Court, By J. Abraham, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323
Hon. Joseph Lipner, Dept. 72

**PROOF OF SERVICE**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

I, Denise Thurman, declare and state as follows:

1.     At the time of service, I was over 18 years of age and not a party to this action.

2.     My business address is 10250 Constellation Boulevard, Suite 2900, Los Angeles, CA 90067.

3.     I served the following documents:

a.     Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

b.     Paul Frank Limited's Notice of Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

c.     Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

d.     Exhibits 1-48 to the Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

e.     Declaration of Jessica R. Corpuz in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

f.     Civil Case Cover Sheet and Addendum;

g.     Notice of Case Assignment;

h.     First Amended General Order Mandatory Electronic Filing;

i.     Voluntary Efficient Litigation Stipulation Packet; and

j.     Alternative Dispute Resolution Packet.

4.     I served the documents by email on September 19, 2023 to Bo Zheng at bo.zheng@chinabrandsgroup.com.cn, with a copy to David Zhou at david.zhou@chinabrandsgroup.com.cn.  Attached hereto as Exhibit 1 is a true and correct copy of  the email I sent on September 19, 2023.

5.     I further served the documents by Federal Express on September 19, 2023, an express service carrier which provides overnight delivery, as follows: I enclosed the documents in envelopes or packages provided by an overnight delivery carrier.  I placed the envelopes or packages for collection

weintraub tobin chediak coleman grodin
LAW CORPORATION

and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier. The envelopes or packages were addressed as follows:

a. Mr. Bo Zheng
China Brands Group
No. 196, 1st Branch of Tianjingshan Road,
Jimo District
Tsingdao City
Shandong Province
China

b. Mr. Bo Zheng
China Brands Group
No. 9, 2899 Guangfu West Road
Shanghai 200062
P.R. China

6. Attached as Exhibit 2 hereto is a true and correct copy of the confirmations I received from Federal Express.

7. I further served the documents on September 19, 2023 by mailing to addresses outside California by registered mail with return receipt requested to the addresses set forth in Paragraph 5 herein. As of today's date, the USPS website states for each package, "Your item departed a transfer airport in CAPITAL, BEIJING, CHINA on September 26, 2023 at 1:53 pm. The item is currently in transit to the destination."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 15, 2023, at Los Angeles, California

Denise Thurman

Denise Thurman

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

# EXHIBIT 1

**Denise Thurman**

| | |
|---|---|
| **From:** | Denise Thurman |
| **Sent:** | Tuesday, September 19, 2023 3:10 PM |
| **To:** | 'bo.zheng@chinabrandsgroup.com.cn' |
| **Cc:** | 'david.zhou@chinabrandsgroup.com.cn'; Jessica R. Corpuz; Kavan J. Jeppson |
| **Subject:** | Paul Frank Limited v. China Brands Group |

Mr. Zheng:

Please see below a link to Paul Frank's Petition to Compel Arbitration and supporting documents recently filed with Los Angeles Superior Court.

https://weintraub.sharefile.com/d-s754d9b4bb28b4cfc9cbd6fe90f77d611

Please let me know if you have any issues accessing the Sharefile.

Hard copies will follow via FedEx and Registered Mail.

Thank you.

*Denise Thurman*
Assistant to Jessica R. Corpuz, Gary A. Waldron
and Jacqueline M. Simonovich

**weintraub | tobin**
Direct: (310) 860-3353 | dthurman@weintraub.com

# EXHIBIT 2

**Denise Thurman**

---

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Sunday, September 24, 2023 7:45 PM |
| **To:** | Denise Thurman |
| **Subject:** | [EXTERNAL] FedEx Shipment 773465077699: Your package has been delivered |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

# Hi. Your package was delivered Mon, 09/25/2023 at 10:38am.

Delivered to NO. 9,O 2899 GUANGFU WEST ROAD, SHANGHAI 200062
Received by Q.IAN TAI

**OBTAIN PROOF OF DELIVERY**

| | |
|---|---|
| **TRACKING NUMBER** | 773465077699 |
| **FROM** | WEINTRAUB TOBIN<br>10250 CONSTELLATION BLVD<br>SUITE 2900<br>LOS ANGELES, CA, US, 90067 |

| | |
|---|---|
| **TO** | CHINA BRANDS GROUP<br>ATTN: MR. BO ZHENG<br>NO. 9,<br>2899 GUANGFU WEST ROAD<br>SHANGHAI, CN, 200062 |
| **REFERENCE** | 314423.3 |
| **SHIPPER REFERENCE** | 314423.3 |
| **SHIP DATE** | Tue 9/19/2023 03:45 PM |
| **DELIVERED TO** | Receptionist/Front Desk |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | LOS ANGELES, CA, US, 90067 |
| **DESTINATION** | SHANGHAI, , CN, 200062 |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 7.90 LB |
| **SERVICE TYPE** | FedEx International Economy |

## Wondering when a package will arrive?

Enter your tracking number to see your estimated delivery time within a 4-hour window.

**TRACK A PACKAGE**

**FOLLOW FEDEX**

     

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 9:44 PM CDT 09/24/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**Denise Thurman**

---

**From:** TrackingUpdates@fedex.com
**Sent:** Monday, September 25, 2023 8:54 PM
**To:** Denise Thurman
**Subject:** [EXTERNAL] FedEx Shipment 773465820522: Your package has been delivered

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

# Hi. Your package was delivered Tue, 09/26/2023 at 11:46am.

Delivered to NO 196 1ST BRCH OF TIANJI JIMO, TSINGDAO 266300
Received by R.QIANTAI

**OBTAIN PROOF OF DELIVERY**

**TRACKING NUMBER** 773465820522

**FROM** WEINTRAUB TOBIN
10250 CONSTELLATION BLVD
SUITE 2900
LOS ANGELES, CA, US, 90067

| | |
|---|---|
| **TO** | CHINA BRANDS GROUP<br>MR. BO ZHENG<br>NO 196 1ST BRCH OF TIANJINGSHAN RD<br>JIMO DISTRICT<br>TSINGDAO, CN, 266300 |
| **REFERENCE** | 314423.3 |
| **SHIPPER REFERENCE** | 314423.3 |
| **SHIP DATE** | Tue 9/19/2023 03:45 PM |
| **DELIVERED TO** | Shipping/Receiving |
| **PACKAGING TYPE** | FedEx Box |
| **ORIGIN** | LOS ANGELES, CA, US, 90067 |
| **DESTINATION** | TSINGDAO, , CN, 266300 |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 7.90 LB |
| **SERVICE TYPE** | FedEx International Economy |

Wondering when a package will arrive?

Enter your tracking number to see your estimated delivery time within a 4-hour window.

**TRACK A PACKAGE**

**FOLLOW FEDEX**

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 10:53 PM CDT 09/25/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

# EXHIBIT K

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 11/20/2023 11:03 AM David W. Slayton, Executive Officer/Clerk of Court, By E. Gregg, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323
Hon. Joseph Lipner, Dept. 72

**PROOF OF SERVICE**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

I, Gang XU(徐刚), declare and state as follows:

1.  At the time of service, I was over 18 years of age and not a party to this action.

2.  My business address is No. 168, Lane 3333 Gudai Road, Minhang District, 201615, Shanghai, China.

3.  I served the following documents:

   a.  Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

   b.  Paul Frank Limited's Notice of Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration;

   c.  Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and stay Litigation Pending Arbitration;

   d.  Exhibits 1-48 to the Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and stay Litigation Pending Arbitration;

   e.  Declaration of Jessica R. Corpuz in Support of Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and stay Litigation Pending Arbitration;

   f.  Civil Case Cover Sheet and Addendum;

   g.  Notice of Case Assignment;

   h.  First Amended General Order Mandatory Electronic Filing;

   i.  Voluntary Efficient Litigation Stipulation Packet; and

   j.  Alternative Dispute Resolution Packet.

4.  I served the documents by personally delivering the documents to Tao Zheng on October 17, 2023 at the Shanghai New International Exhibition Center located at 2345 Longyang Road, Pudong New Area, Shanghai, P.R.C. 201204.

/ / /

/ / /

/ / /

/ / /

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 30, 2023, at Shanghai, China.

徐刚

Gang XU(徐刚)

weintraub tobin chediak coleman grodin LAW CORPORATION

# EXHIBIT L

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Petitioner(s): Jessica R. Corpuz and Kavan J. Jeppson appear via LA CourtConnect

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Hearing on Motion to Compel Arbitration

The matter is called for hearing.

There is no appearance for or on behalf of Respondent.

Court hears from counsel for Moving Party.

After hearing from counsel, the matter is taken under submission.

The Clerk will give notice of the Court's final ruling.

LATER:

The Court, having taken the matter under submission, now rules as follows:

Petitioner Paul Frank Limited ("Petitioner") moves an order (1) compelling Respondent China Brands Group ("Respondent") to arbitrate Petitioner's claims against Respondent in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Petitioner and Grand Union Trading Limited ("Grand Union"); and (2) staying the lawsuit filed by Respondent against Petitioner in the Intermediate People's Court of Court of Tsingdao City of Shandong Province, Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") during the pendency of the Arbitration.

Respondent has not opposed Petitioner's motion.

The Court grants Petitioner's motion in part as follows. Respondent is ORDERED to arbitrate

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323** November 21, 2023
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP** 8:30 AM

Judge: Honorable Joseph Lipner CSR: None
Judicial Assistant: Veronica Solis ERM: None
Courtroom Assistant: Jennifer Young Deputy Sheriff: None

Petitioner's claims against Respondent in JAMS Reference No. 522002118. The Court denies without prejudice Petitioner's request for a stay of the China Lawsuit.

Petitioner shall give notice.

Background

Petitioner owns the intellectual property associated with the Paul Frank brand. In 2015, Petitioner entered into a Master Licensing Agreement (the "MLA") with Grand Union, under which Grand Union was granted the rights to certain elements of the brand within the territories of mainland China, Hong Kong, and Macau. The First Amendment to the MLA ("First Amendment") contains an arbitration agreement and a choice of law provision which selects the application of California law. Respondent is not a signatory to the MLA or the First Amendment.

During the duration of the MLA, Grand Union sublicensed its rights under the MLA to Respondent.

Petitioner's principal place of business is in Hong Kong. (Wan Decl. ¶ 3.) Respondent's principal place of business is in Shandong Province, China. (Wan Decl. Exh. 19-20.) Grand Union's principal place of business is in Shanghai, China. (Wan Decl. Ex. 4.

In September, 2022, Petitioner terminated the MLA due to a number of alleged violations by Grand Union and Respondent, and shortly thereafter initiated the Arbitration against Grand Union. Grand Union filed a response and counterclaims.

Several months after the Arbitration began, Respondent filed the China Lawsuit against Grand Union and Petitioner. Respondent sought an order compelling Grand Union and Petitioner to stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate [the] brands…." obtained under the MLA. (Wan Decl. Exh. 1, 2.) Respondent and Grand Union together filed an "Agreement on Jurisdiction" to the Chinese court, stating that "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either [Grand Union] or [Respondent] can file lawsuits to the court with jurisdiction at [Respondent's] domiciliate." (Wan Decl. Exh. 43-44.) Respondent also obtained an order from the Chinese court blocking Petitioner's trademarks and copyrights within China, without notice to Petitioner. (Wan Decl. Ex. 45-46.) Paul Frank discovered that its intellectual properties were frozen when it attempted to update license information for a trademark in January, 2023.

Minute Order Page 2 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323** November 21, 2023
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP** 8:30 AM

Judge: Honorable Joseph Lipner CSR: None
Judicial Assistant: Veronica Solis ERM: None
Courtroom Assistant: Jennifer Young Deputy Sheriff: None

---

Petitioner contested jurisdiction in the China Lawsuit. In the Arbitration proceeding, Petitioner sought to have Respondent added as a party to the arbitration. The arbitrator denied the motion on the grounds that the question should be left up to the court.

Petitioner mailed a demand for arbitration to Bo Zheng, the chairman and CEO of Respondent, by FedEx, which Zheng signed for on September 7, 2023. (Corpuz Decl. 4-6.) Petitioner has not received a response to the demand. (Corpus Decl. ¶ 7.)

On November 20, 2023, Petitioner filed a proof of service attesting to the personal service of Petitioner's papers on Respondent by serving Zheng (Respondent's CEO) in Shanghai on October 17, 2023. Moreover, Petitioner served by email to Zheng at bo.zheng@chinabrandsgroup.com.cn, with a copy to David Zho at david.zhou@chinabrandsgroup.com.cn, on September 19, 2023. Petitioner also served the documents by FedEx on two of Zheng's addresses.

Respondent has not filed any opposition to the petition or the motion.

Legal Standard

The California Arbitration Act ("CAA"), Code of Civil Procedure section 1280, et seq., and its cousin, section 1297.11, et seq., work together to set forth the rules for arbitrations within California. Section 1297.11 exists to govern international arbitrations.

Per Section 1297.81, if any party to an agreement governed by Section 1297.11, et seq. "commences judicial proceedings seeking relief with respect to a matter covered by the agreement to arbitrate, any other party to the agreement may apply to the superior court for an order to stay the proceedings and to compel arbitration." (Code Civ. Proc. § 1297.81.) Section 1297.82 further states that, "[a] timely request for a stay of judicial proceedings under Section 1297.81 shall be granted." (Code Civ. Proc. § 1297.82.)

Section 1290.2 of the California Arbitration Act creates a "summary proceeding" for ordering parties to arbitrate disputes. The petitioner must "prov[e] the existence of a valid arbitration agreement by the preponderance of the evidence," and the opposing party "bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." (Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 972 (1997).) "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final

Minute Order Page 3 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

determination." (Ibid.)

Discussion

Arbitration Agreement

The First Amendment to the MLA ("First Amendment") provides that "[i]f a dispute arises out of or relates to this Agreement, …. such dispute … shall be by arbitration in Los Angeles, California …. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration." (Wan Decl., Exh. 3.)

The First Amendment further provides that "Section 30 of the Agreement is deleted in its entirety and replaced with the following: This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law." (Wan Decl., Exh. 3.)

The Court therefore finds that Petitioner has met its burden to demonstrate the existence of an agreement to arbitrate.

Furthermore, Respondent's claims clearly arise out of the MLA. Respondent seeks control over intellectual property obtained and sublicensed as a result of the MLA. Furthermore, as discussed below, Respondent was intimately involved in conducting business with Petitioner over the MLA.

Whether the agreement is binding on China Brands Group

There remains the issue of whether the arbitration agreement is binding on Respondent, because Respondent is not a signatory to it. Petitioner argues that Respondent is Grand Union's agent and alter ego. Therefore, Respondent is bound by the arbitration agreement it signed on behalf of Grand Union. Further, Petitioner argues that Respondent's claims in the China Lawsuit are inextricably linked with the claims between the parties in the Arbitration, and that Respondent should therefore be compelled to stay the China Litigation during the pendency of the Arbitration to avoid the risk of competing rulings on the same facts. As noted, Respondent does not respond to or oppose any of these arguments.

Minute Order Page 4 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Whether Respondent is the alter ego of Grand Union

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (Sonora Diamond Corp. v. Superior Court (2000) 83 Cal.App.4th 523, 538.) When these conditions are met, courts disregard the corporate structure and impute the actions of a corporation onto its owner or parent. (McLaughlin v. L. Bloom Sons Co. (1962) 206 Cal.App.2d 848, 851-852.)

In determining whether to apply the doctrine, California courts consider a number of factors which include but are not limited to (1) inadequate capitalization, (2) commingling of funds, records, and other assets, (3) disregard of corporate formalities (e.g., stock issuance, holding board meetings, keeping of minutes, election of officers and directors, segregation of corporate records), (4) the same equitable ownership in the two entities, (5) the same directors and officers, (6) confusion about corporate identity, (7) use of the same offices and employees, (8) use of subsidiary as a mere shell or conduit for the affairs of the parent, and (9) lack of segregation of corporate records. (Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court (Parsons Corp.) (1997) 60 Cal.App.4th 248, 258.)

There is substantial evidence to indicate that Respondent is the only operating entity, and that Grand Union's operations are conducted only through Respondent.

Grand Union itself does not have any employees who are not also employees of Respondent. (Wan Decl. ¶ 44.) Petitioner has only dealt with Respondent, rather than Grand Union, throughout the course of the MLA. (Wan Decl. ¶ 44.) During the Arbitration, Grand Union admitted that "Grand Union operates under the MLA by entering into business relationships (through [Respondent]) with Sublicensees." (Wan Decl. Exh. 15 ("Grand Union Response and Counterclaims") at p. 34].) All of the email communications between Paul Frank and Grand Union or Respondent were with employees of Respondent. (Wan Decl. Exh. 6-13.) The physical address specified in Section 29 of the Second Amendment to the MLA ("Second Amendment") as No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by Respondent. (Wan Decl. ¶ 46.)

Bo Zheng testified in the Arbitration that he is the "sole director of Grand Union" and "the chairman and chief executive officer of China Brands Group." (Wan Decl. Exh. 25 ("Zheng Statement").) Under the Second Amendment, notices must be sent to Bo Zheng's email address

Minute Order Page 5 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

at Respondent, bo.zheng@chinabrandsgroup.com.cn. (Wan Decl. Exh. 4 at p. 6.) In the Arbitration, Grand Union identified its own contact persons as Bo Zheng, via his email at Respondent, and address, and Respondent's employee Jennifer Huang, also via her email address at Respondent. (Wan Decl. Exh. 15 at p. 10.) Ms. Huang testified that she is the "General Manager of the Licensing Management Department within [Respondent]. As part of [her] role, [she is] responsible for Grand Union's management of the Paul Frank brand and the main liaison with PF Hong Kong relating to the activities under the Master Licensing Agreement." (Wan Decl. Exh. 18 ("Huang Statement") at p. 1, ¶ 4.)

Respondent paid royalties on Grand Union's behalf prior to the MLA (Grand Union Response and Counterclaims at p. 7, ¶ 23.) Respondent also funded Grand Union's development of the brand. (Wan Decl. ¶ 16 at ¶ 19.)

Respondent also held itself out as liable for Grand Union's financial responsibilities under the MLA. With regards to a financial obligation owed by Grand Union under the MLA, an employee of Respondent emailed Petitioner saying, "Pls. do me a favor, [Respondent] is preparing the first payment of Royalty in the amendment, that is USD 1 million, could you send me the invoice…." (Wan Decl. Exh. 35 at p. 3.) Bo Zheng later emailed Petitioner regarding the payment:

"According to the amendment 2 to the Master License Agreement, [Respondent] needs to pay the second installment by September 18, 2021. But now due to [Respondent] don't have enough US dollar in GU's
bank account, we can pay USD 200,000 in advance today…. Based on the above reasons, [Respondent] hereby applies for postponing the payment of the second installment to October 25, 2021."

(Wan Decl. Exh. 36.)

These facts show that Respondent and Grand Union share the same chief officer, use their corporate identities interchangeably, share most or all of their employees, rely on the same employees for contacts without distinguishing their email addresses, share financial liabilities to some degree, and share office space. Respondent apparently conducted most or all of Grand Union's business on its behalf throughout the course of the MLA. However, there is one key element missing: Petitioner has not pointed to any evidence showing that either entity actually owns the other. For this reason, the alter ego doctrine is unavailable.

Whether Respondent is Grand Union's agent

Minute Order Page 6 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. (Hernandez v. Meridian Management Services, LLC (2023) 87 Cal.App.5th 1214, 1220.)

As discussed above, there is overwhelming evidence to indicate that Grand Union conducted its business entirely through Respondent. Regardless of whether the facts support treating Respondent and Grand Union as alter egos, they clearly show that Respondent acted on Grand Union's behalf and subject to its control. Respondent controlled the business dealings stemming out of the MLA and acted as the contact point for all of Petitioner's communications with Grand Union. It appears that Grand Union essentially existed as a shell for Respondent's convenience. Thus, Respondent is Grand Union's agent.

"There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement …. [T]here are six theories by which a nonsignatory may be bound to arbitrate: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." (Suh v. Superior Court (2010) 181 Cal.App.4th 1504, 1513.) A nonsignatory to an arbitration agreement who is an agent to a signatory can be compelled to arbitrate. (Harris v. Superior Court (1986) 188 Cal.App.3d 475, 478-479.)

Because Respondent is Grand Union's agent with regards to the MLA, it can be compelled to arbitrate its claims against Petitioner.

Request for Stay

Section 1297.81 expressly authorizes the Court to stay litigation that conflicts with international arbitration. However, Petitioner's stay request raises complex issues of comity because it would interfere with the litigation proceeding in the courts of another country.

"California courts unquestionably have the power under certain circumstances to issue antisuit injunctions to restrain litigants from pursuing lawsuits in other states or foreign nations." (TSMC North America v. Semiconductor Manufacturing Internat. Corp. (2008) 161 Cal.App.4th 581, 589.) "However, this power must be used sparingly." (Ibid.) "[E]njoining proceedings in another state requires an exceptional circumstance that outweighs the threat to judicial restraint and comity principles." (Id. at p. 591, quoting Advanced Bionics Corp. v. Medtronic, Inc. (2002) 29 Cal.4th 697, 708.)

Minute Order Page 7 of 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Plaintiff’s motion fails to address the legal issue of comity at all, or the California case law referenced above. Accordingly, the Court denies Petitioner’s request for a stay without prejudice.

Petitioner's counsel is to give notice.

Certificate of Mailing is attached.

# EXHIBIT M

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 3/06/2024 9:15 AM David W. Slayton, Executive Officer/Clerk of Court, By K. Hung, Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP**

Date: April 9, 2024
Time: 8:30 a.m.
Dept. 72

Reservation No.: 826041016119

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

weintraub tobin chediak coleman grodin
LAW CORPORATION

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..... 3

I. INTRODUCTION ..... 4

II. FACTUAL BACKGROUND ..... 5

A. The Parties and The MLA ..... 5

B. Grand Union is Wholly Owned by CBG and Acts Only Through CBG ..... 6

C. Paul Frank Terminates the MLA and Files the Arbitration ..... 10

D. CBG Filed the China Lawsuit in an Attempt to Avoid the Jurisdiction of the Arbitration and Obtain a More Favorable Ruling ..... 11

III. PROCEDURAL HISTORY ..... 13

IV. CBG IS REQUIRED TO ARBITRATE ALL CLAIMS RELATED TO THE MLA ..... 14

A. California Law Governing Arbitrations ..... 14

B. The Court Should Compel CBG to Arbitrate All Claims Related to the MLA as Grand Union's Agent and Alter Ego ..... 16

1. The Court Already Determined that CBG is Bound by the Arbitration Agreement as Grand Union's Agent ..... 17

2. CBG is Bound by the Arbitration Agreement as Grand Union's Alter Ego ..... 17

V. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) .....19

*AT&T Techs. v. Communs. Workers of Am.*,
475 U.S. 643 (1986) .....16

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) .....19

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997) .....16

*Gueyffier v. Ann Summers, Ltd.*,
144 Cal. App. 4th 166 (2006), reversed on other grounds, 43 Cal. 4th 1179 (2008) .....14, 15

*Klajic v. Castaic Lake Water Agency*,
90 Cal. App. 4th 987 (2001) .....17

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*,
235 Cal. App. 3d 1220 (1991) .....17

*Lebastchi v. Superior Court*,
33 Cal. App. 4th 1465 (1995) .....17

*Pacific Invest. Co. v. Townsend*,
58 Cal. App. 3d 1 (1976) .....16

*Rowe v. Exline*,
153 Cal. App. 4th 1276 (2007) .....19

*Salgado v. Carrows Restaurants, Inc.*
33 Cal. App. 5th 356 (2019) .....16

*Suh v. Superior Court*,
181 Cal. App. 4th 1504 (2010) .....19

*United Transp. Union v. Southern Cal. Rapid Transit Dist.*,
7 Cal. App. 4th 804 (1992) .....16

*Zoran Corp. v. Chen*,
185 Cal. App. 4th 799 (2010) .....18

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**Statutes**

Cal. Civ. Proc. Code § 1008(b) ....... 5, 13

Cal. Civ. Proc. Code § 1280, *et seq*. ....... 14, 15

Cal. Civ. Proc. Code § 1290.2 ....... 6

Cal. Civ. Proc. Code § 1297.11 ....... 14, 15

Cal. Civ. Proc. Code § 1297.12 ....... 14

Cal. Civ. Proc. Code § 1297.13 ....... 14

Cal. Civ. Proc. Code § 1297.17 ....... 15

Code of Civil Procedure § 1297.81 ....... 5, 15, 16

**Other Authorities**

Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416 ....... 17

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{4202516.DOCX:3}

4

PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP

## I. INTRODUCTION

Pursuant to Code of Civil Procedure § 1297.81, Petitioner Paul Frank Limited ("Paul Frank") hereby petitions the Court for an order compelling Respondent China Brands Group (红纺文化有限公司) ("CBG") to arbitrate Paul Frank's claims against CBG in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Paul Frank and CBG's agent and alter ego Grand Union Trading Limited (宏联国际贸易有限公司) ("Grand Union"). CBG is the agent and alter ego of Grand Union and therefore bound by the arbitration clause in the Master License Agreement ("MLA") between Paul Frank and Grand Union. Further, CBG has filed a lawsuit against Paul Frank and *its own alter ego*, Grand Union, in the Intermediate People's Court of Tsingdao City of Shandong Province., Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") during the pendency of the Arbitration. The China Lawsuit alleges that Paul Frank has violated CBG's rights, which were obtained through a sublicense of the rights granted to Grand Union under the MLA.

In November 2023, this Court ordered that CBG was bound by the relevant arbitration agreement as Grand Union's agent. The Court further found sufficient facts to determine that CBG was the alter ego of Grand Union, but found that there was no evidence that "either entity actually owns the other." Pursuant to Code of Civil Procedure § 1008(b), Paul Frank appears herein to respectfully request that the Court find that CBG is the alter ego of Grand Union, as since the Court's ruling Paul Frank has obtained documentary and testamentary evidence demonstrating CBG's 100% ownership interest in Grand Union. Because the parties expressly agreed to arbitrate any and all disputes in Los Angeles, because the Court already found that service of the previous Petition to Compel was proper under the arbitration agreement, and because CBG's claims in the China lawsuit are inextricably linked with the claims between the parties in the Arbitration, CBG should be compelled to arbitrate such claims as both the agent and alter ego of Grand Union and Paul Frank should be permitted to pursue its claims against CBG in the Arbitration.

## II. FACTUAL BACKGROUND

### A. The Parties and the MLA

Paul Frank owns the intellectual property associated with the world-famous Paul Frank® brand.

weintraub tobin chediak coleman grodin LAW CORPORATION

On January 1, 2015, Paul Frank and Grand Union entered into the Master License Agreement ("MLA"), pursuant to which Grand Union was granted the right to certain elements of the Paul Frank brand within the territory of mainland China, Hong Kong, and Macau. *See* MLA, Exhibit 1 to the Declaration of Stanley Yook-Loong Wan in Support of Paul Frank Limited's Petition to Compel Arbitration ("Wan Decl.").[1] The MLA was negotiated on behalf of Paul Frank by Saban Brands Entertainment Group ("Saban"), which held the rights to the Property prior to Paul Frank's acquisition of the brand in 2020. *See* Wan Decl. at ¶¶ 4-5.

Grand Union admitted in the underlying Arbitration that it was CBG that actually negotiated the MLA. According to Grand Union, it was CBG's "plan" to help Saban "achieve [the] goal" of repositioning the Property to be more "high-end in mainland China." Grand Union's Application for Interim Relief ("Application"), Ex. 16 to Wan Decl. Therefore, "[i]n around 2014, Saban began negotiating with CBG on what would become the MLA." *Id.*; *see also* First Witness Statement of Tao Zheng ("Tao Zheng Statement"), Ex. 17 to Wan Decl. at p. 2, ¶ 8.

The MLA originally provided that any disputes between the parties would be submitted to arbitration in Hong Kong. *See* MLA, Ex. 1 to Wan Decl., at Section 28. However, in 2018, the parties agreed that any disputes "shall be determined by arbitration in Los Angeles, California before a single arbitrator… [and] administered by JAMS." *See* First Amendment to MLA, Ex. 3 to Wan Decl., at Section 28. The First Amendment was negotiated and signed by Bo Zheng, in his capacity as the Director of Grand Union. *See id.* at p. 2; see also Wan Decl. at ¶ 9; *see also* First Witness Statement of Zheng Bo, Ex. 25 to Wan Decl. ("Bo Zheng Statement")[2] at ¶ 2. Bo Zheng also negotiated and signed the Second Amendment in 2021 and the Third Amendment in 2022. *See* Wan Decl. at ¶¶ 10-11.

**B. <u>Grand Union is Wholly Owned by CBG and Acts Only Through CBG</u>**

There is no dispute that Grand Union is wholly owned by CBG and exclusively acts through

---

[1] To avoid burdening the Court with redundant documentation, all references to the declarations of Stanley Yook-Loong Wan and Jessica R. Corpuz refer to the documents previously filed with the Court on September 11, 2023 in support of Paul Frank's previous Petition to Compel Arbitration. The previously filed declarations and exhibits are incorporated herein by this reference.

[2] Chinese naming conventions put the surname before the given name. Thus, his surname is Zheng and his given name is Bo.

weintraub tobin chediak coleman grodin LAW CORPORATION

CBG. This fact was recently confirmed by documents produced by Grand Union during the Arbitration and under oath by Grand Union and CBG's director, Bo Zheng. *See* Declaration of Kavan J. Jeppson in Support of Renewed Petition to Compel Arbitration ("Jeppson Decl."), ¶¶ 3-4. During his deposition, Mr. Zheng was shown the following document produced by Grand Union, which clearly states that Grand Union is 100% owned by CBG:

*See* Ex. 2 to Jeppson Decl.[3]

Mr. Zheng testified that the document accurately depicts the ownership structure between CBG, Grand Union, and their affiliated entities. He was asked "[t]he company at the very bottom of this document is Grand Union. And this document indicates that Grand Union is 100 percent owned by an entity called Smartway International Investment, Inc…Is it accurate that Grand Union is 100 percent owned by Smartway?" *See* Ex. 2 to Jeppson Decl. at pp. 93:22-94:25. Mr. Zheng responded, "Yes." *Id.* at p. 95:1. Mr. Zheng was then asked, "is it accurate that Smartway is 100 percent owned by the next entity… China Brands Group Enterprise Development Limited?" *Id.* at 95:2-7. He was then asked,

[3] This document was produced by Grand Union on November 20, 2023, more than two months after the original Petition to Compel was filed and just one day before the hearing on the Motion to Compel.

weintraub tobin chediak coleman grodin
LAW CORPORATION

"[a]nd is it accurate that that same entity, China Brands Group Enterprise, is 100 percent owned by China Brands Group?" *Id.*, at p. 95:8-10. Mr. Zheng responded, "Yes, that's right." *Id.*, at p. 95:11.

In other words, Grand Union is 100% owned by CBG.

Not only is Grand Union wholly owned by CBG, but Grand Union operates solely through CBG. Grand Union admitted as much in the underlying Arbitration. *See* Grand Union Response and Counterclaims, Ex. 15 to Wan Decl., at ¶ 160, ("Grand Union operates under the MLA by entering into business relationships (through CBG) with Sublicensees."). Grand Union does not conduct any business itself – CBG is the only operating entity. Grand Union does not have any employees. Paul Frank has dealt exclusively with CBG since the signing of the MLA. *See* Wan Decl. at ¶ 44. Bo Zheng testified in the Arbitration that he is the "sole director of Grand Union" and "the chairman and chief executive officer of China Brands Group." Bo Zheng Statement, Exhibit 25 to Wan Decl. Mr. Zheng further confirmed during his deposition that his official title at Grand Union is "Independent Director." *See* Ex. 2 to Jeppson Decl. at p. 21:25-22:2. Mr. Zheng's brother, Tao Zheng, also testified in the Arbitration on behalf of Grand Union, but solely in his capacity as the Vice Chairman of CBG and the "person-in-charge of the intellectual property affairs department." Tao Zheng Statement, Exhibit 17 to Wan Decl. at ¶ 2. Both are shareholders and officers of CBG. *See* Exs. 37-38 to Wan Decl. Bo Zheng is the Chairman of CBG and Tao Zheng is the Vice Chairman. *Id.*; *see also* Exs. 39-40 to Wan Decl.

CBG is the contact party for all legal actions relating to Paul Frank. Any formal notice to be given to Grand Union under the MLA must be sent to Bo Zheng at his CBG email address, with a copy to a David Zhou, also at a CBG email address. *See* Second Amendment, Ex. 4 to Wan Decl., at Section 29. In the Arbitration, Grand Union identified its own contact persons as Bo Zheng, via his CBG email address, and CBG employee Jennifer Huang, also via her CBG email address. Counterclaim, Ex. 15 to Wan Decl. at ¶ 10. Grand Union also filed an Application for Interim Relief in the Arbitration. The only parties to provide witness statements in support of Grand Union's Application for Interim Relief were Tao Zheng, Bo Zheng, and Jennifer Huang – all from CBG. Ms. Huang testified that she is an employee of CBG, yet manages the Paul Frank brand for Grand Union. She is the "General Manager of the Licensing Management Department within CBG. As part of my role, I am responsible for Grand Union's management of the Paul Frank brand and the main liaison with PF Hong Kong relating to the

activities under the Master Licensing Agreement." *See* First Witness Statement of Jennifer Huang ("Huang Statement") Ex. 18 to Wan Decl. at p. 1, ¶ 4. All three individuals use the terms Grand Union and CBG interchangeably in their witness statements. *Id.*, *see also* Tao Zheng Statement, Ex. 17 to Wan Decl., *see also* Bo Zheng Statement, Ex. 25 to Wan Decl.

All of the email communications between Paul Frank and Grand Union were with CBG employees. *See*, *e.g.*, Exs. 6-13 to Wan Decl. Grand Union does not maintain an email server. As Bo Zheng testified in the China Lawsuit, "[t]here is no website" for Grand Union. *See* Investigation Transcript, Exs. 47-48 to Wan Decl. All communications are through CBG's domain name and email server. *See* Wan Decl. at ¶ 45. Paul Frank has never communicated with any person with a Grand Union email address. *Id.* Grand Union also does not maintain any physical offices. The physical address specified in Section 29 of the Second Amendment as No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by CBG. *See* Wan Decl. at ¶ 46.

There is no distinction between the ownership, funds, assets, and debts of Grand Union and CBG. Grand Union admits that CBG paid royalties to Saban under the license agreement that predated the MLA. *See* Counterclaim, Ex 15 to Wan Decl. at p. 7, ¶ 23 ("CBG paid royalties to Paul Frank Industries under such licensing arrangement."). Grand Union also admits that CBG funded the development of the brand. *See* Application, Ex. 16 to Wan Decl. at ¶ 19 ("CBG was required to inject long-term, sustained investment to develop the Paul Frank Brand in the Territory and achieve the objectives of the licensing program."). Ms. Huang, an employee of CBG, uses the term "we" when discussing the payment of the license fee to Paul Frank. *See* Huang Witness Statement, Ex. 18 to Wan Decl. at p. 6, ¶ 29. She also states that the Second Amendment was negotiated in part to "justify the payment with the CBG organization," despite the fact that Grand Union was supposed to be paying the license fee under the Second Amendment. *Id.* at p. 7-8, ¶ 38.

In fact, CBG has directly held itself out as liable for the responsibilities of Grand Union. Pursuant to the Second Amendment, Grand Union was required to pay a minimum guarantee to Paul Frank on September 18, 2021. On August 23, 2021, a CBG employee wrote to Paul Frank stating, "Pls. do me a favor, CBG is preparing the first payment of Royalty in the amendment, that is USD 1 million, could you send me the invoice…." *See* Email dated August 21, 2021 in Email Chain at Ex. 35 to Wan

**weintraub tobin** chediak coleman grodin LAW CORPORATION

Decl., p. 3. On August 24, 2021, that same employee said, "CBG has paid it this morning." *Id.* at p. 2.

Bo Zheng later emailed Mr. Wan regarding the payment:

> According to the amendment 2 to the Master License Agreement, CBG needs to pay the second installment by September 18, 2021. But now due to CBG don't have enough US dollar in GU's bank account, we can pay USD 200,000 in advance today…. Based on the above reasons, CBG hereby applies for postponing the payment of the second installment to October 25, 2021.

Email dated September 17, 2021, Ex. 36 to Wan Decl.

CBG has also held out to the public that CBG holds the rights to the Paul Frank property in China, not Grand Union. In a press interview in 2021, Bo Zheng is identified only as the Chairman of Hongfang Culture (another name for CBG) and bragged that "we started to transform into a brand operation and management company, and made Paul Frank Big Mouth Monkey brand a hit in China, and then started a multi-brand operation model." News Article at Ex. 39 to Wan Decl., p. 1. A 2016 article featured Bo Zheng and Tao Zheng together, stating "Hongfang Culture, led by these two [former] students [of the business school sponsoring the article], has signed a 15-year exclusive image and brand licensing agreement with Paul Frank USA in June last year by spending a huge amount of money…. Hongfang Culture, which is the Chinese brand operator of Paul Frank, owns all rights of its merchandise, cross-border and content development as well as the rights to fight against counterfeit goods…." News Article at Ex. 40 to Wan Decl., p. 2, 3. Grand Union is never mentioned in either article.

With no employees, no offices, no business, and no control over its operations, Grand Union is merely a shell set up by CBG to hold the intellectual property rights under the MLA. CBG is the only operating entity that wholly owns and controls Grand Union.

### C. Paul Frank Terminates the MLA and Files the Arbitration

In 2021 and 2022, the relationship between Paul Frank and Grand Union / CBG deteriorated. Paul Frank discovered that CBG's affiliate Hong Tong Fang (Shanghai) Cultural Development Co., Ltd. ("Hong Tong Fang") had forged an official Paul Frank letter of authorization and submitted it to the online platform TikTok. *See* Paul Frank Preliminary Injunction Brief, Ex. 21 to Wan Decl. at 15-20. Paul Frank also discovered licensed products sold outside the authorized territory and channels of distribution (*id*. at 22-29), and that Grand Union had refused to comply with the additional obligations set forth in the Second Amendment (*id*. at 29-38). Paul Frank has since discovered additional breaches

**weintraub tobin** chediak coleman grodin LAW CORPORATION

of the MLA, including the sale of unapproved products, the filing of fraudulent "anti-counterfeiting" lawsuits, and subjecting the Paul Frank brand to public disrepute. *Id.* at 39-48. Each of these actions were in fact committed by CBG – Grand Union does nothing except through its agent and alter ego CBG.

Therefore, in September 2022, Paul Frank terminated the MLA. *See* Exs. 10-11 to Wan Decl. Shortly thereafter, pursuant to the arbitration provision in the First Amendment, Paul Frank filed a Demand for Arbitration against Grand Union on November 22, 2022. *See* Ex. 14 to Wan Decl. Grand Union filed a Response and Counterclaims on December 16, 2022. *See* Ex. 15 to Wan Decl.

### D. CBG Filed the China Lawsuit in an Attempt to Avoid the Jurisdiction of the Arbitration and Obtain a More Favorable Ruling

Months after Paul Frank filed the Arbitration against Grand Union, Paul Frank discovered that CBG had secretly filed the China Lawsuit against *Grand Union itself* and against Paul Frank. *See* Civil Statement of Claim, Exs. 41-42 to Wan Decl.

In its Statement of Claim, CBG (and a related entity also controlled by CBG, Shanghai Hong Fang Culture Co. Ltd.) asks the Chinese court to issue an order stating that "Defendants [must] immediately stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate these brands…." *Id.* at 1. In other words, CBG is asking the Chinese Court to protect its rights to the Paul Frank intellectual property, obtained only through the MLA. CBG's main complaint is that in July and September 2022 (i.e., when Paul Frank terminated the MLA), "Paul Frank sent Letters to the sub-licensees… stating that all sub-licenses and related certificates that CBG had granted and issued pursuant to its exclusive sub-license had become invalid and requiring them to immediately stop all business activities concerning the band 'Paul Frank.'" *Id.* at 2. CBG claims that such actions infringed its "legal and valid exclusive sub-license." *Id.* at 3. In short, CBG is claiming that it was the party harmed by Paul Frank's termination of the MLA, as the exclusive sub-licensee of Grand Union's intellectual property rights.

Using some highly questionable legal sleight of hand, CBG also named Grand Union – its own alter ego and 100% owned entity – as a party to the China Lawsuit, claiming that it "once contacted Grand Union, requesting it to address the dispute between the parties." *Id.* at 3. The allegations are

weintraub tobin chediak coleman grodin
LAW CORPORATION

laughable, as Grand Union has no employees, no offices, and serves as a mere holding company for CBG intellectual property. CBG cannot "contact" Grand Union – it would be contacting itself.

CBG's nefarious plan in naming Grand Union soon became clear. Despite the fact that Paul Frank was still entirely unaware of the China Lawsuit, CBG and Grand Union together submitted an "Agreement on Jurisdiction" to the Chinese court in an attempt to remove jurisdiction from California. *See* Exs. 43-44 to Wan Decl. The Agreement on Jurisdiction states that "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either [Grand Union] or [CBG] can file lawsuits to the court with jurisdiction at [CBG's] domiciliate. *Id.* In short, CBG sued its own alter ego, then acting as if they were parties on the opposite ends of the lawsuit, "agreed" that any dispute with Paul Frank could be brought in CBG's local Chinese courthouse in order to deceive the Chinese court into retaining jurisdiction over the case.

Soon after the China Lawsuit was filed (but still without notice to Paul Frank), CBG also asked the Court to block Paul Frank's trademarks and copyrights within China. The Chinese court granted CBG's request without any notice to Paul Frank or opportunity to be heard. *See* Civil Ruling, Ex. 45-46 to Wan Decl. This has caused enormous harm to Paul Frank; whose trademarks and copyrights are now frozen. *See* Wan Decl. at ¶ 54.

Paul Frank was unaware of the China Lawsuit until, in January 2023, Paul Frank attempted to update license information for one of its trademarks. *See* Wan Decl. at ¶ 51. It was informed by the trademark office that it could not do so because the trademark was blocked. Paul Frank investigated to determine why the trademarked was blocked, and discovered the China Lawsuit. *Id.*

Paul Frank has of course contested the jurisdiction of the Chinese court in the China Lawsuit. Yet Grand Union / CBG persists in seeking to retain jurisdiction in China. On March 15, 2023, Bo Zheng testified before the Chinese court in order to support CBG's claims of jurisdiction. *See* Investigation Transcript, Exs. 47-48 to Wan Decl. He testified that he is the "sole Director" in Grand Union" and the "legal representative" of CBG. He describes himself as the "main decision-making person." *Id.* at 1. He claims that it has three other employees (whom he does not actually identify and which likely do not exist, as no Grand Union employee ever interacted with Paul Frank during the entire history of the parties' relationship), but that their work is entirely "assisting China Brands Group in

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

approval and stamping." *Id.* "The main business partner is China Brands Group, to help submitting relevant stamped materials." *Id.* In other words, Grand Union only exists as a fiction to issue formal approvals and rubber stamp the actions of CBG – both literally and metaphorically, as Grand Union is often required to use its official company stamp to approve the actions of CBG. Bo Zheng essentially admits that there is no separation between Grand Union and CBG.

The China Lawsuit is a sham. The entire purpose of the lawsuit is to bring this dispute into a favorable court and avoid the jurisdiction of an American arbitrator who is sure to rule in Paul Frank's favor. This Court should not permit CBG to continue to perpetrate this fraud and should order CBG to arbitrate its claims as required under the MLA.

## III. PROCEDURAL HISTORY

On November 21, 2023, Paul Frank's previous Petition to Compel Arbitration was granted in part and denied, in part, without prejudice. *See* Request for Judicial Notice ("RJN"), ¶ 1, November 21, 2023 Minute Order following Hearing on Petition to Compel Arbitration. *Ibid*. The Court Ordered CBG to arbitrate Paul Frank's claims against it as Grand Union's agent. *Ibid*. The Court did not find CBG to be the alter ego of Grand Union because the Court found there was insufficient evidence to show that "either entity actually owns the other." *Ibid*. Thus, Paul Frank files this Renewed Petition to Compel with the facts adduced after the Petition to Compel was filed.

CBG was served with notice of this Court's ruling on the Petition to Compel Arbitration on December 5, 2023. *See* Jeppson Decl., ¶ 5. To date, CBG has not responded.

Meanwhile, the Arbitration against Grand Union has proceeded. The Arbitration Hearing on Paul Frank's claims against Grand Union began on February 26, 2024 and is expected to conclude on March 7, 2024. *See* Jeppson Decl., ¶ 5. Paul Frank will separately pursue a claim against CBG, in addition to its claim against Grand Union.

Section 1008(b) of the Code of Civil Procedure permits a party whose previous application was denied to, "make a subsequent application for the same order upon new or different facts, circumstances, or law." As set forth herein, Paul Frank demonstrates newly discovered facts regarding the ownership and corporate structure of CBG and Grand Union that were previously unknown to Paul Frank at the

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

time it filed its previous Petition to Compel Arbitration. *See* Jeppson Decl., ¶¶ 3-4 and Exhibits 1-2 thereto. Thus, Paul Frank brings this Renewed Petition to Compel Arbitration to compel CBG to arbitrate its claims as required under the MLA as both Grand Union's agent and alter ego.

## IV. CBG IS REQUIRED TO ARBITRATE ALL CLAIMS RELATED TO THE MLA

### A. California Law Governing Arbitrations

Two different titles of the Cal. Civ. Proc. Code govern arbitrations within California. The California Arbitration Act, Section 1280, *et seq*. applies to most arbitrations within the state of California. However, Section 1297.11, *et seq*. ("Title 9.3") governs the manner and conduct of so-called "international commercial arbitrations." It applies where the parties have "their places of business in different states" (i.e. in different countries) but the place of arbitration is within the State of California. Title 9.3, Cal. Civ. Proc. Code §§ 1297.12, 1297.13.

Title 9.3 was enacted in 1988 to specifically govern the "arbitration or conciliation of international commercial disputes." *See* 1988 Cal ALS 23, 1988 Cal AB 2667, 1988 Cal Stats. ch. 23. Title 9.3 is "patterned after the Model Law on International Commercial Arbitration (June 21, 1985) promulgated by the United Nations Commission on International Trade Law." *Gueyffier v. Ann Summers, Ltd.*, 144 Cal. App. 4th 166, 188 (2006), reversed on other grounds, 43 Cal. 4th 1179 (2008). It was designed to incorporate international law on the resolution of disputes. As described in *Gueyffier*:

> The purpose of title 9.3 was explained in an Assembly Committee on Judiciary report thusly: "The model act was intended to serve as a model for the adoption of national laws which would encourage parties to resolve international commercial disputes by arbitration. [¶] Proponent suggested that the adoption of [an] arbitration system based on the UNCITRAL model[] will provide assurance to international commercial interests that arbitrations in California will be conducted 'pursuant to internationally recognized rules based on an international consensus.' Therefore, it is argued that adoption of the bill will encourage foreign commercial interests to select California as the place to conduct their arbitration and provide many American interests with a more convenient forum to resolve their international commercial disputes. [¶] … [¶] This bill permits parties to agree to resolve international commercial disputes by arbitration in California." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2667 (1987–1988 Reg. Sess.) as amended Aug. 26, 1987, p. 4.)
>
> ….
>
> The Senate Rules Committee, Office of Senate Floor Analyses explained: "Existing California statute ([sections 1280 et seq.]) provides for the arbitration of

weintraub tobin chediak coleman grodin LAW CORPORATION

> disputes as an alternative to litigation. Review of proceedings and enforcement of awards are, however, within the venue of the civil justice system and are subject to the regular rules of civil procedure. [¶] In order to provide a framework for the resolution of commercial disputes involving multiple nations from varying legal traditions, [UNCITRAL] has adopted a Model Arbitration Law that has become widely accepted as the procedural standard for resolving international trade differences. This model act differs from the California procedures primarily in the extent to which arbitration issues may be appealed or reviewed in civil court. [¶] This bill would provide for the arbitration and conciliation of international commercial disputes according to the standards of the United Nations Commission on International Trade Law. It would specify the form of the arbitration agreement, delineate judicial involvement in aid of arbitration, establish the manner and conduct of arbitration, the making of awards and termination of proceedings, and specify the conduct and effect of conciliation procedures. [¶] The purpose of this measure is to permit the arbitration of international commercial disputes in California according to accepted international standards, thereby rendering foreign nationals more amenable to negotiating their disputes in this state." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 2667 (1987–1988 Reg. Sess.) as amended Sept. 3, 1987, pp. 1–2.)

*Gueyffier* at 188-89.

Title 9.3 preempts the California Arbitration Act where there are overlapping provisions. Title 9.3 specifically provides: "[T]his title supersedes Section 1280 to 1284.2 [the California Arbitration Act], inclusive, with respect to international commercial arbitration and conciliation." Cal. Civ. Proc. Code § 1297.17. However, the non-preempted provisions of the California Arbitration Act would still apply. For example, in *Gueyffier*, the court held that Title 9.3 therefore "expressly does not supersede California Arbitration Act procedures for enforcement, confirmation, correction, or vacation of an arbitration award, section 1285 et seq." *Gueyffier* at 190. In short, Title 9.3 controls where applicable, and the California Arbitration Act fills in the gaps.

Here, Paul Frank's principal place of business is in Hong Kong (*see* Wan Decl. at ¶ 3) while CBG's principal place of business is in Shandong Province, China (*see* Statement of Claim, Exs. 19-20 to Wan Decl.) and Grand Union's principal place of business is in Shanghai, China (*see* Second Amendment, Ex. 4 to Wan Decl.). The First Amendment specifies that the place of arbitration is Los Angeles, California. *See* Ex. 3 to Wan Decl. Therefore, this Petition is governed by the provisions of both Section 1297.11, *et seq*. and Section 1290, *et seq*. of the California Arbitration Act.

Per Title 9.3, Section 1297.81, if any party to an agreement governed by Title 9.3 "commences judicial proceedings seeking relief with respect to a matter covered by the agreement to arbitrate, any

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

other party to the agreement may apply to the superior court for an order to stay the proceedings and to compel arbitration." Section 1297.81 (emphasis added).

Section 1290.2 of the California Arbitration Act (which is not preempted by Title 9.3) creates a "summary proceeding" for ordering parties to arbitrate disputes. The petitioner must "prov[e] the existence of a valid arbitration agreement by the preponderance of the evidence," and the opposing party "bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997). "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." *Id.*

"Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration." *United Transp. Union v. Southern Cal. Rapid Transit Dist.*, 7 Cal. App. 4th 804, 808 (1992). The general rule is that arbitration will be ordered "unless it can be said with assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Pacific Invest. Co. v. Townsend*, 58 Cal. App. 3d 1, 9–10 (1976). The presumption favoring arbitration is particularly applicable where the arbitration clause is broad, as it is here. *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986). The relevant provision here states that any dispute which "arises out of or relates to this Agreement, or the breach hereof" is subject to arbitration. This exceedingly broad provision applies to CBG, in addition to Paul Frank and Grand Union. In fact, the Court must compel arbitration unless it can be said with assurance that the arbitration clause is not susceptible to an interpretation covering the asserted dispute. *Salgado v. Carrows Restaurants, Inc.* 33 Cal. App. 5th 356, 360 (2019).

Because CBG is bound by this valid and far-reaching arbitration provision, it must be compelled to arbitrate Paul Frank's claims, as well as its own purported claims against Paul Frank.

**B. <u>The Court Should Compel CBG to Arbitrate All Claims Related to the MLA as Grand Union's Agent and Alter Ego</u>**

There can be no dispute that there is a valid arbitration clause in the First Amendment which requires arbitration of all disputes related to the MLA, as both Paul Frank and Grand Union have asserted claims in the Arbitration pursuant to this clause. *See* Demand for Arbitration, Ex. 14 to Wan Decl., *see*

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

*also* Grand Union Response and Counterclaims, Ex. 15 to Wan Decl. CBG is bound by the arbitration agreement because it is Grand Union's agent and alter ego, and because the claims CBG has asserted in the China Lawsuit are intimately founded in and intertwined with the MLA.

**1. <u>The Court Already Determined that CBG is Bound by the Arbitration Agreement as Grand Union's Agent</u>**

As demonstrated at length in Paul Frank's previous Petition to Compel, there is no question that CBG is Grand Union's agent and is bound by the terms of the parties' Arbitration Agreement. *See* Petition to Compel Arbitration at pp. 15:19-16:9, 17:24-19:11. The Court agreed and Ordered CBG "to arbitrate Petitioner's claims against Respondent in JAMS Reference No. 522002118." *See* RJN, ¶ 1 at pp. 1-2. As such, this issue is not in dispute in this Renewed Petition.

**2. <u>CBG is Bound by the Arbitration Agreement as Grand Union's Alter Ego</u>**

It is also undisputed that CBG is the alter ego of Grand Union. When assessing alter ego, "[t]he issue is not whether the corporate entity should be disregarded for all purposes, nor whether its very purpose was to defraud the plaintiff. Rather, the issue is whether in the particular case presented and for the purpose of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." *Lebastchi v. Superior Court*, 33 Cal. App. 4th 1465, 1470 (1995), citing 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, pp. 524-525. It can be applied so as to impose liability on corporation for the acts of its parent or affiliated companies:

> In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it. The court thus has constructed for purposes of imposing liability an entity unknown to any secretary of state comprising assets and liabilities of two or more legal personalities; endowed that entity with the assets of both, and charged it with the liabilities of one or both.

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal. App. 3d 1220, 1249-50 (1991) (citing 2 Marsh's Cal. Corp. Law (3d ed. 1990) § 16.23, p. 1416. Whether the alter-ego doctrine applies is a question of fact. *See Klajic v. Castaic Lake Water Agency*, 90 Cal. App. 4th 987, 1000 (2001). Two conditions must exist: "(1) there is such a unity of interest that the separate personalities of the

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected." *Zoran Corp. v. Chen*, 185 Cal. App. 4th 799, 811 (2010).

In determining whether the alter ego doctrine applies, courts look to a range of factors including "the commingling of funds and other assets," "the failure to segregate funds of the separate entities," "the representation by an [alter ego] that he/she is personally liable for the debts of the corporation," "the identical equitable ownership in the two entities," "the identification of the equitable owners thereof with the domination and control of the two entities," "the identification of the directors and officers of the two entities in the responsible supervision and management," "the failure to adequately capitalize the corporation," "the absence of corporate assets, and undercapitalization," "the use of a corporation as a mere shell, instrumentality, or conduit for a single venture or the business of an individual or another corporation," "the use of the corporate entity to procure labor, services, or merchandise for another person or entity," and "the formation and use of a corporation to transfer to it the existing liability of another person or entity," among others. *Zoran*, 185 Cal. App. 4th at 81-812. "This long list of factors is not exhaustive. The enumerated factors may be considered among others under the particular circumstances of each case. No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Id.* at 812 (2010) (internal citations and quotations omitted).

Here, CBG is plainly the alter ego of Grand Union. The Court has already found that Grand and CBG "share the same chief officer, use their corporate identities interchangeably, share most or all of their employees, rely on the same employees for contacts without distinguishing their email addresses, share financial responsibilities to some degree, and share office space." *See* RJN ¶ 1 at p. 6. The only element the Court previously found missing was evidence that "either entity actually owns the other." *Ibid*. As explained above in Section II(B), this element is no longer in dispute. Grand Union's director testified under oath that Grand Union is 100% owned by CBG. *See* Ex. 2 to Jeppson Decl. at pp. 93:22-94:25; 95:1-11.

These facts demonstrate a clear unity of interest and ownership between CBG and Grand Union. CBG was the only operating business – Grand Union exists as nothing more than a piece of paper. As Grand Union's alter ego, CBG is bound by the MLA to arbitrate its disputes with Paul Frank. "There

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement…. [T]here are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." *Suh v. Superior Court*, 181 Cal. App. 4th 1504, 1513 (2010).

An alter ego of a signatory to an arbitration agreement may be compelled to arbitrate claims related to that agreement. "Indeed, while an agent is one who acts on behalf of a corporation, an alter ego is one who, effectively, *is* the corporation." *Rowe v. Exline*, 153 Cal. App. 4th 1276, 1285 (2007) (compelling arbitration of claims between a signatory and an alter ego of other signatory); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (nonsignatory may enforce arbitration agreement through assumption, alter ego, third-party beneficiary theories, etc.); *see also Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (nonsignatory may be bound under ordinary contract principles such as agency, alter ego and estoppel).

There can be no question that CBG is an alter ego of Grand Union, and is therefore bound by the arbitration agreement CBG itself signed.

## V. CONCLUSION

For the foregoing reasons, Paul Frank respectfully requests that the Court grant this Renewed Petition and enter an Order compelling CBG to appear in the pending Arbitration as both Grand Union's agent and alter ego.

DATED: March 5, 2024

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

Journal Technologies Court Portal

# Make a Reservation

PAUL FRANK LIMITED vs CHINA BRANDS GROUP

Case Number: 23STCP03323 Case Type: Civil Unlimited Category: Other Civil Petition
Date Filed: 2023-09-11 Location: Stanley Mosk Courthouse - Department 72

## Reservation

| Case Name: | Case Number: |
|---|---|
| PAUL FRANK LIMITED vs CHINA BRANDS GROUP | 23STCP03323 |
| Type: Motion to Compel Arbitration | Status: RESERVED |
| Filing Party: PAUL FRANK LIMITED (Petitioner) | Location: Stanley Mosk Courthouse - Department 72 |
| Date/Time: 04/09/2024 8:30 AM | Number of Motions: 1 |
| Reservation ID: 826041016119 | Confirmation Code: CR-QJKB8DFVV3TCTJXBV |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Compel Arbitration | 0.00 | 1 | 0.00 |
| TOTAL | | | $0.00 |

## Payment

| Amount: | Type: |
|---|---|
| $0.00 | NOFEE |
| Account Number: n/a | Authorization: n/a |
| Payment Date: 1969-12-31 | |

Print Receipt
Reserve Another Hearing

Copyright © Journal Technologies, USA. All rights reserved.

Chat

# EXHIBIT N

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
jcorpuz@weintraub.com
kjeppson@weintraub.com
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191

Attorneys for Plaintiff Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 3/06/2024 9:15 AM David W. Slayton, Executive Officer/Clerk of Court, By K. Hung, Deputy Clerk**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Plaintiff,

v.

CHINA BRANDS GROUP,

Defendant.

Case No. 23STCP03323

**DECLARATION OF KAVAN J. JEPPSON IN SUPPORT OF PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP**

Date: April 9, 2024
Time: 8:30 a.m.
Dept. 72

Reservation No.: 826041016119

{00256017.DOCX:3}
1
DECLARATION OF KAVAN J. JEPPSON IN SUPPORT OF PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP

**DECLARATION OF KAVAN J. JEPPSON**

I, Kavan J. Jeppson, declare as follows:

1. I am an attorney licensed to practice before all courts in the State of California and am an associate with Weintraub Tobin Chediak Coleman Grodin Law Corporation, attorneys of record for Petitioner Paul Frank Limited ("Paul Frank"). I am familiar with the facts set forth in this declaration and, if called as a witness, I could and would competently testify to those facts under oath.

2. This Declaration is made in support of Paul Frank's Renewed Petition to Compel Arbitration Against China Brands Group (the "Petition").

3. Attached hereto as **Exhibit 1** is a true and correct copy of relevant portions of the deposition transcript of Bo Zheng, taken on December 4, 2023 in Hong Kong in connection with the arbitration pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Paul Frank and Grand Union Trading Limited (宏联国际贸易有限公司) ("Grand Union").

4. Attached hereto as **Exhibit 2** is a true and correct copy of a document produced by Grand Union in the Arbitration on November 20, 2023 with the file name "3_红纺文化有限公司--宏联股权穿透.pdf." The file name translated into English is: GU-CBG Beneficial Ownership Transparency Chart. **Exhibit 2** was marked as Exhibit 7 to the Deposition of Mr. Zheng and bears the Bates stamp GU0036212.

5. CBG was served with notice of this Court's ruling on the Petition to Compel Arbitration on December 5, 2023. To date, CBG has not responded.

6. The Arbitration Hearing on Paul Frank's claims against Grand Union began on February 26, 2024 and is expected to conclude on March 7, 2024. Paul Frank will separately pursue a claim against CBG, in addition to its claim against Grand Union.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 5, 2024 at Los Angeles, California.

Kavan J. Jeppson

# EXHIBIT 1

ARBITRATION BEFORE JAMS
LOS ANGELES, CALIFORNIA

------------------------------------x
PAUL FRANK LIMITED, :
Claimant, : JAMS Ref No.:
v. : 5220002118
GRAND UNION INTERNATIONAL :
TRADING LIMITED, :
Respondent. :
------------------------------------x
GRAND UNION INTERNATIONAL :
TRADING LIMITED, :
Counter-Claimant, :
v. :
PAUL FRANK LIMITED, :
Counter-Respondent.:
------------------------------------x

Videotaped deposition of BO ZHENG
VOLUME 1
Monday, December 4, 2023
AT:
9:00 a.m.

Taken at:
King & Wood Mallesons
13/F Gloucester Tower, The Landmark
15 Queen's Road Central
Hong Kong
+852 3443 1000

Court Reporter:
KATHERINE SCHILLING, RPR, CA CSR No. 14163

A. My personally? 09:33:28
Q. Yes. 09:33:29
A. No. 09:33:33
Q. Are you represented by counsel here today? 09:33:36 09:33:39
A. Today? 09:33:46
Q. Yes. 09:33:47
A. What do you mean by represented by counsel? 09:33:50 09:33:52
Q. You have your attorney here with you today; right? 09:33:53 09:33:55
A. Yes. 09:33:59
Q. And have you been authorized to provide testimony on behalf of Grand Union? 09:34:00 09:34:03
MR. WELDON: Objection to form. 09:34:15
INTERPRETER: So I was just asking the witness to wait until his attorney makes the objection. Otherwise, they answer at the same time and I can't catch both. 09:34:30 09:34:32 09:34:36 09:34:38
So witness was saying that: 09:34:40
THE WITNESS: What do you mean? This question is very technical, of legal expertise. 09:34:42 09:34:44
BY MS. CORPUZ: 09:34:49
Q. Do you represent -- strike that. 09:34:52
What is your official title at 09:34:55

Grand Union? 09:34:56

A. Independent director. 09:35:10

Q. Are you authorized in your capacity as independent director of Grand Union to provide testimony on behalf of the company? 09:35:11 09:35:13 09:35:15

MR. WELDON: Objection to form. 09:35:18

THE WITNESS: Do I need to answer that? 09:35:40

BY MS. CORPUZ: 09:35:42

Q. Yes. 09:35:42

A. Yes. I am the only independent director of Grand Union, and I represent Grand Union. 09:35:49 09:35:52

Q. Okay. So just to be clear, when your counsel objects, you still need to answer the question unless he instructs you not to answer. Understood? 09:35:56 09:36:01 09:36:04 09:36:08

A. Okay. 09:36:22

Q. What did you do to prepare for your deposition today? 09:36:24 09:36:25

A. I did not prepare much and there are some things and I took a look, and I don't really think there is much to prepare. 09:36:49 09:36:50 09:36:54

Q. Did you review any documents? 09:36:55

A. Sometimes I would read some occasionally and not much. I don't have a lot of time. 09:37:04 09:37:09

Q. What documents did you review? 09:37:13

A. It was before the pandemic. 12:51:26
Q. Okay. I'm going to mark as an exhibit a document from Grand Union's production Bates stamped GU36212. 12:51:28 12:51:38 12:51:40
(Exhibit 7 was marked for identification.) 12:51:44
BY MS. CORPUZ: 12:51:45
Q. Please give it a moment to appear on your screens. 12:51:45 12:51:48
MS. CORPUZ: What exhibit number are we on? 12:52:17
COURT REPORTER: It's going to be 7. 12:52:31
BY MS. CORPUZ: 12:52:38
Q. Okay. You may need to refresh your screen, but it should appear here shortly. 12:52:39 12:52:40
A. Yes. It's there. 12:52:57
Q. Do you recognize this document? 12:52:59
A. Yes. 12:53:21
Q. Is this an accurate depiction of the ownership structure of these companies? 12:53:24 12:53:26
A. What are the other two companies at the latter part, the bottom part of the -- of this document, please? 12:53:42 12:53:45 12:53:48
Q. The company at the very bottom of this document is Grand Union. And this document indicates that Grand Union is 100 percent owned by an entity called Smartway International Investment, 12:53:50 12:53:52 12:54:00 12:54:03

Inc. 12:54:19

Do you see that, sir? 12:54:30

A. Yes, I can see that. I see that in here. 12:54:32

Q. Is that accurate? 12:54:37

MR. WELDON: Objection. Are you asking him what you said is accurate about it? Or ... 12:54:38 12:54:49

BY MS. CORPUZ: 12:54:53

Q. No. Is it accurate that Grand Union is 100 percent owned by the Smartway entity? 12:54:55 12:54:57

MR. WELDON: Okay. 12:55:00

THE WITNESS: Well, let me try this. And in terms of the ownership structure, and we worked on there together with the secretary of the board. And if you are asking me about the ownership structures here and how -- how can I answer this? How would you like me to answer this? 12:55:18 12:55:35 12:55:40 12:55:44 12:55:49 12:55:54

BY MS. CORPUZ: 12:55:56

Q. I'm asking if it's accurate that Grand Union is 100 percent owned by this Smartway entity. 12:55:57 12:55:59 12:56:03

A. This was a structure that we worked on in the past. 12:56:23 12:56:27

Q. Yes. This is a yes-or-no question. Is it accurate that Grand Union is 100 percent owned by Smartway? 12:56:28 12:56:32 12:56:38

A. Yes. 12:56:55

Q. Is it accurate that Smartway -- is it accurate that Smartway is 100 percent owned by the next entity on this list, where there is a Chinese and English name, English name being China Brands Group Enterprise Development Limited? 12:56:57 12:57:05 12:57:09 12:57:12 12:57:16

A. Yes. 12:57:50

Q. Okay. And is it accurate that that same entity, China Brands Group Enterprise, is 100 percent owned by China Brands Group? 12:57:52 12:57:56 12:58:00

A. Yes, that's right. 12:58:13

Q. Does Grand Union have any subsidiaries? 12:58:15

A. Grand Union? I don't know. I need to look that up. 12:58:33 12:58:35

Q. Okay. But as you are sitting here today, you're not aware that it has any subsidiaries? 12:58:35 12:58:38

A. I -- I'm not certain. I cannot be certain about this. I'm not certain whether it had any subsidiaries or not in the past. 12:58:55 12:58:58 12:59:01

Q. Okay. 12:59:03

MS. CORPUZ: We're going to break for lunch. 12:59:05

THE VIDEOGRAPHER: And we're going off the record. This marks the end of the file No. 4. The time is 12:59 p.m. 12:59:07 12:59:09 12:59:11

(There was a lunch recess in the proceedings.) 12:59:22

CERTIFICATE OF COURT REPORTER

I, Katherine Schilling, hereby certify that the testimony of the witness BO ZHENG in the foregoing transcript, numbered pages 1 through 224, taken on December 4, 2023, was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel, or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Date: DECEMBER 5, 2023

Katherine Schilling, RPR, CSR 14163

# EXHIBIT 2

**红纺文化有限公司**
English name: China Brands Group
Incorporation: China
Business address: China

100%

**上海馨若优然企业发展有限公司**
English name: China Brands Group Enterprise Development Limited
Incorporation: China

100%

**SMARTWAY INTERNATIONAL INVESTMENT INC.**
Incorporation: BVI
Business address: BVI

100%

**GRAND UNION INTERNATIONAL TRADING LIMITED**
Incorporation: Hong Kong
Business address: Hong Kong

**Exhibit**
0007

# EXHIBIT O

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Electronically FILED by Superior Court of California, County of Los Angeles 3/06/2024 9:15 AM David W. Slayton, Executive Officer/Clerk of Court, By K. Hung, Deputy Clerk

Attorneys for Petitioner Paul Frank Limited

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP**

Date: April 9, 2024
Time: 8:30 a.m.
Dept. 72

Reservation No.: 826041016119

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{00255156.DOCX:}
1
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Sections 452(d)(1) and 453 of the California Evidence Code, Petitioner Paul Frank Limited ("Paul Frank") respectfully requests that the Court take judicial notice of the Court's own files and records as follows:

1. Minute Order on Paul Frank Limited's Petition to Compel Arbitration Against China Brands Group and Stay Litigation Pending Arbitration, filed on November 21, 2023, attached hereto as Exhibit 1.

DATED: March 5, 2024

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

{00255156.DOCX:}
2
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PAUL FRANK LIMITED'S RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP

# EXHIBIT 1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Petitioner(s): Jessica R. Corpuz and Kavan J. Jeppson appear via LA CourtConnect

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Hearing on Motion to Compel Arbitration

The matter is called for hearing.

There is no appearance for or on behalf of Respondent.

Court hears from counsel for Moving Party.

After hearing from counsel, the matter is taken under submission.

The Clerk will give notice of the Court's final ruling.

LATER:

The Court, having taken the matter under submission, now rules as follows:

Petitioner Paul Frank Limited ("Petitioner") moves an order (1) compelling Respondent China Brands Group ("Respondent") to arbitrate Petitioner's claims against Respondent in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 (the "Arbitration") between Petitioner and Grand Union Trading Limited ("Grand Union"); and (2) staying the lawsuit filed by Respondent against Petitioner in the Intermediate People's Court of Court of Tsingdao City of Shandong Province, Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") during the pendency of the Arbitration.

Respondent has not opposed Petitioner's motion.

The Court grants Petitioner's motion in part as follows. Respondent is ORDERED to arbitrate

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323** November 21, 2023
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP** 8:30 AM

Judge: Honorable Joseph Lipner CSR: None
Judicial Assistant: Veronica Solis ERM: None
Courtroom Assistant: Jennifer Young Deputy Sheriff: None

Petitioner's claims against Respondent in JAMS Reference No. 522002118. The Court denies without prejudice Petitioner's request for a stay of the China Lawsuit.

Petitioner shall give notice.

Background

Petitioner owns the intellectual property associated with the Paul Frank brand. In 2015, Petitioner entered into a Master Licensing Agreement (the "MLA") with Grand Union, under which Grand Union was granted the rights to certain elements of the brand within the territories of mainland China, Hong Kong, and Macau. The First Amendment to the MLA ("First Amendment") contains an arbitration agreement and a choice of law provision which selects the application of California law. Respondent is not a signatory to the MLA or the First Amendment.

During the duration of the MLA, Grand Union sublicensed its rights under the MLA to Respondent.

Petitioner's principal place of business is in Hong Kong. (Wan Decl. ¶ 3.) Respondent's principal place of business is in Shandong Province, China. (Wan Decl. Exh. 19-20.) Grand Union's principal place of business is in Shanghai, China. (Wan Decl. Ex. 4.

In September, 2022, Petitioner terminated the MLA due to a number of alleged violations by Grand Union and Respondent, and shortly thereafter initiated the Arbitration against Grand Union. Grand Union filed a response and counterclaims.

Several months after the Arbitration began, Respondent filed the China Lawsuit against Grand Union and Petitioner. Respondent sought an order compelling Grand Union and Petitioner to stop their acts infringing upon the Plaintiff's exclusive sub-license under the trademark family comprising [Paul Frank] and exclusive right to operate [the] brands…." obtained under the MLA. (Wan Decl. Exh. 1, 2.) Respondent and Grand Union together filed an "Agreement on Jurisdiction" to the Chinese court, stating that "the Parties jointly agreed that concerning all disputes arising from the aforesaid infringement, either [Grand Union] or [Respondent] can file lawsuits to the court with jurisdiction at [Respondent's] domiciliate." (Wan Decl. Exh. 43-44.) Respondent also obtained an order from the Chinese court blocking Petitioner's trademarks and copyrights within China, without notice to Petitioner. (Wan Decl. Ex. 45-46.) Paul Frank discovered that its intellectual properties were frozen when it attempted to update license information for a trademark in January, 2023.

Minute Order Page 2 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

**Civil Division**

Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Petitioner contested jurisdiction in the China Lawsuit. In the Arbitration proceeding, Petitioner sought to have Respondent added as a party to the arbitration. The arbitrator denied the motion on the grounds that the question should be left up to the court.

Petitioner mailed a demand for arbitration to Bo Zheng, the chairman and CEO of Respondent, by FedEx, which Zheng signed for on September 7, 2023. (Corpuz Decl. 4-6.) Petitioner has not received a response to the demand. (Corpus Decl. ¶ 7.)

On November 20, 2023, Petitioner filed a proof of service attesting to the personal service of Petitioner's papers on Respondent by serving Zheng (Respondent's CEO) in Shanghai on October 17, 2023. Moreover, Petitioner served by email to Zheng at bo.zheng@chinabrandsgroup.com.cn, with a copy to David Zho at david.zhou@chinabrandsgroup.com.cn, on September 19, 2023. Petitioner also served the documents by FedEx on two of Zheng's addresses.

Respondent has not filed any opposition to the petition or the motion.

Legal Standard

The California Arbitration Act ("CAA"), Code of Civil Procedure section 1280, et seq., and its cousin, section 1297.11, et seq., work together to set forth the rules for arbitrations within California. Section 1297.11 exists to govern international arbitrations.

Per Section 1297.81, if any party to an agreement governed by Section 1297.11, et seq. "commences judicial proceedings seeking relief with respect to a matter covered by the agreement to arbitrate, any other party to the agreement may apply to the superior court for an order to stay the proceedings and to compel arbitration." (Code Civ. Proc. § 1297.81.) Section 1297.82 further states that, "[a] timely request for a stay of judicial proceedings under Section 1297.81 shall be granted." (Code Civ. Proc. § 1297.82.)

Section 1290.2 of the California Arbitration Act creates a "summary proceeding" for ordering parties to arbitrate disputes. The petitioner must "prov[e] the existence of a valid arbitration agreement by the preponderance of the evidence," and the opposing party "bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." (Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 972 (1997).) "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**
November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young
CSR: None
ERM: None
Deputy Sheriff: None

determination." (Ibid.)

Discussion

Arbitration Agreement

The First Amendment to the MLA ("First Amendment") provides that "[i]f a dispute arises out of or relates to this Agreement, …. such dispute … shall be by arbitration in Los Angeles, California …. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration." (Wan Decl., Exh. 3.)

The First Amendment further provides that "Section 30 of the Agreement is deleted in its entirety and replaced with the following: This Agreement shall be governed by and construed in accordance with the laws of the State of California without giving effect to the provisions thereof relating to conflicts of law." (Wan Decl., Exh. 3.)

The Court therefore finds that Petitioner has met its burden to demonstrate the existence of an agreement to arbitrate.

Furthermore, Respondent's claims clearly arise out of the MLA. Respondent seeks control over intellectual property obtained and sublicensed as a result of the MLA. Furthermore, as discussed below, Respondent was intimately involved in conducting business with Petitioner over the MLA.

Whether the agreement is binding on China Brands Group

There remains the issue of whether the arbitration agreement is binding on Respondent, because Respondent is not a signatory to it. Petitioner argues that Respondent is Grand Union's agent and alter ego. Therefore, Respondent is bound by the arbitration agreement it signed on behalf of Grand Union. Further, Petitioner argues that Respondent's claims in the China Lawsuit are inextricably linked with the claims between the parties in the Arbitration, and that Respondent should therefore be compelled to stay the China Litigation during the pendency of the Arbitration to avoid the risk of competing rulings on the same facts. As noted, Respondent does not respond to or oppose any of these arguments.

Minute Order Page 4 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Whether Respondent is the alter ego of Grand Union

"In California, two conditions must be met before the alter ego doctrine will be invoked. First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." (Sonora Diamond Corp. v. Superior Court (2000) 83 Cal.App.4th 523, 538.) When these conditions are met, courts disregard the corporate structure and impute the actions of a corporation onto its owner or parent. (McLaughlin v. L. Bloom Sons Co. (1962) 206 Cal.App.2d 848, 851-852.)

In determining whether to apply the doctrine, California courts consider a number of factors which include but are not limited to (1) inadequate capitalization, (2) commingling of funds, records, and other assets, (3) disregard of corporate formalities (e.g., stock issuance, holding board meetings, keeping of minutes, election of officers and directors, segregation of corporate records), (4) the same equitable ownership in the two entities, (5) the same directors and officers, (6) confusion about corporate identity, (7) use of the same offices and employees, (8) use of subsidiary as a mere shell or conduit for the affairs of the parent, and (9) lack of segregation of corporate records. (Brooklyn Navy Yard Cogeneration Partners, L.P. v. Superior Court (Parsons Corp.) (1997) 60 Cal.App.4th 248, 258.)

There is substantial evidence to indicate that Respondent is the only operating entity, and that Grand Union's operations are conducted only through Respondent.

Grand Union itself does not have any employees who are not also employees of Respondent. (Wan Decl. ¶ 44.) Petitioner has only dealt with Respondent, rather than Grand Union, throughout the course of the MLA. (Wan Decl. ¶ 44.) During the Arbitration, Grand Union admitted that "Grand Union operates under the MLA by entering into business relationships (through [Respondent]) with Sublicensees." (Wan Decl. Exh. 15 ("Grand Union Response and Counterclaims") at p. 34].) All of the email communications between Paul Frank and Grand Union or Respondent were with employees of Respondent. (Wan Decl. Exh. 6-13.) The physical address specified in Section 29 of the Second Amendment to the MLA ("Second Amendment") as No. 9, 2899 Guangfu West Rd., Shanghai 200062, P.R. China, is an office maintained by Respondent. (Wan Decl. ¶ 46.)

Bo Zheng testified in the Arbitration that he is the "sole director of Grand Union" and "the chairman and chief executive officer of China Brands Group." (Wan Decl. Exh. 25 ("Zheng Statement").) Under the Second Amendment, notices must be sent to Bo Zheng's email address

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323** November 21, 2023
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP** 8:30 AM

Judge: Honorable Joseph Lipner CSR: None
Judicial Assistant: Veronica Solis ERM: None
Courtroom Assistant: Jennifer Young Deputy Sheriff: None

at Respondent, bo.zheng@chinabrandsgroup.com.cn. (Wan Decl. Exh. 4 at p. 6.) In the Arbitration, Grand Union identified its own contact persons as Bo Zheng, via his email at Respondent, and address, and Respondent's employee Jennifer Huang, also via her email address at Respondent. (Wan Decl. Exh. 15 at p. 10.) Ms. Huang testified that she is the "General Manager of the Licensing Management Department within [Respondent]. As part of [her] role, [she is] responsible for Grand Union's management of the Paul Frank brand and the main liaison with PF Hong Kong relating to the activities under the Master Licensing Agreement." (Wan Decl. Exh. 18 ("Huang Statement") at p. 1, ¶ 4.)

Respondent paid royalties on Grand Union's behalf prior to the MLA (Grand Union Response and Counterclaims at p. 7, ¶ 23.) Respondent also funded Grand Union's development of the brand. (Wan Decl. ¶ 16 at ¶ 19.)

Respondent also held itself out as liable for Grand Union's financial responsibilities under the MLA. With regards to a financial obligation owed by Grand Union under the MLA, an employee of Respondent emailed Petitioner saying, "Pls. do me a favor, [Respondent] is preparing the first payment of Royalty in the amendment, that is USD 1 million, could you send me the invoice…." (Wan Decl. Exh. 35 at p. 3.) Bo Zheng later emailed Petitioner regarding the payment:

"According to the amendment 2 to the Master License Agreement, [Respondent] needs to pay the second installment by September 18, 2021. But now due to [Respondent] don't have enough US dollar in GU's
bank account, we can pay USD 200,000 in advance today…. Based on the above reasons, [Respondent] hereby applies for postponing the payment of the second installment to October 25, 2021."

(Wan Decl. Exh. 36.)

These facts show that Respondent and Grand Union share the same chief officer, use their corporate identities interchangeably, share most or all of their employees, rely on the same employees for contacts without distinguishing their email addresses, share financial liabilities to some degree, and share office space. Respondent apparently conducted most or all of Grand Union's business on its behalf throughout the course of the MLA. However, there is one key element missing: Petitioner has not pointed to any evidence showing that either entity actually owns the other. For this reason, the alter ego doctrine is unavailable.

Whether Respondent is Grand Union's agent

Minute Order Page 6 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323** November 21, 2023
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP** 8:30 AM

Judge: Honorable Joseph Lipner CSR: None
Judicial Assistant: Veronica Solis ERM: None
Courtroom Assistant: Jennifer Young Deputy Sheriff: None

Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. (Hernandez v. Meridian Management Services, LLC (2023) 87 Cal.App.5th 1214, 1220.)

As discussed above, there is overwhelming evidence to indicate that Grand Union conducted its business entirely through Respondent. Regardless of whether the facts support treating Respondent and Grand Union as alter egos, they clearly show that Respondent acted on Grand Union's behalf and subject to its control. Respondent controlled the business dealings stemming out of the MLA and acted as the contact point for all of Petitioner's communications with Grand Union. It appears that Grand Union essentially existed as a shell for Respondent's convenience. Thus, Respondent is Grand Union's agent.

"There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement …. [T]here are six theories by which a nonsignatory may be bound to arbitrate: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." (Suh v. Superior Court (2010) 181 Cal.App.4th 1504, 1513.) A nonsignatory to an arbitration agreement who is an agent to a signatory can be compelled to arbitrate. (Harris v. Superior Court (1986) 188 Cal.App.3d 475, 478-479.)

Because Respondent is Grand Union's agent with regards to the MLA, it can be compelled to arbitrate its claims against Petitioner.

Request for Stay

Section 1297.81 expressly authorizes the Court to stay litigation that conflicts with international arbitration. However, Petitioner's stay request raises complex issues of comity because it would interfere with the litigation proceeding in the courts of another country.

"California courts unquestionably have the power under certain circumstances to issue antisuit injunctions to restrain litigants from pursuing lawsuits in other states or foreign nations." (TSMC North America v. Semiconductor Manufacturing Internat. Corp. (2008) 161 Cal.App.4th 581, 589.) "However, this power must be used sparingly." (Ibid.) "[E]njoining proceedings in another state requires an exceptional circumstance that outweighs the threat to judicial restraint and comity principles." (Id. at p. 591, quoting Advanced Bionics Corp. v. Medtronic, Inc. (2002) 29 Cal.4th 697, 708.)

Minute Order Page 7 of 8

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 72

**23STCP03323**
**PAUL FRANK LIMITED vs CHINA BRANDS GROUP**

November 21, 2023
8:30 AM

Judge: Honorable Joseph Lipner
Judicial Assistant: Veronica Solis
Courtroom Assistant: Jennifer Young

CSR: None
ERM: None
Deputy Sheriff: None

Plaintiff's motion fails to address the legal issue of comity at all, or the California case law referenced above. Accordingly, the Court denies Petitioner's request for a stay without prejudice.

Petitioner's counsel is to give notice.

Certificate of Mailing is attached.

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | FILED<br>Superior Court of California<br>County of Los Angeles<br>11/21/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: V. Solis Deputy |
| PLAINTIFF/PETITIONER:<br>PAUL FRANK LIMITED | |
| DEFENDANT/RESPONDENT:<br>CHINA BRANDS GROUP | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCP03323 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Hearing on Motion to Compel Arbitration) of 11/21/2023 upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Jessica R. Corpuz
WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION
10250 Constellation Boulevard
Suite 2900
Los Angeles, CA 90067

David W. Slayton, Executive Officer / Clerk of Court

Dated: 11/22/2023

By: V. Solis
Deputy Clerk

# EXHIBIT P

JESSICA R. CORPUZ (SBN 279237)
KAVAN J. JEPPSON (SBN 327547)
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**
10250 Constellation Boulevard, Suite 2900
Los Angeles, California 90067
Telephone: (310) 858-7888
Facsimile: (310) 550-7191
jcorpuz@weintraub.com
kjeppson@weintraub.com

Attorneys for Petitioner Paul Frank Limited

**Electronically FILED by Superior Court of California, County of Los Angeles 3/06/2024 9:15 AM David W. Slayton, Executive Officer/Clerk of Court, By K. Hung, Deputy Clerk**

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF LOS ANGELES**

PAUL FRANK LIMITED,

Petitioner,

v.

CHINA BRANDS GROUP,

Respondent.

Case No. 23STCP03323

**PAUL FRANK LIMITED'S NOTICE OF RENEWED PETITION TO COMPEL ARBITRATION AGAINST CHINA BRANDS GROUP**

Date: April 9, 2024
Time: 8:30 a.m.
Dept. 72

Reservation No.: 826041016119

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 9, 2024, at 8:30 a.m., or as soon thereafter as this matter may be heard in Department 72 of the above-entitled court, located at 111 N. Hill Street, Los Angeles, CA 90012, Petitioner Paul Frank Limited ("Paul Frank") will, and hereby does, petition the Court for an order compelling Respondent China Brands Group (红纺文化有限公司) ("CBG") to arbitrate Paul Frank's claims against CBG in the arbitration already pending in Los Angeles County, JAMS Reference No. 5220002118 between Paul Frank and CBG's alter ego Grand Union Trading Limited (宏联国际贸易有限公司) ("Grand Union").

This Petition is brought pursuant to California Code of Civil Procedure §§ 1008(b), 1290.2, and 1297.81 on the grounds that CBG is the agent and alter ego of Grand Union and therefore bound by the arbitration clause in the Master License Agreement ("MLA") between Paul Frank and Grand Union. Further, CBG has filed a lawsuit against Paul Frank and Grand Union in the Intermediate People's Court of Tsingdao City of Shandong Province., Case No. (2022) Lu 02 Min Chu No. 1611-1 (the "China Lawsuit") during the pendency of the Arbitration. The China Lawsuit alleges that Paul Frank has violated CBG's rights, which were obtained through a sublicense of the rights granted to Grand Union under the MLA. CBG should therefore be compelled to arbitrate such claims. Pursuant to California Code of Civil Procedure § 1290.2, this Petition should be heard in a summary way, except not less than 10 days' notice of the date set for the hearing.

This Petition is based on this Notice, the accompanying Renewed Petition to Compel Arbitration, the previously filed Declaration of Stanley Yook-Loong Wan in Support of Paul Frank's previous Petition to Compel Arbitration and the Exhibits attached thereto, the previously filed Declaration of Jessica R. Corpuz in Support of Paul Frank's previous Petition to Compel Arbitration and the Exhibits attached thereto, the Declaration of Kavan J. Jeppson and the Exhibits attached thereto, the Request for Judicial Notice filed concurrently herewith, and all pleadings, recordings, and papers on file in this action, and such other evidence and argument as may be presented at the time of the hearing on this matter.

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

DATED: March 5, 2024

JESSICA R. CORPUZ
KAVAN J. JEPPSON
**WEINTRAUB TOBIN CHEDIAK COLEMAN GRODIN LAW CORPORATION**

Jessica R. Corpuz
Attorneys for Petitioner Paul Frank Limited

**weintraub tobin** chediak coleman grodin
LAW CORPORATION

Journal Technologies Court Portal

# Make a Reservation

PAUL FRANK LIMITED vs CHINA BRANDS GROUP

Case Number: 23STCP03323 Case Type: Civil Unlimited Category: Other Civil Petition
Date Filed: 2023-09-11 Location: Stanley Mosk Courthouse - Department 72

## Reservation

| Case Name: | Case Number: |
|---|---|
| PAUL FRANK LIMITED vs CHINA BRANDS GROUP | 23STCP03323 |
| Type: Motion to Compel Arbitration | Status: RESERVED |
| Filing Party: PAUL FRANK LIMITED (Petitioner) | Location: Stanley Mosk Courthouse - Department 72 |
| Date/Time: 04/09/2024 8:30 AM | Number of Motions: 1 |
| Reservation ID: 826041016119 | Confirmation Code: CR-QJKB8DFVV3TCTJXBV |

## Fees

| Description | Fee | Qty | Amount |
|---|---|---|---|
| Motion to Compel Arbitration | 0.00 | 1 | 0.00 |
| TOTAL | | | **$0.00** |

## Payment

| Amount: | Type: |
|---|---|
| $0.00 | NOFEE |
| Account Number: n/a | Authorization: n/a |
| Payment Date: 1969-12-31 | |

Print Receipt

Reserve Another Hearing

Copyright © Journal Technologies, USA. All rights reserved.

Chat